# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**Malå Geoscience AB,**
Skolgatan 11, S-930 70 Malå, Sweden

**Applicant**

**v.**

**Witten Technologies, Inc.,**
1365 Windsor Harbor Drive, Jacksonville, FL 32225

**Respondent**

Civil No.

## APPLICATION TO PARTIALLY VACATE AWARD OF ARBITRATOR

Applicant Malå Geoscience AB applies to this Court to vacate, in part, an arbitration award pursuant to 9 U.S.C. § 10, because the Arbitrator: 1) improperly invaded the exclusive jurisdiction of a separate agreement that compelled international arbitration in Sweden; and 2) made an Award in regard to Respondent's solvency and, in part, in regard to attorneys' fees that has **no** support in the evidentiary record.  Malå respects the arbitration process and will perform the remaining aspects of the Award.  In support of this Application, Malå respectfully shows as follows:

### I. PARTIES

1.  Applicant Malå Geoscience AB ("Malå") is a subsidiary of Malå Geoscience Forvaltnings AB, located at Skolgatan 11, S-930 70 Malå, Sweden.

2.  Respondent Witten Technologies, Inc. ("WTI") is a non-public Florida corporation located at 1365 Windsor Harbor Drive, Jacksonville, FL 32225.

### II. JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

4.  This Court has personal jurisdiction over WTI.  WTI expressly agreed in its License Agreement with Malå to "irrevocably submit to the non-exclusive jurisdiction of any federal court."  WTI further agreed that the arbitration hearing between Malå and WTI would take place in Washington, D.C. with judgment upon any award rendered by the arbitrator in such arbitration hearing to be entered in any court having jurisdiction pertaining to such an award.  Pursuant to the terms of the parties' agreement, the arbitration proceeding itself took place in Washington, D.C.

5.  Venue is proper in this Court because the arbitration award at issue was made in the District of Columbia, and WTI is a corporate entity over which this Court has personal jurisdiction. 28 U.S.C. § 1391 (a) and (c).

### III.  **PROCEDURAL BACKGROUND**

6.  On or about September 9, 1997, Malå and WTI entered a License Agreement ("LA") containing a legally binding arbitration agreement.

7.  On or about June 2, 2005, Malå initiated AAA arbitration against WTI pursuant to the arbitration agreement, seeking termination of the LA on the ground that WTI:  (i) had breached its contractual duty to create and maintain an efficient sales and marketing organization for the CART; and (ii) is insolvent.

8.  On or about October 7, 2005, WTI denied liability in regard to Malå's claims and asserted certain counterclaims.

9.  On April 24, 2006, a hearing began on the subject claims and was completed on April 28, 2006, in Washington, D.C., before AAA Arbitrator Kenneth A. Genoni.  On May 26, 2006 and June 9, 2006, the parties submitted post-hearing briefs and post-hearing reply briefs.  On June 15, 2006, the Arbitrator heard closing arguments.

2

10. On July 10, 2006, the Arbitrator issued a Final Award, finding in favor of WTI in regard to Malå's claims, finding in favor Malå in regard to WTI's counterclaims (with one exception that will be discussed more fully herein), and awarding attorneys' fees and expenses to WTI. See Ex. 1 (American Arbitration Association, No. 50 199 T 00261 05).

## IV. **FACTUAL BACKGROUND**

11. Malå is a business corporation organized under the laws of Sweden, formerly an enterprise of the Swedish government. For many years, Malå has used a number of modalities to locate objects buried in the ground--for example, electromagnetic technology and bore hole technology--including ground-penetrating radar ("GPR"). At present, Malå manufactures about sixty underground technology products for sale throughout the world, including the CART product that is the focus of this dispute.

12. WTI is a non-public corporation founded in 1994 by Robert Green and the late Dr. Alan Witten. WTI was formed to determine whether software developed by Dr. Witten in conjunction with others could be joined together with a GPR "array" - which is a series of radar transmitters/receivers - to make a commercially viable mobile machine that would "see" underground and locate utility pipes, wires, and the like, and perhaps other objects, more efficiently, more accurately, and faster than the technology available in the market. The idea was to solve the age old problem of locating utility pipes and other objects without having to dig up the ground to pinpoint their location.

13. In September 1997, the parties entered a Prototype Development Agreement ("PDA") and the LA. With these agreements, Malå and WTI formed a business relationship to

create a product known as the CART (Computer Assisted Radar Tomography).  See Ex. 2 (Arbitration ("Arb") Ex. 29).

      a.    Malå's obligation under these agreements was to develop a prototype radar array (the first of its kind) that would collect data about objects buried under the surface of the earth.

      b.    WTI's obligations were to: 1) create software that could process the data collected by the Malå radar array and display it on a computer screen such that a radar operator could identify the nature and location of buried objects, 2) create and maintain an efficient sales organization for the CART, and 3) pay royalties to Malå for use of Malå's radar arrays.

14.  In consideration of WTI's undertakings, Malå granted to WTI an *exclusive* license for the CART in the primary utility locating market and a non-exclusive license in other markets.

15.  On December 29, 1999, Malå delivered the prototype to WTI.  Malå began manufacturing CARTs as needed on a very small scale.  To date, fewer than twenty CARTs have been manufactured for use worldwide.

16.  By the end of 1998, disputes had risen between the parties, and the relationship between them has been very contentious since then.  In October, 2002, Malå and WTI resolved certain of those disputes in an agreement entitled the Exchange and Settlement Agreement ("ESA") which signaled the end of the prototype development phase and the beginning of the commercial marketing phase of the CART.

17.  The ESA contained a comprehensive and exclusive arbitration clause that was materially different from the clause in the LA (and in the PDA).  The arbitration clause provided for exclusive jurisdiction of the Stockholm (Sweden) Chamber of Commerce for "[a]ny dispute,

controversy or claim arising out of or in connection with this agreement, or the breach, termination or invalidity thereof. . . ." Ex. 3 (Arb. Ex. 7) at 5.

18.    Disagreements continued, however, and it is undisputed that WTI has not purchased (or had a sublicensee purchase) a CART from Malå since 2004.[1] Both sides acknowledge that sales of the CART were more challenging than they had anticipated, but while WTI had projected the sale of hundreds and even thousands of CARTS by 2004 or 2005 *no sales* at all were occurring in recent years and *no sales efforts* were occurring internationally, with the only sales efforts in the Southeast United States. Indeed WTI appeared to have changed course and was selling underground mapping services using the CARTs it had acquired from Malå years ago, not trying to sell or sublicense CARTs. To Malå, WTI appeared to be distracted by efforts to raise money from investors to carry on, by disputes with others in regard to WTI's marketing efforts and business practices, and by its chronic lack of funds to do the things it had promised.

19.    In 2004 and 2005 Malå delivered several notices of termination of the LA to WTI which WTI ignored. As a last resort, Malå brought this arbitration claim seeking only termination of the LA. WTI responded with counterclaims seeking millions of dollars but then put in no evidence of any damages to WTI at the hearing.

20.    We think WTI's presentation at the merits hearing in the AAA hearing and its post-hearing submissions are fairly characterized as substituting passionate rhetoric – about Malå's alleged "thievery," "stealing," "slight of hand," "shameless . . . lying," "debaucherous,"

---

[1] In 2003, as part of the ESA, WTI sold three CARTs back to Malå and Malå then leased those CARTs back to WTI. WTI has not paid quarterly leasing charges since August 2005.

"surreptitious," and "incorrigible behavior," and "dastardly motives" – for facts based on evidence. WTI also presented breathtakingly dishonest contradictions. As set forth herein, the Arbitrator accepted (and used) WTI's rhetoric despite an evidentiary record that clearly belies WTI's accusations. The Arbitrator also was apparently undisturbed by WTI's dishonest contradictions because the Award studiously ignored them.

21.  Malå respects the Award and the arbitration process to which it agreed and will abide by the Award, except as to the matters submitted herein to the Court.

22.  Nevertheless, given the unfounded vitriol behind WTI's rhetoric (some of which also appears in the Award), we will factually address certain aspects of the Award that we do not ask the Court to vacate, because we believe it is important for the Court to understand that this Award is a travesty and that, in granting relief, the Court will be effecting justice, not undermining it.

23.  Take just two examples. <u>First</u>, WTI claimed, and the Arbitrator determined, that the CARTs Malå delivered to WTI over the years are not commercially viable. While we do not seek to vacate this aspect of the Award, the Court should understand that this claim by WTI is fundamentally inconsistent with WTI's repeated representations historically and throughout the arbitration to customers, potential customers and investors that the CART *is* commercially viable,[2] is superior to competing technology,[3] is and has been reliable,[4] and is capable of generating millions

---

[2] Ex. 4 (Arb. Ex. 63) (WTI's Green to Malå's Leijon: "WTI believes that the CART is commercially viable and has been so for some time"); <u>see also</u> Attachment A, Arbitration Transcript at 1107-08 (WTI valuation expert V. Shea testifying that WTI "didn't tell me that [the CARTs are not commercially viable] and it is not the truth").

[3] Ex. 5 (Arb. Ex. 281) at M 2552 (WTI Answer, Affirmative Defenses and Counterclaims in <u>Dycom Indus, Inc. v. Witten Tech, Inc.</u>: "The CART provides three-dimensional imaging of buried objects and soils, and does so in a manner which is more useful than, and superior to, any other technology").

of dollars in revenues.[5]  Here is what WTI told investors in January 2006 about the CARTs Malå has supplied to WTI: "Our current CARTs were built by Malå Geoscience almost five years ago.  As a credit to Malå and our specifications, they have performed reliably and capably."  Ex. 8 (Arb. Ex. 153) at WTI 8223.

24. WTI thus asserted in the secrecy of the confidential AAA arbitration something directly at odds with what it has repeatedly told potential customers, potential investors, lenders, at least one court, Malå itself, and even the Arbitrator below.[6]  If WTI's litigation position that the CART is not commercially viable is true, then WTI has been engaged in securities fraud on its investors for years, is currently engaged in fraud on the Florida DOT (a WTI customer), and has engaged in fraud on a court.

25. Second, Malå claimed that WTI breached its obligation under the LA to create and maintain an efficient sales and marketing organization for the CART.  The Arbitrator found that WTI has a "small but not inefficient" sales organization.  Ex. 1 at 3.  This ruling flies in the face of evidence that WTI's sales organization for CARTs worldwide consists of two full time salespeople.  That was not the sales organization either party had contemplated over six years after the prototype

---

[4] Ex. 6 (Arb. Ex. 104) (Green to Leijon and Rynning 3/4/05: "These systems have been pretty reliable up to now").

[5] See, e.g., Ex. 7 ((Arb. Ex. 39), Tab 3 at M 2119; Tab 4 at WTI 7094; Tab 5 at WTI 7109).

[6] Att. A at 744-47 (Green testifying about statements in 2006 WTI investor document: "Q: You go on to say: 'Our current CARTs were built by Mala Geoscience almost five years ago.' Is that a truthful statement? A: Yes.  Q: (Continuing.)  'As a credit to Mala, and [our] specifications they have performed reliably and capable.' Is that a truthful statement? A:  For what they were, yes, they did").

was delivered.  As WTI CEO Robert Green testified: "Here is a group of two men.  How are we going to take over the world?  That is ridiculous." Att. A at 1327.

26.  WTI has repeatedly projected over the years that it would sell thousands of CARTs and generate hundreds of millions of dollars in revenue.[7]  In fact, WTI *has not sold a single CART* during the entire relationship between the parties.[8]  Perhaps most tellingly, the Arbitrator found that "WTI's sales efforts were supplemented by agreements with Slumberger [sic] and Dycom." Ex. 1 at 3.  A reader of this statement would conclude that WTI had enlisted the marketing assistance of major oil and gas equipment and services suppliers.  In truth, as the Arbitrator well knew, WTI sold certain distribution rights regarding the CART to Dycom in 1998 in a manner that substantially reduced Malå's royalties in return for a $3 million investment in WTI (on which Malå received no royalties or payment).  Dycom made no CART sales and the WTI-Dycom relationship was resolved in a 2001 lawsuit which terminated Dycom's interest in and efforts on behalf of WTI (and indirectly, Malå).[9]

27.  The Schlumberger story is pretty much the same.  In 2002, Schlumberger invested $1.5 million in WTI in return for certain international distribution rights to the CART, and while Schlumberger did itself buy several CARTs, it never sold any to customers and the relationship

---

[7] See, e.g., Ex. 7 (Arb. Ex. 39); Ex. 9 (Arb. Ex. 280) (summarizing WTI projections 1997 to 2006 vs. actual results); Ex. 10 (Arb. Ex. 201) at M 48 (projecting "5-8 year market of 4-6,000 units in Japan alone"); Tr. at 1228 (S. Green testifying that eight years later, WTI has not sold a single unit to Japan).

[8] See Ex. 9 (Arb. Ex. 280).

[9] Att. A at 698-99 (R. Green testifying about disputes with Schlumberger and Dycom); Id. at 768 (R. Green testifying that "Dycom has never produced"); Ex. 5 (Arb. Ex. 281) (WTI Answer, Affirmative Defenses and Counterclaims in Dycom Indus, Inc. v. Witten Tech, Inc. alleging Dycom "failed to exploit the CART system").

8

between WTI and Schlumberger ended in early 2004 with WTI complaining that Schlumberger had not lived up to its promises to sell the CART with its worldwide sales force and concluding "not one penny of royalty has been paid for the international market."[10] Robert Green testified that the Schlumberger people were among the group trying to steal his technology. Att. A at 697.

28. Malå recognizes that, because there was some evidence in the record that arguably supported WTI's position (although contradicted by the overwhelming weight of the evidence), the Award cannot be challenged in regard to the above matters. Nevertheless, the Arbitrator's failure to explain how WTI could tell one thing to him and another to customers and investors – and his use of examples of performance of the LA by WTI when the facts actually show breach – set the stage for this Application.

## V. <u>RELIEF REQUESTED</u>

29. The Award made four principal rulings:

a.    The LA shall remain in effect and WTI shall have manufacturing rights to the product but no right to Malå's know-how;

b.    Malå shall convey the so-called "Glue Patents" back to WTI;

c.    Malå shall pay WTI $420,000 in attorneys' fees;

d.    Malå shall pay its share of the arbitration forum expenses and shall reimburse WTI $36,599.80 for administrative expenses WTI had already paid to the arbitration forum.

---

[10] Ex. 11 (Arb. Ex. 42) (Letter from R. Green to Schlumberger's N. Fehrenbach: "To date, not one penny of royalty has been paid for the international market. The list of problems WTI has suffered due to SLB's actions is long, sad, very damaging and extremely delaying to WTI's overall opportunity"); Att. A at 698-99 (R. Green testifying about disputes with Schlumberger and Dycom).

30.  Malå accepts the Award and will perform as ordered except as set forth herein. As to the matters we are challenging Malå is willing to enter into an escrow arrangement that protects both sides.

31.  Malå respectfully requests that the Court vacate the Award, in part, in favor of WTI and enter judgment in Malå's favor as set forth herein.

## VI.  <u>ARGUMENT AND AUTHORITIES</u>

### A.     <u>The Arbitrator Exceeded His Powers by Making an Award Concerning the Glue Patents.</u>

32.  <u>Introduction</u>:  In order to understand this aspect of the relief sought the Court needs some technical background.  The CART consists of the Malå radar array and Malå software to collect radar data, along with WTI display software which takes the Malå data and presents it to the operator in a graphic form that shows underground obstructions.  Both sides agree that Malå had a right to its radar and radar software technology, along with any improvements thereto; WTI had a right to its display technology and improvements thereto; and the rights to the CART itself were shared between them as set forth in the LA.

33.  Certain rights of each side were reduced to patents that were obtained after the LA was formed in 1997.  WTI obtained two patents called the "Glue Patents"[11] because they involve software that connect the Malå radar and software to the WTI software.  These patents contain, almost by definition, descriptions of both Malå and WTI technology.  Both sides agree, moreover, that these patents are very broadly stated as to the technology they cover.

_____

[11] U.S. Patents 6,700,526 and 7,034,740.

34.  This arbitration commenced in June 2005 and involved detailed claims and counterclaims but no reference to the Glue Patents.  WTI requested, however, that the Arbitrator "Return . . . all intellectual property and patents conveyed to Mala as a result of the PDA and LA."  Ex. 12 (Arb. Ex. 268) at 16.  In November 2005, Malå objected that WTI had pled no facts that would give rise to such relief and that the Patent Assignment by which intellectual property had been conveyed to WTI arose out of the ESA and could only be arbitrated in Sweden.  On November 11, 2005, Arbitrator Genoni ruled that

> The software licenses and patent assignments were made pursuant to an [ESA] which requires any breach thereof to be resolved by the Arbitration Institute of the Stockholm Chamber of Commerce.  However, Witten has not alleged a breach of the ESA.  Witten has alleged that it is entitled to . . . return of all intellectual property because Mala has breached the [LA] which is within the jurisdiction of this Arbitration.  Whether there is a factual basis for these claims for relief will be decided after a full hearing of the issues.[12]

35.  In early 2006, WTI suddenly referred in a deposition to a September 2004 Patent Assignment and a later recording of that assignment against one of the Glue Patents by Malå.  Malå objected that any dispute in regard to the assignment was not properly before the arbitrator because the assignment arose out of the ESA.[13]  WTI submitted a 37 page pre-hearing brief that addressed both Malå's claims and WTI's counterclaims but made only two very passing references to any Glue Patent dispute.[14]  This document admitted that "[d]isputes arising from the  . . .ESA . . . are not

---

[12] Preliminary Hearing Report and Second Scheduling Order, Nov. 11, 2005, Attachment B, at 2.

[13] Att. C (Email from Bushnell to Lewis, Mar. 27, 2006).

[14] WTI Pre-Arbitration Br., Attachment D, at 31, n. 34; Id. at 33.

11

within this forum's jurisdiction; WTI asserts that consideration of these contracts' terms is pivotal in understanding the parties' history and current dispute under the . . . LA and PDA."[15]

36.  It was only in opening statement that WTI suggested that it was seeking, among other things, return of the Glue Patent that had been conveyed to Malå by the assignment.  Counsel for Malå responded:

> MR. KELLY: "I do need to make a comment.  I got the impression from [WTI counsel's] statement that she wants you to order us to return patents to her.  I want to make it absolutely clear that you do not have the power to effect a resolution under the exchange and settlement agreement.
>
> I'm not conceding, I'm not expanding on anything that you have ruled on up to this point.  The scope of your power derives from the license agreement.  We are happy to make certain accommodations voluntarily, but just because there is testimony here about the exchange and settlement agreement, and the [side] agreement for purposes of context, background, and for purposes of your ultimate award, does not mean that we're conceding that there is some power to adjudicate some remedy under that agreement."

---

[15] Id. at 7, n. 15.

THE ARBITRATOR: "Understood. . . .  Would you tell me, again, Mr. Kelly, what Malå's position is on Witten's claim that Malå had agreed to transfer manufacturing rights and the ability to manufacture to Witten."[16]

37.  Malå reiterated this objection in both of its post-hearing submissions.[17]

1.    **The Arbitrator Exercised Jurisdiction Over a Dispute that the Parties Agreed Could Only Be Arbitrated by the Stockholm (Sweden) Chamber of Commerce.**

38.  Arbitration awards may be vacated when an arbitrator exceeds the power granted him by the subject contract of arbitration.  9 U.S.C. § 10(a)(4) ("[T]he United States…may make an order vacating the award upon the application of any party to the arbitration…where the arbitrators exceeded their powers").  Arbitrators exceed their authority when they go beyond the scope of authority granted by the arbitration agreement. See Thomas H. Oehmke, Commercial Arbitration § 140:1 at 140-1 (3d ed. 2006) ("Arbitration is founded on the law of contracts.  Indeed, arbitration is a creature of contract.  That is, arbitration cannot be commanded unless all parties agree to arbitrate"); 1 Martin Domke, Domke on Commercial Arbitration § 38.1 at 38-3 (3d ed. 2003) ("A further ground for [judicial] challenge is the failure of the arbitrator to observe the limits of his or her authority as fixed by the parties' agreement, such as by determining matters not submitted . . .").[18]

---

[16]  Att. A at 46-47.

[17]  Malå Post-Hearing Br., Att. E, at 21-23; Malå Reply Br., Att. F, at 17-18.

[18]  In a circumstance like the one here – where a U.S. arbitrator undertakes to arbitrate a dispute the parties expressly agreed would be arbitrated in another country – international comity provides a powerful argument for vacatur.  "[F]or the FAA is also based in part on an international convention, 9 U.S.C. § 201 et seq. (codifying the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, [1970] 21 U.S.T. 2517, T.I.A.S. No. 6997), [and is] intended 'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.'" Vimar Seguros y Reaseguros, S.A. v. M/V SKY REEFER, 515 U.S. 528, 538 (1995) (quoting

39. The 1997 LA contains an arbitration agreement that provides that the parties shall resolve all disputes "relating to this Agreement" by AAA arbitration in the District of Columbia. Ex. 2 (Arb. Ex. 29) at WTI 1036. The 2002 ESA provides that "[a]ny dispute, controversy or claim arising out of or in connection with this agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce . . ."

40. Both parties and the Arbitrator agree in principle that the only agreements at issue in the April 2006 AAA arbitration between the parties were the LA and the PDA and that the Arbitrator had no jurisdiction over the ESA or "[a]ny dispute, controversy or claim arising out of or in connection with th[at] agreement."[19]

41. Nevertheless, the Arbitrator concluded that in late 2004 Malå deceptively and wrongfully obtained ownership from WTI of two patents the parties refer to as the Glue Patents. It is undisputed that Malå obtained ownership of the Glue Patents by operation of a written September 29, 2004 Patent Assignment, executed by the principals of both companies on the advice of their respective lawyers.

42. The Patent Assignment recites that it is made "[i]n accordance with the [ESA]." Ex. 13 (Arb. Ex. 14) at 1.

---

Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974)).

[19] Att. E at 21-23; Att. F at 17-18; Att. D at 7, n. 15; Att. G (WTI Post-Arbitration Br.) at 10, n. 36; Ex. 1 at 14.

43. The former WTI senior executive who negotiated the ESA testified that "part of . . . the [ESA] . . . was that [WTI] would make an assignment of the rights to the -- what you called the timing circuit patent to Malå."[20]

44. The former WTI executive who executed the Patent Assignment testified that he understood "that the patent assignment arose out of the [ESA]."[21]

45. The ESA required WTI to execute "an assignment to Malå of WITTEN's right to the patent, 'Ground-Penetrating Radar Array and Timing Circuit', by B JOHANSSON, A WITTEN, and A DEVANEY, (US) Patent Application 09/658,188, filed 8 September 2001." Ex. 3 (Arb. Ex. 7) at 2, paragraph 1.1(c).

46. On September 29, 2004, therefore, WTI executed a Patent Assignment that conveys to Malå "all right, title, and interest in and to the inventions and related patents, design registrations and patent applications, described and claimed in the Witten et al. U.S. Patent Application Serial No. 09/658,188, filed September 8, 2001, and entitled Ground-Penetrating Radar Array and Timing Circuit ('Patents')." Ex. 13 (Arb. Ex. 14) at WTI 2803. The Assignment also conveys ". . . any reissues, reexaminations, *continuing applications*, *continuations*, divisions, renewals, extensions *and continuations-in-part* of such Patents . . . ." Id. (emphasis added).

47. WTI's own CEO, while he insisted that WTI never intended to assign the Glue Patents to Malå, nevertheless testified clearly that he understood that the crux of the dispute was

---

[20] Deposition of Michael Oristaglio ("Oristaglio Dep."), Att. H,  at 95 (submitted to the Arbitrator by designation of testimony).

[21] Att. A at 987; see also id. at 993-94 (Clifford: "Q: Do you agree with me that the [patent] assignment you made was pursuant to the [ESA]?  I mean that is what it says. A: I think the [ESA] was a settling of the prototype development agreement").

whether the parties intended, **when they negotiated the ESA**, that the Glue Patents would be assigned to Malå.[22]

48. The Arbitrator acknowledged that the "Patent Assignment . . . refers only to the ESA, not the [LA]" but concluded that the Patent Assignment nevertheless arose, at least in part, out of the LA, because the "basis for the assignment of foreign counterparts and continuation-in-part applications [in the Patent Assignment] can only be found in the [LA]." Ex. 1 at 9-10. (The "counterparts" and "continuation in part" argument had never been made by WTI, but WTI had argued that its right to the Glue Patents in the first place arose from the LA.) The Arbitrator then analyzed agreements made by the parties in the LA (seven years earlier) in regard to intellectual property rights to determine that the parties did **not** intend for Malå to receive the Glue Patents pursuant to the Patent Assignment. Id. at 10-11.

49. The Arbitrator had no power to make this ruling. First and most fundamentally, an issue does not arise under an agreement for jurisdiction purposes merely because that agreement is consulted to interpret what the parties meant in a much later agreement. The dispute between the

---

[22] See, e.g., Att. A. at 1293 ("Q: In [Mike Oristaglio's] opinion [in Ex. 14, Arb. Ex. 87], he says . . . he think[s] this is a patent that Witten should jointly own with Malå, isn't that true? A: That was his opinion at the time. Q: Was that ever agreed to? A: No. No, that was part of what we tried to come to on the [ESA]"); Id. at 1274 ("when we tried to settle the [ESA] there was a very good reason [the Glue Patent] wasn't mentioned because that was the 'terms of trade' is,'You did not get this patent, or there is no deal. You do not get this patent, or there is no deal,' and they agreed to that"); Id. at 1287 ("There was never any doubt in anybody's mind that Malå had absolutely no right to this and the reason is, and that's the reason, if you look into all the Malå subsequent documentation, all the subsequent documentation up through until we tried to settle in the [ESA], it was agreed upon which we would have gone no further this patent was not a subject of transfer. That was never intended. If there is an argument today, 'Well, we think maybe it is,' well those arguments should have been put forth at the time we were trying to close this up and move on so we could have gone on to court then to settle it. You do not settle making someone believe something and then you go and snipe off something later on").

parties in regard to the Glue Patents is not whether the parties intended that Malå would own the Glue Patents based on their agreements concerning intellectual property rights in the 1997 LA, but whether Malå properly obtained ownership of those patents through the *2004 Patent Assignment* which itself was made under the 2002 ESA.

50. The Arbitrator's use of the 1997 LA to *interpret* the meaning of the language in the 2004 Patent Assignment does nothing to change the fact that the Patent Assignment and dispute *arise under* the ESA, over which the Arbitrator admitted he has no jurisdiction.

51. Second, there *is no support in the record* for the Arbitrator's conclusion that in the Patent Assignment the parties agreed to include continuations in part ("CIP") and foreign counterparts based on the LA. Indeed, the WTI executive who executed the Assignment testified that he did not know what a CIP was,[23] and the Malå IP lawyer, Walter Linder, who drafted the Assignment, testified that he understood the Assignment was being made pursuant to the ESA and did not find it necessary to review the parties' past agreements, including the LA, when he prepared the Assignment. Att. A. at 1531. Moreover, Linder offered *unrebutted* testimony that the language of the Patent Assignment is "routine," id. at 1526, and "conventional." Id. at 1529-30. In other words, the parties executed the Patent Assignment, because it was the conventional form that followed from the language in the ESA – not because of anything in the LA.

52. Indeed, the LA does not address continuations and CIPs any more than the ESA does. As the Arbitrator noted, the LA provides that Malå shall own the technology it contributes (radar) to the parties' CART project and all improvements thereto. The Arbitrator concluded therefore that the LA would give Malå the right to any improvements to its technology described in

continuations and CIPs of the so-called Timing Circuit Patent Application.  More to the point,
however, the ESA gave Malå the right to the technology described in the Timing Circuit Patent
Application.  In order to obtain those rights – the rights WTI agreed in the ESA to assign to Malå –
the Patent Assignment had to be written as it was.  As Linder testified:

> the 188 application [the application identified in the ESA], in fact,
> never even issued as a patent, it went abandoned as shown [Ex. 263],
> and in fact, what happened is a couple of subsequent applications . . .
> were filed claiming priority back to the 188 application.  So in order
> to ultimately get the rights that were referred to in the [ESA] they
> went through a series of procedural approaches in the Patent Office.[24]

53.  Simply put, in 2002, after a working prototype of the product had been created,
and after disputes had arisen between Malå and WTI about their rights and responsibilities, the
parties entered into the ESA and one part of the ESA required WTI to convey to Malå the Timing
Circuit Patent Application.  In performance of that obligation Malå's counsel delivered to WTI's
counsel the Patent Assignment which WTI's counsel approved and sent to WTI for execution.  WTI

---

[23] Att. A at 989-90; Ex. 1 at 11.

[24] Att. A at 1518-19; see also id. at 1538 (Linder: "Any attorney would prepare an
assignment that made sure it encompassed all of the rights that could possibly be associated with
the patent application that was identified as a source"); Id. at 1529 (Linder: "Q: How did you
determine in preparing the patent assignment what rights your client bargained for? A:  Well,
they would at a minimum have gotten the rights to any of the subject matter that was disclosed in
the 188 application and any continuity applications that followed from that").

executed the Assignment, which was the basis for Malå's later recording against the Glue Patents – *applications WTI had filed as "continuations in part" of the Timing Circuit Patent Applications*.

54. WTI claimed in the last stages of the arbitration proceeding that the Assignment was broader than what the ESA allowed and demanded return of the Glue Patents. But the question of whether the Assignment conformed or did not conform to the ESA was a matter that was exclusively to be determined in arbitration before the Stockholm Chamber of Commerce. The Arbitrator here had no right to, in effect, partially rescind the Assignment.

55. The Award must be vacated to the extent it orders Malå to assign the Glue Patents and their progeny back to WTI. "[A]rbitral action[s] contrary to express contractual provisions will not be respected [by courts]." Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n, AFL-CIO, 889 F.2d 599, 604 (5th Cir. 1989).

## 2.    The Award Concerning the Glue Patents is Unjust.

56. Where an arbitrator "exceeds his powers" the award may be vacated. 9 U.S.C. § 10(a)(4). The Arbitrator engaged in mental gymnastics to improperly assume jurisdiction over the Patent Assignment, because he accepted WTI's unfounded rhetoric that Malå acted "despica[bly]" to "steal" the Glue Patents from WTI.[25] The evidentiary record is to the contrary. WTI executed the Patent Assignment *on the advice of its own counsel and based on the 2002 negotiations between Malå and WTI.*

57. WTI retained Powell Goldstein, a large, full service, East Coast law firm with an IP department, to advise it in regard to the Patent Assignment. Malå's counsel sent the Patent Assignment to Powell Goldstein attorney Joe Berl. Berl sent the Assignment on to WTI executive

Tony Clifford, who executed it after reading it and sending it on to other WTI executives (including Robert Green) for review. Att. A. at 986. Clifford testified:

> Joe [Berl] told me that it was appropriate [for me] to sign [the Patent Assignment] at this point in time based on the negotiations he had had with Malå's counsel.[26]
>
> ***
>
> . . . I viewed this as a contract matter, and when Joe Berle [sic] told me to sign it I did.[27]

58.   When Green asked Clifford several months after this arbitration was commenced, why he had assigned the Glue Patent to Malå, Clifford told Green to talk with Berl. Ex. 15 (Arb. Ex. 266). Berl is the one person on WTI's side who was knowledgeable both about the negotiations with Malå (the basis, according to Clifford, for Berl's advice that WTI should execute the Assignment) and the content and implications of the language of the Assignment. ***But Berl was not called as a fact witness in this matter (although he offices in Washington D.C. and could easily have testified).*** The only reasonable inference is that Berl would have testified that he was not misled as to the scope of the Assignment and, as he advised Clifford, that the Assignment was "appropriate . . . based on the negotiations" with Malå. Att. A. at 986.

---

[25] Att. A at 842; Ex. 1 at 11.

[26] Att. A at 986.   See also Ex. 15 (Arb. Ex. 266) (Clifford to Green: "Joe Berl was negotiating directly with Harvey Kaplan on these matters. He reviewed all documents, including the assignment. I did not do anything without Joe's blessing").

[27] Att. A at 988.

59. WTI's claim that it did not understand it was assigning anything other than the Timing Circuit patent application named in the ESA and Patent Assignment is refuted by the language of the Assignment itself and by the purpose of the Assignment.

60. One does not need to be a patent lawyer – or a lawyer of any other variety – to see that the Patent Assignment potentially assigns more than a single patent application. The Assignment defines the subject of the Assignment as "Patents" – plural – and while one may not know the technical meaning of the patent law lingo contained in the Assignment, there can be no doubt that more than the named application is subject to assignment.

61. There is no dispute that the purpose of the Patent Assignment contemplated by the ESA was to assign to Malå the patents and patent applications embodying Malå's technology. To achieve that end, as is customary, the Patent Assignment conveyed not only the identified application but also, among other things, related patents, continuations (which "discloses identical subject matter"), and CIPs (which contain "identical subject matter of the parent, plus some additional subject matter"), which altogether are the "Patents." Att. A at 1521-23.

62. The specific patent application identified in the ESA had already been abandoned by the time the ESA was executed.[28] It is inconceivable that Malå and WTI intended Malå to be conveyed a defunct patent application, with the real rights to the technology (invented by Malå) and described in that application contained in the continuations and CIPs that would continue to be owned by WTI. The Glue Patents describe Malå's hardware – as WTI represented to the Patent Office by filing it as a CIP of the hardware patent application – and a party holding the Glue Patents

---

[28] Ex. 16 (Arb. Ex. 263); Att. A at 1518-19.

could challenge Malå's right to manufacture and sell its *other products*, not just the GPR aspect of the CART.[29]

63.   WTI apparently regretted the Assignment after making it and convinced the Arbitrator with the neat trick of calling the executive who signed the document and may indeed not have understood its scope (while hiding the person who did) – in the face of overwhelming evidence to the contrary – and that the Arbitrator should therefore take jurisdiction he did not possess to right the perceived wrong.

**B.    The Insolvency Ruling Has *No* Support in the Record.**

64.   Arbitration awards may be vacated pursuant to 9 U.S.C. § 10 "when *the* 'fact' underlying an arbitrator's decision is concededly a non-fact and where the parties cannot fairly be charged with the misapprehension . . . . [Under such circumstances], it can fairly be said that the arbitrator 'exceeded [his] powers, or so imperfectly executed them' that vacation may be proper." Nat'l Post Office, Mailhandlers, Watchmen, Messengers and Group Leaders Div., Laborers Int'l Union of N. Am., AFL-CIO v. U.S. Postal Serv., 751 F.2d 834, 843 (6th Cir. 1985) (citing 9 U.S.C.

---

[29] Att. A at 1458-63 (Malå's B. Johansson: "this patent covers all the hardware that we delivered, and so anyone holding this one could cause us problems and I would be afraid of that . . . . that is nothing like a generic GPR antenna.  All commercial antennas are specifically designed to each manufacturer"); Id. at 1470-71; Id. at 1473-74.  Compare Ex. 17 (Arb. Ex.12) (Timing Circuit Patent Application), Figs. 1, 2, 3, 14, 15, 16 with Glue Patent, U.S. No. 6,700,526, Att. I, Figs. 3, 6, 7, 13, 14, 15, (Glue Patent drawings apparently taken from hardware patent drawings).

§ 10 and quoting <u>Elecs. Corp. of Am. v. Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO</u> <u>Local 272</u>, 492 F.2d 1255, 1257 (1st Cir. 1974)).

65.   "When the arbitrator...has reached conclusions that have no support in the evidentiary record, courts will not uphold the award."  <u>Devine v. White</u>, 697 F.2d 421, 436 n. 80 (D.C. Cir. 1983), <u>abrogated on other grounds by</u> <u>Cornelius v. Nutt</u>, 472 U.S. 648 (1985).

66.   Malå claimed that WTI is insolvent and that Malå is, therefore, entitled to terminate the LA based on Section 11 of that agreement, which states in pertinent part: "Either party shall have the right to terminate this Agreement with immediate effect if the other party should . . . become insolvent . . . ."[30]  The LA provides that it is to be "governed by and construed in accordance with the law of New York State . . . ."[31]

67.   While insisting that it is solvent, WTI at the same time claimed that **_Malå_** has known for six years that WTI is **_insolvent_** and Malå therefore waived its right to terminate the LA based on breach of the solvency covenant. WTI argued: "[a]t least since 2000 and probably even prior to then, Malå possessed the requisite knowledge of Witten's financial issues but consciously waived its right to terminate the binding nature of the Agreement."[32]

68.   In the face of this telling admission the Arbitrator concluded:

---

[30] Ex. 2 (Arb. Ex. 29) at WTI 1034.

[31] <u>Id.</u> at WTI 1037.

[32] WTI Pre-Arbitration Br., Att. D, at 26.

Section 11 of the [LA] gives each party the right to terminate if the other party becomes insolvent. Malå relies on a New York statute that provides that a corporation is insolvent when its liabilities exceed the fair market value of its assets. WTI argues that the common law test for insolvency, which is 'the ability to meet obligations as they mature in the ordinary course of business,' should be applied in the case. It does not matter which test is applied. Malå has not proved that WTI is insolvent under either test. Mr. Shea testified that WTI's net present value was $155 million, which greatly exceeds its liabilities of less than $5 million. This evaluation may be excessive, but it is clear from the awards WTI received and WTI's ability to continue to raise money from investors that WTI's intellectual property is recognized as being very valuable. It is also clear from [Ex. 18, Arb. Ex. 331] (paragraph 1) and Malå's extreme and wrongful actions taken to acquire ownership of the Glue Patent that Malå recognized that the WTI intellectual property was very valuable . . . . WTI has been able to meet obligations as they mature in the ordinary course of business. WTI was a little late from time to time but it has always paid or settled the matter.[33]

69. There is *no* support in the evidentiary record for the conclusions reached by the Arbitrator in regard to solvency (despite the fact, discussed more fully below, that the Award points to expert witness testimony and references an exhibit). Similarly put, the Arbitrator ***made up from whole cloth*** a value of WTI's IP rights that was sufficient to off set the seven-figure amount by which WTI's liabilities exceeded its assets.

70. The parties argued the insolvency issue based on two tests that have been used by New York courts to determine insolvency – the assets versus liabilities test and the failure to meet obligations as they come due in the normal course test – and the Award addresses both tests.

71. Regarding the asset-liability insolvency test, the evidence to which the Award points does not establish a value for WTI's assets or intellectual property from which the Arbitrator could reach the conclusion that WTI's assets exceed its liabilities. Malå offered evidence that

_____

[33] Ex. 1 at 5.

WTI's book assets are worth $1.2 million, and WTI's book liabilities are nearly $5 million. Ex. 19 (Arb. Ex. 407). WTI claimed that the book value of its assets did not represent the fair market value of its assets, because WTI has off book assets, the value of which exceed its liabilities. But WTI presented **no** evidence of the value of any such off book assets. Since Malå offered evidence sufficient to prove by a preponderance of the evidence that WTI is insolvent, WTI had the burden to rebut that evidence. See, e.g., Buffalo Auto Glass v. Schueler, 187 B.R. 451 (W.D.N.Y. 1995) ("The Trustee has provided a copy of the Debtor's corporate tax return for the time period in question, which shows negative retained earnings. There being no evidence offered by the Defendant under Fed. R. Civ. P. 56(e) as to why that does not establish the corporation's insolvency at that time, the Court finds that the tax return establishes the Debtor's insolvency at the time of the transfers by a preponderance of the evidence").

        72. WTI's expert witness, Vince Shea, whose testimony is referenced in the Award, testified that he valued the common stock of WTI and **expressly disclaimed** that he had valued WTI's assets or intellectual property. Shea testified that if he had been engaged to value WTI's intellectual property, he would have followed a specific procedure that he did not follow in making his valuation report and testified that he could **not** give a value for WTI's assets or intellectual property.[34] In fact, Shea testified that **to determine solvency, "[w]e have to valuate everything including the IP which was not done."**[35]

_____

[34] Att. A at 1083-84 (Shea: "Q: You did not value Witten's assets, right? . . . . A: No, I did not. Q: You could have chosen a method that would have valued Witten's assets, right? A: I wasn't asked to. Q: You did not specifically value Witten's intellectual property as a subset of the assets? A: No, not as individual item"); id. at 1085-86 (Shea testifying that there is a process he would have followed if he had been engaged to value Witten's intellectual property); id. at 1106 (Shea: "Q: But you cannot give an actual number [for the value of Witten's intellectual

73.  The sole basis for Shea's valuation of WTI was certain 5-year revenue and expense projections prepared by Robert Green and delivered to Shea.  Shea, in effect, present valued these projections to obtain a valuation of the enterprise.  Att. A at 1086.  The record contained a series of projections of WTI financial performance by Green and Green's projections have not only never come to pass, but they have always been wildly optimistic on the revenue side.[36]

74.  Green himself testified – repeatedly – that his projections are "speculative."  Att. A at 720.  Former WTI CEO Tony Clifford testified that Green's projections have been unreasonable.[37]  And WTI CFO Ray Barbee characterized projections like WTI's as "rolling the dice."[38]  Importantly, it appears from the Award that the Arbitrator himself did not accept Shea's report (as he noted that the valuation "may be excessive").  Ex. 1 at 5.

75.  We do not ask the Court to review the various revenue and expense projections Robert Green prepared for WTI from 1996 to 2006,[39] but all follow the same construct: WTI is losing money and has lost money to date, in one or two years the company will

_____

property].  A: No, I cannot").

[35] Att. A. at 1109 (emphasis added).

[36] See, e.g., Ex. 9 (Arb. Ex. 280); Att. A at 468; Att. A at 529-30.

[37] Att. A at 977 (Regarding WTI's 2003 Executive Summary and Business Plan, Ex. 7 (Arb. Ex. 39), Tab 5, "Q: I take it that if I would have asked you at the end of 2003 . . ., 'Is it reasonable to expect that in 2004 you will achieve $11 million in revenues?' you would have said, 'No, I don't believe that is reasonable.' A: If someone asked me then, yes, I would have never expected the level of $11 million").

[38] Att. A. at 1058.

[39] Ex. 7 (Arb. Ex. 39) (projections from 1996 to 2005); Ex. 8 (Arb. Ex. 153) (2006 projection); Ex. 9 (Arb. Ex. 280) (summarizing 1997-2006 projections versus WTI's actual results).

start making money and in several years it will have profits of hundreds of millions of dollars based on sales of hundreds or thousands of CARTs.  For example, in 2001, Green projected the company would be profitable in 2002 and by 2004 would have revenues of $448,200,000 and profits of $334,557,500; in 2006 Green projected – these are the figures Shea used – losses in 2005 and 2006, profitability in 2007, and by 2010 revenues of $345,300,000 and pretax earnings of $262,197,606.  Ex. 7 (Arb. Ex. 39).  Robert Green was described as a zealot and he may be that but no sane person could put any credence on rampant speculation – which he cheerfully and repeatedly admitted all of his projections were – of this type.

76.  Shea's value of WTI's common stock is therefore ***admittedly*** not a fact upon which the Arbitrator could base the value of WTI's assets to determine that WTI's assets exceed WTI's liabilities.  See Elecs. Corp. of Am. v. Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO Local 272, 492 F.2d 1255, 1257 (1st Cir. 1974) (Remanded with direction to resubmit dispute to arbitration, holding that "where the 'fact' underlying an arbitrator's decision is concededly a non-fact and where the parties cannot fairly be charged with misapprehension, the award cannot stand").

77.  The Award also suggested that because WTI still attracts investors, WTI has won certain awards for its technology and Malå viewed the technology as valuable, WTI's assets must exceed its liabilities.  Again, however, there was ***no evidence*** about what the value of the intellectual property was or how the awards translate to dollars.  As to the investments that continue to be made in WTI, it is notable that over the last four years these investors have paid an average of ***$0.11*** for WTI stock.  Ex. 20 (Arb. Ex. 278).  That fact, established by reference to WTI's stock table, undermines, rather than supports, the Arbitrator's conclusion.

78. It was patently unfair for the Arbitrator to accept WTI's speculative assertion that its assets exceed its liabilities based on nothing more than the notion that WTI's intellectual property has some unascertained value, because Malå had no way to refute such unfounded assertions.

79. To reach the conclusion that WTI's assets exceed its liabilities, the Arbitrator had to *make up a value for WTI's off-book assets*. Although courts are reticent to vacate arbitration awards and will not weigh evidence, courts do vacate awards when there is no support in the evidentiary record for the Award and where the Arbitrator relies on a fact that is conceded to be a non-fact.[40]

---

[40] See also Detroit Coil Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Lodge No. 82, 594 F.2d 575, 580-581 (6th Cir. 1979) (Remanded with directions to set aside arbitral award, holding that "the arbitrator's award cannot be deduced rationally from the Agreement" and "if an examination of the record before the arbitrator reveals no support whatever for his determinations, his award must be vacated"); Elecs. Corp. of Am. v. Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO Local 272, 492 F.2d 1255, 1257 (1st Cir. 1974) (Remanded with direction to resubmit dispute to arbitration, holding that "where the 'fact' underlying an arbitrator's decision is concededly a non-fact and where the parties cannot fairly be charged with misapprehension, the award cannot stand"); United Elec., Radio and Mach. Workers of Am., Local 1139 v. Litton Microwave Cooking Prods., Litton Sys., Inc., 704 F.2d 393, 396-397 (8th Cir. 1983) (affirming vacatur of arbitral award and holding that where "the arbitrator assumes the existence of a fact that is central to the award, and an examination of the record reveals no support whatever for the arbitrator's assumption, an award cannot stand").

80. By disregarding the evidence that was in the record and making an Award without any support in the record, the Arbitrator manifestly disregarded the law. See Thomas H. Oehmke, Commercial Arbitration § 149:10 at 149-16 (3d ed. 2006) ("In some circumstances, legally dispositive facts are so firmly established that an arbitrator cannot fail to recognize them without manifestly disregarding the law; a federal court will not confirm an arbitration award that is legally irreconcilable with the undisputed facts"). Put differently, the Arbitrator purported to apply the asset/liability test but, in fact, manifestly disregarded that test by claiming that WTI's assets exceed liabilities where no evidence supported that conclusion.

81. Regarding the common law inability to pay debts as they come due in the normal course of business test, the evidence was overwhelming and **_unrefuted_** that WTI has frequently failed to pay its bills as they have come due in the normal course of business and that it cannot meet its obligations as they come due, most frequently, its payroll. WTI's CFO Ray Barbee testified that in 2006 WTI projects monthly expenses of $160,000. Att. A at 1032. For the first quarter of 2006, WTI had total income of approximately $144,000 – not enough to meet even one month's expenses. Ex. 18 (Arb. Ex. 407).

82. Barbee also testified that on the eve of the arbitration hearing, WTI re-characterized certain liabilities to employees (i.e. long overdue payroll) and shareholders from current liabilities to long term liabilities on the following reasoning: "If we got in $5 million, or $1 million today, what would we pay? . . . . [These obligations] have been sitting there for a couple of years, I think, in that same stature, so we said, 'Are they really payable in the next business cycle?' Probably not." Att. A at 1026.

83.  In December 2004, Robert Green wrote to other WTI executives: "We are not in the position to be settling any debt that does not have us standing at the court house door for any percentage on the dollar." Ex. 21 (Arb. Ex. 45).  Both Green and WTI Vice-President Brian Hurse testified that various trade creditors have terminated services to WTI for nonpayment of obligations.[41]  And Hurse testified that WTI had not made a quarterly lease payment to Malå for CARTs that WTI uses for its mapping business since August 2005.[42]

84.  In addition, for years WTI has repeatedly missed, and failed to make up, payroll for years.[43]  This is a serious issue for the company's officers because they can be personally legally liable for the missed payroll.[44]

85.  The Award did not cite any evidence upon which the Arbitrator relied to determine, in the face of the foregoing evidence, that WTI "has been able to meet obligations as they mature in the ordinary course of business" – because there was none.  In post hearing briefing, WTI asserted that "WTI remains capable today of paying all bills" and cited to the testimony of Hurse.[45]  But what Hurse really said is that WTI *belatedly settled certain bills*. Att. A. at 1357-58.  In fact, his

---

[41] Att. A at 1364-66; Id. at 792-93.

[42] Id. at 1373-74.

[43] See, e.g., Att. A at 1370-71; 935-36; Ex. 22 (Arb. Ex. 33); Ex. 23 (Arb. Ex. 137); Ex. 24 (Arb. Ex. 248) (letter from WTI board to former CEO Anthony Clifford acknowledging "Regular pay missed: $91,394.80"); Ex. 25 (Arb. Ex. 276) (payroll analysis regarding WTI employee Ralph Birken, 2002-mid-2005, showing WTI owes Birken nearly $40,000 in missed pay).

[44] Att. H (Oristaglio Dep.) at 174-75.

[45] Att. G, WTI Post Arbitration Br. at 18.

testimony was that WTI *cannot* meet its obligations *in the normal course and pays bills belatedly.*[46] To his credit, Hurse testified that the way WTI has survived in recent years is paying operating bills with investor money and loans.

**C.    The Attorneys' Fee Award, In Part, Has *No* Support in the Record.**

86.    Malå seeks vacatur of the portion of the Award that obligates Malå to pay $261,799 for the alleged value of stock options WTI issued to its in-house lawyer, Erin Lewis (Robert Green's daughter), in relation to the prosecution of the above-referenced matter. The Arbitrator adopted Lewis' *calculation* of the value of the stock options. The calculation, of course, is not itself evidence, and it was arbitrary and without any support in the record.

---

[46] Att. A at 1358 ("obviously we're going to look at what we can afford to pay and we will pay at certain times, it is what we can pay, so we make sure that everybody gets paid, and there have been times when I have called and said, 'You will be paid at this point,' but yes the[ bills] have been late").

87.  By way of background, it was clear at the end of the arbitration proceeding that WTI had submitted no evidence of damages on its counterclaims, as Arbitrator Genoni noted on the record.  Att. A at 1637-38.  But both sides had asked for attorneys fees and expenses which the arbitration agreement did authorize the Arbitrator to award.  Malå suggested that counsel simply submit their billings and payment records as evidence on this issue, which we think is a customary procedure.  But Malå also emphasized that, because WTI had used its "in-house" counsel as trial counsel, who we assumed was on salary, that WTI could not seek to charge for the ***alleged value*** of the services, just the ***actual cost*** and Arbitrator Genoni agreed.[47]

88.  When WTI submitted its fee application with its reply brief, however, it claimed that it had paid its in-house lawyer $327,250 by issuing her stock options in WTI for 175,000 shares which it valued at $1.87 per share.  While it is certainly not customary in fee shifting cases for a party to claim he paid with equity for services rendered, we do not object to the concept.  We do object, however, to the absence of factual basis for the valuation of the options here.  Arbitrator Genoni awarded $261,799 for the purported option transfer.

89.  The Award states:

---

[47] Email exchange among Bushnell, Lewis, Genoni, May 8-9, 2006.  Att. J.

Counsel for Malå objected to including $327,256 in the award. This was compensation to Ms. Lewis in the form of stock options. I do not agree with counsel for Malå. This item is explained and justified on page 21 of the WTI Reply Brief. I have, however, reduced the amount by 20% ($65,451) to account for time Ms. Lewis may have spent on other matters.[48]

90. Page 21 of WTI's Reply Brief states:

In calculating the value of the stock options paid to Ms. Lewis, WTI relied upon Mr. Shea's expert valuation of WTI's stock at $4.08/share. Ms. Lewis' contract calls for a $0.34 strike price, leaving WTI a payment of $3.74/share. In an effort to be abundantly fair and reasonable, WTI divided that figure in half ($1.87/share) to calculate the value of Ms. Lewis' 175,000 shares, producing a total payment of $327,250.00.[49]

91. Thus, both the Arbitrator and Lewis rejected Shea's valuation of WTI's stock, and neither provided any evidence for a different value. Rather, Lewis arbitrarily cut Shea's number in half (after subtracting the strike price) and called that good. This was not evidence. It was outright speculation and a manifest disregard of the law that speculative evidence may not form the basis for a decision.

92. We submit that no one believes WTI's stock is really worth $1.87/share, and the value of such stock can *only* be determined by examining recent sales of equity in WTI, which the Arbitrator failed to do.

---

[48] Ex. 1 at 14-15.

[49] Att. K, WTI Reply Br. at 21, fn. 96.

93. Indeed, the only *evidence* in the record (other than Shea's valuation which everyone rejected) regarding the value of WTI's stock is WTI's stock table for the period January 2002 through January 2006, Ex. 20 (Arb. Ex. 278), which shows that the average amount investors have actually paid over the last four years for WTI's stock is *$0.11*. [50]  Obviously, at a strike price of $0.34, the options are of no value to Lewis, and WTI is out nothing by conveying such options.

94. There was also no evidence in the record that the shares had vested or remained valid.  In light of these facts, it is clear that WTI's demand for the value of stock options delivered to Ms. Lewis is nothing more than a ruse.  What really happened here is that after specifically seeking that neither side had a right to punitive damages, Ex. 1 at 14, the Arbitrator effectively awarded $261,799 in punitive damages because he had concluded – outside of his jurisdiction – that Malå had no right to the Glue Patent.  The express language of the arbitration clause here is: "The parties hereby expressly waive punitive damages, and under no circumstances shall an award contain any amount that in any way reflects punitive damages."[51]  Accordingly, the portion of the fees award ($261,799) related to Lewis' stock options must be vacated.

---

[50] Moreover, WTI Vice President Hurse testified that WTI obtains debt financing by offering a structure whereby "the lender loans [WTI] $50,000 and then gets an additional right, an additional to some interest on his loan to purchase $50,000 shares at a penny a share."  Att. A at 1367.  Such evidence clearly casts light on the value of Lewis' stock options.

[51] Ex. 2 (Arb. Ex. 29) at WTI 01036.

# VII.  CONCLUSION

95.  The Award must be vacated in part, because the Arbitrator 1) improperly invaded the jurisdiction of the ESA when he awarded relief to WTI in regard to the Glue Patents and 2) made an Award in regard to WTI's solvency and in regard to attorneys' fees that has no support in the evidentiary record.

WHEREFORE, Malå respectfully requests the following relief:

1.  Oral argument on the issues set forth herein;

2.  An order and judgment vacating the Award with respect to the assignment of the Glue Patents;

3.  An order and judgment vacating the Award and terminating the LA on the ground that WTI is insolvent, and Malå is entitled to termination of the LA;

4.  An order and judgment vacating the portion of the Award that obligates Malå to pay WTI $261,799 for Lewis' stock options;

5.  An order and judgment confirming the Award in all other respects; and

6.  Judgment for such other and further relief to which Malå may show itself to be justly entitled.

Respectfully submitted,

By: _____

Thomas W. Brunner (D.C. # 170480)
Albert C. Lambert (D.C. # 489562)
WILEY REIN & FIELDING LLP
1776 K Street NW
Washington, DC  20006
TEL: 202.719.7032

Timothy D. Kelly (MN # 54926)
Sarah E. Bushnell (MN # 0326859)
3720 IDS Center
80 South Eighth St.
Minneapolis, MN 55402
(612) 349-6171

Dated: July 28, 2006                    *Attorneys for Mala Geoscience A.B.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of July, 2006, a true copy of the foregoing Application to Partially Vacate Award of Arbitrator was sent to the following in accordance with 9 U.S.C. § 10:

Erin L. G. Lewis, Esq.
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, Georgia 31204
478.474.6644

_____
Albert C. Lambert