UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MALA GEOSCIENCE, AB, | |
| Respondent in Petition to Confirm and Applicant in Application to Vacate, | |
| v. | Civil Action No.:  1:06-cv-01343 (RMC) |
| WITTEN TECHNOLOGIES, INC., | |
| Petitioner in Petition to Confirm and Respondent in Application to Vacate. | |

**WITTEN TECHNOLOGIES, INC.'S BRIEF IN SUPPORT OF MOTION IN OPPOSITION TO  MALA'S APPLICATION TO PARTIALLY VACATE AWARD OF ARBITRATOR AND IN SUPPORT OF PETITION FOR CONFIRMATION OF AWARD**

COMES NOW Witten Technologies, Inc., and files this Brief in Opposition to Mala's Application to Partially Vacate Award of Arbitrator and in Support of Petition for Confirmation of Award filed in this Court, showing the Court as follows:

## I.        PARTIES AND JURISDICTION

Witten Technologies, Inc. (hereinafter "WTI") stipulates to all party information and jurisdiction and venue claims contained in Sections I and II of the Application to Partially Vacate Award of Arbitrator (hereinafter "Application") filed by Mala GeoScience, AB (hereinafter "Mala"); Mala properly identified the parties in Section I of its Application, and jurisdiction and venue are proper in this Court for the reasons Mala stated.

## II.        PROCEDURAL BACKGROUND

Mala's Application's statements concerning the procedural background of this case call for clarification.  First, Mala did initiate arbitration proceedings with the American Arbitration

Association ("AAA") against WTI in June 2005, but the grounds were originally more expansive than Mala's Application suggests. Mala initially alleged not only that the parties' License Agreement (hereinafter "LA")[1] should be terminated based on WTI's alleged insolvency and failure to maintain an efficient sales organization but also on allegations that WTI failed to use its "best efforts" under the LA and had fraudulently induced Mala into executing the LA. In recognition that these arguments clearly lacked legal support,[2] Mala abandoned these latter two (2) claims prior to the parties' arbitration hearing in April and focused rather on two issues involving questions of fact.

Second, WTI's Response to Mala's Supplemental Demand for Arbitration did deny liability with respect to Mala's claims, but the thrust of WTI's response and counterclaims set the stage for showing Mala's fraudulent activities and multiple failures under the LA and other contracts. WTI stated from the outset of arbitration proceedings that this was not a "split the baby" case and requested that the arbitrator award not only WTI's costs and attorneys' fees arising from the arbitration Mala had initiated but also the return of certain WTI intellectual property (hereinafter "Patents") Mala had acquired from WTI using fraudulent and deceptive means.[3]

Pursuant to the LA, "any such arbitration shall be held in the District of Columbia, before a single (1) arbitrator who shall be impartial … In determining the appropriate background of the

---

[1] Ex. 1 (Arb. Ex. 3), LA between Mala and WTI, 9/9/97.

[2] New York law, which governed the arbitration proceedings pursuant to the LA's choice of law provision, does not enforce "best efforts" provisions in contracts that fail to define the exact performance expected thereunder. Where, as here, the contract does not specify any standard by which "best efforts" can be measured, such provisions are unenforceable. *See Strauss Paper Co. v. RSA Exec. Search, Inc.,* 260 A.D.2d 570, 571 (N.Y. App. Div. 1999). Mala withdrew its fraud claim because it was destined for failure; New York law does not permit fraud claims based upon a party's projections or expectations of future performance. *See Koagel v. Ryan Homes, Inc.*, 167 A.D.2d 822, 822 (1990).

[3] *See* Ex. 2, WTI's Response to Mala's Supplemental Demand for Arbitration, 10/07/05, p. 16.

arbitrator, the appointing authority shall give due consideration to the issues to be resolved …"[4] After Mala filed its initial Demand for Arbitration in June 2005, AAA submitted to both parties a list of 10 potential arbitrators and asked the parties to rank their preferences. Having been made aware of the nature of the parties' dispute and the parties' preferences, AAA selected Mr. Kenneth A. Genoni, a member of the Fish & Neave IP group with the law firm of Ropes & Gray in Washington, D.C.[5] Not only is Mr. Genoni licensed to practice law in New York, the choice of law governing the interpretation of the LA, but he is also an accomplished patent attorney. Mr. Genoni has served as patent counsel (chief patent counsel, vice-president and general patent counsel, general intellectual property counsel and head of patents) for various multi-million/billion dollar corporations over the past three decades. His past experiences and credentials made him an obvious choice for understanding and resolving disputes arising from the parties' complicated history, the LA's complex licensing arrangement, and the parties' now-murky relationship.

Prior to the arbitration hearing (hereinafter "Hearing") which was held over five (5) consecutive days in Washington, D.C. (April 24-28, 2006), Mr. Genoni decided numerous issues between the parties and held two preliminary hearings. In preparation for the Hearing, the parties deposed a total of twelve (12) witnesses; eleven (11) witnesses testified at the Hearing, and deposition testimony of four (4) witnesses was submitted into evidence. The parties submitted pre-hearing briefs (each totaling thirty-eight (38) pages) with voluminous exhibits attached thereto. After the Hearing, the parties submitted both post-hearing briefs (numbering forty-one (41) pages each, both of which cite and reference over one hundred and sixty (160)

---

[4] Ex. 1 (Arb. Ex. 3), LA §17 (a).
[5] Ex. 3, Ropes & Gray Biography and Resume of K. Genoni, Esq., submitted to the parties by AAA during the arbitrator selection process.

exhibits in evidence and case law) and reply briefs (numbering twenty-one (21) pages each and containing over fifty (50) pages in exhibits and over ninety (90) citations to exhibits in evidence and case law).

Mr. Genoni and the parties participated in at least sixty (60) hours of hearings between the two preliminary hearings, the arbitration Hearing and closing arguments held after the reply briefs were filed. The transcript for the arbitration Hearing contained no less than sixteen hundred and forty (1,640) pages, and approximately four hundred and eighteen (418) exhibits were presented for the Arbitrator's consideration at the Hearing. Many of those exhibits contained multiple documents, bringing the total number of documents presented to the Arbitrator during the five-day Hearing to between six and seven hundred (600-700). The literal weight of the evidence presented to the Arbitrator reached well over one hundred (100) pounds. Arbitrator Genoni, a person well-versed in complex international commercial litigation and patent suits, could not have been better suited to deal with this matter.

On July 10, 2006, Arbitrator Genoni issued his "reasoned Award."[6] This Award found in favor of WTI on all major issues: (i) the License Agreement was not terminated, for Mr. Genoni found that Mala had failed to prove either that WTI was insolvent or that WTI had failed to maintain an "efficient sales organization" under the LA's termination provision; (ii) Mala was found to have failed to perform under the LA and the Exchange and Settlement Agreement ("ESA") by not improving malfunctioning hardware and failing to act in good faith in numerous instances; (iii) Mala is required to assign to WTI "all Mala's right, title and interest" to certain

---

[6] A copy of the Arbitrator's Award is attached hereto as Exhibit 4. Note that the Arbitrator, in ¶ 10 of his Award, issued the Award "pursuant to Rule 42(b)" of the applicable American Arbitration Association's Rules, and this rule does not require any arbitrator to issue a "*reasoned*" award containing support for his decision unless he deems such an award to be "appropriate." Our Arbitrator more than satisfied his duty to the parties in issuing such a well-written Award containing thorough explanations for his decisions on each issue in his sixteen-page decision.

patents and patent applications, including patents the parties refer to as "Glue Patent I" and "Glue Patent II"; and (iv) Mala was ordered to pay WTI's attorneys' fees, expenses and costs incurred in connection with the arbitration proceedings Mala commenced.

### III.     FACTUAL BACKGROUND

Mala's Application does not adequately describe either the complexity of the multiple issues presented for Arbitrator Genoni's consideration or the ample and compelling evidence presented. Mala's Application also misstates the record. Neither space nor time permit WTI to rehash every detail of the arbitrated case in this forum; indeed, the parties agreed that binding arbitration was the proper forum for complete presentation of the evidence and have already enjoyed that opportunity below. However, in an effort to streamline this process, WTI will show the Court some of this case's more important and intricate facts, as well as attach hereto (as Exhibits 5 and 6) copies of the post-hearing briefs WTI submitted for the Arbitrator's deliberation. These submissions more fully explain WTI's position and cite a portion of the literally hundreds of pages of arbitration exhibits and testimony presented at the Hearing. This plethora of evidence unquestionably convinced the Arbitrator to enter his Award in WTI's favor. WTI urges the Court to review its post-hearing submissions when considering Mala's Application, as this brief will discuss at length only those facts directly pertinent to the parts of the Award Mala challenges here.

As the evidence presented at arbitration revealed and the Arbitrator's Award recognized,[7] Mala has done everything it could to impede WTI's widespread market entry, both by actively lying to WTI, directly interfering with WTI's attempts to follow through on its licensing program, stealing intellectual property from WTI, and passively allowing its hardware to remain

---

[7] *See* Ex. 4, Award, at ¶ 11(b), ¶ 11(c), ¶ 12, ¶ 13, and ¶ 15(a)-(j).

incapable of widespread deployment in hopes that WTI will fold, thereby releasing Mala from the LA's exclusivity requirements and generating much greater financial gain for Mala. Evidence presented during arbitration persuaded the Arbitrator that Mala's failures to perform its obligations under the LA created difficulty for WTI and that "Mala had acted as though it was much more interested in breaking the relationship with WTI than in performing its duties under the LA."[8]  In Award ¶ 11(c), the Arbitrator analyzes with great interest certain language from a letter Mala's Chairman wrote to Mala's Board of Directors as "evidence that suggests that Mala's failure to support WTI was motivated by a desire to drive WTI into bankruptcy."[9]  Surely to Mala's chagrin, WTI has managed to continue in business (although damaged) despite Mala's underhanded efforts, and Mala pursued arbitration proceedings against WTI in hopes of terminating the LA as a final, desperate attempt to take the CART technology and market for itself.

The overwhelming evidence presented at arbitration and discussed more extensively in both the Award and in WTI's briefs clearly demonstrated Mala's less than forthright behavior over the course of the parties' relationship and recognized Mala's true motive in dealing with WTI—to drive WTI to bankruptcy and obtain ownership of WTI's patented 3-D imaging technology so that it could take the entire worldwide CART market.  The Arbitrator's Award extensively discusses the arbitration evidence of Mala's real aim to bankrupt WTI, along with "Mala's extreme and wrongful actions taken to acquire ownership of the Glue Patent . . ."[10]

---

[8] *See* Ex. 4, Award at ¶ 11(b), pg. 4 (citing the "very persuasive" testimony of WTI's former CEO, Tony Clifford, who the Arbitrator found to be "a very credible witness" (*see* Award ¶ 15(f))).

[9] Ex. 4, Award ¶ 11(c) (citing Arb. Ex. 331, J. Rynning to Mala's Board, 9/11/01, attached hereto as Ex. 7 (Arb. Ex. 331)).

[10] Ex. 4, Award ¶12.  *See also* Award at, *e.g.*,  ¶ 11(b), ¶ 11(c), and ¶ 15.

The Arbitrator, an accomplished patent attorney himself, devoted no less than six (6) full pages of his Award[11] to explaining how Mala's Patent Assignment, "using intentionally deceptive acts"[12] surreptitiously obtained ownership of WTI's Glue Patents.  Mr. Genoni's Award definitively requires the return of both Glue Patents to WTI and specifically precludes Mala from following through with its intention to claim priority over or obtain ownership of additional WTI patents and patent applications now pending using the Patent Assignment.  WTI recommends that the Court carefully review Section 15 of the Award in considering the parties' respective petitions.

Mala also sought termination of the LA under LA § 11 on allegations that WTI is insolvent, and even claims that WTI has admitted that it is insolvent.[13]  A careful reading of the quote on which Mala relies for this purported admission demonstrates the lack of candor that Mala has displayed throughout these proceedings.

The Arbitrator who had all of the evidence available to him found that Mala wholly failed to meet its burden of proving that WTI is insolvent under either of New York's[14] insolvency tests.  The Arbitrator supported his ruling with evidence from the arbitration record.[15]  WTI urges the Court to carefully review Section 12 of the Award, along with pertinent portions of WTI's post-hearing briefs, for context on this issue.[16]

---

[11] *See* Ex. 4, Award ¶ 15, pages 8 through 13.
[12] *See* Ex. 4, Award ¶ 15(h).
[13] *See* Mala's Application, ¶ 67.
[14] Pursuant to the LA's choice-of-law provision (Ex. 1, LA § 18.06), New York law governed the arbitration proceedings.
[15] *See* Ex. 4, Award ¶ 12.
[16] *See* WTI's Post-Hearing Brief, Ex. 5, at 1-2, 18-19, and 37-41; *see also* WTI's Brief in Reply to Mala's Post-Hearing Brief, Ex. 6, at 17-20.

## IV.    ARGUMENT AND CITATION OF AUTHORITY

**A. THE FEDERAL ARBITRATION ACT GOVERNS THIS COURT'S CONSIDERATOIN OF MALA'S APPLICATION FOR VACATUR OF THE ARBITRATOR'S AWARD.**

Mala's Application requests the vacatur of the Arbitrator's Award pursuant to 9 U.S.C. § 10, the Federal Arbitration Act provision setting forth the severely limited grounds upon which federal courts may vacate the awards of arbitrators.[17]   "[T]he applicability of the Federal Arbitration Act [(hereinafter "FAA")] [is not] affected or diluted by the fact that the agreements between the parties specify that they are controlled by [a particular state's] law," but such a choice-of-law provision does require the application of such state's law in the federal court's review of the *substantive legal issues* involving the Arbitrator's power to issue particular awards in the arbitration.[18]

Here, FAA § 10 and case precedent decided thereunder will govern the Court's review of Mala's Application with respect to the general vacatur standard to be applied; however, because the parties elected in their arbitrated contract (*see* LA § 18.06) that New York law would govern the construction of the LA, New York law applies to examine the Arbitrator's Award on the *substantive* matters he considered.  Both New York and federal law overwhelmingly call for this Court to confirm the Arbitrator's Award and to flatly deny Mala's Application.

**B. THE COURT MUST GIVE EXTREME DEFERENCE AND THE NARROWEST OF READINGS TO AN ARBITRATOR'S AWARD.  THE COURT CANNOT REWEIGH EVIDENCE OR CONSIDER WITNESS CREDIBILITY.**

FAA Section 10 (9 U.S.C. § 10) establishes the narrow circumstances under which an arbitrator's award may be vacated in federal court.  In particular, FAA § 10(a)(4) provides for

---

[17] *See* Mala's Application at 1.

[18] *Clarendon Mktg. Inc. v. CT Chems., Inc.*, 1993 U.S.Dist. LEXIS 10796 at *6 (quoting *Masthead Mac Drilling Corp. v. Fleck*, 549 F. Supp. 854, 856 (S.D.N.Y. 1982)).

such vacatur only "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made."[19]  In recognition of the fact that "arbitrators have broad determinative powers" precluding the merits of an arbitrated controversy from being reopened before a court,[20] federal courts across the country have emphatically echoed their sentiment that this subsection "is to be accorded the 'narrowest of readings'"[21] and that courts reviewing arbitration awards have "extremely circumscribed role[s]"[22] in vacatur actions.  The law is abundantly clear that, in reviewing arbitration awards, federal courts "may not reweigh evidence or examine weight or credibility of witness testimony" but rather must focus their review only on the arbitrator and the contract, not on the facts underlying the parties' dispute.[23]  Where the party challenging the arbitrator's award has done nothing more than allege facts which would allow a court to disagree with the arbitrator's award without showing that the award was irrational, the award must be confirmed under FAA standards.[24]

Perhaps the best statement of this limited standard of review lies in the case of *Commercial Refrigeration, Inc. v. Layton Construction Co., Inc.*, 319 F. Supp.2d 1267 (D. Utah, 2004), where the court identified the "extraordinarily deferential standard of review" applicable to motions to vacate arbitration awards as "among the narrowest known to the law" and refused

---

[19] 9 U.S.C. § 10(a)(4) (emphasis added).

[20] *See, e.g., Reynolds Secur., Inc.v. Macquown*,  459 F. Supp. 943 (W.D. Pa., 1978).

[21] *Blue Tee Corp. v. Koehring Co.*, No. 93-7033, slip op. at 4791, 4798, 1993 WL 269703, at *3 (2d Cir. July 21, 1993); *see also Denver & Rio Grande W.R.R. v. Union Pac. R.R.*, 119 F.3d 847, 849 (10th Cir. 1997) (holding that the court's power to review arbitration awards is "among the narrowest known to the law" and that errors in arbitrators' factual findings or legal interpretations do no justify review or reversal absent showing of manifest disregard of law).

[22] *See Local Union No. 337 of Int'l Brotherhood of Teamsters v. Faygo Beverages, Inc.* 609 F. Supp. 769 (E.D. Mich. 1985).

[23] *See Local Union 1160 v. Busy Beaver Bldg. Ctrs.*, 616 F. Supp. 812, 814 (W.D. Pa. 1985).

[24]  *See McLaughlin, Piven, Vogel, Inc. v Gross*, 699 F Supp 55 (E.D. Pa, 1988), aff'd in 862 F.2d 308 (3rd Cir. 1988).

to set aside the challenged arbitration award, noting that the parties had contracted to use arbitration rather than litigation for their dispute resolution and that arbitrators, who "are generally selected for their expertise in a particular area," are entitled to "maximum deference" when their awards are challenged in court.[25]  The court went on to explain the high level of deference courts are required to pay arbitrators' findings of fact ("errors in the arbitrator's . . . findings of fact do not merit reversal") and legal conclusions ("an arbitrator's erroneous interpretations or applications of law are not reversible").[26]  The court goes on to state as follows:

> Added to this extraordinarily deferential standard of review with regard to arbitration awards generally is the rule regarding arbitrators' interpretations of contracts: "**Whether the arbitrators misconstrued a contract is not open to judicial review.**" *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 203 n.4, 100 L. Ed. 199, 76 S. Ct. 273 (1956). Central to the law of contracts is the idea that the law should respect parties' intentions to contract for particular rights and remedies, and judicial review of a contractual [1270] mechanism for dispute resolution is accordingly narrowly confined: "**By agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the court room for the simplicity, informality, and expedition of arbitration.'**" *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31, 114 L. Ed. 2d 26, 111 S. Ct. 1647 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 87 L. Ed. 2d 444, 105 S. Ct. 3346, 3354 (1985)). **Having agreed to make that trade, the parties cannot easily set aside the arbitration award for which they bargained.**[27]

For a small sample of the rulings concerning courts' limited scope of review on appeals from arbitration awards, WTI includes the footnote below.[28]  The policy reasons behind the

---

[25] *Commercial Refrigeration v. Layton Constr. Co.,* 319 F. Supp.2d 1267, 1269 (D. Utah 2004).

[26] *Id.* (quoting *Bowles Financial Group, Inc. v. Stifel, Nicolaus & Co.,* 22 F.3d 1010, 1012 (10th Cir. 1994) and *ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1455 (10th Cir. 1995), respectively).

[27] *Commercial Refrigeration,* 319 F. Supp.2d at 1269-70 (emphasis supplied).

[28] *See Marion Mfg. v. Long,* 588 F.2d 538 (6th Cir. 1978) (holding that even "unequitable" results reached by arbitrators must be upheld unless "clearly erroneous" and that "federal courts do not sit to review arbitration awards *de novo* or to instruct an arbitrator in the computation of damages); *Manion v. Nagin,* 392 F.3d 294 (upholding

Congressional intent to handicap reviewing courts' power to overturn arbitration awards are obvious and commonsensical.  "Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."[29]  "Arbitration cannot achieve the savings in time and money for which it is justly renowned if it becomes merely the first step in lengthy litigation. It is for this reason that the criteria for vacating an award are so stringent . . . "[30]  Applied here, this rigorous standard illuminates the utter failure of Mala's Application to meet its burden of proof and calls for this Court to confirm the Arbitrator's Award.

## C. FEDERAL LAW UNEQUIVOCALLY COMMANDS A RULING THAT ARBITRATOR GENONI HAD JURISDICTION TO ORDER THE RETURN OF THE PATENTS MALA STOLE FROM WTI

---

district court's decision affirming arbitration award because there was no showing that the arbitrator had manifestly disregarded law or that the award was "completely irrational"; appeals court would not review evidence originally submitted to arbitrator); *McGrann v First Albany Corp. 424 F3d 743*, (8th Cir. 2005)(holding that arbitration award was entitled to broad deference and was properly affirmed on judicial review, under *9 USCS § 10(a)*, because the arbitrators had not exceeded their authority and the award was not "completely irrational").

[29] *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993).

[30] *National Bulk Carriers, Inc. v. Princess Management Co*., 597 F.2d 819, 825 (2d Cir. 1979).  For additional discussion of the policy reasons underlying this deferential standard, please *see, e.g., Choice Hotels v. Felizardo*, 278 F. Supp.2d 590, 594  (D. Md. 2003).

Arbitrator Genoni, a distinguished patent attorney with more than 38 years' experience[31] in patent development, prosecution and defense, brought to his examination of the Patent Assignment issue a perspective no one else present at the Hearing could have brought. The Arbitrator's Award revealed his command of the complex facts[32] in connection with this issue, and, recognizing the depth of Mala's deception in stealing WTI's most valuable patents and his jurisdiction under the LA to require their return, the Arbitrator ordered the prompt return of Glue Patent I and Glue Patent II to WTI. Furthermore, he instructed Mala not to petition the U.S. Patent Office for ownership of any additional WTI patents.[33]

Even after its misdeeds have been recognized, Mala now boldly and frivolously calls into question the correctness of Mr. Genoni's Award in hopes of somehow keeping the highly valuable intellectual property it managed to take from WTI. In questioning Mr. Genoni's

---

[31] Mr. Genoni's biography is attached as Exhibit 3. The questions Mr. Genoni addressed to Mala's patent attorney, Walter Linder, illustrate his knowledge of patent law:

> THE ARBITRATOR: Let me ask a question. Did you know at the time you did this that you, in addition to covering continuation applications, that you were picking up rights to a Mala continuation in part application? THE WITNESS: I specifically wrote it to refer to a continuation in part, yes. THE ARBITRATOR: Did you know there was one at the time? THE WITNESS: I do not recall knowing whether I did or I did not …. THE ARBITRATOR: So the assignment should apply only to patents covering the identical subject matter? Is that what your intention was when you did this? THE WITNESS: Not necessarily, no, I don't recall what my intention was exactly, but the mere fact that there was the possibility that that common subject matter could have been carried forward was the reason why I think that good lawyering dictates putting that terminology in the assignment. THE ARBITRATOR: Let me ask this then. The exchange agreement that you're working from which gave Mala the rights to this application, is it correct that it only gave Mala rights to that specific applications and any future application that would result in a patent that covers subject matter disclosed in this application? ... THE WITNESS: It does refer to, yes, the rights to the patent and then there's kind of little anomaly language here, but it refers to the patent identified by this particular application, that's right. THE ARBITRATOR: So if there is a CIP with a new invention in it, this clause would not give Mala rights to that new invention, is that correct? Is that your understanding? THE WITNESS: I think it is silent on that. THE ARBITRATOR: What do you think the law is on that? THE WITNESS: I don't know precisely what the law is on that.

Ex. 8, Hearing Transcript, 1518/21 – 1525/ 2; *See also* Hearing Transcript, 1530, ln. 11 – 1532, ln. 8.

[32] As discussed *supra*, federal law does not allow the parties to retry their case in this forum, and any attempt to restate the arbitration record for this Court could not do justice to the case's true complexity. Therefore, WTI will not waste the Court's time in this manner. For additional factual context on the patent assignment issue and Mr. Genoni's jurisdiction over its resolution, WTI directs the Court to its arbitration briefs. *See* WTI Post-Hearing Brief, Ex. 5 at 13-14 and 24-26 and WTI's Brief in Reply to Mala's Post-Hearing Brief, Ex. 6 at 7-10.

[33] Ex. 4, Award at ¶ 15(i).

authority to require Mala to return the patents, Mala raises the same "lack of jurisdiction" argument that was repeatedly argued and that failed[34] below.

1. **Arbitrator Genoni Correctly Concluded That the License Agreement Gave Him Jurisdiction to Determine the Disposition of the Glue Patents.**

Arbitrator Genoni correctly determined from the language of the LA that he had jurisdiction over the Patent Assignment issue irrespective of the fact that the Patent Assignment happens to be mentioned in the parties' Exchange and Settlement Agreement (hereinafter "ESA"),[35] as well.[36]   LA § 17 states the parties' agreement that "*any claim, dispute, disagreement or controversy* that arises among the parties *relating to this agreement* that is not amicably settled *shall be resolved by final and binding arbitration.*"[37]   It is clear that the dispute over the Patent Assignment qualified as "any dispute . . . relating to" the LA, for the LA (not the ESA) was the contract which dictated the parties' intellectual property rights in plain and unmistakable language.   Indeed, the LA entitles Mala to "own *any improvements to its hardware* resulting from the parties [sic] development efforts," and the question of whether the patents actually conveyed using the Patent Assignment directly related to such improvements was a

---

[34] Mala would have this Court believe that WTI sandbagged it by not timely raising the Glue Patent/Patent Assignment issue below.  The jurisdictional issue over the Patent Assignment was first addressed by Mala on pages 2-3 in its 11/1/05 letter to Genoni attached hereto as Ex. 9.  After a hearing on 11/10/05, Mr. Genoni stated in his Preliminary Hearing Report and Second Scheduling Order on p. 2, ¶ 2, that he would decide the jurisdictional question after a full hearing of the issues, attached hereto as Ex. 10.  Also, as the Arbitrator noted in ¶ 15(a) of the Award:

> Mala had notice of the claim as set forth on pages 7 and 8 of WTI's Brief in Reply to Mala's Post-Hearing Brief.  In addition, it should be noted that Mala was prepared and had the opportunity to address this issue at the hearing.  [Mala Chief Scientist] Bernth Johnson [sic] and [Mala's patent attorney,] Walter Linder[,] both testified about this issue on Mala's behalf.  Also, as further evidence that Mala had notice of the claim, it should be noted that on April 25, the second day of the hearing, Mala submitted a proposed Award; paragraph 4 dealt with the Glue Patent issue.  (See footnote 4 of Mala's Post-Hearing Brief).

WTI's Brief in Reply to Mala's Post Hearing Brief is attached hereto as Ex. 6.  WTI urges the Court to review pages 7-8 thereof in conjunction with the Award language just quoted.
[35] The ESA is attached hereto as Ex. 11 (Arb. Ex. 7).
[36] *See* Ex. 4, Award ¶ 15(c).
[37] Emphasis supplied.

valid subject for the Arbitrator's review pursuant to the LA's arbitration provision. There can be no doubt that Mr. Genoni was entirely within his jurisdiction in considering the Patent Assignment's propriety (or lack thereof, as the case was here).

In its August 2006 Renewed Motion to Compel Arbitration before a Florida court in another pending case with WTI, Mala voiced its staunch agreement with WTI that broad arbitration provisions must be given full force and effect and that "any doubt regarding the scope of [ ] arbitration clauses should be resolved in favor of arbitration."[38] Mala's Florida motion touts the broad nature of the LA's arbitration clause and stresses that it covers "**any** claim . . . **relating to th[e] Agreement**[.]"[39] After having demanded arbitration against WTI under the LA, presented its case before Mr. Genoni and having lost on particular issues, Mala now seeks to restrict the Arbitrator's jurisdiction to resolve those issues. In a separate contract dispute Mala has filed against WTI in Florida, Mala ironically seeks—in an effort to dispose of WTI's valid counterclaims— to have WTI's counterclaims resolved by binding arbitration, singing the praises of arbitration and calling for the strict enforcement of the parties' broad arbitration provisions.[40]

The Arbitrator devoted five (5) full pages of his sixteen-page Award to this very issue,[41] and he logically and systematically addressed and rejected Mala's jurisdiction argument that the ESA, not the LA, determined the parties' intellectual property rights. The Award speaks for itself, and WTI will not fully repeat its contents here; however, a brief overview of his findings is instructive of both the degree of examination he gave this issue and the validity of his findings.

---

[38] Ex. 27, Mala GeoScience AB's Renewed Motion to Compel Arbitration or, Alternatively, Dismiss Witten Technologies, Inc.'s Counterclaims (without attachments), 8/10/06, at 9 and 3-4, ¶¶ 8-12.
[39] *See id* and at 3, ¶ 9 (emphasis in original).
[40] *See id.* at 7, last full paragraph; *see also* p. 9.
[41] *See* Ex. 4, Award at 9-13 (¶¶ 15(c) through 15(j)).

In support of his finding that "Mala did not have a right to an assignment of Witten's Glue Patent" in Award ¶15(b), Mr. Genoni quotes § 6.02 of the Prototype Development Agreement ("PDA") to show that each party was to have ownership of its own intellectual property rights, with Mala specifically to enjoy sole ownership of any IP rights to "improvements to its hardware resulting from the parties [sic] development efforts."[42] The Arbitrator goes on to recognize the LA's fourth "Whereas" clause, which called for all IP developed under the parties' LA to be exclusively owned by the developing party, except that "Mala will have sole ownership of any improvements to its hardware resulting from the parties [sic] development efforts." Mr. Genoni acknowledged Dr. Alan Witten (WTI's co-founder) as the sole inventor of the Glue Patents and noted that neither the ESA's patent assignment provision --nor any other document in evidence--mentioned the Glue Patents. In numerous letters sent in 2000 to WTI's patent attorney, Frank DeCosta, Mala's own patent attorney, Walter Linder, claimed this Glue Patent was related to the LA[43] Mala conveniently abandoned this argument and ignored this clear evidence during arbitration in 2006. Genoni also correctly recounted facts involving WTI's 2004 agreement (in the Patent Assignment) to assign to Mala all rights to the so-called "Timing Circuit" patent, which was undeniably directed to an improvement to Mala's hardware.[44] The Arbitrator then noted that Mala had a right to the Timing Circuit patent under both the LA and the ESA but not to Glue I or Glue II.

---

[42] Ex. 12 (Arbit. Ex.1), PDA, 9/9/97.

[43] Correspondence between F. DeCosta, and W. Linder, was admitted into evidence at the Hearing and showed Mala's attempt to claim ownership of the Glue Patent four years before the Patent Assignment was executed. This evidence undoubtedly convinced the Arbitrator that Mala had unsuccessfully sought ownership of this intellectual property years before the Patent Assignment was executed and then later, through deceptive document drafting, succeeded in taking patents (the Glue Patents) in which it had no ownership rights. This correspondence is attached hereto as Ex. 13(a) – (h) (Arbit. Ex. 417(o) – 417(s), 417(u) – 417(w)).

[44] Certain evidence presented clearly showed the referencing by both sides to the assignment of a single patent. *See* Ex. 14(A) (Arbit. Ex. 417(x)) Email T. Leijon to M. Oristaglio of WTI, ¶ 12, admission of singular "hardware patent" assignment; Ex. 14(B) (Arbit. Ex. 417(y)) 1/2/03 (after signing of ESA) Email T. Hansen of WTI to K.

**2.   The Patent Assignment Arose Pursuant to the Language Set Forth in the PDA and LA Over Which the Arbitrator Enjoyed Unquestionable Jurisdiction.**

In Award ¶ 15(c) and following, the Arbitrator discusses and directly refutes Mala's argument that the Patent Assignment arises solely from the ESA and thereby removes any question involving the Patent Assignment from his jurisdiction.  Noting (i) that the Patent Assignment itself "is silent on the issue of arbitration jurisdiction," (ii) that there was no issue which would require him to "investigate or analyze the breach, termination or invalidity of the ESA," and (iii) that there was "no dispute over Mala's right . . . to . . . the Timing Circuit patent, the only patent identified in the ESA[,]" Mr. Genoni found the *real* dispute over the assigned patents to be whether Mala had the right to draft and record the Patent Assignment in such a way as to intentionally obtain WTI's Glue Patent (in addition to the Timing Circuit patent named explicitly in the Patent Assignment) and noted that "it is necessary to go to the LA to get the answer."   Accordingly, the Arbitrator correctly found the patent dispute to have fallen within his jurisdiction pursuant to LA §17's "any dispute . . . relating to this agreement" language.[45]

In Award ¶15(d), the Arbitrator disagrees with Mala's assertion that "the Patent Assignment undeniably arises out of the ESA" and fairly points out that while the Patent Assignment *refers* only to the ESA, the basis for the assignment of foreign counterparts and continuation-in-part applications to the Timing Circuit patent (which is what the Glue Patent was) could only be found in the LA.  Then, explaining and applying highly technical tenets of U.S. patent law with which he unquestionably has great familiarity, Mr. Genoni carefully

---

Lesch (WTI patent attorney) referencing assignment of single patent, then forwarded to T. Leijon by T. Hansen; Ex. 14 (C) (Arbit. Ex. 350) 4/14/03 Email T. Leijon to J. Rynning with attached Witten FAQ created after ESA by WTI's President M. Oristaglio stating single patent to Mala (M000915); and Ex. 14(D) (Arbit. Ex. 417(z)) Email H. Kaplan (Mala attorney) to J. Berl (WTI attorney) 8/18/04 discussing the assignment of "patent" in the singular form.
[45] *See* Ex. 4, Award ¶15(c).

examined the parties' agreements and fully supported his view that the Patent Assignment issue arises from the LA and is subject to his jurisdiction.[46]

**3.  The LA Requires the Assignment of the Timing Circuit Patent, But It Does Not Call For Assignment of the Glue Patents, As They Do Not Constitute "Improvements to Mala's Hardware."**

Applying the LA's "improvement to hardware" language which the parties agreed would dictate their respective IP rights, the Arbitrator found in Award ¶ 15(e) that the LA required WTI to assign to Mala the Timing Circuit patent and all continuation patents or continuation-in-part applications thereof, but that the assignment of the Glue Patents (pursuant to the Patent Assignment's "continuation-in-part" language)[47] was improper because the Glue Patents are not "an improvement to Mala's hardware."   In recognition of Mala's fraudulent scheme to steal the Glue Patent, the Arbitrator then observed that, "[n]evertheless, without notifying Witten, Mala used the Patent Assignment ([Arb.] Ex. 14) to record the assignment of the Glue Patent to Mala in the United States Patent Office.  Interpreting "continuation-in-part" to include applications not directed to an improvement to Mala's hardware was a violation of the License Agreement."[48]

---

[46] *See* Ex. 4, Award ¶15(d).  *See also* Award, ¶ 20, where, as a testament to his impartiality, the Arbitrator admitted his lack of jurisdiction over a software licensing issue WTI had pursued on the bases that the claim arose "only under the ESA" and that "[t]he License Agreement ha[d] not been violated" on that issue.

[47] Mala's argument (in ¶ 62 of its Application) that WTI's alleged attempt to convey a defunct Timing Circuit patent application to Mala somehow indicates WTI's intention to convey the Glue Patents as continuations-in-part thereof is completely meritless.  The truth is (and the Arbitrator understood) that there were *two* Timing Circuit patents applications.   After WTI filed the first one (because Mala refused to pay for and file this patent outlining improvements to the hardware),  Mala demanded a copy of it from WTI's patent attorneys.  They deleted WTI's inventors' names from the application (which in and of itself is grounds for disqualification of the application with the patent office), and re-filed it without WTI's knowledge.  No evidence was presented that WTI even knew that this second Timing Circuit patent had been filed or issued until arbitration was already underway in 2005, a year after the 2004 Patent Assignment was executed.

In other words, WTI *had no idea* (nor is conceding to that assertion) that the Timing Circuit application named in the Patent Assignment was not, as Mala alleges, a valid patent application.  Indeed, there are no documents in evidence indicating (i) any understanding or knowledge on WTI's part that the Timing Circuit patent it assigned was no longer valid or (ii) any intention on WTI's part to convey the Glue Patent.  Mala's assertions on this topic are inconsistent with the evidence and the Arbitrator saw the disconnect in their logic.

[48] Ex. 4, Award ¶ 15(e), pp. 10-11.

**4.  The Parties Never Bargained or Agreed to Assign the Glue Patents to Mala.**

The Arbitrator allocated ¶¶ 15(f) through 15(h) of his Award to systematically setting out the evidentiary support for his ruling on the patent issue.  The Arbitrator cited testimony of Anthony Clifford, who he called "a very credible witness," to show that WTI's management neither intended for the Patent Assignment to transfer rights to the Glue Patent nor even understood the significance of the "continuation-in-part" language Mala's patent attorney, Walter Linder, had included in the Patent Assignment later presented to Mr. Clifford for signature.[49] [50]  In ¶15(g), the Award cites testimony discussing Mala's agents' "despicable" actions and their use of "slight [sic] of hand in drafting and using the Patent Assignment."  Mr. Genoni goes on to cite testimony of the Glue Patent's relation "to the control of generic hardware" and its lack of dependence on any improvement to Mala's hardware for its claims, along with an admission from Mala Chief Scientist Bernth Johannson that the Glue Patent is not directed to an improvement of Mala's hardware.[51]  In Award ¶15(h), Mr. Genoni, puts the proverbial nail in Mala's coffin.  There, he states his finding that

> ***Mala acquired the Glue Patent using intentionally deceptive acts***.
> Mala had made an earlier attempt to acquire rights to the Glue
> Patent.  Prior to the ESA, Mala argued that Dr. Witten was not the
> sole inventor and that Mala inventors should be added.  WTI did
> not agree that the evidence of joint inventorship was sufficient and
> the United States Patent Office agreed with WTI.  After the ESA
> was signed, Mala drafted a Patent Assignment that specifically
> mentioned only the Timing Circuit patent.  There is no evidence
> that the Glue Patent was discussed at this time, but if WTI had
> agreed to assign the Glue Patent, Mala should have (and would
> have) specifically identified it in the Patent Assignment rather then
> [sic] rely on the "continuation-in-part" language to hide Mala's

---

[49] *See* Ex. 4, Award ¶15(f).
[50] Ex. 15 (Arb. Ex. 417(aa)), Email from H. Kaplan (Mala) to J. Berl (WTI) with Fax and signed Equipment Lease and Patent Assignment Attached, 9/28/04, stating the Patent Assignment was "pretty straight-forward"
[51] *See id.* at ¶15(g).

real intent from WTI.  This finding . . . is . . . further evidence of **Mala's bad faith dealing with WTI**.[52]

Award ¶ 15(i) discusses the troubling events following our hearing in April 2006 involving the discovery that Mala's deception had reached yet another of WTI's patents, "Glue Patent II," and Mala's further—and audaciously verbalized—intention to use the Patent Assignment to grab even more of WTI's intellectual property to which it had no entitlement. Along with his Order that Mala assign all the stolen Glue Patents back to WTI prior to August 15, 2006, Mr. Genoni decisively instructed Mala not to follow through with its plan to record the Patent Assignment for ownership of additional WTI patents in the future.[53]

Additional arbitration evidence not cited in the Award staunchly supports WTI's and the Arbitrator's position that the PDA and LA (over which Mr. Genoni undeniably had jurisdiction), determined the parties' intellectual property ownership rights.[54]  Even Mala's President, Tommy Leijon, admitted:  (i) that the parties' IP rights arose under the LA; (ii) that that the Timing Circuit had been developed under the LA; and (iii) that Mala's right to own the patent to the Timing Circuit arose from the LA.[55]  Mr. Leijon and Mr. Rynning also admitted in depositions that if the Glue Patent had been erroneously assigned, then it should be returned to WTI.[56]

Under the terms of the LA noted *supra*, Mala was to receive IP which was "an improvement" to Mala's hardware, not all IP "**related**" to the *CART* as Mala would have this Court believe.  If that were the case, then every intellectual property that arose during the parties'

---

[52] *Id*. at ¶15(h) (referring  to Award ¶11, where the Arbitrator states that "Mala misused the ESA to acquire ownership of the Witten Glue Patent" and "Mala's actions demonstrate its lack of good faith in dealing with WTI")(emphasis supplied).

[53] *See id*. at ¶15(h) and pg. 15, subpart 2.

[54] See PDA, Ex. 12, (Arb. Ex. 1), at Section 6 and fifth "Whereas" paragraph on pg. 1; LA, Ex. 1, Arb. Ex. 3 at 1.

[55] Ex. 16 (Arb. Ex. 417(h)) (Leijon's 10/19/99 demand to F. DeCosta, WTI's patent attorney, requesting copy of Timing Circuit patent application, *twice* referring to the patent as the hardware patent "covered by the LA."); Ex. 17, Arb. Ex. 417(l) (Leijon to F. DeCosta 4/12/00, stating same as 417(h)).

[56] Ex.  18, J. Rynning depo. at 75/9-76/8, 86/4-9, 89/20-22, 91/14 to 92/3, and 94/10-16; Ex. 19, T. Leijon Depo. at 107/20-108/01 and 110/13 to 111/15.

development relationship would be owned by Mala. This is clearly an absurd proposition and not based in any evidence. It was Dr. Witten who first developed this ground breaking three-dimensional software and approached Mala as a potential fabricator to build the hardware Dr. Witten had specially designed for pairing with his software. Anyone could have built this hardware, but WTI chose Mala to do so. Mala brought nothing unique to the table to warrant its ownership of all intellectual property resulting from years of work by Dr. Witten and the parties' CART development efforts; even Mala's own Chief Scientist, Bernth Johansson, correctly testified[57] that the Glue Patent *does not constitute an improvement* to Mala's hardware. The Arbitrator properly determined that he had both jurisdiction under the LA to order the return of WTI's Glue Patents and sufficient evidence to support such an order.

## 5. Arbitrator Genoni Did Not Act Irrationally In Determining His Jurisdiction Over the Glue Patent Issue

Where, as here, parties have agreed that any disputes between them will be resolved in binding arbitration, the reviewing court's role is limited to ascertaining whether grounds for vacatur exist.[58] Governing law is clear that FAA § 10(a)(4) cannot be used to overturn arbitration awards arising from contract disputes except under the most extenuating circumstances involving an arbitrator's utter failure to interpret the contract before him, and that such arbitration awards are to be upheld even in cases where the reviewing court would have interpreted the contract differently,[59] so long as the award falls "within the bounds of

---

[57] Ex. 20, B. Johansson Testimony at 1470/21 to 1472/16; *See also* Ex. 14(C) (Arb. Ex. 350) at M 000917 (reflecting WTI's position that the Glue Patent was general and not dependent on hardware. Mala never objected to this characterization).

[58] *See Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577 (2nd Cir. 1967); *see also Sutter v. Oxford Health Plans, LLC*, 2005 U.S. Dist. LEXIS 25792 (Dist. NJ 2005)(holding that standard for reviewing arbitration award under 9 USC §10 was not *de novo* but rather whether the arbitrator had exceeded his powers or shown a "manifest disregard of law" and denying motion to vacate because vacatur petitioner's arguments were nothing more than attempts to have the court reinterpret the contract without showing any wrongdoing by the arbitrator).

[59] *See, e.g., Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184 (8th Cir. 1988).

rationality," "draws its essence" or has an "identifiable basis in the contract,"[60] or the arbitrator

has provided "even barely colorable justification" for his interpretation of the contract.[61]     For

example, the Seventh Circuit Court of Appeals has held that

> [a]s long as the award is based on an interpretation of the contract,
> even if the interpretation is unsound, the award will be upheld.
> *Ethyl Corp. v. United Steelworkers of America, 768 F.2d 180, 184-
> 85 (7th Cir. 1985)* cert. denied *475 U.S. 1010, 89 L. Ed. 2d 300,
> 106 S. Ct. 1184 (1986); Fortney v. School Dist. of West Salem, 108
> Wis. 2d 167, 179 321 N.W.2d 225 (1982).* Thus, "the question for
> decision by a federal court asked to set aside an arbitration award .
> . . is **not whether the arbitrator or arbitrators *erred* in
> interpreting the contract; it is not whether they *clearly erred* in
> interpreting the contract; it is not whether they *grossly erred* in
> interpreting the contract; it is whether they *interpreted* the
> contract.**" *Hill v. Norfolk and Western Ry. Co., 814 F.2d 1192,
> 1194-95 (7th Cir. 1987).*[[62]]

The U.S. Supreme Court has offered similar deference to arbitrator's awards:

> Whether the arbitrators misconstrued a contract is not open to
> judicial review. Questions of fault or neglect are solely for the
> arbitrators' consideration. Arbitrators are not bound by the rules of
> evidence.  They may draw on their personal knowledge in making
> an award. Absent agreement of the parties, a written transcript of
> the proceedings is unnecessary. Swearing of witnesses may not be

---

[60] *See, e.g., Ehrich v. A.G. Edwards & Sons, Inc.*, 675 F. Supp. 559, 564 (Dist. S.D. 1987) (confirming arbitration award, without inquiry into the case's particular issues, because (i) the award was inside the scope of the parties' arbitration agreement, the award was "within the bounds of rationality" and "'dr[ew] its essence' from the agreement" (quoting *United Food and Commercial Workers, Local 322 v. Iowa Beef Processors, Inc.*, 683 F.2d 283, 285 (8th Cir. 1982); *Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*, 264 F. Supp.2d 926, 939 (holding that the arbitration panel had not exceeded its powers in issuing a particular order having an "identifiable basis in the contract"); *Parsons v. Blue Ridge-Winkler Textiles*, 517 F. Supp. 422 (E.D. Pa. 1981) (holding that arbitrator did not exceed his powers where his award was squarely based on the parties' agreement); *Standard Tankers (Bahamas) Co. v. Motor Tank Vessel, Akti*, 438 F. Supp. 153 (E.D. N.C. 1977) (noting that, under 9 U.S.C. § 10, arbitration awards must have some foundation in reason or fact, i.e., must in some logical way be derived from the wording or purpose of the contract); *Brentwood Med. Assoc. v. UMW*, 396 F.3d 237, 243 and 241 (3rd Cir. 2005) (holding that decision need only be "minimally rooted" in the arbitrated contract and pass the threshold of being "*in any rational way* derived from the [parties'] agreement" in its refusal to vacate award merely because the arbitrator had considered language not in the arbitrated contract (emphasis in original)).
[61] *See Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 218 (2nd Cir. NY)(award must stand if arbitrator has provided even a "barely colorable justification" for his interpretation of the contract).
[62] *Flexible Manuf. Systems Pty, Ltd. v. Super Products Corp.*, 874 F. Supp. 247, 250 (E.D. Wisc. 1994)(emphasis supplied).

required. And the arbitrators need not disclose the facts or reasons behind their award.[63]

The *Commercial Refrigeration* case cited *supra* offers additional insight into how federal courts are required to handle cases like this one.[64]  That case involved cross-applications seeking confirmation and vacation, respectively, of an arbitrator's award arising from the parties' contract dispute.  That court promptly and appropriately confirmed the award and denied all vacatur motions, relying on the following: (i) evidence (from the award's "careful and thorough discussion" of the parties' debate on a key issue) that the arbitrator had not been "willfully inattentive" to the legal consequences of his factual findings; (ii) the fact that the arbitrator had simply disagreed with the losing party's legal position did not mean the arbitrator had ignored controlling law in violation of his duties; (iii) the award had made it clear that the arbitrator had not ignored the law relevant to the case; and (iv) the arbitrator had neither exceeded his authority in making his award nor "manifestly disregarded law."[65]  The court dismissed the losing party's argument that the arbitrator had "manifestly disregarded" the law by simply disagreeing with the legal authorities cited in such party's briefs and, applying the narrow standard of review to which arbitration awards are entitled in federal courts, refused to examine whether the arbitrator had applied the law *correctly* and decisively confirmed the arbitrator's award.[66]

As evidenced by his thorough Award[67] and analysis of Mala's jurisdiction argument, the arbitrator repeatedly entertained Mala's appeals on this issue yet simply disagreed, based on his broad understanding of U.S. patent law, with Mala's view in light of the facts.  Even if the Court could examine the copious evidence Mr. Genoni reviewed and disagree with Mr. Genoni's

---

[63] *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 206 n. 4 (1956) (citations omitted).
[64] *See Commercial Refrigeration, Inc. v. Layton Constr.*, 319 F. Supp.2d 1267 (Dist. Utah 2004).
[65] *See id.*
[66] *See id.*
[67] See Ex. 4, Award ¶15

findings (and we contend that this Court would absolutely agree with them), it could not vacate the Award on those grounds.  Mr. Genoni plainly considered Mala's assertions on the jurisdiction issue but simply disagreed.

Mala argues in its Application that Mr. Genoni exceeded his jurisdiction when he considered the Patent Assignment issue, awarded the return of WTI's patents based on language in the LA, and allegedly failed to agree with Mala that the Patent Assignment arose solely from the ESA, disputes arising from which are to be arbitrated only in Sweden.  Mala's argument is based on the faulty premise that the ESA is the only agreement whose terms can be used to interpret the Patent Assignment because the ESA is the only agreement *directly referencing* the Patent Assignment document by name.  It is from this springboard that Mala makes the illogical leap to a conclusion that the Arbitrator was out of bounds in applying the LA's language clearly setting forth the parties' basic intentions concerning the respective IP rights and generally-contemplated patent assignments they expected to execute as their joint project progressed.  Clearly, the Arbitrator's jurisdiction over the Patent Assignment was firmly rooted in a valid and plausible interpretation of the LA consistent with the "essence of the contract" rule recited above, especially considering that the Patent Assignment itself does not contain an arbitration provision or provide for dispute resolution in any particular venue.

*Svoboda v. Negey Associates, Inc.*, 655 F. Supp. 1329 (S.D.N.Y. 1987) is perhaps the best case to apply in this context.  There, the court confirmed an arbitration award and denied the losing party's motion to vacate, finding that the arbitrator had not exceeded his authority by considering the prevailing party's claim for vacation benefits in the arbitrated employment contract; even though the contract *did not specifically provide for such vacation benefits, it did*

*provide for "other benefits as are afforded to other employees."[68]*    The court agreed with the arbitrator's conclusion that he had jurisdiction to interpret the "other benefits" terminology of the contract being arbitrated and determine whether such terminology included vacation benefits.[69]

The LA contemplated the later assignment of certain patents to Mala to the extent they were directed to *"improvements to Mala's hardware."[70]*   Applying *Svoboda* to determine, as Mala asserts, whether Mr. Genoni exceeded his jurisdiction by construing the Patent Assignment in accordance with the parties' intentions under the "improvements to Mala's hardware"[71] provision of the LA, it is patently clear Mr. Genoni acted squarely within his jurisdiction under the LA's broad arbitration clause.[72]   That clause gave him authority to resolve "any claim, dispute, [etc.]" between the parties in any way "relating to" the LA.  The Patent Assignment dispute unquestionably "relates" to the LA as it is assigning technology developed pursuant to the PDA and LA.

**6.   <u>The AAA Rules Give the Arbitrator Broad Discretion To Determine His Jurisdiction.</u>**

Furthermore, the American Arbitration Association rules to which Mala submitted when it initiated arbitration (and to which the Arbitrator looked for guidance while hearing the dispute) fully support Mr. Genoni's jurisdiction over questions of "arbitrability."   AAA Rule 7- "Jurisdiction" states, in pertinent part, as follows:

---

[68] *Svodboda,* 655 F. Supp. at 1333 (emphasis supplied).
[69] *Id.*
[70] The LA does not mention the Patent Assignment explicitly for it was signed years before the technology was even developed but was of the sort anticipated by the parties at the outset of the relationship.
[71] *See* Mala's Application at 16, *et. seq*.
[72] Ex. 1 (Arb. Ex. 3), LA § 17 (Arb. Ex. 3),.

> (a) ***The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the*** existence, ***scope*** or validity ***of the arbitration agreement.***[[73]]

New York law (which guided Mr. Genoni's conduct in the arbitration pursuant to the LA) also heavily favors arbitration of all disputed issues which qualify for arbitration under a contract's arbitration agreement[74] and generally upholds an arbitrator's construction of a contract unless such construction is "totally irrational."[75]   Here, the Arbitrator was absolutely within his jurisdiction to determine whether the LA's arbitration provision encompassed the parties' patent assignment dispute, and he correctly found that it did.

On August 22, 2006, Mala filed, as a supplemental exhibit to its Application, an excerpt from the parties' arbitration transcript as support for Mala's argument that the Arbitrator admittedly lacked jurisdiction over the Glue Patent issue.  However, Mala's supplemental filing conveniently fails to acknowledge two important points.  First, the particular statement to which Mala directed the Court's attention can fairly be read to show the Arbitrator's accurate understanding that he lacked jurisdiction under the LA to grant WTI a ***license*** to the Glue Patent. There is no question that the Arbitrator's jurisdiction would not extend to license-granting, but this fact has no bearing on Mr. Genoni's undeniable power to resolve the Patent Assignment dispute as an issue arising under the LA and covered by the LA's broad, "any dispute"

---

[73] *See* AAA Commercial Arbitration Rules, Rule 7(a), which can be viewed at the following web address: http://www.adr.org/sp.asp?id=22440#R1.
[74] *See 5 NY Jur Arbitration and Award § 87*, entitled "Arbitrability of Particular Dispute Under Agreement," stating that "***provisions [for arbitration] should be construed so as to effect a complete and final settlement of all existing controversies between the parties***."  (citations omitted, emphasis supplied.)
*See also Silverman v. Benmor Coats, Inc.*, 61 NY2d. 299 (1984) (holding that, where a valid agreement to arbitrate exists and it is clear that the dispute in question generally comes within the scope of the arbitration agreement, the arbitrator's authority over that issue is "plenary"); *Pearl Street Devel. Corp. v. Conduit & Foundation Corp.*, 41 NY2d 167 (1976) (holding that issues of contract interpretation or construction are for the arbitrator); and *Franklin Cent. School v Franklin Teachers Ass'n*, 51NY2d 348 (1980) (holding that questions concerning the interpretation, application, or **scope** of contracts are for the arbitrator to determine).
[75] *E.g., Hackett v. Milbank,* 86 NY2d 146, 155 (1995).

arbitration clause. In truth, the Arbitrator's statements **do not contain any admission** by the Arbitrator that he lacked jurisdiction to require the Glue Patents' return to WTI as Mala suggests.

Second, the Arbitrator acted entirely within his discretion in claiming jurisdiction over the Patent Assignment dispute by Hearing's end, even if he may not have been convinced of his jurisdiction earlier in the proceedings. During a November 10, 2005 preliminary hearing between the parties, the Arbitrator stated that he would entertain evidence at the arbitration Hearing on the Patent Assignment issue and determine whether he enjoyed jurisdiction over it "after a full hearing of the issues."[76] Notably, the excerpt Mala chose came from Tuesday, April 25, 2006, **the second morning** of the parties' five-day hearing; only one (1) day of proceedings had taken place by that time, and **WTI had not had the opportunity to present any evidence** when the Arbitrator made these statements. The Arbitrator later explained on the **final** day of the arbitration hearing (Friday, April 28, 2005) his view (following WTI's presentation of compelling evidence on the issue) that he *did* enjoy jurisdiction over the issue due to the fact that the Patent Assignment arose out of the LA, not the ESA.[77] As noted *supra*, the Arbitrator provided ample support for this jurisdictional ruling in his Award at § 15(c)-(d). In short, even accepting Mala's insinuation that Mr. Genoni changed his mind on this question, he acted entirely within his prerogative in doing so, and his conclusion is fully supported in the record.

### D. THE ARBITRATOR'S RULING THAT WTI IS NOT INSOLVENT CANNOT BE OVERTURNED SIMPLY BECAUSE THE LOSING PARTY DISAGREES WITH IT.

In a painfully strained effort to establish some basis for overturning the Arbitrator's findings on the insolvency issue, Mala quotes a handful of federal cases for the proposition that the Arbitrator somehow exceeded his powers by doing exactly what arbitrators are called upon—

---

[76] Ex. 10, Preliminary Hearing Report and Second Scheduling Order on p. 2, ¶ 2.
[77] *See* Ex. 28, Arbitration Transcript at 1260/14 to 1266/9.

and given great deference—to do:  interpret the evidence and determine the facts of the case as the weight of that evidence establishes them.

As noted *supra*, reviewing courts are not permitted to vacate arbitration awards due to arbitrators' arguably erroneous factual determinations[78] or misapplications of law unless it is shown that the arbitrator was "willfully inattentive to the legal consequences of his factual determinations" or "deliberately ignored the relevant law."[79]  Further, an arbitrator's decision to "reject[ ] an argument as to the proper legal outcome *on disputed facts* is a very different matter than ignoring controlling law."[80]

Here, the Arbitrator heard evidence from both sides on the issue of WTI's financial position and, applying New York's two insolvency tests, simply disagreed with Mala's position and held that Mala had failed (in its efforts to terminate the LA based on WTI's alleged insolvent state) to meet its burden of showing that WTI is insolvent under *either* of New York's insolvency tests.[81]  In support of his findings, the Arbitrator cites the LA's termination provision and the parties' respective views as to which New York insolvency test should apply.  He then states that "Mala has not proved that WTI is insolvent under either test"[82] and cites WTI valuation expert Vince Shea's testimony of WTI's present value, along with his view from Mala's "extreme and wrongful actions taken to acquire ownership of the Glue Patent that Mala recognized that the Witten intellectual property was very valuable."[83]  The Arbitrator then recognized that while WTI has been "a little late from time to time" in paying bills, "WTI has been able to meet its

---

[78] *See Commercial Refrigeration*, 319 F. Supp2d at 1270 (quoting *Bowles Fin. Group, Inc.  v. Stifel, Nicolaus & Co.*, 22 F.3d 1010, 1012  (10th Cir. 1994) for the proposition that "errors in the arbitrator's  . . . findings of fact do not merit reversal.").

[79] *Id.* at 1270-71.

[80] *Id.* at 1271 (emphasis supplied).

[81] The Arbitrator devoted Award ¶12 to the insolvency issue.

[82] Ex. 4, Award ¶ 12.

[83] *See id.*

obligations as they mature in the ordinary course of business."[84]

Mala's Application takes issue with Mr. Genoni's ruling on the insolvency issue and alleges without qualification that such ruling found absolutely "***no*** support in the record"[85]. First and foremost, it must be noted that Mala's attempt to have this Court reexamine arbitration evidence is wholly inappropriate under the strictly limited scope of review this Court must apply when examining Mr. Genoni's Award.[86] Arbitration awards may not be vacated due to an arbitrator's erroneous finding of fact even where the court disagrees with his view and would have ruled differently.[87]

Mr. Genoni conducted arbitration proceedings "in accordance with the Commercial Arbitration Rules (Including Procedures for Large, Complex Commercial Disputes) of the American Arbitration Association."[88] Commercial Arbitration Rule 30(a) states, in pertinent part, as follows: "R-30. Conduct of Proceedings. (a) The ***claimant shall present evidence to support its claim***. The respondent shall then present evidence to support its defense. . . ."[89] Rule 31, entitled "Evidence," states that

> (a) [t]he parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. . . (b) The ***arbitrator shall determine the*** admissibility, relevance, and ***materiality of the evidence offered*** . . .[[90]]

In light of these rules and basic legal principles allocating burdens of proof, Mala's assertion that Mr. Genoni's insolvency ruling is wholly unsupported by the evidence because

---

[84] *Id.*
[85] Mala's Application at 22.
[86] *See* the section herein discussing the scope of review applicable to court reviews of arbitration awards, *supra*, beginning on page 8.
[87] *See id.*
[88] Ex. 21, Preliminary Hearing Report and First Scheduling Order, 9/22/05, at ¶2, pg. 2.
[89] These rules can be found at http://www.adr.org/sp.asp?id=22440#R31.
[90] *Id.*

**WTI** somehow failed to carry some fictitious burden of proving it was ***not*** insolvent[91] demonstrates just how weak Mala's position is.   Mala, not WTI, instituted arbitration proceedings and sought to terminate the LA (something WTI did not want) based on WTI's alleged insolvency.   At arbitration, the evidentiary support for Mala's insolvency claim was limited to submissions of outdated WTI financial statements that did not take into account WTI's vast patent portfolio; the rest of Mala's case on this issue was comprised of lame efforts to discredit the two accounting experts and expert valuation report *WTI* presented at the hearing in *defense* of Mala's insolvency claim.[92]   Interestingly, Mala attempted to discredit WTI's experts without retaining *its own* experts to show WTI's alleged insolvency; if WTI's alleged insolvency were so obvious to everyone involved (as Mala claims), why is it that Mala could not find an expert to testify to the same?   Mr. Shea's valuation of WTI's stock at $155 million[93] and accounting expert Ray Barbee's testimony refuting the accuracy of the financial documents Mala presented were both coherent and convincing, and Mala allowed WTI's experts and valuation report to be the only credible voices on the insolvency issue by not presenting expert testimony of its own.

Space does not permit WTI to point out all of the liberties Mala's Application takes in recounting the facts of this case.   However, two (2) of Mala's most glaring allegations on the insolvency issue require correction.   First is Mala's assertion that WTI has sold stock over the last four years for "an average of $0.11" per share.[94]   As evidenced by the record, WTI has ***never*** sold its stock for less than $0.50 per share; Mala's counsel have erroneously averaged the value of the *warrants* WTI issued to those who have made loans <u>to</u> WTI, not the prices at which stock

---

[91] *See* Mala's Application, at 25.
[92] *See* Ex. 22, Mala's Post-Hearing Brief, at 7.
[93] *See* Ex. 23 (Arb. Ex. 152), Valuation Report of Expert Vince Shea.
[94] *See* Mala's Application at ¶ 77.

has been *sold* outright.  Stock *warrants* and stock *sales* are two totally different things, and Mala is deliberately shading the truth on this point in hopes of swaying this Court.[95]

Second, Mala's falsely alleges that WTI has admitted that it is insolvent.[96]  WTI has certainly pointed to hard evidence showing Mala's strategic attempts to force WTI into bankruptcy[97] in arguing that Mala: (i) has always been aware of the financial difficulty it was causing WTI; (ii) came to arbitration with unclean hands; and (iii) was legally precluded from obtaining the equitable relief it sought.  Clearly, these arguments are in no way tantamount to an admission of insolvency under any legal definition of the term, and there is no evidence that WTI has made any such admission.

## 1. **The Credibility of Mr. Shea's Valuation Report Cannot Be Reexamined Here.**

Mala argues that Mr. Shea's stock valuation report is not credible due to the fact that it is based on certain revenue projections.[98]  What Mala is not admitting here is that its President and Chairman of the Board have always agreed that such projections are possible,[99] and that evidence of such agreement was presented for the Arbitrator's consideration when weighing Mr. Shea's valuation.  WTI and Mala both confirmed that they could have sold 100 – 150 CARTs by now.  Mala's complaint that "there was no evidence [at arbitration] about what the value of [WTI's] intellectual property was or how the [technology] awards [WTI has received] translate into

---

[95] For a full explanation of this distinction, please *see* page 19 of WTI's Brief in Reply to Mala's Post-Hearing Brief (Ex. 6);  *see also* Ex. 26, B. Hurse testimony, Tr. at 1377/5 to 1379/1 (explaining the warrant sales).

[96] *See* Mala's Application at ¶ 67.

[97] *See* Ex. 7 (Arb. Ex. 331), Mala Board Minutes, 09/11/01, at M 03842.1.

[98] *See* Mala's Application at 26.

[99] *See* Ex. 24,  T. Leijon depo, 126/10 – 127/3;  All parties agreed 100-150 CARTs could have been sold generating significant revenues.  Mala claimed this failure was due to WTI's lack of sales organization, which it failed to proved during the Hearing.  WTI believes this failure is due to Mala's continued failure to perform as Genoni found in his Award, Ex. 4  at p. 4-6, § 11 (b), (c) and § 13 ("I find that Mala's failure to perform its obligations under the License Agreement is a major reason why WTI has not been more successful in selling or leasing the product.  Mala failed to provide a commercially viable CART and refused to give WTI the information and instruction needed to manufacture and repair the CART radar array.  There were technical malfunction of the CARTs supplied by Mala and Mala was unwilling to improve the CART to eliminate malfunctions.  Mala filed to obtain FCC waivers for the 200 MHz CART for operations in the United States. …").

dollars"[100] further illustrates WTI's point here:  *Mala*  (not WTI) had the burden of proving the value of WTI's assets in support of its insolvency claim, and Mala's inability to present persuasive evidence of WTI's assets' value[101]—not the allegedly lacking nature of WTI's valuation evidence—is the reason its insolvency argument failed so miserably.

While Mr. Shea valued the corporation as a whole and did not value WTI's assets directly, the stock value is a clear indication of the value of WTI's intellectual property and other assets.  Mr. Genoni (who spent more than two decades in-house as Chief Patent Counsel at Engelhard Corporation, was Vice-President and General Patent Counsel at Hoechst-Celanese Corporation, was General Intellectual Property Counsel for Hoechst AG, and later served as Head of Patents for Hoechst Marion Roussel) no doubt understood the value of IP in the sort of technologically-based business and industry in which WTI participates.[102]   Even assuming *arguendo* that the valuation was not worthy of the credence Mr. Genoni paid it, questions as to the credibility of witnesses and the materiality of the evidence fall solely within the purview of the Arbitrator, and Mala cannot have his Award vacated just because it sees the evidence another way.

The simple truth is that WTI's experts and the stock valuation report WTI submitted in defense of Mala's insolvency assertions were more convincing to the Arbitrator than Mala's weak documentary evidence and led him to determine that Mala had failed to carry its burden on the insolvency issue.  Now, Mala desperately attacks the Award on the incorrect basis that *WTI's* evidence wasn't strong enough to show we were *not* insolvent.  Mala's argument illustrates the

---

[100] *See* Mala's Application at 27.
[101] Indeed, Mala has at all times known the identities of each and every WTI patent (they are listed by name and number in the WTI Business Plan (Arb. Ex. 39) attached to Mala's Application as Ex. 7. Mala could have enlisted the assistance of its own valuation expert for the purpose of valuing WTI's patent portfolio.  WTI speculates that Mala did not engage such an expert because it accurately assumed that the value of WTI's patents was great and would only hurt its case for insolvency.
[102] *See* Ex. 4, Award ¶ 12.

depths to which Mala is willing to descend to get out of its contractual obligations.

## 2. Cases Allowing Vacatur Where An Arbitrator's Findings Are Wholly Unsupported By The Factual Record Do Not Apply Here.

While it is true that courts may vacate arbitration awards where the arbitrator has reached conclusions having absolutely no support in the evidentiary record, such rule has no application here. The Arbitrator's Award is supported by evidence and may not be vacated on the premise from which Mala argues. Both sides presented evidence on the insolvency issue; the Arbitrator, applying the evidence to New York insolvency law under the lenient AAA Commercial Arbitration Rules which gave him great discretion to determine the weight of the evidence, sided with WTI's view.[103]  Mr. Genoni did not manifestly disregard the law;[104] indeed, his Award notes his recognition thereof,[105] and he gave a thoroughly-considered and logical Award using his "informed judgment."[106]  This scenario does not provide grounds for vacating the Award,[107] and Mala's frivolous Application should not be indulged.

---

[103] *See Commercial Refrigeration*, 319 F. Supp.2d at 1271 (upholding award where arbitrator had not ignored the law but had simply disagreed with the losing party's position).

[104] *See Hoeft v. MVL Group, Inc.*, 343 F.3d 57, 71 (2nd Cir. 2003)(upholding arbitration award that was "supportable" on accounting issues where the arbitrator had not "manifestly disregarded law.")

[105] *See* Ex. 4 , Award ¶12.

[106] *See Nat'l Ass'n of Broad. Emples. & Technicians v. Meredith Corp.*, 2004 U.S. Dist. LEXIS 11384 at **21**-22 (E.D. Mich. 2004) (holding that an arbitrator is to bring his "informed judgment to bear" in considering dispute before him, that he is not required to account to the courts for his reasoning, and that "the mere possibility that this opinion was based on impermissible considerations is not ground for vacating an award.") It is worth noting here that the Arbitrator also heard WTI's argument regarding Mala's "unclean hands" as equitably precluding Mala from obtaining termination of the LA. While the Arbitrator does not cite this argument as having swayed his opinion on the insolvency issue, it is clear that he found Mala to have engaged in "intentionally deceptive acts" (Award at ¶15(h); this certainly may have impacted his insolvency ruling, even though he did not expressly say so.

[107] *See Flexible Manuf. Sys. Pty. Ltd. v. Super Products Corp.*, 874 F. Supp. 247, 250 (E.D. Wisc. 1994), which held as follows:

> It is not up to this Court to decide which version of events best corresponds to reality. [citation omitted.] That was the task of the arbitration panel. It concluded that Flexible's version of events was most likely true and entered an award accordingly. This judgment was obviously based on the terms of the License Agreement and the factual evidence presented to the panel. By no means can the arbitrators be said to have exceed their powers, thus justifying the Court's vacation of the award.

**E.  THE ARBITRATOR'S AWARD OF WTI'S ATTORNEYS' FEES WAS PROPER AND SHOULD BE CONFIRMED.**

The fact that the Arbitrator even awarded WTI its attorneys' fees in this matter is telling of the degree to which the vast evidence of Mala's wrongdoing and the frivolous and unfounded nature of its claims shocked the Arbitrator.  LA § 17(d) gave the Arbitrator discretion for awarding "costs and/or attorneys' fees "as he deems appropriate under the circumstances[,]" and in his Award at ¶ 21, the Arbitrator ordered Mala to pay WTI $420,000 for its attorneys' fees and expenses.  In response to Mala's objection to the fees of WTI General Counsel Erin Lewis, whose compensation was largely comprised of WTI stock options, Mr. Genoni arrived at the $420,000 figure by reducing Ms. Lewis' fees claim by twenty percent (20%) "to account for time Ms. Lewis may have spent on other matters."[108]  Mala's Application seeks vacatur of this portion of the Arbitrator's Award on allegations that it "has no support in the record."[109]

It is well-settled that attorney's fees and costs should be awarded for litigation performed by in-house counsel—at "prevailing market rates in the relevant community"—if such fees would be awarded for the same work performed by outside counsel."[110] Arbitrators' awards of attorneys' fees will not be vacated absent a showing that the arbitrator "either exceeded his authority or acted in a completely irrational fashion in awarding attorneys' fees."[111]  In-house counsel's fees can be calculated on an hourly rate based on an estimate of what an independent counsel would charge for similar services; this approach has been regarded as a reasonable[112]

---

[108] Ex. 4, Award ¶21, pp. 14-15.
[109] Mala's Application at 31.
[110] *See Blum v. Stenson,* 465 U.S. 886, 895 (1984); s*ee also Holmes v. NBC/GE,* 168 F.R.D. 481, 482 n.3 (S.D.N.Y. 1996).
[111] *See First Interregional Equity Corp. v. Haughton,* 842 F. Supp. 105, 112-13 (S.D.N.Y. 1994).
[112] The "common sense" rule governing attorneys' fees awards in regular court actions is for the jury to "decide at trial whether a party may recover such fees; if the jury decides that a party may recover attorneys' fees, then the judge is to determine a reasonable amount of fees."  *See McGuire v. Miller,* 1 F.3d 1306, 1313 (2nd Cir. 1993). Extrapolated to an arbitration context, where the arbitrator is both judge and jury, arbitrators may decide both

basis for calculating in-house attorneys' fees awards.[113]   At least one court has found reduction in the attorney's fees claimed by in-house counsel to be appropriate when, as here, counsel has kept no time records to account for time spent on other matters.[114]

Here, Ms. Lewis submitted a timely claim for her reasonable attorneys' fees based on the hourly rate charged for legal services in the relevant legal market.   The fact that she was compensated for the value of her representation in the form of stock options raises no question concerning the propriety of the award.   Irrespective of the form her compensation took, she earned (and WTI was entitled to reimbursement, according to the Award, for) the reasonable value of her services.   The Arbitrator's attorneys' fees award in WTI's favor does not, as Mala craftily suggests on page 34 of its Application, constitute punitive damages in any form.   Indeed, WTI questions the sincerity of Mala's argument, especially when Ms. Lewis' requested fees were comparable to those for which Mala's attorneys themselves sought reimbursement.[115] Apparently, Mala "do[es] not object to the concept"[116] of Ms. Lewis being compensated with WTI stock options but rather to the valuation of the stock options Ms. Lewis received.

If a client is unable to pay an attorney with cash and the attorney agrees to accept payment for his/her services in the form of goods (*e.g.*, a cow), then the losing party would be required to reimburse the value of that those goods (in our example, such party would have to pay the value of the cow).   WTI was forced to hire, for the first time, a full-time general counsel as a result of Mala filing the arbitration proceedings.   Knowing the expense involved in handling

---

whether attorneys' fees are recoverable *and* what amount, in his discretion, constitutes a "reasonable" attorneys' fees award.

[113] *See Perez v. Velez*, 629 F. Supp. 734, 737-38 (S.D.N.Y. 1985); *Zacharias v. Shell Oil Co.*, 627 F. Supp. 31, 34 (E.D.N.Y. 1984); *Blum v. Stenson,* 465 U.S. at 900.   *See also Browning v. Peyton*, 123 F.R.D. 75, 78 (S.D.N.Y. 1988); *Brisbane v. Port Authority*, 550 F. Supp. 222, 224 (S.D.N.Y. 1982).

[114] *See Video-Cinema Films, Inc. v. CNN, Inc.*, 2004 U.S. Dist. LEXIS 1428 at *22-*23 (S.D.N.Y. 2004).

[115] *See* Ex. 25, Mala's attorney's fees, Exhibits G, H, and I to Mala's Reply Brief.

[116] Mala's Application, at 32.

such a complex commercial dispute, WTI was unable to pay Ms. Lewis for the full value of her services in cash, so it agreed to pay her in stock for handling this matter. Undisputed evidence was presented to the Arbitrator as to the value of that stock compensation, and the Arbitrator considered this evidence in awarding WTI the value of the stock payment.

Previously, WTI stock sold at a peak price of $2.50/share in 2000 to sophisticated investors who managed large investment funds. Since Mala decided to stop cooperating with WTI, WTI has been severely limited in acting upon its Business Plan and Growth Strategy. This devastated WTI's ability to grow exactly when investors are seeking performance. The fact that Mala made this decision over four (4) years ago precisely parallels WTI's declining stock value. WTI has **never** sold equity below $.50/share. The $.11/share value Mala claims is not supported by the record and improperly values $.01 warrants the same as a stock transaction. Evidence presented showed these warrant payments are for personal letters of credit that support WTI's credit facility.[117]

As stated in its Reply Brief to Mala's Post-Hearing Brief, WTI explained its calculation in valuing the stock options paid to Ms. Lewis. Primarily based upon Mr. Shea's unrefuted expert testimony valuing WTI's stock at $4.08/share and on Ms. Lewis' employment contract's provision calling for a $0.34 strike price for all stock options issued to her, WTI paid Ms. Lewis in stock options valued at $3.74/share. Realizing the difficulty in valuing Ms. Lewis' services at $654,500 (even though this is the real value loss to WTI by this stock payment for legal services), WTI divided the $3.74/share price in half (arriving at $1.87/share) when calculating the value of Ms. Lewis' 175,000 shares. This calculation produced a total payment to Ms. Lewis in stock equal to $327,250.00. Had WTI continued with outside counsel it easily would have

---

[117] Ex. 26, B. Hurse testimony, Tr. at 1377/5 to 1379/1 (explaining the warrant sales).

paid much more than this amount. Mr. Genoni even discounted this amount by another twenty percent (20%) even though this stock grant was specifically tied to performance solely in this matter. If it is Mala's desire to pay the amount of attorney's fees "supported in the record," then the evidence has Ms. Lewis' compensation in stock valued at $3.74/share. WTI and the Arbitrator have lightened Mala's financial burden on this front, and Mala has no basis from which to dispute Genoni's factual findings now.

It is worth noting that Mala cites no case law in support of its position on this issue. Applying the case law WTI has set forth above, Mr. Genoni's attorneys' fees award for WTI must be confirmed unless this Court finds such award (and, by extension, his opinion as to the value of WTI stock based on Mr. Shea's expert testimony and valuation report) to have been "completely irrational." Ms. Lewis' attorneys' fees award is rationally tied to the evidence that he had vast discretion to weigh and consider; therefore, Mr. Genoni's award of Ms. Lewis' reasonable attorney's fees found at least a minimally rational basis in the record and cannot be vacated here.

## F. MALA'S APPLICATION IS BASELESS AND FRIVOLOUS, AND FEDERAL LAW EMPOWERS THIS COURT TO REQUIRE MALA TO REIMBURSE WTI FOR ALL ATTORNEYS' FEES AND COSTS INCURRED IN CONNECTION WITH THE PRESENT ACTION.

Mala's Application displays Mala's animosity toward both WTI and Arbitrator Genoni, but, as discussed *supra*, a party's bitterness and disagreement with an arbitrator's factual findings or jurisdictional/arbitrability rulings are insufficient grounds for vacatur of his award where, as here, the parties have clearly agreed to arbitrate any disputes relating to their contract. When a party seeks to vacate the award of an arbitrator who, like Mr. Genoni, acted under a broad arbitration clause in issuing the award, a claim that the arbitrator exceeded his powers under 9

U.S.C. § 10(a)(4) is "frivolous" and entitles the responding party to an award of its attorneys' fees and costs incurred in defending against the moving party's baseless application.[118]

Federal courts award attorneys' fees upon the filing of frivolous applications like Mala's for good reason. As at least one court has established,

> While losing an arbitration may be unpleasant for an attorney to communicate and a client to digest, the experience is not significantly improved by the instigation of a doomed--and no doubt costly--legal action. Having in mind the standard of review and its effect on the relative strengths of the parties' positions, the Court grants [the responding party's] motion for an award of reasonable attorneys' fees in the action before this Court. [footnote omitted]

> Both federal and state decisions regarding judicial review of arbitration awards make it abundantly clear that the pertinent standard is very, very difficult to meet, and parties would be well-advised to take that standard into consideration before undertaking to persuade a court to vacate an arbitrator's ruling.[[119]]

Here, Mala and its capable counsel, knowing the difficult standard courts apply when examining arbitration awards (particularly where the parties' arbitration agreement is so broadly drafted), should never have filed the frivolous and baseless[120] Application to which this brief responds. For reasons explained extensively herein, Mala's assertions simply do not hold up beneath the scrutiny of the law, and Mala, knowing this to be true and having lost its case once

---

[118] *Dighello v. Busconi*, 673 F. Supp. 85, 88 (Dist. Conn. 1987) (holding that, where the contract contained a very broad arbitration clause giving the arbitrator broad powers to hear the parties' various disputes, a 9 U.S.C. § 10(d) [now 9 U.S.C. § 10(a)(4)] claim that he had exceeded those powers was "frivolous." *See also Dominion Video Satellite, Inc. v. Echostar Satellite, LLC*, 430 F.3d 1269 (10th Cir. 2005)(holding that appeal from district court's judgment confirming arbitration award was frivolous and entitled the responding party to seek attorney's fees incurred to defend such appeal).

[119] *Commercial Refrigeration*, 319 F. Supp.2d at 1271 (granting confirmation of the arbitration award, denying motion to vacate the award, and ordering the vacatur movant to pay the confirmation movant's attorneys' fees incurred in connection with the court proceedings).

[120] Indicative of Mala's "sour grapes" motivation is the scathing rhetoric found in Mala's Application, along with the fact that, after spending the first eight (8) pages of its Application bashing Mr. Genoni, his rulings, and WTI in general, Mala richly informs the Court of its recognition that, "because there was some evidence in the record that arguably supported WTI's position . . . [,] the Award cannot be challenged in regard to the above matters." Mala should have stopped there instead of wasting the Court's time with the other 25 pages of its Application.

already, chose to involve this Court instead of graciously admitting its failure and honoring the Arbitrator's well-supported and rational award. Accordingly, WTI respectfully requests that the Court award WTI all attorneys' fees and costs incurred in connection with Mala's challenge in this Court.

### G. IN ISSUING ITS JUDGMENT CONFIRMING THE ARBITRATOR'S AWARD, THIS COURT SHOULD REQUIRE MALA TO PAY WTI INTEREST ON THE PORTION OF THE AWARD IT HAS NOT PAID BY AUGUST 15, 2006.

As the Ninth Circuit Court of Appeals has noted,

> *It should be the rule, rather than the exception, that when arbitrators hand down an award the parties will comply with it, without the necessity of court proceedings*, just as it is (or should be) the normal or usual result that parties comply with a judgment, without the necessity of resort to process or appeal. In the case of judgments, with the exception above noted, the date of judgment is the latest date when interest begins, although appeal is available. **Likewise, in the case of arbitration awards, the date of the award**, unless the award be modified by the court, **should be the latest date when interest begins**. (See 47 C.J.S. Interest § 20).[121]

"The recognized general rule is that state law determines the rate of prejudgment interest in diversity actions" like the one before the Court.[122] As noted *supra*, New York law governed the arbitration, and New York law applies now for calculating the rate of pre-judgment interest to which WTI is entitled due to Mala's failure to fulfill its obligations to WTI by August 15, 2006 as the Award directs.[123] Therefore, New York law mandates that nine percent (9%) interest[124] be added to the amount of the Award Mala still has not paid by August 15, 2006, to be calculated from the date of the Award (July 10, 2006). WTI also requests that the Court impose post-judgment interest (using pertinent federal rules governing post-judgment interest calculations) on

---

[121] *Lundgren v. Freeman*, 307 F.2d 104, 112 (9th Cir. 1962)(emphasis supplied).
[122] *See Northrop Corp. v. Triad Int' Mktg. S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988).
[123] *See* Ex. 4, Award at 15.
[124] *See* NY CLS CPLR § 5004, "Rate of Interest."

any judgment it should enter confirming the Award, with such judgment to begin bearing interest as of the date such judgment is entered.

### H. MALA'S APPLICATION SHOULD BE PROMPTLY DENIED, AND WTI'S PETITION TO CONFIRM THE ARBITRATION AWARD GRANTED, WITHOUT INDULGING MALA'S PRESUMPTUOUS REQUEST FOR A HEARING.

In reviewing motions to vacate arbitration awards like the one Mala has filed here, federal courts often deny such motions and confirm challenged arbitration awards without conducting a full hearing, [125] especially where the issues have been fully briefed by both parties and no hearing is deemed necessary.[126] This Court is among those which have denied petitions to vacate arbitration awards without first holding an oral hearing of the issues.[127]

Here, Mala seeks "oral argument on the issues set forth [in its Application]."[128] WTI submits that this Court has all the information it could ever require for denying Mala's Application and confirming the Arbitrator's Award without need of oral argument, especially considering the voluminous nature of both parties' briefs and the arbitration record.

Based on the foregoing, WTI respectfully requests:

(i)      that Mala's Application to Partially Vacate Award of Arbitrator (and all relief requested therein) be DENIED;

(ii)     that WTI's Motion to Confirm Arbitration Award be GRANTED without the time and expense of a full hearing;

---

[125] *See, e.g., Legion Ins. Co. v. Insurance Gen. Agency, Inc.*, 822 F.2d 541 (5th Cir. 1987) (holding that the district court could properly rule on a motion to vacate arbitration award without conducting a full hearing).

[126] *See, e.g., Choice Hotels Int'l v. Felizardo*, 278 F. Supp.2d 590, 591-92 (Dist. Md. 2003); *Choice Hotels Int'l. v. Ghanshyam K. Patel*, 2004 U.S. Dist. LEXIS 23578 at *1 (Dist. Md. 2004).

[127] *See Cearfoss Constr. Corp. v. Sabre Constr. Corp.*, 1989 U.S. Dist. LEXIS 9639 at *2, *8, *10, *14, and *17 (D.C.D.C. 1989) (confirming arbitration award and denying vacatur petitioner's petition to vacate and request for oral hearing, noting the "exceptional circumstances" required for overturning an arbitration award, paying credence to arbitrator's responsibility "for making evidentiary rulings," and noting the rule that courts shall not "relitigate the merits" of arbitrated cases).

[128] Mala's Application at 35.

(iii)        that this Court would issue an enforceable JUDGMENT confirming the

Arbitrator's Award in its entirety; and

(iv)        that WTI's request for attorneys' fees, costs and interest be GRANTED.


Respectfully submitted, this 5th day of September, 2006.


    __/s/ William Sekyi_____
    William Sekyi (DC # 480325)
    FISH & RICHARDSON, P.C.
    1425 K Street, NW, 11th Floor
    Washington, DC 20005
    TEL:  (202) 783-5070

    *Attorney for Witten Technologies, Inc.*