# LICENSE AGREEMENT

This Agreement has been made on the date set out below between Malå Geoscience AB, a company incorporated under the laws of Sweden (hereinafter referred to as "the Licensor")and Witten Technologies Inc, a company incorporated under the laws of Delaware (hereinafter referred to as "the Licensee")

## WITNESSETH

WHEREAS, the parties have entered into a development agreement dated as of September 1997 for the purpose of working together in the development of a prototypical device for the detection of utility services, ("the Project")

WHEREAS, the new technology developed under the Project primarily is to be used for detecting and mapping pipes and cables using a vehicle mounted multichannel radar system for highspeed service, (the "Prototype")

WHEREAS, the parties intention is to establish proprietary rights to intellectual property, innovations and constructions developed during the period of this agreement and the Project.

WHEREAS, constructions and intellectual property developed under this agreement including the Project shall be exclusively owned by the developing party except that Mala will have sole ownership of any improvements to its hardware resulting from the parties development efforts.

WHEREAS, "Know-how"shall mean knowledge, experience, data, technology, designs, techniques, drawings, software, and other information and knowledge, relating in any way to the parties.

WHEREAS, intellectual property rights mean patents, trademarks, firms etc and applications for all such rights.

WHEREAS, Licensor agrees to allow Licensee use of its Know-how and inellectual property, and Licensee agrees to pay certain licens fees to the Licenso, upon the terms set forth in this agreement.

Civil Action No: 1:06-cv-01343 (RMC)

Respondent WTI Ex. No. 1

Arb. Ex. No: 3

1. Grant

Subject to the terms and conditions of this Agreement the Licensor grants to the Licensee a world wide

a, exclusive right and license to sell, use, lease and assemble, with respect to the detection of utilities only, all technology established or developed of the Licensor under the Project regarding the Prototype and to which the Licensor has established a patent or other intellectual property right or has applied for such right

b, non exclusive right and license to sell, use, lease and assemble, with respect to any application other than the detection of utilities, all other technology established or developed of the Licensor under the Project and to which the Licensor has established a patent or other intellectual property right or has applied for such right

The Licensee is entitled to utilize Licensors applicable patent, patent application and Know-How when exercising the rights granted above.

The Licensee shall have the right to grant sub-licenses on such terms and conditions as are compatible with the provisions of this agreement.

2. Sales promotion

The Licensee shall use its best efforts to promote the sales of the Product in the Territory. To that end the Licensee shall at its own expense provide the necessary pamphlets and other sales promotion material and the Licensee shall without delay and free of charge to the Licensor furnish the Licensor with a copy of all such material. Before use all sales promotion material shall have been approved by the Licensor. The Licensee shall create and maintain an efficient sales organization for the Product.

3. Remuneration

In consideration of the rights granted to the Licensee hereunder, the Licensee shall pay to the Licensor:

a) during the three year period (years 1-3) commencing on the date ("Commencing Date") on which the Licensee first sells, lease or itself uses the Product or any other product using the Licensors intellectual property rights, established or applied for, Licensee shall pay to the Licensor a royalty equal to five (5 %) percent of the Licensee´s gross revenue from sale, lease or use of the Product or such other products.

Such gross revenue shall be calculated based on the invoiced sales price, less any rebates except cash discounts.

b) during the three year period (years 4 -6 ) commencing on the third anniversiry of the Commencement Date, the Licensee Licensee shall pay to the Licensor a royalty equal to four (4 %) percent of the Licensee´s gross revenue from sale, lease or use of the Product or such other products. Such gross revenue shall be calculated based on the invoiced sales price, less any rebates except cash discounts.

c) from the seventh year from the Commencement Day the Licensee Licensee shall pay to the Licensor a royalty equal to three (3 %) percent of the Licensee´s gross revenue from sale, lease or use of the Product or such other products. Such gross revenue shall be calculated based on the invoiced sales price, less any rebates except cash discounts.

Additional costs, such as the costs of freight carriage packing, duties and all other charges, dues and taxes levied by the customs or in the country into which the goods are imported, shall be deducted if they are invoiced separately.

4. **Payment of Royalties**

The royalties shall be calculated for each calendar quarter. All royalties payable by the Licensee under this Agreement shall be paid in the currency in which the Licensee has invoiced its customer, provided however that such currency is freely convertible with the currency of the Licensor´s country, within thirty (30) days of expiration of each preceding calendar quarter. If for any reason any royalty payment could not be effected or if the invoiced currency is not freely convertible with the currency of the Licensor´s country then the royalty payment shall be effected in any currency chosen by the Licensor. In such a case the rate of exchange shall be the bankers buying rate recorded in the Licensor´s country on the last banking day of the relevant calendar quarter. The right to royalties on a Product shall accrue at on date of receipt of payment. Products used by the Licensee and/or its sub-licensees shall be deemed delivered on the date when first used.

5. **Accounting**

The Licensee shall keep true, accurate and consistent records and books of account containing regular entries relating to the manufacture, use, lease and sale of the Product or other products arising under this agreement by the Licensee. These records shall be ready for inspection and examination during normal business hours by duly

authorized representatives of the Licensor for a period of five (5) years following the end of the calendar year to which they pertain. Any such representatives of the Licensor shall be entitled to make copies and extracts of such books and records. The Licensee shall fully co-operate at such examination, and shall give any explanations that may reasonably be requested.

The Licensee shall at each time of payment of royalties due to the Licensor render report to the Licensor giving a true account of total manufacture, use, lease and sale during the preceding calendar quarter. The reports shall be accompanied by one set of invoices and show the number of Products invoiced by the Licensee and/or its sub-licensees during such calendar quarter aswell as the date of delivery, the aggregate net invoiced price therefore and the royalties thereby payable.

6. **Maintenance of Intellectual property**

Save as provided below the Licensor will during the life of this Agreement maintain all its intellectual property rigths and such applications in good standing in all countries of in which its intellectual property are issued or filed. The Licensor and The Licensee will equally share costs recording, registration, renewal and other similar fees in connection with maintaining the intellectual property and applications in good standing.

If the Licensor no longer wishes to maintain in force any intellectual property in one or more countries the Licensor will timely notify the Licensee and the Licensee may at its own expense maintain the intellectual property in such a country from the date of notification until the termination of this Agreement.

7. **Infringement by third parties**

The Licensor and the Licensee shall give each other prompt notice of any acts of infringement by third parties involving intellectual property rights relating to the new technology of which the Licensor or the Licensee has knowledge and they shall consult together in to determine the course of action, if any, to be taken in such circumstances. The Licensee shall assist the Licensor in proceeding against an infringer provided however that a party taking such action shall remunerate the other party for its costs. If the parties are unable to agree on any joint course of action to be taken then the Licensor may in its own discretion decide whether or not to take action against the infringer. If the Licensor decides not to take action against the infringer then the Licensor may authorize the Licensee to take such action at its own expense and to keep any damages which might be awarded; such authorization not to be unreasonably withheld.

8.    Confidentiality

Each party undertakes to keep all trade secrets, confidential and other information, whether oral, in writing or in computer form, whether of a technical nature or otherwise, or in any manner relating to the business affairs of the parties, as confidential.

The obligation to keep the above mentioned information strictly confidential shall survive the termination of this Agreement and shall continue in force until the Know-how has been generally disclosed to the public other than by breach of this obligation.

9.    Indemnity

The Licensee shall have complete and exclusive responsibility for all its activities and the Licensee undertakes to indemnify and hold harmless the Licensor of any liability, direct or indirect, resulting from the use, manufacture, sale or lease of the technology, including but not limited to claims from third parties, absent bad faith or willfull misconduct by the Licensor.

Without limitation and included in the above indemnification, the Licensee is responsible for any infringement on patent or any other intellectual property rights belonging to a third party due to the use, manufacture, sale or lease caused by the Licensee without any right of recourse against the Licensor.

10.    Commencement and Duration

This Agreement becomes effective on the date of signing by both parties and shall remain in force as long as any intellectual property rigth, any intellectual property rigth issued pursuant to the intellectual property application or any improvement is valid and in good standing.

11.    Premature Termination

Without prejudice to any remedy it may have against the other for breach or non-performance of the Agreement either party shall have the right to terminate this Agreement by giving the other party not less than thirty (30) days notice in writing if the other party should commit or permit a material breach of any of the obligations herein contained and should fail to remedy such breach within thirty (30) days after receipt of notice from the complaining party.

Either party shall have the right to terminate this Agreement with immediate effect if the other party should enter into liquidation, either voluntary or compulsory, or become insolvent, or enter into composition or corporate reorganization proceedings or

if execution be levied on any goods and effects of the other party or the other party should enter into receivership or bankruptcy.

12.          Assignment of the Agreement

Neither party to this Agreement may wholly or partly assign or pledge its rights or obligations under this Agreement to any third party, exept from the above mentioned rigth of sub-license, without the prior written consent of the other party.

13.          Taxes

All taxes of whatever kind levied in the country of the Licensee shall be paid and borne by the Licensee.

14.          Force Majeure

The parties shall be relieved from liability for a failure to perform any obligation under this Agreement during such period and to the extent that the due performance thereof by either of the parties is prevented by reason of any circumstance beyond the control of the parties, such as war, warlike hostilities, mobilization or general military call-up, civil war, fire, flood or other circumstances of similar importance.

The party desiring to invoke an event of force majeure shall give immediate notice to the other party of the commencement and the cessation of such event of force majeure, failing which the party shall not be discharged from liability for any non-performance caused by such event of force majeure.

Both parties shall make all reasonable efforts to prevent and reduce the effect of any non-performance of this Agreement caused by an event of force majeure.

15.          Amendments

Only those amendments and additions to this contract that are made in writing and signed by the following officers of the parties shall be givin force and effect.

16.          Notices

Any notice, request, demand or other communication to be given or made pursuant to this Agreement shall be given in writing addressed:
          (a)          in the case of Mala, to it at Skolgatan 11, S-930 70 Mala
          (b)          in the case of Witten, to it at 2509 P Street, N.W.,
Washington, D.C. 20007;

(c) or at such other addresses as Mala and Witten may from time to time notify to each other. All such notices, requests, demands or other communications shall be deemed to be given by one party when received by the other.

17. **Arbitration.**

The parties shall endeavor to settle all disputes by amicable negotiations. Any claim, dispute, disagreement or controversy that arises among the parties relating to this Agreement that is not amicably settled shall be resolved by final and binding arbitration, as follows:

(a) Any such arbitration shall be held in the District of Columbia, before a single (1) arbitrator who shall be impartial. Except as the parties may otherwise agree, the arbitrator shall be appointed by the appropriate official in the District of Columbia office of the American Arbitration Association or, in the event of his or her unavailability by reason of disqualification or otherwise, by the appropriate official in the New York City office of the American Arbitration Association. In determining the appropriate background of the arbitrator, the appointing authority shall give due consideration to the issues to be resolved, but his or her decision as to the identity shall be final. Except as otherwise provided in this Section, all of the arbitration proceedings shall be conducted in accordance with the applicable commercial arbitration rules of the American arbitrator Association.

(b) Notwithstanding anything to the contrary herein, the parties agree that violation by any party, person or entity of any provision in sections 3, 4 and 8 to this agreement may cause immediate irreparable harm, and either party shall be entitled at any time to initiate legal action in a court of proper jurisdiction seeking injunctive relief preventing any violation of sections 3, 4 or 8 of this agreement.

(c) An arbitration may be commenced by any party to this Agreement by the service of a written request for arbitration upon the other affected parties. Such request for arbitration shall summarize the controversy or claim to be arbitrated, and shall be referred by the complaining party to the appointing authority for appointment of an arbitrator ten (10) days following such service or thereafter. If the arbitrator is not appointed by the appointing authority within thirty (30) days following such reference, any party may apply to any court within the District of Columbia for an order appointing an arbitrator qualified as set forth below.

(d) All attorneys' fees and costs of the arbitration shall in the first instance be borne by the respective party incurring such costs and fees, but the arbitrator shall have the discretion to award costs and/or attorneys' fees as he deems appropriate under the circumstances. The parties hereby expressly waive punitive damages, and under no circumstances shall an award contain any amount that in any way reflects punitive damages.

(e) Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(f) It is intended that controversies or claims submitted to arbitration under this Section shall remain confidential, and to that end it is agreed by the parties that neither the facts disclosed in the arbitration, the issues arbitrated, nor the views or opinions of any persons concerning them, shall be disclosed to third persons at any time, except to the extent necessary to enforce an award or judgment or as required by law or in response to legal process or in connection with such arbitration.

## 18. General Provisions

18.01 The provisions of Sections 2, 3, 4, 5, 8, 9, 16, 17 and 18 of this Agreement shall survive any termination of this Agreement.

18.02 This Agreement may be executed in more than one counterpart, each of which shall be deemed an original and all of which together shall be deemed one and the same instrument.

18.03 This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto.

18.04 This Agreement may not be amended or otherwise modified except in a writing signed by all parties to the Agreement.

18.05 This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and amends and restates in their entirety all other agreements, representations, understandings and the like in respect thereof.

18.06 This Agreement shall be governed by and construed in accordance with the law of New York State and the parties hereto irrevocably submit to the non-exclusive jurisdiction of any federal court.

IN WITNESS WHEREOF, MALA GEOSCIENCE A.B.. and WITTEN TECHNOLOGIES, INC. have caused this Agreement to be executed and delivered by their duly authorized representatives, to be effective as of the Effective Date.

MALA GEOSCIENCE A.B.
a Swedish Corporation,

By

WITTEN TECHNOLOGIES, INC.
a Delaware Corporation

By:

October 7, 2005

*BY ELECTRONIC MAIL & USPS*
Timothy D. Kelly
Kelly & Berens, P.A.
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

WITTEN
TECHNOLOGIES INC

*Re: 50 199 T 00261 05 Mala Geoscience, AB v. Witten Technologies, Inc. – Witten's Response and Counter Claim to Mala's Demand for Arbitration*

Dear Tim:

Thank you for providing Witten Technologies, Inc. ("Witten") a more clarified Demand for Arbitration from Mala Geoscience, AB ("Mala"). This letter will serve as a supplement to the response filed for Witten by Steve Smith of Powell Goldstein on June 17, 2005. Please find our response laid out in a similar fashion as the demand which precedes our Counter Claim against Mala.

**I. <u>WITTEN'S SUPPLEMENTAL RESPONSE TO MALA'S DEMAND FOR ARBITRATION</u>**

<u>FRAUD IN THE INDUCEMENT</u>

Witten agrees with Mala in their claim that the "Agreement has not operated as envisioned, planned and projected by <u>both sides</u>." Mala and Witten both envisioned the Computer Assisted Radar Tomography ("CART") would break into the market and generate immediate recognition and sales opportunities. Witten still believes this is possible if Mala would abide by the contracts and produce a CART that is commercially viable and reproducible. Without that ability, it is just a prototype incapable of greater uses. It is not a genuine argument for Mala to claim fraud in the inducement because: 1) Mala was more aware of the market than Witten because of their already established world wide business in ground penetrating radar ("GPR"); 2) they can not prove the elements as required under New York law; 3) promises of future actions is not a fraud, especially since this was not a pre-existing business or market in which to solidly base ones expectations and then claim fraud when those expectations were not met; and 4) Mala has consistently frustrated the purpose of the License Agreement ("LA") in numerous ways.

The purpose of the Prototype Development Agreement ("PDA") and the LA was to combine the specialized skills of both companies. Mala, as they stated is "a world leader in developing and manufacturing commercial ground penetrating radar" and Witten, a younger company with cutting edge

Erin L. G. Lewis, Esq.
GENERAL COUNSEL
3638 Overlook Ave.
Macon, GA 31204
PHONE 478.474.6644 or
404.808.0812
FAX 478.474.8688
erinlglewis@aol.com

Civil Action No: 1:06-cv-01343
Respondent WTI Ex. No. 2
Arb. Ex. No:

processing technology could together generate a market not yet realized, much less tapped into. Together the two companies were going to forge ahead into uncharted waters if they could take both of their skills and as they stated, "develop something that had not been done before." The purpose of the collaboration was to produce a unit "with multi-channel radar system for high speed service" that generated quality 3 dimensional images which could be replicated to readily supply the market.

Furthermore, when Tom Fenner, President of Mala Geoscience, USA approached Witten about a collaboration, Witten had already been introduced to the market through all of Dr. Witten's previous academic publications but also by an article and an image of a buried pipe published in *Defense News*, the defense industry's most notable magazine. Witten along with Robert Green had found a way to create an image of a buried utility using geophysical diffraction tomography (GDT) that was unmatched by America's top defense contractors. Because of the possibilities of making this technology mobile and capable to locate utilities, Mala and Witten saw great possibilities. Jan Reynning, Chairman of Mala said to Mr. Green in Washington, D.C. back in the Summer of 1997 that the existing $50 million per year GPR market could grow tenfold with the development of the CART. Likewise, Mr. Reynning believed the $1 billion per year service market would grow.

Legally, Mala can not prove any of the elements required under New York law which the parties chose this contract to be construed under. For one to make a claim of fraud in the inducement, there must be a misrepresentation of a "material existing fact, falsity, scienter, deception and injury." Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 406-407 (N.Y. 1958). Mala can not reasonably state, much less prove that Witten "knowingly uttered a falsehood intending to deprive [Mala] of a benefit and that [Mala] was thereby deceived and damaged." *Id.*

New York case law also seems to suggest that this claim might not even be grounded in fraud, but when involving a contract, is likely to be just a breach of contract. *See* Spellman v. Columbia Manicure Mfg. Co., Inc., 111 A.D.2d 320, 489 N.Y.S.2d 304, 308 (1985) *See also* Tesoro Petroleum Corp. v. Holborn Oil Co., Ltd., 108 A.D.2d 607, 484 N.Y.S.2d 834, 835 (1985) ("a failure to perform promises of future acts is merely a breach of contract"). Either way, Mala can not prove that Dr. Witten, Robert Green, Shane Green or Witten as a corporate unit ever had the intent to deceive Mala when their professional goals encompassed only the success of the CART into the marketplace.

In the third paragraph on page two of Mala's demand, Mala says that they agreed to an exclusive contract with Witten so long as they "exclusively owned the rights to the hardware and the embedded signal processing software then in development." Your are correct in that Mala was to develop the hardware and

Witten was to supply the software. However, no where in the contract does it say that Mala was to receive the "embedded signal processing software" of which Alan Witten and Tony Devaney had been working on for almost a decade. That technology caused Witten Technologies to be formed and Witten would not sell off its major IP for the development of this CART. No one else could do what Witten and Devaney were doing so it is even an illogical argument as well as not being evidenced in the contract that Witten would relinquish such a valuable asset.

On the first page of the LA, ¶5 states "construction and intellectual property developed under this agreement including the Project shall be exclusively owned by the developing party [not Mala] except that Mala will have sole ownership of any improvements to its hardware resulting from the parties development efforts." Mala was to have improvements to their hardware, not to the essential technology developed by Witten that would make their hardware marketable with the CART. Furthermore, what is conspicuously left out twice of ¶3 on p. 2 of your letter, the "use, sell, or lease" language was Witten's right to "the use, manufacture, sale or lease" as stated collectively every single time throughout the LA.

In response to your itemized representations supposedly made by Mr. Green, Witten is incapable of responding specifically at this moment without further discovery, but in general makes the following response:

a. Witten has raised over $10,000,000 in investor capital to develop our software, Mala's hardware and create a commercial network. However, as of this moment, Mala cannot deliver the "commercially relevant" CART equipment in reproducible quantities that enables a commercial network to actually operate. Witten's software has been ready for years and we believe Mala is perfectly capable of delivering the equipment to which we all agreed upon. However, Witten is unsure as to why Mala is deliberately refusing to abide by the terms;

b. – d. In a market and business not yet realized, Mala who is a "world leader" in their industry knew these numbers were all speculative and are not actionable because they did not come into fruition as all thought they could. Mala, of all people, did understand the implications of Witten's software merged into a radar array. If any party understood the market and its needs, Mala did. Mala is one of the world's oldest manufacturers of electromagnetic geophysical instruments. Jan Rynning has even stated to Robert Green that it takes 10 years to bring a new product to market. Rynning delivered a copy of Geoffrey Moore's book, *Crossing the Chasm* to Green last year affirming the time required to accomplish new product adoption.

Logically speaking, how can one put a definitive number on something that has not even been approved by the FCC much less not even been developed yet? Mala agreed with these numbers and the possibility of success. That is why they agreed to the exclusivity provision. This was not a creation of a dry cleaning business in Atlanta, Georgia or some other well established industry with an established product in an established market. Mala can not now use this as the foundation of their argument that they were "duped" into this contract. Mala did not even deliver the first CART prototype until around the first of the year in 1999 so it is difficult to understand how Mala would now make its claim stated in subsection "d." No one truly knew how long it would take to develop the CART, refine the software and obtain product adoption. But all knew the implication once this was achieved.

Lastly, the future performances suggested by Witten did not contemplate Mala delivering the specified equipment of the PDA that would be not be reproducible. That was why under the PDA and LA royalties were expected to be paid to Mala, there was the presumption of commercial reproducibility. Hence, the PDA presumed commercial viability for success. Commercial viability requires readily available equipment free from major defects. Mala, today cannot or will not produce a commercially relevant CART.

It appears they are deliberately hiding behind an FCC regulation (which Mala knew well in advance of in 2002) that has outmoded their timing circuit in the 6' wide array. In spite of promises they have refused to apply to the FCC approval of the wider array (as GSSI did). This prevents the reproduction of the commercially relevant CART. As of this date, only 8 CARTs manufactured by Mala exist that can be used in the US. Mala's own Licensee, General Engineering and Geophysics, (GEG) has possession of two. No more can be built and shipped into the US. How can Witten serve a possible $2 billion dollar market with 6 CARTs? It is an absurd claim by Mala that Witten made representations that it knew it could not fulfill.

The facts are this is a tougher market to penetrate than expected. It was assumed by all parties prior to entering into the Prototype Development Agreement ("PDA") that if the utility and governing communities could see what the technology would produce they would quickly adopt a more enhanced and efficient way of performing work. Because this was such a new technology, there had to be continual efforts to prove to a skeptical community with demanding clients, the quality and reliability of the imaging. These problems had nothing to do with Witten's performance, representations or intent when entering the contract.

It is a more correct statement to say that Mala and Witten were attempting to create a new market rather than penetrate one. The goals to become the "standard" for the industry were lofty ones, but achievable. Witten has used all resources to try and realize the CARTs potential. Unfortunately, if the right equipment is not available from Mala because it is either incapable or just refusing to provide a commercially relevant CART, Witten is not responsible for the results caused by Mala's breaches.

Witten did not need to induce Mala into anything and Mala did not need to rely on any numbers set forth by Witten. Mala knew the market and knew that once the technology was fully realized, its capabilities were nearly immeasurable. Mala knew no numbers were true and accurate because there was no existing business in which to base them. Mala can not prove that Witten fraudulent induced them into signing the LA either under the laws of New York or under the contract. This claim fails on its face.

BREACH OF SALES ORGANIZATION OBLIGATIONS

Witten is not in breach of the sales obligations of the LA. The provision as set forth in the contract is not enforceable under New York law and can not be used as a claim for breach of the LA. Furthermore, Witten's efforts far exceed any good faith requirements read into the agreement.

The "Sales Promotion" Section numbered 2 of the LA is not valid under New York law and is an inapplicable measuring stick by which to claim a breach of the LA by Witten.

It is well settled law in New York that:

> "there is no material issue of fact to be resolved with respect to whether [a party] utilized or was permitted to utilize its "best efforts" ... [w]here, as here, a clause in an agreement expressly provides that a party must use its "best efforts", it is essential that the agreement also contain clear guidelines against which to measure such efforts in order for such clause to be enforced ... [s]ince this agreement contained no guidelines to define the term "best efforts", the [party] cannot seek to enforce its right to payment under this portion of the agreement.
>
> Strauss Paper Co. v. RSA Exec. Search, Inc., 260 A.D.2d 570, 571 (N.Y. App. Div. 1999).

Under this law, Mala can not apply an undefined and vague standard to Witten and rescind the contract claiming a material breach. No where in the contract are guidelines or goals by which Witten is to obtain or be measured. Based

just on these legal principles, Mala's argument for breach of sales organization obligations fail.

To show that Witten has been diligently pursuing marketing and sales campaigns for the CART in good faith, please see Exhibit 1. It outlines some of the events attended by Witten just in 2004. Since 2000 Witten has been engaged in placing our scientist and marketing personnel on important boards and councils that promote our technology. Witten has also won numerous awards and been the feature of national articles. *See attached* Exhibit 2.

Witten has employed four individuals over the past 5 years who have served full time in Sales and Development or Marketing. In addition to these four individuals, Witten has also had numerous people who have committed substantial efforts to these same tasks, either working independently or in conjunction with our full time Sales/Marketing person. At least 5 national or multi-national companies have also assisted in these efforts. These preeminent companies being recognized in their fields and locations were able to help Witten and Mala's CARTs generate an identification that might have been impossible to do otherwise.

The extensive efforts exerted by Witten have caused state law (FL) and national standards to change in our favor. More recently at the NHUC (National Highway Utility Conference) at St. Pete Beach, FL, a presentation by one of our competitors who represents an international engineering firm listed our CART as one of the standards in the industry.

As stated previously, Mala had not even completed the prototype development until around 1999. It took Mala two years to give Witten this prototype. It took Witten two years to make it work in a commercially relevant way. Witten was not in a position to launch a national campaign until there was a product to offer. Even today, Witten must have delivery of the CART in a commercially viable condition and sufficiently reproducible way such that they are available in sufficient numbers in order to advertise confidently. It has looked poorly on Witten in the past when we have tried to supply CARTs and Mala's supply was either non-existent or was delivered inoperable.

In the fall of last year Mala supplied Witten with a CART for one of Witten's sub-licensees. After Mala delayed delivery for 30 days while they prepared the CART, when the CART was picked up Witten found problems with the CART that rendered it unusable. Tommy Leijon, Mala's President told Mr. Green and others that on the "29th of November Robert Green left a voice mail on Matt Wolf's cell phone [President of Mala USA]. He only said "Matt, give me a call" no mentioning about a missing measuring wheel. Without giving a reason for why he was to call Robert Green, Matt Wolf of course did not call back."

Witten attempted to contact Mala via email on the 1st and 20th of December and it wasn't until a third phone call in which Witten's issues were finally addressed. This is just one example of how Witten has been prohibited from fully promoting the CART to the interested community. Requests are often met with obstreperous behavior (as in the above email) or unacceptable equipment. Witten's sub-licensee refused to make royalty payments to Witten for three months because the condition of the CART delivered by Mala.

What has also proven to be a difficult hurdle for Mala is its inability to provide a CART with FCC approval that is not already used and/or damaged. Mala of Sweden had over a years notice of the upcoming FCC changes. In 2002 Matt Wolf warned of supply problems with the changes that would be implemented. Yet Mala's competitor, GSSI, has their own CARTs (TerraVision) that are 6' wide and FCC approved. They can be delivered in unlimited quantities. The market demand is easily in the hundreds of CART units and some feel thousands. This demand was impossible for Witten to meet when Mala's CARTs were not available or in a commercially reproducible form.

To respond to your specific bulleted points made on p. 4:

- The ASCE put Alan Witten on the SUE Standards Committee, which is the most important committee that controlled the adoption of GPR systems;
- Witten was unable to begin this campaign at this time in part due to Mala not finishing their part of production until the beginning of 1999. Witten then needed to complete its part of the software and CART positioning development once the Mala hardware was provided. Incidentally, it was during this time that Mala was actively pursuing Witten to buy them out because of their apparent financial distress. Because of Mala's financial position, Witten had to pay Mala's portion of their hardware patent fees which they agreed to pay in Section 6 of the LA.
- Dr. Witten was already well known for all of his innovative technology, in 1999. He was more concerned with getting the CART commercially ready because it had taken Mala longer than expected to complete the first prototype. It is unreasonable for Mala to take longer than expected on their part then require Witten to instantly produce a highly complex adaptation of the software ready to operate on the CART. Mala actually had the less complex part of the development because they could follow the previous work of their competitor, GSSI. Witten had no other examples to follow. Our work was the first of its type.
- The CART was not ready for demonstrations until May 2001. Once it was ready, Witten, with the help of the Electric Power and Research Institute ("EPRI") immediately began promotion of the product. *See* Exhibit 3, *EPRI Service Opportunity* (distributed worldwide). Witten also won the Wall Street Journal Award for the most Innovative Software in 2004 for its work on the CART.

- Witten prepared and issued thousands of sales brochures as Mala already knows. Witten did have additional market studies performed, one being a report by Hitachi.

It is interesting that so much of Mala's complaints are prior to the CART being ready for market. For years since then, Witten was extremely forbearing with Mala in allowing them time to create a reproducible 6' wide array and correct the FCC problem. Witten was concerned that Mala would refuse to deliver or maintain equipment (as they are now doing and have harassingly threatened to do numerous times every year). Witten felt that in spite of every problem, Mala's inducement of Witten into the agreements with manufacturing rights would enable Witten to build their own equipment if Mala failed to do so.

Mala complained to Witten that it thought the uptake was too slow. In an effort to prove to Mala that it was not due to a lack of effort on Witten's part, Witten permitted Mala to sub-license CARTs themselves. To date, Mala's sub-licensee has failed to even compare to Witten's efforts.

More recently, Witten tried to accommodate Mala's wishes when in February of 2005 they solicited a reseller software licensing agreement from Witten. This was to allow them to pursue more of the international business opportunity alone. The language Mala presented as a software resale agreement in effect would have allowed them to co-opt Witten's entire business opportunity, not be just a software reseller.

Desiring to avoid any room for misinterpretation, Witten employed the services of Powell Goldstein to write an appropriate resale agreement that protected all parties. Mala refused to accept a fair and reasonable agreement. It appeared that Mala was interested only in Witten's business opportunity and control of our intellectual properties. Since this effort by Mala failed, they now are attempting to terminate the LA without cause.

After years of Mala failing to deliver a commercially relevant CART, Witten was forced to begin to try and manufacture its own CARTs. Since exploring this option, Witten was recently surprised to discover that Mala's Licensor, GSSI, is claiming Mala was not permitted to grant Witten the right to manufacture. In the LA, five times it references Witten's right to manufacture. When confronted by Witten, Mala refused to produce the license agreement it has with GSSI to confirm that Mala was able to grant Witten the right to manufacture.

This makes it very difficult for Witten to fully seize the market when they are questioning their supplier's abilities and commitment to providing the CART the market requires. What is even more interesting, in September of last year the Gas Technology Institute held its annual meeting in Manteno, Illinois. There was a presentation of "GPR Manufacturer's Shootout." All of the major

manufacturers, Vermeer, GSSI and Sensors & Software were present. Mala was not. This was shocking to Witten that Mala was not even appearing at such important events. In spite of these questions, Witten has remained fully committed to selling and marketing the product even if Mala is not.

The law in the state of New York is well settled in that the courts will not apply a best efforts provision against a party unless the contract specifically lays out the guidelines that would qualify as being one's "best efforts." From a policy standpoint this is a highly logical application of law because otherwise best effort provisions would lead to abuse. Witten's sales and marketing has been highly effective and has made this company recognized as the world's leader in an industry that did not even exists 6 years ago. Witten has been recognized through various national awards, articles and well respected people in the industry. There is no other way to attribute this success other than to the efforts of a successful and qualified network of sales people.

INSOLVENCY

Witten admits that Mala's numerous breaches of this LA has put Witten in a financial position that was difficult at times. Witten believed that by this time it would have ready access to numerous commercially relevant CARTs that had marketable viability and FCC approval. It is highly specious that Mala is making this claim of insolvency against Witten. Mala is the reason Witten continues to have to raise investments through diluting its ownership of a valuable patent portfolio rather than licensing our software and operating and leasing a commercially viable CART. Furthermore, it is also highly suspect that Mala makes this claim when: it was just recently notified by GSSI that it was in breach of their license agreement for non-payment; and Mala is currently refusing to pay Witten $16,000 for a software upgrade they received pursuant to another agreement between the parties.

Witten has been late or not made certain payments to Mala because Mala provided to Witten inoperable equipment. Witten refused to make certain payments until Mala cured the defects. Mala was to provide to Witten various documentation on the CART so that it could be repaired on the jobsites thereby creating efficiency, saving money and time. To fully operate the CARTs Witten has requested: a user manual; troubleshooting guide; notes on bugs and work-arounds; preventative maintenance and servicing guides; any kind of warranty information outlining Witten v. Mala's responsibility for repairs; power specifications to run the system for optimal performance; the amount of coaxial between the antennas and control box. Lastly, Mala has never been able to repair the equipment in 3 business days or less. Mala has never provided such items yet they claim we are insolvent because they have prohibited us from running an efficiently reactive business plan.

These refusals on Mala part has generated numerous specific issues with Witten's work for customers, namely:

- Overall ruggedness and reliability is insufficient;
- Insufficient protection of Control Unit and antennas from power supply surges;
- Antennas not packed ruggedly or waterproofed (leads to a lot of accidental defects on bow-tie antennas and water/moisture damage and corrosion;
- Seam between antenna electronics and antennas prone to moisture/water damage and corrosion;
- RS232 Communication between Control Unit and control computer not always stable (Witten is not sure of the cause because we have been barred from access to the necessary diagrams); and
- Antenna responses are not similar enough (antennas are not properly matched).

Aside from all of the above mentioned problems our relationship with Mala has presented, Witten has continued and continues to this day to pay its debts. We continue to operate at a loss but many companies do so without a frustration of the purpose of their businesses. Witten has sought assistance through partnership type agreements with various companies. A couple of them did not present the opportunities Witten had anticipated. However, Witten in no way settled with these entities in a manner that "significantly burden[ed] its future revenue stream with obligations to the departed partners."

Witten has raised over $10,000,000 which has paid for numerous activities required to bring the CART to market. This includes paying for necessary payroll, research and development, contract negotiations, litigation and other professional activities required by almost every business. Witten's patent portfolio and available licenses provide Witten the necessary assets to continue to realize what they have been attempting to achieve for ten years.

The lack of a commercially viable CART is the primary reason for Witten's illiquid position even though it is still not insolvent. Mr. Leijon has stated that there is no market and has recognized that some of the CARTs are more than seven years old. In spite of written promises, he refuses to make final developments. His reasoning is that he will not complete the development until he sees the market in which to pay for the improvements. Which Mr. Leijon stated in an email in January that he did not see any market, yet he petitions this court to ask to be free to pursue the same market.

This refusal by Mala works two fold in that: 1) Witten continues to be forced to sell portions of its asset base because Mala will not produce a relevant CART;

and 2) Witten is limited in its sales efforts when only a prototype CART is available for demonstrations. Customers want to see a 6' wide commercially reproducible CART with the performance characteristics embodied in the PDA 8 years ago. Witten can not show them this because Mala is refusing to manufacture it, yet the competition does not appear to have this same problem.

Witten is not insolvent even though Mala's unclean hands have constantly precipitated the sale of parts of Witten's asset base to cover cash demands. Mr. Leijon is right in that there is no market for Mala's prototype CART. Until Mala produces the commercially relevant CART as it said it would do or until Witten is finally permitted to manufacture itself, Witten will continue to be forced to sell securities to cover cash flow demands.

## II. WITTEN'S COUNTER CLAIMS AGAINST MALA

### A. BACKGROUND

In order to understand the issues of this case, one must first understand the history. Witten was formed in October 1994 by Dr. Alan Witten and Robert Green. *Please see* Exhibit 3 (resume of Dr. Witten as of 1996) (deceased, 2005). Dr. Anthony Devaney became involved shortly thereafter. Witten and Devaney were college roommates and had both studied under the world famous physicist, Dr. Emil Wolfe. Dr. Wolfe wrote physics' seminal text in optics, *Principles of Optics.* Devaney was considered by Wolfe to be his brightest student in optical theory ever. Because of the life long familiarity with Devaney's theories, Alan Witten became the first man to truly understand and be able to apply Devaney's most important theory, Geophysical Diffraction Tomography (**GDT**).

In 1984, while working as a scientist at Schlumberger's research facility in Ridgefield, CT, Devaney collaborated with Wolf to write a number of important patents. Among these were several patents on GDT. Based in optical theory, the patent lead to a CAT-scan-like image of the underground.

Dr. Witten independently worked on making the patents relevant for field use. In 1987, while working as a geophysicist at Oak Ridge National Laboratory, Dr. Witten undertook an experiment with GDT to try to figure out how to create an image. He was successful and became the first person to reduce GDT to practice by acoustically imaging a buried water line. GDT was so complex, it took Devaney and Witten two years to fully understand what they had observed.

By the early 1990's, GDT was rapidly changing the world of oil and gas exploration, from a 2- dimensional world into a 3-dimensional one. Devaney's patents in GDT were finally incorporated into Schlumberger's exploration

practices by a team of scientists at Schlumberger led by Mike Oristaglio, a seasoned geophysicist whom Tony had hired and later became the President of Witten in 2002.

To test the ability to adapt GDT, Green and Witten built an "acoustical camera" in 1993 to image a pipe they had buried in a Florida lake. They spent over a year lakeside attempting to verify the high-resolution capabilities of GDT. The experiments were a success, and the results were reported worldwide and in the magazine, *Defense News.*

At that point, Green began the actions which ultimately formed Witten in October of 1994. Mala and Witten's relationship began in 1996 through Tom Fenner, then President of Mala USA. Both companies were small and were looking for improvements in ground penetrating radar ("GPR"). Witten was seeking a manufacturer to build an array so that Dr. Witten's technology could be tested. Upon reading Dr. Witten's papers, Jan Rynning, Chairman of Mala of Sweden, recognized Dr. Witten's unique skills.

In 1996, an agreement was reached with Mala GeoScience of Sweden to build an array of radar transmitters and receivers that would provide quality data with the speed necessary to test Witten's technology and signal processing capability. The prototype radar array was delivered in January 1999 for testing.

By the late 1990's, Witten was making filings at the US Patent office, long before the market or competitors even understood the emerging ability to "see underground." Today, Witten's combination of hardware/software /patents are beginning to play a large role in the underground construction /engineering market.

With the employment of Tommy Leijon in 2002, Mala decided to try and change the course of the relationship with Witten. These changes by Mala were identified by Green during the final phases of the research and development of the CART. In an attempt to work things out, Green gave Mala the right to sell the CART's in Europe so long as Witten's software and business plan was employed. Mala made no sales.

By 2002 into 2003 it became apparent that Mala had decided to abandon all their obligations to Witten. Through frivolous reasoning, deceptive agreements and fraud, Mala did not to produce the commercially viable CART developed pursuant to the PDA. This deception has effectively cut off Witten's access to the key component necessary to develop markets around the visions and agreements of Witten and Mala. It has caused severe and enormous financial damage to Witten.

B. **FRAUD IN THE INDUCEMENT:** 1) FAILURE TO REVEAL GSSI LICENSE AGREEMENT TO RADAR ARRAY; AND 2) LACK OF AUTHORITY TO LICENSE WITTEN TO MANUFACTURE RADAR ARRAYS

Mala's fraudulent inducement of Witten to sign the LA was perpetrated in two parts. Firstly, Mala represented to Witten that it owned the rights to the radar array and jointly, the two companies could merge their technology into a single unit that would hopefully change an emerging industry. Secondly, at Witten's insistence, Mala conveyed to Witten in the LA the right to manufacture the radar array. Witten demanded this to prevent just such actions as Mala is currently taking.

In 1997 when Witten initially discussed going into an exclusive arrangement with Mala, a key element of the LA was the radar array. Witten not only wanted a license to use Mala's radar array in the CART, but Witten also wanted to have the ability to manufacture the radar array. References to this original intent are evidenced in at least five sections of the LA.

Years after the LA and PDA were signed, Witten learned that Mala's rights to the radar array came from a license they received from Geophysical Survey Systems, Inc. ("GSSI"), the GSSI/Mala license. Prior to that time Witten was unaware that a critical component to the LA and PDA hinged upon a sub-license from a party in which Witten had no business relations. This material element in which the entire venture was based was fraudulently concealed from Witten in order to induce them into signing a contract with Mala.

During the extensive due diligence process conducted by both parties, Mala failed to reveal the GSSI/Mala license to Witten. Had Mala done so Witten would have been forced to consider the impact of the GSSI/Mala license on Witten's business plan or have demanded to see a copy of the license. Not only was a business relationship being established with Mala, Witten would have required assurances from GSSI that Witten would not be cut off from radar arrays should Mala default.

Witten would also have had the opportunity to determine if Mala was authorized to convey to Witten the right to manufacture. Witten was denied this opportunity because of Mala's concealment of the license. Mala knew it did not have the authority to convey manufacturing rights to Witten, yet Mala induced Witten to sign the LA based on that premise. When recently confronted by Witten to produce the necessary documents to manufacture or even make repairs on jobsites, Mala suspiciously refused to do so.

Over the summer Witten received a call from GSSI's President Dennis Johnson. He informed Witten that Mala had defaulted under the GSSI/Mala license and therefore the Mala/Witten license was rescinded, effectively cutting

off Witten's supply of CARTs. Mala has assured us this has not occurred but GSSI has recently rescinded this statement. Mala continues to refuse to supply Witten with a copy of the GSSI/Mala license. Mala's failure to maintain all of its' intellectual property rights is a material breach of Section 6 of the LA as outlined in the following portion of this Counter Claim.

As mentioned previously, Witten was extremely patient with Mala in allowing them time to correct the FCC problem because Witten believed if Mala ultimately failed Witten would be able to manufacture their own CARTs. Now that Witten has determined Mala is incapable and/or unwilling to deliver the commercially relevant CART, Witten's two safeguards: 1) radar array license and 2) license to manufacture a radar array are in danger of evaporating.

Witten relied upon both of Mala's representation and has been detrimentally damaged by these fraudulent acts committed by Mala. Had they actually owned the radar array license as it represented, Witten's business could not be suffocated by an outside company in which Witten had no knowledge it was "getting into bed with." Furthermore, Mala's apparent default under the GSSI/Mala license was a breach of Section 6 of the LA. This is Witten's only access to a radar array license. Its long term effectiveness has now been called into question along with the manufacturing rights Mala granted to Witten in the LA. Mala knew this at the time of negotiating the PDA and LA and never intended Witten to benefit from the terms promised.

C. **MATERIAL BREACH OF CONTRACT:** 1) FAILURE TO DELIVER COMMERCIALLY VIABLE CARTs; 2) BREACH OF INTELELCTUAL PROPERTY SECTION OF LA; AND 3) REFUSAL TO DELIVER DOCUMENTATION TO REPAIR OR MANUFACTURE

Mala has committed a material breach of the LA by failing to adhere to numerous provisions set forth within the LA. Mala has failed to deliver the CART in a condition that would permit it to be widely used and licensed. Mala has also failed to adhere to two critical portions of Section 6 of the LA. Lastly, Mala has failed provide to Witten the necessary documentations as required by the LA which permits Witten to mitigate its damages by manufacturing a commercially viable CART.

To begin with, Mala's refusal or inability to deliver the CART in a form that may be repeatedly leased to customers is a material breach of the LA. The primary purpose of the PDA and LA was to produce this product in quantities sufficient to service the market to the extent that the financial projections described. Witten has been expending large amounts of capital and extremely valuable scientific resources in developing software that would make the CART commercially relevant. Furthermore, Witten has: launched ad campaigns; applied and received numerous awards and recognitions; applied

and received protection for their IP from the U.S. Patent and Trademark Office; sent their scientist to forums and discussions to promote the technology; and attended copious trade-shows and speaking engagements relating to ground penetrating radar. For Mala to now be unalbe to produce the CART in the manner contracted for, is a material breach of this contract.

Mala is also in material breach of two parts of Section 6 of the LA, "Maintenance of Intellectual Property." It states in pertinent part:

> ... [T]he Licensor [Mala] will during the life of this Agreement maintain all its intellectual property rights and such applications in good standing in all countries of in which its intellectual property are issued or filed. The Licensor [Mala] and The Licensee [Witten] will equally share costs recording, registration, renewal and other similar fees in connection with maintaining the intellectual property and applications in good standing.

Mala has breached the first sentence in their failure to properly maintain the GSSI/Mala license for the radar array. This breach greatly impacts all of Witten's business and efforts to promote the CART. Furthermore, Mala has yet to pay its portion of the initial hardware patent filed in 2002 which was a result of this collaboration. The application for the "Ground Penetrating Radar Array and Timing Circuit" was filed, paid for and issued solely because of Witten's financial support. Witten no longer has ownership of this patent because Mala insisted it be transferred pursuant to this LA in spite of their failure to bear the cost they promised to bear. It is Witten's position that Mala's ownership of this patent is not valid due to their complete failure and material breach of the LA.

Finally, Mala has committed a material breach of the LA by refusing to deliver to Witten the necessary documentation which would allow Witten to repair or manufacture the CART. The LA is clear in that it grants to Witten the right to manufacture the CART. However, Mala always refused to release the documents so that Witten could manufacture. Witten, until recently, was unsure why Mala was refusing to do so.

It makes more sense to Witten now, in light of the recent allegations by GSSI that Mala was not authorized to license Witten to manufacture the radar array. Mala knew they could not authorize Witten to manufacture but Mala induced them into signing the PDA and the LA. Once Witten accomplished its part of the agreements, Mala then refused to supply Witten with the tools to effectuate that term of the contracts. Not only was this act a fraud in the inducement, the refusal to supply the documentation even if Mala did have the right to convey, was a material breach of the contract.

D. **RELIEF SOUGHT**

Based on the foregoing, Witten respectfully request the following:

1. Denial of Mala's request to rescind or terminate the LA;
2. Unspecified damages to be determined at a later date
3. Witten has right to manufacture radar arrays under the GSSI license to replace faulty equipment provided by Mala;
4. Reimbursement for the costs of developing reproducible CARTs as envisioned in the 1997 PDA and LA;
5. Continuation of all licenses from Mala to Witten;
6. Rescission of all software licenses granted to Mala as payments;
7. Return of all intellectual property and patents conveyed to Mala as a result of the PDA and LA;
8. Payment of all costs associated with the patenting of technology that arose during or as a result of LA that are jointly used by both parties;
9. Attorney's fees associated with the disputes involved over the past year due to Mala's harassing behavior; and
10. Other relief the Arbitrator deems appropriate.

Witten reserves the right to amend this Response and Counter Claim as permitted in accordance with the Commercial Arbitration Rules (Including Procedures for Large, Complex Commercial Disputes) of the American Arbitration Association.

Very truly yours,

Erin L. G. Lewis

ERIN L. G. LEWIS

cc: Kenneth A. Genoni, Esq. (via electronic mail and USPS)
Andrea H. Bugbee, ICDR (via electronic mail and USPS)

ROPES

# Kenneth A. Genoni

Counsel

**Ropes & Gray**
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005-3948

T 202-508-4683
F 202-508-4650
kenneth.genoni@ropesgray.com

PRACTICES
**Corporate**

**Fish & Neave IP Group**

- Alternative Dispute Resolut
- Biotechnology
- Chemical
- Nanotechnology
- Pharmaceutical

**Litigation**

Printable Bio

Add to Outlook Contacts

**Practice**

Kenneth Genoni is counsel in the Fish & Neave IP Group of Ropes & Gray.

**Professional Experience**

He served as Chief Patent Counsel at Engelhard Corporation, 1981-87; General Patent Counsel of H Celanese Corporation, (including Hoechst Roussel Pharmaceuticals, Inc.) 1987-96; General Intellec Property Counsel of Hoechst AG, 1996-97; and Head of Patents for Hoechst Marion Roussel AG, 19 2000.

**Bar Admissions**

- New York
- New Jersey
- Washington, D.C.

**Courts**

- U.S. District Court for the Eastern District of New York
- U.S. District Court for the Southern District of New York
- U.S. Court of Appeals for the Federal Circuit

**Education**

- 1974, LL.M., New York University
- 1966, LL.B., New York University
- 1959, B.S. (Chemical Engineering), Purdue University

©2006 Ropes & Gray LLP. All rights reserved.

BACK

Civil Action No: 1:06-cv-01343
Respondent WTI Ex. No. 3
Arb. Ex. No:

**Contact** American Arbitration Association
1633 Broadway
10th Floor
New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274

**Commercial Panel**

**Kenneth A. Genoni, Esq.**

**Current Employer-Title** Ropes & Gray - IP Group

**Profession** Attorney - Patent, Trademarks, Trade Secrets, Unfair Competition, Licensing Intellectual Property

**Work History** Ropes & Gray, 2005-present; Of Counsel, Fish & Neave, 2000-05; Head of Patents, Hoechst Marion Roussel, 1997-00; General Intellectual Property Counsel, Hoechst AG, 1996-97; Vice President and General Patent Counsel, Hoechst-Celanese Corporation, 1988-96; Chief Patent Counsel, Engelhard Corporation, 1981-87; Patent Counsel, Celanese Corporation, 1974-81; Attorney, Amster Rothstein & Engelberg, 1972-74; Attorney, Exxon Research, 1961-67; Commissioned Officer, U.S. Navy, 1959-61.

**Experience** Heavy involvement in patent infringement litigation at Fish & Neave. Over 38 years of corporate and law firm experience in the intellectual property field. Most recently, worked in Germany for almost four years as Head of Patents for Hoechst Marion Roussel A.G. with global responsibility for pharmaceutical matters. Patent experience also in the areas of chemical and textile. Has extensive experience managing and directly handling litigation and resolving disputes, relating primarily to patents, trade secrets, and unfair competition, with major corporations in Japan, Korea, Taiwan, Germany, France, Great Britain, Norway, Canada, China, Brazil, and the United States.

**Alternative Dispute Resolution Experience** Extensive experience in ADR including serving as an arbitrator in many patent and commercial cases. Also serves on the AAA International Panel.

**Alternative Dispute Resolution Training** AAA International Arbitration Symposium, Washington, DC, 4/05; ACE004 - Practical Tips for Dealing with Delay Tactics of Parties and Advocates, Washington, DC, 2/05; ACE001 - Arbitration Awards: Safeguarding, Deciding & Writing Awards, 6/04; AAA Commercial Arbitrator II Training: Advanced Case Management Issues, New York, 7/02; AAA Arbitrator Update 2001; AAA International Arbitrator Training, New York, 10/00; AAA Commercial Arbitrator Training, Somerset, 9/99; AAA International Arbitrator Training, San Francisco, 10/94; various other ADR training.

**Professional Licenses** Admitted to the Bar: New York, 1967; New Jersey, 1979; District of Columbia, 2004.

**Professional Associations** Association of the Bar of the City of New York; Association of

Corporate Patent Counsel; American Intellectual Property Law Association; Tau Beta Pi; Omega Chi Epsilon; Phi Lambda Upsilon.

**Education** Purdue University (BS, Chemical Engineering-1959); New York University (JD-1966; LLM-1974).

**Compensation** $3,220.00 Per Day
$460.00 Per Hour
Charges for study time, award preparation, travel time, resolving discovery disputes etc., and hearing time.

**Citizenship** United States of America

**Locale** Washington, DC

 International Centre
for Dispute Resolution

Thomas Ventrone
Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

July 10, 2006

**VIA FACSIMILE AND UPS OVERNIGHT EXPRESS**

Timothy D. Kelly, Esq.
Sarah E. Bushnell, Esq.
Kelly & Berens, P.A.
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Erin L. G. Lewis, Esq.
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, GA 31204

Bree O. Sullivan, Esq.
Bree O. Sullivan, LLC
109 Hampton Court
Thomasville, GA 31792

Re: 50 199 T 00261 05
Mala Geoscience AB
vs
Witten Technologies, Inc.

Civil Action No: 1:06-cv-01343
Respondent WTI Ex. No. 4
Arb. Ex. No:

Dear Counsel:

By direction of the Arbitrator we herewith transmit to you the duly executed Final Award in the above matter. The hard copy of said Award will follow shortly. This serves as a reminder that there is to be no direct communication with the Arbitrator. All communication shall be directed to the Association.

At this time we have verified with the Arbitrator that he has submitted all requests for compensation and expenses in this matter. Accordingly, we have conducted a final reconciliation of the finances and are providing each party with a Financial History and Compensation Summary. If a party had any unused compensation deposits, we have issued a refund check that should arrive in the mail shortly. If a party has an outstanding balance, that party will continue to receive cyclical invoices until the balance is paid.

Note that the financial reconciliation reflects costs as they were incurred during the course of the proceeding. Any apportionment of these costs by the arbitrator, per section R-43 of the Commercial Arbitration Rules, will be addressed in the award and will be stated as one party's obligation to reimburse the other party for costs incurred. Any outstanding balances the parties may have with the AAA for the costs incurred during the arbitration proceedings remain due and payable to the AAA even after the final award is issued, and regardless of the arbitrator's apportionment of these costs between the parties in the award.

Please be reminded the Accelerated Exchange Program is terminated. All communications shall be directed to the Association.

Please make arrangements to pick up your exhibits immediately; one business day's notice is appreciated to arrange for the pick up. We will dispose of any exhibits still in our possession ten (10) days from the date of this letter.

Thank you for using the services of the International Centre for Dispute Resolution, a worldwide leader in dispute resolution.

Sincerely,

Andrea H. Bugbee
Senior International Case Manager
(212) 484-3299
BugbeeA@adr.org

**Via Facsimile Only w/o Encl.**
cc: Kenneth A. Genoni, Esq.

Encl.

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

-----------------------------------------------------x

In the Matter of the Arbitration Between

MALA GEOSCIENCE, AB

Claimant and Counterclaim Respondent,

and

WITTEN TECHNOLOGIES, INC.

Respondent and Counterclaim Claimant

-----------------------------------------------------x

Case No. 50 199 T 00261 05

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above named Parties, and dated September 19, 1997, and having been duly sworn and having duly heard the proofs and allegations of the Parties do hereby FIND and AWARD as follows:

1. Mala Geoscience, AB ("Mala") seeks recission and/or termination of the License Agreement dated September 19, 1997 between Mala and Witten Technologies, Inc. ("WTI"). In the Demand and supplemental Demands, Mala alleged that there had been fraud in the inducement of the License Agreement and that WTI had materially breached the agreement by failing to use its best efforts to promote the sales of the Product in the Territory, by failing to create and maintain an efficient sales organization for the Product, and by failing to pay royalties in a timely manner. Mala also alleged that it had a right to terminate pursuant to Section 11 of the License Agreement because WTI was insolvent. During the hearing, counsel for Mala stated that Mala was no longer accusing WTI of fraud in the inducement.

2. In accordance with Section 17 of the License Agreement, Mala initiated arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration

Association. The Association's Procedures for Large Complex Disputes apply to this Arbitration.

3.    Mala is also seeking an award of attorney's fees and costs. Section 17(d) of the License Agreement provides that the "arbitrator shall have the discretion to award costs and/or attorney's fees as he deems appropriate under the circumstances".

4.    In its Response and Supplemental Response to Mala's Demand and Supplemental Demands, WTI denied the substantive allegations of Mala's Demands and asserted a Counterclaim based on an allegation of fraud in the inducement by failing to reveal a patent license from GSSI to manufacture the radar array and Mala's lack of authority to sublicense WTI under the patent; and, WTI alleged material breach of the License Agreement based on Mala's (a) failure to deliver commercially viable CARTS, (b) breach of the intellectual property section of the License Agreement and (c) Mala's refusal to provide WTI with the documentation and instruction required to enable WTI to manufacture and repair the radar array in accordance with WTI's exclusive license to manufacture the array.

5.    The relief sought by WTI included (a) damages, (b) an order requiring Mala to provide WTI with documentation and instruction required to enable WTI to manufacture and repair Mala's Radar Array, (c) rescission of all software licenses granted to Mala, (d) assignment to WTI of all intellectual property, particularly the "Glue Patent," conveyed to Mala under the License Agreement, (e) payment of all costs associated with patenting technology under the License Agreement, (f) attorney's fees and (g) costs.

6.    At a preliminary hearing, the parties agreed to exchange documents and to take a limited number of depositions. Mala deposed Robert Green, Mike Oristaglio, Tuna Uluaydin, Dennis Johnson, Ray Barbee, Jeff Cummings, Vince Shea, and Brian Hurse. WTI deposed

Tommy Leijon, Jan Rynning, Bernth Johnson, Walter Linder, Michael Oristaglio, Tuna Uluaydin and Dennis Johnson.

7. Section 17(a) of the License Agreement provides that the Arbitration shall be conducted in Washington, D.C. Hearings were conducted for five full days on September 24 through September 28, 2006 at the American Arbitration Association offices in Washington, D.C. At the completion of the fifth day of hearings, each party acknowledged that it had no further proofs to offer or witnesses to be heard. A stenographic record was made of the hearings.

8. It was ordered that each party file and serve a post-hearing brief by May 26 and a reply brief by June 9. The briefs were filed and served and basis for an award of attorney's fees was submitted with each party's reply brief. Closing arguments were heard by telephone conference on June 15.

9. The hearing was closed on June 15.

10. In accordance with Rule 42, the Arbitrator has determined that a reasoned Award, without findings of fact and conclusion of law, is appropriate.

11. (a) Mala has not proved that WTI breached the License Agreement by failing to "create and maintain an efficient sales organization for the Product" as required by Section 2 of the License Agreement. Mala argues that WTI's sales organization was too small and that WTI's failure to achieve its sales projections demonstrates the inadequacy of the sales organization. WTI's sales organization was small but not inefficient. WTI used its best efforts to promote sales of the product as shown by testimony about the marketing and sales materials and many awards for the WTI software documented in Exhibit 418. Thus, for example, WTI received the Wall Street Journal 2004 technology innovation award. In addition, WTI's sales efforts were supplemented by agreements with Slumberger and Dycom (U.S.).

(b) I find that Mala's failure to perform its obligations under the License Agreement is a major reason why WTI has not been more successful in selling or leasing the product. Mala failed to provide a commercially viable CART and refused to give WTI the information and instruction needed to manufacture and repair the CART radar array. There were technical malfunctions of the CARTs supplied by Mala and Mala was unwilling to improve the CART to eliminate the malfunctions. (See, for example, Exhibits 383, 384, 411 and 416(c)). Mala failed to obtain FCC Waivers for the 200 MHz CART for operation in the United States. Anthony Clifford testified that he had a very difficult time getting support from Mala. He said that Mala acted as though it was much more interested in breaking the relationship with WTI than in performing its duties under the License Agreement. (See transcript beginning at page 843). His testimony was very persuasive.

(c) There is some evidence that suggests that Mala's failure to support WTI was motivated by a desire to drive WTI into bankruptcy. In Exhibit 331, which is a letter from Mr. Rynning to the Mala Board dated September 11, 2001, Mr. Rynning discusses four alternatives to improving the situation. One of the alternatives was to be "passive" in the relationship by failing to support WTI. He states in item 3 that passivity could contribute to WTI's bankruptcy. The letter points out, however, that Mala could not function without WTI's software and Mala would not have access to WTI's software if WTI went into bankruptcy. This problem was later solved for Mala by the execution of an Exchange and Settlement Agreement ("ESA") with WTI. This Agreement required WTI to deposit it's source code into escrow and gave Mala the right to use the software in the event of WTI's bankruptcy. The letter to the Mala Board, Ex. 331, also said that a Witten bankruptcy might tie up the Witten patents and they would not be available to Mala. The ESA provided Mala with a partial solution to this problem.

Mala misused the ESA to acquire ownership of the Witten Glue Patent. There was much testimony by Robert Green and Anthony Clifford that, even after the ESA was signed, Mala was difficult to deal with and failed to support WTI. Although relief for Mala's breach of the ESA cannot be given in this arbitration, it is important to note that Mala refused to perform its obligations under the ESA: it refused to return a $500,000 note to WTI marked "paid in full"; it refused to execute software license agreements required by the ESA; and it refused to put manufacturing blueprints into escrow as required by the ESA. Mala's actions demonstrate its lack of good faith in dealing with WTI.

12. Mala has failed to prove that WTI is insolvent. Section 11 of the License Agreement gives each party the right to terminate if the other party becomes insolvent. Mala relies on a New York statute that provides that a corporation is insolvent when its liabilities exceed the fair market value of its assets. WTI argues that the common law test for insolvency, which is "the ability to meet obligations as they mature in the ordinary course of business," should be applied in the case. It does not matter which test is applied. Mala has not proved that WTI is insolvent under either test. Mr. Shea testified that WTI's net present value was $155 million, which greatly exceeds its liabilities of less than $5 million. This evaluation may be excessive, but it is clear from the awards WTI received and WTI's ability to continue to raise money from investors that WTI's intellectual property is recognized as being very valuable. It is also clear from Ex. 331 (paragraph 1) and Mala's extreme and wrongful actions taken to acquire ownership of the Glue Patent that Mala recognized that the Witten intellectual property was very valuable. (See paragraph 15 of this Award.) WTI has been able to meet obligations as they mature in the ordinary course of business. WTI was a little late from time to time but it has always paid or settled the matter.

13.    I find that WTI's occasional late payment of royalties was not a material breach of the License Agreement. Mala's failure to perform contributed to WTI's inability to make timely payments.

14.    (a)    Section 1 of the License Agreement grants WTI the "right and license to sell, use, lease and assemble." In Section 1a, the license is exclusive with respect to the detection of utilities and, according to Section 1b., nonexclusive for all other applications. This grant includes the right and license under Mala's "patent or other intellectual property right" to manufacture the product (the CART). Mala argues that "assemble" does not include manufacturing, but the License Agreement uses the terms interchangeably. The accounting provision, Section 5, requires WTI to report about its "manufacture, use, lease and sale" of the Product or other products and Section 9 refers to the indemnity to licensor resulting from the "use, manufacture, sale or lease" of the technology. Neither of there provisions refers to "assembly." Thus, it is clear that the License Agreement contemplated having WTI manufacture the CART. It is also clear that Mala had agreed to make available its know-how to be used to manufacture the Product. The fifth whereas clause states that "Know-how shall mean knowledge, experience, data, technology, designs, techniques, drawings, software, and other information ..." The last whereas clause provides that "Licensor agrees to allow Licensee use of its Know-how."

    (b)    Even if I were to find that the License Agreement was ambiguous, which I do not, the parol evidence clearly establishes an intent to include manufacturing rights in the grant. This evidence was developed very well in the testimony of Shane Green. Thus, for example, in a letter, Ex. 11, from Jan Rynning dated August 27, 1997, Mr. Rynning states in paragraph 3, that Mala will grant WTI the right to manufacture, sell, lease and use the product.

The Prototype Development Agreement and License Agreement were signed a few weeks later on September 19, 1999.

(c)    Mala argues that the ESA curtails those rights in the circumstances identified in paragraph 3.2 of the ESA and that the ESA would be meaningless if WTI had an independent right to manufacture the CART radar equipment and also the right to demand from Mala the know-how, including blueprints, necessary to do that. Mala also argues that the dispute over manufacturing rights is governed by the ESA, which requires arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce. I do not agree with Mala's arguments. The ESA does not terminate the License Agreement or attempt to limit WTI's license under a Mala "patent or other intellectual property right" to manufacture the CART product using Mala's technology and know-how that has already been made available to WTI, which includes, for example, the technology disclosed in Mala's patents, such as the Timing Circuit patent. At most, the ESA defers or modifies Mala's duty to make available blueprints to WTI. WTI has withdrawn its demand for additional know-how, including blueprints, from Mala. WTI stated in the post hearing briefs that it would obtain such additional know-how from a third party. At closing arguments, WTI's counsel confirmed that WTI was no longer asking for additional manufacturing know-how from Mala. Therefore, I do not need to decide whether the ESA has deferred or eliminated Mala's duty to provide additional manufacturing know-how to WTI. Accordingly, I find that the dispute over manufacturing rights arises in connection with the License Agreement, not the ESA, and is within the scope of the arbitration clause set forth in the License Agreement. I also find that the license to "sell, use, lease, and assemble" includes the right to manufacture the CART radar array.

(d)    In post hearing briefs WTI asked for $710,000 in damages. WTI has purchased additional manufacturing know-how from a third party because Mala refused to make additional manufacturing know-how available to WTI. The claim for damages is denied because Mala did not have an opportunity for discovery or cross-examination for this damage claim.

15.    (a)    Mala argues that the Glue Patent claim was never pled by WTI and that the assignment of the Glue Patent is outside the scope of this arbitration. I disagree. Mala had notice of the claim as set forth on pages 7 and 8 of WTI's Brief in Reply to Mala's Post-Hearing Brief. In addition, it should be noted that Mala was prepared and had the opportunity to address this issue at the hearing. Bernth Johnson and Walter Linder both testified about this issue on Mala's behalf. Also, as further evidence that Mala had notice of the claim, it should be noted that on April 25, the second day of the hearing, Mala submitted a Proposed Award; paragraph 4 dealt with the Glue Patent issue. (See footnote 4 of Mala's Post Hearing Brief).

(b)    Mala did not have the right to an assignment of Witten's Glue Patent. (Ex. 86). Article 6.02 of the Prototype Development Agreement provides that each party will own the intellectual property which it develops except that Mala will have sole ownership of any intellectual property rights to "improvements to its hardware resulting from the parties development efforts, subject only to Witten's license rights under this agreement." This concept is also in the License Agreement. In the fourth whereas clause, it is provided that intellectual property developed under the License Agreement shall be exclusively owned by the developing party except that "Mala will have sole ownership of any improvements to its hardware resulting from the parties development efforts." Dr. Witten is the sole inventor of the Glue Patent, which is US patent 6,700,526, issued March 2, 2004.

In accordance with the ESA, Witten agreed to assign the patent resulting from United States patent application serial number 09/658,188, which was filed in the names of Johanssen, Witten and Deveny. This is referred to as the "Timing Circuit" patent and it is undisputed that this patent was directed to an improvement to Mala's hardware. No mention of the Glue Patent is made in the ESA. Mala had the right to the Timing Circuit patent under the License Agreement and the ESA.

(c) Counsel for Mala argues that I do not have jurisdiction over this issue because the Patent Assignment was drafted in accordance with the ESA and the ESA, paragraph 5, provides that any dispute or controversy arising out of or in connection with this agreement or in the breach, termination or invalidity thereof shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce. The Patent Assignment is silent on the issue of arbitration jurisdiction. There is no dispute which would require me to investigate or analyze the breach, termination or invalidity of the ESA, and there is no dispute over Mala's right to an assignment of the Timing Circuit patent, the only patent identified in the ESA. There is, however, a dispute over whether or not Mala had the right to record the Patent Assignment, which specifically identifies only the Timing Circuit patent, to obtain ownership of the Glue Patent. It is necessary to go to the License Agreement to get the answer. Therefore, the dispute arises under the License Agreement, not the ESA, and Section 17 of the License Agreement gives jurisdiction to the Arbitrator to resolve the dispute.

(d) In addition, I disagree with Mala's assertion that the "Patent Assignment undeniably arises only out of the ESA." The Patent Assignment, which was drafted by Mala, refers only to the ESA, not the License Agreement. But basis for the assignment of foreign counterparts and continuation-in-part applications can only be found in the License Agreement.

It is clear from the License Agreement that Mala has the right to an assignment of foreign

counterparts of the U.S. Timing Circuit patent because they are directed to an improvement to

Mala's hardware.  The Glue Patent is a different matter.  The Patent Assignment refers to the

United States "Timing Circuit" patent application specifically identified in the ESA.  In addition,

the Patent Assignment provided that all "continuations-in-part" of the Timing Circuit patent

application and foreign counterparts thereof also be assigned.  Continuations-in-part applications

are not mentioned in the ESA.  Only the United States Timing Circuit patent, not the foreign, is

mentioned in the ESA.  No mention of the Glue Patent is made in the Patent Assignment or the

ESA.  I agree with Mala's contention that the agreement in the ESA to assign the U.S. Timing

Circuit application to Mala included the right to an assignment of the United States continuation

applications because, as asserted by Mala, a continuation only "discloses identical subject

matter."  In contrast, a continuation-in-part application contains new matter that may be directed

to a different invention than the one disclosed in the parent application.  Therefore it is clear that

Mala must look to the License Agreement for a basis to include continuation-in-part applications

in the Patent Assignment.  The License Agreement provides that Mala shall own all applications,

including continuation-in-part applications, that are directed to improvements to Mala's

hardware.

      (e)     It is clear from the License Agreement that WTI would have a duty to

assign a continuation-in-part application, or any other patent application, only if the application

was directed to an improvement to Mala's hardware.  It turned out that the Glue Patent is a

"continuation-in-part" of the Timing Circuit patent application, but the Glue Patent is not

directed to an improvement to Mala's hardware.  Nevertheless, without notifying Witten, Mala

used the Patent Assignment (Ex. 14) to record the assignment of the Glue Patent to Mala in the

United States Patent Office.  Interpreting "continuation-in-part" to include applications not

directed to an improvement to Mala's hardware was a violation of the License Agreement.

       (f)     Anthony Clifford, who signed the Patent Assignment for WTI, testified

that he had no idea what a continuation-in-part application was, much less was he aware of the

fact that the Glue Patent application was designated a continuation-in-part of the Timing Circuit

patent application.  There is nothing in the Patent Assignment that would alert him to the fact

that it was written sufficiently broad to cover the Glue Patent.  I found Mr. Clifford to be a very

credible witness.

       (g)     Anthony Clifford also testified that Mala's actions were despicable.  He

accused Mala of stealing the Glue Patent with slight of hand in drafting and using the Patent

Assignment.  He also testified that the Glue Patent had nothing to do with an improvement to

Mala's hardware.  (Tr. 842.)  Robert Green also testified to this fact.  Robert Green testified that

the invention claimed in the Glue Patent relates to the control of generic hardware and does not

depend in any way on an improvement to Mala's hardware.  Mr. Johanssen, who testified on

behalf of Mala, said that the Glue Patent was important for the use of the Mala hardware, but he

admitted that the patent was not directed to an improvement of Mala's hardware.  (Tr. 1470/2 to

1472/16.)  This testimony is consistent with my reading of the Glue Patent.

       (h)     I also find that Mala acquired the Glue Patent using  intentionally

deceptive acts.  Mala had made an earlier attempt to acquire rights to the Glue Patent.  Prior to

the ESA, Mala argued that Dr. Witten was not the sole inventor and that Mala inventors should

be added.  WTI did not agree that the evidence of joint inventorship was sufficient and the

United States Patent Office agreed with WTI.  After the ESA was signed, Mala drafted a Patent

Assignment that specifically mentioned only the Timing Circuit patent.  There is no evidence

that the Glue Patent was discussed at this time, but if WTI had agreed to assign the Glue Patent, Mala should have (and would have) specifically identified it in the Patent Assignment rather then rely on the "continuation-in-part" language to hide Mala's real intent from WTI. This finding is not required for my holding that Mala breached the License Agreement by taking ownership of the Glue Patent. It is, however, further evidence of Mala's bad faith dealing with WTI. (See paragraph 11 above).

(i)     On June 9, 2006, counsel for the parties informed me that Mala's patent counsel discovered that on April 25, 2006 the Patent Office issued a new patent that is a continuation of the Glue Patent. The Glue II patent is U.S. 7,034,740. Counsel asked for an additional page for the reply brief so that each party could present its position regarding Glue II. In a letter dated June 14, 2006, Counsel for Mala informed me that the Patent Assignment, Ex. 14, had been recorded against the Glue II patent application in November 2004 giving Mala ownership of the Glue II patent. Under cover of a letter dated June 16, 2006, Counsel for Mala provided a proposed license agreement that would grant WTI a nonexclusive license under both of the Glue Patents in the event that I terminate the License Agreement. WTI agrees that I should decide what should be done with the Glue II patent, but WTI asks that it be assigned to WTI because, like the Glue I patent, it is not directed to an improvement to Mala's hardware. In an email dated June 20, 2006, I asked Counsel for Mala if there are any other U.S. and foreign patents claiming priority to the U.S. application that issued as the Glue Patents as was suggested in Mala's proposed Glue Patents License agreement. I also asked if they had been assigned to Mala. Counsel for Mala informed me on June 22, 2006 that Mala is aware of one foreign application that claims priority to the application that issued as the Glue I patent. It is PCT application PCT/US02/08274, filed April 22, 2002, and that corresponding regional or national

applications have been filed by WTI in Australia, China, Europe and Japan. Mala had not yet recorded the Patent Assignment to record ownership of these applications, but it intends to do so. It should not do so.

      (j)    I find that Mala should be ordered to transfer all of its right, title and interest to the Glue I patent, U.S. 6,700,526, to WTI. The Glue II patent, U.S. 7,034,5740, must also be assigned to WTI. The Glue II patent is a continuation of the patent application that issued as the Glue I patent, which by definition means that the specification or disclosure of the Glue II patent is essentially identical to the specification of the Glue I patent and therefore can not contain new matter that is directed to an improvement to Mala's hardware. Mala must also assign to WTI all of its right, title and interest to foreign patents and applications claiming priority to the patent applications that issued as the Glue I and Glue II patents. The obligation to assign rights to foreign counterparts shall also be limited to those foreign counterparts that have a specification that is essentially identical to that of the Glue Patents. The obligation does not apply to any foreign counterpart, if any, containing new matter directed to an improvement to Mala's hardware. There has been no suggestion by either party that Witten has added any such new matter to any foreign or United States application.

      16.    WTI has not proved that Mala made any material representation or omission to WTI about the GSSI patent that was false or misleading when the parties negotiated the License Agreement in 1997 or the ESA in 2002. Mala did not learn about the GSSI patent until three years after the License Agreement was signed. Mala introduced expert testimony that Mala's GPR multi-channel survey systems that use multiple transmitters do not infringe the GSSI patent. Mala also introduced other evidence indicating that Mala took a license for nuisance value. The

testimony was not rebutted.  WTI has therefore not established that Mala's failure to disclose the potential infringement problem to WTI in the ESA negotiations was a material omission.

17.    WTI has not proved damages for Mala's failure to apply for an FCC waiver or Mala's failure to design and maintain the CART.  The amounts of the damage claims are speculative and therefore damages are not recoverable.

18.    The counterclaim based upon Mala's failure to pay one-half of the patent application costs is denied because the evidence to support the amount of damages was not identified during discovery or introduced at the hearing.  Mala had no opportunity for discovery or cross-examination.

19.    WTI has not proved any compensatory damages and Section 17(d) of the License Agreement prohibits an award of punitive damages.

20.    WTI has asked that the software licenses granted pursuant to the ESA be returned to WTI.  This claim arises only under the ESA.  The License Agreement has not been violated.  Therefore, I have no jurisdiction over this claim.

21.    Section 17(d) of the License Agreement gives the Arbitrator "discretion to award costs and/or attorney's fees as he deems appropriate under the circumstances."  Both parties have asked for attorney's fees and filed and served support for these fees at the same time the final Reply Briefs were filed and served.  Counsel for each party had the opportunity at the closing arguments on June 15 to object to any item included in the other party's supporting materials.  Based upon the above findings, I have decided to award attorneys fees and expenses (R-43 and R-50) to WTI.  The attorney's fees and expenses claimed by WTI total $520,040.04.  This includes $37,465 for AAA fees and arbitrator compensation which shall be awarded separately.  Counsel for Mala objected to including $327,256 in the award.  This was compensation to Ms.

Lewis in the form of stock options. I do not agree with counsel for Mala. This item is explained and justified on page 21 of the WTI Reply Brief. I have however reduced the amount by 20% ($65,451) to account for time Ms. Lewis may have spent on other matters. In summary, I have subtracted $65,451 and $37,465 from WTI's claimed fees and expenses and I have rounded the award for attorney's fees and expenses to $420,000. I also find that, in accordance with R-43(c), all the administrative fees and arbitrator compensation shall be borne by Mala as set forth in paragraph 4 below.

Accordingly, I AWARD AS FOLLOWS:

1. The License Agreement shall remain in full force and effect. The "right and license to sell, use, lease and assemble" in Sections 1a. and b. of the License Agreement includes, and has always included, the right and license to manufacture.

2. Mala shall, prior to August 15, 2006, assign to WTI all of Mala's right, title and interest to:

   (a) U.S. Patents 6,700,526 and 7,034,740 and all United States continuation applications that claim priority to the U.S. patent applications that issued as U.S. Patents 6,700,526 and 7,034,740; and

   (b) all foreign patents and applications claiming priority to the U.S. patent applications that issued as U.S. patents 6,700,526 and 7,034,740, provided the specification of the foreign patent or application is essentially identical to the specification of U.S. Patent 6,700,526 and 7,034,740.

3. Mala shall, prior to August 15, 2006, pay to WTI $420,000 for attorney's fees and expenses.

4. The administrative fees of the International Centre for Dispute Resolution totaling $17,250.00 and the compensation and expenses of the Arbitrator totaling $49,199.60 shall be borne entirely by Mala. Therefore, Mala shall, prior to August 15, 2006, also pay to WTI the sum of $36,599.80 which represents the portion of administrative fees and arbitrator compensation and expenses that had previously been paid by WTI.

5. This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are herby denied.

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Washington, D.C.

July 10, 2006
Date

Kenneth G Genoni

District of Columbia )
) SS:
)

I, Kenneth A. Genoni, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

July 10, 2006
Date

Kenneth G Genoni

WITNESS, My hand and official seal, this the 10th day of July 2006.

NOTARY PUBLIC
[signature]
My Commission Expires: 7/31/07