International Centre for Dispute Resolution

| | |
|---|---|
| In the Matter of the Arbitration Between | |
| MALA Geoscience, AB, | |
| Claimant, | |
| and | Case No. 50 199 T 00261 05 |
| Witten Technologies, Inc., | |
| Respondent. | |

## WITTEN TECHNOLOGIES, INC.'S BRIEF IN REPLY TO MALA'S POST-HEARING BRIEF

June 9, 2006

ERIN L.G. LEWIS, Esq.
General Counsel, Witten Technologies, Inc.
Georgia Bar No. 450320
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, Georgia 31204
478.474.6644
478.474.8688 (f)

BREE O. SULLIVAN, Esq.
Georgia Bar No. 691141
Bree O. Sullivan, LLC
109 Hampton Court
Thomasville, Georgia 31792
229.226.3033

Civil Action No:  1:06-cv-01343

Respondent WTI Ex. No. 6

Arb. Ex. No:

## WITTEN TECHNOLOGIES, INC.'S BRIEF IN REPLY TO MALA'S POST HEARING BRIEF

### TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | The Parties' Proposed Awards. | 1 |
| II. | Mala's Misstatements of "Background" Facts | 3 |
| III. | Manufacturing Rights | 4 |
| IV. | Mala's Fraud in Procuring WTI's Glue Patents | 7 |
| | a. The Arbitrator Has Authority to Require the Glue Patents' Return | 7 |
| | b. The Evidence Calls for the Glue Patents' Return to WTI | 7 |
| | c. A Mere License to the Glue Patents Are Insufficient to Make WTI Whole | 10 |
| V. | WTI'S Damages | 10 |
| VI. | Mala's Fraud Relating to Its Patent License Agreement with GSSI | 11 |
| VII. | Mala Multiple Breaches of the LA | 12 |
| | a. FCC Issue | 12 |
| | b. Patent Costs. | 14 |
| | c. Failure to Provide Documents for Manufacture/Repair | 15 |
| VIII. | WTI's Efficient Sales Organization | 15 |
| IX. | WTI is Solvent. | 17 |
| X. | Attorney's Fees. | 20 |
| XI. | Conclusion. | 21 |

EXIBITS TO WITTEN'S REPLY BRIEF

A Method and Apparatus for identifying Buried Objectus Using Ground
Penetrating Radar, A. Witten, Issued April 25, 2006, Patent. No. 7,034,740...................... A

$500,000 Promissory Note. ................................................................ ............... B

Erin Lewis Email in response to S. Bushnell's of 3/29/06 ................................................. C

Re Wil-Low Cafeterias, (citing, e.g., Brouwer v. Harbeck, American Castype
Corp. v. Niles-Bement-Pond Co. ................................................................ ....................... D

Aiken v. Herman Wolz Textile Corporation. ...................................................... E

Section 271, N.Y. Debtor and Creditor Law, Art. 10 –
Fraudulent Conveyance. ................................................................ ........................... F

In re Gordon Car & Truck Rental, Inc................................................................ G

WTI's Attorney's Fees ................................................................ ........................ H

Due to space limitations, this brief will respond, in point-by-point format for the Arbitrator's convenience, only to a select few of the assertions in Mala's Post-Hearing Brief.

## I.     The Parties' Proposed Awards.

The parties do not agree the LA should end, and the terms Mala proposed to accomplish that result are wholly inadequate in light of all WTI has lost due to Mala's fraud and failures to perform its contractual obligations.  While WTI does not wish to see the LA terminated, WTI recognizes the practical possibility that the Arbitrator will terminate the LA, and WTI crafted its proposed award in anticipation of that possibility to include the terms under which WTI would be partly compensated for the severe losses it has endured due to Mala's wrongdoing.[1]  There is no fair compensation to remedy their breaches or make WTI whole.  Not only was Mala successful in stealing WTI's Glue Patent (6,700,526), a continuation patent of that patent was issued the week of our hearing in D.C. ("Glue Patent #2" – 7,034,740) in which Mala will most assuredly assert ownership rights to as well.[2]

Mala has entirely failed to prove its case, and releasing Mala from the terms of the LA would only reward their fraud.  Mala's early arguments sought relief from the LA due to WTI's alleged failure to perform, with no mention of any interest in competing with WTI.  In stark contrast, Mala now argues (probably because there is no evidence to support its earlier allegations against WTI) for termination of the LA so as to enable Mala to "compete worldwide"[3] —with the benefit of the know-how, technology and contacts it acquired only through WTI's support and financing.

---

[1] WTI's request to have Mala build, at its own cost, CARTs to the specifications initially expected in the 1997 PDA is exceedingly fair and reasonable in light of the nine years WTI has waited for Mala to meet those specifications and build a commercially viable CART.  Mala has failed to build a CART worthy of the money and time WTI has invested in dealing with Mala, and WTI justifiably expects Mala to develop the CART WTI contracted and paid for.

[2] Attached hereto as Ex. A, METHOD AND APPARATUS FOR IDENTIFYING BURIED OBJECTUS USING GROUND PENETRATING RADAR, A. Witten, Issued April 25, 2006, Pat. No. 7,034,740, with USPTO Assignment Record.

[3] Mala's Post-Hearing Brief at 1.

Prior to the hearing in this matter, WTI's management initially believed the termination of the LA was probable. That belief has changed now that the we have gained a full understanding of the ongoing nature and complexity of Mala's fraud. After careful review of all the evidence presented at the hearing and in subsequent briefs, it is clear to WTI that Mala has failed to prove its case, while WTI has effectively proven numerous instances of fraudulent behavior by Mala. In no way should they be released from the terms of the LA to "compete worldwide." In addition to opposing the LA's termination, WTI continues to pray for their damages to be awarded.

The limited scope of Mala's proposal shows what WTI has contended all along, that Mala is just hoping to undo the LA – whatever the terms – so that it can take the entire CART opportunity with possession of WTI's software and patents. Mala would have the Arbitrator believe that under their proposal the parties can simply part company with their respective products and compete on equal footing. In truth, Mala's (i) failures to produce FCC-approved, operable CARTs or otherwise live up to its agreements with WTI; (ii) fraudulent schemes; and (iii) outright theft of valuable WTI intellectual property ("IP") have stripped WTI of its ability to compete while bolstering Mala's position. Now that Mala has seized WTI's value and is well on its way to cornering the CART market (and half of WTI's $155m valuation), Mala seeks to complete its fraud through this arbitration by a release from the LA and the exclusivity terms precluding their entry into the U.S. market. Examined in view of the record, Mala's proposal is anything but reasonable; equity demands more than what Mala has offered. To allow Mala to terminate the LA (and WTI's manufacturing rights also without reimbursement for its costs in acquiring alternative know-how), and giving WTI only a license to the **patents** Mala stole

without more[4] would be profound injustice.[5]

## II.    Mala's Misstatements of "Background" Facts.

Mala's Post-Hearing Brief is filled with factual misstatements, and space does not permit WTI to address each one. However, Mala's suggestion that terminating the LA on its proposed terms would permit WTI to continue its current business "with a fair opportunity for growth" must be addressed.[6] First, Mala cannot be permitted to "turn tail and run" from its deal with WTI after failing to provide WTI with the consideration it has bargained (and paid) for since 1997; usable, 200 MHz, six-foot-wide arrays.[7] Mala's failure to provide WTI with specified hardware which can be used in the U.S. has left WTI with virtually *no* opportunity[8] for growth at the present time; indeed, Mala's offer to sell WTI all the CARTs it needs for the next two years is not very valuable when Mala's only FCC-approved CARTs, the 400 MHz, are only three feet wide and take twice as long as the 200 MHz array to scan the same area.[9] Second, the parties, respective opportunities cannot be said to be "fair" if the LA should terminate under Mala's proposed terms; WTI would lose its bargained-for, exclusive right to use the CARTs in the U.S. for utility locating and mapping, with Mala competing here using WTI's software unfettered by any licensing arrangement governing its use. In other words, Mala would get back the exclusivity it sold WTI in the LA, but WTI would *not* get back the things it gave Mala –

---

[4] Indeed, WTI already enjoys the contractual right to purchase equipment from Mala; therefore, Mala's seemingly generous offer to allow WTI to purchase CARTs at arms length until it can find a new supplier is actually worthless.

[5] This past week WTI received from Mala the $500,000 note. It is unclear if this is the original and whether it was intended to be marked "Paid In Full" as the ESA required since it bore no such markings. Attached as Ex. B.

[6] Mala's Post-Hearing Brief at 3.

[7] See, e.g., Ex. 1, PDA (and Ex. A thereto); Ex. 3, LA.

[8] Mala cites S. Carney's testimony, Tr. At 325-26, to show WTI's purported ability to obtain CARTs from GSSI and "leave Mala without being hurt." The Arbitrator should know that GSSI cannot contract with WTI due to its exclusive arrangement with Underground Imaging Technologies. Also, 3-D Radar has been approached by GSSI as infringing on GSSI's radar array patent. This doesn't seem to be as viable as once thought.

[9] Mala's failure to obtain FCC approval for its wider array is especially crippling to WTI's opportunity in light of GSSI's success in getting its six-foot wide array approved. GSSI's Terravision CART can perform jobs twice as fast as Mala's. Mala could alter the arrangement of the transmitters and receivers in the 400 MHz array to have the width specified in the PDA (and the GSSI unit), but Mala has yet to do so.

software, patents, time and money. Such result would be truly unjust.

Mala has attempted to demonize WTI's proposal as handicapping Mala in the future. Mala's complaint is really a complaint that they are handicapped from taking the market *Witten developed*, utility locating and mapping. Mala offered this term in the LA to acquire WTI's software and CART technology, and now that they have the know-how, they now cry foul. Mala forgets that WTI has had to operate its business for numerous years with Mala as its severest handicap. Had WTI not needed to devote so much money addressing Mala's "eternal negotiations" and continual fraud, WTI could have been confronting many competitors and opportunities. Furthermore, when a party operates so egregiously that their repetitive actions of fraud practically amount to a RICO violation, they deserve to be held accountable. Fair is that the parties do as they promised.

### III.    Manufacturing Rights.[10]

The ESA[11] does not usurp the Arbitrator's authority to recognize and enforce the delivery of WTI's manufacturing rights under the LA. Mala would have us believe the manufacturing rights issue was left unsettled in the LA and PDA and was finally resolved in the ESA, but such argument lacks evidentiary foundation. The LA clearly allows WTI to retain the right to manufacture, and the 2002 ESA's escrow provision[12] in no way *reversed* those rights; indeed, the ESA activated the LA's terms, and Mala opted not to remove the "Know-How" and "manufacturing" terms from the LA prior to activating it. Mala flaunts the ESA §3.2 as a modification or "curtailment"[13] of WTI's LA-given manufacturing rights; conveniently absent

---

[10] It is true that WTI failed to mention manufacturing rights in its April 26 proposal. Counsel caught this oversight and included this demand in its April 27th proposal which is consistent with all other submissions.

[11] Ex. 7.

[12] The ESA's escrow provisions are in no way inconsistent with the LA's manufacturing rights provisions. WTI saw the escrow provision as a way of protecting its manufacturing rights in the even of Mala's bankruptcy.

[13] See Mala's Post-Hearing Brief at 15.

from Mala's brief, however is any mention of ESA §3's language, which clearly state the escrow arrangement is to be "a separate agreement" "*in addition to the LA*"[14] an not an alteration of it. Further, there is *no documentary evidence* that the parties "negotiated" the manufacturing rights issue "for years"[15] following the LA's 1997 execution, and for good reason – the issue was settled in the PDA and LA. There is no provision in the LA limiting the Arbitrator's authority to declare the parties' respective rights – including manufacturing rights – under the LA in the light of all the evidence on the record.

Mala's brief displays apparent confusion[16] regarding the manufacturing rights debate and requires correction. It was Alan Witten (not Mala) who, in the 1980s,[17] conceived of the process by which underground objects can be seen by using various forms of diffraction tomography after he reduced his college roommates invention to practice in 1988. It was WTI who, in 1997 shopped around for a manufacturer to build a radar array tailored specially for use within WTI's software; WTI chose Mala from the field of interested companies. It was WTI, not Mala, who had the vision for the CART; in 1997, Mala was a recently privatized,[18] floundering [19] hardware

---

[14] Ex. 7, ESA §3.

[15] See Mala's Post-Hearing Brief at 13. see also Mala's Post-Hearing Brief at 20-21 (asserting that the parties understood that the manufacturing rights issue was left ambiguous in the LA and that further negotiations would be necessary on this point). Mala never made WTI aware of its view that the LA's terms were "ambiguous" on this or any other issue, and Mala's position here is just additional proof that Mala never intended to honor the LA from the beginning but promised manufacturing rights thereunder to fraudulently induce WTI into partnering with Mala instead of contracting with another fabrication company.

[16] This confusion of the facts concerning the manufacturing rights issue undoubtedly explains Mala's inability to comprehend WTI's position concerning its desire for CART know-how. Obviously, WTI should not be permitted to obtain a double recovery be receiving both *reimbursement* for Ensco's know-how *and* delivery of Mala's know-how. WTI simply seeks to be compensated for its expense in acquiring know-how elsewhere in mitigation of the damages Mala created by shirking their responsibilities under the LA.

[17] Ex. 418, Tab 15 (A. Witten's 1988 paper on the geophysical diffraction tomography process); see also Tr. at 1266/12 – 1282/04.

[18] Tr. At 71/15 to 72/2.

[19] S. Green's testimony, Tr. at 1161/13 to 1164/6 re: Ex. 303 at WTI 00320 (Mala's financial struggles and Mala asking WTI to make partial payment on $500,000 note even though not due so that Mala could get grant from Swedish government); R. Green's testimony, Tr. at 1596/18 to 1597/12 (Mala's poor financial strength).

production company who jumped at the opportunity to participate in WTI's exciting work.[20]  The

rights to manufacture the very product WTI conceived of were always WTI's to give away, not

Mala's to convey, and WTI opted to keep them under the parties' agreements.  The only limited

"right to manufacture" Mala ever enjoyed was what WTI allowed it to have.  The parties were

not "two ships passing in the night"[21] on this issue; both understood full well WTI's entitlement

to manufacturing rights and memorialized that understanding in the LA.[22]  When Mala failed to

produce a suitable product after ample opportunity, WTI *did* seek to obtain the know-how it had

paid for,[23] but to no avail.

Mala suggests that WTI could not possibly have manufacturing rights because there is no

"paper trail" of WTI's demands for the know-how's delivery.[24]  This assertion is clearly

fallacious, as there is a plethora of evidence of the parties' understanding that WTI retained

manufacturing rights and requested that know-how be delivered in exercise of those rights.

Mala's Post-Hearing Brief is conspicuously silent in response to the extensive document trail[25]

and the LA provisions exhaustively discussed at our hearing which plainly show Mala's

understanding that manufacturing rights were to remain with WTI.  This silence speaks volumes

to the credence of WTI's position on this issue.  Mala knows it cannot disprove the great weight

of the record, so it merely cries that to recognize WTI's manufacturing rights would be "no

---

[20] Ex. 301(B). (Rynning's recognition to Mala's Board that the CART project was "high-risk" and "could costs [Mala]" but Mala could "learn technically even if the project fails is probably worth the money" because it would enable Mala to use WTI's knowledge and contacts in other projects.)

[21] See Mala's Post-Hearing Brief at 20.

[22] See WTI's Post-Arbitration Brief at 5-9 and Ex. 422 at (J. Rynning's admission to Mala's Board that *"Witten has the right to take Mala's know-how and turn to another supplier.  The agreement is constructed this way."*)

[23] See Ex. 321 and 385; On pg. 17 of its Post-Hearing Brief, Mala alleges that WTI paid only $125,000 of its $500,000 obligation to Mala for CART prototype development.  This is untrue.  WTI's satisfaction of its $500,000 obligation was comprised of $125,000 cash, software licenses to Mala, and patent costs paid for Mala.

[24] See Mala's Post-Hearing Brief at 12.

[25] See WTI's Post-Arbitration Brief at 5-9.

fair"[26] to Mala, as if Mala had not so obviously agreed to precisely that result in the LA and admitted the same in compelling internal documents.[27]  Further, Mala's assertion that it *never* gives its know-how to *anyone* further proves Mala's fraudulent scheme to induce WTI into agreements by promising WTI manufacturing rights/Know-How while never having any intention to deliver on those promises.[28]

IV.  **Mala's Fraud in Procuring WTI's Glue Patents.**

    a.  **The Arbitrator Has Authority to Require the Return of the Glue Patents.**

Mala argues that the Patent Assignment arises solely from the ESA, but the truth is that the PDA & LA determined the parties' intellectual property ownership rights not the ESA.[29]  Mala's President, Tommy Leijon admitted that the IP rights arose and the assignment was made pursuant to the LA[30] and that if the Glue Patent had been erroneously assigned, then it should be returned to WTI.[31]  WTI urges the Arbitrator to review again WTI's Post-Arbitration Brief at 12-16 and 24-26 for full explanation on this point.  Furthermore, under the LA Mala was to receive IP which was "an improvement" to Mala's hardware, not all IP "related" to the CART as stated in Mala's Post-Hearing Brief.[32]  Bernth Johansson testified the Glue Patent is *not an improvement*, end of story, they have no rights to either of the patents.[33]

    b.  **The Evidence Calls for the Glue Patents' Return to WTI**

Mala would have the Arbitrator believe that WTI sandbagged it by not timely raising the

---

[26] See Mala's Post-Arbitration Brief at 15-19.
[27] See, e.g., Ex. 422.
[28] See Mala's Post-Hearing Brief at 16.
[29] See PDA, Ex. 1 at Section 6; LA, Ex. 3 at 1.
[30] Ex. 417H (Leijon's 10/19/99 demand to F. DeCosta, WTI's patent attorney, requesting copy of Timing Circuit patent application, *twice* referring to the patent as the hardware patent "covered by the LA."); Ex. 417L (Leijon to F. DeCosta 4/12/00 stating same thing as 417H);
[31] J. Rynning depo. At 75/9-76/8, 86/4-9, 89/20-22, 91/14 to 92/3, and 94/10-16; T. Leijon Depo. At 107/20-108/01 and 110/13 to 111/15.
[32] Mala's Post-Hearing Brief at 22.
[33] B. Johansson Testimony at 1470/21 to 1472/16; See also Ex. 350 at M 000917 (reflecting WTI's position that the Glue Patent was general and not dependent on hardware.  Mala never objected to this characterization).

Glue Patent/Patent Assignment issue. The record demonstrates, however, that WTI pled Mala's

fraud in its initial counterclaim and included in its plea for damages and requested "the return of

all intellectual property and _patents_ conveyed to Mala as a result of the PDA and LA."[34] In the

parties' 11/10/05 hearing, Mala's counsel argued that the Patent Assignment fell outside the

scope of arbitration, but the Arbitrator ordered[35] that he would decide "whether there is a factual

basis for [WTI's] claims for relief will be decided after a full hearing of the issues." WTI further

alerted Mala of its continued intent to explore this issue when it deposed Tommy Leijon and Jan

Rynning on the subject in February 2006,[36] and after Leijon recommended that WTI ask the

involved patent lawyers about the assignment, WTI suggested that both parties waive their

attorney-client privilege so that the issue might be laid bare for close scrutiny; Mala refused, and

WTI expressed frustration with being precluded from exploring the facts surrounding the Patent

Assignment.[37] While Joe Berl's testimony would have been consistent with Mr. Clifford's and

Mr. Green's on this point, it would have added very little to WTI's already solid case. It was for

this reason (not for fear) that WTI did not call him to testify. Indeed, WTI would never have

offered to waive attorney-client privilege with respect to Mr. Berl's work if WTI feared his

"story" were inconsistent with WTI's claims. Further, WTI did not want to call Mr. Berl to

testify on this point with no reciprocal waiver of the attorney-client privilege from Mala.

Ironically, Mala realized at the hearing that WTI had put on compelling evidence of Mala's theft

(even in Berl's absence) and ended up waiving the privilege anyway so as to present Linder as a

---

[34] See WTI's Response and Counterclaim to Mala's Supplemental Demand, 10/07/05 (emphasis added). WTI had discovered the erroneous assignment but was still attempting to understand how it was effectuated.
[35] See Preliminary Hearing Report and Second Scheduling Order at 2, subsection 2.
[36] See Rynning depo. At 75-76, 86, 89, 91-92, and 94; Leijon Depo. At 97-111 and 195-204.
[37] See Email, E. Lewis response S. Bushnell, 3/29/06, attached hereto as Ex. C, responding to Exhibit "D" of Mala's Post-Hearing Brief at 27 and attached thereto.

rehabilitating witness.[38]

The documentary evidence of the parties' Patent Assignment negotiations reveals: (i) that the Glue Patents are *not widget patents*[39] protecting Mala's hardware but rather are *process patents* protecting Alan Witten's entire process (which functions irrespective of how the hardware is configured); (ii) *no prior discussion between the parties whatsoever* concerning the Glue Patents' assignment; and (iii) Mala's knowledge (at least through its patent attorney, Walter Linder) that the Assignment it drafted would grab the Glue Patent(s) Mala had wanted for years but of which WTI had always claimed exclusive ownership in previous disputes.[40]  The Assignment itself only lists one patent – the Timing Circuit patent – by name, and, as the Arbitrator noted[41] at hearing, Tony Clifford never understood the significance of the Assignment's "CIP" language.

Mala charges WTI with paying poor attention to detail, when, in reality, WTI never even knew that the Timing Circuit Application was "abandoned" or that the Glue Patents would qualify as a "CIP" of the Timing Circuit Patent until Mala's scheme to steal the Glue Patents were revealed.  Had WTI known or intended to assign the Glue Patents WTI would have just assigned it/them outright.  Perhaps most disconcerting in Mala's brief is the assertion *that Mala had no duty to reveal that the Glue Patent (not just the Timing Circuit Patent) would be assigned* because WTI was represented by counsel;[42] this statement reveals with crystal clarity that Mala and its attorneys *knew* Mala was getting more than it bargained for and deliberately kept quiet in hopes that its fraudulent plan to acquire the Glue Patents would succeed.  WTI is amazed at

---

[38] WTI would have appreciated prior notice of Mala's intention to call Linder for this purpose, especially in light of WTI's February request.

[39] Linder's opinion of why the Timing Circuit patent does not pose an infringement risk impliedly admits that it is not a process patent but a patent for a widget, a radar array and timing circuit, apart from any process for using it.

[40] See WTI's Post-Arbitration Brief at 12-14 and exhibits cited therein.

[41] Tr. at 1263/21 to 1264/4.

[42] See Mala's Post-Hearing Brief at 25.

Mala's audacious claim that WTI bore the burden to *discover* Mala's theft by the usage of "patents" in the Assignment, as if Mala had no duty *not to steal* the patent in the first instance. WTI is absolutely shocked by Mala's unscrupulous behavior and wonders why Mala does not now just concede that it acted deviously rather than trying to justify and rationalize its behavior using technicalities of patent law.[43]

### c. Mere Licenses to the Glue Patents Are Insufficient to Make WTI Whole.

Mala sanctimoniously touts[44] its willingness to "give up rights" by granting WTI a mere *license* to the Glue Patent (now Glue Patents) it obtained using fraudulent means, boldly implying that WTI should be happy to accept measly licenses to access the very process WTI invented, patented (WTI's shareholders paid for) and used as the basis for its entire business! Mala is now glad to offer *licenses* because it knows that *owning* the rights to the entire RT process gives it value leverage in the market – leverage WTI created and patented – and that it is lucky to have gotten away with owning the patent at all.  The result Mala seeks would clearly not "put the parties on the same footing"[45] as Mala asserts.

### V. **WTI'S Damages**

First, WTI did present documentary and testimonial evidence of its damages during the hearing by showing the frequency with which it had to (i) engage attorneys to deal with Mala's many demands; (ii) pay exorbitant repair and freight fees; (iii) pay royalties to Mala for a product that never met PDA specifications or performed adequately; (iv) endure the frustrating inability to follow up[46] with interested prospective customers or order new CARTs due to Mala's failures

---

[43] Mr. Linder admitted actions with respect to Mala's Glue Patent seizure raise grave questions of professional wrongdoing, and WTI is truly appalled that Mala and its current counsel have chosen to justify this questionable behavior instead of distancing themselves from it.
[44] See Mala's Post-Hearing Brief at 2, 27-28.
[45] See Mala's Post Hearing Brief at 4.
[46] See infra. at 15, n.67.

to make the CARTs operational, reproducible, and available for use in the U.S.; (v) pay patent

costs without Mala's promised assistance; (vi) pay $80,000 more on its agreement to purchase 3

CARTs in 1999; (vii) pay for know-how from another source in mitigation of damages as a

result of Mala's failures; and (viii) endure the turmoil wreaked by Mala's fraudulent schemes,

among other things. Exhibit 26 to WTI's Pre-Arbitration Brief sets forth a portion of those

damages, and an additional spreadsheet was submitted with WTI's Post-Arbitration Brief with

more complete accounting of WTI's exact damages in terms of dollars. To Mala's assertion that

WTI failed to provide evidence in response to Mala's damages interrogatory, WTI responds that,

due to the complex nature of the harm perpetrated against it, WTI's damages have largely been

difficult to quantify until recently. WTI submitted its damages as soon as that information was

reasonably determined.

VI.   **Mala's Fraud Relating to Its Patent License Agreement with GSSI**

WTI largely rests on its briefs on this issue but must also challenge Mala's disingenuous

assertion that WTI, presumably in LA, Section 7, assumed the risk of third party infringement

claims like the one GSSI could (and most likely *would*) bring against WTI for exercising its

manufacturing rights. Please note the risk WTI assumed in LA, Section 7 was *only* that of

infringement suits "caused by the Licensee [WTI]"; any argument that this provision somehow

applies to the potential infringement suit to which *Mala* exposed WTI with its "secret" GSSI

agreement makes no sense in this context. How could WTI be said to have "caused" or assumed

responsibility for any patent infringement claim by GSSI? Even more noteworthy is the

*admission* built into Mala's argument. If Mala truly believed WTI bore the risk of any third-

party infringement suit which might arise, then the intent element of WTI's fraud claim is

automatically satisfied in that Mala *knew* that it was exposing WTI to liability with its agreement

with GSSI and deliberately concealed the agreement's existence and terms from WTI, believing all the while that WTI could be sued because it had purportedly assumed all liability for patent infringement.  In short, Mala brokered its secret deal with GSSI to protect only itself[47] while knowingly setting WTI up to be sued.  WTI in no way created or assumed this risk, and it finds no "comfort"[48] at Linder's feeling that GSSI has no viable claim, as his opinion will prove wholly moot when WTI faces the onslaught of expensive litigation at the hands of GSSI.

    VII.    **Mala Multiple Breaches of the LA**

        a.    **FCC Issue.**

The evidence[49] emphatically supports WTI's claims of Mala's many breaches of its obligations to TWO.  First, Mala's failure to apply for FCC waiver is indefensible; the PDA required Mala to build, to WTI's specifications, a 200MHz CART of a particular width[50] which Mala understood WTI would use for utility locating in the U.S. pursuant to the LA.  Knowing its obligations to provide such product and the importance WTI placed on having the array be of certain width and 200 MHz antenna frequency,[51] Mala should have fervently sought FCC waivers for the 200MHz CART for which WTI bargained.  Instead, Mala failed entirely to

---

[47] Had Mala been acting in good faith, it would have immediately notified WTI of the potential infringement issue as soon as it was contacted by GSSI in 2000 and asked GSSI for permission to include WTI in the "royalty payments to avoid a lawsuit" trade-off.  GSSI would have gladly accepted, and WTI would have gladly paid, additional royalties to protect WTI's exercise of manufacturing rights under the LA.  The truth is that Mala must have believed that it could not reveal the issue to WTI then and risk losing WTI's allegiance during the CART development period; indeed, had WTI been informed of GSSI's assertion of potential infringement and Mala's apparent inability to convey manufacturing rights to WTI free and clear, it would never have executed the ESA with Mala to activate the LA.  Mala knew that it was placing WTI's manufacturing rights on precarious footing with its GSSI deal but despicably chose to do so anyway to protect its own ability to profit from its relationship with WTI.

[48] See Mala's Post-Hearing Brief at 33.

[49] See, e.g., WTI's Post-Arbitration Brief at 26-34.

[50] See Exhibit "1" at Exhibit "A", "Performance Specifications for Mala,", Item 1: "the antenna system should have 16 channels of antenna pairs with 20cm spacing between each antenna pair center points."  GSSI's FCC approved 400 MHz array has a six-foot wide survey path and is similar in this regard to our 200MHz array which isn't permitted by the FCC due to its emissions.  Mala's FCC-approved 400 MHz array is configured so that it is half as wide as GSSI's.

[51] See PDA Ex. 1, Specifications.

pursue FCC approval[52] for the 200 MHz CARTs or to reconfigure the 400 MHz CARTs to be as

wide as the 200 MHz version. Worse, Mala constantly and dishonestly assured WTI that it was

working on the issue, knowing all the while that it had no intention of doing so, as it admittedly

"had no incentive to fix the FCC problem."[53] Plus, Mala's offer raises another question: if the

CART is so commercially viable in its present condition and requires no further upgrades saying

they could sell 100 of them, why has *Mala itself* been unable to sell them using the five (5)

software licenses WTI provided in the ESA?[54]

The answer to this question is evident when one looks at the evidentiary record[55]

concerning difficulties in market uptake along with the CART's countless problems which WTI

and others have repeatedly brought to Mala's attention, only to be ignored. What Mala dismisses

as a "handful of emails" containing "isolated complaints" is actually no less than thirty-five (35)

exhibits, most of which contain multiple emails expressing WTI's dissatisfaction with the

---

[52] Mala correctly states on page 34 of its Post-Hearing Brief that "no one in the GPR industry... has received FCC approval or waiver for a 200 MHz CART. However, Mala conveniently ignores the fact that GSSI could reconfigure its higher-frequency array to be just as efficient as a 200 MHz array) *has* received FCC approval; if GSSI could reconfigure its higher-frequency array to be just as efficient as a 200 MHz design so as to obtain FCC sanction, Mala certainly could have done so, as well. The only explanation for Mala's utter inaction in this regard is that it wanted to contribute to WTI's downfall (*see* Exhibit 331 at M3842.1-2.3, discussing Mala's plan to "contribute to [WTI's] bankruptcy...") and take both WTI's assets and its business opportunity.

[53] Exhibit 354 at WTI 4455. See also Exhibit 357 at WTI 5016 (WTI asking for response on FCC waiver issue following no clear responses from Mala to date); Exhibit 366 at WTI 2056 (Leijon assuring WTI that the FCC problem is the only reason Mala cannot set it CARTs and that Mala is "doing [its] best an spending a lot of efforts ad money" to apply for FCC waivers); Ex. 376 at WTI 2211 and Ex. 378 at WTI 1884 (both regarding Mala's counsel's assurances that Mala would submit its 200 MHz waiver application as soon as the 400 MHz waiver is granted). See also Tr. At 1449/11 to 1450/12 (B. Johansson's admission of both Mala's failure to apply for 200 MHz waivers and one reason for that failure-that the application process "involved quite a lot of money," "$7,000").

[54] Indeed, as Mr. Leijon testified, only one (1) of the five (5) software licenses WTI sold it in the ESA is currently in use. Leijon, Tr. at 491/19 to 493/6; Rynning, Tr. at 239/9-17.

[55] See WTI's Post-Arbitration Brief at 15 and 26-27, along with all the documents referenced in fn. 64 therein. See also T. Leijon's testimony when questioned on just a few of these documents, Tr. at 589/3 to 601/3. It is worth noting here that Mala's claims (Post-Hearing Brief at 35) mischaracterize the facts concerning the Craig A. Smith issue. The truth is that WTI's dismantling did not create the CART's problems (an accomplished electrical engineer, carefully performed the task, and the technical failures later reported were not of the type caused by disassembly); further, as R. Green explained, WTI dismantled the equipment to avoid paying an additional $7,500.00 fee (which, was never discussed before WTI arrived in Charleston to pick up the CART).

WTI Reply Brief

CART's operability and suggestions for improvement.[56] Mala ceased all development efforts on the CART years ago.[57]

### b. Patent Costs.

As explained in WTI's earlier briefs,[58] Mala has failed to share patent application costs as agreed in PDA, Section 6.03. Mala incorrectly asserts that it paid for the application that issued the Timing Circuit patent; [59] the truth is that Mala's patent attorneys simply filed the draft application WTI's patent attorneys had charged WTI some $40,000 to prepare.[60] During arbitration, WTI proved that it had spent much time and money obtaining patents covering the CART,[61] and Exhibit "H" to WTI's Post-Arbitration Brief lays out WTI's damages in this regard.[62]

One particular admission to this fact was an email from J. Rynning to R. Green on 10.23.00 where he states that to close the PDA and begin the LA "Mala has to produce a set of drawings and designs of the CART … Witten must deliver a financial statement to the hardware patent from Finnegan & Henderson."[63] This language is important in that it's an admission of three things: 1) Mala is obligated to pay WTI's patent costs;[64] 2) Mala is obligated to produce the manufacturing details; and 3) the Timing Circuit patent (and assignment) arises from the

---

[56] See WTI's Post-Arbitration Brief at 15, n. 64.
[57] See Exhibit 384 at WTI 3309.
[58] See WTI's Pre-Arbitration Brief at 36-37 and WTI's Post-Arbitration Brief at 14-15 and 29-30.
[59] See Mala's Post-Hearing Brief at 17-18.
[60] See Ex. 301A (7-30-97 Ltr. in which R. Green notifies J. Rynning that Dr. Witten is developing specifications for the machine); Ex. 417B and 417D (S. Green's 3/29/99 Ltr. notifying B. Johansson that T. Devany and others are working on the application for the Timing Circuit patent and B. Johansson's Ltr. re: changes); Ex. 417H (Leijon's 10/19/99 demand to F. DeCosta, WTI's patent attorney, requesting copy of Timing Circuit patent application, *twice* referring to the patent as the hardware patent "covered by the LA."); Ex. 417L (Leijon to F. DeCosta 4/12/00 stating same thing as 417H); Ex. 5 (Mala's Timing Circuit patent which is almost identical to WTI's application Ex. 12).
[61] Practically all of Ex. 417, with its 29 counterparts, evidence the extensive involvement and costs of WTI's patent attorneys.
[62] Because it encompassed only the process Dr. Witten invented, WTI never expected Mala to pay half the costs of obtaining the Glue Patents.
[63] Ex. 321.
[64] Note the date of this document is **after** the date Mala filed its Timing Circuit patent, Ex. 5.

PDA and LA (not the ESA). These are very important admissions by Mala's Chairman which proves multiple assertions by WTI.

### c. Failure to Provide Documents for Manufacture/Repair.

WTI refers the Arbitrator to pages 4-7, supra, in responding to Mala on this point,.

VIII. <u>**WTI's Efficient Sales Organization**</u>

In connection with its assertion that WTI failed to meet its sales obligations, Mala states that "WTI refused to promise minimum sales or revenues but, instead, promised to create and maintain an efficient sales organization for the [CART]";[65] indeed, the LA contains no minimum sales provision, largely because WTI has always had, apart from Mala, *every incentive* to market the CART in that it is WTI's brainchild[66] and the sole product upon which the corporation started its business.[67] Mala never would have enjoyed the opportunity it now has absent WTI's creative vision for the CART and selection of Mala to fabricate the hardware WTI scientists required.

Next, Mala remarkably calls the CART a "dead product"[68] due to WTI's alleged failure to meet its sales obligations. If the CART is "dead" it is only so because Mala set out to *cause* its death[69] so that WTI would have no product to license, its business would go under, and Mala could seize WTI's source codes under ESA, Section 3, improve the CART, and sell CART services without WTI globally. As the arbitration record reflects, Mala cunningly ceased all

---

[65] Mala's Post-Hearing Brief at 5.
[66] Ex. 418, Tab 15 (A. Witten's 1998 paper on the geophysical diffraction tomography process he invented); <u>See</u> also Tr. at 1266/12 to 1282/04.
[67] Minimum sales requirements are often used as incentives for Company A to sell Company B's product or Company B will find another sales rep. When the product is Company A's invention to begin with. Company B can not hold Company A to a minimum. Company A would just replace Company B as a manufacturer. Even besides that hypothetical, WTI's goal was to *license* its own software thereby creating sales for Mala.
[68] Mala's Post-Hearing Brief at 5.
[69] Tr. T. Leijon pg 1477/3-7 "Q From the time of spring 2002, to October 2004, Mala could not send any new 200 or 400 megahertz CARTs into the country, is that correct? A That is correct, yes. We could only replace and repair, and so on, yes."

development on the CART in 2002[70] and *deliberately* chose not to seek FCC approval[71] for the

200MHz CART, all the while knowing they were denying WTI 90% of its Business Plan and the

ability to license the CART.   Any marketing difficulty WTI has encountered has been because

of Mala, not because its sales organization is not efficient.[72]  Even the best sales organization

must have available, mass-producible products to sell or license in order to be successful, attract

new customers,[73] and keep its existing customers coming back.[74]  Mala has failed to provide

WTI with such a product.[75]

Jan Rynning admitted to WTI in June of 2004 that Mala understood it would be very

expensive and take along time to penetrate the market.[76]  This was just one year prior to them

filing a demand to terminate the LA.  Contrary to Mala's Post-Hearing Brief, Mala also agreed

---

[70] Exhibit 354 at WTI 4455 (no incentive to fix CARTs);

[71] Tr. at 1449/11 to 1450/12 (B. Johansson's admission of both Mala's failure to apply for 200 MHz waivers and one reason for that failure-the application process "involved quite a lot of money," "$7,000").

[72] Ex. 39, tab's 2 - 8 - Witten Business Plans, *Business Models and Growth Strategy* (August 2000, M003402; January 2001, M002111;  September 2002, WTI 07090; June 2003, 07105;  June 2004, WTI 07050; October 2005, WTI 07225, 07226) and all during negotiations in 1997, WTI has stated its growth strategy hinged on Licensees of the CART to carry up to 90% of the Market. WTI has always stated its role was that of a supplier of technology and innovation with its own crews primarily being tasked to prove the efficacy of the technology and show the market how to adopt Radar Tomography. Mala has always been aware of the importance of new CARTs to execute WTI's Business Plan and Growth Strategy. Mala has deliberately arranged not to deliver new CARTs for WTI's Licensing Program, the key component to its Business Plan.

[73] On pp. 5-6 of its Post-Hearing Brief, Mala states that WTI has never "sold a single CART" during the parties entire relationship and that "WTI contracted to sell  CARTs, not just raise investment funds for its own use."  It is true that WTI never sold a single CART even though WTI gave Mala the sale of the 4 Schlumberger CARTs because WTI's interest is in *licensing*; WTI never purported to be in the business of *selling* CARTs the way Mala does but has instead sought a licensing program. Mala is using a semantics game to imply that WTI was obligated, and failed, to *sell* CARTs, which was patently untrue.  Further, WTI would not be in the position of having to raise investment funds in the first instance had Mala supplied CARTs worthy and capable of widespread deployment.

[74] It is true that WTI has gleaned interest in the CART from international sources.  See Mala's Post-Hearing Brief at 7, n. 22.  This interest, however, cannot be met without CARTs capable of mass production and deployment on a widespread basis.  Further, Mala's failures have left WTI powerless to go even so far as the negotiation stage with prospective customers, as WTI cannot negotiate in good faith knowing that it has no CART to deliver.  Under these circumstances, if WTI did negotiate in this ways, it could face legal liability for misleading its prospects.

[75] Aside from Mala's failures, the CART has been a hard "sale" due to the facts that (i) it is expensive to obtain and maintain and (ii) it is an entirely new approach to underground utility locating which can only be advanced by, as R. Barbee put it, "teaching old dogs in the construction industry new tricks."  See Tr. at 1063.  Further, Mala's Post-Hearing Brief, pg. 5, quotes R. Green at Tr. 1327.  This quote was taken out of context; WTI urges the Arbitrator to review that testimony in light of the line of questioning to which Green was responding. The "two men" Green mentions are himself and Dr. Witten; he was in no way characterizing his current sales efforts.

[76] See Ex. 327 ("We know from Witten, Inc., Schlumberger and GEL that it will take a long time with a lot of investments in marketing and demos etc before you can start to get some cash flow back and even a longer period of time before you start to earn some money form [sic] the technology.")

that WTI should pursue a leasing arrangement rather than sell the CARTs directly. [77]

Mala goes on to cite Scott Carney's testimony of WTI's allegedly "negative reputation" and "poor service". [78] It is worth nothing that Carney based these assertions on WTI's work in a *single, isolated job* in Florida run by now estranged former employees, Burns and DeRubeis, and that Mr. Green, frustrated with the situation also, solicited Carney's services for assistance in identifying its operational shortcomings on that job and the problems those employees were causing. [79] Further, Carney's testimony cannot be given much credence in light of his obvious bias in favor of Mala, who not only shares office space with his company but also gives it free CART repairs and expensive CART parts free of charge; further, WTI and GEL are competitors, and Carney has everything to gain from undermining WTI's good name.

IX.    **WTI is Solvent**

WTI is solvent, and the record does not support termination of the LA based on insolvency. Case law in NY shows the common law test of solvency is what is applied in circumstance such as ours. The common law test for solvency is "the inability to meet obligations as they mature in the ordinary course of business." [80] In New York there are two statutory sources of insolvency, Mala cites one of them but fails to recognize the statutes are narrowly used in cases of fraudulent and preferential conveyances. [81] [82] Not that WTI has a

---

[77] See Mala's Post-Hearing Brief at 5. see Ex. 303 at WTI 00321 ("We agree that Witten should pursue a leasing arrangement for each CART unit rather than sell them outright.")
[78] Mala's Post-Hearing Brief at 7.
[79] R. Green, Tr. at 1323/9 to 1325/4 (WTI bringing Craig A. Smith on board to help with miscommunications); S. Carney, Tr. at 368/1 to 370/1 (Carney was helping WTI better understand and reach CART market).
[80] See attached Ex. D  Re Wil-Low Cafeterias, 22 F. Supp. 617 at 619 (S.D.N.Y. 1937) (citing, e.g., Brouwer v. Harbeck, 9 N.Y. 589 (1854); American Castype Corp. v. Niles-Bement-Pond Co., 266 A.D. 557, 559, 42 N.Y.S.2d 638, 639 (1943); see also Ex. E Aiken v. Herman Wolz Textile Corporation, 152 N.Y.S.2d 664 at 666 (1956).
[81] Mala's Post-Hearing Brief at 8.
[82] See Ex. F attached, §271 in the N.Y. Debtor and Creditor Law is under Art. 10 – Fraudulent Conveyance, which is not applicable. See attached Ex. G In re Gordon Car & Truck Rental, Inc., 59 B.R. 956, 961 (Bankr. N.D.N.Y.1985) where the court states "neither party cites any statutory provisions which require application of either insolvency test. Therefore, the Court finds the License Agreements are controlled by the common law meaning of insolvency."

problem with this test because it also does not show WTI is insolvent, but counsel for WTI believes the proper law needs to be applied.

In addition to all of the arguments previously set forth by WTI on this issue,[83] Mala failed on all counts to prove WTI is unable to meet their obligations in the ordinary course of business. Even under the test Mala puts forth, Mala has not proven WTI's liabilities exceed the *fair market value* of WTI's assets.[84]  A point Mala appears to misunderstand is that under GAAP WTI could characterize a portion of the $13 million spent on developing the IP internally as an intangible asset.[85]  Mala can not argue and has failed to prove that WTI's liabilities exceed our assets when a major portion of the assets are not represented in WTI's books.[86] [87]  As for WTI's situation getting worse, Mala also fails to understand that a significant portion of the monthly operation cost goes to continued marketing, software development, cost of replacing the know-how Mala refuses to deliver and paying for the cost of litigating with Mala.  Besides that WTI is continuing to pay its bills as they become due in the ordinary course of business.

Mala's attempt to discredit Mr. Shea's valuation through the projections provided by WTI flatly fails in that those projections are tied to one key document, the "Single CART Revenue Analysis."[88]  This analysis is backed up by four years of field history and millions in earnings on real projects by WTI and Licensees.  History has proven that the revenue build up is very accurate and hence, Shea's analysis based upon the history of previous CART revenue is

---

[83] See WTI's Pre-Arbitration Brief at 23-28;  see also WTI's Post-Arbitration Brief at 37-41.

[84] If WTI's Net Present Value, as calculated by V. Shea, is $155 million, and its total liabilities are less than $5 million, it is easy to see based upon ANY calculation of value that the fair market value of WTI's assets exceed its liabilities.  The best evidence of that fact is the extent that Mala has gone to steal these assets.

[85] Considering there is a difference of $3.5 million between WTI's assets and liabilities, that amount could easily be recaptured as part of the costs expensed on developing the IP.  WTI has not calculated the exact cost though and placed it on the books.  WTI chose to receive a tax break rather than making the books look pretty.  This allowed WTI to build up a significant asset base while maximizing its tax write off capability.

[86] Hence, Mala's claim that Mr. Green "outright lie[d]" when asked about whether WTI is insolvent can not be given any credence.  Mala's Post-Hearing Brief at 8.

[87] It is not WTI's burden to prove we are solvent, but is Mala's burden to prove WTI is insolvent.  Even so, WTI's IP assets are valued through Mr. Shea's net present value calculation and clearly exceed the liabilities listed.

[88] Ex. 39, tab 8, WTI 07225.

accurate. Mala knows that a **single** CART has repeatedly proven its ability to earn profits up to $250,000 / month. Mala also believes there is an easy market in the US alone for 100 -150 CARTs. That is why they have stooped to such vile behavior to stop the CART's from getting on the market under the current LA. They simply want WTI's rights under the LA.

Another issue to address is WTI's stock value. Previously WTI stock sold for a peak of $2.50/share in 2000 to sophisticated investors who managed large investment funds. Since Mala decided to stop cooperating with WTI, WTI has been unable to act upon its Business Plan and Growth Strategy. This devastated WTI's ability to grow exactly when investors are seeking performance. The fact that Mala made this decision over 4 years ago exactly parallels WTI's declining stock value. WTI has **never** sold equity below $.50/share. The $.11/share value Mala claims is absurd and deceptively values $.01 warrants the same as a stock transaction. Mala know these warrant payments are for personal Letters of Credit that support WTI's credit facility.[89]

Lastly, for Mala to claim that WTI cannot get repeat business because WTI performs so poorly is rich in light of Mala and its Licensee behavior in deceptively representing themselves and WTI to potential customers in the state of Florida. WTI presented evidence at the hearing of lying and back stabbing by Mala and its Licensee.[90] They, of all people, know that they strategy for market adoption of the CART was to, as Mr. Kelly stated, make radar tomography the "poster child," a standard by the FL DOT. Mala is aware that this adoption is concluding and they have one last chance to break the LA and destroy WTI. If Mala is forced to abide by the

---

[89] B. Hurse testimony, Tr. at 1377/5 to 1379/1 (explaining the warrant sales).
[90] See Ex. 358 at WTI 00715 (email from G. Jeffries, WTI's Licensee/Craig. A. Smith ("CAS"), 1/22/04 regarding calls with a customer where Jim Cook of Mala was lying to the customer saying CAS did not have CART, which Jeffries was upset because it was calling his integrity with the customer into question. Cook told Jeffries directly that Mala could "yank [CARTs] out from under Witten at any time."); and see Ex. 375 (email from Jeffries, 8/5/04 where S. Carney lied to another customer of CAS and was interfering with business).

WTI Reply Brief

exclusivity of the LA, the majority of the value of the opportunity created by Dr. Witten's genius will flow to Witten Technologies and its shareholders, not Mala. Therefore Mala has done everything in its power, to ensure that does not occur.

## X.    Attorney's Fees

Mala contends that WTI deserves to be sanctioned-in the form of an award to Mala of attorneys' fees-for allegedly refusing to agree to the "reasonable" offers Mala allegedly offered WTI over the years. WTI implores the Arbitrator to consider the weighty evidence illustrating the erratic, obstructionist, abnormal, even fraudulent behavior WTI has endured in dealing with Mala in determining which party has acted "reasonably". Mala's determination to keep up the "eternal negotiation"[91] with no commitment to the deals it signed with WTI (not WTI's stubbornness) led Mala to drag WTI into arbitration proceedings. WTI now knows, in view of the documents and Tommy Liejon's testimony[92] that none of its agreements with Mala were ever worth the paper they were printed on; indeed, how does a company like WTI place any confidence in Mala or Leijon, either personally or in business, when their motivation to undermine WTI is so obvious? In short, Mala has lied to and stolen from WTI, just as WTI has counterclaimed and verified with evidence,[93] and should be sanctioned accordingly by being made to pay WTI's attorney's fees[94] in connection with the arbitration proceedings Mala instigated.

Because Mala decided to bring these proceedings, WTI was forced to hire a full-time

---

[91] See Ex. 331 at M3842.1-2.2.
[92] See e.g. Tr. at 638/21 to 647/03.
[93] For a representative sample of Mala's dishonesty and theft, please see the following: Ex. 343 and 344 (March 2002 emails from Schlumberger re: CART problems); Ex. 346 (Leijon's response to Schlumberger lying about never having received feedback on CART problems from WTI); Ex. 400 (6/23/05 Ltr. from D. Johnson of GSSI re: Mala lying); T. Leijon, Tr. at 645/17 to 647/3 (stating they lie to business partners); Ex. 313 (1999 Ltr. Agreement where WTI ended up paying $80,000 more than the contract called); Ex. 14 (Patent Assignment); Ex. 7 (ESA – failure to return $500,000 note marked "Paid In Full" and failure to sign the Software License Agreements for the 5 licenses to software received in the ESA.)
[94] WTI's attorney's fees calculation is attached hereto as Ex. H.

General Counsel, which it has never previously employed. Knowing the expense involved in handling such a complex commercial dispute WTI agreed to pay Ms. Lewis a small salary with stock option benefits to further and more fairly compensate her. This payment with stock options comprise a large part of the attorney's fees incurred by WTI. Mala should be forced to not only pay for Ms. Lewis' limited cash salary[95] but also the stock benefits WTI paid.[96] These fees are in addition to all other attorneys' fees and expenses incurred in the process of this arbitration. Mala in no way deserves to have its attorneys' fees paid, especially in light of the utterly appalling extent of the fraud it perpetrated and Mala's failure to prove that WTI breached the LA in any way.

### XI.    Conclusion

Based on the foregoing, Respondent respectfully requests that the Arbitrator find entirely in its favor, dismissing Claimant's claims and awarding Respondent damages, the return of its Glue Patents and Timing Circuit patent, and all other and further relief as requested.


Respectfully submitted this 9th day of June, 2006, by:


ERIN L.G. LEWIS, Esq.            BREE O. SULLIVAN, Esq.
Georgia Bar No. 450320           Georgia Bar No. 691141
Witten Technologies, Inc.        Bree O. Sullivan, LLC
3638 Overlook Avenue             109 Hampton Court
Macon, Georgia 31204             Thomasville, Georgia 31792

---

[95] It is true that Ms. Lewis has devoted a diminutive portion of her time to other matters; however, WTI hired Ms. Lewis specifically for this arbitration with Mala. Considering her numerous 60- and 80-hour work weeks devoted solely to this case, WTI conservatively included 80% of her salary in its attorneys' fees calculation. WTI's fees claim is entirely legitimate; even with the stock option payments, WTI paid much less in attorneys' fees than it would have had it hired outside counsel.

[96] In calculating the value of the stock options paid to Ms. Lewis, WTI relied upon Mr. Shea's expert valuation of WTI's stock at \$4.08/share. Ms. Lewis' contract calls for a \$0.34 strike price, leaving WTI a payment of \$3.74/share. In an effort to be abundantly fair and reasonable, WTI divided that figure in half (\$1.87/share) to calculate the value of Ms. Lewis' 175,000 shares, producing a total payment of \$327,250.00. Had WTI continued with outside counsel it easily would have paid much more than this.

WTI Reply Brief

M 003839 –3842

To The board of Mala GeoScience

Uppsala, September 11, 2001

**Regarding Witten**

At the board meeting on September 5 Tommy and me were instructed to in writing describe Mala's action alternatives in the Witten project and analyse the consequences of the different alternatives.

Regarding the current situation it is giver reference to the "undated" letter to Witten that was presented for the board on September 5. The letter was sent August 28 at 16.52 via e-mail.

In this context it should be mentioned that Witten currently are negotiating with GEL about a close relationship for the possibility to use the Cart for environmental mapping mapping/decontamination. DOD (department of Defence) has shown a strong interest in using the technology. GEL have expressed that the parties would like it if Mala got involved in this project. The application of the technology ought to be outside of the exclusiveness that Dycom and Schlumberger have. Possibly Wittens acting can be a new way of trying to save some parts of the business at a possible bankruptcy. If it is going to be a new company that will be created Witten will probably suggest that it <u>won't</u> be owned by Witten but by some of the private persons that are partners in Witten. Tommy and I want however point out that we don't have any information that confirms our speculations.

What action alternatives are thinkable? The following four main alternatives exist according to us.

1) <u>Cancel the agreement</u>.  If we cancel the agreement the consequence is that we can't even in theory count on that Witten will settle their debts to Mala. We won't get any royalties either. Probably Witten will try and find other contractors that can supply their need for Carts. Possibly Witten will try to copy Mala's construction. This is of course under the condition that Witten survives.

   For Mala a cancellation means that Mala have a product that is almost impossible to sell. What Mala could do in this situation is to develop its own software, which probably will take 1-2 years, possible more. The cost for the development is large. Mala will also have to bear the marketing costs for the product. Our judgemnet is that this alternative is not realistic.

2) <u>Passitivity</u> One alternative to the above is o wait and be passive. In comparison to the cancellation alternative the passiveness has the advantage that Mala has that possibility to get its claims covered, which currently are approximately 600.000 USD. Witten s also locked in the existing agreement with Mala, which among other things should keep them from copying the construction.

Civil Action No:  1:06-cv-01343

Respondent WTI Ex. No. 7

Arb. Ex. No: 331

M 003842.1

For Mala this can mean lower costs like costs for Tommy's and my travelling, cost for lawyers etc. Regarding attorney costs there is a risk that we can be hit be those despite conscious passiveness.

On the negative side it should be noted that the risk that the Witten project totally stops increases. This risk is of course hard to quantify. During our last contacts it has come to our knowledge that Green & Co are interested in help. Another aspect of the passiveness is that we through that possible contribute to a bankruptcy. Dycom's strategy seams to be to wait and se if they will survive. Possible is Schlumberger also doing that.

3) Bankruptcy. Bankruptcy is not per se an action alternative for Mala. Mala can however in one way or another contribute to a bankruptcy. One way is to be passive.

What will happen after a bankruptcy is according to our lawyers hard to predict. Our guess is that the patent that have been developed by Witten not yet are assigned/released from its inventor to the company and that Robert Green & Co will claim that these are not owned by Witten Tech Inc. With these patents as a ground part of the owners will try and build a new business. I this context it should be noted that also Mala has chosen this strategy to secure Mala that the patents that belongs to the company not are dragged in to a bankruptcy or are owned together with Mala, Allan Witten and Tony Deveny.

Schlumberger has, we know, prepared for a possible bankruptcy. We assume that they have investigated the risk of not getting their patents out at a bankruptcy. From the discussions that we have had with Schlumberger we have gotten the opinion that Schlumberger are safe in this regard. Schlumberger has also bought the software with source codes to be able to go through with the project even if Witten is bankrupt.

To sum up one can conclude that the consequences of a bankruptcy are hard to estimate. We are not convinced that Schlumberger is the best solution. Their efforts have so far only resulted in three sold Carts. Additionally, as will be seen in the letter to Witten, be questioned if the type of organisation that Schlumberger is, is such that it efficiently launches new technology.

4) Negotiate The last alternative is to try and contribute to a reconstruction of Witten. All of the involved are, we think, now convinced that Witten needs to be reconstructed to be able to live. It's obvious that the owners can't reform the system from the inside. In that case they should have done it a long time ago.

Whether Mala can contribute to a reconstruction we don't know. The parties (Witten and Schlumberger) seen however interested in trying this possibility.

The advantage with this alternative is that we at least know what will happen. Also it ought to be the only possibility to keep up the tempo in the project, even if the tempo is not very high.

Out of four bad alternatives we suggest the last, to keep to the eternal negotiation.

M 003842.2

# Capital Reporting Company

Page 1517

1    Deveny, U.S. patent application
2    09658188 filed 8
3    September 2001."
4    Do you see that?
5    A   I do.
6    Q   You would agree with me, I take it, that
7    the language in Exhibit 14, the second whereas
8    clause, is broader than the language in
9    subparagraph C of paragraph 1.1 of the settlement
10   agreement.
11       THE ARBITRATOR:  I am sorry, I didn't
12   quite hear.  If you would ask that question again.
13   BY MS. BUSHNELL:
14       Q   Would you agree with me that the language
15   in the second whereas cause of Exhibit 14, the
16   patent assignment, is broader than the language in
17   subparagraph C?
18       THE ARBITRATOR:  Thank you.
19   BY MS. BUSHNELL:
20       Q   Under Witten's obligations in the
21   exchange and settlement agreement Exhibit 7?
22       A   Yes, I mean literally there are

Page 1518

1    differences that could be interpreted that way,
2    yes.
3        Q   Why don't you look at Exhibit 263 which
4    is in the red book.  Do you know what Exhibit 263
5    is?
6        A   It looks like a list of the continuity
7    history of a series of patents presumably ones
8    involving this 188 application.
9        Q   I want you to compare with Exhibit 7
10   again subparagraph C, the patent application that
11   is to be assigned pursuant to the exchange and
12   settlement agreement, do you see that on this
13   Exhibit 263?
14       A   I would refer to it as the 188
15   application shown in the settlement agreement is
16   shown in Exhibit 263, yes, as one of the referenced
17   patent applications.
18       Q   So you understood that that application
19   was to be assigned to Mala, right?
20       A   Right.
21       Q   Why did you draft the language in Exhibit
22   14 to be broader than that, broader than just

Page 1519

1    saying "This one patent?"
2        A   Well, because this application, the 188
3    application, in fact, never even issued as a
4    patent, it went abandoned as shown here in this
5    other continuity data document, and in fact, what
6    happened is a couple of subsequent applications, we
7    call them continuing applications, were filed
8    claiming priority back to the 188 application.
9        So in order to ultimately get the rights
10   that were referred to in the settlement agreement
11   they went through a series of procedural approaches
12   in the Patent Office.
13       MS. LEWIS:  Objection to this testimony.
14   This is initially what Mala put forth previously
15   that they wanted Mr. Linder to testify to.
16       I objected to this testimony and it was
17   limited solely to his expertise as to whether the
18   Mala technology infringed upon the GSSI patent and
19   that was it.  This is all new testimony that I
20   never had an opportunity to examine Mr. Linder on.
21       MS. BUSHNELL:  I would like to respond to
22   that.  That is not true.  You never objected to

Page 1520

1    that.  When we got your answer and counterclaim it
2    said nothing about the GLUE patent and nothing
3    about a patent assignment.
4        I didn't know there was any issue in this
5    case about a patent assignment until I walked into
6    Tommy's deposition which was after we got the order
7    from Mr. Genoni in regard to the scope of Mr.
8    Linder's testimony.
9        Thereafter, we objected both during
10   motion practice and subsequently that the patent
11   assignment is pursuant to the exchange and
12   settlement agreement and not part of this
13   proceeding.
14       There's been a lot of testimony in this
15   case about this patent assignment, whether it was
16   appropriately or inappropriately done and I think
17   it is appropriate to have Mr. Linder testify about
18   what he did and why he did it.
19       THE ARBITRATOR:  I will accept it and in
20   fact I want to hear why he did it.
21   BY MS. BUSHNELL:
22       Q   Mr. Linder, why is this language written

67 (Pages 1517 to 1520)

Civil Action No:  1:06-cv-01343
Respondent WTI Ex. No. 8
Arb. Ex. No:

## Capital Reporting Company

Page 1521

1  this way in the patent assignment?
2      A   Routinely when we prepare patent
3  assignments we contemplate the possibility that the
4  application that might be pending at that point in
5  time will go through a series of continuations
6  before it ultimately issues as a patent and you get
7  secured rights.
8          Routinely when you file these
9  continuation patent applications they carry forward
10 your rights to secure patent protection on the
11 invention disclosed in the earlier application.
12     So you effectively need to refer to the
13 potential for continuations in order to ensure that
14 your client gets the rights that it bargained for
15 in the initial application.
16     Q   What is a continuation?
17     A   A continuation is an application that's
18 filed subsequent, after earlier an application,
19 which discloses identical subject matter as the
20 prior case.
21     Q   So a continuation of the patent
22 application that was to be disclosed or that was to

Page 1522

1  be transferred would contain ...
2      A   The continuation of the 188 application
3  and can have a specification that was identical to
4  the 188 specification.
5      Q   Do you know when the patent application
6  listed in the exchange and settlement agreement
7  went abandoned?
8      A   I do not know that right offhand.
9          THE ARBITRATOR: Let me ask a question.
10 Did you know at the time you did this that you, in
11 addition to covering continuation applications,
12 that you were picking up rights to a Mala
13 continuation in part application?
14         THE WITNESS: I specifically wrote it to
15 refer to a continuation in part, yes.
16         THE ARBITRATOR: Did you know there was
17 one at the time?
18         THE WITNESS: I do not recall knowing
19 whether I did or I did not. I don't recall whether
20 I knew that or not, but the reason I would have
21 included the words "continuation in part" is
22 because, generally, a continuation in part has the

Page 1523

1  identical subject matter of the parent, plus some
2  additional subject matter and the possibility,
3  therefore, would have existed that in the
4  continuation in part application, they could have
5  patented the same subject that was matter in
6  assigned 188 application.
7          THE ARBITRATOR: So the assignment should
8  apply only to patents covering the identical
9  subject matter? Is that what your intention was
10 when you did this?
11         THE WITNESS: Not necessarily, no, I
12 don't recall what my intention was exactly, but the
13 mere fact that there was the possibility that that
14 common subject matter could have been carried
15 forward was the reason why I think that good
16 lawyering dictates putting that terminology in the
17 assignment.
18         THE ARBITRATOR: Let me ask this then.
19 The exchange agreement that you're working from
20 which gave Mala the rights to this application, is
21 it correct that it only gave Mala rights to that
22 specific applications and any future application

Page 1524

1  that would result in a patent that covers subject
2  matter disclosed in this application?
3          THE WITNESS: It does refer -- I mean, it
4  does respect -- Are we referring to the settlement
5  agreement?
6          THE ARBITRATOR: Yes.
7          THE WITNESS: It does refer to, yes, the
8  rights to the patent and then there's kind of
9  little anomaly language here, but it refers to the
10 patent identified by this particular application,
11 that's right.
12         THE ARBITRATOR: So if there is a CIP
13 with a new invention in it, this clause would not
14 give Mala rights to that new invention, is that
15 correct? Is that your understanding?
16         THE WITNESS: I think it is silent on
17 that.
18         THE ARBITRATOR: What do you think the
19 law is on that?
20         THE WITNESS: I don't know precisely what
21 the law is on that.
22         THE ARBITRATOR: Go ahead. Sorry.

68 (Pages 1521 to 1524)

## Capital Reporting Company

Page 1525

1　Another question. No. You already answered it.
2　Go ahead.
3　BY MS. BUSHNELL:
4　　　Q　Let me have you look at Exhibit 12.
5　　　A　I have it in front of me.
6　　　Q　Is this the patent application that was
7　to be assigned as set forth in the exchange and
8　settlement agreement? Is it the patent application
9　identified in the exchange and settlement
10　agreement?
11　　　A　It is not the application identified. It
12　is a continuation of a continuation of the
13　application identified in the settlement agreement.
14　So it has, presumably, a specification that is
15　identical to the application identified in the
16　settlement agreement.
17　　　Q　At the point you did this patent
18　assignment in the fall of 2904, how long had you
19　been working for Mala?
20　　　A　I don't recall that exactly. Perhaps for
21　a few years before that, I think.
22　　　Q　Did you have an opportunity that Mala

Page 1526

1　insisted on owning its own technology?
2　　　A　I recall that generally when I first
3　started representing Mala, and there were some
4　disputes with Witten, the general focus was sort of
5　based upon a dichotomy between hardware and
6　software and the distinction was that Mala was
7　interested in the hardware and the software was
8　Witten's technology.
9　　　Q　Is the language in the patent assignment,
10　Exhibit 14, language that you and your firm
11　customarily used in patent assignments?
12　　　A　It is very routine patent assignment
13　language, yes.
14　　　Q　Could a person knowledgeable in your
15　business read this assignment to convey only the
16　patent application listed in the exchange and
17　settlement agreement?
18　　　A　I don't think that would be a reasonable
19　interpretation. No, in fact, it literally is not
20　because this specifically says that it covers
21　continuations and continuations in part.
22　　　Q　Do you remember whether you ever received

Page 1527

1　from Witten's lawyer or heard about any objection
2　from Witten's lawyer about this patent assignment?
3　　　A　I have no recollection of that, no.
4　　　MS. BUSHNELL: Nothing further.
5　　　MS. LEWIS: I need a few minutes.
6　　　THE ARBITRATOR: Take five.
7　　　　(Whereupon, a break in the
8　　　　proceedings.)
9　　　CROSS-EXAMINATION
10　BY MS. LEWIS:
11　　　Q　Mr. Linder, did you review the exchange
12　and settlement agreement prior to preparing the
13　patent assignment?
14　　　A　I did, yes. How immediately prior to
15　preparing it, I don't recall.
16　　　Q　Did you notice in the exchange and
17　settlement agreement that it referred only to the
18　single patent, the single timing circuit patent?
19　　　A　I don't recall that precisely at this
20　point, but given the fact that the assignment
21　refers to the same application number, I presumably
22　did, yes.

Page 1528

1　　　Q　Did you testify that Exhibit 263, which
2　was this parent continuity data, that has the
3　different continuation in part, is it your
4　testimony that you did not review this information
5　prior to preparing the patent assignment?
6　　　A　I don't recall testifying to that effect.
7　　　Q　Did you review correspondence between the
8　parties prior to preparing the patent assignment in
9　regards to the patent to be transferred?
10　　　A　Correspondence between Witten and Mala.
11　　　Q　Yes.
12　　　A　I don't recall having -- I mean, in the
13　course of my representation of Mala, I reviewed
14　correspondence. Whether I did that directly in
15　connection with assignment, I do not recall.
16　　　Q　You testified when you prepared these
17　patent assignments, you're preparing a patent
18　assignment so that your client gets the rights they
19　bargained for, is that correct?
20　　　A　Correct. I don't know if I said those
21　exact words, but I think that is a fair summary of
22　that.

69 (Pages 1525 to 1528)

# Capital Reporting Company

Page 1529

1    Q   How did you determine in preparing the
2   patent assignment what rights your client bargained
3   for?
4        A   Well, they would at a minimum have gotten
5   the rights to any of the subject matter that was
6   disclosed in the 188 application and any continuity
7   applications that followed from that.
8        Q   Is that just in your experience as a
9   patent lawyer or is that in your experience in
10  directly communicating with your client in regards
11  to this patent assignment?
12       A   Well, at a minimum that would be
13  something that I would do as an experienced patent
14  attorney. I don't recall precisely discussing the
15  details of the assignment with my client at the
16  time we were preparing it.
17       Q   You seem to suggest, and correct me if I
18  am wrong, but you seem to suggest that this patent
19  assignment was a form, where maybe you used a form
20  language that you used in patent assignments, is
21  that correct?
22       A   It is very conventional language for

Page 1530

1   patent assignments, correct.
2        Q   Yet you cannot say one way or another
3   whether you confirmed with your client what rights
4   they bargained for prior to preparing this patent
5   assignment?
6        A   I don't quite understand that question.
7        Q   You're saying, or I believe you're
8   saying, that this patent assignment contains
9   typical form language.
10       A   Yes, I would say that.
11       Q   You also said that you prepare patent
12  assignments so that your clients get the rights
13  they bargained for, but you cannot seem to say
14  whether you consulted your client to see if this
15  assignment gave them the rights they bargained for,
16  am I understanding that correctly?
17       A   No, I don't think so. Clearly, the
18  assignment was something that was done in
19  connection with the settlement agreement and the
20  settlement agreement by its expressed terms says
21  that they got the rights to the possible 188
22  application.

Page 1531

1        THE ARBITRATOR: Let me interject here.
2   How did you go from that to deciding that they also
3   got rights to all the corresponding foreign? Did
4   you look any other agreements between the parties?
5        THE WITNESS: I believe there were some
6   other agreements between the parties, but I don't
7   recall the details at that point.
8        THE ARBITRATOR: Did you look at those to
9   determine that they are also not only entitled to
10  this application in the U.S., but all the foreign
11  counterparts?
12       THE WITNESS: I don't recall, but
13  routinely foreigns flow with U.S. patent rights and
14  that would be pretty routine. I would have
15  expected that if that wasn't the case that the
16  attorneys for the other side would have negotiated
17  that issue.
18       THE ARBITRATOR: Again, though, you were
19  dealing from 1.1(c) in this settlement agreement
20  which has a very specific grant, is that not
21  correct?
22       THE WITNESS: Yes.

Page 1532

1        THE ARBITRATOR: Limited to the one
2   application.
3        THE WITNESS: It refers to the one
4   application, yes, but presumably that application
5   was already abandoned at that point.
6        THE ARBITRATOR: Thank you.
7        THE WITNESS: So that there was more that
8   flowed.
9   BY MS. LEWIS:
10       Q   You were engaged by Mala in 2000 to
11  negotiate with Witten's attorneys in regards to Dr.
12  Witten's patent which was Exhibit 86. Isn't that
13  correct? It is what we have been referring to as
14  the GLUE patent.
15       A   I do not recall exactly which application
16  it was, that the issues arose with respect to, but
17  there was a provisional application. I cannot
18  recall if the regular application had been filed at
19  that point or not. There was an application that
20  had different or had the inventive entities where
21  there was some overlap, I believe.
22       Q   I will bring you to Exhibit 417 at Tab O.

70 (Pages 1529 to 1532)

## KELLY & BERENS, P.A.

ATTORNEYS AT LAW
3720 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MINNESOTA 55402

SARAH E. BUSHNELL
sbushnell@kellyandberens.com

November 1, 2005

(612) 349-6171

FAX
(612) 349-6416

*__Via Email__*

Arbitrator Kenneth A. Genoni, Esq.
Ropes & Gray
Suite 900
One Metro Center
700 12th Street N.W.
Washington, D.C. 20005-3948

        Re:    <u>MALA Geoscience ("Malå")  v. Witten Technologies, Inc.</u>
             <u>("Witten")</u>

Dear Arbitrator Genoni:

        I write to request permission to supplement Malå's arbitration demand of September 23, 2005 based on events that have occurred since then.  I further write in response to Ms. Lewis's letter of October 7, 2005, wherein Witten responded to Malå's arbitration demand and asserted certain counterclaims against Malå.

<u>Request for Permission to Supplement the Arbitration Demand</u>

        Malå respectfully requests permission to supplement its arbitration demand to include a claim for premature termination of the License Agreement pursuant to Paragraph 11 of the License Agreement.

        The License Agreement, at ¶ 11, states:

> Without prejudice to any remedy it may have against the other for breach or non-performance of the Agreement, either party shall have the right to terminate this Agreement by giving the other party not less than thirty (30) days notice in writing if the other party should commit or permit a material breach of any of the obligations herein contained and should fail to remedy such breach within thirty (30) days after receipt of notice from the complaining party.

Civil Action No:  1:06-cv-01343

Respondent WTI Ex. No. 9

Arb. Ex. No:

**KELLY & BERENS, P.A.**
ATTORNEYS AT LAW

Arbitrator Kenneth A. Genoni, Esq.
Page 2
November 1, 2005

Pursuant to paragraph 11, Malå has a right to terminate the License Agreement based on Witten's material breach of the License Agreement in the following matters:

1. Witten has failed to pay royalties to Malå for the calendar quarter ended December 31, 2004 within 30 days of expiration of said calendar quarter, as required by License Agreement ¶ 4;

2. Witten has failed to render to Malå the report required by License Agreement ¶ 5 giving a true account of total manufacture, use, lease and sale of CARTs during the calendar quarter ended December 31, 2004; and

3. Witten has failed to deliver to Malå invoices showing the number of products invoiced by Witten and its sublicensees during the period October 1, 2004 through June 30, 2005.

By letter dated September 23, 2005, Malå gave Witten notice of the above defaults under the License Agreement and stated: "Without prejudice to Malå's arbitration claims, this letter constitutes notice of Malå's exercise of its right to terminate the License Agreement in accordance with Section 11 of the License Agreement."

Witten responded by letter dated October 4, 2005: "Witten denies Mala's claim that we are in default under the License Agreement . . . . [Mala] has called for arbitration in Washington, D.C.  That is the appropriate forum to address these issues now and Witten will not respond further to these allegations."  A copy of this letter is attached hereto.

The thirty-day cure period established by paragraph 11 of the License Agreement has now expired.  Witten has still not paid Malå royalties for the last quarter of 2004 or provided the accountings required by the License Agreement for the period October 1, 2004 through June 30, 2005 and MALA, therefore, has a right to terminate the License Agreement.  Since Witten has refused to allow this termination, Malå has a right to arbitrate that dispute here.

Objection to Certain of Witten's Counterclaims as Outside the Scope of this Arbitration

Malå objects to Witten's requested relief at page 16 of Ms. Lewis's October 7, 2005 letter, points 6 and 7, wherein Witten requests "rescission of all software licenses granted to Malå as payments" and "[r]eturn of all intellectual property and patents conveyed to Malå as a result of the [Prototype Development Agreement and License Agreement]."  The software licenses and patent assignments were made pursuant to an Exchange and Settlement Agreement

**KELLY & BERENS, P.A.**
ATTORNEYS AT LAW

Arbitrator Kenneth A. Genoni, Esq.
Page 3
November 1, 2005

("ESA") between Malå and Witten dated October 31, 2002, copy enclosed.  The ESA provides at paragraph 5 that "[a]ny dispute, controversy or claim arising out of or in connection with this agreement or . . . termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the SCC Institute)."

        In a contract created long after the contracts at issue here, therefore, the parties agreed to an exclusive dispute resolution mechanism different than the mechanism selected in those agreements.  Thus, any dispute under the ESA is outside the scope of this arbitration.  We do not suggest, however, that all evidence regarding the performance of the ESA is necessarily irrelevant here, but there may be no resolution here of disputes under the ESA.

        Very truly yours,

        *Sarah E Bushnell*

        Sarah E. Bushnell

:seb

Enclosures

cc:    Andrea Bugbee
       Erin L.G. Lewis, Esq.
       Timothy D. Kelly, Esq.

October 4, 2005

Mr. Harvey F. Kaplan
90 South Seventh Street
5500 Wells Fargo Center
Minneapolis, Minnesota 55402-4126

RECEIVED

OCT 1 1 2005

Kelly & Berens P.A.

*Re: Your letters of September 23, 2005*



**W I T T E N**
TECHNOLOGIES INC

Dear Mr. Kaplan:

I am in receipt of your two recent letters. Witten denies Mala's claim that we are in default under the License Agreement. Witten has been in compliance with all agreements for some time even though Witten is not compelled to comply with the terms of any contract until your client comes into compliance as well.

As you know, your client has called for arbitration in Washington, D.C. That is the appropriate forum to address these issues now and Witten will not respond further to these allegations. Mala picked this time and this venue to litigate matters associated with the License Agreement, so they should to stick to that decision and cease harassing us via your letters.

In regards to the second letter dealing with the Equipment Lease, Witten notified your client many times over the past several years that it was in default of this same agreement. These breaches were due to their failure to provide equipment as contemplated by the contract. As evidence by numerous letters between yourself and Joe Berl of Powell Goldstein, the CARTs have been in various states of disrepair since they were received, no manuals or diagrams were produced and they have never been upgraded beyond the prototype quality. Specifically, please refer to the two letters sent to you last June and August 2004 from Mr. Berl which details some of these breaches and complaints by Witten.

Erin L. G. Lewis

GENERAL COUNSEL

3638 Overlook Ave.

Macon, GA 31204

PHONE 478.474.6644 or

404.808.0812

FAX 478.474.8688

E.Lewis@wittentech.com

Mala is in breach of Section 1.2 of the Agreement effective on October 31, 2002. It states that "Mala shall after receiving three CARTs from Witten with the bill of sale, upgrade the three CARTs to the latest version, at the time, of the hardware, firmware and operating software, and lease the CARTs back to Witten under the terms of the ..." Mala refused to perform these hardware upgrades and make the CARTs commercially viable, yet Witten continued to make lease payments for over two (2) years. This failure to upgrade has cost Witten money and opportunity. Witten will no longer make these payments since it is clear Mala will not reciprocate in good faith as Witten has.

In Subsection (iii) of your letter you state that "you are requested to return to Mala ..." We will not return these CARTs because Mala never had them to begin with. They never took possession of the CARTs and upgraded them as they represented to Witten. We also will not give these CARTs to your client because there was a lack of consideration for the contract. Therefore these CARTs never became the property of Mala. They have no rights to lease payments and they have no rights of possession.

Furthermore, the lease payments made by Witten to Mala are hereby requested to be returned since Mala still to this day refuses to produce a commercially relevant product. Unfortunately, because of the damage Mala has brought upon our ten year relationship, we will no longer attempt to forge ahead with them.

Lastly, on August 19, 2005 Witten invoiced Mala for the software upgrades they received pursuant to the side Agreement, Section 1.1. After receiving these upgrades, Mr. Leijon refused to pay the invoice. We were forced to notice Mala that the software license upgrades are now terminated also.

Sincerely,

Erin L. G. Lewis

cc: Timothy D. Kelly, Esq.

*Execution Copy*

# EXCHANGE AND SETTLEMENT AGREEMENT

This agreement has been made on the date set out below between Malå Geoscience AB, a company incorporated under the laws of Sweden (hereinafter referred to as Malå), and Witten Technologies, Inc. a company incorporated under the laws of Florida (hereinafter referred to as WITTEN).

## WITNESSETH

WHEREAS, the parties during a period of years have been working together in the development of a prototype of a device for the detection of utility services, now called the CART Imaging System ("CART"); and

WHEREAS, Malå and WITTEN made and entered into a Prototype Development Agreement (the "PDA") and a License Agreement (the "LA") both dated as of September 9, 1997; and

WHEREAS, certain obligations of Malå under the PDA have been fulfilled by the delivery to WITTEN of a CART; and

WHEREAS, in consideration of the agreements contained herein and other good and valuable consideration, described in other documents executed concurrently herewith, the sufficiency of which is hereby mutually acknowledged,

NOW THEREFORE, the parties have agreed upon that by the fulfilling of this Agreement, the PDA will terminate and, except as hereinafter provided, neither party hereto hereafter shall have any other or further obligation to the other under the PDA. Notwithstanding the foregoing, article 6 and article 11 of the PDA shall survive such termination. The parties have also agreed upon that the LA shall commence on the Effective Date of October 1, 2002.

# 1    Termination of the PDA

Upon the fulfillment by both parties of the following conditions, except as otherwise set forth herein, the PDA shall terminate and be of no further force and effect.

## 1.1    WITTEN's Obligations

WITTEN shall fulfill its obligations according to the PDA, as soon as is reasonably possible, by the following:

a) Delivering to Malå three (3) used CART's, fully-owned by WITTEN, an estimated value of 140 000 USD, along with a bill of sale marked "PAID IN FULL", and

b) Providing to Malå five (5) concurrent licenses for WITTEN's CART software, a value of 400 000 USD, along with a bill of sale marked "PAID IN FULL";

c) Executing an assignment to Malå of WITTEN's rights to the patent, "Ground-Penetrating Radar Array and Timing Circuit", by B JOHANSSON, A WITTEN, and A DEVANEY, (US) Patent Application 09/658,188, filed 8 September 2001.

Two (2) of the licenses mentioned in (b) shall be intended for non-exclusive use in the market for utility and non-utility services in North America. Malå shall have the right to sublicense these two (2) licenses to General Engineering Laboratories, Inc., a corporation with offices at 2040 Savage Road, Charleston, SC 29417. The other three (3) licenses shall be intended for non-exclusive use in the market for non-utility services in Europe. These three (3) licenses can be used outside of Europe if, in each specific case, the parties hereto mutually agree.

## 1.2    Malå's Obligations

Malå shall, after receiving the above mentioned CARTs, software licenses and patent assignment, deliver to WITTEN the Promissory Note, dated September 9, 1997, made by WITTEN in favor of Malå, marked "PAID IN FULL". Malå hereby waives any claim for accrued interest.

2

## 2 License Agreement

The parties have agreed that the LA shall commence on the effective date of October 1, 2002, implying that any job or royalty payment received or invoiced after this date shall be in accordance with Section 3 of the LA with October 1, 2002 being the Commencing Date (as such term is defined in the LA) for the purposes of such Section 3.

### 2.1 Other Agreements

WITTEN undertakes to deliver to Malå signed copies of all agreements with third parties, i.e., sublicenses, connected to the LA.

## 3 Escrow

The parties undertake to, in addition to the LA, enter into a separate agreement concerning the deposit into escrow of source code of WITTEN's CART software and Malå's blueprints for the CART (the "Escrow"). The deposit shall be made with the Stockholm Chamber of Commerce.

The parties have agreed upon that the Escrow shall be construed in a way that secures the following rights and obligations of the parties.

### 3.1 Deposit of Source code

WITTEN shall deposit with the Stockholm Chamber of Commerce a sealed package containing a complete copy of the source code of WITTEN's CART software, along with an overall description of the files, including descriptions of how the different modules interact and instructions for compiling the code, in a machine-readable form ("Source Code").

WITTEN shall be responsible for ensuring that the Source Code so presented shall continually conform the latest version available of the Software licensed to any customer that WITTEN shall have delivered the software to.

3

(a) Malå shall be entitled to receive, use and further develop the Source Code if WITTEN is declared bankrupt, or is subject of a voluntary or involuntary institution of bankruptcy proceedings, which are not dismissed within forty-five (45) days following the institution of such proceedings; or ceases doing business as a going concern. The right to the Source Code according to this clause (a) shall be subject to a commercially reasonable licence fee to be determined by good faith negotiations between the Parties. The licence fee shall be paid during a maximum period of five years from the date on which Malå receives the Source Code according to above.

(b) Malå shall also have a right to receive, use and further develop the Source Code, if WITTEN fails to perform stipulated obligations to improve or update the Source Code. Furthermore, in case Malå receives a right to the Source Code according to this clause (b), WITTEN shall supply Malå with manpower with the knowledge and ability to assist Malå in the use and further development of the Source Code. The work accomplished by the manpower assigned by WITTEN to Malå according to this clause shall be performed on a consultant basis and compensated on commercially reasonable terms.

**3.2        Deposit of Blueprints concerning the CART**

Malå shall deposit with the Stockholm Chamber of Commerce a sealed package containing complete copies of the blueprints for manufacturing and assembling the CART's radar components, including hardware, firmware, and operating software ("Blueprints").

Malå shall be responsible to lease CARTs to WITTEN and to keep a stock of antennas and control units in Charleston, SC, for repair and replacement of leased CARTs in a timely way.

(a) WITTEN shall be entitled to receive and use the Blueprints if Malå is declared bankrupt, or is subject of a voluntary or involuntary institution of bankruptcy proceedings, which are not dismissed within seventy five (75) days following the institution of such proceedings; or ceases doing business as a going concern. The right to the Blueprints according to this clause (a) shall be subject to a commercially reasonable

4

licence fee to be determined by good faith negotiations between the Parties. The licence fee shall be paid during a maximum period of five years from the date on which WITTEN receives the blue prints according to above.

(b) WITTEN shall have a right to receive and use the Blueprints if Malå fails to perform stipulated obligations to lease CARTs to WITTEN. Furthermore, in case WITTEN shall receive a right to the Blueprints according to this clause (b), Malå shall supply WITTEN with manpower, consisting of two or three persons, with the knowledge and ability to assist WITTEN in the understanding and use of the Blueprints. The work accomplished by the manpower assigned by Malå to WITTEN according to this clause shall be performed on a consultant basis and compensated on commercially reasonable terms. Notwithstanding the foregoing, WITTEN shall not have the right to receive and use the Blueprints if Mala's failure to perform arises because the FCC does not approve the CART for use in the US market.

4       **Applicable law**

The Agreement shall be governed by, construed and enforced in accordance with the substantive laws of Sweden without regard to its principles of conflict of laws.

5       **Arbitration**

Any dispute, controversy or claim arising out of or in connection with this agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the SCC Institute).

The Rules for Expedited Arbitrations of the Arbitration Institute of the Stockholm Chamber of Commerce shall apply, unless the SCC Institute, taking into account the complexity of the case, the amount in dispute and other circumstances, determines, in its discretion, that the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce shall apply. In the latter case, the SCC Institute shall also decide whether the arbitral tribunal shall be composed of one or three arbitrators.

The Arbitral Tribunal decides on the apportionment of the Arbitration Costs between the parties with regard to the outcome of the case and other circumstances.

//////////////////////////////////////////////////////LAST ARTICLE//////////////////////////////////////////////////////

IN WITNESS WHEREOF,

MALÅ GEOSCIENCE AB and WITTEN TECHNOLOGIES, INC. have caused this Agreement to be executed and delivered by their duly authorized representatives, to be effective as of the Effective Date.

MALÅ GEOSCIENCE AB

A Swedish Corporation

Date: 31/10 - 2002

By: _____
Tommy Loijon, *President*

WITTEN TECHNOLOGIES, INC.

a Florida Corporation

Date: 31 October 2002

By: _____
Michael Oristaglio, *President*

6

## International Centre for Dispute Resolution

In the Matter of the Arbitration Between

MALA Geoscience,

Claimant

Case No. 50 199 T 00261 05

and

Witten Technologies, Inc.

Respondent

––––––––––––––––––

### PRELIMINARY HEARING REPORT AND
### SECOND SCHEDULING ORDER

Pursuant to the procedures of the International Centre for Dispute Resolution, a division of the American Arbitration Association, a preliminary hearing was held by telephone on November 10, 2005, before the Arbitrator, Kenneth A. Genoni.  Appearing on behalf of Claimant MALA Geoscience ("Mala") was Sarah E. Bushnell of Kelly & Berens, P.A.  Appearing on behalf of Respondent Witten Technologies, Inc. ("Witten") was Erin L.G. Lewis, in house counsel of Witten.  In an email dated November 8, 2005, counsel identified the prehearing issues that the parties had agreed upon.  The issues were also addressed in letters from Ms. Lewis dated November 2 and November 9, 2005 and letters from Ms. Bushnell dated November 1, November 3 and November 9, 2005.

By Agreement of all parties and Order of the Arbitrator, it is Ordered that –

1.    Mala's request to amend the Demand to add a breach of license agreement claim stated in Ms. Bushnell's letter of November 1,

Civil Action No:  1:06-cv-01343

Respondent WTI Ex. No. 10

Arb. Ex. No:

2005 is granted.  In a letter dated September 23, 2005, Mala notified Witten that it was exercising its right to terminate pursuant to Section 11 of the License Agreement.  Notwithstanding the notice of termination, the parties have agreed that they will continue performing their obligations under the License Agreement during the pendency of this arbitration.

2.      Mala's motion to strike Witten's requested relief numbers 6 and 7 is denied.  The software licenses and patent assignments were made pursuant to an Exchange and Settlement Agreement ("ESA") which requires any breach thereof be resolved by the Arbitration Institute of the Stockholm Chamber of Commerce.  However, Witten has not alleged a breach of the ESA.  Witten has alleged that it is entitled to a recission of the software licenses and return of all intellectual property because Mala has breached the License Agreement which is within the jurisdiction of this Arbitration.  Whether there is a factual basis for these claims for relief will be decided after a full hearing of the issues.

3.      Mala's document requests:

a.      Request No. 10

As proposed by Witten, it will produce the records that are in its custody which identify the entities directly or indirectly controlling, controlled by, or under common control with Witten and graphical documentation evidencing such.

b.    Request Nos. 12 and 13.

Witten has withdrawn its objections.

c.    Request Nos. 17 & 18.

Witten has agreed to produce documents but will redact the identity of potential customers and sublicensees.

d.    Request Nos. 23 and 24.

Witten will produce the documents for the years 2002 through 2005.

e.    Request No. 26.

Witten will produce documents for the years 2004 and 2005.

f.    Request No. 30.

Witten will produce (a) audited financial statements for the years 2002-2004 and (b) internal unaudited financial statements for the years 2002-2005.

g.    Request Nos. 27 and 31.

Witten will produce these documents for the years 2002-2004.

h.    Request Nos. 32, 33 and 35.

Witten will produce these documents for the years 2002-2005.

i.    Request No. 28.

Witten will produce documents to the extent not prohibited by a confidentiality obligation to the ex employee.  If there is such a prohibition, Witten will identify the ex employee and produce a copy of the

confidentiality agreement.  Witten may redact irrelevant portions from the agreement.

j.        Request No. 29.

Witten will produce the Complaint and Counterclaim.  If requested by Mala, the Arbitrator will determine if additional documents should be produced.

k.        Request No. 34.

Witten will produce documents for the years 2002-2005.

l.        Request No. 36.

No documents will be produced.  Mala will serve an interrogatory requesting the information.

Dated:  _Nov. 11_____, 2005.                    So Ordered by The Arbitrator

Kenneth A. Genoni