Execution Copy

# EXCHANGE AND SETTLEMENT AGREEMENT

This agreement has been made on the date set out below between Malå Geoscience AB, a company incorporated under the laws of Sweden (hereinafter referred to as Malå), and Witten Technologies, Inc. a company incorporated under the laws of Florida (hereinafter referred to as WITTEN).

## WITNESSETH

WHEREAS, the parties during a period of years have been working together in the development of a prototype of a device for the detection of utility services, now called the CART Imaging System ("CART"); and

WHEREAS, Malå and WITTEN made and entered into a Prototype Development Agreement (the "PDA") and a License Agreement (the "LA") both dated as of September 9, 1997; and

WHEREAS, certain obligations of Malå under the PDA have been fulfilled by the delivery to WITTEN of a CART; and

WHEREAS, in consideration of the agreements contained herein and other good and valuable consideration, described in other documents executed concurrently herewith, the sufficiency of which is hereby mutually acknowledged,

NOW THEREFORE, the parties have agreed upon that by the fulfilling of this Agreement, the PDA will terminate and, except as hereinafter provided, neither party hereto hereafter shall have any other or further obligation to the other under the PDA. Notwithstanding the foregoing, article 6 and article 11 of the PDA shall survive such termination. The parties have also agreed upon that the LA shall commence on the Effective Date of October 1, 2002.

Civil Action No: 1:06-cv-01343
Respondent WTI Ex. No. 11
Arb. Ex. No: 7

WTI
01297

1       Termination of the PDA

Upon the fulfillment by both parties of the following conditions, except as otherwise set forth herein, the PDA shall terminate and be of no further force and effect.

1.1     WITTEN's Obligations

WITTEN shall fulfill its obligations according to the PDA, as soon as is reasonably possible, by the following:

a) Delivering to Malå three (3) used CART's, fully-owned by WITTEN, an estimated value of 140 000 USD, along with a bill of sale marked "PAID IN FULL", and

b) Providing to Malå five (5) concurrent licenses for WITTEN's CART software, a value of 400 000 USD, along with a bill of sale marked "PAID IN FULL";

c) Executing an assignment to Malå of WITTEN's rights to the patent, "Ground-Penetrating Radar Array and Timing Circuit", by B JOHANSSON, A WITTEN, and A DEVANEY, (US) Patent Application 09/658,188, filed 8 September 2001.

Two (2) of the licenses mentioned in (b) shall be intended for non-exclusive use in the market for utility and non-utility services in North America. Malå shall have the right to sublicense these two (2) licenses to General Engineering Laboratories, Inc., a corporation with offices at 2040 Savage Road, Charleston, SC 29417. The other three (3) licenses shall be intended for non-exclusive use in the market for non-utility services in Europe. These three (3) licenses can be used outside of Europe if, in each specific case, the parties hereto mutually agree.

1.2     Malå's Obligations

Malå shall, after receiving the above mentioned CARTs, software licenses and patent assignment, deliver to WITTEN the Promissory Note, dated September 9, 1997, made by WITTEN in favor of Malå, marked "PAID IN FULL". Malå hereby waives any claim for accrued interest.

2

WTI
01298

2       License Agreement

The parties have agreed that the LA shall commence on the effective date of October 1, 2002, implying that any job or royalty payment received or invoiced after this date shall be in accordance with Section 3 of the LA with October 1, 2002 being the Commencing Date (as such term is defined in the LA) for the purposes of such Section 3.

2.1     Other Agreements

WITTEN undertakes to deliver to Malå signed copies of all agreements with third parties, i.e., sublicenses, connected to the LA.

3       Escrow

The parties undertake to, in addition to the LA, enter into a separate agreement concerning the deposit into escrow of source code of WITTEN's CART software and Malå's blueprints for the CART (the "Escrow"). The deposit shall be made with the Stockholm Chamber of Commerce

The parties have agreed upon that the Escrow shall be construed in a way that secures the following rights and obligations of the parties.

3.1     Deposit of Source code

WITTEN shall deposit with the Stockholm Chamber of Commerce a sealed package containing a complete copy of the source code of WITTEN's CART software, along with an overall description of the files, including descriptions of how the different modules interact and instructions for compiling the code, in a machine-readable form ("Source Code").

WITTEN shall be responsible for ensuring that the Source Code so presented shall continually conform the latest version available of the Software licensed to any customer that WITTEN shall have delivered the software to.

3

WTI
01299

NOV.-01'02(FRI) 13:55    GENERAL ENGINEERING         TEL:8437697397              P. 008
Case 1:06-cv-01343-RMC    Document 11    Filed 09/05/2006    Page 4 of 16
Nov 01 02 12:37p

p.10

(a) Malå shall be entitled to receive, use and further develop the Source Code if WITTEN is declared bankrupt, or is subject of a voluntary or involuntary institution of bankruptcy proceedings, which are not dismissed within forty-five (45) days following the institution of such proceedings; or ceases doing business as a going concern. The right to the Source Code according to this clause (a) shall be subject to a commercially reasonable licence fee to be determined by good faith negotiations between the Parties. The licence fee shall be paid during a maximum period of five years from the date on which Malå receives the Source Code according to above.

(b) Malå shall also have a right to receive, use and further develop the Source Code, if WITTEN fails to perform stipulated obligations to improve or update the Source Code. Furthermore, in case Malå receives a right to the Source Code according to this clause (b), WITTEN shall supply Malå with manpower with the knowledge and ability to assist Malå in the use and further development of the Source Code. The work accomplished by the manpower assigned by WITTEN to Malå according to this clause shall be performed on a consultant basis and compensated on commercially reasonable terms.

3.2     Deposit of Blueprints concerning the CART

Malå shall deposit with the Stockholm Chamber of Commerce a sealed package containing complete copies of the blueprints for manufacturing and assembling the CART's radar components, including hardware, firmware, and operating software ("Blueprints").

Malå shall be responsible to lease CARTs to WITTEN and to keep a stock of antennas and control units in Charleston, SC, for repair and replacement of leased CARTs in a timely way.

(a) WITTEN shall be entitled to receive and use the Blueprints if Malå is declared bankrupt, or is subject of a voluntary or involuntary institution of bankruptcy proceedings, which are not dismissed within seventy five (75) days following the institution of such proceedings; or ceases doing business as a going concern. The right to the Blueprints according to this clause (a) shall be subject to a commercially reasonable

4

WTI
01300

licence fee to be determined by good faith negotiations between the Parties. The licence fee shall be paid during a maximum period of five years from the date on which WITTEN receives the blue prints according to above.

(b) WITTEN shall have a right to receive and use the Blueprints if Malå fails to perform stipulated obligations to lease CARTs to WITTEN. Furthermore, in case WITTEN shall receive a right to the Blueprints according to this clause (b), Malå shall supply WITTEN with manpower, consisting of two or three persons, with the knowledge and ability to assist WITTEN in the understanding and use of the Blueprints. The work accomplished by the manpower assigned by Malå to WITTEN according to this clause shall be performed on a consultant basis and compensated on commercially reasonable terms. Not withstanding the foregoing, WITTEN shall not have the right to receive and use the Blueprints if Mala's failure to perform arises because the FCC does not approve CART for use in the US market.

4       Applicable law

The Agreement shall be governed by, construed and enforced in accordance with the substantive laws of Sweden without regard to its principles of conflict of laws.

5       Arbitration

Any dispute, controversy or claim arising out of or in connection with this agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the SCC Institute).

The Rules for Expedited Arbitrations of the Arbitration Institute of the Stockholm Chamber of Commerce shall apply, unless the SCC Institute, taking into account the complexity of the case, the amount in dispute and other circumstances, determines, in its discretion, that the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce shall apply. In the latter case, the SCC Institute shall also decide whether the arbitral tribunal shall be composed of one or three arbitrators.

5

WTI
01301

NOV.-01'02(FRI) 13:56    GENERAL ENGINEERING    TEL:8137697707    P.010
Case 1:06-cv-01343-RMC    Document 11    Filed 09/05/2006    Page 6 of 16
Nov 01 02 12:37p

P.12

The Arbitral Tribunal decides on the apportionment of the Arbitration Costs between the parties with regard to the outcome of the case and other circumstances.

////////////////////////////////////LAST ARTICLE////////////////////////////////////

IN WITNESS WHEREOF,

MALÅ GEOSCIENCE AB and WITTEN TECHNOLOGIES, INC. have caused this Agreement to be executed and delivered by their duly authorized representatives, to be effective as of the Effective Date.

MALÅ GEOSCIENCE AB  
A Swedish Corporation

Date: 31/10 2002

By: _____  
Tommy Leijon, *President*

WITTEN TECHNOLOGIES, INC.  
a Florida Corporation

Date: 31 October 2002

By: _____  
Michael Onstaglio, *President*

6

WTI
01302

# PROTOTYPE DEVELOPMENT AGREEMENT

This AGREEMENT, (the "Agreement") is made as of the 9th day of September, 1997 (the "Effective Date"), by and between MALA GEOSCIENCE, AB, a corporation organized under the laws of Sweden ("Mala"), and WITTEN TECHNOLOGIES, INC., a corporation organized under the laws of Delaware ("Witten").

WITNESSETH

Civil Action No: 1:06-cv-01343
Respondent WTI Ex. No. 12
Arb. Ex. No: 1

WHEREAS, The parties have developed various proprietary technologies relating to ground penetrating radar.

WHEREAS, the parties after Witten's first contact with Mala have sought to negotiate terms for a cooperative and succesfull relationship between them for the purpose to produce a functioning prototypical device for the detection of utility services which implements and demonstrates the technology in a commercially viable and successful manner, (the "New Technology").

WHEREAS the New Technology is primarily to be used for detecting and mapping pipes and cables using a vehicle mounted multichannel radar system for highspeed service, (the "Prototype").

WHEREAS, the parties are aware of that the success of this project is highly dependent on both parties fulfilling of their respective obligations to the project.

WHEREAS Mala shall be the exclusive owner of all hardware and intellectual property rights developed by Mala in the project.

WHEREAS Witten shall have an exclusive license in certain areas in the utility locating industry on all patents granted to Mala regarding the New Technology and a non-exclusive license to use the developed technology in applications which incorporate WITTEN software technology.

WHEREAS Witten is in the position to use the New Technology in a functioning device for the detection of underground utility services and in other applications which incorporate WITTEN software technology in a succesfull way and is willing to make certain payments to Mala and other undertakings for the development and use of the New Technology.

WHEREAS if the project is successfull in developing the New Technology the parties intend to start negotiations for further and deeper cooperation concerning the production of the Prototype and other projects in the area of ground penetra

WTI
00323

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, intending to be legally bound, Mala and Witten hereby agree as follows:

1. **Production of the Prototype**

1.01    The parties shall act to provide to each other the information, goods and materials, transaction execution, and services specified in Exhibit A attached to this Agreement (the "Goods and Services").

1.02    There may from time to time be added to Exhibit A to this Agreement such additional goods and services as Mala and Witten may agree and such goods and services shall, from the time of such addition or additions, be treated as part of the Goods and Services and subject in all respects to the provisions of this Agreement.

2. **Duties of the Parties**

The parties are aware that the success of this project is highly dependent on both parties fulfillment of their obligation in the project. Each party therefor undertakes to use all reasonable endeavors to participate actively and to perform on time the tasks and work under the schedule shown in Exhibit A.

In connection with its obligations hereunder, each party shall:

(a)    exercise all due diligence and skill so that the Goods and Services are of such quality as may be reasonably required by each party for the development of the Prototype;
(b)    employ sufficient staff, or otherwise obtain the services of sufficient suitable persons, of the quality necessary to discharge promptly and effectively its obligations hereunder; and
(c)    at all times ensure that it has sufficient and adequate materials, administrative and technical facilities to perform its obligations hereunder to the highest standards.

3. **Manner of Performance; Guidelines and Instructions**

3.01    With respect to the Goods and Services to be provided the parties shall on a monthly basis and upon request consult with each other and provide each other with information and instructions regarding the development of the Prototype.

3.02    Each party shall report all activities effected by the party as part of the Goods and Services to the other party on a monthly basis.

4. **Remuneration**

4.01     In consideration of the Goods and Services to be provided by Mala under this agreement Witten shall execute and deliver to Mala, on completion, the convertible note attached hereto as Exhibit B.

4.02     In the event that Mala shall not complete the Goods and Services to be produced by it under this agreement, Mala and Witten shall negotiate in good faith partial alternative compensation which shall be based on the fair value of the Goods and Services actually completed by Mala.

4.03     In the event that Witten shall not complete its resposibilities hereunder, Witten shall in addition to executing and delivering the convertible note be obliged to compensate Mala for all its costs during the development process within 60 days of the termination of this agreement.. The parties shall negotiate in good faith any dispute as to such costs.

5. **Delegation**

5.01     In the performance of its obligations hereunder each partiy may, instead of using its employees contract with consultants to perform such obligations on its behalf and in its stead, provided, however, that the employment of any such consultant shall not prejudice or affect the liability of the parties hereunder, and such consultants and there employees shall first be contractually bound in writing to honor all applicable provisions of this agreement, including confidentially and proprietary rights and obligations.

5.02     Subject to Section 5.01 hereof, this Agreement shall not be assigned by either party save with the written consent of the other party.

6. **Ownership, intellectual property, patents**

6.01     Intellectual property rights, constructions and know-how owned and controlled by each of the parties at the time of execution of this Agreement shall be exclusively owned by such party.

6.02     During the period of this Agreement, each party which develops intellectual property or constructions shall have the sole right to establish proprietary rigths to such innovations. Intellectual property or constructions developed during the period of this Agreement shall be exclusively owned by such party, exept that notwithstanding anything to the contrary in this agreement, Mala will have sole ownership of any improvements to its hardware resulting from the parties development efforts, subject only to Wittens license rights under this agreement.

6.03    Mala and Witten agree to equally share costs for patent applications and to maintain patents and patent applications developed during the period of this Agreement regarding the New Technology and the Prototype.

6.04    Witten shall have the ownership of the first vehicle mounted multichannel radarsystem for highspeed service produced under the terms of this agreement.

7.    License

7.01    Mala shall provide to Witten an exclusive license for the detection of utilities, in the form of Exhibit C, to use the New Technology developed pursuant to this Agreement, in exchange for the royalty provided therein.

7.02    Mala shall also provide to Witten a non-exclusive license, in the form of Exhibit C, to use the patented technology developed pursuant to this Agreement, in exchange for the royalty provided therein, in applications other then the detection of utilities which incorporate Witten software technology.

8.    Independent Contractor

In rendering services pursuant to this Agreement, the parties shall act as independent contractors each having responsibility to determine the methods to be adopted and the actions to be taken to carry out it's obligations concerning the Goods and Services.

9.    Commencement and Termination

9.01    This Agreement shall commence on the Effective Date and shall continue in force thereafter until delivery of an acceptable Prototype.

9.02    Without prejudice to any other remedy it may have against the other for breach or non-performance of the Agreement either party shall have the right to terminate this Agreement by giving the other party not less than thirty (30) days notice in writing if the other party should commit or permit a material breach of any of the obligations herein contained and should fail to remedy such breach within thirty (30) days after receipt of notice from the complaining party.

9.03    Either party shall have the right to terminate this Agreement with immediate effect if the other party should enter into liquidation, either voluntary or compulsory, or become insolvent, or enter into composition or corporate reorganization proceedings or if execution be levied on any goods and effects of the other party or the other party sould enter into receivership. This Agreement shall terminatie automatically if either par subject to reorganisation or liquidation, volentary or involentary, pursuant to code

WTI
00326

10.     **Consequence of early termination**

In the event that either party should commit a breach of any material provision of this Agreement and should fail to discontinue or make good such breach within thirty (30) days after receipt of notice in writing from the other party, then the failing party shall be liable to pay the other party a of USD 200 000 as liquidated damages provided always, however, that the other party may claim larger damages upon proof that the real injury corresponds to a greater amount than such agreed penalty and without prejudice to the other party's right to terminate this Agreement.

11.     **Confidentiality**

11.01   Each party shall with at all times act to with due diligence preserve the confidentiality and proprietary nature of the New Technology and shall treat the New Technology with at least as much care as its own intellectual property.

11.02   Each party undertakes to keep all information, whether oral, in writing or in computer form, whether of a technical nature or otherwise, or in any manner relating to the business affairs of the parties, as confidential.

11.03   The parties hereto acknowledge that the confidentiality agreement between them dated August 1, 1997 shall continue to be in full force and effect between them and each shall continue to be fully bound thereby.

11.04   The obligation to keep the above mentioned information strictly confidential shall survive the termination of this Agreement and shall continue in force until the Know-how has been generally disclosed to the public other than by breach of this obligation.

12.     **Notices**

Any notice, request, demand or other communication to be given or made pursuant to this Agreement shall be given in writing addressed:
        (a)     in the case of Mala, to Skolgatan 11, S-930 70 Malå
        (b)     in the case of Witten, to it at 2509 P Street, N.W., Washington, D.C. 20007;

        (c)     or at such other addresses as Mala and Witten may from time to time notify to each other. All such notices, requests, demands or other communications shall be deemed to be given by one party when received by the other.

13.     **Arbitration.**

The parties shall endeavor to settle all disputes by amicable negotiations. Any claim, dispute, disagreement or controversy that arises among the parties relating to this Agreement that is not amicably settled shall be resolved by final and binding arbitration, as follows:

(a)     Any such arbitration shall be held in the District of Columbia, before a single (1) arbitrator who shall be impartial. Except as the parties may otherwise agree, the arbitrator shall be appointed by the appropriate official in the District of Columbia office of the American Arbitration Association or, in the event of his or her unavailability by reason of disqualification or otherwise, by the appropriate official in the New York City office of the American Arbitration Association. In determining the appropriate background of the arbitrator, the appointing authority shall give due consideration to the issues to be resolved, but his or her decision as to the identity shall be final. Except as otherwise provided in this Section, all of the arbitration proceedings shall be conducted in accordance with the applicable commercial arbitration rules of the American arbitrator Association.

(b)     Notwithstanding anything to the contrary herein, the parties agree that violation by any party, person or entity of any provision in sections 5, 6 or 111 may cause immediate irreparable harm, and either party shall be entitled at any time to initiate legal acction in a court of proper jurisdiction seeking injunctive relief preventing any violation of sections 5, 6 or 11 of this agreement.

(c)     An arbitration may be commenced by any party to this Agreement by the service of a written request for arbitration upon the other affected parties. Such request for arbitration shall summarize the controversy or claim to be arbitrated, and shall be referred by the complaining party to the appointing authority for appointment of an arbitrator ten (10) days following such service or thereafter. If the arbitrator is not appointed by the appointing authority within thirty (30) days following such reference, any party may apply to any court within the District of Columbia for an order appointing an arbitrator qualified as set forth below.

(d)     All attorneys' fees and costs of the arbitration shall in the first instance be borne by the respective party incurring such costs and fees, but the arbitrator shall have the discretion to award costs and/or attorneys' fees as he deems appropriate under the circumstances. The parties hereby expressly waive punitive damages, and under no circumstances shall an award contain any amount that in any way reflects punitive damages.

(e)     Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(f)     It is intended that controversies or claims submitted to arbitration under this Section shall remain confidential, and to that end it is agreed by the parties that neither the facts disclosed in the arbitration, the issues arbitrated, nor the views or opinions of any persons concerning them, shall be disclosed to third persons at any time, excr̃ ˙ ˙˙ necessary to enforce an award or judgment or as required by law or in respor process or in connection with such arbitration.

WTI
00328

14.     **General Provisions**

14.01   The provisions of Sections 1, 2, 4, 5, 6, 7, 8, 10, 11, 13 and 14 of this Agreement shall survive any termination of this Agreement.

14.02   This Agreement may be executed in more than one counterpart, each of which shall be deemed an original and all of which together shall be deemed one and the same instrument.

14.03   This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto.

14.04   This Agreement may not be amended or otherwise modified except in a writing signed by all parties to the Agreement.

14.05   This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and amends and restates in their entirety all other agreements, representations, understandings and the like in respect thereof.

14.06   This Agreement shall be governed by and construed in accordance with the law of New York State and the parties hereto irrevocably submit to the nonexclusive jurisdiction of any federal court in New York.

IN WITNESS WHEREOF, MALA GEOSCIENCE A.B.. and WITTEN TECHNOLOGIES, INC. have caused this Agreement to be executed and delivered by their duly authorized representatives, to be effective as of the Effective Date.

MALA GEOSCIENCE A.B.
a Swedish Corporation,

By: _____

WITTEN TECHNOLOGIES, INC.
a Delaware Corporation

By: _____

# PROTOTYPE DEVELOPMNT AGREEMNT BETWEEN
# MALA GEOSCIENCE AND WITTEN TECHNOLOGIES, INC.

## EXHIBIT A

### PERFORMANCE SPECIFICATIONS FOR MALA

1. The antenna system should have 16 channels of antenna pairs with a 20cm spacing between each antenna pair center points
2. Minimum energy band of 300 MHz
3. Antennas should be 200 MHz center frequency
4. 512 time samples per receiver
5. Selectable sampling interval down to 200 pico seconds
6. Switchable transmitter/receiver pairing
7. 10 lines of data per second
8. Wheel mounted system triggered from wheel under user control
9. Provide beam pattern

### PERFORMANCE SPECIFICATIONS FOR WITTEN

1. Develop digital signal processing (DSP), including:
    a) horizontal spatial resolution of 30 cm
    b) vertical spatial resolution of approx. 10cm ($\lambda/4$)
    c) high pass spatial filters to remove direct arrivals and/or horizontal interfaces
    d) geometric filters to admit only utility-like objects

2. Algorithms will be computationally efficient to ultimately allow real-time DSP chip-based processing

3. Algorithms will be tested at several buried utility sites

WTI
01038

EXHIBIT B

FORM OF NOTE

DO NOT DESTROY THIS NOTE: When paid, this note must be surrendered to Witten Technologies, Inc. for cancellation before payment hereon will be made.

PROMISSORY NOTE

Amount U.S. $500,000                                    Dated: September 19, 1997

For value received, the undersigned, Witten Technologies, Inc. ("Witten"), a Delaware corporation, hereby promises to pay to the order of Mala Geoscience A.B. ("Mala"), at its office in Mala, Sweden, or at such other place or to such other party or parties as the holder of this note may from time to time designate, the principal sum of $500,000, with interest on unpaid principal from the date hereof at the rate of 10 percent per annum. Such interest shall be payable on September 1, 1999.

At any time prior to payment in full of this note, at the option of Mala, this note may be exchanged for outstanding common stock of Witten. In the event Mala makes such election, Mala and Witten shall execute documentation reasonably satisfactory to both parties to effect such exchange.

If this note is not paid when due, whether at maturity or by acceleration, the undersigned promises to pay all costs of collection, including, but not limited to, reasonable attorneys' fees, and all expenses incurred in connection with the protection or realization of any collateral or enforcement of any guaranty, incurred by the holder hereof, on account of any such collection.

The noteholder may at any time and from time to time after December 31, 1997 convert all or a portion of the outstanding balance of the note into a number of shares of common stock ("Shares") of the issuer at the price of $2 per share.

The maker of this note expressly waives presentment, protest and demand, notice of protest, demand and dishonor and nonpayment of this note and all other notices of any kind, and expressly agrees that this note, or any payment thereunder, may be extended from time to time without in any way affecting the liability of the maker and endorsers hereof. To the fullest extent permitted by law, the defense of the statute of limitations in any action on this note is waived by the undersigned. This note has been executed and delivered in the State of New York and is to be governed by and construed according to the laws thereof.

No single or partial exercise of any power hereunder shall preclude other or further exercise thereof or the exercise of any other power. The holder hereof shall at all times

WTI 01039

04/29/1998  14:19   2026957___                WITTEN TECHNOLOGIES                    PAGE  17

have the right to proceed in such manner as the holder may deem fit, without waiving any rights with respect to other actions. No delay or omission on the part of the holder hereof in exercising any right hereunder shall operate as a waiver of such right or of any other right under this note. The release of any party liable under this note shall not operate to release any other party liable hereon.

All agreements between the undersigned and the holder hereof are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the holder hereof for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable usury laws. If, from any circumstances whatsoever, fulfillment of any provision hereof or the deed of trust securing this note or any other agreement referred to herein, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

This note may from time to time be extended or renewed, with or without notice to the undersigned or any guarantor hereon and any related right may be waived, exchanged, surrendered or otherwise dealt with, all without affecting the liability of the undersigned or any guarantor hereon.

WITTEN TECHNOLOGIES, INC.

_____  9/19/97
Robert E. Green, President         Date

WTI
01040