| | | | | | | | |
| ✎ | ✎ | ✎ | ✎ | ✎ | ✕ | ▲ ▼ | ? |

Close

**From:** Tommy Leijon

**To:** 'Michael Oristaglio '

**Cc:**

**Subject:** PDA

**Sent:** 2002-10-11 12:20                    **Importance:** Normal

Mike

Coming back to you after our discussion the other day.

We agreed on most of the points we had discussed before but I will here try to clarify the whole deal going back to my first mail and integrate our discussions. I also send you a suggestion how we can solve the leasing arrangement for the existing three CARTS. After this points we say that the PDA-agreement are solved and no further steps is going to take place according to the PDA. The License agreement is going on like it is today if you don't have any changes to suggest.

1)    We reduce the dept to $ 0. No interest.
2)    We agree that we start the License agreement from 1 of October. This means that any job or royalty payment received or invoiced after this date are according to the License agreement.

3.    Witten reports all revenues from CART services or royalty payments within 30 days of end of calendar-year quarters. (i.e. April 30, July 30, Oct. 30 Jan. 30).

4.    Payment terms 30 days net after the end of each quarters.
5)    Malå receive 5 unlimited licences for the software. 2 for nonexclusive use for utility and non-utility in North America and 3 for nonexclusive use in Europe for non-utility. For use outside Europe Witten and Malå shall discuss this from time to time. Malå can sell to GEL in US two unlimited licences.

6.    Witten upgrades the licences according to the release plan that is valid for every other customer. Software upgrades are free for 2 years and after this Malå pays 10 % of the actual software prise at each time but never more than the price that is valid to day. I suggest that we pay this upgrade fee for the licence we sell to GEL and only one up-grade fee for the three licences Malå have by their own.

7)    Witten are placing the updated source codes in a way that Malå can get access to the updated source codes if anything happens to Witten Inc.

8.    See above. Malå sell two licenses to GEL.
9)    Witten sends to Malå signed copies of all agreements connected to the license agreement.
10.    Witten sells their three CARTs to Malå for a reasonable price. We have to define this price but the price has to be according to the actual purchase price less depreciations. Please let me know what you suggest.

11.    Malå upgrade these three CARTs. We have to plan this and we are trying to do the upgrade in Charleston. US. if possible. (Maybe we have to send the antennas and CU to Sweden for upgrades). Malå lease these three CARTs back to Witten on a long-term lease agreement defined below.

12)    The hardware patent is signed over to Malå.
13.    Malå will keep a stock of antennas and CU in Charleston.
14.    Malå are willing to sign a reasonable agreement with Witten that defines how we shall work on the European market.
15.    Leasing agreement for the existing three CARTs. We are willing to lease the three CARTs for a special leasing price for a three years period. The price is US $ 3.250 for each equipment and quarter.

M 000466

.../read.asp?command=open&obj=00000000C2E9A276F2B4D2

Civil Action No:  1:06-cv-01343

Respondent WTI Ex. No. 14A

Arb. Ex. No: 417-X

16.   Leasing agreement for new CARTs. (No vehicle) US $.

Leasing per day 770
Leasing per week          3 850
Leasing per month, 1 to 3 months          10 500
Leasing per month, 3 to 6 months          8 050
Leasing per month, 6 to 12 months          5 950
Leasing per month, more than 12 months  5 025

Mike, I hope I have covered all the different questions we discussed. Please let me know your comments ASAP.
We need, for different reason, solve this matter while I am in the US, so if everything is OK we have to get this
agreement on paper so we are able to sign it before the end of this month. I am in Charleston from the 23rd until
31st of October.

Best regards

Tommy

M 000467

.../read.asp?command=open&obj=00000000C2E9A276F2B4D2118253008D5F65906707 2002-10-21

**From:**      "Thorkild Hansen" <t.hansen@wittentech.com>
**To:**        <tommy.leijon@malags.se>
**Cc:**        <m.oristaglio@wittentech.com>
**Sent:**      Thursday, January 02, 2003 9:37 AM
**Subject:**   Assignment of patent to Mala

Tommy,

I am forwarding you an email I sent to our patent lawyer Kenneth Lesch
requesting that the rights to the patent "Ground Penetrating Radar Array
and Timing Circuit," US Patent Application No. 10/079,807 be assigned to Mala.

Thanks,

Thorkild


>Date: Mon, 30 Dec 2002 18:22:59 -0500
>To: kenneth.lesch@finnegan.com
>From: Thorkild Hansen <t.hansen@wittentech.com>
>Subject: Assignment to Malaa
>Cc: m.oristaglio@wittentech.com
>
>Keneth,
>
>Witten Technologies has signed a new agreement with Mala. Under this new
>agreement Mala gets the patent "Ground Penetrating Radar Array and Timing
>Circuit, US Patent Application No. 10/079,807."
>
>Our records indicate that A.J. Devaney and A. Witten have already assigned
>the rights to Witten Technologies. Is this true? If not please send the
>required assignment forms.
>
>We would like you to craft a document to be signed by Michael Oristaglio,
>President of Witten Technologies, that assigns all rights to Mala.
>
>Thanks,
>
>thorkild

Civil Action No:  1:06-cv-01343

Respondent WTI Ex. No. 14B                WTI
                                          02974
Arb. Ex. No: 417-Y

Från:        "Tommy Leijon" <tommy.leijon@malags.se>
Till:        "Jan Rynning (E-mail)" <jr@ahlford.se>
Datum:       den 14 april 2003  2:09
Ärende:      Info från Wittens CD

Hej

Sänder dig tva underlag som beskriver Wittens syn på Schlumberger och Malå

<<WITTEN-TECHNOLOGIES-MoreFAQs-rev2003.doc>>
<<WITTEN-TECHNOLOGIES-FAQs-rev2003.doc>>

Best regards.

Tommy Leijon

MALÅ GeoScience
Skolgatan 11
S-930 70 MALA
SWEDEN

"Let's make it visible"

Office:   +46 (0) 953 345 60
Mobile:           +46 (0) 70 216 48 48
Fax:     +46 (0) 953 345 67
Private Fax:     +46 (0) 70 386 48 48
E-mail:  tommy.leijon@malags.se
http://www.malags.com


> ................................................ ....
>
> This communication is confidential and is only intended for the use of the
> individual or entity to which it is directed. It may contain information
> that is privileged and exempt from disclosure under applicable law. If you
> are not the intended recipient please notify us immediately. You should not
> copy it or disclose its contents to any other person.
>
> ...................................................
>
>


Civil Action No:  1:06-cv-01343

Respondent WTI Ex. No. 14C        M 000913

Arb. Ex. No: 350

TRANSLATION:

Hi,
I am sending you two bases that describe Witten's view on Schlumberger and Malå.

<<WITTEN-TECHNOLOGIES-MoreFAQs-rev2003.doc>>
<<WITTEN-TECHNOLOGIES-FAQs-rev2003.doc>>

Best regards,
Tommy

M 000913.1

**DUE DILIGENCE FAQs (more)**
**Witten Technologies, Inc.**

**Specific List**

*Witten has established a number of strategic and investor relationships. Please explain the specifics of each of the following, as well as provide copies of contracts and contact information:*

**Malå GeoScience AB**

Malå is a Swedish company specializing in detection of subsurface objects. Malå has about 50 employees.

- Describe the history and nature of this relationship. Malå claims ownership of the CART/GPiR technology on their website. In an article on the WTC attack, Malå states, "Malå's CART/GPiR technology, which is being used in the WTC project, was developed in collaboration with Witten Inc. Malå GeoScience developed the hardware, while Witten Inc. developed the presentation software." Per an EPRI article dated September 2001 entitled, EPRI-Member Use of the Ground Penetrating imaging Radar (GPiR) System, "The CART (Computer-Assisted Radar Tomography) Imaging System uses a patented radar array specially built for WTI by the Swedish company MALÅ GeoScience AB."

The initial contact with Malå Geoscience AB was made through its American company, Malå Geoscience USA, which at the time was run by Thomas Fenner. Fenner, a geophysicist, was a friend of Alan Witten and introduced WTI to Malå in 1997. Malå was interested in finding a technology partner for further development of its market in ground-penetrating radar systems.

*PDA and License Agreement*
In September 1997, Malå and WTI signed a Prototype Development Agreement (PDA), with an accompanying License Agreement. The PDA called for joint development of new technology for detecting and mapping pipes and cables using a high-speed multi-channel radar system. This multi-channel radar array (called the "Prototype" in the PDA) is the radar hardware of the CART Imaging system.

The PDA called for Malå to develop the new radar hardware according to specifications in the PDA and for WTI to develop digital signal processing (imaging) software.

The PDA provides that Malå shall be the owner of the intellectual property and patent rights for the radar hardware. The License Agreement gives WTI an exclusive worldwide license "to sell, use, lease and assemble" the system in the field of utility locating and mapping and a non-exclusive worldwide license for all other applications. WTI retained

M 000914

all rights to use of its software.

In October 2002. WTI and Malå signed an agreement to close the PDA and begin the Licensing Agreement.

*CART Systems*
Malå delivered a first prototype multi-channel radar array (CART-0) to WTI in 1999. After some problems were identified in the timing circuits by tests carried out in the summer of 1999 and spring of 2000, a second prototype (CART-1) was delivered in April 2000 and has been in use by WTI since then. (In fact, this system is now being used for the project at the World Trade Center.) WTI has purchased for its own use two additional systems from Malå: an experimental higher-frequency system (CART-2, June 2000) and system that was used for the development with John Deere of the front-mounted CART (CART-3, July 2000).

WTI also purchased from Malå the two CART radar systems delivered to Schlumberger as part of the May 2000 Agreement.

(Malå also agreed last year to develop a radar controller interface that operates under Windows 2000, and in August 2001 delivered to WTI a beta version of the software, which is currently in field test.)

WTI and Malå filed a joint US patent on the radar hardware array in September 2000

- *Ground penetrating radar array and timing circuit, Bernth Johansson, Alan Witten and Anthony Devaney, US Patent Application 09/658,188.*

According to the terms of the agreement signed in October 2002 to close the PDA, WTI will assign its rights to this hardware patent to Malå, but retains through the License Agreement exclusive rights to the technology worldwide for the field of utility locating and non-exclusive rights for all other applications.

Malå would like to be WTI's preferred supplier of CART radar hardware. (Malå retains the right to manufacture the CART radar array for applications outside utility locating and mapping.) John Deere's Special Technology Division has also expressed an interest in manufacturing the CART radar components. At present, WTI intends to purchase the radar component from Malå and find a suitable partner (such as John Deere) for integration of the radar into different mobile vehicles.

- Is the CART owned by Witten and built by Malå? – owned by Malå and sold to Witten – licensed to Witten?

A complete CART Imaging System consists of several components:
  - Multi-channel (17 antenna) radar array with control electronics (CART hardware)
  - Position tracking system (eg, survey theodolite, available commercially)

M 000915

- Processing, imaging, visualization and mapping software (CART software)

WTI purchases the CART radar array from Malå. Malå builds the hardware to our specifications, and WTI takes title (with rights to use under the License Agreement). WTI has developed and owns the intellectual property rights of all the processing, imaging, visualization and mapping software in the CART Imaging System.

- Malå would seem to have a hand-pushed version of the CART – who owns this? – what is its capability? Explain?

Malå's core business is selling single-channel GPRs. These "handheld" systems are commercially available from several manufacturers. GSSI, based in New Hampshire, is the world leader in this market. Malå is second worldwide; Sensors and Software, Inc (a Canadian company) is third. Each company sells a broad range of systems with antennas of different sizes and frequencies.

Single-channel radar systems (or even the 2- or 4-channel systems marketed by GSSI) are not true 3D radar systems and do not have the imaging and mapping capabilities of the CART. A "GPR profile" obtained by dragging a single-channel system along the surface covers about a 6-inch swath through the ground (ie, is sensitive mainly to pipes or other underground objects in a vertical slice through ground that is about 6 inches thick and passes through the track of the radar unit on the surface).

The CART Imaging System, which is equivalent to operating 16 single-channel systems in parallel, covers a *6 25-ft* (2 meter) swath in one pass. In one day, a CART System can collect data over of area of about 40,000 sq ft (roughly one acre) with 3-inch horizontal resolution. It would be nearly impossible to use a handheld system to map such large areas with this detail. (The increase in efficiency is actually much larger than the nominal factor of 16—provided by the parallel channels of the CART—because of time that is lost in positioning the handheld system for each pass over the area.)

Handheld systems are useful for reconnaissance work and soil surveys and for locating individual utility lines at particular locations. WTI actually purchases handheld systems from Malå and uses these systems to complement the CART in its service contracts.

- What are the components to the system? What is patented? Who owns the intellectual property and what rights does each party have with regard to the intellectual property and to each other?

See the answer above ("Is the CART owned by Witten and built by Malå?") and the Intellectual Property portfolio.

WTI has an exclusive worldwide license to use, sell, lease and assemble the CART radar hardware in the field of utility mapping worldwide, and a non-exclusive worldwide license for other applications.

M 000916

- Does Malå have intellectual property rights in the software either directly or through license?

Malå has no rights to the software (nor any rights to the GPiR IP that WTI received with the assignment of the EPRI Agreement from Schlumberger), except through individual software licenses (valid for use in Europe, outside the field of utility mapping) that WTI provided under the agreement closing the PDA.

- How dependent is Witten on Malå and vice versa?

At present, WTI relies on Malå to provide the radar array, and we intend to continue purchasing these units from Malå as long as they are meeting the specifications and providing a good price. The License Agreement, however, gives WTI the right to manufacture the array independently of Malå. There are many companies that could manufacture the CART hardware to WTI's specifications. In addition, there are other manufacturers of GPR that could build a radar array that could be used with WTI's imaging software.

As long as WTI exists, Malå is excluded from the field of utility locating and mapping by the terms of the License Agreement. Moreover, we believe that WTI's software and integrated system for producing final underground maps, which can be used for any application, adds tremendous value to Malå's radar hardware and can be the basis for further agreements for licensing and sales of CART Systems for applications outside utility mapping.

We believe that it would take Malå (or any other company) at least 4 to 6 man-years to develop software equivalent to WTI's integrated mapping system.

WTI is the only company that holds all the IP rights and license agreements that allow it to use and develop the CART Imaging System unimpeded in the field of utility locating and mapping.

In addition, WTI has filed two patent applications on the broad concept of underground radar mapping, in which the IP claimed is independent of a particular hardware embodiment (ie, not dependent on the specific hardware of the CART):

- *Method for Merging Position Information with Measurements and Filtering to Obtain High-Quality Images that are Positioned Accurately with Respect to Global Coordinates, Burns et al., 14 March 2001*

- *A Method and Apparatus for Identifying Buried Objects using Ground Penetrating Radar, Alan Witten, 20 April 2001.*

WTI believes that these two patents (if allowed) will be sufficiently broad to defend its

M 000917

market in the use of array GPR systems (such as the CART) for shallow underground imaging and mapping, independent of any particular hardware embodiment.

WTI has also received a patent for an alternative to a physical multi-channel array, which is a "virtual array" created by scanning a single-channel radar rapidly over the ground (to simulate a physical multi-channel array).

- *A Rotating Scanning Antenna Apparatus and Method for Locating Buried Objects", Albats et al, filed 1 November 2000.*

WTI has received formal Notice of Allowance from the PTO for the claims in this patent application. The patent itself should issue shortly.

- What limits as to use/geography does Malå have on the intellectual property?

Malå can use, sell or lease the CART hardware in any field outside of utility locating and mapping anywhere in the world. But as long as WTI exists, Malå is excluded from the field of utility locating and mapping by the terms of the License Agreement. Also, at present Malå does not have rights to use WTI's software.

- Any limits as to Witten's use/geography?

WTI has rights to use the CART Imaging System for all applications in the United States and Canada. In the May 2000 Agreement, WTI gave Schlumberger an exclusive license to use the CART Imaging System in the field of mapping utility mapping outside the United States and Canada (and WTI retained no rights to its use in the territory for this application).

- Who owns the intellectual property embodied in the hardware?

According to the PDA, Malå will own the intellectual property rights in the hardware. As mentioned above, however, WTI and Malå have filed a joint patent on the CART hardware, co-authored by Johansson (Malå Geoscience), Witten and Devaney. (Filing of the patent was fully funded by WTI.) In papers filed with the US PTO, Witten and Devaney have assigned their rights to WTI. Once a satisfactory framework is reached for closing the PDA, WTI will assign its rights to Malå and retain the right to use the technology through the exclusive License Agreement in the PDA or a follow-up agreement. If a satisfactory framework is not reached for closing the PDA with Malå, WTI will assert its right to the hardware patent as co-inventors.

- Can Witten find a second source of hardware – originally 3 systems where tested – Malå, GSSI and GeoRadar Instruments.

As mentioned above, there are several other radar manufacturers—including GSSI and Sensors & Software, Inc (but probably not GeoRadar which is a very small

M 000918

operation)—which can build radar arrays that could be used with WTI's software.

- Does/Can Malå provide a competing locating service to Witten's?

The License Agreement excludes Malå from using the CART for utility locating and mapping. Malå (and other manufacturers) can sell single-channel radar systems—or provide a utility locating service with these systems—that can compete with WTI. But WTI believes that the superior product provided by 3D imaging will eventually dominate the market, in the same that 3D seismic has come to dominate the market for oil and gas exploration (almost completely eliminating 2D seismic from the exploration marketplace).

- Provide copies of Malå agreements.

OK.

- Malå contact – name, title, address, phone.

Tommy Leijon
President
MALÅ GeoScience
Skolgatan 11
S-930 70 MALÅ
SWEDEN

Office: +46 (0) 953 345 60
Mobile: +46 (0) 70 216 48 48
Fax: +46 (0) 953 345 67

M 000919

| | |
|---|---|
| From: | Chin, Janet [jcc@kskpa.com] |
| Sent: | Wednesday, August 18, 2004 12:50 PM |
| To: | Berl, Joseph |
| Cc: | tommy.leijon@malags.se; jr@ahlford.se |
| Subject: | Message from Harvey Kaplan |

Dear Joe:

As I indicated when we spoke yesterday, I have had an opportunity to look more carefully at the various agreements between Witten and Malå and have identified a few matters that require attention.

First, paragraph (c) of Section 1.1 of the October 31, 2002 Exchange and Settlement Agreement provides that Witten is to execute "an assignment to Malå of WITTEN'S rights to the patent, "Ground-Penetrating Radar Array and Timing Circuit", by BJOHANSSON, AWITTEN and ADEVANEY, (US) Patent Application 09/658,188 Filed September 8, 2001." I do not believe Witten has done so.

Second, Section 2.1 of the Exchange and Settlement Agreement requires Witten to deliver to Malå signed copies of all sublicenses. I do not believe any have been delivered to Malå.

Third, the last sentence of Section 5 of the October 31, 2002 License Agreement provides that Royalty Reports "shall be accompanied by one set of invoices and show the number of Products invoiced by the Licensee and/or its sublicensees during such calendar quarter as well as the date of delivery . . . ." None of the Royalty Reports since October 31, 2002 complied with those requirements.

Finally, in the second paragraph of Section 1.1 of the October 31, 2002 Agreement, Witten agreed to maintain CART software and provide upgrades to Malå. I understand that upgrades have been created but that none have been provided to Malå.

If I am mistaken as to any of the foregoing, please so advise me; otherwise, please advise me as to when Malå should expect to receive the aforedescribed materials.

I have passed on to Tommy Leijon the questions you asked me concerning the leasing of a 200 MHz grandfathered CART and I will be in further touch with you as soon as I have his responses.

Sincerely, Harvey Kaplan

1

Civil Action No: 1:06-cv-01343

Respondent WTI Ex. No. 14D

Arb. Ex. No: 417-Z

WTI
03255

**DTI Office Services-DC**

| | |
|---|---|
| **From:** | Kaplan, Harvey F. [hfk@kskpa.com] |
| **Sent:** | Tuesday, September 28, 2004 11:41 AM |
| **To:** | Berl, Joseph |
| **Cc:** | Jan Rynning (E-mail); Tommy Leijon |
| **Subject:** | MALÅ GeoScience AB-Patent Assignment-231194 |

  

DOCS-75973-v2-ma DOCS-75973-vDOC MALA Geoscience
la witten equi...   -mala witten eq...   AB-Patent Assi...

Dear Joe –

    Attached is a revised Equipment Lease incorporating the changes you requested.  Also attached is a copy of the document marked to show changes from the original draft.  I trust you will find the document to be in order, but if you do have any questions or comments concerning it, please don't hesitate to call.

    Also attached is a form of Patent Assignment that was prepared by MALÅ's IP counsel. The document appears to be pretty straight-forward and, unless I hear from you to the contrary, I will assume that it meets with your approval.

    Please have two copies of the Equipment Lease and the Patent Assignment executed on behalf of Witten and returned to me.  Upon receipt, I will forward the Equipment Lease to MALÅ for execution and then return one fully executed copy to you.  As I previously indicated to you, Witten should expect to receive the CART within approximately five weeks after MALÅ receives the Equipment Lease executed by Witten.  I will also see to the filing of the executed Patent Assignment in the USPTO.  MALÅ expects that promptly after Witten subleases the Equipment, MALÅ will receive all of Witten's software upgrades.

    Please also advise me as to the name and contact data of the person with whom Delloite ought to discuss establishment of "agreed-upon procedures" with respect to the royalty examination.

    Best regards.

                       Harvey
<<MALA Geoscience AB-Patent Assignment-231194.doc>>

Civil Action No:  1:06-cv-01343

Respondent WTI Ex. No. 15

Arb. Ex. No: 417-AA

WTI
02240

# WITTEN
technologies Inc

Witten Technologies Inc
10528 Democracy Blvd.
Potomac, MD 20854

1 301 983-5449 phone
1 301 983-4296 fax

# *fax*

| | | | |
|---|---|---|---|
| *To:* | Harvey Kaplan | *Fax:* | 612-375-1143 |
| *From:* | Tony Clifford | *Date:* | 9/29/2004 |
| *Re:* | Equipment Lease and Patent Assignment | *Pages:* | 8 *(including cover page)* |
| *CC:* | Joe Berl | *Fax:* | (202) 624-7222 |

Dear Mr. Kaplan,

Telecopy herewith is a copy of the Equipment Lease, two executed copies of which I have sent via FedEx to Tommy Leijon this afternoon. Also attached is copy of the fully executed patent assignment that I also sent directly to Tommy.

Regards,

Anthony E. Clifford
Chairman and CEO
Witten Technologies, Inc.

## CONFIDENTIAL
This facsimile transmission may contain information that is confidential and proprietary.
Do not read the message if you are not its intended recipient.
If you have received this transmission in error, please notify us at (1) 301 983 5449.

WTI
02797

# Equipment Lease

THIS LEASE MADE as of 22/4 September, 2004 between Witten Technologies, Inc., a Florida corporation (the "Lessee"), and Malå GeoScience AB, of Malå, Sweden (the "Lessor")

Lessor hereby agrees to lease to Lessee, and Lessee hereby agrees to lease from Lessor the property described in Schedule "A" attached hereto, together with all replacement parts, additions, repairs and accessories incorporated therein and/or affixed thereto (the "Equipment") on the following terms and conditions:

1.    **Term.** This lease is for a term of 7 months, beginning on the date that the Lessee receives the Equipment (the "CART Receipt Date") and ending 7 months after said date

2.    **Rentals.** Lessee shall pay to Lessor rentals aggregating 41,650 USD, plus applicable taxes, of which 0 USD is herewith paid in advance and the balance of the rental is payable in 7 equal, successive, monthly rental payments of 5,950 USD each, of which the first is due on the CART Receipt Date, and the others on the same date of each month thereafter, until fully paid Rental payments shall be made at the address of Lessor first above noted or at such place as Lessor or Lessor's assigns shall notify Lessee in writing.

3.    **Place of Use.** The Equipment shall be kept in the possession of the Lessee or a Sublessee of the Lessee.

4.    **Operation, Maintenance, Repairs, and Upgrades.** Lessee shall cause the Equipment to be operated by competent operators only, and shall pay or cause to be paid all expenses of operation. Lessee shall undertake and bear or cause to be undertaken and borne the expenses of normal maintenance of Equipment. If Equipment ceases, to operate properly, Lessee shall return Equipment, or cause the Equipment to be returned, to Lessor for repair. Lessor shall be responsible for repairing Equipment and returning it to Lessee or Lessee's Sublessee, as the case may be, in a timely fashion, normally within 3 working days. Lessee shall have the option of returning Equipment, or causing the Equipment to be returned, to Lessor from time to time for upgrade to the most recent versions of hardware, firmware, and operating software. Lessee shall bear the reasonable cost of repair or upgrade according to the normal price list published from time to time by Lessor.

5.    **Liability.** Lessee shall indemnify and save Lessor harmless against and from all loss, damage, expense or penalty arising from any claim or action on account of personal injury or damage to property occasioned by the operation, handling or transportation of the Equipment during the rental period ("Losses"), but shall be credited with any amounts received by Lessor from insurance procured at Lessee's expense; provided, however, that Lessor shall not be entitled to indemnification pursuant to this Section 5 if the Losses are the result of the gross negligence or willful misconduct of Lessor. Damage for any injury to the Equipment shall be based on the then true and reasonable market value of the Equipment irrespective of rentals theretofore paid or agreed. Lessee's indemnification obligations for damage to the Equipment pursuant to this Section 5 shall not exceed $200,000.

6.    **Insurance.** Lessee, at its reasonable expense, shall keep the Equipment insured at the full value thereof and for the term hereof against fire, theft, collision and extended coverage and against such other risks and in such amounts as Lessor may specify with losses, if any, payable to Lessor. Lessee shall, on request of Lessor, deliver to Lessor the policies or evidence of insurance reasonably satisfactory to Lessor, together with receipts for premiums paid thereunder

759973.2

If Lessee fails to insure as aforesaid, then Lessor may place insurance as Lessor deems advisable and Lessee will be obligated to pay the premium on demand.

7.    **Taxes and Laws.** Lessee shall comply with and conform to all laws and regulations relating to the ownership, possession, use or maintenance of the Equipment, and save Lessor harmless against actual or asserted violations of such laws and regulations, and pay all costs and expenses of every character occasioned by or arising out of such use.

8.    **Title.** All Equipment shall remain personal property, and title thereto shall remain in Lessor exclusively. Lessee shall keep the Equipment free from any and all liens and claims, and shall do or permit no act or thing whereby Lessor's title or rights may be encumbered or impaired. Upon expiration or termination hereof, the Equipment shall be returned unencumbered to Lessor by Lessee at Lessee's sole expense and in the same condition as when received by Lessee, reasonable wear and tear resulting from proper use thereof alone excepted. Lessee shall pay rent at the above rate until all Equipment arrives at Lessor's premises; no holding over shall be construed as an extension of the term of this Lease.

9.    **Inspection.** Unless Lessee notifies Lessor within 7 days after delivery of the Equipment, stating details of any defects, Lessee shall be conclusively presumed to have inspected and accepted it. Lessee shall, whenever requested, advise Lessor of the exact location of the Equipment and shall give Lessor immediate notice of any attachment or other judicial process affecting the Equipment, and indemnify and save Lessor harmless from any loss or damage caused thereby. Lessor may at all reasonable times, with prior notice to Lessee, enter upon any job, building or place where the Equipment is located to verify that Equipment is being used and maintained in a proper manner.

10.    **Non-Waiver.** Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right thereafter to demand strict compliance therewith or with any other provision. Waiver of any default shall not waive any other default.

11.    **No Warranty.** There are no representations, warranties or conditions, express or implied, statutory or otherwise, other than those herein contained. No oral agreement, guaranty, promise, condition, representation or warranty shall be binding; all prior conversations, agreements or representations related hereto and/or to the Equipment are integrated herein. No modification hereof shall be binding unless in writing signed by Lessor and Lessee.

12.    **Possession.** Lessor covenants to and with Lessee that Lessor is the lawful owner of the Equipment free from all encumbrances and that, conditioned upon Lessee's performing the conditions hereof, Lessee shall peaceably and quietly hold, possess and use the Equipment during said term without hindrance. Lessor shall indemnify and save Lessee harmless against and from all loss, damage, expense or penalty incurred by Lessee arising from a breach of this Section 12.

13.    **Default.** In the event of Lessee's default hereunder, or if Lessee is the subject of a voluntary or involuntary institution of bankruptcy proceedings, which are not dismissed within seventy five (75) days following the institution of such proceedings; or Lessee's failure to continue to do business in the ordinary course; or ceases doing business as a going concern, or if Lessee attempts to sell or transfer or part with the possession of Equipment, (a) all sums due and to become due hereunder shall, at the option of Lessor or any assignee of Lessor, become

W-11
02799

payable forthwith; (b) Lessor and/or its agents may without notice or liability or legal process enter into any premises of or under control or jurisdiction of Lessee or any agent of Lessee where the Equipment may be or by Lessor is believed to be, and repossess the Equipment, disconnecting and separating all thereof from any other property and using all force necessary or permitted by applicable law so to do, Lessee hereby expressly waiving all further rights to possession of the Equipment and all claims for injury suffered through or loss caused by such repossession; and (c) Lessor may sell the Equipment or may re-lease the Equipment for a term and a rental which may be equal to, greater than, or less than the rental and term herein provided. Any proceeds of such sale or any rental payments received under a new lease for the period prior to the expiration of this lease, less Lessor's expenses of taking possession, storage, reconditioning and sale or re-leasing, shall be applied on Lessee's obligations hereunder, and Lessee shall remain liable for the balance of the unpaid aggregate rental set forth above. Lessee will pay all costs, charges and expenses incurred in retaking possession of the Equipment hereby leased, and if this Lease is placed in the hands of an attorney for collection or enforcement, 15% of the amount due hereunder shall be added and payable by Lessee for collection charges if not prohibited by law.

14.    **Assignments**. Neither this lease nor Lessee's rights hereunder shall be assignable except with Lessor's written consent, which consent shall not be unreasonably withheld; the conditions hereof shall bind any permitted successors and assigns of Lessee. If Lessor assigns the rents reserved herein or all or any of Lessor's other rights hereunder, assignee's rights shall be independent of any claim, defense or offset of Lessee against Lessor; Lessee on receiving notice of any such assignment shall abide thereby and make payment as may therein be directed. Following such assignment the term "Lessor" shall be deemed to include or refer to Lessor's assignee. Nothing herein shall prohibit Lessee from subletting the Equipment, subject to Lessor's rights hereunder provided that no such subletting shall relieve Lessee from its obligations hereunder.

15.    **Miscellaneous**. Lessee shall identify each item of the Equipment by suitable lettering thereon to indicate Lessor's ownership, but Lessee shall have the right to place its own marks upon Equipment. This lease is irrevocable for the full term hereof and for the aggregate rentals herein reserved, and the rent shall not abate by reason of termination of Lessee's right of possession and/or the taking of possession by Lessor or for any other reason, and delinquent installments of rental shall bear interest at the rate of 1% per month (12% per annum). All notices relating hereto shall be mailed registered to Lessor or Lessee at its respective address above shown or at any later address last known to the sender. Lessee waives all rights under all exemption Laws. Lessee acknowledges receipt of a true copy of this Equipment Lease. Lessor's rights hereunder are cumulative and not alternative. The provisions of this Lease shall inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors and assigns of the parties hereto, except as herein otherwise provided. If Lessee is a corporation, this lease is executed by authority of its Board of Directors.

16.    **Purchase Option**. If Lessee has paid in full all rentals owing hereunder and be not then in default hereunder, Lessee shall have the option to purchase the Equipment exercisable by giving written notice to such effect and paying the purchase price therefor not less than 30 days prior to expiration of the term hereof. The purchase price shall be 46,680 USD. Title shall remain in Lessor until the purchase price is fully paid in cash and this Lease has terminated.

WTI
02800

17.    **Governing Law**. This Offer shall be governed by and construed in accordance with the laws of the State of Florida.

**IN WITNESS WHEREOF** the parties hereto have executed this Lease as of the date first written above.

WITTEN TECHNOLOGIES, INC

By _____

Its _____

MALÅ GEOSCIENCE AB

By _____

Tommy Leijon, its President

WTI
02801

# Schedule "A"
# Equipment Description

One used 200 MHz CART with 17 antennas with control unit and plastic cover

WTI
02802

# PATENT ASSIGNMENT

THIS PATENT ASSIGNMENT ("Patent Assignment"), dated as of _9-29-2004_ is from Witten Technologies, Inc , a Florida corporation having an address at 10528 Democracy Blvd , Potomac, MD 20854 ("Assignor"), to Malå GeoScience AB, a business organized under the laws of Sweden and having an address at Skolgatan 11, S-930 70 Malå, Sweden, ("Assignee")

## WITNESSETH

WHEREAS, Assignor and Assignee have heretofore entered into that certain Exchange and Settlement Agreement, dated October 31, 2002 ("Settlement Agreement"),

WHEREAS, In accordance with the Settlement Agreement, Assignor desires to assign to Assignee all right, title and interest in and to the inventions and related patents, design registrations and patent applications described and claimed in the Witten et al U S Patent Application Serial No 09/658,188, filed September 8, 2001, and entitled Ground-Penetrating Radar Array and Timing Circuit ("Patents"),

WHEREAS, Assignee desires to acquire the Patents from Assignor, and

WHEREAS, Assignor and Assignee desire to confirm of record the assignment of the Patents to Assignee

NOW, THEREFORE, for and in consideration of the foregoing recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agrees as follows

1       Assignor hereby assigns, transfers and conveys to Assignee all right, title and interest in and to the Patents throughout the world, together with (i) any all Letters Patents, both foreign and domestic, that are or may be granted therefrom, including, without limitation, any reissues, reexaminations, continuing applications, continuations, divisions, renewals, extensions and continuations-in-part of such Patents (collectively, the "Assigned Patents"), and (ii) all rights and privileges pertaining to the Assigned Patents, including, without limitation, all causes of action, claims and demands and other rights for, or arising from, any infringement, including past infringements, of the Assigned Patents

2       Assignor further agrees without further consideration to cause to be performed such other lawful acts and to be executed such further assignments and other lawful documents as Assignee may from time to time reasonably request to effect fully this Patent Assignment and to permit Assignee to be duly recorded as the registered owner of the Patents and all other rights hereby conveyed

IN WITNESS WHEREOF, Assignor has caused this Patent Assignment to be duly executed by its authorized representative on the day and year first above written

Witten Technologies, Inc

By _Anty E Clifford_

Printed Name _Anthony E. Clifford_

Title _ceo_

STATE OF _Maryland_ )
)
COUNTY OF _Montgomery_ )

On this _29_ day of _September_, 2004, before me personally appeared _Anthony Clifford_ known to me to be the person described in and who executed the foregoing instrument as _____ of Witten Technologies, Inc. and acknowledged that he executed the same as a free act and deed.

_Aisha Lawrence_
Notary Public

AISHA LAWRENCE
Notary Public
Montgomery County, MD
My Commission Expires Nov. 24, 2007

M2 20658603 01