

Frank A. DeCosta, III
Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P.

1300 I Street, N. W.
Washington, DC 20005-3315

Sent via facsimile to 202 408 4400

1999-10-19

Dear Mr Frank A. DeCosta, III

We have today received the first information about patent and patent application concerning the co-operation between Witten Tec Inc and MALÅ GeoScience AB covered by the License Agreement.

We would like you to send us, as soon as possible, all documents that covers your work concerning the patent and patent applications and other documents related to the co-operation between Witten Tec Inc and MALÅ GeoScience AB covered by the License Agreement.

Please send all documents via FedEx to the following address:

Mr. Tommy Leijon
MALÅ GeoScience AB
Skolgatan 11
S-930 70 MALÅ
Sweden

Yours truly

MALÅ GeoScience AB

Tommy Leijon
President

Civil Action No: 1:06-cv-01343

Respondent WTI Ex. No. 16

Arb. Ex. No: 417-H

M 000121

MALÅ GeoScience
Skolgatan 11,
S-930 70 MALÅ, Sweden

Tel: +46 953 345 50
Fax: +46 953 345 67

E-mail: geoscience@malags.se
www.malags.se
Org no: 556102-8209

'00 04/12 08:33 FAX 46 953 34567        MALÅ GEOSCIENCE                              ☏001



1 (1)

Frank A. DeCosta, III
Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P.

1300 I Street, N. W.
Washington, DC 20005-3315

Sent via facsimile to 202 408 4400

2000-04-12

Dear Mr Frank A. DeCosta, III

You have send Mr Jan Rynning a letter saying that you should have sent all documents covering all patent and patent application concerning the co-operation between Witten Tec Inc and MALÅ GeoScience AB covered by the License Agreement to him.

We have still not received anything.

We would like you to send us and a copy to our layer Mr. Harvey Kaplan, as soon as possible, all documents that covers your work concerning the patent and patent applications and other documents related to the co-operation between Witten Tec Inc and MALÅ GeoScience AB covered by the License Agreement.

Please send all documents via FedEx to the following addresses:

Mr. Tommy Leijon
MALÅ GeoScience AB
Skolgatan 11
S-930 70 MALÅ
Sweden

Civil Action No: 1:06-cv-01343
Respondent WTI Ex. No. 17
Arb. Ex. No: 417-L

| MALÅ GeoScience AB | Head office | Umeå | USA | | |
| Postal address | Skolgatan 11 | Fabvägen 8 | 400 Harvey Rd | | |
| | S-930 70 MALÅ Sweden | S-906 20 UMEÅ, Sweden | Manchester, NH 03103, USA | | |
| Telephone | +46-(0)953 345 60 | +46-(0)90 1844 50 | +1(603)-827-5941 | Org no: 5! | |
| Telefax | +46-(0)953 345 67 | +46-(0)90 1844 59 | +1(603)-827-5874 | Vat no: SI | |
| e-mail | geoscience@mala.se | geoscience@mala.se | sales.usa@mala.se | www.mala | |

WTI 01270

And a copy to our layer via FedEx to the following address:

Mr. Harvey Kaplan
Kaplan, Strangis and Kaplan, P.A.
5500 Norwest Center * 90 South Seventh Street
Minneapolis, Minnesota 55402
Phone 612/375-1138
Fax 612/375-1143


Yours truly

MALÅ GeoScience AB


_____

Tommy Leijon
President

Page 74

1  Q  So the key would seem to be producing an image
2  from the data collected, does that sound right?
3  A  Yeah, kind of.
4  Q  It would be the next leap in the technology?
5  A  Yeah, but you have to understand that we were
6  creating at that time images because everything that you
7  get on the screen and that the geophysicist is looking
8  at is some type of image. It's nothing that existed in
9  reality, it's pictures of, so that was not new but what
10 was new was the possibility of making something that was
11 easier for the mind, human mind, to understand, to make
12 something that looked like parts of cables underneath
13 the ground but you can argue that this was actually not
14 that important, the important was to get the reliable
15 information.
16 Q  Is the information produced by the radars up
17 to that point fairly reliable or was there a concern
18 over that reliability?
19 A  I think that it had always been a problem with
20 radar, the reality of the data, and you know sometimes
21 you have conditions where it doesn't work and sometimes
22 you have poor conditions and sometimes you have good

Page 75

1  conditions so it's always a question of whether it works
2  or not works.
3  Q  Okay.
4     MS. BUSHNELL: When you get to a good stopping
5  place.
6     MS. LEWIS: Okay.
7     (A brief recess was taken.)
8     BY MS. LEWIS:
9  Q  In the demand filed by Mala which is Exhibit
10 2, on page 3 of that demand, actually, I apologize, page
11 2 of the demand, paragraph 3, it says that in the first
12 sentence, "Mala insisted that it must exclusively own
13 the rights to the hardware and the imbedded signal
14 processing software then in development." Is the
15 software, the imbedded signal processing software
16 mentioned there, is that the software Mala developed to
17 accompany the hardware?
18 A  Yeah.
19 Q  Would that have included the software
20 Dr. Witten was developing to create the images?
21 A  No, it's quite easy because you have, on the
22 border you export from the information from the cart,

Page 76

1  the hardware, to the PC and the border is when it's
2  going into the PC and it's stuff that Witten or
3  Schlumberger or whoever developed.
4  Q  So Mala has never believed it had rights to
5  any of the software once it crossed that border?
6  A  Yeah, that's the way I think it was.
7  Q  Do you still think that is true?
8  A  Yeah.
9  Q  Do you recall how Witten and Mala first began
10 negotiation or communications over this relationship?
11 A  Yeah.
12 Q  How did that occur?
13 A  I think Olaf Forsland met Alan Witten
14 somewhere in Egypt or in the Middle East and they had a
15 talk concerning the possibility of creating a more
16 sophisticated array.
17 Q  Was there anything that preceded that meeting?
18 A  I don't think so. I think that was, as I
19 remember that was the starting point, at least the
20 information I got.
21 Q  Do you recall which company approached the
22 other company?

Page 77

1  A  It was Alan Witten that approached.
2  Q  Mala?
3  A  Yeah. As I told you, when Alan Witten came
4  along and made the approach we had, we were in the
5  process of discussing this type of equipment with Battel
6  so it was nothing new, the structure of the equipment
7  was created.
8  Q  When Mala and Witten was first negotiating
9  these agreements did Robert or Alan ever represent that
10 they had taken any new products to market or do you know
11 if this was a first-time venture for them?
12 A  Yes, my belief at that point was that Robert
13 Green was an experienced businessman and he had been
14 running a quite big company in the construction area
15 and, you know, marketing is marketing, doesn't make a
16 big difference if you are marketing consultancy business
17 or construction or whatever it is. So I had, I think
18 that Robert told me he was good in selling and marketing
19 and I think I believed it. I think I also wrote that to
20 the board of directors and we were talking about in the
21 early days also the value of that.
22 Q  At the time the parties were negotiating the

Capital Reporting Company

Page 86

1 asking him if he's knowledgeable about it today or was
2 he knowledgeable about it sometime in the past?
3      BY MS. LEWIS:
4   Q   Were you, at the time this patent assignment
5 was executed in 2004, were you aware that when this
6 assignment was executed it not only assigned Mala the
7 timing circuit patent, it also assigned Alan Witten's --
8   A   No, and I didn't know anything about this
9 until now, yesterday.
10  Q   Okay. Would it be --
11  A   Of course I know that the patent or patents
12 have been assigned but I have never given a thought what
13 kind of documents that were, what kind of innovations
14 that were transferred. I know of course what's because
15 I have written that, it's according to what it says in
16 the prototype development agreement, I written that and
17 I'm also the one who have established the policy in the
18 company. I can guess that the patent lawyers and your
19 lawyers have just technically been going through what it
20 says in the prototype development agreement and that
21 they have executed the way they believe was the correct
22 way.

Page 87

1   Q   If Witten assigned this patent assignment
2 under, with the understanding that they were only
3 transferring a timing circuit patent but not
4 Dr. Witten's ground penetrating radar patent would you
5 say then that Mala should receive both patents?
6   A   The policy and the idea behind the wording in
7 the paragraph in the prototype development agreement is
8 that we are not doing business the way that we can end
9 up with being hindered, is that right word, and by
10 patents or other concerning our core intellectual
11 property.
12      And as I told you we had some bad experience
13 about that earlier. So I believe that it might be
14 correct the way patent lawyers have been dealing with it
15 but I don't have any specific, I was not involved in
16 that. I believe also that they might have been that
17 actually we weren't specifically involved what were
18 transferred, it might be that Bernth knows something
19 about it but I don't.
20  Q   Based on the negotiations of the terms you
21 understand that were outlined in the prototype
22 development agreement, the license agreement and even

Page 88

1 the exchange and settlement agreement, the patent that
2 was to be transferred, wasn't that to be the patent that
3 solely related to like you said the core hardware and
4 the software prior to that border you described in which
5 the data was processed?
6      MS. BUSHNELL: Objection.
7      MS. LEWIS: I'm not done with my question.
8      MS. BUSHNELL: Finish your question, I thought
9 you were done.
10     BY MS. LEWIS:
11  Q   Was that the understanding of the ownership
12 that should have transferred?
13     MS. BUSHNELL: Objection to the
14 characterization.
15     BY MS. LEWIS:
16  Q   Do you understand what I'm asking?
17  A   I can't, I cannot have any opinion about it
18 until I have been going through this with the lawyers
19 that we hired.
20  Q   What was the intent, though, when the terms
21 when negotiated, not what the lawyers come up with
22 later, what was the intent when these terms were

Page 89

1 negotiated that Mala should own? Should they have owned
2 Witten's processing software that produced the images?
3   A   No, that was not the intent but the intent was
4 that was there something that could have an impact on
5 our core business then it was ours, and what I'm talking
6 about there is the hardware and the single processing
7 software.
8   Q   Couldn't have, that's what I'm trying to
9 describe is if what Mala ultimately ended up receiving
10 was not the core hardware, it was not that processing
11 prior to the software Witten has that processed the data
12 and made the image, should Mala have received that
13 patent ownership?
14     MS. BUSHNELL: Objection, assumes facts not in
15 evidence.
16     THE WITNESS: I cannot have any, I can't
17 answer that question because it's too hypothetical and
18 you have to, I have to consult with the guys that were
19 actually dealing with them to understand what they were
20 doing. What I'm saying it might as well be right what
21 they have done and it could be, of course, you cannot
22 exclude it could have been something done wrong but I'm

Capital Reporting Company

Page 90

1  not going to sit here to make statements about it. I
2  know the policies and I know also the meaning of the
3  idea behind the paragraph and prototype development
4  agreement but how it's handled is beyond what I know.
5      BY MS. LEWIS:
6   Q  Well, if two parties into a contract with a
7  certain understanding shouldn't that, those
8  understandings be what comes out of the relationship,
9  not what people come in after the fact and say, well,
10 you know this actually does relate to the core
11 technology because in essence it sounds like everything
12 could relate to the core technology, is that true?
13     MS. BUSHNELL: Objection, compound.
14     BY MS. LEWIS:
15  Q  Yeah. In essence couldn't all the technology
16 developed in the cart system relate to the core IP that
17 Mala developed?
18  A  I don't think that that was the meaning at
19 that point when we entered the agreement.
20  Q  So how can --
21  A  There is a border somewhere and I don't know
22 whether the border is here or there but of course there

Page 91

1  is a border. It's not that uncommon and I have an
2  example just it happened a couple of months ago in
3  another company where, you know, if you define the
4  problem you have actually done half of the process of
5  creating a patent.
6      The other half is to find a solution to that
7  problem and if one party come with experience and
8  knowledge about the technology they know the problem,
9  and then sometimes if you're doing something jointly you
10 could end up in a situation where the other party who
11 get the problem presented for him is trying to think
12 about it and exactly that situation that we tried to
13 avoid and whether this fits in or not I can't tell.
14  Q  At any point from the time in which the
15 prototype development agreement and license agreement
16 was signed as well as the exchange and settlement
17 agreement and the patent assignment occurred, was it
18 ever Mala's intent to take ownership of Dr. Witten's
19 patent on ground penetrating radar?
20  A  No, I don't think so. We were not interested
21 in getting other person's patent but we have an
22 agreement and that agreement says if there is something

Page 92

1  that will hinder us in the future development of the
2  product that is ours then it doesn't make any difference
3  whether we who are the inventor or somebody else.
4      MS. BUSHNELL: Let me just ask for a
5  clarification, what did you mean by Dr. Witten's, I
6  think you said ground penetrating radar patent?
7      MS. LEWIS: It is the --
8      MS. BUSHNELL: Is it Exhibit 13?
9      BY MS. LEWIS: The patent described in Exhibit
10 19.
11     MS. BUSHNELL: The apparatus.
12     BY MS. LEWIS:
13  Q  Yes, so if it was not Mala's intent to take
14 Dr. Witten's patent as described in Defendant's Exhibit
15 19 would it then be Mala's responsibility to return that
16 patent to Witten?
17     MS. BUSHNELL: Objection, mischaracterizes the
18 testimony.
19     BY MS. LEWIS:
20  Q  Did you state that your intent was never to
21 get Dr. Witten's patent on ground penetrating radar?
22  A  What I'm talking about is that in our

Page 93

1  relationship of course we don't have any intention to
2  take something that belongs to somebody else, but if we
3  have an agreement that says that if Mr. Witten is
4  inventing something that during the process of creating
5  this equipment that is going to hinder us in the future
6  then we have agreed that that patent is ours.
7   Q  Did Witten sign an agreement that or is there
8  an agreement between Mala and Witten that states
9  Dr. Witten's patent is covered by the prototype
10 development agreement and license agreement?
11  A  I don't understand the question.
12     MS. BUSHNELL: Are you asking if there's a
13 separate agreement?
14     BY MS. LEWIS:
15  Q  Is there any recognition by Witten that
16 Dr. Witten's patent described in Defendant's Exhibit 19
17 falls under the terms outlined in either the prototype
18 development agreement or license agreement?
19  A  I don't know, I can't answer that question.
20 As far as I know there are no other side agreements
21 except the one that we have here.
22  Q  Are you aware of disputes that have occurred

24 (Pages 90 to 93)

Capital Reporting Company

Page 94

1  between Dr. Witten and Mala patent attorneys over the
2  ownership of this patent described in Exhibit 19?
3      A    Never heard of it.
4      Q    If it was unintentional on Witten's part to
5  transfer that patent to Mala should it be returned to
6  Witten?
7      A    It's a hypothetical question, whether it falls
8  under the scope of the paragraph in the prototype
9  development agreement or not, I don't know.
10     Q    Whether it's under the scope or not, if Witten
11 did not intend to transfer it to Mala should it be
12 returned?
13     A    Yeah, if it's in accordance with the prototype
14 development agreement it should not be returned. If
15 it's outside the scope, there is something wrong done, I
16 guess that is curable.
17     Q    So would you say it's normal for a party to --
18     A    Erin, I don't know what was in the mind of
19 lawyers up in Minnesota when they did this.
20         MS. BUSHNELL: Off the record for a minute.
21         MS. LEWIS: Uh-huh.
22         (Discussion off the record.)

Page 95

1          BY MS. LEWIS:
2      Q    Can you outline what reasons -- do you believe
3  Witten intended to assign this patent described in
4  Defendant's Exhibit 19 to Mala?
5          MS. BUSHNELL: Objection, speculation.
6          THE WITNESS: Do you want me to answer the
7  question?
8          BY MS. LEWIS:
9      Q    Yes.
10     A    I believe it's possible that the lawyer that
11 you used who had the authority to negotiate this
12 believed that this was the right way to interpret the
13 contract. Yeah, I think it's possible, and I think also
14 it's possible that our lawyers who had the authority to
15 negotiate and to take care of that business also
16 believed that this, it was the right interpretation of
17 the section in the prototype development agreement and
18 also the paragraph in the exchange and settlement
19 agreement, I think that is possible.
20     Q    Do you think, though, that Witten though as a
21 company outside of whether the lawyer, outside of what
22 the lawyer did or didn't do, do you think that Witten as

Page 96

1  a company intended to assign Dr. Witten's patent which
2  he had been working on for numerous years to Mala?
3          MS. BUSHNELL: Objection, speculation.
4          THE WITNESS: And also of course it's possible
5  that you can have, yes, it's speculation. I guess that
6  Tony Clifford, isn't he the one who wrote it, that of
7  course he could believe that this is the right
8  interpretation of the course and that way it's binding.
9  But still I don't know whether it's wrong or if it's
10 right, the interpretation of the paragraph in the PDA.
11         BY MS. LEWIS:
12     Q    Can you describe the purpose of the license
13 agreement between GSSI and Mala which is Defendant's
14 Exhibit 20?
15     A    I have some more knowledge about that than the
16 other assignment document. The purpose of the agreement
17 was to avoid possible litigation concerning infringement
18 and the way it sold was that we accepted to pay a
19 symbolic royalty, I think it was something like 1
20 percent of, and it was restricted to, only to the CPU.
21     Q    The control unit?
22     A    Yeah, control unit, I think and it also

Page 97

1  restricted in other ways and it's only on the American
2  market. So the burden that we have to, the royalty
3  burden was limited and we had a problem that we had to
4  take care of and I think it was a good way of trying to
5  solve it this way.
6      Q    What problem is that?
7      A    The problem was that there was a patent that
8  GSSI had that at least in their point of view we were
9  infringing on that.
10     Q    Is that why Mala entered into the license
11 agreement with GSSI?
12     A    Yes, our opinion was and it was the same
13 opinion that also Finnegan and Henderson, your patent
14 lawyer had about this, they were the one who brought it
15 up, we didn't know it until the search were made when we
16 were applying for the patent.
17     Q    Did the lawyers at Finnegan and Henderson tell
18 you that it was the same radar array or --
19     A    I can't remember and I was not involved in the
20 discussion between Finnegan and Henderson but as far as
21 I have been informed it was, this was brought up when
22 they were doing a research of what could, what patent

25 (Pages 94 to 97)

Capital Reporting Company

Page 106

1 identification.)
2     BY MS. LEWIS:
3  Q   Labeled Defendant's Exhibit 18 titled, Due
4 Diligence Frequently Asked Questions which is Mala's
5 document produced M000914. Have you seen that document
6 before?
7  A   Yeah, I think so.
8  Q   Do you know who prepared this document?
9  A   I'm actually not sure.
10 Q   You're not sure if Mala produced this
11 document?
12     MS. BUSHNELL: Produced meaning created?
13     BY MS. LEWIS:
14 Q   Yeah, created.
15 A   I can actually not recall, I usually don't
16 write this much so --
17 Q   If you could turn to page 4 of Exhibit 18,
18 under the second bullet point, actually never mind, if
19 you're not sure who produced this or who created it. If
20 you look on the last page 6, I know it has your name,
21 address and number.
22 A   I'm sorry but I can't actually because I

Page 107

1 remember parts of it but the whole, I'm not sure that
2 because this is not my way of writing.
3  Q   Okay, that's okay, we can skip over it. I
4 think prior to lunch we were going over Defendant's
5 Exhibit 14 which is the patent assignment. Is it your
6 testimony and belief that the reason this patent
7 assignment contains the plural form of patents is
8 because it relates to the patent described as it was
9 filed not only in the United States but also in Europe?
10 A   I believe so, yes.
11 Q   Are you aware of the fact that Alan Witten's
12 patent titled Method and Apparatus for Identifying
13 Buried Objects Using Ground Penetrating Radar was a
14 continuation in part of this same patent?
15     MS. BUSHNELL: Asked and answered, go ahead.
16     THE WITNESS: As I said before, I'm not a
17 patent lawyer or knowledgeable in that area so I don't
18 think I, I'm not aware about that.
19     BY MS. LEWIS:
20 Q   Okay. So when the patent assignment was
21 executed it was not Mala's intent to receive ownership
22 of Dr. Witten's patent that I just named?

Page 108

1  A   No, it was not.
2  Q   Would it be your opinion that since Mala did
3 receive this patent based upon this -- excuse me, in
4 your opinion do you believe that because Mala received
5 ownership of Dr. Witten's patent the Method and
6 Apparatus for Identifying Buried Objects Using Ground
7 Penetrating Radar as a result of this that it should be
8 returned to Witten Technologies?
9      MS. BUSHNELL: Objection, assumes facts not in
10 evidence.
11     BY MS.: .
12 Q   Do you understand my question?
13 A   I would like to say, fully understand this the
14 background and discuss it internally and discuss it with
15 our lawyers because I don't fully understand.
16 Q   So if Mala received a patent Witten didn't
17 intend to assign, Mala didn't intend on receiving, you
18 would not think Witten should get it back?
19     MS. BUSHNELL: Objection, hypothetical, calls
20 for speculation.
21     THE WITNESS: As I said, I think now when you
22 mention this that I would like to discuss it internally

Page 109

1 and with our lawyers so I fully understand what it's all
2 about.
3      MS. BUSHNELL: Off the record, please.
4      (Discussion off the record.)
5      (Exhibit Number 19 was marked for
6 identification.)
7      BY MS. LEWIS:
8  Q   I'm going to label as Defendant's Exhibit 19
9 Mala's document produced 005283 which is a United States
10 patent and trademark office recordation of assignment
11 document, have you ever seen this before?
12 A   What I know is that all this usually are taken
13 care of by our R and D department but I'm not, actually
14 not sure I've ever seen this or not.
15 Q   Are you aware that Mala currently has received
16 ownership of this patent, it's titled there at the
17 bottom?
18 A   Is that the one that --
19     MS. BUSHNELL: That's the one who transfers it
20 and that's the one to whom it's been transferred.
21     BY MS. LEWIS:
22 Q   To clarify the record she was saying that

Page 110

1  Witten Technologies is the assignor transferred the
2  patent title on this document to the assignee which is
3  Mala GeoScience.
4  A    I'm not sure actually.
5       MS. BUSHNELL: Jan tells me he is
6  knowledgeable about this so you can ask him about it
7  tomorrow.
8       BY MS. LEWIS:
9  Q    Okay. So to clarify with you, you have no
10 knowledge of this, the assignment of this patent?
11 A    I probably have seen it but I can't let's say
12 remember it.
13 Q    Okay. Is it your testimony that it was not
14 Mala's intent in receive Alan Witten's patent described
15 on Defendant's Exhibit 19?
16 A    If this is the patent our intention has always
17 been that the writing in the PDA and now the license
18 agreement that we should own the hardware, I mean
19 hardware software and Witten should own the
20 interpretation software but if there is an application,
21 I'll repeat myself again, I would like to look into it
22 so I fully understand it and discuss it internally and

Page 111

1  discuss it with our lawyers because --
2  Q    We're going to have to depose him against once
3  he understands it from his lawyer?
4       MS. BUSHNELL: Off the record.
5       (Discussion off the record.)
6       MS. BUSHNELL: Back on the record.
7       BY MS. LEWIS:
8  Q    So it was your understanding that Witten only
9  intended to assign hardware rights; is that correct, and
10 not interpretation?
11 A    The complete package of the hardware,
12 including the hardware software.
13 Q    But not including the interpretation software
14 as you stated it; is that correct?
15 A    Yes.
16 Q    Are you aware of how much Witten spent in
17 order to file patents and prosecute patents nationally
18 and internationally?
19 A    No.
20 Q    Did anyone at Witten ever express to you that
21 if Witten had to pay to file a hardware patent that they
22 believed they should own that hardware patent?

Page 112

1  A    I'm not sure of that, no, but my recollection
2  there had been a lot of e-mails and discussions and
3  meetings.
4  Q    The two patents that Mala currently received
5  through assignment from Witten, are you aware of whether
6  Mala paid any portion of the patent application cost?
7       MS. BUSHNELL: Objection, assumes facts not
8  in evidence, answer if you know.
9       THE WITNESS: I don't know. I don't think so.
10      BY MS. LEWIS:
11 Q    How many carts has Mala manufactured to date?
12 A    If I recall it correctly it's 12 or 13 carts.
13 Q    Who is in possession of these carts?
14 A    Three Witten have leased, one is at, I don't
15 know but what I heard when they leased the fourth cart
16 it was intended for Craig Smith but if they have it or
17 not I don't know. In our storage room in Charleston we
18 have I believe three carts and in Sweden today we have
19 four, I believe. How many is that?
20      MS. BUSHNELL: Eleven.
21      THE WITNESS: Eleven, and one of them we have
22 sold to the last year to the military defense

Page 113

1  organization in Sweden.
2       BY MS. LEWIS:
3  Q    Do you recall any other carts outside of
4  these?
5  A    We have sold two carts to Japan.
6  Q    Is that to the government or to a business in
7  Japan?
8  A    It's a business organization that operates on
9  the, they're working for the government, you could say
10 that. They're looking for pot holes in the roads or
11 sink hole, both words.
12 Q    The two carts sold to Japan, are you aware of
13 what software they were using?
14 A    It's the governmental software that the
15 company have produced for this type of equipment.
16 Q    Are they using Witten software?
17 A    No.
18 Q    What about the ones sold to the military in
19 Sweden?
20 A    They are doing their own software.
21 Q    Does GEL also have a cart, own a cart?
22 A    They rent cart from us.

Page 1470

```
 1      I would say, because what I gave the patent lawyers
 2      were schematics and descriptions and they put that
 3      all the their wording so that I am pinpointing
 4      details later on.  That is not strange.
 5           Q    Was it strange that Dr. Deveny was
 6      editing the patent to you or contributing in some
 7      manner?
 8           A    Well, I am not aware that he did that.
 9           Q    I believe in Shane's letter to you,
10      Exhibit B, he stated that and your response doesn't
11      seem to indicate any concern regarding that.
12           A    No.  No.  I still don't know what he did.
13      Can you please pinpoint what changes he proposed?
14           Q    I'm not sure myself either.  If Mr.
15      Deveny was changing this invention that you claim
16      that you are the sole inventor of wouldn't you
17      likely have responded back to Shane?
18           A    Not necessarily.
19           Q    Did you invent ground penetrating radar?
20           A    No.
21           Q    Is it your testimony that if the GLUE
22      patent was to fall in the hands of someone who is
```

Civil Action No: 1:06-cv-01343
Respondent WTI Ex. No. 20
Arb. Ex. No:

Page 1471

1  hostile to Mala that it would keep Mala from using
2  their hardware?
3       A    Potentially, yes, but not if we had
4  plenty of money.
5            MR. KELLY:  Bingo!  I am just saying that
6  that is the way the world works.
7  BY MS. LEWIS:
8       Q    Does that necessarily mean the GLUE
9  patent is actually an improvement on Mala's
10 hardware?
11      A    No.
12      Q    Are you aware that under the agreements
13 between Witten and Mala that Mala is only to
14 receive intellectual property that improves on
15 Mala's hardware?
16      A    No, I am not aware of this.  Would you
17 please restate that Mala is wholly entitled to.
18      Q    Under the agreements between the two
19 parties it states that Mala is to receive ownership
20 of the intellectual property that improves Mala's
21 hardware.
22      A    Yes.  No, I was not aware of that.

Capital Reporting Company

Page 1472

1  THE ARBITRATOR: Does the GLUE patent
2  describe an improvement to Mala hardware?
3  THE WITNESS: It is very hard to say what
4  the GLUE patent describes.
5  THE ARBITRATOR: What do you think it
6  describes? Do you think it describes an
7  improvement?
8  THE WITNESS: No, and I think to be
9  honest, I think it is an attempt to cover as much
10 as possible in the broadest possible way without
11 pointing to details, so it can cover anything, but
12 it is extremely hard to read out what it really is.
13      I pointed to a few. I pointed to a few
14 things that I thought was clear, but apart from
15 that, it is hard to find clear.
16 THE ARBITRATOR: Thank you.
17 MS. LEWIS: You made me think of
18 something when you said that, so if I can have a
19 minute.
20 BY MS. LEWIS:
21     Q   There was a document reviewed previously
22 which was an e-mail from Mike Oristaglio to, I



**ROPES & GRAY LLP**
ONE METRO CENTER  700 12TH STREET, NW  SUITE 900  WASHINGTON, DC 20005-3948  202-508-4600  F 202-508-4650
BOSTON  NEW YORK  PALO ALTO  SAN FRANCISCO  WASHINGTON, DC  www.ropesgray.com

September 22, 2005

Kenneth A. Genoni
202-508-4683
kenneth.genoni@ropesgray.com

**BY FACSIMILE**

Ms. Andrea Bugbee
International Case Manager
American Arbitration Association
International Centre for Dispute Resolution
1633 Broadway, 10th Floor
New York, NY 10019

Re:  *MALA Geoscience AB v. Witten Technologies, Inc.*
Case No. 50 199 T 00261 05

Dear Ms. Bugbee:

Enclosed you will find an executed copy of the Preliminary Hearing Report and First Scheduling Order completed in the above-referenced matter.

Sincerely yours,

Kenneth A. Genoni

KAG:gs
Enclosure

7209243_1

Civil Action No: 1:06-cv-01343
Respondent WTI Ex. No. 21
Arb. Ex. No:

# International Centre for Dispute Resolution

In the Matter of the Arbitration Between

MALA Geoscience,

Claimant

and                                                                Case No. 50 199 T 00261 05

Witten Technologies, Inc.

Respondent

## PRELIMINARY HEARING REPORT AND FIRST SCHEDULING ORDER

Pursuant to the procedures of the International Centre for Dispute Resolution, a division of the American Arbitration Association, a preliminary hearing was held by telephone on September 20, 2005, before the Arbitrator, Kenneth A. Genoni. Appearing on behalf of Claimant MALA Geoscience ("Mala") was Sarah E. Bushnell of Kelly & Berens, P.A. Appearing on behalf of Respondent Witten Technologies, Inc. ("Witten") was Erin L.G. Lewis, in house counsel of Witten. In a letter dated September 19, 2005, counsel identified the prehearing issues that the parties had agreed upon.

By Agreement of all parties and Order of the Arbitrator, it is Ordered that —

1. **Filing and Service.** Unless otherwise stated, filing and service in this Arbitration shall be accomplished by a party transmitting a copy of a submission and all materials accompanying it via facsimile or electronic mail to the Arbitrator and to counsel for the other party. The Arbitrator's email address is kenneth.genoni@ropesgray.com and his fax number is

(202) 508-4650. As part of the filing, the original of that submission shall be sent to the Case Administrator, Andrea H. Bugbee, via U.S. Postal Service first class mail or private courier service. Aside from the aforementioned submissions, there shall be no direct telephone or any other type of contact with the Arbitrator. If a party wishes to discuss an issue with the Arbitrator, the party should contact the Case Administrator who will arrange a telephone conference for both parties and the Arbitrator.

2. These arbitration proceedings shall be conducted in accordance with the Commercial Arbitration Rules (Including Procedures for Large, Complex Commercial Disputes) of the American Arbitration Association.

3. Prehearing Activities

   (a) Mala will file and serve a more specific Demand on or before September 23, 2005. Witten will file and serve a definitive Response on or before October 7, 2005.

   (b) Mala and Witten jointly shall file and serve a stipulation of uncontested facts fourteen (14) days before the commencement date of the Hearing.

   (c) Discovery

       (1) Document discovery will be completed on or before December 31, 2005. Mala will file and serve document requests on or before September 28, 2005. Witten will file and serve document requests by October 12, 2005. Witten

will file and serve objections to Mala's requests on or before October 19, 2005. Mala will file and serve objections to Witten's requests on or before October 26, 2005.

Each party will file and serve a privilege log on or before December 1, 2005.

All documents that are not subject to an objection will be exchanged by December 7, 2005.

(2) A telephone hearing shall be scheduled for December 20, 2005 to resolve any dispute relating to document production, and to determine what depositions are necessary in accordance with Rule L-4(d).

(d) Each party shall file and serve exhibit lists seven (7) business days before the Hearing along with copies of exhibits which are not already in the possession of the other party. The parties will also exchange any demonstrative evidence seven (7) business days before the Hearing.

(e) Each party will file and serve witness lists, including experts, if any, with fair disclosure as to the identity of the witnesses and subject(s) of testimony on or before December 19, 2005 and will, seven (7) business days before hearing, file and serve final witness lists that identify by full name and title each witness who will testify at the Hearing barring unforeseen circumstances, together with a short

summary of such expected testimony. The witnesses on the final witness list must have been identified previously with fair notice.

(f) Seven (7) business days before the Hearing, each party shall file and serve a statement identifying sworn statements and deposition transcripts to be used at the Hearing. Copies of the sworn statements shall also be provided to opposing counsel at the same time. The parties have indicated that they recognize that sworn statements by witnesses who do not appear for cross-examination in person or at a deposition have little weight, and the parties have agreed that the use of such statements by either party should be discouraged.

(g) Four (4) business days before the Hearing, each party shall file and serve a brief of the case it will present at the Hearing. The brief shall not exceed 35 double-spaced pages in length (with a 12 pt font) without the approval of the Arbitrator. The page limit shall not include exhibits or cases.

4. **Hearing Administration.** The Hearing shall take place as follows:

(a) The Hearing shall commence on Monday, April 24, 2006, and the parties and Arbitrator have reserved the balance of that entire week, with the expectation that the Hearing may be able to conclude during the fourth day of hearings. Each party shall be allocated approximately half of the Hearing time available.

(b) The location of the Hearing shall be as follows, unless otherwise ordered:

American Arbitration Association
Suite 850
1776 I Street, N.W.
Washington, DC 20006

(c) The parties should be ready to commence each Hearing day at 10:00 a.m. Each day's Hearing usually will end about 5:30 p.m.

(d) Given that there will be post-hearing written submissions and a reasoned award, the parties have agreed to secure the services of a qualified stenographic reporter who is authorized to administer oaths and transcribe verbatim the statements made in legal proceedings in the District of Columbia. Counsel for Witten will make the arrangements. The parties shall pay for such services on an equal basis. Such reporter shall so record the testimony and other statements made at the Hearing and shall do so at the direction of the Arbitrator. Thus, if a party's counsel wishes to "go off the record," he or she must request permission to do so. The parties' counsel shall see to it that the Arbitrator receives a copy of any written transcript, index, and/or computer disc of the Hearing record on the same basis as those counsel do.

(e) The parties shall make arrangements to schedule the attendance of witnesses so that the Hearing can proceed expeditiously. At the beginning of the Hearing, each side may make a brief opening statement. After the opening statements, Claimant shall present its

case-in-chief, to be followed by the Respondent's presentation of its defense, followed by the Claimant's rebuttal. No later than the day before witnesses are expected to appear at the Hearing, at a time that is reasonable under the circumstances, the party scheduled to present such witnesses shall notify the other party of the witness' names and the order of their testimony. The Arbitrator encourages the parties to work out as much in advance of the Hearing as possible, the order of testimony of the witnesses, and the expected time for each witness' testimony.

(f) Witnesses testifying at the Hearing shall be sequestered from the Hearing until they have testified and shall be instructed not to disclose their testimony to other witnesses. Each party's designated corporate representative, inside and outside counsel, and expert witnesses, if any, may attend all phases of the Hearing.

5. **Award.** The parties have requested a reasoned award, without findings of fact and conclusions of law, and the Arbitrator has determined that a reasoned award is appropriate.

6.  **Deadlines.** All deadlines stated in this or any other Arbitrator's Order in this arbitration shall be strictly enforced. Submissions that do not comply with their assigned deadlines shall not be considered unless the Arbitrator has granted leave to do so for good cause shown. All times stated herein shall be Eastern Standard or Eastern Daylight Savings Time, as applicable.

Dated: Sept 22, 2005.

So Ordered by The Arbitrator

Kenneth A. Genoni