# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

In the Matter of the Arbitration Between:

MALÅ GEOSCIENCE AB,

                Claimant and
                Counterclaim Respondent,

and

WITTEN TECHNOLOGIES, INC.,

                Respondent and
                Counterclaim Claimant.

Case No. 50 199 T 00261 05

## CLAIMANT MALÅ GEOSCIENCE AB'S POST-HEARING BRIEF

Dated: May 26, 2006.

KELLY & BERENS, P.A.
    Timothy D. Kelly, #54926
    Sarah E. Bushnell, #0326859
    3720 IDS Center
    80 South Eighth Street
    Minneapolis, Minnesota 55402
    (612) 349-6171

    **Attorneys for Claimant**
    **Malå Geoscience AB**

Civil Action No: 1:06-cv-01343
Respondent WTI Ex. No. 22
Arb. Ex. No:

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    The LA Must Terminate: Malå's Claims and Proposed Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Breach of LA: Failure to Create and Maintain an Efficient Sales Organization for the CART. . . . . . . . . . . . . . 4

    B.    Insolvency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.    The Terms Upon Which the LA Should Terminate. . . . . . . . . . . . . . . 11

    A.    Manufacturing Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.    The Arbitrator Has No Authority to Grant WTI Manufacturing Rights. . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.    It Would Be Unjust to Award WTI Manufacturing Rights to the CART Radar Equipment. . . . . . . . . . . . . . 15

            a.    An Award of Manufacturing Rights to WTI Would be a Manifest Injustice. . . . . . . . . . . . . . . . 15

            b.    WTI Would Obtain New Rights Through an Award of Manufacturing Rights. . . . . . . . . . . . . . 20

    B.    Glue Patent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.    WTI Cannot Challenge the Patent Assignment in This Arbitration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        2.    It Would Be a Manifest Injustice to Award the Glue Patent to WTI, Even if the Arbitrator Had the Power to do so. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

3.    Malå Will Consent to an Award Granting WTI a Perpetual, Royalty-Free License to WTI of the Glue Patent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.    WTI's Counterclaims and Other Requested Relief. . . . . . . . . . . 28

1.    WTI's Counterclaims. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

a.    Fraudulent Inducement: GSSI Patent License Agreement. . . . . . . . . . . . . . . . . . . . . . . . 30

b.    Breach of LA: Failure to Apply for FCC Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

c.    Breach of LA: Design and Maintenance of the CART. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

d.    Breach of LA: Failure to Share Patent Application Costs. . . . . . . . . . . . . . . . . . . . . . . . 36

e.    Breach of LA: Failure to Provide Documents to Allow WTI to Manufacture and Repair CARTs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

2.    WTI's Requested Relief. . . . . . . . . . . . . . . . . . . . . . . . . . 38

III.    Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## INTRODUCTION

The parties apparently agree that the License Agreement ("LA") should end.[1] The real question is what are fair terms on this record to accomplish that end. This brief will primarily address that issue.

## BACKGROUND

Please pay careful attention to how the parties' positions have changed in regard to the relief each has requested in this arbitration. WTI has never made any genuine effort to suggest reasonable terms on which the parties may separate. On June 2, 2005, Malå demanded arbitration and termination of the LA as its sole remedy. WTI, represented by Powell, Goldstein, Frazer & Murphy LLP ("Powell Goldstein"), initially responded by simply denying Malå's claims. Powell Goldstein then disappeared, and WTI asserted counterclaims and requested a smorgasbord of relief – much of which was unconnected to the claims WTI alleged and some of which was outside the Arbitrator's power to grant.[2]

In pre-hearing briefing and throughout the merits hearing, Malå made clear that it wants a resolution fair to both sides, i.e., that the parties go their separate ways and each exploit its own technology on that technology's merits. The parties will compete worldwide, with Malå

---

[1] See Claimant Malå Geoscience AB's Proposed Award, submitted April 25, 2006; Respondent Witten Technologies' Proposed Order, submitted April 27, 2006.

[2] WTI requested: "1. Denial of Mala's request to rescind or terminate the LA; 2. Unspecified damages to be determined at a later date; 3. Witten has right to manufacture radar arrays under the GSSI license to replace the faulty equipment provided by Mala; 4. Reimbursement for the costs of developing reproducible CARTs as envisioned in the 1997 PDA and LA; 5. Continuation of all licenses from Mala to Witten; 6. Rescission of all software licenses granted to Mala as payments; 7. Return of all intellectual property and patents conveyed to Mala as a result of the PDA and LA; 8. Payment of all costs associated with the patenting of technology that arose during or as a result of LA that are jointly used by both parties; 9. Attorney's fees associated with the disputes involved over the past year due to Mala's harassing behavior; and 10. Other relief the Arbitrator deems appropriate." Ex. 268.

1

manufacturing and selling its CARTs in conjunction with software it purchases from WTI,
develops itself, or sources from another software supplier, and WTI selling its software in
conjunction with radar equipment it purchases from Malå or another radar manufacturer.[3] Malå
and WTI each contend that its product is the best in the world and that, were it not for the
misfeasance or malfeasance of the other, it would have hit the long ball long ago. If both parties
are correct, both will prosper in the worldwide market – but only if each is permitted to exploit
its own technology unburdened by the other. Malå's Proposed Award aims for that result.

WTI, on the other hand, insists on unmerited and punitive divorce terms that would
handicap Malå in the future.

Please review the parties' proposed awards carefully.[4] They speak volumes about what
each side thinks is a fair divorce. While Malå proposed that it *give up* rights it would have if the
Arbitrator simply granted Malå's request that the LA be terminated (a result more than justified
by the evidence), WTI went in precisely the opposite direction.

For example, Malå offered to give the Arbitrator authority he does not otherwise have to
order Malå to grant WTI a perpetual, royalty-free license to the so-called Glue Patent.[5] To the
extent WTI claimed it needed time to move to a new CART supplier, Malå also proposed that
WTI would have purchase rights to Malå CARTs for two years.

Now let us see what WTI proposed the Arbitrator require Malå to do:

- re-design the CART at Malå's expense;

---

[3] Tr. at 82.

[4] On April 25, 2006, Malå submitted its Proposed Award, attached hereto as Exhibit A. On April 26, 2006, WTI responded in writing, attached hereto as Exhibit B, and on April 27, 2006, WTI submitted its own Proposed Order, attached hereto as Exhibit C.

[5] Ex. 86, U.S. Patent No. 6,700,526.

2

- pay WTI 20% royalties on the re-designed product;

- bind Malå to the terms of WTI's End User License Agreement (that Malå had previously rejected) regarding software purchases from *suppliers other than WTI*;

- pay WTI $2 million damages (although WTI never provided *any* evidence of damages) *in addition to* WTI's costs for the CART project;

- give WTI ownership of two CARTs *for free*;

- allow WTI to use its current CARTs royalty free;

- assign the Glue Patent to WTI;

- refrain from doing virtually any CART business in the U.S.;

- turn over to WTI the know how to manufacture the CART; and

- refrain from selling or licensing the CART outside of Europe for utility locating.

Stated another way, if the Arbitrator were to terminate the LA on the terms that Malå proposed, WTI would continue to have the business it now has with a fair opportunity for growth. If the Arbitrator, on the other hand, were to terminate the LA on the terms that WTI proposed, the effect would be to permanently hobble Malå in the CART business as well as all of Malå's other business endeavors, while giving WTI *new* rights that, in some cases, the Arbitrator does not have the power to order. This exercise illustrates why Malå ended up in arbitration instead of negotiating a divorce with Robert Green and demonstrates that this is a case where an equitable resolution cannot be found by simply splitting each party's demands down the middle.

**I.    The LA Must Terminate: Malå's Claims and Proposed Award.**

The evidence that requires termination of the LA is overwhelming, and we think WTI essentially conceded this result when it proposed on April 27 that the LA terminate.

3

The reasonableness of the terms in Malå's Proposed Award is also evident.  The premise of Malå's Proposed Award is a termination that leaves WTI in a position to promote and sell its software or, indeed, integrated CART products, by contracting at arms length with Malå or another radar equipment supplier, something WTI has represented to its investors, to Malå, and to GEG – and Robert Green testified in the hearing -- WTI can easily do.[6]

Thus, each party may continue to use the licenses it currently possesses from the other on the current terms (except that Malå will allow WTI to use CART radar equipment it currently possesses royalty free, a significant benefit to WTI).  And, to the extent either party would be prejudiced by the time required to find or integrate a new supplier of radar equipment or software, as the case may be, the parties would sell to the other up to 20 CARTs or software licenses over a two year period for a fixed price.  Malå also would grant to WTI a perpetual, royalty-free license to the Glue Patent to put the parties on the same footing regarding the rights contained in the Glue Patent.

### A.    Breach of LA: Failure to Create and Maintain an Efficient Sales Organization for the CART.

The parties agree that there is a good market for the CART.[7]  And, if there was any doubt about that fact, the advent of competitors in recent years confirms it.[8]

Malå agreed in the LA to allow WTI to be the *exclusive licensee worldwide* for the CART technology in utility locating, the principal market for the CART,[9] *meaning Malå could not sell*

---

[6] Ex. 153 at WTI 8223; Tr. at 148; Tr. at 751; Ex. 253; Tr. at 325-26 (Carney: "Q: Did he tell you anything about that, why he could leave Mala without being hurt? A: They had met with GSSI and they had other options out there . . .").

[7] See, e.g., Tr. at 82; Tr. at 740-42.

[8] Tr. at 74.

[9] Oristaglio Dep. at 31.

4

*the CART itself or through other licensees in the utility locating market.*[10]  WTI refused to promise minimum sales or revenues but, instead, promised to "create and maintain an efficient sales organization for the [CART]."[11]

As Malå relied solely on WTI in the CART's primary market, the only way for the relationship to function was for WTI to live up to this crucial promise.  In the absence of such performance, the CART product, from Malå's perspective, is a dead product.

The evidence was that WTI has failed to establish an efficient sales organization. WTI's CART sales in comparison with its own projections demonstrate the inadequacy of the sales organization.  No one contemplated in 1997 when the LA was negotiated that the "efficient sales organization" WTI promised to create would consist in 2006 of two full-time salespeople and two sub-licensees that produce *virtually no* revenues.  As Robert Green testified: "Here is a group of two men.  How are we going to take over the world?  That is ridiculous"[12]

It was painfully obvious at the hearing that WTI's "sales organization" can never achieve the projections WTI created periodically, i.e., that WTI would sell thousands of CARTs and generate hundreds of millions of dollars in revenue.[13]  In fact, WTI *has not sold a single CART* during the entire relationship between the parties.  WTI has apparently built up an effective

---

[10] Pursuant to the ESA, Malå does have two licenses to use WTI's software for utility locating in the United States.

[11] Ex. 29 at WTI 1031; Tr. at 801-02.

[12] Tr. at 1327.  See also Tr. at 793; Ex. 271; Ex. 286 (Sub-licensee Craig A. Smith produced revenues of $3,000 in third quarter 2004 – before it had a CART – and has produced no revenues since that time); Tr. at 970 (Clifford testifying that the $3,000 revenue from Craig A. Smith was probably prepayment on license fee); Tr. at 800 (Turkish sub-licensee has generated $15,000 in revenues).

[13] See, e.g., Ex. 39; Ex. 280; Ex. 201 (projecting "5-8 year market of 4-6,000 units in Japan alone"); Tr. at 1228 (S. Green testifying that eight years later, WTI has not sold a single unit to Japan).

organization to raise money, but WTI contracted to *sell CARTs*, not just to raise investment funds for its own use.

Efficient sales organizations do essentially two things: they bring in new customers, and they get repeat business from existing customers.[14] WTI's "sales organization" has done neither. Indeed, WTI now claims it is a software development shop and rejects the very notion that it should be or provide a sales organization for the CART.[15]

In 1998, WTI contracted with Dycom (U.S.), and in 2000 with Schlumberger (worldwide) to be the exclusive distributors of the CART in the utility locating market.[16] Almost immediately, however, WTI had disputes with both companies, and both proved to be either unwilling or incapable of effectively selling CARTs or CART services.[17] Dycom and Schlumberger have not been part of WTI's distribution plan for years, and WTI has not created any mechanism to replace Dycom and Schlumberger's sales organizations.

As of March 31, 2003, four customers made up 91% of WTI's total sales,[18] at least two of whom are no longer using WTI's services.[19] In 2005, WTI had a total of ten customers and in 2006 to date, only two.[20] Despite WTI's exclusive worldwide right to the utility locating market – and corresponding duty to market internationally – neither WTI nor its sub-licensees have

---

[14] Tr. at 818 (R. Green testifying that repeat sales are implicit in WTI's projections).

[15] Tr. at 43-44 (WTI opening statement: "Nobody else has been able to [create imaging software] quite as well as we have . . . . This is what Witten does. We are not a sales marketing tool for Malå as they purport where it's they who made this and we're suppose sell it. That is not what's going on here").

[16] Ex. 55; Ex. 216; Tr. at 804-05.

[17] Tr. at 698-99; Tr. at 768; Tr. at 804-07; Ex. 42; Ex. 281.

[18] Ex. 36 at M 3738.

[19] Tr. at 736-37.

[20] Ex. 271.

produced any significant revenue from the international market[21] – and not for want of international interest.[22] WTI has no sales brochures in foreign languages, although such brochures are its responsibility under the LA.[23]

WTI's failure to generate significant repeat business[24] was explained and confirmed by Scott Carney, who testified that WTI has developed a *negative* reputation for use of the CART[25] in the southeast U.S. market where WTI focuses its efforts.[26] ConEd, for example, was one of WTI's biggest customers in 2003, WTI's best year for revenues, but now seldom purchases from WTI.[27] Thus, not only WTI but other CART users, like Carney's organization, have trouble convincing customers who have been burned by WTI's poor service to try the CART again.[28]

WTI counters that it has won prestigious awards in regard to its software – publicity one cannot buy. Awards are wonderful, but they do not sell CARTs.[29] Malå and WTI are businesses

---

[21] Tr. at 800; Green Dep. at 167.

[22] See Ex. 284 (Emails produced by WTI showing potential sales opportunities in Israel, Germany, China, New Zealand, Japan, Malåysia, Hong Kong, Macau, India, Sweden, Brazil, Australia, Turkey, Colombia, Greece, France, Poland, South Korea, Philippines, Thailand, Belgium, Netherlands, Luxembourg, Spain, Italy, UK, South Africa, Russia, Chile, Taiwan, Ecuador, Puerto Rico, Saudi Arabia, and Dubai).

[23] See, e.g., Ex. 267 at WTI 1849, 2132-33, 2139; Ex. 29 at WTI 1031.

[24] See Ex. 286; Ex. 291 (Clifford: "[WTI is u]nable to get repeat business in utility markets. A number of one time clients with no follow-on contracts . . . . Do not have the resources to follow-up"); Tr. at 925 (Clifford: "we could not follow up in a broad sense for every utility that was interested").

[25] Tr. at 333-49, 376-77; Ex. 293.

[26] Tr. at 1099-1100 (Shea: "Q: . . . . your understanding of . . . Witten's business plan is that Witten is planning to capture 3 to 5 percent of the local market. A: The Southeastern market, yes. Q: The Southeastern U.S.? A: Yes"); Tr. at 925 (Clifford: "the way that Witten ended up selling that and dealing with [the lack of resources to properly follow up with clients] was by concentrating on certain areas like the State of Florida . . . ."); Ex. 291 (Clifford notes that, as of November 2003, WTI has "[n]o real marketing effort except in [Florida] with Robert Green").

[27] Tr. at 736-37; Tr. at 923-24.

[28] Tr. at 333.

[29] Tr. at 140-41; Tr. at 480; Tr. at 901 (Clifford: "Q: Did [the 2004 Wall Street Journal award] bring in additional business for Witten? A: . . . . I don't know that we can attribute any specific business to this . . . .").

7

and entered a contractual relationship *to make money*. Among potential purchasers of CARTs and CART services, WTI has been a dismal failure.

### B. Insolvency.[30]

A corporation is insolvent when its liabilities exceed the fair market value of its assets. N.Y. Debtor and Creditor Law § 271(1) (McKinney 2006).[31]  See Morgan Guar. Trust Co. v. Hellenic Lines Ltd., 621 F. Supp. 198, 220 (S.D.N.Y. 1985).

We think WTI acknowledged at trial that it is insolvent on a book basis, and that is objectively true. WTI's 2005 balance sheet lists assets of nearly $1.2 million, total liabilities of nearly $4.6 million, and negative retained earnings of more than $13 million.[32] WTI's Q1 2006 balance sheet shows assets of just over $1.2 million, total liabilities of $4.7 million, and negative retained earnings of $13.3 million.[33] Robert Green denied that WTI is insolvent on a book basis,[34] but that is an outright lie and is contradicted not only by WTI's financial statements themselves but also by the testimony of WTI's CFO.[35]

---

[30] Since WTI claimed it was not insolvent at the hearing, we do not address WTI's waiver argument.

[31] The common law test for insolvency is the inability to pay debts as they come due in the ordinary course of business. Under this test, WTI is undeniably insolvent as well. The evidence is overwhelming that WTI has frequently failed to pay Malå and its other creditors as bills have come due in the normal course. See, e.g., Ex. 45 (R. Green: "We are not in the position to be settling any debt that does not have us standing at the courthouse door for any percentage on the dollar"); Tr. at 1364-66 (Hurse testifying that various companies have terminated services to WTI for nonpayment of obligations); Tr. at 1373-74 (Hurse testifying that WTI has not made a lease payment to Malå since August 2005); Tr. at 792-93 (R. Green testifying that trade creditors have cut WTI off for failing to pay bills in a timely fashion). Significantly, WTI has repeatedly missed payroll. See, e.g., Tr. at 1370-71; Tr. at 935-36; Ex. 33; Ex. 137; Ex. 248; Ex. 276. This is a serious issue for the company's officers because they can be personally legally liable for the missed payroll. Oristaglio Dep. at 174-75.

[32] Ex. 152 at WTI 8310.

[33] Ex. 407.

[34] Tr. at 710.

[35] Tr. at 1030-32. Barbee claimed WTI is solvent but got there, though admitting WTI is insolvent on a book basis, by rejecting the legal definition of insolvent and coining his own: the "[h]opeless[ness]" test. Tr. at 1027, 1046. But the parties expressly agreed that they would be governed by New York law in regard to the LA, and New York law prescribes the insolvency test here. Ex. 29 at WTI 1037, paragraph 18.06.

And, WTI's situation is getting worse. WTI's CFO, Ray Barbee, testified that WTI has monthly expenses of $160,000.[36] For the first quarter of 2006, WTI had total income of approximately $144,000[37] – not enough to meet even one month's expenses.

WTI claimed during its opening statement that it is solvent on the asset/liability test after it re-classified certain current liabilities as long-term liabilities.[38] Putting aside that WTI's reason for re-classifying the liabilities was unsupported by evidence,[39] Barbee admitted that WTI fails the asset/liability test for insolvency no matter how the liabilities are characterized.[40]

WTI could only defend against the significant evidence of its insolvency by showing that it has off-book assets worth more than WTI's liabilities and retained earnings.[41] But WTI presented *no* evidence at the hearing about the value of its intellectual property or any other off-

---

[36] Tr. at 1032.

[37] Ex. 407.

[38] Ex. 407; Tr. at 27-28.

[39] Tr. at 1025-26; Tr. at 1048-50. Barbee's testimony is a good example of the overstatement we saw repeatedly from WTI witnesses. Barbee testified that the restatement of certain long-term debt on WTI's 2004 outside auditor financials into long term debt on its March 31, 2006 financials was proper because the liability was deferred compensation and the creditors - present and former employees - had signed notes and agreed to forebear for an indefinite period. Of course we saw no signed notes from any employee in evidence. When confronted with that fact, Barbee testified that he did not know whether the notes had been signed – only that they had been prepared. WTI made a practice in papers and during the hearing of making broad, sweeping statements like this one that were never supported by documentary evidence.

[40] Tr. at 1066 (Barbee: "They were there before in current liabilities and they are now in long term liabilities, and under GAAP, liabilities still exceed assets whether they are up top or down at the bottom"). See also Tr. at 1028 (Barbee testifying that moving the liabilities from current to long term "was a geographical one to try to portray in the March financial statements what we really believed is due in the next business cycle. It had nothing to do with [the] solvency question").

[41] Tr. at 1105 (Shea: "Q: You and I talked a little bit at your deposition about the asset liability test for insolvency that you are familiar with. What you are basically doing in an asset liability test is you are looking at the balance sheet and you are determining the fair market value of assets and liabilities, all of them, and trying to figure out in a liquidation situation the assets would exceed the liabilities or at least all the creditors would get paid. A: Yes. Q: To do that test, you have to consider the retained earnings, right? A: That is part of it").

9

book asset.  WTI's expert, Vince Shea, was not asked to value WTI's assets and did not do so.[42]
In fact, Shea testified that to determine solvency, "[w]e have to valuate everything including the
IP which was not done."[43]

Instead, Shea testified that WTI is worth more than $150 million.[44]  We think it was
abundantly clear during the hearing that this was charlatanry.   The sole basis for the valuation
was Robert Green's five-year projections.[45]  Green's projections have not only never come to
pass, but they have always been wildly optimistic.[46]  Green himself testified that his projections
are "speculative."[47]  Former WTI CEO Tony Clifford testified that recent projections have been
unreasonable.[48]  And Barbee characterized projections like WTI's as "rolling the dice."[49]

The best way to value what WTI owns is to consider what people have been willing to
pay for it.  Consider, for example, that before there were any CART competitors, Dycom paid $3
million to purchase 1.5 million shares of WTI stock.[50]  Likewise, Schlumberger paid $1.5 million
for 937,977 shares of WTI stock and an exclusive license for the CART in the worldwide utility

---

[42] Tr. at 1083-84 (Shea: "Q: You did not value Witten's assets, right? . . . . A: No, I did not. Q: You could
have chosen a method that would have valued Witten's assets, right? A: I wasn't asked to. Q: You did not
specifically value Witten's intellectual property as a subset of the assets? A: No, not as individual item"); id. at 185-
86 (Shea testifying that there is a process he would have followed if he had been engaged to value Witten's
intellectual property); id. at 1105-06 (Shea: "Q: But you cannot give an actual number [for the value of Witten's
intellectual property].  A: No, I cannot").

[43] Tr. at 1109.

[44] Tr. at 1073, 1077; Ex. 152.

[45] Tr. at 1086.

[46] See, e.g., Ex. 280; Tr. at 468; Tr. at 529-30.

[47] Tr. at 720.

[48] Tr. at 977 (Regarding WTI's 2003 Executive Summary and Business Plan, Ex. 39, Tab 5, "Q: I take it
that if I would have asked you at the end of 2003 . . ., 'Is it reasonable to expect that in 2004 you will achieve $11
million in revenues?' you would have said, 'No, I don't believe that is reasonable.' A: If someone asked me then,
yes, I would have never expected the level of $11 million").

[49] Tr. at 1058.

[50] Ex. 55 at WTI 3034, 3042.

locating market.[51]  Since 2002, WTI's stock has sold for an average price of $0.11.[52]  These

actual market facts are fundamentally inconsistent with WTI having a value of $152 million.

WTI is the opposite of a fledgling company that has had increasing sales on an annual

basis but has still not recaptured its buildout costs so that its insolvency is temporary.[53]  WTI's

revenues spiked in 2003 at over $2 million and then fell precipitously to just under $700,000 the

next year and have stayed low,[54] largely because WTI cannot get repeat business.  Consider, for

example, that WTI attributes the precipitous decline in revenues in large part to a significant

decline in business from ConEd after 2003.[55]  ConEd undoubtedly continues to have many

underground projects, but it generally does not use WTI for that work.

## II.    The Terms Upon Which the LA Should Terminate.

The disposition of the radar manufacturing rights and of the Glue Patent are, we believe,

the most significant issues you will face in crafting an Award.  Thus, we address those issues first

and then turn our attention to WTI's counterclaims and other requests for relief.

### A.    Manufacturing Rights.

WTI did not directly request access to Malå's know-how or seek manufacturing rights in

its April 26, 2006 proposed order.  Only on April 27 did WTI demand manufacturing rights.  The

next day, April 28, Malå witnesses testified about the devastating effect an award of Malå's

manufacturing rights to WTI would have on Malå's business,[56] and WTI's lawyer and CEO both

---

[51] Ex. 216 at WTI 7369.

[52] Ex. 278.

[53] Nor can WTI's financial failure be laid at Malå's door.  See infra, Section II.C.1.c.

[54] Compare Ex. 37 at WTI 3218 with Ex. 152 at WTI 8309 and Ex. 407 at WTI 8463.

[55] Tr. at 736-37; Tr. at 923-24.

[56] See, e.g., Tr. at 1424-25; Tr. at 1571-75.

disclaimed that WTI was asking for manufacturing rights or Malå's know how.[57] Reminded that

WTI's April 27 Proposed Order expressly requests manufacturing rights, Ms. Lewis tried to

distinguish WTI's request for manufacturing rights from a request for access to Malå's know

how and appeared very confused when Robert Green insisted that WTI *does* want Malå's know

how.  Ms. Lewis then led Robert instead to testify that WTI already had purchased know how

from another source.[58]

    It is undisputed that WTI has never possessed Malå's blueprints or other know how

related to the CART.  If the manufacturing rights were as important to WTI as it claims and WTI

is as unhappy with Malå's manufacturing and upkeep of the CART as WTI claims, you would

have seen a paper trail a mile long with WTI demanding that the know how be delivered.[59]

    1.       <u>**The Arbitrator Has No Authority to Grant WTI Manufacturing Rights.**</u>

    Despite the history set forth above, we think WTI will insist in the post-hearing briefs that

it has a right to manufacturing rights for the CART and that the Arbitrator should order Malå to

---

[57] Tr. at 1586-87 (Lewis: "Because Mr. Kelly explored the option with you that if Mr. Genoni ordered Mala to provide the 'know how' to Witten, I guess that maybe there's a concern whether Witten could take that 'know how' and take it to another manufacturer, to do something that may be outside what you would want Witten to do, so my question to you is: Had you reviewed the proposed order, that Witten did not request that information?); Tr. at 1590 (R. Green: "Q: If Arbitrator Genoni gives you manufacturing rights which is, as I understand here, and where is that proposed order? A: We haven't asked for that").

[58] Tr. at 1636 ("Q: Robert, Witten wants manufacturing rights, correct? A: Yes. Q: Does Witten want Mala's 'know how'? A: Yes. Q: Witten wants Mala's 'know how' or does Witten want to purchase or has Witten purchased the know how? A: I am sorry.  I think we have purchased the know how.  What are you trying to say?  Q:  I have to ask you.  Has Witten had to buy the know how because of Mala's failure to deliver it? A: Yes, we have").

[59] In early 2005, WTI's lawyer, Joe Berl, did demand that Malå deliver its know how to WTI so that WTI could "assemble" CARTs itself, a carefully chosen word.  Ex. 411.  This was just months before this arbitration began and the dispute between the parties was in full flower.  Moreover, this request was made in the context of the ESA, and WTI apparently made a demand it later dropped that, due to the FCC issues, Malå deliver the blueprints.  WTI no doubt dropped this demand, because the ESA expressly states that the escrow provision will not be triggered if the reason for Malå's non-performance is the FCC regulations.  See also Tr. at 163 (Rynning testifying that WTI did not demand manufacturing details from Malå prior to 2002).

turn over its know how. But, the Arbitrator cannot make such an Award without changing the deal the parties struck in the Exchange and Settlement Agreement ("ESA") – something all parties agree is outside the scope of this arbitration.[60]

A great deal of evidence has been offered by both sides regarding who had manufacturing rights the day after the LA was executed, and we will briefly address that evidence. All of that evidence, however, is fairly unimportant in view of the significant documentary evidence and the testimony of the principals on both sides that the parties had heated post-LA disputes about which party had manufacturing rights with regard to the CART hardware in 1999-2001; that the parties negotiated for years about where those manufacturing rights would ultimately land; and that those issues were resolved in the 2002 ESA in favor of Malå having the exclusive right to the know how necessary to manufacture the CART radar equipment until such time as certain events not at issue here occurred.[61]

Shane Green, for example, testified:

My understanding is that there is still a difference of opinion over what occurred at that time, meaning there was still a disagreement over what we discussed, but subsequent to that, and sort of for practical reasons, both companies agreed to an arrangement that provided for Mala to do the manufacturing . . .[62]

Likewise, Robert Green testified: "At the end of the day with all of this arguing over manufacturing rights, if you look through the documents, Witten has consistently asked Mala to

---

[60] WTI Pre-Hearing Brief at 7, fn. 15 ("Disputes arising from the parties' ESA . . . are not within this forum's jurisdiction; however, WTI asserts that consideration of [this contract's] terms is pivotal in understanding the parties' history and current dispute under the contemporaneous LA and PDA").

[61] See, e.g., Tr. at 162-63; Tr. at 486; Tr. at 1174-75; Tr. at 1557-58; Tr. at 1560-61; Tr. at 1568-69.

[62] Tr. at 1216-17. Robert Green, of course, claimed Shane was wrong that the manufacturing rights issue has been resolved in the ESA. But, confronted with the escrow provision in the ESA, Robert could offer no explanation as to the meaning of that provision other than that it resolves the manufacturing rights issue. Tr. at 1613.

13

build the array. *I mean it is even in the settlement.* We are not trying to take something away from them."[63]

The escrow provision of the ESA cannot be read as anything other than a definitive resolution of a dispute about who has manufacturing rights, as Robert Green seemed to acknowledge.[64] The ESA states:

> Mala shall deposit with the Stockholm Chamber of Commerce a sealed package containing complete copies of the *blueprints for manufacturing and assembling the CART's radar components*, including hardware, firmware, and operating software ("Blueprints"). Mala shall be responsible to lease CARTs to WITTEN and to keep a stock of antennas and control units in Charleston, SC, for repair and replacement of leased CARTs in a timely way.
>
> (a) WITTEN shall be entitled to receive and use the Blueprints if Mala is declared bankrupt, or is subject of a voluntary or involuntary institution of bankruptcy proceedings, which are not dismissed . . . . The right to the Blueprints according to this clause (a) shall be subject to a commercially reasonable license fee to be determined by good faith negotiations between the Parties. The license fee shall be paid during a maximum period of five years from the date on which WITTEN receives the blue prints according to above.
>
> (b) WITTEN shall have a right to receive and use the Blueprints if Mala fails to perform stipulated obligations to lease CARTs to WITTEN. . . . Not withstanding the foregoing, WITTEN shall not have the right to receive and use the Blueprints if Mala's failure to perform arises because the FCC does not approve CART for use in the US market.[65]

This provision would be meaningless if WTI had a right independent of this provision to manufacture the CART radar equipment and demand the know how necessary to do that.

---

[63] Tr. at 1293-94 (emphasis added). Of course, Robert testified inconsistently later the same day. See Tr. at 1333-34.

[64] Tr. at 1613 ("Q: Why would you tell Mala to put their plans in escrow if you had a right just to demand that they deliver them and put them on your desk? A: It was a stupid thing. That is the reason. I wasn't the author of this document").

[65] Ex. 7 at 4, paragraph 3.2 (emphasis added).

If the LA itself had granted manufacturing rights to WTI, as WTI has argued, then WTI agreed in the ESA to a curtailment of those rights such that WTI would only have those rights in the circumstances identified in paragraph 3.2 of the ESA, none of which have occurred. And if, as Malå contends, WTI did not have manufacturing rights arising out of the LA, then the parties agreed in the ESA that Malå's exclusive right to manufacture would be contingent upon the non-occurrence of the circumstances identified in paragraph 3.2. Whatever the parties' rights to manufacture the CART radar equipment were prior to the ESA, the parties agreed in the ESA that Malå would have the sole right to manufacture such equipment, until one of the events described in paragraph 3.2 of the ESA occurred. The Arbitrator cannot award WTI manufacturing rights to the CART radar equipment, therefore, without improperly invading the ESA.

2.    **It Would Be Unjust to Award WTI Manufacturing Rights to the CART Radar Equipment.**

a.    **An Award of Manufacturing Rights to WTI Would be a Manifest Injustice.**

WTI has never manufactured the CART radar equipment and has never had the necessary know how to do so.[66] What would WTI do if awarded that know how now? WTI told us repeatedly during the hearing: WTI would deliver the know how to one of Malå's competitors to manufacture the radar equipment for WTI.[67] And that would be a very good day for WTI, because it would provide a much-needed capital infusion.

---

[66] See, e.g., Tr. at 1212-13; Tr. at 1571-72.

[67] See, e.g., Tr. at 65 (WTI opening statement: "We need the manufacturing details. We need to go take them to someone so they can manufacture"); Tr. at 263-64; 1574-75 (Rynning testifying that only competitors and large organizations like Schlumberger are capable of CART manufacturing).

15

Malå is a manufacturer,[68] and Malå has never given the know how to manufacture the CART radar equipment, or the right to such know how, to *anyone*,[69] largely because as Malå's principals testified, Malå's entire product line is interwoven such that delivering the know how for manufacture of the CART would give a competitor the essential know how for *virtually all of* Malå's other products in which WTI has no interest.[70]

We think WTI justifies this position in part with its claim that Malå has the source code for WTI's software and thus Malå can knock of WTI's technology but WTI cannot do the same as to Malå's technology.[71]   The evidence was just to the contrary.  Malå's President and Vice President both testified that Malå does not have and cannot access the source code to WTI's software, because WTI delivered software in a protected form.[72]

Far more importantly, however, WTI's former president, Mike Oristaglio, who delivered the software copies to Malå, testified:

> I think in my e-mail I was telling Tommy that we were sending this CD with the executable code to Mala for their licenses . . . . Question:  When you say the executable code, is that the Witten software?  Answer:  *That's the Witten software in executable form, meaning, it's machine readable only.  There's no source code.*[73]

---

[68] Tr. at 82-83.

[69] Tr. at 1424-25; Tr. at 1464-65; Tr. at 1482-83; Tr. at 1573-74; see also Tr. at 1558-59.

[70] Tr. at 92; Tr. at 577; Tr. at 1464; Tr. at 1573-75.

[71] Tr. at 1332-33 (R. Green: "it has been made exquisitely clear to me by our people that the form that the code was delivered to Mala in, that any smart person could unravel it.  So it was not locked up.  So that I was left with the assumption that Mala has got some smart guys.  I mean, they unraveled it, so I was left wondering if they have not unraveled it, then why if we are in such financial bad shape, didn't they demand that we deposit this source code in escrow?"); see also  Tr. at 35 (WTI opening statement: "[Malå has] our source codes for our software.  We cannot take that back . . ."); Tr. at 46 (WTI opening statement: "[Malå has] our source codes and they have our patents.  We are left with very very little").

[72] Tr. at 554-56; Tr. at 1454-56.

[73] Tr. at 684-86 (emphasis added).

16

WTI thus asks you to terminate the relationship between the parties but award WTI a right to Malå's proprietary technology so that WTI can continue to access the benefits of Malå's technology. WTI, meanwhile, suggests you leave Malå to find software wherever it can at whatever price it can negotiate (and, indeed, burdened by terms imposed by WTI in transactions to which WTI is a stranger).[74]

WTI next justifies a demand for CART manufacturing rights because it paid for development of the prototype and for the patents that protect the hardware. Let us look more closely at the facts. Malå was to develop a prototype, for which WTI would pay certain costs. Malå would own all rights to the technology it developed, subject only to the licensed rights granted in paragraph 1 of the LA (which rights could be terminated). Moreover, while WTI was to pay for the development costs of the CART through a $500,000 convertible note at 10% interest, WTI only paid $125,000 on that note.[75] The parties then agreed to discharge the note in the ESA, i.e., Malå paid $375,000 of the costs and WTI paid $125,000.

As to the patent costs, the patents that protect the radar equipment (except the Glue Patent) were paid for by Malå. WTI paid for certain patent *applications* on the radar equipment that never issued as patents, but Malå itself paid for the application that was issued. As to the Glue Patent, WTI presented no evidence about what it paid for the Glue Patent but, far more importantly, the parties agreed that WTI would bear patenting costs related to the radar equipment with no modification of Malå's rights to own the technology it developed and the patent protections on that technology.[76]

---

[74] Ex. B hereto, paragraph 6; Ex. C hereto, paragraph 8.
[75] Tr. at 1231; Tr. at 484-85.
[76] See infra, Section II.C.1.d.

17

Finally, WTI claimed in opening statement to need Malå's manufacturing rights, because "[w]e cannot get the CARTs anywhere else . . . we can get them from outside the U.S. . . . . but the problem is that we have to go back through a development phase, to go back through what we just spent eight years going through with Mala"[77] But WTI did not provide any *evidence* to support this assertion – that WTI cannot get CARTs without going through another long development phase – nor did WTI provide any evidence about how long a development phase would take, if it was required. The evidence – from WTI's documents and witnesses – was just the opposite.

WTI represented to potential investors in its 2006 Executive Summary and Business Plan that:

> WITTEN is currently negotiating with two of the world's leading companies in ground penetrating radar. They are 3D Radar out of Norway and Ensco, Inc. . . . an agreement will be made with one of these entities to supply WITTEN with a completely new CART ready for production . . . . WITTEN can purchase radar equipment on the open market, adapt it to our use and operate very profitably.[78]

Robert Green testified that all of these statements are true.[79] Asked in particular, whether WTI really "can purchase radar equipment on the open market, adapt it to our use and operate very profitably," Robert responded, "Yes, we have proven that."[80]

WTI made the same representation to Shea, its valuation expert.[81]

---

[77] Tr. at 64-65.

[78] Ex. 153 at WTI 8223.

[79] Tr. at 745-51. Green did note that WTI is no longer in negotiations with 3D Radar. Id. at 748.

[80] Tr. at 751. Robert testified that he incorporated these statements into the business plan in view of the litigation with Malå. Tr. at 752-53.

[81] Tr. at 1104-05.

Moreover, WTI's legitimate business interest – a ready supply of CARTs – is also satisfied by Malå's Proposed Award in which Malå invites you to require Malå to supply WTI with CARTs for two years for the same fixed price WTI has paid for CARTs in the past.[82] Indeed, Malå's Proposed Award satisfies WTI's legitimate interest *better* than WTI's proposal. Malå is a manufacturer and the inventor of the CART radar equipment and is prepared on short notice to deliver CARTs to WTI, *assuming WTI pays for them*. If WTI receives Malå's manufacturing rights, however, WTI will have to wait for CARTs until it can negotiate an agreement with one of Malå's competitors to produce the CARTs *and* until the competitor can build up production to match the blueprints.

An award conveying Malå's manufacturing rights and know how to WTI would be ironic in that WTI would get in the termination of the LA something it has never before possessed. Please look at the LA's terms as to what rights survive a termination – they do not include the licensed rights.[83] Moreover, an award of manufacturing rights would be an unmitigated disaster for Malå and a windfall for WTI. Since WTI's difficulties to date have been due to its failure to successfully market the CART, access to manufacturing rights will not improve that plight. There has always been a supply of CARTs available to WTI, and Malå will gladly continue to supply CARTs to WTI. All manufacturing rights would add to the picture for WTI is a quick way to get a payday from a Malå competitor and harm Malå.

---

[82] The Proposed Award contemplates the sale of up to 20 CARTs over two years. Malå would, frankly, be delighted if WTI presented orders in excess of 20 CARTs in two years and welcomes you to order Malå to fulfill WTI's reasonable orders for two years – provided that WTI pays in advance.

[83] Ex. 29 at WTI 1037.

19

**b.    WTI Would Obtain New Rights Through an Award of Manufacturing Rights.**

Both sides presented a great deal of evidence during the hearing regarding whether the LA granted WTI manufacturing rights.  The ESA makes clear that Malå alone possesses such rights and is dispositive, for purposes of this arbitration, with regard to the manufacturing rights issue.  Nevertheless, the fact that Malå never clearly granted manufacturing rights to WTI makes WTI's request that manufacturing rights now be awarded to WTI all the more unjust.

The documents pre- and post-LA contain a very muddled picture about who actually had manufacturing rights for the radar equipment.[84]  The fairest characterization of the evidence is that the parties were two ships passing in the night – each believing that it had manufacturing rights and each incensed when the other party suggested to the contrary.  Both sides agree that the parties contemplated that Malå would manufacture the prototype and manufacture CARTs during the build up but that a day might come when the demand for CARTs would outstrip Malå's manufacturing capacity.[85]  Both parties agreed that, at such time, manufacturing would have to be done by a company like Hitachi that is not interested in manufacturing relatively small numbers but is skilled at mass production.[86]  Rynning testified that manufacturing rights was a very difficult issue during the parties' negotiations, that he understood Malå had retained manufacturing rights, but that the issue may have been left somewhat ambiguous, because the

---

[84] Compare, e.g., Ex. 11; Ex. 303 at WTI 320; Ex. 310 with, e.g., Ex. 301C; Ex. 422 ("At the discussions that have been we have (Mala and Witten) agreed on that Mala should manufacture the central parts").  See also Tr. at 1564-65 (Rynning testifying that in 1998, Malå applied for and obtained a conditional loan on which it is still paying and changed management and employees at Malå to build up production); Tr. at 1584.

[85] See Tr. at 96-97; Tr. at 196; Tr. at 1198-1200; Tr. at 1595-96.

[86] Tr. at 1198-1200; Tr. at 1595-96.

parties understood that further negotiations would be necessary after a prototype had actually been developed and the parties knew what they were dealing with.[87]

WTI pointed to a number of post-LA documents wherein WTI claimed that the LA granted manufacturing rights to WTI. Despite WTI's outward insistence to Malå that it had manufacturing rights, WTI internally acknowledged that the issue had not been resolved in the LA. In April 1999, a year and a half after the LA was executed and months before the Harvey meeting, Shane Green insisted at a WTI board meeting that "the bigger issue [in the Malå/WTI relationship] was who would own the hardware technology and the manufacturing rights. There would be instability, he argued, until this core issue was resolved."[88]

The foregoing explains the ambiguity in the language of the LA itself: There is no grant of manufacturing rights to WTI, but the LA requires WTI to account for, and to indemnify Malå regarding, CART manufacturing activities.

**B.    Glue Patent.**

The Glue Patent claim was never pled by WTI,[89] and Malå has consistently objected that 1) WTI never pled facts that would put the Patent Assignment at issue and 2) more fundamentally, the assignment of the Glue Patent is outside the scope of this arbitration.[90]

---

[87] Tr. at 90; Tr. at 164-65.

[88] Ex. 305 at WTI 2461.

[89] Robert Green testified that he first learned that the Glue Patent had been assigned to Malå in November 2005, Tr. at 1275-77, explaining why WTI did not plead any claim regarding the Glue Patent in its October 2005 Counterclaims. But WTI never amended its pleading to assert a claim and said virtually nothing about the Glue Patent or the Patent Assignment in its Pre-Hearing Brief.

[90] See Letter from Bushnell to Genoni, Nov. 1, 2005; Letter from Bushnell to Genoni, Nov. 3, 2005; Email from Bushnell to Lewis, Mar. 27, 2006, attached as Exhibit D hereto.

1.    <u>**WTI Cannot Challenge the Patent Assignment in This Arbitration.**</u>

In an effort to avoid the exclusive jurisdiction provision of the ESA, WTI has argued that the Patent Assignment was made pursuant to the LA. While it is true that Malå has always claimed that it is entitled to own all of the radar technology related to the CART project[91] and that the agreement of the parties to that effect is set forth in the LA, the Patent Assignment undeniably arises *only* out of the ESA.

The ESA was intended to resolve the disputes of the parties that had occurred to that point, one of which was the ownership of certain patents and patent applications filed by WTI.[92] The ESA requires WTI to execute "an assignment to Mala of WITTEN's right to the patent, 'Ground-Penetrating Radar Array and Timing Circuit', by B JOHANSSON, A WITTEN, and A DEVANEY, (US) Patent Application 09/658,188, filed 8 September 2001."[93] The Patent Assignment recites that it is made "[i]n accordance with the [ESA]"[94] The WTI former executive who negotiated the ESA testified: "part of . . . the [ESA] . . . was that [WTI] would make an assignment of the rights to the -- what you called the timing circuit patent to MALA."[95]

The former WTI executive who executed the Patent Assignment testified that he understood "that the patent assignment arose out of the [ESA]."[96] And, the Malå IP lawyer who

---

[91] <u>See</u> Tr. at 91-92.

[92] <u>See, e.g.,</u> Tr. at 129-30; Tr. at 1419-27; Tr. at 1562-63.

[93] Ex. 7 at 2, paragraph 1.1(c).

[94] Ex. 14 at 1.

[95] Oristaglio Dep. at 95:14-18.

[96] Tr. at 987; <u>see also</u> Tr. at 993-94 (Clifford: "Q: Do you agree with me that the [patent] assignment you made was pursuant to the [ESA]? I mean that is what it says. A: I think the [ESA] was a settling of the prototype development agreement").

22

drafted the Assignment testified that he understood the Assignment was being made pursuant to the ESA and did not review the parties' past agreements when he prepared the Assignment.[97]

The Arbitrator could only grant WTI's request to require Malå to assign the Glue Patent to WTI, therefore, by arbitrating a dispute that has arisen under the ESA (i.e., whether the parties intended that the hardware patent applications and Glue Patent that were continuations and continuations in part of the abandoned patent application identified in the ESA be assigned pursuant to the Patent Assignment),[98] something all parties agree you must not do.[99]

### 2.    It Would Be a Manifest Injustice to Award the Glue Patent to WTI, Even if the Arbitrator Had the Power to do so.

The purpose of the Patent Assignment contemplated by the ESA was to assign to Malå the patents and patent applications embodying Malå's technology.  WTI now argues that the Patent Assignment was *only* to convey the patent application identified in the ESA, but the evidence belies WTI's argument.  WTI apparently agrees that the patent assignment was to resolve the parties' dispute over the Ground Penetrating Radar Array and Timing Circuit patent application ("Timing Circuit application"), Ex. 12, which WTI had filed in the names of Witten,

---

[97] Tr. at 1531.

[98] That is precisely the way Robert Green framed the issue. See, e.g., Tr. at 1293 (R. Green: "Q: In [Mike Oristaglio's] opinion [in Ex. 87], he says . . . he think[s] this is a patent that Witten should jointly own with Mala, isn't that true? A: That was his opinion at the time. Q: Was that ever agreed to? A: No. No, that was part of what we tried to come to on the [ESA]"); Tr. at 1274 ("when we tried to settle the [ESA] there was a very good reason [the Glue Patent] wasn't mentioned because that was the 'terms of trade' is,'You did not get this patent, or there is no deal. You do not get this patent, or there is no deal,' and they agreed to that"); Tr. at 1287 ("There was never any doubt in anybody's mind that Mala had absolutely no right to this and the reason is, and that's the reason, if you look into all the subsequent documentation, all the subsequent documentation up through until we tried to settle in the [ESA], it was agreed upon which we would have gone no further this patent was not a subject of transfer. That was never intended. If there is an argument today, 'Well, we think maybe it is,' well those arguments should have been put forth at the time we were trying to close this up and move on so we could have gone on to court then to settle it. You do not settle making someone believe something and then you go and snipe off something later on").

[99] WTI Pre-Hearing Brief at 7, fn. 15.

Devaney, and Johansson, but to which Malå claimed Witten and Devaney had not contributed.[100] But that application is not identified in the ESA.  Exhibit 12 is a *continuation* of the patent application identified in the ESA.[101]  Moreover, the application identified in the ESA had already been abandoned by the time the ESA was executed.[102]

WTI apparently agrees that all of the continuations of the patent application identified in the ESA were properly assigned to Malå and argues only that it did not realize it was assigning to Malå the Glue Patent, which *WTI filed as a continuation in part* of the application identified in the ESA.

One does not need to be a patent lawyer – or a lawyer of any other variety – to know that the Patent Assignment potentially assigns more than a single patent application.  The object of assignment is defined as

> all right, title, and interest in and to the inventions *and related patents*, design registrations and patent applications, described and claimed in the Witten et al. U.S. Patent Application Serial No. 09/658,188, filed September 8, 2001, and entitled Ground-Penetrating Radar Array and Timing Circuit ('Patents').[103]

Further, the plain language of the Assignment conveys not only the "Patents" as defined above but also ". . . any reissues, reexaminations, *continuing applications, continuations*, divisions, renewals, extensions *and continuations-in-part* of such Patents . . ."[104]

---

[100] <u>See</u> Tr. at 843; Tr. at 1287-90.

[101] Tr. at 1525-26.

[102] Ex. 263; Tr. at 1518-19.

[103] Ex. 14 at 1 (emphasis added).

[104] <u>Id.</u> (emphasis added).

24

While, as the Arbitrator pointed out,[105] a typical business man is probably not knowledgeable about the technical meanings of continuations, CIPs, and the like, he is undoubtedly capable of reading the language of the Assignment and understanding that it purports to assign, at least potentially, more than a single, identified patent application.[106] Far more importantly, however, WTI had hired Powell Goldstein, a large, full service, East Coast law firm with an IP department, to advise it in regard to the Patent Assignment, and the former executive who executed the Assignment testified that he acted on that legal advice.[107]

It is not Malå's responsibility (indeed, it would be inappropriate for Malå) to provide legal advice to sophisticated executives with whom it is negotiating at arms length – particularly where those executives are already receiving what Malå could only assume to be excellent legal representation. Moreover, of the parties, WTI and its lawyers were in a significantly better position to know the effect of the Patent Assignment. After all, *WTI* chose to file the Glue Patent as a CIP of the hardware patent application. Malå's lawyers could certainly research whether there were continuations or CIPs to the identified patent application, but WTI had institutional first hand knowledge.

As Malå's IP lawyer, Walter Linder, testified, the language of the Patent Assignment was "routine"[108] and "conventional."[109] And there is very good reason for the use of language that

---

[105] Tr. at 1263-64.

[106] Tr. at 984 (Clifford: ". . . I do hold myself out as a reasonable reader of documents . . .").

[107] Tr. at 986 (Clifford: "Joe [Berl] told me that it was appropriate [for me] to sign [the Patent Assignment] at this point in time based on the negotiations he had had with Mala's counsel"); Tr. at 988 (". . . I viewed this as a contract matter, and when Joe Berle told me to sign it I did"); Ex. 266 ("Joe Berl was negotiating directly with Harvey Kaplan on these matters. He reviewed all documents, including the assignment. I did not do anything without Joe's blessing").

[108] Tr. at 1526.

[109] Tr. at 1529-30.

25

captures, among other things, continuations and CIPs. A continuation "discloses identical subject matter" of the preceding patent application or patent.[110] A CIP contains "identical subject matter of the parent, plus some additional subject matter."[111]

It is inconceivable that Malå and WTI intended Malå to own a defunct patent application, with the real rights to the technology (invented by Malå) and described in that application contained in the continuations and CIP that would continue to be owned by WTI. The Glue Patent describes Malå's hardware – as WTI represented to the Patent Office by filing it as a CIP of the hardware patent application – and a party holding the Glue Patent could require Malå to pay significant license fees to continue manufacturing and selling its *own products*.[112] As Linder testified:

> the 188 application, in fact, never even issued as a patent, it went abandoned as shown [Ex. 263], and in fact, what happened is a couple of subsequent applications . . . were filed claiming priority back to the 188 application. So in order to ultimately get the rights that were referred to in the [ESA] they went through a series of procedural approaches in the Patent Office.[113]

What really happened here is that WTI had a management transition, and Robert Green, the new CEO, claims he did not know the purpose or effect of the Patent Assignment (although

---

[110] Tr. at 1521.

[111] Tr. at 1522-23.

[112] Tr. at 1458-63 (Johansson: "this patent covers all the hardware that we delivered, and so anyone holding this one could cause us problems and I would be afraid of that . . . . that is nothing like a generic GPR antenna. All commercial antennas are specifically designed to each manufacturer"); Tr. at 1470-71; Tr. at 1473-74. Compare Ex. 12, Figs. 1, 2, 3, 14, 15, 16 with Glue Patent, U.S. No. 6,700,526, Figs. 3, 6, 7, 13, 14, 15, attached hereto as Exhibit E (Glue Patent drawings apparently taken from hardware patent drawings).

[113] Tr. at 1518-19; see also Tr. at 1538 ("Any attorney would prepare an assignment that made sure it encompassed all of the rights that could possibly be associated with the patent application that was identified as a source"). See also Tr. at 1529 (Linder: "Q: How did you determine in preparing the patent assignment what rights your client bargained for? A: Well, they would at a minimum have gotten the rights to any of the subject matter that was disclosed in the 188 application and any continuity applications that followed from that").

26

former CEO Tony Clifford testified that he circulated the Assignment to Green for review)[114] and

that WTI was thus deceived into assigning more than it intended.

WTI called Clifford (who executed the Assignment) to testify quite passionately that

"Tommy, apparently, made a successful attempt . . . to steal a patent . . . and I just thought that

that was just completely despicable."[115] But Clifford has no first hand knowledge. He is just

testifying about what Robert told him months after Clifford left WTI's employ.

In this regard it is significant that when Green asked Clifford in late 2005 why he had

assigned the Glue Patent to Malå, Clifford told Green to talk with WTI's lawyer, Joe Berl.[116]

*Berl, of course, was not called as a fact witness in this matter (although he offices in Washington*

*D.C.).*[117] The only reasonable inference that can be taken from WTI's failure to call him as a

witness is that he would have testified that he was not misled as to the scope of the

Assignment.[118] By calling Clifford, who did not know what a CIP was, and not calling Berl, who

presumably did, WTI created a false image of having been misled.

### 3.     Malå Will Consent to an Award Granting WTI a Perpetual, Royalty-Free License to WTI of the Glue Patent.

Despite all of the foregoing, as set forth in Malå's Proposed Award, Malå will consent to

a limited extension of the Arbitrator's jurisdiction to permit you to order Malå to grant to WTI a

---

[114] Tr. at 986.

[115] Tr. at 842.

[116] Ex. 266.

[117] WTI offered to waive its attorney-client privilege in regard to the Patent Assignment if Malå would do the same. Malå declined to do that because, as set forth above, the Patent Assignment is not within the scope of this arbitration. But WTI would not have had to waive the privilege to have Berl testify about his negotiations with Malå's lawyer and his understanding of the deal, just as Linder did. And in any event, WTI could have made a unilateral privilege waiver, as Malå did in regard to the FCC issue and the GSSI patent infringement issue.

[118] Tr. at 986 (Clifford: "Joe [Berl] told me that it was appropriate [for me] to sign [the Patent Assignment] at this point in time based on the negotiations he had had with Mala's counsel").

paid-up, irrevocable, perpetual, royalty-free license of the Glue Patent. We believe this protects the legitimate interests of both parties and will allow the parties to go their own ways – with each able to use the technology it developed and without restraint upon its ability to compete with the other party.

## C.    WTI's Counterclaims and Other Requested Relief.

WTI's counterclaims were not supported by evidence, and equity would be disserved by an Award incorporating any terms proposed by WTI.

### 1.    WTI's Counterclaims.

The evidence has shown what we predicted it would show: that WTI's counterclaims are baseless – merely a litigation strategy intended to deflect attention from the meritorious claims against WTI. WTI has used this strategy to try to gain a strategic advantage in every litigation, to our knowledge, in which WTI has been a defendant.[119] Indeed, Ms. Lewis, in her opening statement, said: "We are not dragging people to the courthouse, but when they try to take us, we will fight back . . ."[120]

The events at the close of the hearing are, we think, the best indicator that WTI's counterclaims are meritless. At the end of the hearing, the Arbitrator commented that there had been no evidence of damages on WTI's counterclaims.[121] Counsel responded that would be addressed in the briefs - as if that could cure an evidentiary vacuum. But the failure of proof problem is more fundamental than that.

---

[119] See Malå Pre-Hearing Brief at 21 and citations therein.

[120] Tr. at 34. See also Tr. at 1328 (R. Green: "this bad old counterclaim that I filed against Dycom, resolved the whole issue").

[121] Tr. at 1637-38.

There was *no evidence of any harm to WTI* from any alleged misconduct by Malå. This would be a different case, indeed, if WTI could point to *even one* order for purchase or lease of a CART that WTI had placed and that Malå had failed or refused to fulfill.

Even more fundamentally, this would be a different case if WTI had sought to prove that there were *specific customers* who had agreed or even were prepared to deal with WTI but had abandoned WTI because of alleged misbehavior by Malå. But there was no such specificity.

For example, when Tony Clifford came on board he wrote Tommy Leijon that WTI was embarking on a licensing program and had five licensees poised to sign.[122] We submit that this is the same type of overstatement of WTI's business expectations that pervades the documents and, indeed, pervaded the testimony.[123] Clifford's actual testimony was that one of the five – Craig A. Smith – received a CART. With regard to the other four, he described business negotiations but no final deal and no walk-away because Malå failed or refused to provide a CART.

The important point is that WTI never presented the name of *even one* company which failed to do business with it because Malå allegedly failed to supply CARTs. Because of this lack of specificity Malå was never in a position to refute these grandiose generalized statements about future customers or business opportunities that Malå allegedly frustrated.

---

[122] Ex. 354.

[123] Tr. at 851-853. Another good example of WTI overstatement is WTI's insistence that it honored the December 30, 1999 purchase agreement signed at or after the Harvey meeting. That agreement, as the Arbitrator will recall, called for $80,000 cash *and* a $175,000 letter of credit on or before January 10, 2000. Ex. 313. The letter of credit was never posted, and Robert Green contends that the $175,000 was paid in cash much later, Tr. at Tr. at 1615-16, which was probably true because the CARTs were delivered. As to the $80,000, however, there was a dispute as to whether a payment of that amount was fairly attributed to the December 30, 1999 agreement. At the end of the day, it became clear that the $80,000 was for development of a 400 MHz CART and that WTI has indeed received a 400 MHz CART. See Ex. 319; Ex. 324; Tr. at 1626-29.

We will address each of WTI's counterclaims substantively – not because they are meritorious but because the very fact that they are *not* meritorious goes to the equities of the terms upon which these parties will divorce. We ask you to keep in mind as we discuss the counterclaims that if this dispute had been venued in a court, WTI's failure to respond to Malå's damages interrogatory or to provide *any evidence at any time* of harm would have been the subject of a successful dispositive motion. Although the procedure is different in an arbitration, the failure to show harm is equally fatal to WTI's claims here.

### a.    Fraudulent Inducement: GSSI Patent License Agreement.

WTI presented *no* evidence at the hearing that Malå made any material representation or omission to WTI that was false or misleading when the parties negotiated the LA in 1997.

The undisputed evidence in regard to the GSSI Patent License Agreement is that *three years after* Malå and WTI had entered into the LA, Malå's competitor, GSSI, wrote Malå that Malå's "GPR multi-channel survey systems that use multiple transmitters may possibly infringe on [our] patent."[124] The letter was obviously written by a lawyer and pointedly does not demand an immediate cease and desist. Malå Vice President Bernth Johansson testified that he reviewed the GSSI patent referenced in the letter, consulted with Malå's IP counsel,[125] and became comfortable that Malå's CART technology does not infringe on GSSI's patent.[126]

GSSI's president testified in deposition that he wrote the June 2000 letter alleging *possible* infringement based on his review of a photograph of the *outside* of Malå's system.[127] He

---

[124] Ex. 116.
[125] See Ex. 123.
[126] Tr. at 1428-36.
[127] Johnson Dep. at 14-15.

did not know how Malå's system operated (and still does not know)[128] but believed that GSSI

itself had developed the most economical way to create a radar array, so he surmised that Malå's

technology likely had copied GSSI's patented intellectual property.[129]  Nor have GSSI's

engineers ever examined Malå's equipment.[130]  This testimony, good evidence of the specious

nature of GSSI's potential infringement claim, is bolstered by a handwritten note made by Leijon

in the summer or fall of 2000 after talking with Johnson: "We don't think that we have infringed

. . . GSSI admits that our product doesn't infringes [sic] GSSI's patent."[131]

Rather than engage in expensive patent litigation with GSSI, however, Malå entered a

Patent License Agreement with GSSI for a token royalty (1% of U.S. sales).[132]  The only effect of

the GSSI agreement is to immunize Malå itself from a patent infringement lawsuit by GSSI, and

Malå had no duty to purchase that same immunity for WTI.  The parties expressly agreed in the

LA that *WTI* would bear the risk of a third party infringement claim -- with no recourse against

Malå:[133]

> the Licensee is responsible for any infringement on patent or any other intellectual
> property rights belonging to a third party due to the use, manufacture, sale or lease
> caused by the Licensee without any right of recourse against the Licensor.[134]

---

[128] Id. at 19 ("Q: Do you know whether Malå has a radar board in its system? A: No.  I don't know anything about the Mala system").

[129] Id. at 14.

[130] Id. at 15-16; 22.

[131] Ex. 118 at M 4927 (handwritten note in Swedish); M 4927.1 (translation of same); Tr. at 1554-55.

[132] See Ex. 258 (Email from T. Leijon to R. Green:  "We pay GSSI a License Fee each year to avoid any problem with one of their patents.  We are sure that the GSSI patent have no impact on our patent but we try to do it the Swedish way to avoid problems").

[133] Likewise, as the GSSI agreement has no effect on WTI, Malå had no duty to disclose that agreement to WTI.  Indeed, Malå had a duty to GSSI *not* to disclose the agreement and had to obtain permission from GSSI to produce the agreement in this litigation.  Ex. 20 at M 3094.

[134] Ex. 29 at WTI 1034.  The fact that WTI itself agreed to bear the risk for any third party infringement suit also bars WTI's claim that Malå somehow breached a duty to WTI when it failed to timely pay certain royalties due to GSSI under the GSSI Patent License Agreement.  In any event, there is no dispute that Malå cured its breach of

31

WTI submitted no affirmative evidence that the Malå technology actually infringes on GSSI's patent; the evidence was significant and unrefuted, on the other hand, that Malå's CART radar equipment does not infringe on GSSI's patent. Faegre & Benson patent attorney Linder testified that he reviewed the GSSI patent with its prosecution history, interviewed Malå employees about Malå's technology, and reviewed documents regarding Malå's technology[135] and concluded that Malå's CART technology does not infringe on GSSI's patent for two reasons.[136] First, the GSSI patent describes a system that requires two separate signals to cause an antenna to fire. The Malå CART employs only one signal to cause an antenna to fire. This difference results in no infringement of independent claim one and dependent claims two through four of the GSSI patent.[137] (Independent claim five and dependent claim six also require triggering and enabling signals to fire an antenna and are not infringed for the same reason).[138]

Second, the GSSI patent describes a radar board that includes means for generating a timing pulse signal and a high voltage signal. In the Malå system, only one signal is used. The triggering signal is supplied by the control unit to an antenna, which is connected to a high voltage source. Further, nothing in the Malå system can be described as a radar board, much less one that generates two signals. These differences result in no infringement of independent claim seven and dependent claim eight.[139] Linder testified that he has an "extremely high level of

---

the GSSI Patent License Agreement within the cure period. See Johnson Dep. at 29; Tr. at 1610-11.

[135] Tr. at 1505.

[136] Malå Vice President Bernth Johansson's testimony was in accord. See Tr. at 1428-32.

[137] Tr. at 1506-09.

[138] Tr. at 1510-11.

[139] Tr. at 1511-13.

32

confidence" in his infringement analysis.[140]  This unrebutted testimony defeats WTI's claim that

Malå simply copied GSSI's technology and derives its rights to the CART from the GSSI Patent

License Agreement and should give WTI comfort that GSSI has no viable claim against WTI for

its use of Malå's technology.

### b.    Breach of LA:  Failure to Apply for FCC Waiver.

When the parties commenced their relationship in 1997 with the LA and PDA, ground

penetrating radar ("GPR") was not regulated by the U.S. FCC, and no one contemplated that it

would be.  In 1999, the FCC began to contemplate regulating ultra-wideband devices, including

GPR.[141]  In spring 2002, the FCC did, in fact, regulate GPR, including the CARTs, to limit

electromagnetic emissions.[142]

Thereafter, Malå went to a great deal of trouble and expense to try to obtain FCC

approval or waiver for the CARTs,[143] despite the fact that it had no contractual obligation to WTI

to do so.  The process took a great deal of time, because of bureaucracy and because the FCC

requires testing of the equipment at an FCC-approved lab and the submission of the test results

together with certain other documents to pass on a request for approval or waiver.  Moreover, the

labs required to perform testing did not know how to test the equipment under the new

regulations.[144]

---

[140] Tr. at 1542-43.

[141] Tr. at 1438; Ex. 9.

[142] Tr. at 1440-41.

[143] See, e.g., Tr. at 1442-44; Tr. at 1449-50; Exs. 128-33.

[144] Tr. at 1443-44.

WTI was fully informed about Malå's efforts to obtain FCC approval or waiver for the CARTS[145] and, in October 2002, the parties agreed in the ESA – the only agreement to address the FCC rules – that Malå had certain obligations to deliver CARTs to WTI but that Malå would not be penalized if its failure to do so was due to the FCC regulations.[146]

In October 2004, Malå obtained FCC approval for the 400 MHZ version of the CART.[147] Malå never applied to the FCC for a waiver on the 200 MHZ CART, because the CART emissions were substantially over the limits permitted by the FCC rules in critical bands (i.e., public safety communications, TV and FM broadcasting, aeronautical navigation and instrument landing, aeronautical communications, and military).[148] Malå's lawyer, Mitchell Lazarus, advised Malå that the chances that the FCC would grant a waiver for the 200 MHZ CART were very "small."[149] No one in the GPR industry, to our knowledge, has received FCC approval or waiver for a 200 MHZ CART.

Malå breached no duty to WTI by its actions in regard to the FCC but, even if it had, WTI was not harmed. Malå has repeatedly offered to sell or lease grandfathered CARTs to WTI, but WTI has purchased only one such CART (for Craig A. Smith).[150] WTI claims that in 2004, it requested that Malå supply CARTs so that WTI could launch a licensing program and Malå refused.[151] In fact, Malå replied that it could provide grandfathered CARTs to WTI but could not

---

[145] See Tr. at 1446-48; Ex. 15 at 5366-76 (drafted by Mike Oristaglio).
[146] Ex. 7 at paragraph 3.2 (b).
[147] Ex. 134.
[148] Tr. at 1449-50; Ex. 133; see also Ex. 15 at M5392-93; Tr. at 1448-49.
[149] Tr. at 1453.
[150] Tr. at 1549-51.
[151] See, e.g., Ex. 354; Tr. at 1362-63.

sell *new* CARTs to WTI until the FCC granted approval or waiver.[152]  WTI never took Malå up

on its repeated offers to provide grandfathered CARTs and, indeed, never signed up any

additional licensees who would need CARTs.[153]  Nor has WTI purchased a 400 MHZ CART

from Malå since the FCC approved the 400 MHZ CART.

#### c.     Breach of LA:  Design and Maintenance of the CART.

At the hearing, WTI addressed a handful of emails from 1999-2002 setting forth isolated

complaints by WTI about equipment failures and requests for improvements to the CART by

other parties.[154]  The evidence regarding the invalidity of these "complaints," if they can be

categorized as such, was significant and unrefuted.[155]  WTI also claimed that the CART for Craig

A. Smith was delivered by Malå in poor condition.[156]  In fact, Malå had tested the CART before

WTI's man picked the CART up in Charleston and dismantled it for transport.[157]  WTI's only

response was that it did not want to pay Malå for the transport vehicle, so it rented its own.[158]

But the bottom line is that WTI stands by its statement to potential investors in early 2006

– after this litigation was well under way – that: "Our current CARTs were designed by Malå

---

[152] Tr. at 1555-57; Ex. 365.

[153] Tr. at 1549-51; Ex. 260 at M 1270 (Email from Leijon to Green, Sept. 22, 2005: "You have asked us to deliver CARTs to [WTI] rather often and we have always said that this is OK (when we could deliver to you) but you have never gone any further than to ask.  You have never order any CARTs.  Except for the CAS CART").  WTI itself, of course, has significant unused capacity with the CARTs it currently possesses.  Tr. at 951-52.

[154] See Ex. 23; Ex. 340; Ex. 343; Ex. 351; Tr. at 1415-17.

[155] See, e.g., Tr. at 1385-1417; Uluaydin Dep. at 45.  See also Oristaglio Dep. at 87-88; 120-21 (moisture issues did not become an "operational problem"); Tr. at 329.

[156] See, e.g., Ex. 387; Tr. at 883-84.

[157] Ex. 382; Tr. at 1011-12.

[158] Tr. at 1331-32.

GeoScience almost five years ago. *As a credit to Malå and our specifications, they have performed reliably and capably.*"[159]

### d.    Breach of LA:  Failure to Share Patent Application Costs.

The LA provides that Malå and WTI "will equally share" patent costs.[160]  There is no dispute that Malå and WTI have not shared patent costs – and for very good reason.  The unrefuted evidence was that, for various reasons, the parties entered a subsequent oral agreement, later confirmed in writing, that WTI would bear patent application costs itself.[161]  Thus, Robert Green wrote to Jan Rynning on October 31, 1999: "We agreed on a street corner in Washington, D.C. a year ago Witten would take the responsibility for the patents."[162]  In regard to this letter, Shane Green testified: "I know the arrangement was made . . . . I knew that that was the case, that we agreed to take the cost on in paying for the patents . . ."[163]  We submit that WTI itself does not take this claim very seriously, as it presented no evidence of the actual patent costs it paid that it claims Malå should have shared – something that would have been easy to prove if WTI had wanted to do it.

### e.    Breach of LA:  Failure to Provide Documents to Allow WTI to Manufacture and Repair CARTs.

As set forth in section II.A above, WTI has no right to documents that would allow WTI to manufacture the CART.  The parties agreed in the ESA that Malå alone would have the

---

[159] Ex. 153 at WTI 8223 (emphasis added); Tr. at 1625.  See also Tr. at 1302-04; Ex. 281 (WTI Answer and Counterclaim in Dycom case: "The CART . . . is superior to, any other technology").

[160] Ex. 29 at WTI 1033.

[161] Tr. at 1166-67 (S. Green: "Q: Did Witten end up paying patent costs in pursuing the patent prosecution itself? A: Yes . . . . but at the time we very much agreed, again . . . we had ever[y] interest in the world to make sure that this technology was protected whether they helped to pay for it or not");

[162] Ex. 213.

[163] Tr. at 1223.

manufacturing rights to the CART and, only in certain circumstances not at issue here, would WTI have access to the blueprints necessary to manufacture the CART.[164]

In the same way, the parties have agreed that Malå will repair the CARTs,[165] a customary right for a proprietary manufacturer. Nothing in the parties' agreements requires Malå to provide documentation regarding CART repairs or functioning. Indeed, Malå has repeatedly insisted that WTI not open the CART equipment[166] or make any changes to it.[167]

The testimony of Malå's Vice President, Bernth Johansson was definitive in regard to this claim: Malå has not created manuals or release notes for the CARTs, because there are not enough systems in circulation to justify such manuals.[168] Former WTI president, Mike Oristaglio, testified during his deposition that a manual would not have been "tremendously" helpful to WTI. WTI "eventually understood how [the CART] worked well enough to use it. So a manual would be helpful, but not -- it certainly would be something that would be needed before large-scale commercial deployment with licensees, et cetera."[169] Nevertheless, Malå does provide troubleshooting to its customers over the phone (going so far as to give a home number, where necessary) and has provided specifications for the CART to WTI.[170]

---

[164] Ex. 7 at 4-5.

[165] See, e.g., Ex. 7 at 4; Ex. 287 at WTI 1304.

[166] See, e.g. Ex. 109 (Email from Leijon to Green: "The thing that is important is that you describe the problem with a unit. You are not allowed to open up the equipment, if you do no warranty is valid and we have to go thru everything to see what you have done before we start to trouble shout [sic]").

[167] See, e.g. Ex. 260 (Email from Leijon to Green complaining that WTI had gone into a CART unit and made several alterations, including soldering two wires to the back of the power connector board. The ends of the wires were left naked. "What you have done can only be described in a short and concisely way; very unprofessional and very dangerous . . . . You know that you are not allowed to go into our products and do changes to them").

[168] Tr. at 1406; Tr. at 1408.

[169] Oristaglio Dep. at 127-28. The deposition testimony of WTI engineer, Tuna Uluaydin, was in accord. Everything WTI claims to have needed in the form of documentation, WTI either had as institutional knowledge or received from Malå, Uluaydin Dep. at 59-71.

[170] Tr. at 1406-07.

## 2.    WTI's Requested Relief.

The relief WTI proposes the Arbitrator order in its April 26 and April 27 submissions is not the kind of relief parties typically request in litigation. The requested relief does not relate to the claims asserted by WTI. Rather, it represents WTI's demand that the Arbitrator dissolve the current relationship between the parties, only to replace it with a new business partnership between the parties on terms so favorable to WTI and unfavorable to Malå that we submit WTI could never obtain such terms in an arms length transaction with any party.

Two of WTI's requests bear separate comment. First, WTI requests that you order Malå to enter into an agreement (End User License Agreement) that Malå previously rejected during negotiations between the parties in 2005.[171] (Notably, Malå sent a counterproposal to WTI's lawyer and never received a response).[172] WTI's justification for this request, presumably, is its contention that Malå's use of the software WTI licensed to Malå pursuant to the ESA should be governed by additional terms. There are at least two problems with this theory. The first is that the parties did not discuss, contemplate, or negotiate that any terms other than those in the ESA and contemporaneously executed Side Agreement would govern Malå's use of WTI's software.[173] Only after those agreements had been signed, when WTI delivered the software, did WTI seek to impose additional terms. Willing to consider additional, reasonable terms, Malå's president responded to WTI with proposed revisions. WTI never responded to him and apparently abandoned its desire for new terms to govern the software licensing relationship[174] –

---

[171] See Ex. 393-94.
[172] See Ex. 294.
[173] Tr. at 493.
[174] Ex. 95; Tr. at 494-98.

until the commencement of this litigation. The second problem is that the terms WTI wants you to impose on Malå are separate from the software licensing terms WTI sent to Malå in 2002. WTI should not receive in arbitration – with no consideration to Malå – the benefits of an agreement that was not palatable to Malå even in combination with the consideration WTI was offering during the 2005 negotiations.

Second, WTI asks that you give WTI a perpetual, unrestricted, royalty-free license to the *hardware patents* that protect Malå's radar equipment related to the CART. In other words, WTI suggests that you terminate the LA and replace it with a license that gives WTI virtually all of the benefits of the radar technology for free. The evidence demands termination of the LA, because *WTI* has not fulfilled its obligations under that agreement. Dissolving the LA only to give WTI what amounts to ownership of the CART radar technology would be a travesty.

## III.    Attorneys' Fees.

Both parties requested an award of attorneys' fees. As we said during the hearing, we know that an award of attorneys' fees to Malå would be technical in the sense that WTI is unlikely ever to satisfy the obligation.[175] But, we think there are few cases in which an award of attorneys' fees would be more appropriate than this case, and you should award fees as a sanction against WTI for two reasons.

First, Malå has tried repeatedly for years – both before the commencement of the arbitration proceedings and during the proceedings – to resolve the issues between the parties and find a way to make the relationship work (or dissolve) on mutually beneficial terms.[176] We ask

---

[175] Tr. at 18-19.

[176] See, e.g., Tr. at 279-80; Tr. at 476-79; Tr. at 518-19; Tr. at 522-23; Tr. at 550-51.

you to pay careful attention to the parties' proposed awards as you consider the parties' requests for fees. We submit that the proposed awards speak volumes about which party is reasonable and which is responsible for this arbitration and the failure of the parties to settle their differences long ago.

The evidence of WTI's breaches of the LA is overwhelming. Malå was forced to arbitration, because WTI was not willing to negotiate reasonable terms to party company. On April 27, the second to last day of the hearing, WTI proposed to the Arbitrator that the LA be terminated – the sole relief Malå has been seeking all along. Rather than simply agree to a termination on reasonable terms at the outset, WTI has forced the parties to go through this litigation.

Second, Malå has spent a tremendous amount of money defending against WTI's counterclaims – all of which are frivolous. At the time WTI pled its counterclaims, it knew it had suffered no harm, as is evident from the fact that after the exchange of approximately 13,000 pages of documents and twelve depositions, WTI could not produce a shred of evidence of harm. Moreover, throughout these proceedings, WTI has continued to add new defenses (i.e., the insolvency waiver argument) and unpled counterclaims (i.e., transfer of the Glue Patent was a mistake) and to change its position (i.e., on April 27, 2006, WTI requested that the Arbitrator grant WTI manufacturing rights; on April 28, WTI's lead counsel and CEO both claimed that WTI had not requested such rights; later the same day, WTI, again claimed it *did* want manufacturing rights).

The majority of the time our office has spent on this case has focused on understanding and defending against WTI's shifting counterclaims; a significant volume of the documents

40

exchanged focused on WTI's claims; at least four of the witnesses deposed would have had no relevance to the case absent WTI's counterclaims; and Malå would not have had to call a Faegre & Benson partner to provide an expert opinion and offer expert testimony during deposition and at the hearing were it not for WTI's counterclaims.

WTI routinely uses frivolous counterclaims to gain an advantage in litigation. The Arbitrator should not countenance that behavior and should require WTI to pay Malå's fees and expenses in regard to this arbitration.[177]

## CONCLUSION

For the foregoing reasons, Malå respectfully requests that you execute Malå's Proposed Award, Exhibit A hereto.

Dated: May 26, 2006

KELLY & BERENS, P.A.

By: *Sarah E Bushnell*
Timothy D. Kelly, #54926
Sarah E. Bushnell, #0326859
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 349-6171
*Attorneys for Claimant*
*Malå Geoscience AB*

---

[177] For the same reasons, Malå strenuously objects to WTI's claims for attorneys' fees.

41