IN THE CIRCUIT COURT OF THE
FOURTH JUDICIAL CIRCUIT IN
AND FOR DUVAL COUNTY, FLORIDA

CASE NO.:   16-2005-CA-007500

DIVISION:   CV-H

MALA GEOSCIENCE AB,

      Plaintiff/Counter-Defendant,

vs.

WITTEN TECHNOLOGIES, INC.,

      Defendant/Counter-Plaintiff.

_____/

## MALA GEOSCIENCE AB'S RENEWED MOTION TO COMPEL ARBITRATION OR, ALTERNATIVELY, DISMISS WITTEN TECHNOLOGIES, INC.'S COUNTERCLAIMS

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA") and the Florida Arbitration Code, Fla. Stat. §§ 682.01-682.22 (the "Code"), plaintiff/counter-defendant Mala Geoscience AB ("Mala") moves this Court for entry of an order dismissing Counts One, Two, Three (in part), Four and Five of Witten Technologies, Inc.'s ("Witten") Amended Counterclaim, because the alleged claims asserted in those counts are subject to mandatory written arbitration agreements and/or were recently adjudicated in arbitration before the American Arbitration Association ("AAA"). By Award dated July 10, 2006, the claims alleged in Counts One, Two, Three (in part), Four and Five of Witten's Amended Counterclaim were adjudicated in the arbitration proceeding before the AAA styled *Mala Geoscience AB v. Witten Technologies, Inc.*, AAA Case No. 50 199 T 00261 05. The bases for this motion are as follows:[1]

---

[1]  Undersigned counsel for Mala certify that they conferred with Witten's counsel prior to filing this motion in a good faith effort to resolve the issues raised herein without Court intervention. Undersigned counsel are continuing to confer with Witten's counsel regarding these issues.

HomerBonner
1200 Four Seasons Tower • 1441 Brickell Avenue • Miami, Florida
TELEPHONE: (305) 350-5100

Civil Action No: 1:06-cv-01343

Respondent WTI Ex. No. 27

Arb. Ex. No:

## **Background**

1.      On November 3, 2005, Mala commenced this action against Witten.

2.      Mala's Complaint asserts two claims against Witten for breach of contract and replevin.  Mala's claims arise from Witten's material breach of a written Equipment Lease between the parties by failing to pay to Mala the $9,750 rental payment due on September 1, 2005 (which Witten admits in its Answer it did not pay) and subsequent rental payments, by failing to pay to Mala all sums due and to become due as declared by Mala (totaling $97,500), and by failing to return the subject equipment to Mala despite demand.  *See* Complaint.

3.      On February 15, 2006, Witten filed a Counterclaim against Mala.

4.      On March 3, 2006, Mala filed a motion seeking to compel arbitration of Witten's counterclaims, among other things.  Witten did not file any opposition to that motion.

5.      In June 2006, Witten filed an Amended Counterclaim against Mala.

6.      In its Amended Counterclaim, Witten asserts alleged claims for breach of various written agreements between Mala and Witten, as well as claims for alleged fraud in the inducement.  However, the written agreements (other than the Equipment Lease) which are the subject of Witten's alleged counterclaims contain, or are subject to, <u>mandatory</u> written agreements to arbitrate between the parties.  As demonstrated below, these counterclaims fall squarely within the scope of the extremely broad arbitration provisions and, accordingly, the counterclaims must be dismissed because they <u>cannot</u> be litigated in this forum and, indeed, have already been arbitrated and adjudicated.

7.      In Count One of its Amended Counterclaim for alleged breach of contract, Witten alleges that Mala breached the following three agreements between the parties:  Prototype Development Agreement ("PDA");  License Agreement ("LA");  and Exchange and Settlement

2

Agreement ("ESA").  Copies of these agreements are attached to the Amended Counterclaim as

Exhibits A, B and C, respectively.  For ease of reference, copies are also attached hereto as

Exhibits A, B and C, respectively.

8.    In pertinent part, the PDA contains the following mandatory agreement to

arbitrate at page 6:

> **Any** claim, dispute, disagreement or controversy that arises among
> the parties **relating to this Agreement** that is not amicably settled
> **shall** be resolved by final and binding arbitration... (emphasis
> added).

9.    In pertinent part, the LA contains the following mandatory agreement to arbitrate

at page 7:

> **Any** claim, dispute, disagreement or controversy that arises among
> the parties **relating to this Agreement** that is not amicably settled
> **shall** be resolved by final and binding arbitration.... (emphasis
> added).

10.    In pertinent part, the ESA contains the following mandatory agreement to

arbitrate at page 5:

> **Any** dispute, controversy or claim **arising out of or in connection
> with** this agreement, **or the breach**, termination or invalidity
> thereof, **shall** be finally settled by arbitration administered by the
> Arbitration Institute of the Stockholm Chamber of Commerce....
> (emphasis added).

11.    The alleged breaches of the agreements asserted in Count One plainly fall within

the scope of the arbitration clauses contained within those very same agreements and, thus,

cannot be litigated in this Court.

12.    In Count Two of its Amended Counterclaim for alleged breach of contract, Witten

alleges that Mala breached a "Side Agreement" (Exhibit D to Amended Counterclaim).  Witten

alleges that the purpose of the Side Agreement was to, among other things, amend the terms of

the ESA. *See* Amended Counterclaim at ¶ 110. Because Witten's claim for the alleged breach of what it claims to be an amendment to the ESA plainly arises out of or in connection with the ESA, it is subject to and falls squarely within the mandatory agreement to arbitrate contained in the ESA as follows:

> **Any** dispute, controversy or claim **arising out of or in connection with** this agreement, **or the breach**, termination or invalidity thereof, **shall** be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce.... (emphasis added).

13. In Count Three of its Amended Counterclaim for breach of contract, Witten alleges that Mala breached an Equipment Lease and an Amendment thereto (Exhibits E and F to Amended Counterclaim). According to Witten, the Amendment to the Equipment Lease called for Witten to assign certain rights, with Witten retaining license privileges and manufacturing rights pursuant to the LA. *See* Amended Counterclaim at ¶ 137.[2] Witten alleges that Mala breached the Amendment to Lease when it allegedly failed to provide Witten with the promised license to manufacture pursuant to the LA. *Id.* at ¶ 138. Accordingly, because the portion of Count Three that relates to the alleged Amendment to Lease is expressly alleged by Witten to relate to the LA and requires adjudication of a dispute that has arisen under the LA, i.e., whether Mala conveyed manufacturing rights to Witten in the LA, it is subject to and falls squarely within the mandatory agreement to arbitrate contained in the LA as follows:

> **Any** claim, dispute, disagreement or controversy that arises among the parties **relating to this Agreement** that is not amicably settled **shall** be resolved by final and binding arbitration.... (emphasis added).

---

[2]  Although Mala disputes that Witten had any rights to manufacture, such rights (if any) would derive from the PDA, LA and/or the ESA, all of which require arbitration. Indeed, Witten alleges that it obtained manufacturing rights through the PDA and LA. Amended Counterclaim at ¶¶ 74-79.

14.     In Count Four of its Amended Counterclaim, Witten alleges fraud in the inducement in connection with the PDA, LA, ESA and Lease. As an initial matter, as set forth more fully below, a claim for fraudulent inducement into these agreements (with the exception of the Lease) is, on its face, subject to the mandatory arbitration agreements contained in those agreements.

15.     The gravamen of Count Four is at ¶ 145 of the Amended Counterclaim, wherein Witten alleges that "Witten would have never entered into the ESA (and begun paying royalties under the LA), Patent Assignment, Side Agreement, Lease or Amendment to Lease had Witten been aware of the material fact that Mala was legally incapable of granting manufacturing rights to Witten . . . ." Witten alleges at paragraph ¶¶ 74-79 that it received manufacturing rights from Mala pursuant to the PDA and LA. Witten's claim that it was fraudulently induced into certain other agreements (including the Lease and Amendment to Lease), therefore, cannot be determined without interpreting the LA and PDA and adjudicating a dispute that has arisen under those agreements, i.e., whether Witten obtained CART manufacturing rights through those agreements. Such a dispute is subject to the mandatory arbitration agreements in the LA and PDA and has, in fact, already been arbitrated pursuant to the arbitration agreements.

16.     Witten's claim that "Mala induced Witten into the ESA, Side Agreement, Lease and Amendment to Lease, never intending to obtain (or even seek) FCC waivers for the 200 MHz CART System even though it represented otherwise to Witten," Amended Counterclaim at ¶ 153, is really an allegation that Mala *breached* the ESA. *See* Amended Counterclaim at ¶ 51 ("In the ESA, Witten also requested that Mala obtain FCC waivers for the CARTs"). It is, therefore, subject to the ESA's arbitration agreement.

HomerBonner
1200 Four Seasons Tower • 1441 Brickell Avenue • Miami, Florida 33131
TELEPHONE: (305) 350-5100

17.    Witten's claim that it was fraudulently induced into the Patent Assignment is subject to the ESA's mandatory arbitration agreement.  The ESA (Exhibit C to Amended Counterclaim) at page 2, paragraph 1.1(c), obligates Witten to execute the Patent Assignment, and the Patent Assignment (Exhibit H to Amended Counterclaim) recites that it is made "[i]n accordance with the [ESA]."  As such, the Patent Assignment is subject to the mandatory arbitration agreement in the ESA, because any dispute arising out of the Patent Assignment arises "out of or in connection with" the ESA.

18.    As set forth in paragraph 12 above, a dispute related to the Side Agreement is also subject to the ESA's arbitration agreement.

19.    Witten also alleges that Mala entered into its agreements with Witten, but did not intend to comply with them, *see* Amended Counterclaim at ¶¶ 151, 152, 160, 161, 162, 166, and that Witten relied on Mala's alleged false assurances and representations, including representations in the agreements themselves, when it continued to perform under these agreements. *See, e.g., id.* at ¶ 158.  These allegations relate to, or arise out of or in connection with, the parties' agreements which mandate the arbitration of such claims, and those claims have already been arbitrated.

20.    As further evidence of the arbitrability of Witten's counterclaims, Witten alleged and has adjudicated the identical or nearly identical claims in an arbitration proceeding between Mala and Witten before the American Arbitration Association (AAA Case No. 50 199 T 00261 05) (the "Arbitration").  *See* Exhibit D, attached hereto, at 11-16.  On October 7, 2005, Witten filed a counterclaim in the Arbitration which asserts alleged claims for fraud in the inducement and breach of contract. *Id.*  Those alleged claims involve, among other things, the same PDA

6

and LA which are the subject of Witten's counterclaims asserted in this action. *Id.* By Award dated July 10, 2006, Witten's claims were adjudicated in that proceeding.

21.     Count Five of the Amended Counterclaim purports to be a claim for fraud in the inducement in connection with the Patent Assignment. As set forth in paragraph 17 above, any dispute in connection with the Patent Assignment must be arbitrated in Sweden in accordance with the ESA's arbitration provision, because it arose out of and was made "[i]n accordance with the ESA."

<u>**Argument**</u>

Whether examined in accordance with the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), or the Florida Arbitration Code, Fla. Stat. §§ 682.01-682.22 (the "Code"), the Court must enforce the foregoing arbitration clauses. Also, Witten cannot re-litigate in Court claims that have already been adjudicated in arbitration. Accordingly, Witten's counterclaims cannot proceed in this Court and must be dismissed.

Because the agreements between the parties involve interstate commerce, the FAA applies. *See* 9 U.S.C. §§ 1, 2. The FAA establishes an emphatic federal policy favoring arbitration, and federal law requires that all doubts (if any) should be resolved in favor of arbitration. *E.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-26 (1985); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) (citing cases). Accordingly, agreements to arbitrate are to be construed liberally in favor of arbitration, and any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration. *E.g., Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Moreover, with respect to international disputes (like this one), the federal policy in favor of arbitration "<u>applies with special force</u>." *Mitsubishi Motors*, 473 U.S. at 631 (emphasis added).

HomerBonner
1200 Four Seasons Tower • 1441 Brickell Avenue • Miami, Florida 33131
TELEPHONE: (305) 350-5100

Florida law recognizes these same policies favoring arbitration. *E.g., Chase Manhattan Inv. Servs., Inc. v. Miranda*, 658 So.2d 181, 182 (Fla. 3d 1995) (there is a strong bias favoring arbitration mandated by both federal law and Florida law). Federal and Florida law require that all doubts (if any) should be resolved in favor of arbitration and, accordingly, arbitration provisions are construed liberally in favor of arbitration and any doubts concerning the scope of arbitral issues are resolved in favor of arbitration. *E.g., Prudential Sec. v. Katz*, 807 So.2d 173, 174 (Fla. 3d DCA 2002); *Martha A. Gottfried, Inc., v. Paulette Koch Real Estate, Inc.*, 778 So.2d 1089, 1090 (Fla. 4th DCA 2001). Any doubts about the scope of arbitration agreements are to be resolved in favor of arbitration, and arbitration clauses are to be given the broadest possible interpretation in order to accomplish the purpose of resolving controversies outside of the courts. *E.g., Ocwen Fin. Corp. v. Holman*, 769 So.2d 481, 483 (Fla. 4th DCA 2000) (citations omitted).

Both federal and Florida law require that Witten's alleged counterclaims be arbitrated. Section 4 of the FAA requires a Court to issue an order compelling arbitration when the opposing party refuses, neglects, or fails to comply with an arbitration provision. 9 U.S.C. § 4. Similarly, the Florida Arbitration Code provides that written agreements to arbitrate are "valid, enforceable, and irrevocable without regard to the justiciable character of the controversy," and that a party may apply to the Court for an order directing the parties to proceed with arbitration according to the terms of the agreement when the opposing party refuses to comply with the arbitration provision in the agreement. Fla. Stat. §§ 682.02 & 682.03. Under both the FAA and the Code, there are three elements for Courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitral issue exists; and (3) whether the right to arbitration was waived. *E.g., Marine*

8

*Envtl. Partners, Inc. v. Johnson*, 863 So.2d 423, 426 (Fla. 4th DCA 2003).  Indeed, Witten previously submitted it claims to arbitration and has now had its claims adjudicated in arbitration.

Here, the broad arbitration provisions in the parties' agreements easily encompass Witten's alleged counterclaims for breach of contract and fraud.  The alleged breach of contract claims clearly fall within the scope of the arbitration clauses, as those alleged claims relate to, or arise out of or in connection with, the agreements containing the arbitration clauses.  For the same reason, the alleged fraud in the inducement claims also fall within the scope of the broad arbitration clauses.  *See Singer v. Gaines*, 896 So.2d 851, 854-55 (Fla. 3d DCA 2005) (fraud in the inducement claim subject to arbitration);  *Kaplan v. Kimball Hill Homes Fla., Inc.*, 915 So.2d 755 (Fla. 2d DCA 2005) (claims for fraud in the inducement and fraud in the performance of a contract are arbitrable).  Similarly, alleging that an agreement was procured by fraud does not defeat enforcement of an arbitration provision contained therein.  *E.g., Buckeye Check Cashing, Inc. v. Cardegna*, ___ U.S. ___, 126 S.Ct. 1204 (2006) (reversing Florida Supreme Court);  *Teichner v. Concorde Trading Group, Inc.*, 776 So.2d 281 (Fla. 3d DCA 2000);  *Great Western Fin. Secs. Corp. v. Grandison*, 701 So.2d 1202 (Fla. 5th DCA 1997).  Not only are Witten's counterclaims arbitrable and within the scope of the arbitration clauses, but the parties have completed arbitration on the very claims that Witten now seeks to re-litigate in this Court.  This Court cannot entertain such claims and they must be dismissed.

Even if Witten's alleged counterclaims did not fall squarely within these arbitration provisions (which they do), any doubt regarding the scope of the arbitration clauses should be resolved in favor of arbitration.  *E.g., Martha A. Gottfried, Inc.*, 778 So.2d at 1090.  Moreover, the burden is on the party opposing arbitration (here, Witten) to show that the claims fall outside

the scope of the arbitration agreement. *Singer*, 896 So.2d at 854-55. This Witten cannot do. Accordingly, under both the FAA and the Code, Witten's claims must be dismissed because they fall within the scope of the above-referenced mandatory arbitration provisions and/or have already been adjudicated in arbitration and, under either scenario, cannot be litigated in this Court.

**WHEREFORE**, Mala requests that the Court enter an order dismissing Counts One, Two, Three (in part), Four and Five of Witten's Amended Counterclaim, and awarding such other and further relief as is just and proper.

Respectfully submitted:

**HOMER BONNER, P.A.**
Attorneys for Plaintiff
The Four Seasons Tower, Suite 1200
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5100
Telecopier: (305) 372-2738

By: _____
Peter W. Homer
Florida Bar No. 291250
Gregory J. Trask
Florida Bar No. 0055883

**KELLY & BERENS, P.A.**
Sarah E. Bushnell, Esq.
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Telephone: (612) 349-6171
Telecopier: (612) 349-6416

*Attorneys for Plaintiff Mala Geoscience AB*

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent this 10th day

of August 2006 by postage prepaid first class U.S. mail to the following:

Richard M. Stoudemire, Esq.
Cole, Stone, Stoudemire & Morgan, P.A.
201 North Hogan Street
Suite 200
Jacksonville, FL 32202

Erin L. G. Lewis, Esq.
Witten Technologies, Inc.
3638 Overlook Ave.
Macon, GA 31204

_____
Gregory J. Trask

\\MIA-SVR\DATA\Docs\Wdox\CF\41245\0002\00020621.DOC

HomerBonner
1200 Four Seasons Tower • 1441 Brickell Avenue • Miami, Florida 33131
TELEPHONE: (305) 350-5100

# EXHIBIT A

EXHIBIT A

# PROTOTYPE DEVELOPMENT AGREEMENT

This AGREEMENT, (the "Agreement") is made as of the 9th day of September, 1997 (the "Effective Date"), by and between MALA GEOSCIENCE, AB, a corporation organized under the laws of Sweden ("Mala"), and WITTEN TECHNOLOGIES, INC., a corporation organized under the laws of Delaware ("Witten").

## WITNESSETH



WHEREAS, The parties have developed various proprietary technologies relating to ground penetrating radar.

WHEREAS, the parties after Witten's first contact with Mala have sought to negotiate terms for a cooperative and succesfull relationship between them for the purpose to produce a functioning prototypical device for the detection of utility services which implements and demonstrates the technology in a commercially viable and successful manner, (the "New Technology").

WHEREAS the New Technology is primarily to be used for detecting and mapping pipes and cables using a vehicle mounted multichannel radar system for highspeed service, (the "Prototype").

WHEREAS, the parties are aware of that the success of this project is highly dependent on both parties fulfilling of their respective obligations to the project.

WHEREAS Mala shall be the exclusive owner of all hardware and intellectual property rights developed by Mala in the project.

WHEREAS Witten shall have an exclusive license in certain areas in the utility locating industry on all patents granted to Mala regarding the New Technology and a non-exclusive license to use the developed technology in applications which incorporate WITTEN software technology.

WHEREAS Witten is in the position to use the New Technology in a functioning device for the detection of underground utility services and in other applications which incorporate WITTEN software technology in a succesfull way and is willing to make certain payments to Mala and other undertakings for the development and use of the New Technology.

WHEREAS if the project is succesfull in developing the New Technology the parties intend to start negotiations for further and deeper cooperation concerning the production of the Prototype and other projects in the area of ground penetrating radar.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, intending to be legally bound, Mala and Witten hereby agree as follows:

1.          Production of the Prototype

1.01          The parties shall act to provide to each other the information, goods and materials, transaction execution, and services specified in Exhibit A attached to this Agreement (the "Goods and Services").

1.02          There may from time to time be added to Exhibit A to this Agreement such additional goods and services as Mala and Witten may agree and such goods and services shall, from the time of such addition or additions, be treated as part of the Goods and Services and subject in all respects to the provisions of this Agreement.

2.          Duties of the Parties

The parties are aware that the success of this project is highly dependent on both parties fulfillment of their obligation in the project. Each party therefor undertakes to use all reasonable endeavors to participate actively and to perform on time the tasks and work under the schedule shown in Exhibit A.

In connection with its obligations hereunder, each party shall:

(a)          exercise all due diligence and skill so that the Goods and Services are of such quality as may be reasonably required by each party for the development of the Prototype;
(b)          employ sufficient staff, or otherwise obtain the services of sufficient suitable persons, of the quality necessary to discharge promptly and effectively its obligations hereunder; and
(c)          at all times ensure that it has sufficient and adequate materials, administrative and technical facilities to perform its obligations hereunder to the highest standards.

3.          Manner of Performance; Guidelines and Instructions

3.01          With respect to the Goods and Services to be provided the parties shall on a monthly basis and upon request consult with each other and provide each other with information and instructions regarding the development of the Prototype.

3.02          Each party shall report all activities effected by the party as part of the Goods and Services to the other party on a monthly basis.

4.    <u>Remuneration</u>

4.01        In consideration of the Goods and Services to be provided by Mala under this agreement Witten shall execute and deliwer to Mala, on completion, the convertible note attached hereto as Exhibit B.

4.02        In the event that Mala shall not complete the Goods and Services to be produced by it under this agreement, Mala and Witten shall negotiate in good faith partial alternative compensation which shall be based on the fair value of the Goods and Services actually completed by Mala.

4.03        .. In the event that Witten shall not complete its resposibilities hereunder, Witten shall in addition to executing and delivering the convertible note be obliged to compensate Mala for all its costs during the development process within 60 days of the termination of this agreement.. The parties shall negotiate in good faith any dispute as to such costs.

5.    <u>Delegation</u>

5.01        In the performance of its obligations hereunder each partiy may, instead of using its employees contract with consultants to perform such obligations on its behalf and in its stead, provided, however, that the employment of any such consultant shall not prejudice or affect the liability of the parties hereunder, and such consultants and there employees shall first be contractually bound in writing to honor all applicable provisions of this agreement, including confidentially and proprietary rights and obligations.

5.02        Subject to Section 5.01 hereof, this Agreement shall not be assigned by either party save with the written consent of the other party.

6.    <u>Ownership, intellectual property, patents</u>

6.01        Intellectual property rights, constructions and know-how owned and controlled by each of the parties at the time of execution of this Agreement shall be exclusively owned by such party.

6.02        During the period of this Agreement, each party which develops intellectual property or constructions shall have the sole right to establish proprietary rigths to such innovations. Intellectual property or constructions developed during the period of this Agreement shall be exclusively owned by such party, exept that notwithstanding anything to the contrary in this agreement, Mala will have sole ownership of any improvements to its hardware resulting from the parties development efforts, subject only to Wittens license rights under this agreement.

6.03    Mala and Witten agree to equally share costs for patent applications and to maintain patents and patent applications developed during the period of this Agreement regarding the New Technology and the Prototype.

6.04    Witten shall have the ownership of the first vehicle mounted multichannel radarsystem for highspeed service produced under the terms of this agreement.

7.    <u>License</u>

7.01    Mala shall provide to Witten an exclusive license for the detection of utilities, in the form of Exhibit C, to use the New Technology developed pursuant to this Agreement, in exchange for the royalty provided therein.

7.02    Mala shall also provide to Witten a non-exclusive license, in the form of Exhibit C, to use the patented technology developed pursuant to this Agreement, in exchange for the royalty provided therein, in applications other then the detection of utilities which incorporate Witten software technology.

8.    <u>Independent Contractor</u>

In rendering services pursuant to this Agreement, the parties shall act as independent contractors each having responsibility to determine the methods to be adopted and the actions to be taken to carry out it's obligations concerning the Goods and Services.

9.    <u>Commencement and Termination</u>

9.01    This Agreement shall commence on the Effective Date and shall continue in force thereafter until delivery of an acceptable Prototype.

9.02    Without prejudice to any other remedy it may have against the other for breach or non-performance of the Agreement either party shall have the right to terminate this Agreement by giving the other party not less than thirty (30) days notice in writing if the other party should commit or permit a material breach of any of the obligations herein contained and should fail to remedy such breach within thirty (30) days after receipt of notice from the complaining party.

9.03    Either party shall have the right to terminate this Agreement with immediate effect if the other party should enter into liquidation, either voluntary or compulsory, or become insolvent, or enter into composition or corporate reorganization proceedings or if execution be levied on any goods and effects of the other party or the other party sould enter into receivership. This Agreement shall terminatie automatically if either party shall be subject to reorganisation or liquidation, voluntary or involentary, pursuant to applicable code.

10.        Consequence of early termination

In the event that either party should commit a breach of any material provision of this Agreement and should fail to discontinue or make good such breach within thirty (30) days after receipt of notice in writing from the other party, then the failing party shall be liable to pay the other party a of USD 200 000 as liquidated damages provided always, however, that the other party may claim larger damages upon proof that the real injury corresponds to a greater amount than such agreed penalty and without prejudice to the other party´s right to terminate this Agreement.


11.        Confidentiality

11.01      Each party shall with at all times act to with due diligence preserve the confidentiality and proprietary nature of the New Technology and shall treat the New Technology with at least as much care as its own intellectual property.

11.02      Each party undertakes to keep all information, whether oral, in writing or in computer form, whether of a technical nature or otherwise, or in any manner relating to the business affairs of the parties, as confidential.

11.03      The parties hereto acknowledge that the confidentiality agreement between them dated August 1, 1997 shall continue to be in full force and effect between them and each shall continue to be fully bound thereby.

11.04      The obligation to keep the above mentioned information strictly confidential shall survive the termination of this Agreement and shall continue in force until the Know-how has been generally disclosed to the public other than by breach of this obligation.


12.        Notices

Any notice, request, demand or other communication to be given or made pursuant to this Agreement shall be given in writing addressed:

        (a)            in the case of Mala, to Skolgatan 11, S-930 70 Malå
        (b)            in the case of Witten, to it at 2509 P Street, N.W., Washington, D.C. 20007;

        (c)    or at such other addresses as Mala and Witten may from time to time notify to each other. All such notices, requests, demands or other communications shall be deemed to be given by one party when received by the other.

13.    <u>Arbitration.</u>

The parties shall endeavor to settle all disputes by amicable negotiations. Any claim, dispute, disagreement or controversy that arises among the parties relating to this Agreement that is not amicably settled shall be resolved by final and binding arbitration, as follows:

(a)    Any such arbitration shall be held in the District of Columbia, before a single (1) arbitrator who shall be impartial. Except as the parties may otherwise agree, the arbitrator shall be appointed by the appropriate official in the District of Columbia office of the American Arbitration Association or, in the event of his or her unavailability by reason of disqualification or otherwise, by the appropriate official in the New York City office of the American Arbitration Association. In determining the appropriate background of the arbitrator, the appointing authority shall give due consideration to the issues to be resolved, but his or her decision as to the identity shall be final. Except as otherwise provided in this Section, all of the arbitration proceedings shall be conducted in accordance with the applicable commercial arbitration rules of the American arbitrator Association.

(b)    Notwithstanding anything to the contrary herein, the parties agree that violation by any party, person or entity of any provision in sections 5, 6 or 111 may cause immediate irreparable harm, and either party shall be entitled at any time to initiate legal acction in a court of proper jurisdiction seeking injunctive relief preventing any violation of sections 5, 6 or 11 of this agreement.

(c)    An arbitration may be commenced by any party to this Agreement by the service of a written request for arbitration upon the other affected parties. Such request for arbitration shall summarize the controversy or claim to be arbitrated, and shall be referred by the complaining party to the appointing authority for appointment of an arbitrator ten (10) days following such service or thereafter. If the arbitrator is not appointed by the appointing authority within thirty (30) days following such reference, any party may apply to any court within the District of Columbia for an order appointing an arbitrator qualified as set forth below.

(d)    All attorneys' fees and costs of the arbitration shall in the first instance be borne by the respective party incurring such costs and fees, but the arbitrator shall have the discretion to award costs and/or attorneys' fees as he deems appropriate under the circumstances. The parties hereby expressly waive punitive damages, and under no circumstances shall an award contain any amount that in any way reflects punitive damages.

(e)    Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(f)    It is intended that controversies or claims submitted to arbitration under this Section shall remain confidential, and to that end it is agreed by the parties that neither the facts disclosed in the arbitration, the issues arbitrated, nor the views or opinions of any persons concerning them, shall be disclosed to third persons at any time, except to the extent necessary to enforce an award or judgment or as required by law or in response to legal process or in connection with such arbitration.

14.        <u>General Provisions</u>

14.01        The provisions of Sections 1, 2, 4, 5, 6, 7, 8, 10, 11, 13 and 14 of this Agreement shall survive any termination of this Agreement.

14.02        This Agreement may be executed in more than one counterpart, each of which shall be deemed an original and all of which together shall be deemed one and the same instrument.

14.03        This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto.

14.04        This Agreement may not be amended or otherwise modified except in a writing signed by all parties to the Agreement.

14.05        This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and amends and restates in their entirety all other agreements, representations, understandings and the like in respect thereof.

14.06        This Agreement shall be governed by and construed in accordance with the law of New York State and the parties hereto irrevocably submit to the nonexclusive jurisdiction of any federal court in New York.


IN WITNESS WHEREOF, MALA GEOSCIENCE A.B.. and WITTEN TECHNOLOGIES, INC. have caused this Agreement to be executed and delivered by their duly authorized representatives, to be effective as of the Effective Date.


MALA GEOSCIENCE A.B.                    WITTEN TECHNOLOGIES, INC.
a Swedish Corporation,                         a Delaware Corporation



By:                                                      By:

PROTOTYPE DEVELOPMENT AGREEMNT BETWEEN
MALA GEOSCIENCE AND WITTEN TECHNOLOGIES, INC.

EXHIBIT A

PERFORMANCE SPECIFICATIONS FOR MALA

1. The antenna system should have 16 channels of antenna pairs with a 20cm spacing between each antenna pair center points
2. Minimum energy band of 300 MHz
3. Antennas should be 200 MHz center frequency
4. 512 time samples per receiver
5. Selectable sampling interval down to 200 pico seconds
6. Switchable transmitter/receiver pairing
7. 10 lines of data per second
8. Wheel mounted system triggered from wheel under user control
9. Provide beam pattern

PERFORMANCE SPECIFICATIONS FOR WITTEN

1. Develop digital signal processing (DSP), including:
    a) horizontal spatial resolution of 30 cm
    b) vertical spatial resolution of approx. 10cm ($\lambda/4$)
    c) high pass spatial filters to remove direct arrivals and/or horizontal interfaces
    d) geometric filters to admit only utility-like objects

2. Algorithms will be computationally efficient to ultimately allow real-time DSP chip-based processing

3. Algorithms will be tested at several buried utility sites

# EXHIBIT B

EXHIBIT B

# LICENSE AGREEMENT

This Agreement has been made on the date set out below between Malå Geoscience AB, a company incorporated under the laws of Sweden (hereinafter referred to as "the Licensor")and Witten Technologies Inc, a company incorporated under the laws of Delaware (hereinafter referred to as "the Licensee")



## WITNESSETH

WHEREAS, the parties have entered into a development agreement dated as of September 1997 for the purpose of working together in the development of a prototypical device for the detection of utility services, ("the Project")

WHEREAS, the new technology developed under the Project primarily is to be used for detecting and mapping pipes and cables using a vehicle mounted multichannel radar system for highspeed service, (the "Prototype")

WHEREAS, the parties intention is to establish proprietary rights to intellectual property, innovations and constructions developed during the period of this agreement and the Project.

WHEREAS, constructions and intellectual property developed under this agreement including the Project shall be exclusively owned by the developing party except that Mala will have sole ownership of any improvements to its hardware resulting from the parties development efforts.

WHEREAS, "Know-how"shall mean knowledge, experience, data, technology, designs, techniques, drawings, software, and other information and knowledge, relating in any way to the parties.

WHEREAS, intellectual property rights mean patents, trademarks, firms etc and applications for all such rights.

WHEREAS, Licensor agrees to allow Licensee use of its Know-how and inellectual property, and Licensee agrees to pay certain licens fees to the Licenso, upon the terms set forth in this agreement.

## 1.    Grant

Subject to the terms and conditions of this Agreement the Licensor grants to the Licensee a world wide

a,    exclusive right and license to sell, use, lease and assemble, with respect to the detection of utilities only, all technology established or developed of the Licensor under the Project regarding the Prototype and to which the Licensor has established a patent or other intellectual property right or has applied for such right

b,    non exclusive right and license to sell, use, lease and assemble, with respect to any application other than the detection of utilities, all other technology established or developed of the Licensor under the Project and to which the Licensor has established a patent or other intellectual property right or has applied for such right

The Licensee is entitled to utilize Licensors applicable patent, patent application and Know-How when exercising the rights granted above.

The Licensee shall have the right to grant sub-licenses on such terms and conditions as are compatible with the provisions of this agreement.


## 2.    Sales promotion

The Licensee shall use its best efforts to promote the sales of the Product in the Territory. To that end the Licensee shall at its own expense provide the necessary pamphlets and other sales promotion material and the Licensee shall without delay and free of charge to the Licensor furnish the Licensor with a copy of all such material. Before use all sales promotion material shall have been approved by the Licensor. The Licensee shall create and maintain an efficient sales organization for the Product.


## 3.    Remuneration

In consideration of the rights granted to the Licensee hereunder, the Licensee shall pay to the Licensor:

a)    during the three year period (years 1-3) commencing on the date ("Commencing Date") on which the Licensee first sells, lease or itself uses the Product or any other product using the Licensors intellectual property rights, established or applied for, Licensee shall pay to the Licensor a royalty equal to five (5 %) percent of the Licensee's gross revenue from sale, lease or use of the Product or such other products.

Such gross revenue shall be calculated based on the invoiced sales price, less any rebates except cash discounts.

b)      during the three year period (years 4 -6 ) commencing on the third anniversiry of the Commencement Date, the Licensee Licensee shall pay to the Licensor a royalty equal to four (4 %) percent of the Licensee′s gross revenue from sale, lease or use of the Product or such other products. Such gross revenue shall be calculated based on the invoiced sales price, less any rebates except cash discounts.

c)      from the seventh year from the Commencement Day the Licensee Licensee shall pay to the Licensor a royalty equal to three (3 %) percent of the Licensee′s gross revenue from sale, lease or use of the Product or such other   products. Such gross revenue shall be calculated based on the invoiced sales price, less any rebates except cash discounts.

Additional costs, such as the costs of freight carriage packing, duties and all other charges, dues and taxes levied by the customs or in the country into which the goods are imported, shall be deducted if they are invoiced separately.

4.      Payment of Royalties

The royalties shall be calculated for each calendar quarter. All royalties payable by the Licensee under this Agreement shall be paid in the currency in which the Licensee has invoiced its customer, provided however that such currency is freely convertible with the currency of the Licensor′s country, within thirty (30) days of expiration of each preceding calendar quarter. If for any reason any royalty payment could not be effected or if the invoiced currency is not freely convertible with the currency of the Licensor′s country then the royalty payment shall be effected in any currency chosen by the Licensor. In such a case the rate of exchange shall be the bankers buying rate recorded in the Licensor′s country on the last banking day of the relevant calendar quarter. The right to royalties on a Product shall accrue at on date of receipt of payment. Products used by the Licensee and/or its sub-licensees shall be deemed delivered on the date when first used.

5.      Accounting

The Licensee shall keep true, accurate and consistent records and books of account containing regular entries relating to the manufacture, use, lease and sale of the Product or other products arising under this agreement by the Licensee. These records shall be ready for inspection and examination during normal business hours by duly

authorized representatives of the Licensor for a period of five (5) years following the end of the calendar year to which they pertain. Any such representatives of the Licensor shall be entitled to make copies and extracts of such books and records. The Licensee shall fully co-operate at such examination, and shall give any explanations that may reasonably be requested.

The Licensee shall at each time of payment of royalties due to the Licensor render report to the Licensor giving a true account of total manufacture, use, lease and sale during the preceding calendar quarter. The reports shall be accompanied by one set of invoices and show the number of Products invoiced by the Licensee and/or its sub-licensees during such calendar quarter aswell as the date of delivery, the aggregate net invoiced price therefore and the royalties thereby payable.

6.        Maintenance of Intellectual property

Save as provided below the Licensor will during the life of this Agreement maintain all its intellectual property rigths and such applications in good standing in all countries of in which its intellectual property are issued or filed. The Licensor and The Licensee will equally share costs recording, registration, renewal and other similar fees in connection with maintaining the intellectual property and applications in good standing.

If the Licensor no longer wishes to maintain in force any intellectual property in one or more countries the Licensor will timely notify the Licensee and the Licensee may at its own expense maintain the intellectual property in such a country from the date of notification until the termination of this Agreement.

7.        Infringement by third parties

The Licensor and the Licensee shall give each other prompt notice of any acts of infringement by third parties involving intellectual property rights relating to the new technology of which the Licensor or the Licensee has knowledge and they shall consult together in to determine the course of action, if any, to be taken in such circumstances. The Licensee shall assist the Licensor in proceeding against an infringer provided however that a party taking such action shall remunerate the other party for its costs. If the parties are unable to agree on any joint course of action to be taken then the Licensor may in its own discretion decide whether or not to take action against the infringer. If the Licensor decides not to take action against the infringer then the Licensor may authorize the Licensee to take such action at its own expense and to keep any damages which might be awarded; such authorization not to be unreasonably withheld.

8.        Confidentiality

Each party undertakes to keep all trade secrets, confidential and other information, whether oral, in writing or in computer form, whether of a technical nature or otherwise, or in any manner relating to the business affairs of the parties, as confidential.

The obligation to keep the above mentioned information strictly confidential shall survive the termination of this Agreement and shall continue in force until the Know-how has been generally disclosed to the public other than by breach of this obligation.

9.        Indemnity

The Licensee shall have complete and exclusive responsibility for all its activities and the Licensee undertakes to indemnify and hold harmless the Licensor of any liability, direct or indirect, resulting from the use, manufacture, sale or lease of the technology, including but not limited to claims from third parties, absent bad faith or willfull misconduct by the Licensor.

Without limitation and included in the above indemnification, the Licensee is responsible for any infringement on patent or any other intellectual property rights belonging to a third party due to the use, manufacture, sale or lease caused by the Licensee without any right of recourse against the Licensor.

10.        Commencement and Duration

This Agreement becomes effective on the date of signing by both parties and shall remain in force as long as any intellectual property rigth, any intellectual property rigth issued pursuant to the intellectual property application or any improvement is valid and in good standing.

11.        Premature Termination

Without prejudice to any remedy it may have against the other for breach or non-performance of the Agreement either party shall have the right to terminate this Agreement by giving the other party not less than thirty (30) days notice in writing if the other party should commit or permit a material breach of any of the obligations herein contained and should fail to remedy such breach within thirty (30) days after receipt of notice from the complaining party.

Either party shall have the right to terminate this Agreement with immediate effect if the other party should enter into liquidation, either voluntary or compulsory, or become insolvent, or enter into composition or corporate reorganization proceedings or

if execution be levied on any goods and effects of the other party or the other party should enter into receivership or bankruptcy.

12.        Assignment of the Agreement

Neither party to this Agreement may wholly or partly assign or pledge its rights or obligations under this Agreement to any third party, expt from the above mentioned rigth of sub-license, without the prior written consent of the other party.

13.        Taxes

All taxes of whatever kind levied in the country of the Licensee shall be paid and borne by the Licensee.

14.        Force Majeure

The parties shall be relieved from liability for a failure to perform any obligation under this Agreement during such period and to the extent that the due performance thereof by either of the parties is prevented by reason of any circumstance beyond the control of the parties, such as war, warlike hostilities, mobilization or general military call-up, civil war, fire, flood or other circumstances of similar importance.

The party desiring to invoke an event of force majeure shall give immediate notice to the other party of the commencement and the cessation of such event of force majeure, failing which the party shall not be discharged from liability for any non-performance caused by such event of force majeure.

Both parties shall make all reasonable efforts to prevent and reduce the effect of any non-performance of this Agreement caused by an event of force majeure.

15.        Amendments

Only those amendments and additions to this contract that are made in writing and signed by the following officers of the parties shall be givin force and effect.

16.        Notices

Any notice, request, demand or other communication to be given or made pursuant to this Agreement shall be given in writing addressed:
        (a)        in the case of Mala, to it at Skolgatan 11, S-930 70 Mala
        (b)        in the case of Witten, to it at 2509 P Street, N.W.,
Washington, D.C. 20007;

(c)   or at such other addresses as Mala and Witten may from time to time notify to each other.  All such notices, requests, demands or other communications shall be deemed to be given by one party when received by the other.


17.        Arbitration.

The parties shall endeavor to settle all disputes by amicable negotiations.  Any claim, dispute, disagreement or controversy that arises among the parties relating to this Agreement that is not amicably settled shall be resolved by final and binding arbitration, as follows:

(a)   Any such arbitration shall be held in the District of Columbia, before a single (1) arbitrator who shall be impartial.  Except as the parties may otherwise agree, the arbitrator shall be appointed by the appropriate official in the District of Columbia office of the American Arbitration Association or, in the event of his or her unavailability by reason of disqualification or otherwise, by the appropriate official in the New York City office of the American Arbitration Association.  In determining the appropriate background of the arbitrator, the appointing authority shall give due consideration to the issues to be resolved, but his or her decision as to the identity shall be final.  Except as otherwise provided in this Section, all of the arbitration proceedings shall be conducted in accordance with the applicable commercial arbitration rules of the American arbitrator Association.

(b)   Notwithstanding anything to the contrary herein, the parties agree that violation by any party, person or entity of any provision in sections 3, 4 and 8 to this agreement may cause immediate irreparable harm, and either party shall be entitled at any time to initiate legal action in a court of proper jurisdiction seeking injunctive relief preventing any violation of sections 3, 4 or 8 of this agreement.

(c)   An arbitration may be commenced by any party to this Agreement by the service of a written request for arbitration upon the other affected parties.  Such request for arbitration shall summarize the controversy or claim to be arbitrated, and shall be referred by the complaining party to the appointing authority for appointment of an arbitrator ten (10) days following such service or thereafter.  If the arbitrator is not appointed by the appointing authority within thirty (30) days following such reference, any party may apply to any court within the District of Columbia for an order appointing an arbitrator qualified as set forth below.

(d)   All attorneys' fees and costs of the arbitration shall in the first instance be borne by the respective party incurring such costs and fees, but the arbitrator shall have the discretion to award costs and/or attorneys' fees as he deems appropriate under the circumstances.  The parties hereby expressly waive punitive damages, and under no circumstances shall an award contain any amount that in any way reflects punitive damages.

(e)    Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(f)    It is intended that controversies or claims submitted to arbitration under this Section shall remain confidential, and to that end it is agreed by the parties that neither the facts disclosed in the arbitration, the issues arbitrated, nor the views or opinions of any persons concerning them, shall be disclosed to third persons at any time, except to the extent necessary to enforce an award or judgment or as required by law or in response to legal process or in connection with such arbitration.

18.    General Provisions

18.01    The provisions of Sections 2, 3, 4, 5, 8, 9, 16, 17 and 18 of this Agreement shall survive any termination of this Agreement.

18.02    This Agreement may be executed in more than one counterpart, each of which shall be deemed an original and all of which together shall be deemed one and the same instrument.

18.03    This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto.

18.04    This Agreement may not be amended or otherwise modified except in a writing signed by all parties to the Agreement.

18.05    This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and amends and restates in their entirety all other agreements, representations, understandings and the like in respect thereof.

18.06    This Agreement shall be governed by and construed in accordance with the law of New York State and the parties hereto irrevocably submit to the non-exclusive jurisdiction of any federal court.


IN WITNESS WHEREOF, MALA GEOSCIENCE A.B.. and WITTEN TECHNOLOGIES, INC. have caused this Agreement to be executed and delivered by their duly authorized representatives, to be effective as of the Effective Date.


MALA GEOSCIENCE A.B.          WITTEN TECHNOLOGIES, INC.
a Swedish Corporation,             a Delaware Corporation


By                                         By:

# EXHIBIT C

EXHIBIT C

*Execution Copy*

# EXCHANGE AND SETTLEMENT AGREEMENT

This agreement has been made on the date set out below between Malå Geoscience AB, a company incorporated under the laws of Sweden (hereinafter referred to as Malå), and Witten Technologies, Inc. a company incorporated under the laws of Florida (hereinafter referred to as WITTEN).

### WITNESSETH

> **EXHIBIT**
> C

WHEREAS, the parties during a period of years have been working together in the development of a prototype of a device for the detection of utility services, now called the CART Imaging System ("CART"); and

WHEREAS, Malå and WITTEN made and entered into a Prototype Development Agreement (the "PDA") and a License Agreement (the "LA") both dated as of September 9, 1997; and

WHEREAS, certain obligations of Malå under the PDA have been fulfilled by the delivery to WITTEN of a CART; and

WHEREAS, in consideration of the agreements contained herein and other good and valuable consideration, described in other documents executed concurrently herewith, the sufficiency of which is hereby mutually acknowledged,

NOW THEREFORE, the parties have agreed upon that by the fulfilling of this Agreement, the PDA will terminate and, except as hereinafter provided, neither party hereto hereafter shall have any other or further obligation to the other under the PDA. Notwithstanding the foregoing, article 6 and article 11 of the PDA shall survive such termination. The parties have also agreed upon that the LA shall commence on the Effective Date of October 1, 2002.

# 1     Termination of the PDA

Upon the fulfillment by both parties of the following conditions, except as otherwise set forth herein, the PDA shall terminate and be of no further force and effect.

## 1.1     WITTEN's Obligations

WITTEN shall fulfill its obligations according to the PDA, as soon as is reasonably possible, by the following:

a) Delivering to Malå three (3) used CART's, fully-owned by WITTEN, an estimated value of 140 000 USD, along with a bill of sale marked "PAID IN FULL", and

b) Providing to Malå five (5) concurrent licenses for WITTEN's CART software, a value of 400 000 USD, along with a bill of sale marked "PAID IN FULL";

c) Executing an assignment to Malå of WITTEN's rights to the patent, "Ground-Penetrating Radar Array and Timing Circuit", by B JOHANSSON, A WITTEN, and A DEVANEY, (US) Patent Application 09/658,188, filed 8 September 2001.

Two (2) of the licenses mentioned in (b) shall be intended for non-exclusive use in the market for utility and non-utility services in North America. Malå shall have the right to sublicense these two (2) licenses to General Engineering Laboratories, Inc., a corporation with offices at 2040 Savage Road, Charleston, SC 29417. The other three (3) licenses shall be intended for non-exclusive use in the market for non-utility services in Europe. These three (3) licenses can be used outside of Europe if, in each specific case, the parties hereto mutually agree.

## 1.2     Malå's Obligations

Malå shall, after receiving the above mentioned CARTs, software licenses and patent assignment, deliver to WITTEN the Promissory Note, dated September 9, 1997, made by WITTEN in favor of Malå, marked "PAID IN FULL". Malå hereby waives any claim for accrued interest.

2        License Agreement

The parties have agreed that the LA shall commence on the effective date of October 1, 2002, implying that any job or royalty payment received or invoiced after this date shall be in accordance with Section 3 of the LA with October 1, 2002 being the Commencing Date (as such term is defined in the LA) for the purposes of such Section 3.

2.1        Other Agreements

WITTEN undertakes to deliver to Malå signed copies of all agreements with third parties, i.e., sublicenses, connected to the LA.

3        Escrow

The parties undertake to, in addition to the LA, enter into a separate agreement concerning the deposit into escrow of source code of WITTEN's CART software and Malå's blueprints for the CART (the "Escrow"). The deposit shall be made with the Stockholm Chamber of Commerce

The parties have agreed upon that the Escrow shall be construed in a way that secures the following rights and obligations of the parties.

3.1        Deposit of Source code

WITTEN shall deposit with the Stockholm Chamber of Commerce a sealed package containing a complete copy of the source code of WITTEN's CART software, along with an overall description of the files, including descriptions of how the different modules interact and instructions for compiling the code, in a machine-readable form ("Source Code").

WITTEN shall be responsible for ensuring that the Source Code so presented shall continually conform the latest version available of the Software licensed to any customer that WITTEN shall have delivered the software to.

3



(a) Malá shall be entitled to receive, use and further develop the Source Code if WITTEN is declared bankrupt, or is subject of a voluntary or involuntary institution of bankruptcy proceedings, which are not dismissed within forty-five (45) days following the institution of such proceedings; or ceases doing business as a going concern. The right to the Source Code according to this clause (a) shall be subject to a commercially reasonable licence fee to be determined by good faith negotiations between the Parties. The licence fee shall be paid during a maximum period of five years from the date on which Malá receives the Source Code according to above.

(b) Malá shall also have a right to receive, use and further develop the Source Code, if WITTEN fails to perform stipulated obligations to improve or update the Source Code. Furthermore, in case Malá receives a right to the Source Code according to this clause (b), WITTEN shall supply Malá with manpower with the knowledge and ability to assist Malá in the use and further development of the Source Code. The work accomplished by the manpower assigned by WITTEN to Malá according to this clause shall be performed on a consultant basis and compensated on commercially reasonable terms.

3.2        Deposit of Blueprints concerning the CART

Malá shall deposit with the Stockholm Chamber of Commerce a sealed package containing complete copies of the blueprints for manufacturing and assembling the CART's radar components, including hardware, firmware, and operating software ("Blueprints").

Malá shall be responsible to lease CARTs to WITTEN and to keep a stock of antennas and control units in Charleston, SC, for repair and replacement of leased CARTs in a timely way.

(a) WITTEN shall be entitled to receive and use the Blueprints if Malá is declared bankrupt, or is subject of a voluntary or involuntary institution of bankruptcy proceedings, which are not dismissed within seventy five (75) days following the institution of such proceedings; or ceases doing business as a going concern. The right to the Blueprints according to this clause (a) shall be subject to a commercially reasonable

4

licence fee to be determined by good faith negotiations between the Parties. The licence fee shall be paid during a maximum period of five years from the date on which WITTEN receives the blue prints according to above.

(b) WITTEN shall have a right to receive and use the Blueprints if Malå fails to perform stipulated obligations to lease CARTs to WITTEN. Furthermore, in case WITTEN shall receive a right to the Blueprints according to this clause (b), Malå shall supply WITTEN with manpower, consisting of two or three persons, with the knowledge and ability to assist WITTEN in the understanding and use of the Blueprints. The work accomplished by the manpower assigned by Malå to WITTEN according to this clause shall be performed on a consultant basis and compensated on commercially reasonable terms. Not withstanding the foregoing, WITTEN shall not have the right to receive and use the Blueprints if Malå's failure to perform arises because the FCC does not approve CART for use in the US market.

4        Applicable law

The Agreement shall be governed by, construed and enforced in accordance with the substantive laws of Sweden without regard to its principles of conflict of laws.

5        Arbitration

Any dispute, controversy or claim arising out of or in connection with this agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the SCC Institute).

The Rules for Expedited Arbitrations of the Arbitration Institute of the Stockholm Chamber of Commerce shall apply, unless the SCC Institute, taking into account the complexity of the case, the amount in dispute and other circumstances, determines, in its discretion, that the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce shall apply. In the latter case, the SCC Institute shall also decide whether the arbitral tribunal shall be composed of one or three arbitrators.

5



The Arbitral Tribunal decides on the apportionment of the Arbitration Costs between the parties with regard to the outcome of the case and other circumstances.

////////////////////////////////////////////////LAST ARTICLE/////////////////////////////////////////////////

IN WITNESS WHEREOF,

MALÅ GEOSCIENCE AB and WITTEN TECHNOLOGIES, INC. have caused this Agreement to be executed and delivered by their duly authorized representatives, to be effective as of the Effective Date.

MALÅ GEOSCIENCE AB
A Swedish Corporation

Date: 31/10 2002

By: ..................................
Tommy Leijon, *President*

WITTEN TECHNOLOGIES, INC.
a Florida Corporation

Date: 31 October 2002

By: ..................................
Michael Onstaglio, *President*

# EXHIBIT D

October 7, 2005

*BY ELECTRONIC MAIL & USPS*
Timothy D. Kelly
Kelly & Berens, P.A.
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402



**W I T T E N**
TECHNOLOGIES INC

Re:    *50 199 T 00261 05  Mala Geoscience, AB v.  Witten*
       *Technologies, Inc. – Witten's Response and Counter Claim to*
       *Mala's Demand for Arbitration*

Dear Tim:

Thank you for providing Witten Technologies, Inc. ("Witten") a more clarified
Demand for Arbitration from Mala Geoscience, AB ("Mala").  This letter will
serve as a supplement to the response filed for Witten by Steve Smith of
Powell Goldstein on June 17, 2005.  Please find our response laid out in a
similar fashion as the demand which precedes our Counter Claim against Mala.

## I.    WITTEN'S SUPPLEMENTAL RESPONSE TO MALA'S DEMAND FOR ARBITRATION

### FRAUD IN THE INDUCEMENT

Witten agrees with Mala in their claim that the "Agreement has not operated as
envisioned, planned and projected by <u>both sides</u>." Mala and Witten both
envisioned the Computer Assisted Radar Tomography ("CART") would break
into the market and generate immediate recognition and sales opportunities.
Witten still believes this is possible if Mala would abide by the contracts and
produce a CART that is commercially viable and reproducible.  Without that
ability, it is just a prototype incapable of greater uses.  It is not a genuine
argument for Mala to claim fraud in the inducement because:  1)  Mala was
more aware of the market than Witten because of their already established
world wide business in ground penetrating radar ("GPR"); 2) they can not
prove the elements as required under New York law; 3) promises of future
actions is not a fraud, especially since this was not a pre-existing business or
market in which to solidly base ones expectations and then claim fraud when
those expectations were not met; and 4) Mala has consistently frustrated the
purpose of the License Agreement ("LA") in numerous ways.

The purpose of the Prototype Development Agreement ("PDA") and the LA
was to combine the specialized skills of both companies.  Mala, as they stated
is "a world leader in developing and manufacturing commercial ground
penetrating radar" and Witten, a younger company with cutting edge

Erin L. G. Lewis, Esq.

GENERAL COUNSEL

3638 Overlook Ave.

Macon, GA 31204

PHONE 478.474.6644 OR

404.808.0812

FAX  478.474.8688

E.Lewis@wittentech.com

processing technology could together generate a market not yet realized, much less tapped into. Together the two companies were going to forge ahead into uncharted waters if they could take both of their skills and as they stated, "develop something that had not been done before." The purpose of the collaboration was to produce a unit "with multi-channel radar system for high speed service" that generated quality 3 dimensional images which could be replicated to readily supply the market.

Furthermore, when Tom Fenner, President of Mala Geoscience, USA approached Witten about a collaboration, Witten had already been introduced to the market through all of Dr. Witten's previous academic publications but also by an article and an image of a buried pipe published in *Defense News*, the defense industry's most notable magazine. Witten along with Robert Green had found a way to create an image of a buried utility using geophysical diffraction tomography (GDT) that was unmatched by America's top defense contractors. Because of the possibilities of making this technology mobile and capable to locate utilities, Mala and Witten saw great possibilities. Jan Reynning, Chairman of Mala said to Mr. Green in Washington, D.C. back in the Summer of 1997 that the existing $50 million per year GPR market could grow tenfold with the development of the CART. Likewise, Mr. Reynning believed the $1 billion per year service market would grow.

Legally, Mala can not prove any of the elements required under New York law which the parties chose this contract to be construed under. For one to make a claim of fraud in the inducement, there must be a misrepresentation of a "material existing fact, falsity, scienter, deception and injury." Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 406-407 (N.Y. 1958). Mala can not reasonably state, much less prove that Witten "knowingly uttered a falsehood intending to deprive [Mala] of a benefit and that [Mala] was thereby deceived and damaged." *Id.*

New York case law also seems to suggest that this claim might not even be grounded in fraud, but when involving a contract, is likely to be just a breach of contract. *See* Spellman v. Columbia Manicure Mfg. Co., Inc., 111 A.D.2d 320, 489 N.Y.S.2d 304, 308 (1985) *See also* Tesoro Petroleum Corp. v. Holborn Oil Co., Ltd., 108 A.D.2d 607, 484 N.Y.S.2d 834, 835 (1985) ("a failure to perform promises of future acts is merely a breach of contract"). Either way, Mala can not prove that Dr. Witten, Robert Green, Shane Green or Witten as a corporate unit ever had the intent to deceive Mala when their professional goals encompassed only the success of the CART into the marketplace.

In the third paragraph on page two of Mala's demand, Mala says that they agreed to an exclusive contract with Witten so long as they "exclusively owned the rights to the hardware and the embedded signal processing software then in development." Your are correct in that Mala was to develop the hardware and

2

Witten was to supply the software. However, no where in the contract does it say that Mala was to receive the "embedded signal processing software" of which Alan Witten and Tony Devaney had been working on for almost a decade. That technology caused Witten Technologies to be formed and Witten would not sell off its major IP for the development of this CART. No one else could do what Witten and Devaney were doing so it is even an illogical argument as well as not being evidenced in the contract that Witten would relinquish such a valuable asset.

On the first page of the LA, ¶5 states "construction and intellectual property developed under this agreement including the Project shall be exclusively owned by the <u>developing</u> party [not Mala] except that Mala will have sole ownership of any improvements to its hardware resulting from the parties development efforts." Mala was to have improvements to their <u>hardware</u>, not to the essential technology developed by Witten that would make their hardware marketable with the CART. Furthermore, what is conspicuously left out twice of ¶3 on p. 2 of your letter, the "use, sell, or lease" language was Witten's right to "the use, <u>manufacture</u>, sale or lease" as stated collectively every single time throughout the LA.

In response to your itemized representations supposedly made by Mr. Green, Witten is incapable of responding specifically at this moment without further discovery, but in general makes the following response:

a.   Witten has raised over $10,000,000 in investor capital to develop our software, Mala's hardware and create a commercial network. However, as of this moment, Mala cannot deliver the "commercially relevant" CART equipment in reproducible quantities that enables a commercial network to actually operate. Witten's software has been ready for years and we believe Mala is perfectly capable of delivering the equipment to which we all agreed upon. However, Witten is unsure as to why Mala is deliberately refusing to abide by the terms;

b. – d.  In a market and business not yet realized, Mala who is a "world leader" in their industry knew these numbers were all speculative and are not actionable because they did not come into fruition as <u>all</u> thought they could. Mala, of all people, did understand the implications of Witten's software merged into a radar array. If any party understood the market and its needs, Mala did. Mala is one of the world's oldest manufacturers of electromagnetic geophysical instruments. Jan Rynning has even stated to Robert Green that it takes 10 years to bring a new product to market. Rynning delivered a copy of Geoffrey Moore's book, *Crossing the Chasm* to Green last year affirming the time required to accomplish new product adoption.

3

Logically speaking, how can one put a definitive number on something that has not even been approved by the FCC much less not even been developed yet? Mala agreed with these numbers and the possibility of success. That is why they agreed to the exclusivity provision. This was not a creation of a dry cleaning business in Atlanta, Georgia or some other well established industry with an established product in an established market. Mala can not now use this as the foundation of their argument that they were "duped" into this contract. Mala did not even deliver the first CART prototype until around the first of the year in 1999 so it is difficult to understand how Mala would now make its claim stated in subsection "d." No one truly knew how long it would take to develop the CART, refine the software and obtain product adoption. But all knew the implication once this was achieved.

Lastly, the future performances suggested by Witten did not contemplate Mala delivering the specified equipment of the PDA that would be not be reproducible. That was why under the PDA and LA royalties were expected to be paid to Mala, there was the presumption of commercial reproducibility. Hence, the PDA presumed commercial viability for success. Commercial viability requires readily available equipment free from major defects. Mala, today cannot or will not produce a commercially relevant CART.

It appears they are deliberately hiding behind an FCC regulation (which Mala knew well in advance of in 2002) that has outmoded their timing circuit in the 6' wide array. In spite of promises they have refused to apply to the FCC approval of the wider array (as GSSI did). This prevents the reproduction of the commercially relevant CART. As of this date, only 8 CARTs manufactured by Mala exist that can be used in the US. Mala's own Licensee, General Engineering and Geophysics, (GEG) has possession of two. No more can be built and shipped into the US. How can Witten serve a possible $2 billion dollar market with 6 CARTs? It is an absurd claim by Mala that Witten made representations that it knew it could not fulfill.

The facts are this is a tougher market to penetrate than expected. It was assumed by all parties prior to entering into the Prototype Development Agreement ("PDA") that if the utility and governing communities could see what the technology would produce they would quickly adopt a more enhanced and efficient way of performing work. Because this was such a new technology, there had to be continual efforts to prove to a skeptical community with demanding clients, the quality and reliability of the imaging. These problems had nothing to do with Witten's performance, representations or intent when entering the contract.

4

It is a more correct statement to say that Mala and Witten were attempting to create a new market rather than penetrate one. The goals to become the "standard" for the industry were lofty ones, but achievable. Witten has used all resources to try and realize the CARTs potential. Unfortunately, if the right equipment is not available from Mala because it is either incapable or just refusing to provide a commercially relevant CART, Witten is not responsible for the results caused by Mala's breaches.

Witten did not need to induce Mala into anything and Mala did not need to rely on any numbers set forth by Witten. Mala knew the market and knew that once the technology was fully realized, its capabilities were nearly immeasurable. Mala knew no numbers were true and accurate because there was no existing business in which to base them. Mala can not prove that Witten fraudulent induced them into signing the LA either under the laws of New York or under the contract. This claim fails on its face.

## BREACH OF SALES ORGANIZATION OBLIGATIONS

Witten is not in breach of the sales obligations of the LA. The provision as set forth in the contract is not enforceable under New York law and can not be used as a claim for breach of the LA. Furthermore, Witten's efforts far exceed any good faith requirements read into the agreement.

The "Sales Promotion" Section numbered 2 of the LA is not valid under New York law and is an inapplicable measuring stick by which to claim a breach of the LA by Witten.

It is well settled law in New York that:

> "there is no material issue of fact to be resolved with respect to whether [a party] utilized or was permitted to utilize its "best efforts" ... [w]here, as here, a clause in an agreement expressly provides that a party must use its "best efforts", it is essential that the agreement also contain clear guidelines against which to measure such efforts in order for such clause to be enforced ... [s]ince this agreement contained no guidelines to define the term "best efforts", the [party] cannot seek to enforce its right to payment under this portion of the agreement.
>
> Strauss Paper Co. v. RSA Exec. Search, Inc., 260 A.D.2d 570, 571 (N.Y. App. Div. 1999).

Under this law, Mala can not apply an undefined and vague standard to Witten and rescind the contract claiming a material breach. No where in the contract are guidelines or goals by which Witten is to obtain or be measured. Based

just on these legal principles, Mala's argument for breach of sales organization obligations fail.

To show that Witten has been diligently pursuing marketing and sales campaigns for the CART in good faith, please see Exhibit 1. It outlines some of the events attended by Witten just in 2004. Since 2000 Witten has been engaged in placing our scientist and marketing personnel on important boards and councils that promote our technology. Witten has also won numerous awards and been the feature of national articles. *See attached* Exhibit 2.

Witten has employed four individuals over the past 5 years who have served full time in Sales and Development or Marketing. In addition to these four individuals, Witten has also had numerous people who have committed substantial efforts to these same tasks, either working independently or in conjunction with our full time Sales/Marketing person. At least 5 national or multi-national companies have also assisted in these efforts. These preeminent companies being recognized in their fields and locations were able to help Witten and Mala's CARTs generate an identification that might have been impossible to do otherwise.

The extensive efforts exerted by Witten have caused state law (FL) and national standards to change in our favor. More recently at the NHUC (National Highway Utility Conference) at St. Pete Beach, FL, a presentation by one of our competitors who represents an international engineering firm listed our CART as one of the standards in the industry.

As stated previously, Mala had not even completed the prototype development until around 1999. It took Mala two years to give Witten this prototype. It took Witten two years to make it work in a commercially relevant way. Witten was not in a position to launch a national campaign until there was a product to offer. Even today, Witten must have delivery of the CART in a commercially viable condition and sufficiently reproducible way such that they are available in sufficient numbers in order to advertise confidently. It has looked poorly on Witten in the past when we have tried to supply CARTs and Mala's supply was either non-existent or was delivered inoperable.

In the fall of last year Mala supplied Witten with a CART for one of Witten's sub-licensees. After Mala delayed delivery for 30 days while they prepared the CART, when the CART was picked up Witten found problems with the CART that rendered it unusable. Tommy Leijon, Mala's President told Mr. Green and others that on the "29th of November Robert Green left a voice mail on Matt Wolf's cell phone [President of Mala USA]. He only said "Matt, give me a call" no mentioning about a missing measuring wheel. Without giving a reason for why he was to call Robert Green, Matt Wolf of course did not call back."

6

Witten attempted to contact Mala via email on the 1st and 20th of December and it wasn't until a third phone call in which Witten's issues were finally addressed. This is just one example of how Witten has been prohibited from fully promoting the CART to the interested community. Requests are often met with obstreperous behavior (as in the above email) or unacceptable equipment. Witten's sub-licensee refused to make royalty payments to Witten for three months because the condition of the CART delivered by Mala.

What has also proven to be a difficult hurdle for Mala is its inability to provide a CART with FCC approval that is not already used and/or damaged. Mala of Sweden had over a years notice of the upcoming FCC changes. In 2002 Matt Wolf warned of supply problems with the changes that would be implemented. Yet Mala's competitor, GSSI, has their own CARTs (TerraVision) that are 6' wide and FCC approved. They can be delivered in unlimited quantities. The market demand is easily in the hundreds of CART units and some feel thousands. This demand was impossible for Witten to meet when Mala's CARTs were not available or in a commercially reproducible form.

To respond to your specific bulleted points made on p. 4:
- The ASCE put Alan Witten on the SUE Standards Committee, which is the most important committee that controlled the adoption of GPR systems;
- Witten was unable to begin this campaign at this time in part due to Mala not finishing their part of production until the beginning of 1999. Witten then needed to complete its part of the software and CART positioning development once the Mala hardware was provided. Incidentally, it was during this time that Mala was actively pursuing Witten to buy them out because of their apparent financial distress. Because of Mala's financial position, Witten had to pay Mala's portion of their hardware patent fees which they agreed to pay in Section 6 of the LA.
- Dr. Witten was already well known for all of his innovative technology, in 1999. He was more concerned with getting the CART commercially ready because it had taken Mala longer than expected to complete the first prototype. It is unreasonable for Mala to take longer than expected on their part then require Witten to instantly produce a highly complex adaptation of the software ready to operate on the CART. Mala actually had the less complex part of the development because they could follow the previous work of their competitor, GSSI. Witten had no other examples to follow. Our work was the first of its type.
- The CART was not ready for demonstrations until May 2001. Once it was ready, Witten, with the help of the Electric Power and Research Institute ("EPRI") immediately began promotion of the product. *See* Exhibit 3, *EPRI Service Opportunity* (distributed worldwide). Witten also won the Wall Street Journal Award for the most Innovative Software in 2004 for its work on the CART.

7

- Witten prepared and issued thousands of sales brochures as Mala already knows. Witten did have additional market studies performed, one being a report by Hitachi.

It is interesting that so much of Mala's complaints are prior to the CART being ready for market. For years since then, Witten was extremely forbearing with Mala in allowing them time to create a reproducible 6' wide array and correct the FCC problem. Witten was concerned that Mala would refuse to deliver or maintain equipment (as they are now doing and have harassingly threatened to do numerous times every year). Witten felt that in spite of every problem, Mala's inducement of Witten into the agreements with manufacturing rights would enable Witten to build their own equipment if Mala failed to do so.

Mala complained to Witten that it thought the uptake was too slow. In an effort to prove to Mala that it was not due to a lack of effort on Witten's part, Witten permitted Mala to sub-license CARTs themselves. To date, Mala's sub-licensee has failed to even compare to Witten's efforts.

More recently, Witten tried to accommodate Mala's wishes when in February of 2005 they solicited a reseller software licensing agreement from Witten. This was to allow them to pursue more of the international business opportunity alone. The language Mala presented as a software resale agreement in effect would have allowed them to co-opt Witten's entire business opportunity, not be just a software reseller.

Desiring to avoid any room for misinterpretation, Witten employed the services of Powell Goldstein to write an appropriate resale agreement that protected all parties. Mala refused to accept a fair and reasonable agreement. It appeared that Mala was interested only in Witten's business opportunity and control of our intellectual properties. Since this effort by Mala failed, they now are attempting to terminate the LA without cause.

After years of Mala failing to deliver a commercially relevant CART, Witten was forced to begin to try and manufacture its own CARTs. Since exploring this option, Witten was recently surprised to discover that Mala's Licensor, GSSI, is claiming Mala was not permitted to grant Witten the right to manufacture. In the LA, five times it references Witten's right to manufacture. When confronted by Witten, Mala refused to produce the license agreement it has with GSSI to confirm that Mala was able to grant Witten the right to manufacture.

This makes it very difficult for Witten to fully seize the market when they are questioning their supplier's abilities and commitment to providing the CART the market requires. What is even more interesting, in September of last year the Gas Technology Institute held its annual meeting in Manteno, Illinois. There was a presentation of "GPR Manufacturer's Shootout." All of the major

8

manufacturers, Vermeer, GSSI and Sensors & Software were present. Mala was not. This was shocking to Witten that Mala was not even appearing at such important events. In spite of these questions, Witten has remained fully committed to selling and marketing the product even if Mala is not.

The law in the state of New York is well settled in that the courts will not apply a best efforts provision against a party unless the contract specifically lays out the guidelines that would qualify as being one's "best efforts." From a policy standpoint this is a highly logical application of law because otherwise best effort provisions would lead to abuse. Witten's sales and marketing has been highly effective and has made this company recognized as the world's leader in an industry that did not even exists 6 years ago. Witten has been recognized through various national awards, articles and well respected people in the industry. There is no other way to attribute this success other than to the efforts of a successful and qualified network of sales people.

<u>INSOLVENCY</u>

Witten admits that Mala's numerous breaches of this LA has put Witten in a financial position that was difficult at times. Witten believed that by this time it would have ready access to numerous commercially relevant CARTs that had marketable viability and FCC approval. It is highly specious that Mala is making this claim of insolvency against Witten. Mala is the reason Witten continues to have to raise investments through diluting its ownership of a valuable patent portfolio rather than licensing our software and operating and leasing a commercially viable CART. Furthermore, it is also highly suspect that Mala makes this claim when: it was just recently notified by GSSI that it was in breach of their license agreement for non-payment; and Mala is currently refusing to pay Witten $16,000 for a software upgrade they received pursuant to another agreement between the parties.

Witten has been late or not made certain payments to Mala because Mala provided to Witten inoperable equipment. Witten refused to make certain payments until Mala cured the defects. Mala was to provide to Witten various documentation on the CART so that it could be repaired on the jobsites thereby creating efficiency, saving money and time. To fully operate the CARTs Witten has requested: a user manual; troubleshooting guide; notes on bugs and work-arounds; preventative maintenance and servicing guides; any kind of warranty information outlining Witten v. Mala's responsibility for repairs; power specifications to run the system for optimal performance; the amount of coaxial between the antennas and control box. Lastly, Mala has never been able to repair the equipment in 3 business days or less. Mala has never provided such items yet they claim we are insolvent because they have prohibited us from running an efficiently reactive business plan.

9

These refusals on Mala part has generated numerous specific issues with Witten's work for customers, namely:

- Overall ruggedness and reliability is insufficient;
- Insufficient protection of Control Unit and antennas from power supply surges;
- Antennas not packed ruggedly or waterproofed (leads to a lot of accidental defects on bow-tie antennas and water/moisture damage and corrosion;
- Seam between antenna electronics and antennas prone to moisture/water damage and corrosion;
- RS232 Communication between Control Unit and control computer not always stable (Witten is not sure of the cause because we have been barred from access to the necessary diagrams); and
- Antenna responses are not similar enough (antennas are not properly matched).

Aside from all of the above mentioned problems our relationship with Mala has presented, Witten has continued and continues to this day to pay its debts. We continue to operate at a loss but many companies do so without a frustration of the purpose of their businesses. Witten has sought assistance through partnership type agreements with various companies. A couple of them did not present the opportunities Witten had anticipated. However, Witten in no way settled with these entities in a manner that "significantly burden[ed] its future revenue stream with obligations to the departed partners."

Witten has raised over $10,000,000 which has paid for numerous activities required to bring the CART to market. This includes paying for necessary payroll, research and development, contract negotiations, litigation and other professional activities required by almost every business. Witten's patent portfolio and available licenses provide Witten the necessary assets to continue to realize what they have been attempting to achieve for ten years.

The lack of a commercially viable CART is the primary reason for Witten's illiquid position even though it is still not insolvent. Mr. Leijon has stated that there is no market and has recognized that some of the CARTs are more than seven years old. In spite of written promises, he refuses to make final developments. His reasoning is that he will not complete the development until he sees the market in which to pay for the improvements. Which Mr. Leijon stated in an email in January that he did not see any market, yet he petitions this court to ask to be free to pursue the same market.

This refusal by Mala works two fold in that: 1) Witten continues to be forced to sell portions of its asset base because Mala will not produce a relevant CART;

and 2) Witten is limited in its sales efforts when only a prototype CART is available for demonstrations. Customers want to see a 6' wide commercially reproducible CART with the performance characteristics embodied in the PDA 8 years ago. Witten can not show them this because Mala is refusing to manufacture it, yet the competition does not appear to have this same problem.

Witten is not insolvent even though Mala's unclean hands have constantly precipitated the sale of parts of Witten's asset base to cover cash demands. Mr. Leijon is right in that there is no market for Mala's prototype CART. Until Mala produces the commercially relevant CART as it said it would do or until Witten is finally permitted to manufacture itself, Witten will continue to be forced to sell securities to cover cash flow demands.

## II.   WITTEN'S COUNTER CLAIMS AGAINST MALA

### A. BACKGROUND

In order to understand the issues of this case, one must first understand the history. Witten was formed in October 1994 by Dr. Alan Witten and Robert Green. *Please see* Exhibit 3 (resume of Dr. Witten as of 1996) (deceased, 2005). Dr. Anthony Devaney became involved shortly thereafter. Witten and Devaney were college roommates and had both studied under the world famous physicist, Dr. Emil Wolfe. Dr. Wolfe wrote physics' seminal text in optics, *Principles of Optics.* Devaney was considered by Wolfe to be his brightest student in optical theory ever. Because of the life long familiarity with Devaney's theories, Alan Witten became the first man to truly understand and be able to apply Devaney's most important theory, Geophysical Diffraction Tomography (**GDT**).

In 1984, while working as a scientist at Schlumberger's research facility in Ridgefield, CT, Devaney collaborated with Wolf to write a number of important patents. Among these were several patents on GDT. Based in optical theory, the patent lead to a CAT-scan-like image of the underground.

Dr. Witten independently worked on making the patents relevant for field use. In 1987, while working as a geophysicist at Oak Ridge National Laboratory, Dr. Witten undertook an experiment with GDT to try to figure out how to create an image. He was successful and became the first person to reduce GDT to practice by acoustically imaging a buried water line. GDT was so complex, it took Devaney and Witten two years to fully understand what they had observed.

By the early 1990's, GDT was rapidly changing the world of oil and gas exploration, from a 2- dimensional world into a 3-dimensional one. Devaney's patents in GDT were finally incorporated into Schlumberger's exploration

11

practices by a team of scientists at Schlumberger led by Mike Oristaglio, a seasoned geophysicist whom Tony had hired and later became the President of Witten in 2002.

To test the ability to adapt GDT, Green and Witten built an "acoustical camera" in 1993 to image a pipe they had buried in a Florida lake. They spent over a year lakeside attempting to verify the high-resolution capabilities of GDT. The experiments were a success, and the results were reported worldwide and in the magazine, *Defense News.*

At that point, Green began the actions which ultimately formed Witten in October of 1994. Mala and Witten's relationship began in 1996 through Tom Fenner, then President of Mala USA. Both companies were small and were looking for improvements in ground penetrating radar ("GPR"). Witten was seeking a manufacturer to build an array so that Dr. Witten's technology could be tested. Upon reading Dr. Witten's papers, Jan Rynning, Chairman of Mala of Sweden, recognized Dr. Witten's unique skills.

In 1996, an agreement was reached with Mala GeoScience of Sweden to build an array of radar transmitters and receivers that would provide quality data with the speed necessary to test Witten's technology and signal processing capability. The prototype radar array was delivered in January 1999 for testing.

By the late 1990's, Witten was making filings at the US Patent office, long before the market or competitors even understood the emerging ability to "see underground." Today, Witten's combination of hardware/software /patents are beginning to play a large role in the underground construction /engineering market.

With the employment of Tommy Leijon in 2002, Mala decided to try and change the course of the relationship with Witten. These changes by Mala were identified by Green during the final phases of the research and development of the CART. In an attempt to work things out, Green gave Mala the right to sell the CART's in Europe so long as Witten's software and business plan was employed. Mala made no sales.

By 2002 into 2003 it became apparent that Mala had decided to abandon all their obligations to Witten. Through frivolous reasoning, deceptive agreements and fraud, Mala did not to produce the commercially viable CART developed pursuant to the PDA. This deception has effectively cut off Witten's access to the key component necessary to develop markets around the visions and agreements of Witten and Mala. It has caused severe and enormous financial damage to Witten.

B. **FRAUD IN THE INDUCEMENT:** 1) FAILURE TO REVEAL GSSI LICENSE AGREEMENT TO RADAR ARRAY; AND 2) LACK OF AUTHORITY TO LICENSE WITTEN TO MANUFACTURE RADAR ARRAYS

Mala's fraudulent inducement of Witten to sign the LA was perpetrated in two parts. Firstly, Mala represented to Witten that it owned the rights to the radar array and jointly, the two companies could merge their technology into a single unit that would hopefully change an emerging industry. Secondly, at Witten's insistence, Mala conveyed to Witten in the LA the right to manufacture the radar array. Witten demanded this to prevent just such actions as Mala is currently taking.

In 1997 when Witten initially discussed going into an exclusive arrangement with Mala, a key element of the LA was the radar array. Witten not only wanted a license to use Mala's radar array in the CART, but Witten also wanted to have the ability to manufacture the radar array. References to this original intent are evidenced in at least five sections of the LA.

Years after the LA and PDA were signed, Witten learned that Mala's rights to the radar array came from a license they received from Geophysical Survey Systems, Inc. ("GSSI"), the GSSI/Mala license. Prior to that time Witten was unaware that a critical component to the LA and PDA hinged upon a sub-license from a party in which Witten had no business relations. This material element in which the entire venture was based was fraudulently concealed from Witten in order to induce them into signing a contract with Mala.

During the extensive due diligence process conducted by both parties, Mala failed to reveal the GSSI/Mala license to Witten. Had Mala done so Witten would have been forced to consider the impact of the GSSI/Mala license on Witten's business plan or have demanded to see a copy of the license. Not only was a business relationship being established with Mala, Witten would have required assurances from GSSI that Witten would not be cut off from radar arrays should Mala default.

Witten would also have had the opportunity to determine if Mala was authorized to convey to Witten the right to manufacture. Witten was denied this opportunity because of Mala's concealment of the license. Mala knew it did not have the authority to convey manufacturing rights to Witten, yet Mala induced Witten to sign the LA based on that premise. When recently confronted by Witten to produce the necessary documents to manufacture or even make repairs on jobsites, Mala suspiciously refused to do so.

Over the summer Witten received a call from GSSI's President Dennis Johnson. He informed Witten that Mala had defaulted under the GSSI/Mala license and therefore the Mala/Witten license was rescinded, effectively cutting

13

off Witten's supply of CARTs. Mala has assured us this has not occurred but GSSI has recently rescinded this statement. Mala continues to refuse to supply Witten with a copy of the GSSI/Mala license. Mala's failure to maintain all of its' intellectual property rights is a material breach of Section 6 of the LA as outlined in the following portion of this Counter Claim.

As mentioned previously, Witten was extremely patient with Mala in allowing them time to correct the FCC problem because Witten believed if Mala ultimately failed Witten would be able to manufacture their own CARTs. Now that Witten has determined Mala is incapable and/or unwilling to deliver the commercially relevant CART, Witten's two safeguards: 1) radar array license and 2) license to manufacture a radar array are in danger of evaporating.

Witten relied upon both of Mala's representation and has been detrimentally damaged by these fraudulent acts committed by Mala. Had they actually owned the radar array license as it represented, Witten's business could not be suffocated by an outside company in which Witten had no knowledge it was "getting into bed with." Furthermore, Mala's apparent default under the GSSI/Mala license was a breach of Section 6 of the LA. This is Witten's only access to a radar array license. Its long term effectiveness has now been called into question along with the manufacturing rights Mala granted to Witten in the LA. Mala knew this at the time of negotiating the PDA and LA and never intended Witten to benefit from the terms promised.

   C. **MATERIAL BREACH OF CONTRACT: 1) FAILURE TO DELIVER COMMERCIALLY VIABLE CARTs; 2) BREACH OF INTELELCTUAL PROPERTY SECTION OF LA; AND 3) REFUSAL TO DELIVER DOCUMENTATION TO REPAIR OR MANUFACTURE**

Mala has committed a material breach of the LA by failing to adhere to numerous provisions set forth within the LA. Mala has failed to deliver the CART in a condition that would permit it to be widely used and licensed. Mala has also failed to adhere to two critical portions of Section 6 of the LA. Lastly, Mala has failed provide to Witten the necessary documentations as required by the LA which permits Witten to mitigate its damages by manufacturing a commercially viable CART.

To begin with, Mala's refusal or inability to deliver the CART in a form that may be repeatedly leased to customers is a material breach of the LA. The primary purpose of the PDA and LA was to produce this product in quantities sufficient to service the market to the extent that the financial projections described. Witten has been expending large amounts of capital and extremely valuable scientific resources in developing software that would make the CART commercially relevant. Furthermore, Witten has: launched ad campaigns; applied and received numerous awards and recognitions; applied

14

and received protection for their IP from the U.S. Patent and Trademark Office; sent their scientist to forums and discussions to promote the technology; and attended copious trade-shows and speaking engagements relating to ground penetrating radar. For Mala to now be unalbe to produce the CART in the manner contracted for, is a material breach of this contract.

Mala is also in material breach of two parts of Section 6 of the LA, "Maintenance of Intellectual Property." It states in pertinent part:

> ... [T]he Licensor [Mala] will during the life of this Agreement maintain all its intellectual property rights and such applications in good standing in all countries of in which its intellectual property are issued or filed. The Licensor [Mala] and The Licensee [Witten] will equally share costs recording, registration, renewal and other similar fees in connection with maintaining the intellectual property and applications in good standing.

Mala has breached the first sentence in their failure to properly maintain the GSSI/Mala license for the radar array. This breach greatly impacts all of Witten's business and efforts to promote the CART. Furthermore, Mala has yet to pay its portion of the initial hardware patent filed in 2002 which was a result of this collaboration. The application for the "Ground Penetrating Radar Array and Timing Circuit" was filed, paid for and issued solely because of Witten's financial support. Witten no longer has ownership of this patent because Mala insisted it be transferred pursuant to this LA in spite of their failure to bear the cost they promised to bear. It is Witten's position that Mala's ownership of this patent is not valid due to their complete failure and material breach of the LA.

Finally, Mala has committed a material breach of the LA by refusing to deliver to Witten the necessary documentation which would allow Witten to repair or manufacture the CART. The LA is clear in that it grants to Witten the right to manufacture the CART. However, Mala always refused to release the documents so that Witten could manufacture. Witten, until recently, was unsure why Mala was refusing to do so.

It makes more sense to Witten now, in light of the recent allegations by GSSI that Mala was not authorized to license Witten to manufacture the radar array. Mala knew they could not authorize Witten to manufacture but Mala induced them into signing the PDA and the LA. Once Witten accomplished its part of the agreements, Mala then refused to supply Witten with the tools to effectuate that term of the contracts. Not only was this act a fraud in the inducement, the refusal to supply the documentation even if Mala did have the right to convey, was a material breach of the contract.

## D. **RELIEF SOUGHT**

Based on the foregoing, Witten respectfully request the following:

1. Denial of Mala's request to rescind or terminate the LA;
2. Unspecified damages to be determined at a later date
3. Witten has right to manufacture radar arrays under the GSSI license to replace faulty equipment provided by Mala;
4. Reimbursement for the costs of developing reproducible CARTs as envisioned in the 1997 PDA and LA;
5. Continuation of all licenses from Mala to Witten;
6. Rescission of all software licenses granted to Mala as payments;
7. Return of all intellectual property and patents conveyed to Mala as a result of the PDA and LA;
8. Payment of all costs associated with the patenting of technology that arose during or as a result of LA that are jointly used by both parties;
9. Attorney's fees associated with the disputes involved over the past year due to Mala's harassing behavior; and
10. Other relief the Arbitrator deems appropriate.

Witten reserves the right to amend this Response and Counter Claim as permitted in accordance with the Commercial Arbitration Rules (Including Procedures for Large, Complex Commercial Disputes) of the American Arbitration Association.

Very truly yours,

ERIN L. G. LEWIS

cc:    Kenneth A. Genoni, Esq. (via electronic mail and USPS)
       Andrea H. Bugbee, ICDR (via electronic mail and USPS)

16

1259

```
1                                           (8:00 a.m.)
2                      April 28, 2006
3            THE ARBITRATOR:  Before we start our
4   questions, I need some help on a couple of issues
5   since this might be our last day, and I hope it is,
6   our last day of testimony.  I want to tell you what
7   I need help with so if you need to present more
8   testimony on it today you can focus on that.
9            There are two issues.  One is the
10  manufacturing rights.  Witten has given its
11  reasons, Mr. Kelly, why it thinks the license
12  agreement has granted exclusively manufacturing
13  rights for the hardware to Witten pursuant to the
14  license agreement together with the right to
15  sublicense others such as Hitachi to manufacture
16  the equipment for them.
17           I believe the other day when we discussed this
18  briefly, Mr. Kelly, you mentioned even if that were
19  the case, a later agreement trumps the license
20  agreement.  I think that was the word you used.  I
21  don't understand that yet, so I thought I would
22  alert you to that fact, so if you want to devote
```

1260

```
1   some time to that today, or you can rely on it in
2   your brief, that's fine, but I don't understand it.
3            I think you were referring to the exchange
4   agreement.
5            MR. KELLY:  Correct.
6            THE ARBITRATOR:  It wasn't clear to me
7   yesterday.  There was some indication that there
8   might have been still another agreement that gave
9   rights back to Mala, I don't know, but I'm just
10  telling you that I'm confused about it.
11           MR. KELLY:  Let me make a point on that
12  initially.  If you terminate the license agreement,
13  Section 1 goes away.
14           THE ARBITRATOR:  I understand that.  The
15  other issue is the GLUE patent and whether or not I
16  have power or authority to decide whether or not
17  the GLUE patent should have been assigned from
18  Witten to Mala.
19           The license agreement says that patents
20  covering improvements to hardware, to Mala's
21  hardware, will be owned by Mala subject, of course,
22  to the license agreement.
```

1261

```
1            The exchange and settlement agreement, as best
2   as I can tell, does not specifically identify the
3   GLUE patent.  It seems to me that the issue of
4   whether or not the assignment should have been made
5   is whether or not the GLUE patent is an improvement
6   to Mala's hardware as specified in the license
7   agreement.
8            That leads me to believe that the issue is
9   related to the license agreement and it may also be
10  related to the exchange agreement which may give me
```

11    *power to decide the issue.*

12    You haven't said it exactly in that way yet,
13    Ms. Lewis, but I think that that's maybe what you
14    hand mind when you said that you thought I did have
15    the power.

16    *If I do have the power to decide that issue,*
17    *what I need is more information about the GLUE*
18    *patent and the timing patent.  First, I need copies*
19    *of those patents and then I need enough information*
20    *to decide whether or not the GLUE patent is an*
21    *improvement to Mala's hardware, that is covers an*
22    *improvement to Mala's hardware.*

1262

1    *Those are issues that seem to me at this point*
2    *to be open and I need help with that, so to the*
3    *extent you can deal with that today, I would*
4    *appreciate it.*

5    MR. KELLY:  Let me just tell you.  You
6    have the GLUE patent and you have the timing
7    circuit patent.

8    THE ARBITRATOR:  What are the exhibit
9    numbers?  That's all right.  You don't have to tell
10    me now.

11    MR. KELLY:  I will give it to you at the
12    break.  Mr. Johansson will be here to testify about
13    both patents.  I think he's probably the only one
14    to testify, out of all the witnesses, qualified to
15    testify about the guts of a patent, but then how do
16    I know.

17    Also the patent lawyer will be here to
18    testify, our IP counsel, who will be here to
19    testify.

20    THE ARBITRATOR:  I thought that was about
21    the GSSI patent.

22    MR. KELLY:  He will testify about the

1263

1    GSSI patent, but he will testify about some other
2    things, and Sara can explain the circumstances, but
3    the fact of the matter is when you made your
4    interpretation ruling they had not even introduced
5    into this case their basic theories about stealing
6    patents, that the patent assignment stole their
7    patent, none of that.  Now, I was not involved in
8    those rulings, though, Ken, so I am hard pressed to
9    comment on them.

10    THE ARBITRATOR:  Let me make one more
11    comment.  Was it Exhibit 14, is that the patent
12    assignment, well, it doesn't matter, but in any
13    event, and again this is troubling to me, but in
14    the patent assignment, the GLUE patent is not
15    specifically identified and it is not picked up
16    because of the word "patents."

17    It is picked up, I believe, from what I
18    gathered yesterday, it is picked up in the language
19    of the license agreement because it's a
20    continuation in part of the timing patent.

21    Now, it was clear to me yesterday that

22      Mr. Clifford had no idea what a "continuation in
1264
1      part" was, and Mr. Kelly, just to alert you to this
2      issue, I found it troubling that the GLUE patent
3      was not specifically identified and that reliance
4      was made on that continuation.
5            MR. KELLY:  That's why we are bringing in
6      the lawyer who wrote this.
7            THE ARBITRATOR:  That's fine.  I just
8      wanted to make sure you knew that this was still an
9      issue to me and you have the opportunity today to
10     talk about that.
11           MS. LEWIS:  My only concern is that Mr.
12     Linder's testimony was limited to whether the
13     timing circuit patent infringed upon GSSI's patent.
14           I had set forth in our response to their
15     initial demand the concern of these patents.  We
16     address them and prior to them and all the
17     testimony had been limited.
18           MR. KELLY:  This is really unfair.  I
19     didn't argue this.  I don't understand anything
20     about the history.  This discussion ought to await
21     Sara's arrival.  This is just completely unfair.  I
22     am happy to have the discussion, but it should be
1265
1      with the people who know the history.
2            THE ARBITRATOR:  We will do it later.
3      That's fine.
4           MR. KELLY:  Your questions are well taken
5      and I am happy to address them, but the notion that
6      we should now talk about the scope of Walt Linder's
7      testimony when I was not a participant in those
8      earlier proceedings, is ---
9           THE ARBITRATOR:  I agree with that and if
10     somehow there wasn't, I can always give you the
11     opportunity to call someone at a later time if that
12     becomes unfair.
13           MS. LEWIS:  We can talk about it.
14           THE ARBITRATOR:  I just wanted both of
15     you to know about two of the issues that I am
16     confused about.
17           MS. LEWIS:  This changes a little bit my
18     approach with Robert because he does have some of
19     the history.  I would need to identify a few
20     documents to explore with him which I had not
21     intended to do.
22           THE ARBITRATOR:  Before you finish today
1266
1      with him you can take a break and find those
2      documents and then you can finish.  I am sorry I
3      have taken your time.
4           MR. KELLY:  No, we need to know that.  It
5      is very important.
6           THE ARBITRATOR:  Yes, I think it is
7      significant too.  Did you have anything else, Mr.
8      Kelly, before we continue?
9           MR. KELLY:  No.

```
10              DIRECT EXAMINATION (cont'd)
11        BY MS. LEWIS:
12             Q    Mr. Green, if you would look in the
```

**[Emphasis added]**