

# International Centre for Dispute Resolution

# FAX

*Thomas M. Ventrone, Esq.*
*Vice President*
*International Centre for Dispute Resolution*
1633 Broadway, New York, NY 10019-6708
telephone 212 484 3299, facsimile 212 246 7274

| | | | |
|---|---|---|---|
| DATE | July 10, 2006 | | |
| TO | Timothy D. Kelly, Esq. | FAX NUMBER | 1-612-349-6416 |
| | Sarah E. Bushnell, Esq. | | |
| | Erin L. G. Lewis, Esq. | | 1-478-474-8688 |
| | Kenneth A. Genoni, Esq. | | 1-202-508-4650 |

FROM        Andrea H. Bugbee
            ICDR Senior Case Manager

NUMBER OF PAGES   20   Mr. Kelly and Ms. Bushnell w/Respective Financial History
                  20   Ms. Lewis w/Respective Financial History
                   3   Mr. Genoni w/o Encl.

RE          *50 199 T 00261 05*
            *Mala Geoscience AB*
            *vs*
            *Witten Technologies, Inc.*

CC

MESSAGE     Dear Counsel and Mr. Genoni:

            Please see the attached. Thank you.

            Kind Regards,

            Andrea

Civil Action No: 1:06-cv-01343(RMC)

Respondent WTI Exhibit to Petition to

Confirm: **A**

Arb. Ex. No:

THIS FAX TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE PERSON TO
WHOM IT IS ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS CONFIDENTIAL,
PRIVILEGED OR OTHERWISE EXEMPT FROM DISCLOSURE. IF YOU ARE NOT THE
INTENDED RECIPIENT OR THE PERSON AUTHORIZED TO DELIVER THIS FAX TO THE
INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OF
THIS FAX IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE
NOTIFY US IMMEDIATELY BY TELEPHONE (COLLECT) AND RETURN THE ORIGINAL
FAX TO US BY FIRST CLASS MAIL AT THE ABOVE ADDRESS.



**International Centre
for Dispute Resolution**

Thomas Ventrone
Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

July 10, 2006

## VIA FACSIMILE AND UPS OVERNIGHT EXPRESS

Timothy D. Kelly, Esq.
Sarah E. Bushnell, Esq.
Kelly & Berens, P.A.
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Erin L. G. Lewis, Esq.
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, GA 31204

Bree O. Sullivan, Esq.
Bree O. Sullivan, LLC
109 Hampton Court
Thomasville, GA 31792

Re: 50 199 T 00261 05
    Mala Geoscience AB
    vs
    Witten Technologies, Inc.

Dear Counsel:

By direction of the Arbitrator we herewith transmit to you the duly executed Final Award in the above matter. The hard copy of said Award will follow shortly. This serves as a reminder that there is to be no direct communication with the Arbitrator. All communication shall be directed to the Association.

At this time we have verified with the Arbitrator that he has submitted all requests for compensation and expenses in this matter. Accordingly, we have conducted a final reconciliation of the finances and are providing each party with a Financial History and Compensation Summary. If a party had any unused compensation deposits, we have issued a refund check that should arrive in the mail shortly. If a party has an outstanding balance, that party will continue to receive cyclical invoices until the balance is paid.

Note that the financial reconciliation reflects costs as they were incurred during the course of the proceeding. Any apportionment of these costs by the arbitrator, per section R-43 of the Commercial Arbitration Rules, will be addressed in the award and will be stated as one party's obligation to reimburse the other party for costs incurred. Any outstanding balances the parties may have with the AAA for the costs incurred during the arbitration proceedings remain due and payable to the AAA even after the final award is issued, and regardless of the arbitrator's apportionment of these costs between the parties in the award.

*A Division of the American Arbitration Association*

Please be reminded the Accelerated Exchange Program is terminated. All communications shall be directed to the Association.

Please make arrangements to pick up your exhibits immediately; one business day's notice is appreciated to arrange for the pick up. We will dispose of any exhibits still in our possession ten (10) days from the date of this letter.

Thank you for using the services of the International Centre for Dispute Resolution, a worldwide leader in dispute resolution.

Sincerely,

Andrea H. Bugbee
Senior International Case Manager
(212) 484-3299
BugbeeA@adr.org

**Via Facsimile Only w/o Encl.**
cc: Kenneth A. Genoni, Esq.

Encl.

# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

--------------------------------------------------------x

In the Matter of the Arbitration Between

MALA GEOSCIENCE, AB

Case No. 50 199 T 00261 05

      Claimant and Counterclaim Respondent,

and

**RECEIVED**

JUL 10 2006

INTERNATIONAL CENTER

WITTEN TECHNOLOGIES, INC.

      Respondent and Counterclaim Claimant

--------------------------------------------------------x

## AWARD OF ARBITRATOR

    I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above named Parties, and dated September 19, 1997, and having been duly sworn and having duly heard the proofs and allegations of the Parties do hereby FIND and AWARD as follows:

    1.    Mala Geoscience, AB ("Mala") seeks recission and/or termination of the License Agreement dated September 19, 1997 between Mala and Witten Technologies, Inc. ("WTI"). In the Demand and supplemental Demands, Mala alleged that there had been fraud in the inducement of the License Agreement and that WTI had materially breached the agreement by failing to use its best efforts to promote the sales of the Product in the Territory, by failing to create and maintain an efficient sales organization for the Product, and by failing to pay royalties in a timely manner. Mala also alleged that it had a right to terminate pursuant to Section 11 of the License Agreement because WTI was insolvent. During the hearing, counsel for Mala stated that Mala was no longer accusing WTI of fraud in the inducement.

    2.    In accordance with Section 17 of the License Agreement, Mala initiated arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration

Association. The Association's Procedures for Large Complex Disputes apply to this Arbitration.

3.    Mala is also seeking an award of attorney's fees and costs. Section 17(d) of the License Agreement provides that the "arbitrator shall have the discretion to award costs and/or attorney's fees as he deems appropriate under the circumstances".

4.    In its Response and Supplemental Response to Mala's Demand and Supplemental Demands, WTI denied the substantive allegations of Mala's Demands and asserted a Counterclaim based on an allegation of fraud in the inducement by failing to reveal a patent license from GSSI to manufacture the radar array and Mala's lack of authority to sublicense WTI under the patent; and, WTI alleged material breach of the License Agreement based on Mala's (a) failure to deliver commercially viable CARTS, (b) breach of the intellectual property section of the License Agreement and (c) Mala's refusal to provide WTI with the documentation and instruction required to enable WTI to manufacture and repair the radar array in accordance with WTI's exclusive license to manufacture the array.

5.    The relief sought by WTI included (a) damages, (b) an order requiring Mala to provide WTI with documentation and instruction required to enable WTI to manufacture and repair Mala's Radar Array, (c) rescission of all software licenses granted to Mala, (d) assignment to WTI of all intellectual property, particularly the "Glue Patent," conveyed to Mala under the License Agreement, (e) payment of all costs associated with patenting technology under the License Agreement, (f) attorney's fees and (g) costs.

6.    At a preliminary hearing, the parties agreed to exchange documents and to take a limited number of depositions. Mala deposed Robert Green, Mike Oristaglio, Tuna Uluaydin, Dennis Johnson, Ray Barbee, Jeff Cummings, Vince Shea, and Brian Hurse. WTI deposed

Tommy Leijon, Jan Rynning, Bernth Johnson, Walter Linder, Michael Oristaglio, Tuna Uluaydin and Dennis Johnson.

7.    Section 17(a) of the License Agreement provides that the Arbitration shall be conducted in Washington, D.C. Hearings were conducted for five full days on September 24 through September 28, 2006 at the American Arbitration Association offices in Washington, D.C. At the completion of the fifth day of hearings, each party acknowledged that it had no further proofs to offer or witnesses to be heard. A stenographic record was made of the hearings.

8.    It was ordered that each party file and serve a post-hearing brief by May 26 and a reply brief by June 9. The briefs were filed and served and basis for an award of attorney's fees was submitted with each party's reply brief. Closing arguments were heard by telephone conference on June 15.

9.    The hearing was closed on June 15.

10.    In accordance with Rule 42, the Arbitrator has determined that a reasoned Award, without findings of fact and conclusion of law, is appropriate.

11.    (a)    Mala has not proved that WTI breached the License Agreement by failing to "create and maintain an efficient sales organization for the Product" as required by Section 2 of the License Agreement. Mala argues that WTI's sales organization was too small and that WTI's failure to achieve its sales projections demonstrates the inadequacy of the sales organization. WTI's sales organization was small but not inefficient. WTI used its best efforts to promote sales of the product as shown by testimony about the marketing and sales materials and many awards for the WTI software documented in Exhibit 418. Thus, for example, WTI received the Wall Street Journal 2004 technology innovation award. In addition, WTI's sales efforts were supplemented by agreements with Slumberger and Dycom (U.S.).

3

(b)    I find that Mala's failure to perform its obligations under the License Agreement is a major reason why WTI has not been more successful in selling or leasing the product. Mala failed to provide a commercially viable CART and refused to give WTI the information and instruction needed to manufacture and repair the CART radar array. There were technical malfunctions of the CARTs supplied by Mala and Mala was unwilling to improve the CART to eliminate the malfunctions. (See, for example, Exhibits 383, 384, 411 and 416(c)). Mala failed to obtain FCC Waivers for the 200 MHz CART for operation in the United States. Anthony Clifford testified that he had a very difficult time getting support from Mala. He said that Mala acted as though it was much more interested in breaking the relationship with WTI than in performing its duties under the License Agreement. (See transcript beginning at page 843). His testimony was very persuasive.

(c)    There is some evidence that suggests that Mala's failure to support WTI was motivated by a desire to drive WTI into bankruptcy. In Exhibit 331, which is a letter from Mr. Rynning to the Mala Board dated September 11, 2001, Mr. Rynning discusses four alternatives to improving the situation. One of the alternatives was to be "passive" in the relationship by failing to support WTI. He states in item 3 that passivity could contribute to WTI's bankruptcy. The letter points out, however, that Mala could not function without WTI's software and Mala would not have access to WTI's software if WTI went into bankruptcy. This problem was later solved for Mala by the execution of an Exchange and Settlement Agreement ("ESA") with WTI. This Agreement required WTI to deposit it's source code into escrow and gave Mala the right to use the software in the event of WTI's bankruptcy. The letter to the Mala Board, Ex. 331, also said that a Witten bankruptcy might tie up the Witten patents and they would not be available to Mala. The ESA provided Mala with a partial solution to this problem.

4

Mala misused the ESA to acquire ownership of the Witten Glue Patent. There was much testimony by Robert Green and Anthony Clifford that, even after the ESA was signed, Mala was difficult to deal with and failed to support WTI. Although relief for Mala's breach of the ESA cannot be given in this arbitration, it is important to note that Mala refused to perform its obligations under the ESA: it refused to return a $500,000 note to WTI marked "paid in full"; it refused to execute software license agreements required by the ESA; and it refused to put manufacturing blueprints into escrow as required by the ESA. Mala's actions demonstrate its lack of good faith in dealing with WTI.

12.     Mala has failed to prove that WTI is insolvent. Section 11 of the License Agreement gives each party the right to terminate if the other party becomes insolvent. Mala relies on a New York statute that provides that a corporation is insolvent when its liabilities exceed the fair market value of its assets. WTI argues that the common law test for insolvency, which is "the ability to meet obligations as they mature in the ordinary course of business," should be applied in the case. It does not matter which test is applied. Mala has not proved that WTI is insolvent under either test. Mr. Shea testified that WTI's net present value was $155 million, which greatly exceeds its liabilities of less than $5 million. This evaluation may be excessive, but it is clear from the awards WTI received and WTI's ability to continue to raise money from investors that WTI's intellectual property is recognized as being very valuable. It is also clear from Ex. 331 (paragraph 1) and Mala's extreme and wrongful actions taken to acquire ownership of the Glue Patent that Mala recognized that the Witten intellectual property was very valuable. (See paragraph 15 of this Award.) WTI has been able to meet obligations as they mature in the ordinary course of business. WTI was a little late from time to time but it has always paid or settled the matter.

5

13.    I find that WTI's occasional late payment of royalties was not a material breach of the License Agreement. Mala's failure to perform contributed to WTI's inability to make timely payments.

14.    (a)    Section 1 of the License Agreement grants WTI the "right and license to sell, use, lease and assemble." In Section 1a, the license is exclusive with respect to the detection of utilities and, according to Section 1b., nonexclusive for all other applications. This grant includes the right and license under Mala's "patent or other intellectual property right" to manufacture the product (the CART). Mala argues that "assemble" does not include manufacturing, but the License Agreement uses the terms interchangeably. The accounting provision, Section 5, requires WTI to report about its "manufacture, use, lease and sale" of the Product or other products and Section 9 refers to the indemnity to licensor resulting from the "use, manufacture, sale or lease" of the technology. Neither of there provisions refers to "assembly." Thus, it is clear that the License Agreement contemplated having WTI manufacture the CART. It is also clear that Mala had agreed to make available its know-how to be used to manufacture the Product. The fifth whereas clause states that "Know-how shall mean knowledge, experience, data, technology, designs, techniques, drawings, software, and other information ..." The last whereas clause provides that "Licensor agrees to allow Licensee use of its Know-how."

(b)    Even if I were to find that the License Agreement was ambiguous, which I do not, the parol evidence clearly establishes an intent to include manufacturing rights in the grant. This evidence was developed very well in the testimony of Shane Green. Thus, for example, in a letter, Ex. 11, from Jan Rynning dated August 27, 1997, Mr. Rynning states in paragraph 3, that Mala will grant WTI the right to manufacture, sell, lease and use the product.

6

The Prototype Development Agreement and License Agreement were signed a few weeks later on September 19, 1999.

    (c)    Mala argues that the ESA curtails those rights in the circumstances identified in paragraph 3.2 of the ESA and that the ESA would be meaningless if WTI had an independent right to manufacture the CART radar equipment and also the right to demand from Mala the know-how, including blueprints, necessary to do that. Mala also argues that the dispute over manufacturing rights is governed by the ESA, which requires arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce. I do not agree with Mala's arguments. The ESA does not terminate the License Agreement or attempt to limit WTI's license under a Mala "patent or other intellectual property right" to manufacture the CART product using Mala's technology and know-how that has already been made available to WTI, which includes, for example, the technology disclosed in Mala's patents, such as the Timing Circuit patent. At most, the ESA defers or modifies Mala's duty to make available blueprints to WTI. WTI has withdrawn its demand for additional know-how, including blueprints, from Mala. WTI stated in the post hearing briefs that it would obtain such additional know-how from a third party. At closing arguments, WTI's counsel confirmed that WTI was no longer asking for additional manufacturing know-how from Mala. Therefore, I do not need to decide whether the ESA has deferred or eliminated Mala's duty to provide additional manufacturing know-how to WTI. Accordingly, I find that the dispute over manufacturing rights arises in connection with the License Agreement, not the ESA, and is within the scope of the arbitration clause set forth in the License Agreement. I also find that the license to "sell, use, lease, and assemble" includes the right to manufacture the CART radar array.

7

(d)    In post hearing briefs WTI asked for $710,000 in damages. WTI has purchased additional manufacturing know-how from a third party because Mala refused to make additional manufacturing know-how available to WTI. The claim for damages is denied because Mala did not have an opportunity for discovery or cross-examination for this damage claim.

15.    (a)    Mala argues that the Glue Patent claim was never pled by WTI and that the assignment of the Glue Patent is outside the scope of this arbitration. I disagree. Mala had notice of the claim as set forth on pages 7 and 8 of WTI's Brief in Reply to Mala's Post-Hearing Brief. In addition, it should be noted that Mala was prepared and had the opportunity to address this issue at the hearing. Bernth Johnson and Walter Linder both testified about this issue on Mala's behalf. Also, as further evidence that Mala had notice of the claim, it should be noted that on April 25, the second day of the hearing, Mala submitted a Proposed Award; paragraph 4 dealt with the Glue Patent issue. (See footnote 4 of Mala's Post Hearing Brief).

(b)    Mala did not have the right to an assignment of Witten's Glue Patent. (Ex. 86). Article 6.02 of the Prototype Development Agreement provides that each party will own the intellectual property which it develops except that Mala will have sole ownership of any intellectual property rights to "improvements to its hardware resulting from the parties development efforts, subject only to Witten's license rights under this agreement." This concept is also in the License Agreement. In the fourth whereas clause, it is provided that intellectual property developed under the License Agreement shall be exclusively owned by the developing party except that "Mala will have sole ownership of any improvements to its hardware resulting from the parties development efforts." Dr. Witten is the sole inventor of the Glue Patent, which is US patent 6,700,526, issued March 2, 2004.

8

In accordance with the ESA, Witten agreed to assign the patent resulting from United States patent application serial number 09/658,188, which was filed in the names of Johanssen, Witten and Deveny. This is referred to as the "Timing Circuit" patent and it is undisputed that this patent was directed to an improvement to Mala's hardware. No mention of the Glue Patent is made in the ESA. Mala had the right to the Timing Circuit patent under the License Agreement and the ESA.

(c)    Counsel for Mala argues that I do not have jurisdiction over this issue because the Patent Assignment was drafted in accordance with the ESA and the ESA, paragraph 5, provides that any dispute or controversy arising out of or in connection with this agreement or in the breach, termination or invalidity thereof shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce. The Patent Assignment is silent on the issue of arbitration jurisdiction. There is no dispute which would require me to investigate or analyze the breach, termination or invalidity of the ESA, and there is no dispute over Mala's right to an assignment of the Timing Circuit patent, the only patent identified in the ESA. There is, however, a dispute over whether or not Mala had the right to record the Patent Assignment, which specifically identifies only the Timing Circuit patent, to obtain ownership of the Glue Patent. It is necessary to go to the License Agreement to get the answer. Therefore, the dispute arises under the License Agreement, not the ESA, and Section 17 of the License Agreement gives jurisdiction to the Arbitrator to resolve the dispute.

(d)    In addition, I disagree with Mala's assertion that the "Patent Assignment undeniably arises only out of the ESA." The Patent Assignment, which was drafted by Mala, refers only to the ESA, not the License Agreement. But basis for the assignment of foreign counterparts and continuation-in-part applications can only be found in the License Agreement.

It is clear from the License Agreement that Mala has the right to an assignment of foreign counterparts of the U.S. Timing Circuit patent because they are directed to an improvement to Mala's hardware. The Glue Patent is a different matter. The Patent Assignment refers to the United States "Timing Circuit" patent application specifically identified in the ESA. In addition, the Patent Assignment provided that all "continuations-in-part" of the Timing Circuit patent application and foreign counterparts thereof also be assigned. Continuations-in-part applications are not mentioned in the ESA. Only the United States Timing Circuit patent, not the foreign, is mentioned in the ESA. No mention of the Glue Patent is made in the Patent Assignment or the ESA. I agree with Mala's contention that the agreement in the ESA to assign the U.S. Timing Circuit application to Mala included the right to an assignment of the United States continuation applications because, as asserted by Mala, a continuation only "discloses identical subject matter." In contrast, a continuation-in-part application contains new matter that may be directed to a different invention than the one disclosed in the parent application. Therefore it is clear that Mala must look to the License Agreement for a basis to include continuation-in-part applications in the Patent Assignment. The License Agreement provides that Mala shall own all applications, including continuation-in-part applications, that are directed to improvements to Mala's hardware.

(e) It is clear from the License Agreement that WTI would have a duty to assign a continuation-in-part application, or any other patent application, only if the application was directed to an improvement to Mala's hardware. It turned out that the Glue Patent is a "continuation-in-part" of the Timing Circuit patent application, but the Glue Patent is not directed to an improvement to Mala's hardware. Nevertheless, without notifying Witten, Mala used the Patent Assignment (Ex. 14) to record the assignment of the Glue Patent to Mala in the

10

United States Patent Office. Interpreting "continuation-in-part" to include applications not directed to an improvement to Mala's hardware was a violation of the License Agreement.

(f)    Anthony Clifford, who signed the Patent Assignment for WTI, testified that he had no idea what a continuation-in-part application was, much less was he aware of the fact that the Glue Patent application was designated a continuation-in-part of the Timing Circuit patent application. There is nothing in the Patent Assignment that would alert him to the fact that it was written sufficiently broad to cover the Glue Patent. I found Mr. Clifford to be a very credible witness.

(g)    Anthony Clifford also testified that Mala's actions were despicable. He accused Mala of stealing the Glue Patent with slight of hand in drafting and using the Patent Assignment. He also testified that the Glue Patent had nothing to do with an improvement to Mala's hardware. (Tr. 842.) Robert Green also testified to this fact. Robert Green testified that the invention claimed in the Glue Patent relates to the control of generic hardware and does not depend in any way on an improvement to Mala's hardware. Mr. Johanssen, who testified on behalf of Mala, said that the Glue Patent was important for the use of the Mala hardware, but he admitted that the patent was not directed to an improvement of Mala's hardware. (Tr. 1470/2 to 1472/16.) This testimony is consistent with my reading of the Glue Patent.

(h)    I also find that Mala acquired the Glue Patent using intentionally deceptive acts. Mala had made an earlier attempt to acquire rights to the Glue Patent. Prior to the ESA, Mala argued that Dr. Witten was not the sole inventor and that Mala inventors should be added. WTI did not agree that the evidence of joint inventorship was sufficient and the United States Patent Office agreed with WTI. After the ESA was signed, Mala drafted a Patent Assignment that specifically mentioned only the Timing Circuit patent. There is no evidence

11

that the Glue Patent was discussed at this time, but if WTI had agreed to assign the Glue Patent, Mala should have (and would have) specifically identified it in the Patent Assignment rather then rely on the "continuation-in-part" language to hide Mala's real intent from WTI. This finding is not required for my holding that Mala breached the License Agreement by taking ownership of the Glue Patent. It is, however, further evidence of Mala's bad faith dealing with WTI. (See paragraph 11 above).

      (i)    On June 9, 2006, counsel for the parties informed me that Mala's patent counsel discovered that on April 25, 2006 the Patent Office issued a new patent that is a continuation of the Glue Patent. The Glue II patent is U.S. 7,034,740. Counsel asked for an additional page for the reply brief so that each party could present its position regarding Glue II. In a letter dated June 14, 2006, Counsel for Mala informed me that the Patent Assignment, Ex. 14, had been recorded against the Glue II patent application in November 2004 giving Mala ownership of the Glue II patent. Under cover of a letter dated June 16, 2006, Counsel for Mala provided a proposed license agreement that would grant WTI a nonexclusive license under both of the Glue Patents in the event that I terminate the License Agreement. WTI agrees that I should decide what should be done with the Glue II patent, but WTI asks that it be assigned to WTI because, like the Glue I patent, it is not directed to an improvement to Mala's hardware. In an email dated June 20, 2006, I asked Counsel for Mala if there are any other U.S. and foreign patents claiming priority to the U.S. application that issued as the Glue Patents as was suggested in Mala's proposed Glue Patents License agreement. I also asked if they had been assigned to Mala. Counsel for Mala informed me on June 22, 2006 that Mala is aware of one foreign application that claims priority to the application that issued as the Glue I patent. It is PCT application PCT/US02/08274, filed April 22, 2002, and that corresponding regional or national

applications have been filed by WTI in Australia, China, Europe and Japan. Mala had not yet recorded the Patent Assignment to record ownership of these applications, but it intends to do so. It should not do so.

          (j)     I find that Mala should be ordered to transfer all of its right, title and interest to the Glue I patent, U.S. 6,700,526, to WTI. The Glue II patent, U.S. 7,034,5740, must also be assigned to WTI. The Glue II patent is a continuation of the patent application that issued as the Glue I patent, which by definition means that the specification or disclosure of the Glue II patent is essentially identical to the specification of the Glue I patent and therefore can not contain new matter that is directed to an improvement to Mala's hardware. Mala must also assign to WTI all of its right, title and interest to foreign patents and applications claiming priority to the patent applications that issued as the Glue I and Glue II patents. The obligation to assign rights to foreign counterparts shall also be limited to those foreign counterparts that have a specification that is essentially identical to that of the Glue Patents. The obligation does not apply to any foreign counterpart, if any, containing new matter directed to an improvement to Mala's hardware. There has been no suggestion by either party that Witten has added any such new matter to any foreign or United States application.

      16.    WTI has not proved that Mala made any material representation or omission to WTI about the GSSI patent that was false or misleading when the parties negotiated the License Agreement in 1997 or the ESA in 2002. Mala did not learn about the GSSI patent until three years after the License Agreement was signed. Mala introduced expert testimony that Mala's GPR multi-channel survey systems that use multiple transmitters do not infringe the GSSI patent. Mala also introduced other evidence indicating that Mala took a license for nuisance value. The

testimony was not rebutted. WTI has therefore not established that Mala's failure to disclose the potential infringement problem to WTI in the ESA negotiations was a material omission.

17.    WTI has not proved damages for Mala's failure to apply for an FCC waiver or Mala's failure to design and maintain the CART. The amounts of the damage claims are speculative and therefore damages are not recoverable.

18.    The counterclaim based upon Mala's failure to pay one-half of the patent application costs is denied because the evidence to support the amount of damages was not identified during discovery or introduced at the hearing. Mala had no opportunity for discovery or cross-examination.

19.    WTI has not proved any compensatory damages and Section 17(d) of the License Agreement prohibits an award of punitive damages.

20.    WTI has asked that the software licenses granted pursuant to the ESA be returned to WTI. This claim arises only under the ESA. The License Agreement has not been violated. Therefore, I have no jurisdiction over this claim.

21.    Section 17(d) of the License Agreement gives the Arbitrator "discretion to award costs and/or attorney's fees as he deems appropriate under the circumstances." Both parties have asked for attorney's fees and filed and served support for these fees at the same time the final Reply Briefs were filed and served. Counsel for each party had the opportunity at the closing arguments on June 15 to object to any item included in the other party's supporting materials. Based upon the above findings, I have decided to award attorneys fees and expenses (R-43 and R-50) to WTI. The attorney's fees and expenses claimed by WTI total $520,040.04. This includes $37,465 for AAA fees and arbitrator compensation which shall be awarded separately. Counsel for Mala objected to including $327,256 in the award. This was compensation to Ms.

Lewis in the form of stock options. I do not agree with counsel for Mala. This item is explained and justified on page 21 of the WTI Reply Brief. I have however reduced the amount by 20% ($65,451) to account for time Ms. Lewis may have spent on other matters. In summary, I have subtracted $65,451 and $37,465 from WTI's claimed fees and expenses and I have rounded the award for attorney's fees and expenses to $420,000. I also find that, in accordance with R-43(c), all the administrative fees and arbitrator compensation shall be borne by Mala as set forth in paragraph 4 below.

Accordingly, I AWARD AS FOLLOWS:

1.  The License Agreement shall remain in full force and effect. The "right and license to sell, use, lease and assemble" in Sections 1a. and b. of the License Agreement includes, and has always included, the right and license to manufacture.

2.  Mala shall, prior to August 15, 2006, assign to WTI all of Mala's right, title and interest to:

    (a)  U.S. Patents 6,700,526 and 7,034,740 and all United States continuation applications that claim priority to the U.S. patent applications that issued as U.S. Patents 6,700,526 and 7,034,740; and

    (b)  all foreign patents and applications claiming priority to the U.S. patent applications that issued as U.S. patents 6,700,526 and 7,034,740, provided the specification of the foreign patent or application is essentially identical to the specification of U.S. Patent 6,700,526 and 7,034,740.

3.  Mala shall, prior to August 15, 2006, pay to WTI $420,000 for attorney's fees and expenses.

4.  The administrative fees of the International Centre for Dispute Resolution totaling $17,250.00 and the compensation and expenses of the Arbitrator totaling $49,199.60 shall be borne entirely by Mala. Therefore, Mala shall, prior to August 15, 2006, also pay to WTI the sum of $36,599.80 which represents the portion of administrative fees and arbitrator compensation and expenses that had previously been paid by WTI.

5.  This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are herby denied.

15

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Washington, D.C.

_July 10, 2006_
Date

_Kenneth A. Genoni_

District of Columbia            )
                               )    SS:
                               )

I, Kenneth A. Genoni, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_July 10, 2006_
Date

_Kenneth A. Genoni_

WITNESS, My hand and official seal, this the _10th_ day of _July_ 2006.

NOTARY PUBLIC
Debra B. Cundauck

My Commission Expires: _7/31/07_



## WITTEN TECHNOLOGIES, INC.

### Administrative Fees and Expenses:

| | | |
|---|---|---|
| Filing Fees: | $ | 8,000.00 |
| Case Service Fees: | $ | 3,250.00 |
| Hearing Room Expenses: | $ | 0.00 |
| AAA Hearing Room Rental: | $ | 750.00 |

| | | |
|---|---|---|
| Your Share of Administrative Fees and Expenses: | $ | 12,000.00 |
| Amounts Paid for Administrative Fees and Expenses: | $ | 9,750.00 |
| Balance Administrative Fees and Expenses: | $ | 2,250.00 |

### Neutral Compensation and Expenses:

| | | |
|---|---|---|
| Kenneth A. Genoni, Esq.: | $ | 49,199.60 |
| Your Share of Neutral Compensation and Expenses: | $ | 24,599.80 |
| Amounts Paid for Neutral Compensation and Expenses: | $ | 24,840.00 |
| Balance Neutral Compensation and Expenses: | $ | (240.20) |

| | | |
|---|---|---|
| Party Balance: | $ | **2,009.80** |

Case 1:06-cv-01343-RMC    Document 13-2    Filed 09/05/2006    Page 21 of 33

p.7

*Execution Copy*

# EXCHANGE AND SETTLEMENT AGREEMENT

This agreement has been made on the date set out below between Malå Geoscience AB, a company incorporated under the laws of Sweden (hereinafter referred to as Malå), and Witten Technologies, Inc. a company incorporated under the laws of Florida (hereinafter referred to as WITTEN).

## WITNESSETH

WHEREAS, the parties during a period of years have been working together in the development of a prototype of a device for the detection of utility services, now called the CART Imaging System ("CART"); and

WHEREAS, Malå and WITTEN made and entered into a Prototype Development Agreement (the "PDA") and a License Agreement (the "LA") both dated as of September 9, 1997; and

WHEREAS, certain obligations of Malå under the PDA have been fulfilled by the delivery to WITTEN of a CART; and

WHEREAS, in consideration of the agreements contained herein and other good and valuable consideration, described in other documents executed concurrently herewith, the sufficiency of which is hereby mutually acknowledged,

NOW THEREFORE, the parties have agreed upon that by the fulfilling of this Agreement, the PDA will terminate and, except as hereinafter provided, neither party hereto hereafter shall have any other or further obligation to the other under the PDA. Notwithstanding the foregoing, article 6 and article 11 of the PDA shall survive such termination. The parties have also agreed upon that the LA shall commence on the Effective Date of October 1, 2002.

Civil Action No: 1:06-cv-01343(RMC)

Respondent WTI Exhibit to Petition to

Confirm: **B**

Arb. Ex. No: 7

WTI
01297

NOV. -01' 02 (FRI) 13:54    GENERAL ENGINEERING          TEL: 8432697397      P. 006
Case 1:06-cv-01343-RMC    Document 13-2    Filed 09/05/2006    Page 22 of 33

Nov 01 02 12:36p                                                              p. 8

1          Termination of the PDA

Upon the fulfillment by both parties of the following conditions, except as
otherwise set forth herein, the PDA shall terminate and be of no further force and
effect.

1.1        WITTEN's Obligations

WITTEN shall fulfill its obligations according to the PDA, as soon as is reasonably
possible, by the following:

a) Delivering to Malå three (3) used CART's, fully-owned by WITTEN, an estimated
value of 140 000 USD, along with a bill of sale marked "PAID IN FULL", and

b) Providing to Malå five (5) concurrent licenses for WITTEN's CART software, a value
of 400 000 USD, along with a bill of sale marked "PAID IN FULL";

c) Executing an assignment to Malå of WITTEN's rights to the patent, "Ground-
Penetrating Radar Array and Timing Circuit", by B JOHANSSON, A WITTEN, and A
DEVANEY, (US) Patent Application 09/658,188, filed 8 September 2001.

Two (2) of the licenses mentioned in (b) shall be intended for non-exclusive use in the
market for utility and non-utility services in North America. Malå shall have the right to
sublicense these two (2) licenses to General Engineering Laboratories, Inc., a corporation
with offices at 2040 Savage Road, Charleston, SC 29417. The other three (3) licenses
shall be intended for non-exclusive use in the market for non-utility services in Europe.
These three (3) licenses can be used outside of Europe if, in each specific case, the parties
hereto mutually agree.

1.2        Malå's Obligations

Malå shall, after receiving the above mentioned CARTs, software licenses and patent
assignment, deliver to WITTEN the Promissory Note, dated September 9, 1997, made by
WITTEN in favor of Malå, marked "PAID IN FULL". Malå hereby waives any claim for
accrued interest.

2

WTI
01298

NOV. -01' 02(FRI) 13:55    GENERAL ENGINEERING         TEL:8437697387       Page 23 of 33
Case 1:06-cv-01343-RMC    Document 13-2    Filed 09/05/2006    Page 23 of 33

Nov 01 02 12:37p

P.9

2        License Agreement

The parties have agreed that the LA shall commence on the effective date of October 1,
2002, implying that any job or royalty payment received or invoiced after this date shall
be in accordance with Section 3 of the LA with October 1, 2002 being the Commencing
Date (as such term is defined in the LA) for the purposes of such Section 3.

2.1        Other Agreements

WITTEN undertakes to deliver to Malå signed copies of all agreements with third parties,
i.e., sublicenses, connected to the LA.

3        Escrow

The parties undertake to, in addition to the LA, enter into a separate agreement
concerning the deposit into escrow of source code of WITTEN's CART software and
Malå's blueprints for the CART (the "Escrow"). The deposit shall be made with the
Stockholm Chamber of Commerce

The parties have agreed upon that the Escrow shall be construed in a way that secures the
following rights and obligations of the parties.

3.1        Deposit of Source code

WITTEN shall deposit with the Stockholm Chamber of Commerce a sealed package
containing a complete copy of the source code of WITTEN's CART software, along with
an overall description of the files, including descriptions of how the different modules
interact and instructions for compiling the code, in a machine-readable form ("Source
Code").

WITTEN shall be responsible for ensuring that the Source Code so presented shall
continually conform the latest version available of the Software licensed to any customer
that WITTEN shall have delivered the software to.

3

NOV. -01'02(FRI) 13:55    GENERAL ENGINEERING        TEL:8437697397        P. 008
Case 1:06-cv-01343-RMC    Document 13-2    Filed 09/05/2006    Page 24 of 33

Nov 01 02 12:37p

P. 10

(a) Malå shall be entitled to receive, use and further develop the Source Code if WITTEN
is declared bankrupt, or is subject of a voluntary or involuntary institution of bankruptcy
proceedings, which are not dismissed within forty-five (45) days following the institution
of such proceedings; or ceases doing business as a going concern. The right to the Source
Code according to this clause (a) shall be subject to a commercially reasonable licence fee
to be determined by good faith negotiations between the Parties. The licence fee shall be
paid during a maximum period of five years from the date on which Malå receives the
Source Code according to above.

(b) Malå shall also have a right to receive, use and further develop the Source Code, if
WITTEN fails to perform stipulated obligations to improve or update the Source Code.
Furthermore, in case Malå receives a right to the Source Code according to this clause
(b), WITTEN shall supply Malå with manpower with the knowledge and ability to assist
Malå in the use and further development of the Source Code. The work accomplished by
the manpower assigned by WITTEN to Malå according to this clause shall be performed
on a consultant basis and compensated on commercially reasonable terms.

### 3.2        Deposit of Blueprints concerning the CART

Malå shall deposit with the Stockholm Chamber of Commerce a sealed package
containing complete copies of the blueprints for manufacturing and assembling the
CART's radar components, including hardware, firmware, and operating software
("Blueprints").

Malå shall be responsible to lease CARTs to WITTEN and to keep a stock of antennas
and control units in Charleston, SC, for repair and replacement of leased CARTs in a
timely way.

(a) WITTEN shall be entitled to receive and use the Blueprints if Malå is declared
bankrupt, or is subject of a voluntary or involuntary institution of bankruptcy
proceedings, which are not dismissed within seventy five (75) days following the
institution of such proceedings; or ceases doing business as a going concern. The right to
the Blueprints according to this clause (a) shall be subject to a commercially reasonable

WTI
01300

NOV. -01' 02(FRI) 13:55    GENERAL ENGINEERING        TEL:8437607587    Case 1:06-cv-01343-RMC    Document 13-2    Filed 09/05/2008    Page 25 of 33

Nov 01 02 12:37p

p.11

licence fee to be determined by good faith negotiations between the Parties. The licence fee shall be paid during a maximum period of five years from the date on which WITTEN receives the blue prints according to above.

(b) WITTEN shall have a right to receive and use the Blueprints if Malå fails to perform stipulated obligations to lease CARTs to WITTEN. Furthermore, in case WITTEN shall receive a right to the Blueprints according to this clause (b), Malå shall supply WITTEN with manpower, consisting of two or three persons, with the knowledge and ability to assist WITTEN in the understanding and use of the Blueprints. The work accomplished by the manpower assigned by Malå to WITTEN according to this clause shall be performed on a consultant basis and compensated on commercially reasonable terms. Not withstanding the foregoing, WITTEN shall not have the right to receive and use the Blueprints if Malå's failure to perform arises because the FCC does not approve CART for use in the US market.

## 4        Applicable law

The Agreement shall be governed by, construed and enforced in accordance with the substantive laws of Sweden without regard to its principles of conflict of laws.

## 5        Arbitration

Any dispute, controversy or claim arising out of or in connection with this agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the SCC Institute).

The Rules for Expedited Arbitrations of the Arbitration Institute of the Stockholm Chamber of Commerce shall apply, unless the SCC Institute, taking into account the complexity of the case, the amount in dispute and other circumstances, determines, in its discretion, that the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce shall apply. In the latter case, the SCC Institute shall also decide whether the arbitral tribunal shall be composed of one or three arbitrators.

5

MILD

WTI
01301

The Arbitral Tribunal decides on the apportionment of the Arbitration Costs between the parties with regard to the outcome of the case and other circumstances.

/////////////////////////////////////LAST ARTICLE/////////////////////////////////////////

IN WITNESS WHEREOF,

MALÅ GEOSCIENCE AB and WITTEN TECHNOLOGIES, INC. have caused this Agreement to be executed and delivered by their duly authorized representatives, to be effective as of the Effective Date.

MALÅ GEOSCIENCE AB                    WITTEN TECHNOLOGIES, INC

A Swedish Corporation                 a Florida Corporation

Date: 31/10 2002                      Date: 31 October 2002

By: ..................                 By: ..................
Tommy Leijon, *President*             Michael Onstaglio, *President*

WTI
01302



# I C
# D R

International Centre for Dispute Resolution

## FAX

*Thomas M. Ventrone, Esq.*
*Vice President*
*International Centre for Dispute Resolution*
1633 Broadway, New York, NY 10019-6708
telephone 212 484 3299, facsimile 212 246 7274

| | | | |
|---|---|---|---|
| DATE | August 25, 2005 | | |
| To | Timothy D. Kelly, Esq. | FAX NUMBER | 1-612-349-6416 |
| | Erin L. G. Lewis, Esq. | | 1-476-474-8688 |
| | Kenneth A. Genoni, Esq. | | 1-202-508-4650 |

FROM    Andrea H. Bugbee
ICDR Case Manager

NUMBER OF PAGES    7    Mr. Kelly w/Respective Invoice
7    Ms. Lewis w/Respective Invoice
11    Mr. Genoni w/o Invoices

RE    *50 199 T 00261 05*
*Mala Geoscience AB*
*vs*
*Witten Technologies, Inc.*

CC

MESSAGE    Dear Counsel and Arbitrator Genoni:

Please see the attached formal notice of Mr. Genoni's appointment as Arbitrator in the above matter.
Thank you.

Best Regards,

Andrea

Civil Action No: 1:06-cv-01343(RMC)

Respondent WTI Exhibit to Petition to

Confirm: <u>C</u>

Arb. Ex. No:

THIS FAX TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE PERSON TO WHOM IT IS ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS CONFIDENTIAL, PRIVILEGED OR OTHERWISE EXEMPT FROM DISCLOSURE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE PERSON AUTHORIZED TO DELIVER THIS FAX TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OF THIS FAX IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (COLLECT) AND RETURN THE ORIGINAL FAX TO US BY FIRST CLASS MAIL AT THE ABOVE ADDRESS.



**International Centre**
**for Dispute Resolution**

Thomas Ventrone
Vice President

Steve Kim
Assistant Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

August 25, 2005

**VIA FACSIMILE ONLY**

Timothy D. Kelly, Esq.
Kelly & Berens, P.A.
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Erin L. Lewis, Esq.
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, GA 31204

Re: 50 199 T 00261 05
    Mala Geoscience AB
    vs
    Witten Technologies, Inc.


Dear Counsel:

We are writing this letter to inform the Parties that the ICDR has appointed Kenneth A. Genoni, Esq. to hear the above-captioned matter. Enclosed please find copies of the arbitrator's duly executed Compensation Arrangements. Please refer to the Notice of Compensation Arrangements for the specific rates of the Arbitrator. Per our rules, all arbitrators are neutrals, unless otherwise agreed by the parties in the situation of party appointed arbitrators

Compensation to the arbitrator represents an independent obligation of the parties, and it is understood that the AAA has no liability, direct or indirect, for such payment. Each party shall promptly deposit in advance with the ICDR such sums of money as required by the administrator to defray the costs of the neutrals' fees. Compensation incurred will be deducted from deposits on hand, if any. Upon request, checks are to be made payable to the American Arbitration Association and submitted to the case manager.

This letter will also serve to confirm that a Preparatory Conference will be scheduled shortly. The Parties and the Arbitrator are requested to advise of their conference call availability for the weeks beginning **September 12, 2005 and September 19, 2005** by close of business on September 2, 2005. We have attached a formal Notice of Preliminary Hearing and invoices for the same. These invoices reflect an estimated amount of eight (8) hours of Arbitrators' compensation, including study and Preparatory Conference time. Please process the invoices and remit payment to the ICDR by **September 9, 2005**. Failure to submit payment by said date may result in the Arbitrator suspending the hearing. Please note that you may receive duplicate invoices since invoices are also generated automatically every 30-days from our central accounting department.

*A Division of the American Arbitration Association*

This is a proposed agenda of the Preparatory Conference. Please note the following items are primarily for scheduling purposes and to structure the arbitration:

1.   Brief presentation by the Parties of claim and answer to disclose the complexity and magnitude of the matter;

2.   Discussion of the Parties' preparation of a stipulation of uncontested facts;

3.   Discussion regarding the need for the exchange of information and documents as well as further written statements and/or briefs;

4.   Discussion regarding the form of the award, including confirmation if a reasoned award is requested; and

5.   Discussion regarding any additional necessary items.

In certain cases the parties may also be in a position to discuss the following matters:

6.   Arrangements for the advance filing of exhibits.  The parties are encouraged to agree upon and submit a consolidated set of joint exhibits.  Each Party shall also exchange and submit one set of exhibits to the tribunal with a cover letter to the ICDR confirming exhibits sent to the Arbitrator, by on or before the date set by the Arbitrator;

7.   Discussion regarding the list of witnesses and the nature of their testimony;

8.   Discussion regarding the estimated length and scheduling of hearing;

9.   Discussion regarding the necessity of a court reporter and / or a language translator;

At the conclusion of the preliminary hearing, the Parties' representatives and the Case Manager will discuss the AAA's billing and deposit practices with regard to covering the arbitrator's anticipated fees and expenses for the entire proceeding.  These deposits are typically due thirty days prior to the evidentiary hearings, but this may vary depending on the schedule specific to this case.  We ask that the representatives discuss this with their clients prior to the conference so that any questions they may have can be addressed.

Please note that following the Preparatory Conference the Arbitrator will issue a procedural order with regard to scheduling, submission and all remaining issues.

Each party should be responsible for updating its disclosures as such information become available.  The duty to update this information continues up to and including the date of the hearing.

To ensure the efficient and speedy transmittal of communication between the parties and the Arbitrator, the Parties are requested to have all written communications sent via fax, by courier, or via e-mail if authorized by the Arbitrator directly to the Arbitrator, with one copy to the ICDR. Aside from the aforementioned written communications, there shall be no direct telephone or any other type or contact with the Arbitrator.  Please note that any challenges or financial matters must be exclusively submitted to the case manager.

Sincerely,

Andrea H. Bugbee
International Case Manager
(212) 484-3299
BugbeeA@adr.org

**Via Facsimile and Federal Express w/o Invoices**
cc: Kenneth A. Genoni, Esq.

Encl.



**International Centre
for Dispute Resolution**

Thomas Ventrone
Vice President

Steve Kim
Assistant Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

## Notice of Compensation Arrangements

August 15, 2005

Re: 50 199 T 00261 05
    Mala Geoscience AB
    vs
    Witten Technologies, Inc.

Dear Mr. Genoni,

You have been invited to serve as an arbitrator in the above matter. It is important that you understand the terms of your compensation and the role you play in ensuring that you receive payment for fees and expenses that you may incur during your service. This invitation to serve is based on our assumption that unless your panel biography states otherwise, you are willing to comply with the Association's *Billing Guidelines for International, Commercial, Construction, and Employment Neutrals*, which are enclosed. If you expect to assess charges that fall outside those guidelines and those charges are not detailed on your panel biography, you must notify the Association <u>prior to accepting your appointment</u> so that the parties can determine whether they still seek your services as an arbitrator.

### Your Compensation

This matter is being administered under the procedures of the International Arbitration Rules. As such, you will be compensated at the following rates, per the rate structure indicated on your biographical record:

| | | |
|---|---|---|
| Hearing Time: | $3,220.00 | per day |
| Study Time: | $460.00 | per hour |
| Travel Time: | Charges for Travel Time | |

Inasmuch as you are agreeing to serve in this matter at the above rate, any subsequent change to your published rate after your appointment will not apply to this case.

### Your Expenses

On most cases, your expenses should be nominal and will be reimbursed immediately after you submit them. For any single expense over $25, please include a receipt with your request for reimbursement.

If you anticipate that you will incur significant expenses, such as airfare or hotel room costs, please advise your Case Manager in advance so that the parties can be asked to make deposits prior to you incurring the expense.

## Deposits and Payment

Payment for your compensation is the obligation of the parties and it is understood that the American Arbitration Association has no liability, direct or indirect, for such payment. During the course of the proceeding the Case Manager will ask that you provide an estimate of the amounts needed to cover your fees. Generally this occurs immediately after the preliminary hearing, although on longer or more complex cases it can occur immediately upon appointment or after each series of hearings.

Unless you specify otherwise, the parties are advised that deposits are due 30 days prior to the first hearing. No later than two weeks prior to the hearing, the Case Manager will advise you of the total amount on deposit. Should the parties fail to make deposits in a timely manner, you must determine whether to go forward or suspend the proceedings until such time as deposits have been made. If you decide to go forward without full deposits, you may not subsequently delay the rendering of the award for lack of payment of your fees. *The time to deal with this issue is prior to the commencement of the hearings.* Should you decide to suspend the proceedings, your Case Manager can assist you in issuing an appropriate order to the parties.

If you realize that you are spending more time on this matter than you originally estimated, it is your obligation to inform the Case Manager prior to exhausting the current deposit. The Case Manager will then make arrangements with the parties for additional deposits per your instructions.

In order to receive payment, please submit bills promptly. Your bills should be submitted in a format that is presentable to the parties, should detail the dates on which the charges were incurred and must correspond with the terms of compensation outlined herein. Upon receipt, the AAA will release payment from the amounts deposited by the parties. Should there be insufficient funds on deposit, you will not receive payment until the parties have made additional deposits. Further, we will not use one party's deposit to cover another party's obligation without written permission to do so.

In the event your Award is delivered prior to payment by the parties of the agreed upon compensation, the Association is authorized but not obligated to seek to collect these monies on your behalf by all lawful means to represent you in any action or proceeding for such recovery and to file a claim in any bankruptcy or insolvency proceeding for such monies. The Association may prosecute and receive any recovery on behalf of the undersigned and has full authority to compromise or settle such claims as may be, in its discretion, appropriate. However, under no circumstances whatsoever will the Association be liable for any failure to collect any or all the monies due. The Association is authorized to subtract a reasonable amount for collection and attorney's fees.

## Failure to Disclose and Forfeiting Compensation

As an arbitrator in this matter, you have an ongoing obligation to disclose any direct or indirect relationship with the case participants. Your failure to make disclosures in a timely manner would be a serious transgression and may be grounds for your removal as arbitrator from this case and/or from the AAA's Roster of Neutrals. Should this occur, you may be required to forfeit the compensation for the time you spent on this matter after you should have made such disclosures.

If you are willing to serve on this matter per the compensation terms detailed above, please complete and sign the following section and return it, along with your Notice of Appointment, to your Case Manager.

## ARBITRATOR MUST COMPLETE THE FOLLOWING SECTION

Compensation payments, and the corresponding IRS reporting, will be made to either to you individually (attributed to your Social Security Number) or to your employer (attributed to the Employer Identification Number), based on the preference you indicated and as recorded in your panel record. If you are unsure of your current payment preference, you may view this information by logging in to the AAA's Neutrals eCenter. You may also contact your Case Manager or the AAA Department of Neutrals' Services. Promptly inform the AAA if this information is incorrect or changes during the case, or if an address correction is necessary.

If the AAA does not have the payee's tax information on record, we must withhold 31% of compensation payments, as required by the IRS. Reimbursements of expenses are not subject to withholding and are not reported to the IRS.

I am willing to accept appointment on this matter under the compensation terms detailed above.

Signed: _Kenneth A. Hanson_    Date: _Aug 24, 2005_