UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Malå Geoscience AB,**<br><br>    Applicant<br><br>  v.<br><br>**Witten Technologies, Inc.,**<br><br>    Respondent | Civil No. 1:06CV01343 (RMC) |

## REPLY MEMORANDUM REGARDING APPLICATION TO PARTIALLY VACATE AWARD OF ARBITRATOR

### I. INTRODUCTION

Arbitration has come to play a critical role in the American justice system. To protect the nature and function of arbitration, a number of doctrines have arisen in American courts to prevent courts from conducting plenary review of arbitration awards. These doctrines are powerful and indispensable. But these doctrines also have necessary limits, recognized by statute and by courts.

If, for example, arbitrators could substitute rhetoric and speculation for facts based on evidence without any accountability to the courts, the arbitration system could not long endure. Therefore, where, as here, an arbitrator passes judgment on a dispute the parties have not agreed to arbitrate, or bases a decision upon speculation rather than evidence, a Court must intervene and vacate the award.

WTI correctly asserts that a court must not reweigh evidence or judge witness credibility. Mala does not ask this Court to weigh evidence submitted to the Arbitrator. As set forth in our Application, we believe that the Arbitrator was flatly wrong in certain rulings and that the

evidence overwhelmingly supported Mala's position on those issues. Because there was some evidence upon which the Arbitrator could rely, however, Mala does not challenge those aspects of the Award. Mala challenges only the aspects of the Award that rule on issues the parties did not agree to submit to arbitration or that are entirely without proper evidentiary support.

The Award should be vacated in part, as set forth in the Application.

## II.   ARGUMENT

### A.   The Arbitrator Admitted He Had No Jurisdiction Over the Patent Assignment.

Throughout the arbitration hearing, the Arbitrator acknowledged that the Patent Assignment was made pursuant to, and governed by, the ESA and that he did not have jurisdiction over the ESA and issues arising from the ESA. Consider the following exchanges:

April 24, 2006: Day One (end of opening statements)

> MR. KELLY: I do need to make a comment. I got the impression from [WTI counsel's opening] statement that she wants you to order us to return patents to her. I want to make it absolutely clear that you do not have the power to effect a resolution under the exchange and settlement agreement.
>
> I'm not conceding, I'm not expanding on anything that you have ruled on up to this point. The scope of your power derives from the license agreement. We are happy to make certain accommodations voluntarily, but just because there is testimony here about the exchange and settlement agreement, and the [side] agreement for purposes of context, background, and for purposes of your ultimate award, does not mean that we're conceding that there is some power to adjudicate some remedy under that agreement.
>
> THE ARBITRATOR: Understood . . . . Mala Att. A at 46-47.

April 25, 2006: Day Two

> THE ARBITRATOR: Mr. Kelly, did you want to address the proposal that you made for a consent judgment?
>
> MR. KELLY: . . . . Anyway, the I way I see it is that we have kind of three "rights" so to speak. Mala has got hardware rights. Witten has got display

> software rights, and in between the two, is this so-called GLUE patent. I'm not knowledgeable in patents, and I am not knowledgeable in software, but in my simple way of looking at things, the GLUE patent, in order to efficiently operate, it has to have elements of our stuff and elements of their stuff. So as I said in opening, I thought Erin's point in regard to the GLUE patent made sense, so this addresses the GLUE patent that I think is fair to both sides . . . .
>
> THE ARBITRATOR: . . . . This is a proposed judgment, but it is also in the nature of an offer to settle as well. I believe on the one hand it doesn't deal with your ESA problems, but ***it does deal at least with the grant to you, Mr. Green, of a license under the one patent that was assigned under the ESA agreement and that is something beyond which I could grant, I believe*** . . . . That's an opportunity and I encourage you to settle. Mala Att. L at 292-96 (emphasis added).

April 28, 2006: Day Five

WTI argued at page 25-26 of its brief[1] that Arbitrator Genoni had simply not heard enough evidence by day two in the hearing to realize that he had jurisdiction over the Patent Assignment.[2] Indeed, on the morning of the fifth and final day of the hearing, the Arbitrator presented the theory he ultimately used as a justification for deciding the Glue Patents issue. WTI Ex. 28 at 1260-62. But, on the *afternoon* of the last day of the hearing the Arbitrator again acknowledged that the Patent Assignment derived from the ESA, over which he had repeatedly acknowledged he does not have jurisdiction:

---

[1] Witten Technologies, Inc.'s Brief in Support of Motion in Opposition to Mala's Application to Partially Vacate Award of Arbitrator and in Support of Petition for Confirmation of Award ("WTI Brief").

[2] WTI also argued that the Arbitrator's comments on the second day of the arbitration show nothing more than "the Arbitrator's accurate understanding that he lacked jurisdiction under the LA to grant WTI a *license* to the Glue Patent." WTI Brief at 25 (emphasis in original). But, of course, if the Arbitrator had the power under the LA to return patents to WTI, he could also have awarded WTI the lesser relief of a license to those patents. The Arbitrator's statement on day two of the arbitration was a clear recognition that he understood he lacked the power to determine a breach of the ESA or Patent Assignment or to grant any relief related to those agreements – including any relief related to the assignment of the Glue Patents.

>THE ARBITRATOR [to Mala's IP lawyer regarding the drafting of the Patent Assignment]: Let me ask this then. ***The exchange agreement that you're working from which gave Mala the rights to this application***, is it correct that it only gave Mala rights to that specific applications and any future application that would result in a patent that covers subject matter disclosed in this application? WTI Ex. 8 at 1523-24 (emphasis added).[3]

Despite these telling admissions, the Arbitrator ultimately ruled on the Glue Patents issue, because he bought into WTI's rhetoric – particularly that of WTI witness Tony Clifford – that Mala had unjustly "stolen" the patents from WTI.

From the moment Mala began cross examining Clifford through the closing briefs, the thrust of Mala's argument against putting weight on Clifford's testimony that he was misled as to the scope of the Patent Assignment when he executed it at the direction of WTI outside counsel Joe Berl, was that the wrong witness was testifying on this legal conclusion. WTI never called Berl, a lawyer from a top flight Washington D.C. law firm with an intellectual property section, and thus Berl never said that, as the person on the WTI side of the assignment transaction in the best position to understand the scope of the assignment, he thought it did not encompass the Glue Patents. Where we challenge the intellectual rigor of the Arbitrator's decision on the assignment issue is that he made no comment at all about this key point – and we think Arbitrator Genoni made no comment because there is no sensible explanation for the absence of Berl from the hearing that supports WTI.

---

[3] Ironically, WTI cited Dighello v. Busconi, 673 F. Supp. 85, 88 (Dist. Conn. 1987) for the proposition that Mala's claim that the Arbitrator exceeded his authority is frivolous. Unlike this case where Mala repeatedly told the Arbitrator he could not arbitrate the dispute regarding the Patent Assignment, and the Arbitrator agreed, in Dighello, the party challenging the arbitration award, "[w]hen specifically asked by one of the arbitrators . . . whether the arbitration was to cover 'all the disputes' between the parties" responded "'We are before the panel on all disputes involving this transaction.'" Id. at 88.

By analogy, assume that a business executive testifies he was misled into signing a general release of a lawsuit because he believed all he was releasing was the claims relating to the facts in dispute in the lawsuit and that he did not know that he was, in fact, releasing other claims as well – not surprising testimony given the prolixity of releases today. Further assume that the lawyer for the executive's company, the person who told him to sign the release, is never called and does not say that he too did not understand the breadth of the release. The only reasonable ruling on these facts is that the company has failed to prove that it was misled as to the breadth of the release because it failed to call the only person qualified to understand the scope of the language.

We would feel differently about this failure of proof if the Arbitrator had told us why he ignored the absence of testimony by the lawyer who told Clifford to sign an assignment that on its face conveyed "Patents."

Not surprisingly under these circumstances, the justifications the Arbitrator ultimately used for his usurpation of the ESA's exclusive arbitration agreement and WTI's justification of the same are fatally flawed. First, WTI argues that because, in 1997, the parties made certain agreements regarding ownership of intellectual property rights to be created in the future, and the 2004 Patent Assignment clearly has some bearing on that agreement, the Assignment therefore "relates" to the LA and may be arbitrated under the LA's dispute resolution provision. This argument proves too much. The 1997 PDA and LA set the course of the parties' relationship, and virtually everything in their relationship can be related in some way back to those agreements. When disputes arose and the parties attempted to settle those disputes in 2002 with

the ESA, they agreed on a new, exclusive dispute resolution mechanism (arbitration in Sweden) to govern the ESA and the agreements made pursuant to the ESA – one of which was the agreement to assign the Glue Patents.  In doing so, the parties demonstrated their exclusive intention to arbitrate such disputes in Sweden – not in the US under the earlier arbitration agreement.[4]

Second, the ESA's exclusive dispute resolution provision supersedes the arbitration provision of the LA, because the ESA is a subsequent agreement, and the arbitration provisions of the two agreements are in conflict.  See, e.g., Kreiss v. McCown De Leeuw & Co., 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999) ("under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract") (quotation omitted); Dickinson v. Heinold Sec., Inc., 661 F.2d 638, 639 n.2 (7th Cir. 1981) ("The arbitration clauses of the original and subsequent agreements differ slightly in certain immaterial respects.  The district court found that the later agreement controlled to the extent that there were any differences . . . .").

Third, the ESA's arbitration agreement trumps the LA's arbitration agreement in regard to the Patent Assignment, because the Glue Patent dispute arises directly out of WTI's undertaking in the ESA to provide a Patent Assignment, and the meaning of that undertaking.  What the Arbitrator really did was to use the LA to *interpret* the ESA and Patent Assignment – something he admittedly had no business doing in the first place – and then claim he had

---

[4] WTI's citation of Svoboda v. Negey Assocs., Inc., 655 F. Supp. 1329 (S.D.N.Y. 1987) is inapposite for the same reason.  The Svoboda decision stands for the uncontroversial proposition that an arbitrator may determine the meaning of an ambiguous term of an agreement subject to his jurisdiction.  The Glue Patents dispute called for the interpretation of terms in agreements that were ***admittedly not subject to the Arbitrator's jurisdiction***.  To interpret those terms, the Arbitrator consulted the LA over which he did have jurisdiction, but that exercise does not somehow transform the dispute into one arising under the LA.

jurisdiction because his use of the LA meant that the Patent Assignment "[arose] under" the LA. Mala Ex. 1 at 9.

It is fundamental that parties cannot be forced to arbitrate disputes they have not agreed to arbitrate and cannot be forced to arbitrate in forums other than the forums in which they have agreed they will arbitrate.  See, e.g., Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241 (1962) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit") (quotation omitted); Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995) ("Arbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.  Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which the arbitration will be conducted") (citations omitted).

Where an Arbitrator's decision exceeds the scope of the authority granted to him by the parties, the award may be vacated.  9 U.S.C. § 10(a)(4).  That is particularly true in a case like this, where the forum the parties have chosen is another country.  See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629 (1985) ("[W]e conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context"); Scherk v. Alberto-Culver Co., 417 U.S. 506, 516-17 (1974) ("A contractual provision specifying in advance the forum in which disputes shall be

litigated and the law to be applied is . . . an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction . . . . A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages . . . . [S]uch a legal no-man's-land would surely damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements").

What really happened is that the parties made certain general agreements in 1997 – before the CART technology was created – regarding the ownership of to-be-developed intellectual property. Over the ensuing years, and after the technology came into existence, disputes arose between the parties as to the ownership of the new intellectual property. The parties settled those disputes in the ESA with WTI's agreement to execute the Patent Assignment (and subsequent execution of the Patent Assignment). The ESA's dispute resolution provision, therefore, governs exclusively.

The Arbitrator's reasoning – that one must go to the LA to see what the parties meant when they resolved their disputes five years later in the ESA – makes no sense. The LA had not been effective in preventing or resolving the parties' disputes up to 2002, and so the parties then made a settlement agreement with an exclusive dispute resolution provision in it.

We must address two other issues raised in WTI's Brief. First, WTI contends that the Patent Assignment is "silent" in regard to arbitration jurisdiction (page 16 of WTI Brief, quoting the Award). In fact, the Patent Assignment recites that it was made "[i]n accordance with the [ESA]," Mala Ex. 13 at 1, and the ESA's arbitration provision pertaining to "[a]ny dispute,

controversy or claim arising out of or in connection with this agreement, or the breach, termination or invalidity thereof" clearly applies.  Mala Ex. 3 at 5.

Second, WTI argues that Mala's President, "Tommy Leijon, admitted: (i) that the parties' IP rights arose under the LA; (ii) that that [sic] the Timing Circuit had been developed under the LA; and (iii) that Mala's right to own the patent to the Timing Circuit arose from the LA."  WTI Brief at 19.  Of course, to support these "admissions," WTI cites to **pre-ESA** communications.  Id. at n. 55.  The communications cited by WTI are simply evidence of the existence of disputes that arose in the post-LA period that the parties later resolved in the ESA.

**B.     The Insolvency Issue.**

    **1.     Asset-Liability Test.**

Mala agrees with WTI that Mala had the burden of proving that the value of WTI's liabilities exceed the value of its assets as an initial matter, and Mala did exactly that.  There is no dispute that Mala presented a great deal of evidence (primarily WTI's own financial statements)[5] showing that on a book basis ***WTI's liabilities exceed its assets by millions of dollars***.  E.g., Mala Ex. 19 (WTI 2006 balance sheet showing assets of approximately $1.2 million and liabilities of more than $4.6 million).  The burden to rebut the evidence then shifted to WTI.  See, e.g., Buffalo Auto Glass v. Schueler, 187 B.R. 451, 453 (W.D.N.Y. 1995) ("The Trustee has provided a copy of the Debtor's corporate tax return for the time period in question,

---

[5] WTI's assertion that "accounting expert Ray Barbee's testimony refuting the accuracy of the financial documents Mala presented were both coherent and convincing" is so disingenuous, it is comical.  WTI Brief at 29.  WTI did not cite to any such testimony in the record – perhaps because Mala's most powerful evidence regarding WTI's insolvency was WTI's own 1Q 2006 financial statements, which were prepared by Barbee and others.  Mala Att. M at 1025.  (Barbee, by the way, was never qualified as an expert witness and was offered by WTI to give fact, not expert, testimony).  Mala Att. N (WTI's final witness list, dated April 13, 2006).

which shows negative retained earnings. There being no evidence offered by the Defendant under Fed. R. Civ. P. 56(e) as to why that does not establish the corporation's insolvency at that time, the Court finds that the tax return establishes the Debtor's insolvency at the time of the transfers by a preponderance of the evidence").[6] We agree as a conceptual matter that a responding party may then show off book assets that make it solvent (or unbooked value of booked assets).

In response to Mala's evidence that WTI's liabilities exceed its assets by over $3 million, WTI argued that its off book assets (primarily intellectual property) exceed the shortfall but presented *no* evidence of the value of such off book assets. The Arbitrator adopted WTI's unfounded assertions, and based his determination of solvency upon a vague notion that WTI's intellectual property must have some value and a guess that this value exceeds the amount of WTI's liabilities.

As WTI points out, the Arbitrator heard and reviewed a mountain of evidence on insolvency. But neither WTI nor the Arbitrator could find any evidence of the value of WTI's assets beyond book value. Indeed, ***neither even asserted a value***. Both were content to presume that the value was greater than the amount of WTI's liabilities. And, while the Arbitrator pointed to evidence that had actually been admitted in the hearing, the evidence he pointed to could not, as a matter of law, support his determination.

---

[6] Interestingly, the very AAA rule (R-30(a)) WTI cited for the proposition that Mala has the burden of proof demonstrates this burden shifting: "R-30. Conduct of Proceedings. (a) The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. . . ." In other words, the claimant must put on its evidence, and the respondent may then attempt to rebut the evidence presented by the claimant.

The primary evidence the Arbitrator cited was the testimony of WTI's expert witness, Vince Shea.[7] But, the Arbitrator rightly rejected Shea's valuation as "excessive." Mala Ex. 1 at 5. Indeed, the sole basis for Shea's valuation of WTI was certain 5-year revenue and expense projections *prepared by WTI's Robert Green* and delivered to Shea. Shea, in effect, present valued these projections to obtain a valuation of the enterprise. Mala Att. A at 1086. There is no dispute that the projections are speculative and that WTI's prior projections have, without exception, been wildly optimistic on the revenue side. See, e.g., Mala Ex. 9; Mala Att. A at 468; id. at 529-30.

For example, consider the following evidence provided to the Arbitrator concerning the accuracy of WTI's projections:

| Date of Projection | Projection | Actual | Actual as a Percentage of Projected[8] |
|---|---|---|---|

---

[7] The other support the Arbitrator cited for his conclusion that the value of WTI's intellectual property must exceed the value of its liabilities was evidence and inferences that WTI and Mala viewed WTI's intellectual property as valuable. Mala does not dispute that WTI's intellectual property has some unknown value, but it does dispute that the value of WTI's intellectual property is over $3 million and strenuously objects to the concept that the speculative notion that intellectual property has some unascertained value can translate to that amount without any evidentiary support. The best reference point for the value of WTI's intellectual property is the amount for which Brian Hurse, a skilled seller of securities who raises funds for businesses, has been able to sell WTI stock and convertible loans. Hurse testified that in 2006 he had been able to sell WTI stock for about $0.50/share but that he also obtained debt financing for WTI by offering a structure whereby "the lender loans [WTI] $50,000 and then gets an additional right, [in] additional to some interest on his loan to purchase $50,000 shares at a penny a share." Mala Att. A at 1366-67. The Arbitrator rejected this marketplace evidence about what real investors are willing to pay to invest in WTI in favor of out and out guesswork.

[8] The information in this table is taken from Mala Exs. 7; 26; 27. The actual as percentage of projected calculation has been added.

| 1997 | 2002 revenues: $111.9 M | 2002 revenues: $1.9 M | 2% |
| 2001 | 2003 revenues: $207.4 M | 2003 revenues: $2.1 M | 1% |
|      | 2004 revenues: $448.2 M | 2004 revenues: $0.7 M | 0.1% |

See also Mala Ex. 9 for a summary of WTI's historical "hockey stick" projections versus actual results. The projections Shea reviewed and on which his valuation was based are simply the latest iteration of such quixotic projections. The difference between the revenues WTI has actually earned over the past six years and the revenues WTI projects it will earn over the next five years – the projections on which the Shea valuation is based – is striking:

**WTI Actual Revenues 2000-2006**

| 2000[9] | 2001[10] | 2002[11] | 2003[12] | 2004[13] | 2005 (1Q only)[14] | 2006 (1Q only)[15] |
|---|---|---|---|---|---|---|
| $529,562 | $727,315 | $1,871,721 | $2,142,028 | $689,320 | $99,115 | $144,261 |

**WTI Projected Revenues 2006-2010[16]**

| 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| $3,310,403 | $18,646,000 | $50,020,000 | $127,650,000 | $345,300,000 |

---

[9] Mala Ex. 28.

[10] Mala Ex. 29.

[11] Mala Ex. 26.

[12] Mala Ex. 27.

[13] Id.

[14] Mala Ex. 19.

[15] Id.

[16] Mala Ex. 30.

If WTI had purchased an apartment building based on rosy neutral projections that never came true, then made its own new rosy and unrealistic projections and asked Shea to present value the apartment owning company based on the future earning potential of the enterprise based solely on the assumption that the projections would come true, his report would have just as much credibility as the report Shea actually prepared for WTI.

More to the point, Shea's report, even if credible, could not support the Arbitrator's finding that WTI's assets exceed its liabilities, because Shea testified that he did *not* value WTI's assets (including intellectual property) and could *not* provide a value for those assets.[17]

To be clear, Mala is not asking this Court to weigh evidence or to judge the credibility of witnesses. Mala is asking the Court to vacate the Award, because the Arbitrator did not base it on evidence; he based it on rank speculation as to the value of WTI's intellectual property.

The arbitration system simply cannot work if the claimant presents evidence sufficient to meet its burden of proof, the other party defends by making unfounded assertions that cannot be challenged, and the arbitrator is free to adopt the unsubstantiated guesswork over the evidence.

The Arbitrator either based his determination that WTI is solvent on a non-fact or, while saying he was applying New York's statutory asset-liability test, he, in fact, disregarded that test

---

[17] Mala Att. A at 1083-84 (Shea: "*Q: You did not value Witten's assets, right? . . . . A: No, I did not.* Q: You could have chosen a method that would have valued Witten's assets, right? A: I wasn't asked to. *Q: You did not specifically value Witten's intellectual property as a subset of the assets? A: No, not as individual item*") (emphasis added); id. at 1085-86 (Shea testifying that there is a process he would have followed if he had been engaged to value Witten's intellectual property); Mala Att. M at 1106 (Shea: "*Q: But you cannot give an actual number [for the value of Witten's intellectual property]. A: No, I cannot*") (emphasis added); Mala Att. A at 1109 (Shea testifying that *to determine solvency, "[w]e have to valuate everything including the IP which was not done*") (emphasis added).

and determined WTI was solvent based on other criteria, i.e., some undisclosed modification of Shea's valuation of the company based on its supposed future earning potential. In either case, the Award must be vacated.

As WTI acknowledges, an award is properly vacated where the arbitrator based his decision on a non-fact. WTI Brief at 32; see also Mala Application at 22-23 and 28 n. 40 for case citations.

Courts must also vacate awards where the arbitrator manifestly disregarded the law. See, e.g., Siegel v. Titan Indus. Corp., 779 F.2d 891, 893 (2d Cir. 1985) ("Manifest disregard of the law may be found . . . if the arbitrator 'understood and correctly stated the law but proceeded to ignore it'") (quotation omitted); Challenger Caribbean Corp. v. Union Gen. de Trabajadores, 903 F.2d 857, 861 (1st Cir. 1990) (where an award is "unfounded in reason and fact…based on reasoning so palpably faulty that no judge or group of judges could ever conceivably have made such a ruling, or is mistakenly based on a crucial assumption which is decidedly a non-fact," vacature is proper) (quoting In re Hotel Da Vinci, 797 F.2d 33, 34 (1st Cir. 1986)); Sobel v. Hertz, Warner & Co., 469 F.2d 1211, 1214 (2d Cir. 1972) ("if the arbitrators simply ignore the applicable law, the literal application of a 'manifest disregard' standard should presumably compel vacation of the award"); Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 218 (2d Cir. 2002) ("The manifest disregard doctrine is not confined to that rare case in which the arbitrator provides us with explicit acknowledgment of wrongful conduct, however . . . . A court may find intentional disregard if the reasoning supporting the arbitrator's judgment 'strain[s] credulity,' or does not rise to the standard of 'barely colorable'") (citations and quotations omitted).

### 2. Ability to Meet Obligations in the Ordinary Course Test.

Mala presented substantial evidence of frequent failures by WTI to pay its vendors, its ever-shifting law firms, and its employees. Mala's Vice President Brian Hurse testified that the creditors WTI does pay are paid through loans and equity investments. A company that has repeatedly failed to pay its employees for years can hardly be heard to argue that it meets its obligations in the ordinary course, and WTI provided no evidence to support such an assertion. Indeed, "in the ordinary course" means that one pays its bills from operating revenues, not loans and equity investments.

### C. The Attorneys' Fees Issue.

The basis for Mala's prayer that this Court vacate, in part, the Award related to fees is based on the same law and rationale as the previous section: the Arbitrator awarded WTI the value of stock options issued to its lawyer as compensation based on a number picked out of the air to represent the value of those options.

As stated in our Application, Mala does not object to the concept of in kind payment to lawyers or the reimbursement of such payments in a fee award. We do, however, object to an award of fees paid in kind based on nothing more than a guess as to the value of the rights bargained for legal services.

The only evidence regarding the value of WTI's stock was WTI's stock table for January 2002 to January 2006 and the Shea valuation. Mala Ex. 20. As set forth above, the Shea valuation is, by definition, speculative, and the Arbitrator rejected the Shea valuation as "excessive."

WTI's stock table – which shows that the average amount paid or payable for each share of WTI stock over the past four years is approximately $0.11 – is the best evidence of the value of WTI's stock, and based on this evidence, the stock options are valueless to WTI's counsel.[18] Indeed, given the convertible loans WTI offers, it is virtually certain that WTI's counsel will never exercise her stock options at 3 shares for a dollar. If she wanted to invest in WTI she would loan WTI a dollar and receive interest on the loan and the right to purchase 100 shares at a penny a piece. (By the same token, WTI loses nothing in granting such options). But the Arbitrator also apparently rejected the stock table as a basis for valuing WTI's stock options.

Instead, he accepted the entirely arbitrary value suggested by WTI's lawyer – 50% of the "excessive" Shea valuation[19] (less the option strike price). No one believes that is really the value of WTI stock. It is simply a speculative guess at the value, and we don't think anyone even believes it to be a good guess. The Arbitrator thus rejected the speculative opinion testimony of Shea (and the marketplace evidence of what investors have been willing to pay to obtain WTI stock) and then tried to cure the evidentiary void by cutting Shea's speculative number in half. The public will lose all confidence in arbitration if arbitrators are free to reject genuine evidence and instead award hundreds of thousands of dollars in damages or fees based

---

[18] WTI argues that the options and warrants WTI issued should not be taken into consideration when calculating the prices paid for WTI stock. But the issuance of the options and warrants with nominal or no exercise prices has the effect of diluting the average price paid or payable for the shares; the price for shares for which cash consideration was paid would be diluted by approximately 80% from $0.5186 per share to $0.1024 per share.

[19] It appears from WTI's Post-Arbitration Brief that counsel intended to cut the Shea value in half. In fact, she used an arbitrary number that is 17% higher than Shea's number. We have not been able to determine where the number came from.

on nothing more than revenue guesses by an entrepreneur that have been wrong every time he has made them.

**D.     WTI's Fees.**

WTI offers this Court no basis for its assertion that Mala's Application is "frivolous and baseless." The cases cited by WTI do not involve multiple arbitration agreements or other claims that the Arbitrator stepped outside his authority in a fashion fairly comparable to the facts here. In the Dominion Video case cited by WTI, for example, the party challenging the award had appeared before the Court prior to arbitrating the dispute and argued that it did not have to abide by its contracts based on arguments that federal preemption, the First Amendment, and the like shielded its breach. The Court compelled arbitration and told the party its arguments were frivolous. The party challenging the award then lost the arbitration and returned to the Court with the same arguments. That is simply not comparable to the situation here. And, the Commercial Refrigeration case is a case in which the losing party simply disagreed with the arbitrator's legal reasoning, not a case where, as here, the Arbitrator usurped jurisdiction of a dispute that he had repeatedly acknowledged he could not review.

WTI's request for attorneys' fees spent responding to the Application should be denied.

### III.     CONCLUSION

For the foregoing reasons, the Court should vacate the Award in part as set forth in Mala's Application, grant the other relief requested therein, confirm the Award in all other respects, and deny the relief requested by WTI in its Petition to Confirm. Mala reiterates its request for oral argument on these issues.

17

                      Respectfully submitted,

By: __/s/ Albert C. Lambert_____
    Thomas W. Brunner (D.C. 170480)
    Albert C. Lambert (D.C. 489562)
    WILEY REIN & FIELDING LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032

    Timothy D. Kelly (MN 54926)
    Sarah E. Bushnell (MN 0326859)
    3720 IDS Center
    80 South Eighth St.
    Minneapolis, MN 55402
    (612) 349-6171

Dated: September 15, 2006        *Attorneys for Mala Geoscience A.B.*