**Main Identity**

п:        "Jan Rynning" <JR@ahlford.se>
          <mloristaglio@earthlink.net>
**Sent:**     Monday, November 13, 2000 9:53 AM
**Subject:**  Ang: Re: Our Agreements

Dear Mike.

Thank you for your mail.

I'm glad to hear that you have been sucessfull in Turkey. Since the Luleä session we have been convinced that the Cart is a powerful equipment. But there is still a lot of work to do. The assuption still is that it will take another year or two of additional development until we have reached the point where we have a stabel product. This is just the begining. Malä would like to underline that Malä will do it's best to preform in accordance with what the parties agree on. Witten is a, very important partner and customer.

The development of the prototype is finished. That means we are entering into a new phase in our co-operation. I think the parties can agree on that the co-operation has not been working well all the time. The objective has to be to make it work better in the future. When we meet I think it would be appropriate to discuss this issue.

I propose following agenda:

1. How can Malä help Witten?
2. How can we organize the co-operation in a better way? Steering committee?
3. Responsibilities. Who is resonsible for diffrent parts of the development?
    "outines.
    formation.
6. Renumeration ( As the situation is today a good idea might be that Malä put the cost of the development on the purchaseprice of the Carts).

It might also be convenient to disuss the development that have to be done in the near future. Tommy will be prepared to discuss such issues.

We will solve all problems. We also have to close the new deal.

Sincerely

Jan R

>>> "Michael Oristaglio" <mloristaglio@earthlink.net> 00-11-13 05:29 >>>
Tommy / Jan:

Some e-mails have been exchanged the last few weeks about
the relative readiness of Mala and Witten to close the PDA
and sign new Agreements. Your position seems to be that Mala
has fulfilled all of its obligations, without any defects
    soever, and that it is entirely Witten's fault that
closure of the PDA is dragging out so long (see, eg. Tommy's
e-mail below).

Civil Action No: 1:06-cv-01343(RMC)
Respondent WTI Sur-Reply:
Exhibit No. 29
Arb. Ex: No: 324

Until now I've been occupied with closing Schlumberger and
preparing for the introduction of their UtiliLOG service
in Turkey, and have not been able to respond in any detail.

.     ı this e-mail I want to correct the record a bit --
particularly with regard to the technical development
of the CART.

To quote Tommy: "I hope you don't take this the wrong way."
I do fully support closing the PDA and getting on with
the new Agreements as quickly as possible. And, our goal is
still very much to cooperate with Mala and develop through
the CART a large market in shallow geophysical services
benefitting both companies enormously.

I do, however, want point out some areas where our current
product falls short because the CART lacks some features
that we have requested repeatedly.

The two most important features -- better displays for
quality control during acquisition and Windows acquistion
software -- were identified back in February. We indicated
clearly back then, and again in the meeting in May at Fargo,
that these were high priorities (along with development
of the 400 MHz antennas for CART-2), to be covered by the
development funds of $80k that WTI gave Mala at the start
⌐f the year.  In fact, I helped convince Robert that targeting
        payment for development would be a nice gesture of
guud faith to continue to move the project along, after a
long period of essentially no development (see next paragraph).
I could have argued at the time -- and I will insist now -- that
these features are essential to any serious commercial deployment
of CART systems and should be considered as minimal requirements
to fully close the PDA (without any further payment whatsoever).
My guess is that these features are still missing because
Mala more or less stopped devoting resources to further
engineering of the CART back in May -- the last accounting I
received for CART development time was for April -- but I
would be happy to hear your own explanation.

Before getting to the list, and at the risk of fanning old
flames, I want to remind you of a very important reason why
closing the PDA has dragged on so long: viz, that the first
CART supplied by Mala, CART-0, simply DID NOT WORK PROPERLY
because of bad timing circuits in the trigger box. These timing
problems were evident back in August of last year, but were not
fixed until the new circuits were designed for CART-1 in April.
And, let's be frank. Mala more or less refused to acknowledge
any problem with CART-0 until February, when Doug, Tony, and I
came to Sweden and did the "lift test" that showed the timing
        s clearly ("incontrovertibly", as Doug would say).
,     se problems rendered CART-0 unusable. Any claim otherwise
is wrong.

Anyway, here's the list:

1  The CART lacks any useful displays for monitoring
        acquisition.  The current DOS screen not only does
n.. ..now the data being collected (on any of the channels),
it does not even provide an indication of the state of
the acquisition buffer that can easily overflow and render
an entire profile useless.  This has become a severe
limitation as we try to collect longer and longer profiles
at speeds of 1 to 2 km/hr (as we did in Turkey). Moreover,
since the current acquisition software runs only under DOS,
to see any data it is necessary to stop acquisition,
shut down DOS, reboot the computer, and fiddle with
peripherals on the laptop (such as zip drives) that
are incompatible with DOS.  This can take up to 20 minutes
and is very embarassing in the field when the client asks
to see a real-time display.

2. CART acquistion software needs to run under Windows
(or any modern operating system that allows even primitive
multi-tasking).  Providing this feature would allow us
to fix problem 1 ourselves, and moreover, allow us to
start overlapping processing with data acquisition.
Again this is a severe limitation as we try to collect
longer and longer profiles. Any decent modern PC can
easily handle the acquisition and processing loads.

        iistion software under Windows might also solve the
problem of swapping acquistion computers.  Right now, this
is like rolling dice. Eg, each of our 4 field crew try to
maintain identical laptops (Dell CPxs) to run the CART.
In practice, it usually turns out that only one of the
systems works with a particular CART and this computer
becomes dedicated as an acquisition system, which is
very inconvenient for the crew. Also, IBM laptops that
worked perfectly with CART-1 do not work with CART-3.
Etc, etc.

IT IS IMPOSSIBLE TO CONSIDER WIDESPREAD DEPLOYMENT OF CART
SYSTEMS WITHOUT FEATURES 1 and 2. MOREOVER, AS YOU KNOW, BOTH
FEATURES ARE PROVIDED IN MALA'S RAMAC SYSTEMS WHICH SELL
FOR CONSIDERABLY LESS THAN THE CART.

3. CART antennas are inadequately protected and fragile.
Leaving the bottom of the antenna box open leads to corrosion
of the bowtie and requires delicate handling of the units
during maintenance.

4. Connections on the antennas and control box easily shake
loose during transport and routine use causing noisy channels.

5. .viring inside the CART needs to be done with feedthroughs
instead of a spaghetti maze on top of the antennas.

WTI
03662

To conclude on a positive note, the demonstration in Turkey
last week for Schlumberger's client Antsu went extremely well.
We collected nearly 4500 m of profiles in 3 days and, overall,
'ata and image quality were extremely good. (There were,
h     ver, some noisy profiles and it would have helped
enormously to have had the data from the calibration lift
test recorded for CART-3 before it was shipped. Have you
sent this yet?)

Regards,


----- Original Message -----
From: "Tommy Leijon" <tommy.leijon@malags.se>
To: "'Robert Green'" <Escoe3@aol.com>
Cc: "'Michael Oristaglio'" <mloristaglio@earthlink.net>; "'Jan Rynning'"
<jr@ahlford.se>
Sent: Sunday, October 22, 2000 5:14 PM
Subject: Our Agreements and the delivery of Cart 4 to France


> Dear Robert
>
> It is now one week until you have to fulfill you obligation according to
> either the old or the new Agreements for PDA and License. This is of
course
·  if you like us to deliver the Cart 4 to Schlumberger in France free of
    rge according to our Agreements.
>
> We are ready to ship Cart 4 to France the 1st of November.
>
> To my understanding we have fulfilled our obligation, Schlumberger has
> fulfilled there obligation and now, as always, we all waiting for you to
> fulfill your part of our Agreements.
>
> Your have to, before we release the Cart 4 to France, transfer the due
> amount according to our Agreements, arrange for the patent and all other
> matter that you have to fulfill according to the Agreements.
>
> An other way to solve your problem, for the moment, is that you transfer
the
> amount of money that are due according to your order for Cart 4 and Cart 5
> plus for the extra you have ordered for these Carts.
>
> I hope you don't take this in a wrong way. We have always tried to keep
our
> part of our Agreements and we will always do this in the future to, but we
> have not the same experience from your way of behaving.
>
> I know that you are aware of the obligations that Mala and Witten Inc. has
    :ording to our Agreements therefore I believe that it is time for you to
 .      .ke contact with us and start talk to us about how you can solve your
> obligations according to our Agreements.
>

WTI
03663

> Waiting for your replay as soon as possible.
>
>
>     regards,
>
> Tommy Leijon
> _____
>
> MALÅ GeoScience
> Skolgatan 11
> S-930 70  MALÅ
> SWEDEN
>
> "we make the subsurface transparent"
> _____
>
> Teleph.:      +46 (0) 953 345 60
> Mobile:       +46 (0) 70 216 48 48
> Fax.:          +46 (0) 953 345 67
> Private Fax:  +46 (0) 70 386 48 48
> E-mail:        tommy.leijon@malags.se
> http://www.malags.com/
>
>
>
>
:

WTI
03664

## Main Identity

| | |
|---|---|
| 1: | "Jan Rynning" <JR@ahlford.se> |
| | <Escoe3@aol.com> |
| **Sent:** | Monday, October 23, 2000 10:21 AM |
| **Subject:** | Ang: Re: Our Agreements and the delivery of Cart 4 to France |

Dear Robert,

Our proposal is that the parties close the deal November 16 and 17 in Miami.

Before closing of the deal is possible we have to take care of following
issues:

Mala's undertakings:

1. Mala has to manufactur the Cart free of charge. At the end of October Mala
will be ready to deliver that Cart.

2. Mala also has to produce a set of drawings and designs of the Cart. We
will deliver those documents at closing in Miami.

Witten's undertakings:

1. Witten has to assign it's rights to the hardware patent to Mala.

      Witten must deliver a financial statement from Finnegan & Hendersson.

3. As soon as possible Witten has to provide us with documents nessesary for
Mala's evaluation of the status of Witten. Of great importance is how long
time the existing funds will last, the possibility of getting new funds and
how the dispute between between Dycom and Witten will be settled. Are there
other potential disputes between the shareholders?

If you belive it's unlikely to get Mala's board to approve to an investment
in Witten you have to tell us immediatly.Than we have to find other solutions
on that problem.One possible sollution could be a instalment plan.

We are ready for closing. Let's just solve the rest of the problems.

Sincerely

Jan R
>>> <Escoe3@aol.com> 00-10-23 10:56 >>>
Tommy,

We have been ready to complete the PDA but we are awaiting several pieces of
the deliverables Mala owes WTI.

    item is that WTI has all of the necessary information to be able to
    uce the CART radar system. We need to have all information relevant to
being able to build all components of the CART independent of Mala. We need
this as part of the closing documents.

Civil Action No: 1:06-cv-01343(RMC)
Respondent WTI Sur-Reply:
Exhibit No. 30
Arb. Ex. No: 321

WTI
03678

Mala also agreed to deliver acceptable terms for an option to purchase Mala USA. We need this as part of the closing documents.

so said that Mala was having second thoughts about accepting stock in lieu of cash for the note due to the question of Dycom. WTI is only ready to deliver stock. I have been waiting for someone on your side to confirm Mala's intent.

**WTI will have its costs of patents from our attorneys this week for Mala to pay its share.**

If the deal is not closed in time to ship CART 4 to France, WTI will pay for CART 4 and just accept another CART (5-10) for free instead.

As for keeping agreements, I believe that WTI has kept its part of the entire bargain from the outset. Your accusation is very nonproductive and untrue. I do not feel it is WTI holding up the closing. Mala raised the stock question and has not delivered important elements of the closing package.

You are trying to rush to close this PDA before Mala has delivered crucial elements of the PDA. Deliver the information necessary to produce the CART, acceptable terms for the option and WTI will have the costs of the patents ready this week. Have our free CART ready to deliver and then WTI will promptly close.

Sincerely,

rt E. Green

WTI
03679

**Main Identity**

Fro..      "Johan Friborg" <johan.friborg@malags.se>
To:        <m.oristaglio@wittentech.com>
Sent:      Friday, October 26, 2001 3:58 AM
Subject:   VB: URGENT

1ike,

1st joining the converstion to make sure that you recieve the EEPROM
oftware.

t should be fairly self-explanatory. Please read a copy of the EEPROM, save

: to disk and send me a copy. I'll check if it is OK.

Regards

ohan Friborg

√Iala GeoScience AB


----Ursprungligt meddelande-----
Från: Bernth Johansson
Skickat: Friday, October 26, 2001 10:52 AM
Till: 'Michael Oristaglio'
Kopia: Tommy Leijon; Kenneth Jakobsson; Johan Friborg
Ämne: RE: URGENT


I!      1ike,

The control unit that we have will be sent today. There was some loose
breadbords inside, you will have a deatailed report soon.

That the eeprom fails is something very strange for us and I wouldn't rule
out a serious sofware bug.

If you are in a position where you urgently need to use the system, you have
to continue with the DOS-software, as you already have concluded.

I'll see too that you'll get the software that we use to program the eeprom.
With this you can try to read it and also save the content to a file. I'm on
a very slow line so I can't attach it myself.

Regards

Bernth


-----Original Message-----
From: Michael Oristaglio
To: tommy Leijon; bernth Johansson
Cc: r.green@wittentech.com; m.burns@wittentech.com
s      '01-10-26 04:17
Subject: URGENT

Civil Action No: 1:06-cv-01343(RMC)
Respondent WTI Sur-Reply:
Exhibit No. 31
Arb. Ex. No: 334

WTI
03588

Tommy, Bernth:

other CU has failed. The new Windows control box is no
longer functioning properly: it appears that the EPROM is
not being read by the Windows software, and
SYSTEM CALIBRATION is set to 0.

We have just started a large survey for a utility
company and cannot afford to be without a functioning CART.
We are trying to patch something together using the DOS
software and a calibration file.

We HAVE TO have a quick response on this. All three of
our CU's have failed in the last 4 months (none has been
in service for more than a 18 months).

Please call me at 203 426 1688 first thing tomorrow.

Thanks, Mike


Attachment Converted: "d:\program files\qualcomm\eudora\mail\attach\EEPROMmer1.zip"

**KELLY & BERENS, P.A.**
ATTORNEYS AT LAW
3720 IDS CENTER
80 SOUTH EIGHTH STREET
MINNEAPOLIS, MINNESOTA 55402

TIMOTHY D. KELLY
tkelly@kellyandberens.com

September 23, 2005

TELEPHONE
(612) 349-6171

FAX
(612) 349-6416

**BY E-MAIL & FEDERAL EXPRESS**

Erin L.G. Lewis, Esq.
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, Georgia 31204

Re:  License Agreement ("Agreement") between Malå
     Geoscience AB ("Malå") and Witten
     Technologies Inc. ("Witten")

Dear Erin:

     The undersigned represents Malå.  This letter
supplements the June 2, 2005 demand for arbitration by Malå under
paragraph 17, the arbitration clause, of the above-identified
Agreement, as we agreed.  The relief Malå seeks is rescission
and/or termination of the contract and other relief as deemed
appropriate.  The grounds for this relief are fraud in the
inducement and breach of contract in two respects.  This letter
will follow the same order of presentation as the earlier letter:

                    **FRAUD IN THE INDUCEMENT**

     The Agreement has not operated as envisioned, planned
and projected by both sides.  This failure was due to
misrepresentations made by Witten to Malå at the outset of
negotiations and which Witten continued to make as Malå completed
the manufacture of its patented device, whose commercial
distribution is the purpose of the Agreement.

     Malå, a world leader in developing and manufacturing
commercial ground penetrating radar, was induced into entering
into the exclusive, worldwide licensing agreement for its Product
because Witten made a series of misrepresentations, upon which
Malå reasonably relied, relating to Witten's ability to penetrate
the worldwide utility locating market and its ability to meet its
own sales projections.  Due in large part to internal struggles
and mismanagement, Witten has fallen far short of its own revenue
and profit projections and, based in part on Witten's insolvency,
appears unable to meet further projections as promised.

Civil Action No: 1:06-cv-01343(RMC)
Respondent WTI Sur-Reply:
Exhibit No. 32
Arb. Ex. No:

**KELLY & BERENS, P.A.**
ATTORNEYS AT LAW

Erin L. Lewis, Esq.
Page 2
September 23, 2005

In June 1997, Alan Witten  of Witten and Olof Forslund
of Malå met in Egypt, and discussed a possible collaboration
between the two companies to develop a mobile ground-penetrating
radar system for mapping of underground utility pipes and the
like ("Product").  In August 1997, Jan Rynning, the Chairman of
Malå, met with Robert Green ("Green") in Washington, D.C.  Green
was accompanied by  Witten, Stephen Willard, and Green's son,
Shane Green.  In October 1997, both parties invested substantial
time and energy negotiating what became the Prototype Development
Agreement ("PDA").

Under the PDA, the parties were to collaborate and
develop a product that had not been developed before to perform
the above functions.  The PDA charged Malå with the duty to
develop the hardware and ground penetrating radar and Witten with
the duty to develop signal processing software for the Product.
The collaboration was successful, and in  late 1998, MALA
delivered to Witten a prototype of the hardware for the Product
with embedded signal processing software, and in 2000 Witten
acquired necessary additional software from a third party .  At
that point, a prototype of the Product ("CART") was developed and
performed successfully.

In the 1997 negotiations, Malå insisted that it must
exclusively own the rights to the hardware and the embedded
signal processing software then in development, and Green
responded that Witten must have an exclusive right to use, sell,
or lease the Product commercially for detection of utilities and
a non-exclusive right to use, sell, or lease the Product for
applications other than the detection of utilities.

Malå ultimately agreed on delivering these rights to
Witten based on certain representations, which Malå later found
were untrue:

    a.    Green represented that he had gathered
        sufficient investor funds which were
        available to develop a commercial network to
        sell and distribute the product to persons
        who need to detect and map underground
        utility pipes and cables;

**KELLY & BERENS, P.A.**
ATTORNEYS AT LAW

Erin L. Lewis, Esq.
Page 3
September 23, 2005

b.   Green delivered to Rynning financial
     information from a 1996 equity offering by
     Witten and told Rynning that in 1997 and
     1998, he expected losses for Witten of about
     $3 million, but in 1999, based on rapid
     introduction of the CART to the marketplace,
     $10 million in revenues and over $4 million
     in profits could be expected.  In 2000 and
     2001, revenues would jump to $20 million and
     $40 million, respectively, and profits would
     be $6 million and more than $13 million,
     respectively;

c.   Green also represented that each CART placed
     in the marketplace could generate about
     $1 million in income per year beginning in
     1999 and that income would level out to
     $1.3 million by 2001;

d.   Green also represented that by 1999, there
     should be 40-50 units sold or leased to the
     marketplace, and that number would increase
     to 140-160 by 2001; and

e.   Malå stated that it wanted a minimum quantity
     requirement in return for the utility mapping
     exclusivity Witten demanded.  Witten
     responded that a minimum was unnecessary
     because under U.S. law, if Witten failed to
     develop a satisfactory marketing and sales
     organization, Malå could terminate the
     License Agreement.

At no time did Witten ever have the ability to do what
it represented it could do.  These conditions were known to
Witten at the time these misrepresentations were made to Malå and
justify Malå's rescission of the Agreement.

**BREACH OF SALES ORGANIZATION OBLIGATIONS**

Under the terms of the License Agreement Witten
promised to "use its best efforts to promote the sales of the

## KELLY & BERENS, P.A.
### ATTORNEYS AT LAW

Erin L. Lewis, Esq.
Page 4
September 23, 2005

Product in the Territory."  In order to fulfill this promise,
Witten also promised to "create and maintain an efficient sales
organization for the Product."  This organization was to be
capable of performing the duties allocated to Witten under the
Agreement.

Witten never created an "efficient sales organization
for the Product."

In late 1997, confirming statements made orally before
the PDA or Agreement were signed, Shane Green outlined to Malå a
marketing plan which he said Witten would execute.  This plan
included:

- obtaining "strong support" from the National
Utility Contractors Association and the ASCE;

- intensive marketing efforts beginning in
1999;

- a public relations campaign featuring Dr.
Witten beginning in 1999;

- a heavy print media trade campaign to
introduce the Product--bearing the name
"CART"--in the winter of 1999;

- Witten brochures would be prepared as sales
tools;

- Witten would conduct additional market
research.

Most of these things were never done.

To the contrary, since 1997, the primary business
activity of Witten has been a series of efforts to raise money
from new investors.  At no time has Witten had more than 30
employees and has never had more than a single sales employee.
Indeed, the primary marketing and sales effort Witten has
actually made was the creation at the end of 2000 of a website
regarding the CART and what it could do.  The investment funds

## KELLY & BERENS, P.A.
### ATTORNEYS AT LAW

Erin L. Lewis, Esq.
Page 5
September 23, 2005

Witten raised did not go to pay for marketing or sales; they paid salaries to the Greens, legal and accounting fees, and other expenses  unrelated to the creation of an efficient sales organization.

In short, Witten never performed its obligation to create an "efficient sales organization." As of this writing, fewer than twenty CARTS have been sold or leased anywhere in the world – nowhere near the hundreds of CARTS Witten projected it would distribute by this time.

Instead of creating an efficient sales organization to market the CARTs, Witten entered agreements with certain other companies to market the CARTs, i.e., delegated its duties to others.  The companies with whom Witten entered such agreements never performed the obligations, as Witten later disclosed.

In August 2001, for example, Witten filed a claim in Florida state court against Dycom Industries, Inc. ("Dycom"), to whom Witten had granted an exclusive sub-license for distribution of CARTs in the United States, to the disadvantage of MALA, alleging that Dycom "failed to use reasonable efforts to market or exploit the CART system" because "Dycom concluded that it could make higher profits and pump up its stock price by not marketing the CART while attempting to instead tie-up the CART technology."  Witten entered a similarly unsuccessful agreement with Schlumberger Technologies Operating Limited ("Schlumberger"), a British Virgin Islands corporation, for the exclusive distribution of the Product outside the United States. When disputes with Dycom and Schlumberger arose, Witten settled them in a fashion that seriously burdened its ability to sell CARTs in the future.

From time to time, potential buyers of CARTs would come to MALA and seek to purchase units.  When MALA asked Witten to be allowed to fulfill these requests, Witten refused.

After notice of its non-compliance with the duty to create an efficient sales organization, Witten failed to cure the breach.  Witten's failure to perform under the terms of this Agreement is a material breach of the Agreement that separately justifies rescission.  Witten's failure to meet its own sales

### KELLY & BERENS, P.A.
ATTORNEYS AT LAW

Erin L. Lewis, Esq.
Page 6
September 23, 2005

projections also demonstrates either Witten's gross
misrepresentation of its ability to sell Malå's product, or a
failure to develop an efficient sales organization that could
effectively use "best efforts" in promoting the sales, or both.

### INSOLVENCY

Under the terms of paragraph 11 of the Agreement,
insolvency of Witten provides a separate and express right for
immediate termination of the Agreement by Malå.  Upon information
and belief, Witten's present financial position meets the
relevant definition of insolvency.

Beginning in 2000, Witten agreed to begin delivering
copies of its tax returns and financial statements to Malå.  The
first return for 1999 showed a loss of $1.3 million and net worth
of slightly less than $2.9 million.  In later years, Witten
failed to deliver its tax returns to MALA.

By year end 2000, Witten's financial statements showed
its shareholder equity was $1.319 million after a loss of $2.251
million.  In April 2002, Green wrote to the shareholders
outlining what he called a "dire cash situation" at Witten,
stated that payroll had been suspended for exempt employees, and
admitted that Witten "has begun to fall behind on numerous
creditors."  The letter also admitted that Witten's major
corporate "partners" had abandoned Witten.  In fact, some of
those partners were in the process of making claims against
Witten, which were expensive disputes that Witten ultimately
settled by significantly burdening its future revenue stream with
obligations to the departed partners.

By the end of 2002, Witten's financial statements
showed negative shareholder equity of $1.026 million (and losses
to date of over $7.5 million), and Witten's outside auditors
noted that if Malå were to demand payment on amounts Witten owed
to Malå, Witten might not be able to raise the funds to pay those
amounts without liquidating the company.  In or about 2002,
Witten made an assignment to certain shareholders who had
arranged for letters of credit to support Witten's bank
borrowings.  The assignment was of substantially all the assets
of the company.  Witten's financials did not improve in 2003 and

**KELLY & BERENS, P.A.**
ATTORNEYS AT LAW

Erin L. Lewis, Esq.
Page 7
September 23, 2005

2004, and the company remains insolvent.  It has been the subject
of lawsuits by employees for non-payment of compensation due.

Witten has routinely been delinquent in the payments it
owes to Malå.  Not only is Witten insolvent under either of the
commonly understood definitions of insolvency (liabilities exceed
assets *or* inability to pay bills in the normal course of
business), but it is hopelessly insolvent.

Very truly yours,

Timothy D. Kelly

TDK:jz


cc:  Andrea H. Bugbee, ICDR (by Federal Express)
     Kenneth A. Genoni, Esq. (by Federal Express)
     Jan Rynning (by email)
     Tommy Leijon (by email)

| Från: | "Tommy Leijon" <tommy.leijon@malags.se> |
|---|---|
| Till: | "Jan Rynning (E-mail)" <jr@ahlford.se> |
| Datum: | den 14 april 2003 2:09 |
| Ärende: | Info från Wittens CD |

Hej

Sänder dig två underlag som beskriver Wittens syn på Schlumberger och Malå

<<WITTEN-TECHNOLOGIES-MoreFAQs-rev2003.doc>>
<<WITTEN-TECHNOLOGIES-FAQs-rev2003.doc>>

Best regards,

Tommy Leijon

MALÅ GeoScience
Skolgatan 11
S-930 70 MALÅ
SWEDEN

"Let's make it visible"

Office:  +46 (0) 953 345 60
Mobile:      +46 (0) 70 216 48 48
Fax:    +46 (0) 953 345 67
Private Fax:    +46 (0) 70 386 48 48
E-mail: tommy.leijon@malags.se
http://www.malags.com

> .....................................................
>
> This communication is confidential and is only intended for the use of the
> individual or entity to which it is directed. It may contain information
> that is privileged and exempt from disclosure under applicable law. If you
> are not the intended recipient please notify us immediately. You should not
> copy it or disclose its contents to any other person.
>
> .....................................................
>
>

Civil Action No: 1:06-cv-01343(RMC)
Respondent WTI Sur-Reply:
Exhibit No. 33
Arb. Ex. No: 350

M 000913

TRANSLATION:

Hi,
I am sending you two bases that describe Witten's view on Schlumberger and Malå.

<<WITTEN-TECHNOLOGIES-MoreFAQs-rev2003.doc>>
<<WITTEN-TECHNOLOGIES-FAQs-rev2003.doc>>

Best regards,
Tommy

M 000913.1

## DUE DILIGENCE FAQs (more)
## Witten Technologies, Inc.

### Specific List

*Witten has established a number of strategic and investor relationships. Please explain the specifics of each of the following, as well as provide copies of contracts and contact information:*

### Malå GeoScience AB

Malå is a Swedish company specializing in detection of subsurface objects. Malå has about 50 employees.

- Describe the history and nature of this relationship. Malå claims ownership of the CART/GPiR technology on their website. In an article on the WTC attack, Malå states, "Malå's CART/GPiR technology, which is being used in the WTC project, was developed in collaboration with Witten Inc. Malå GeoScience developed the hardware, while Witten Inc. developed the presentation software." Per an EPRI article dated September 2001 entitled, EPRI-Member Use of the Ground Penetrating imaging Radar (GPiR) System, "The CART (Computer-Assisted Radar Tomography) Imaging System uses a patented radar array specially built for WTI by the Swedish company MALÅ GeoScience AB."

The initial contact with Malå Geoscience AB was made through its American company, Malå Geoscience USA, which at the time was run by Thomas Fenner. Fenner, a geophysicist, was a friend of Alan Witten and introduced WTI to Malå in 1997. Malå was interested in finding a technology partner for further development of its market in ground-penetrating radar systems.

*PDA and License Agreement*
In September 1997, Malå and WTI signed a Prototype Development Agreement (PDA), with an accompanying License Agreement. The PDA called for joint development of new technology for detecting and mapping pipes and cables using a high-speed multi-channel radar system. This multi-channel radar array (called the "Prototype" in the PDA) is the radar hardware of the CART Imaging system.

The PDA called for Malå to develop the new radar hardware according to specifications in the PDA and for WTI to develop digital signal processing (imaging) software.

The PDA provides that Malå shall be the owner of the intellectual property and patent rights for the radar hardware. The License Agreement gives WTI an exclusive worldwide license "to sell, use, lease and assemble" the system in the field of utility locating and mapping and a non-exclusive worldwide license for all other applications. WTI retained

M 000914

all rights to use of its software.

In October 2002. WTI and Malå signed an agreement to close the PDA and begin the Licensing Agreement.

*CART Systems*
Malå delivered a first prototype multi-channel radar array (CART-0) to WTI in 1999. After some problems were identified in the timing circuits by tests carried out in the summer of 1999 and spring of 2000, a second prototype (CART-1) was delivered in April 2000 and has been in use by WTI since then. (In fact, this system is now being used for the project at the World Trade Center.) WTI has purchased for its own use two additional systems from Malå: an experimental higher-frequency system (CART-2, June 2000) and system that was used for the development with John Deere of the front-mounted CART (CART-3, July 2000).

WTI also purchased from Malå the two CART radar systems delivered to Schlumberger as part of the May 2000 Agreement.

(Malå also agreed last year to develop a radar controller interface that operates under Windows 2000. and in August 2001 delivered to WTI a beta version of the software, which is currently in field test.)

WTI and Malå filed a joint US patent on the radar hardware array in September 2000

- *Ground penetrating radar array and timing circuit, Bernth Johansson, Alan Witten and Anthony Devaney, US Patent Application 09/658,188.*

According to the terms of the agreement signed in October 2002 to close the PDA, WTI will assign its rights to this hardware patent to Malå, but retains through the License Agreement exclusive rights to the technology worldwide for the field of utility locating and non-exclusive rights for all other applications.

Malå would like to be WTI's preferred supplier of CART radar hardware. (Malå retains the right to manufacture the CART radar array for applications outside utility locating and mapping.) John Deere's Special Technology Division has also expressed an interest in manufacturing the CART radar components. At present, WTI intends to purchase the radar component from Malå and find a suitable partner (such as John Deere) for integration of the radar into different mobile vehicles.

- Is the CART owned by Witten and built by Malå? – owned by Malå and sold to Witten – licensed to Witten?

A complete CART Imaging System consists of several components:
    - Multi-channel (17 antenna) radar array with control electronics (CART hardware)
    - Position tracking system (eg, survey theodolite, available commercially)

M 000915

- Processing, imaging, visualization and mapping software (CART software)

WTI purchases the CART radar array from Malå. Malå builds the hardware to our specifications, and WTI takes title (with rights to use under the License Agreement). WTI has developed and owns the intellectual property rights of all the processing, imaging, visualization and mapping software in the CART Imaging System.

- Malå would seem to have a hand-pushed version of the CART – who owns this? – what is its capability?  Explain?

Malå's core business is selling single-channel GPRs. These "handheld" systems are commercially available from several manufacturers. GSSI, based in New Hampshire, is the world leader in this market. Malå is second worldwide; Sensors and Software, Inc (a Canadian company) is third. Each company sells a broad range of systems with antennas of different sizes and frequencies.

Single-channel radar systems (or even the 2- or 4-channel systems marketed by GSSI) are not true 3D radar systems and do not have the imaging and mapping capabilities of the CART. A "GPR profile" obtained by dragging a single-channel system along the surface covers about a 6-inch swath through the ground (ie, is sensitive mainly to pipes or other underground objects in a vertical slice through ground that is about 6 inches thick and passes through the track of the radar unit on the surface).

The CART Imaging System, which is equivalent to operating 16 single-channel systems in parallel, covers a *6.25-ft* (2 meter) swath in one pass. In one day, a CART System can collect data over of area of about 40,000 sq ft (roughly one acre) with 3-inch horizontal resolution. It would be nearly impossible to use a handheld system to map such large areas with this detail. (The increase in efficiency is actually much larger than the nominal factor of 16—provided by the parallel channels of the CART—because of time that is lost in positioning the handheld system for each pass over the area.)

Handheld systems are useful for reconnaissance work and soil surveys and for locating individual utility lines at particular locations. WTI actually purchases handheld systems from Malå and uses these systems to complement the CART in its service contracts.

- What are the components to the system?  What is patented?  Who owns the intellectual property and what rights does each party have with regard to the intellectual property and to each other?

See the answer above ("Is the CART owned by Witten and built by Malå?") and the Intellectual Property portfolio.

WTI has an exclusive worldwide license to use, sell, lease and assemble the CART radar hardware in the field of utility mapping worldwide, and a non-exclusive worldwide license for other applications.

M 000916

- Does Malå have intellectual property rights in the software either directly or through license?

Malå has no rights to the software (nor any rights to the GP*i*R IP that WTI received with the assignment of the EPRI Agreement from Schlumberger), except through individual software licenses (valid for use in Europe, outside the field of utility mapping) that WTI provided under the agreement closing the PDA.

- How dependent is Witten on Malå and vice versa?

At present, WTI relies on Malå to provide the radar array, and we intend to continue purchasing these units from Malå as long as they are meeting the specifications and providing a good price. The License Agreement, however, gives WTI the right to manufacture the array independently of Malå. There are many companies that could manufacture the CART hardware to WTI's specifications. In addition, there are other manufacturers of GPR that could build a radar array that could be used with WTI's imaging software.

As long as WTI exists, Malå is excluded from the field of utility locating and mapping by the terms of the License Agreement. Moreover, we believe that WTI's software and integrated system for producing final underground maps, which can be used for any application, adds tremendous value to Malå's radar hardware and can be the basis for further agreements for licensing and sales of CART Systems for applications outside utility mapping.

We believe that it would take Malå (or any other company) at least 4 to 6 man-years to develop software equivalent to WTI's integrated mapping system.

WTI is the only company that holds all the IP rights and license agreements that allow it to use and develop the CART Imaging System unimpeded in the field of utility locating and mapping.

In addition, WTI has filed two patent applications on the broad concept of underground radar mapping, in which the IP claimed is independent of a particular hardware embodiment (ie, not dependent on the specific hardware of the CART):

- *Method for Merging Position Information with Measurements and Filtering to Obtain High-Quality Images that are Positioned Accurately with Respect to Global Coordinates, Burns et al., 14 March 2001*

- *A Method and Apparatus for Identifying Buried Objects using Ground Penetrating Radar, Alan Witten, 20 April 2001.*

WTI believes that these two patents (if allowed) will be sufficiently broad to defend its

M 000917

market in the use of array GPR systems (such as the CART) for shallow underground imaging and mapping, independent of any particular hardware embodiment.

WTI has also received a patent for an alternative to a physical multi-channel array, which is a "virtual array" created by scanning a single-channel radar rapidly over the ground (to simulate a physical multi-channel array).

- *A Rotating Scanning Antenna Apparatus and Method for Locating Buried Objects"*, Albats et al, filed 1 November 2000.

WTI has received formal Notice of Allowance from the PTO for the claims in this patent application. The patent itself should issue shortly.

- What limits as to use/geography does Malå have on the intellectual property?

Malå can use, sell or lease the CART hardware in any field outside of utility locating and mapping anywhere in the world. But as long as WTI exists, Malå is excluded from the field of utility locating and mapping by the terms of the License Agreement. Also, at present Malå does not have rights to use WTI's software.

- Any limits as to Witten's use/geography?

WTI has rights to use the CART Imaging System for all applications in the United States and Canada. In the May 2000 Agreement, WTI gave Schlumberger an exclusive license to use the CART Imaging System in the field of mapping utility mapping outside the United States and Canada (and WTI retained no rights to its use in the territory for this application).

- Who owns the intellectual property embodied in the hardware?

According to the PDA, Malå will own the intellectual property rights in the hardware. As mentioned above, however, WTI and Malå have filed a joint patent on the CART hardware, co-authored by Johansson (Malå Geoscience), Witten and Devaney. (Filing of the patent was fully funded by WTI.) In papers filed with the US PTO, Witten and Devaney have assigned their rights to WTI. Once a satisfactory framework is reached for closing the PDA, WTI will assign its rights to Malå and retain the right to use the technology through the exclusive License Agreement in the PDA or a follow-up agreement. If a satisfactory framework is not reached for closing the PDA with Malå, WTI will assert its right to the hardware patent as co-inventors.

- Can Witten find a second source of hardware – originally 3 systems where tested – Malå, GSSI and GeoRadar Instruments.

As mentioned above, there are several other radar manufacturers—including GSSI and Sensors & Software, Inc (but probably not GeoRadar which is a very small

M 000918

operation)—which can build radar arrays that could be used with WTI's software.

- Does/Can Malå provide a competing locating service to Witten's?

The License Agreement excludes Malå from using the CART for utility locating and mapping. Malå (and other manufacturers) can sell single-channel radar systems—or provide a utility locating service with these systems—that can compete with WTI. But WTI believes that the superior product provided by 3D imaging will eventually dominate the market, in the same that 3D seismic has come to dominate the market for oil and gas exploration (almost completely eliminating 2D seismic from the exploration marketplace).

- Provide copies of Malå agreements.

OK.

- Malå contact – name, title, address, phone.

Tommy Leijon
President
MALÅ GeoScience
Skolgatan 11
S-930 70 MALÅ
SWEDEN

Office: +46 (0) 953 345 60
Mobile: +46 (0) 70 216 48 48
Fax: +46 (0) 953 345 67

M 000919

## Capital Reporting Company

Page 579

INTERNATIONAL CENTER FOR DISPUTE RESOLUTION

In the Matter of the Arbitration Between

```
-------------------------x
MALA GEOSCIENCE AB,            )
                               )   Case No.
Claimant and                   )   50 199 T 00261 05
Counterclaim Respondent        )
                               )
               and             )   Volume III
                               )
Witten Technologies, Inc.      )
                               )
Respondent and                 )
                               )
Counterclaim Claimant.         )
-------------------------x
```

An Arbitration before
Arbitrator Kenneth A. Genoni
conducted at the offices of the
American Arbitration Association
Eighth Floor, 1176 I Street, Northwest
Washington, D.C.

Wednesday, April 26, 2006

Civil Action No: 1:06-cv-01343(RMC)
Respondent WTI Sur-Reply
Exhibit No. 34
Arb. Ex. No:

4f214577-c2c8-420a-8aa4-215fe765fb8d

## Capital Reporting Company

Page 580

```
1        APPEARANCES:
2        FOR THE CLAIMANT/COUNTER RESPONDENT
3        KELLY & BERENS, P.A.
4        By: Timothy D. Kelly, Esquire
             Sara E. Bushnell, Esquire
5            3720 IDS Center
             80 South Eighth Street
6            Minneapolis, Minnesota 55402
             (612) 349-6171
7
         FOR THE RESPONDENT/COUNTER CLAIMANT
8        ERIN L.G. LEWIS, ESQUIRE
         General Counsel
9        Witten Technologies, Inc.
         3638 Overlook Avenue
10       Macon, Georgia 31204
         (478) 474-5024
11
12              INDEX OF WITNESSES
13
14       TOMMY LEIJON
         DIRECT  CROSS  REDIRECT RECROSS
15            658
16
         ROBERT GREEN
17       DIRECT  CROSS  REDIRECT RECROSS
         695    N/A    N/A      N/A
18
19       ANTHONY CLIFFORD
         DIRECT  CROSS  REDIRECT RECROSS
20       831
21
22
```

Page 581

```
1            THE ARBITRATOR:  We are back on the
2    record.  Were you finished with your
3    cross-examination of this gentleman?
4            MS. LEWIS:  No, and before I begin again
5    Witten wanted to just present you, and we have
6    submitted to Mala a counter proposal this morning.
7    We have discussed it, but we are still going to
8    continue with the arbitration because they have
9    made some points that we will continue to discuss
10   as well.
11           THE ARBITRATOR:  Good, that is
12   encouraging.  This is still within your control
13   until you get a decision from me.
14           I remember, when I was in-house counsel,
15   telling my client that we had a 90 percent chance
16   of winning a case, so we should just go ahead
17   regardless.  By the time the case went to the jury
18   it looked like a 50/50 case to me.
19           Would you please proceed.
20           CROSS-EXAMINATION (cont'd)
21   BY MS. LEWIS:
22       Q    Mr. Leijon, if you would turn to Exhibit
```

Page 582

```
1    310, which would the white notebook with the blue
2    cover.  I will do these probably a little different
3    today since we are trying to move things along a
4    little bit.  I will try and to point out some
5    correspondence asking you to verify if you received
6    it or if you wrote it.
7            We are running low on time, so this is in
8    an effort to keep things moving.
9        A    This is 310.
10       Q    Yes.
11       A    That is 1424.
12       Q    Yes, that is correct.
13       A    You see some have put the paper behind
14   the number or before it.
15       Q    This is a letter that Robert Green sent
16   to you in September 1999.  Do you recall receiving
17   this letter?
18       A    I cannot say, but I probably received it.
19       Q    Do you see in the section that is number
20   3 where Mr. Green states:
21           "Witten will grant the right to
22           Mala to oversee (not the control
```

Page 583

```
1            of) the development of the CART
2            through its prototype phase.
3            The control will be vested in a
4            committee of three people.  That
5            is one, Mala.  One, Dycom.  And
6            one, Witten, and the right to
7            manufacture will remain with
8            Witten.  But as long as Mala can
9            meet the market demand, and
10           price, they will manufacture the
11           CART radar components."
12   Do you recall this?
13       A    Yes.
14       Q    Do you know whether you responded to
15   this?
16       A    I cannot remember.
17       Q    If you would flip to the next document
18   which is Exhibit 311.  It is dated October 1, 1999.
19   It appears to be a letter from yourself to Robert.
20           In referencing the letter of
21   September 14, 1999 from Robert, is it not correct
22   that in the text of this letter in no way do you
```

2 (Pages 580 to 583)

4f214577-c2c8-420a-8aa4-215fe765fb8d

Capital Reporting Company

Page 840

1  presented me with two demand letters. The first
2  day that I met him one was to solve what was
3  purported to be a breach of the licensing agreement
4  and another one was a breach of the lease agreement
5  at the time.
6          I started off with a feeling that this
7  was going to be a difficult thing to accomplish in
8  terms of getting these two companies to try and
9  work together for the betterment of both and I
10 think that that theme just continued through the
11 entire time I was at Witten.
12         Tommy was always demanding money
13 immediately. Sometimes in advance of when it was
14 necessary. Sometimes in writing. Sometimes giving
15 notice of a breach before the breach even occurred.
16 I know that happened once, and essentially, I just
17 don't think, or I think that Tommy would have been
18 much happier probably even before I got there if he
19 could have somehow severed the relationship with
20 Witten. I don't think anything that I could have
21 done during the time I was CEO would have changed
22 his mind.

Page 841

1      Q   You sound through your description right
2  there that you were bothered by how the
3  relationship to you in relation to your tenure
4  started off.
5      A   I was sort of trying to be open minded.
6  I don't think Tommy was. That is sort of how I
7  would characterize the way it started.
8      Q   What bothered you the most about this?
9      A   The thing that bothered me most in the
10 overall relationship was not this. It was the
11 fact, again, trying to get the companies to go
12 forward. We tried to solve some matters in the
13 fall of 2005, that I viewed as corporate cleanup.
14         MR. KELLY: The fall of 2005?
15         THE WITNESS: Sorry, the fall of 2004.
16 Sorry. There were matters that I viewed as
17 corporate cleanup regarding whether or not the
18 exchange and settlement agreement was ever
19 completely settled and part of that had to do with
20 patents. There was a patent, pursuant to, I guess
21 it was the prototype development agreement, so I
22 may not be accurate with some of these, I haven't

Page 842

1  lived this for at least 15 months, but in the
2  exchange and settlement agreement -- No, in the
3  prototype development agreement, it was written
4  that Mala had the rights to hardware patents and
5  there was one hardware patent that Witten had and
6  Tommy wanted that back.
7          I basically said, yes, I mean, we should
8  get that accomplished, and in the process of doing
9  that Tommy, apparently, made a successful attempt,
10 to at least so far a successful attempt to try to
11 steal a patent that was developed by Witten's
12 founder, Alan Witten, that had nothing to do with
13 hardware. It was software. It was something that
14 Alan had assigned to Witten and I just thought that
15 that was completely despicable that move.
16     Q   What made you think he was trying to
17 steal the patent?
18     A   He didn't deserve it according to the
19 prototype development agreement. It was a software
20 patent. It wasn't a hardware patent.
21     Q   What was he doing in, like you said, if
22 he trying to steal it, was he trying to maneuver to

Page 843

1  get it or what was going on?
2      A   I learned this after I had left the
3  company that this was going on and, apparently, he
4  was using an argument in one of the clauses of the
5  assignment that Mala righteously owned this because
6  it was referenced or something. The previous
7  patent was referenced by Alan. That is all I could
8  say, but I mean he did not deserve it and knew it
9  and in every conversation we had internally within
10 Witten or with our attorneys or with Mala, it was a
11 hardware patent and it was absolutely recognized
12 that hardware and software were two different
13 things and the rights for hardware and software
14 were clearly bifurcated between the two companies.
15     Q   So the patent, you understood, that was
16 okay to go ahead and assign to Mala was always?
17     A   The hardware patent.
18     Q   Would that be the timing circuit patent?
19     A   Yes, that's it. That was the thing. The
20 other stuff? Tommy had an agenda that he, or at
21 least, this is my sort of thinking about it, but
22 Tommy had an agenda that he would like to break the

67 (Pages 840 to 843)

4f214577-c2c8-420a-8aa4-215fe765fb8d

Capital Reporting Company

Page 844

1  relationship with Witten.
2      Tommy has had a relationship with Witten
3  for a long time and I know that he is pretty
4  frustrated by it. He wanted to break it seven
5  different ways. He was ultimately unsuccessful and
6  I guess that is why we are here. In terms of that,
7  that is business to a certain extent. You can
8  argue about these things but I was really upset by
9  the patent.
10     The other stuff was where maybe he was
11 pushier than I would ever have been. Maybe he used
12 a sledge hammer when something could have been a
13 little more subtle, but basically he was trying to
14 do something. I don't think he was ultimately
15 successful, but the thing with the patent bothered
16 me, much more than anything else in the
17 relationship, much more than comments being made by
18 Mala people in Florida and other places about how
19 Witten was going to fail or Witten didn't have the
20 rights to CARTs and Mala could yank them back at
21 any time.
22     Q   We will cover some of that specifically.

Page 845

1  The book in front of you has a numerous exhibits.
2  I want to look at Exhibit 354. This is a letter
3  that looks like from you to Tommy Leijon that is
4  dated December 9, 2003. Does this appear to be the
5  letter that you wrote in response to that meeting
6  you referenced earlier where he made a demand on
7  the first meeting?
8      A   Well, I guess it was in response to an
9  e-mail of December 3rd saying they were forced to
10 send me a written termination. A lot of the
11 substance here is November 5 demand letters, yes.
12     Q   Mr. Leijon said on December 3rd that he
13 was forced to send you a written notice of
14 termination.
15     A   Yes.
16     Q   This is your response to that.
17     A   Right.
18     Q   Then what is highlighted in here are
19 notes or your comments on the November 5, 2003
20 demand letters, is that correct?
21     A   Yes.
22     Q   In the middle of the page you have three

Page 846

1  things. Final demand, license fee, final demand
2  and payment of leasing fee, inspection of equipment
3  according to equipment lease agreement. The next
4  paragraph you state:
5          "As you well know, Witten wired
6          the entire amount demanded on
7          the license fee in the entire
8          amount demanded under the
9          equipment lease less the
10         disputed amount on November 21,
11         2003."
12     What are you talking about here?
13     A   When Tommy presented me with these
14 letters, of course, I immediately went back to
15 Witten and said, "What is going on here? I looked
16 at these documents," and I said, "We definitely owe
17 the entire amount on the license fee," and there
18 was an issue regarding equipment lease and we took
19 care of that on the date mentioned of November 21
20 which was well within the time frame required to
21 make good on the demand letter.
22     MR. KELLY:  You mean the cure period.

Page 847

1      THE WITNESS:  The cure period, yes.
2  BY MS. LEWIS:
3      Q   Is my understanding correct that he still
4  said that he was going to serve you with a notice
5  of termination although those payments were made?
6      A   Yes.
7      Q   Was that just in regards to the license
8  agreement as well as the lease agreement, or do you
9  recall?
10     A   I do not recall.
11     Q   This mention of inspection of equipment
12 according to the equipment lease agreement, what is
13 that?
14     A   Pursuant to the equipment lease Mala had
15 the right to request an inspection of their
16 property given notice, so I guess Tommy requested
17 inspection.
18     Q   Did that ever occur?
19     A   It occurred some months later. Tommy
20 said to contact somebody in their South Carolina
21 office. We did that and then where the equipment
22 was located at that time, I think he decided that

68  (Pages 844 to 847)

4f214577-c2c8-420a-8aa4-215fe765fb8d

## Capital Reporting Company

Page 1256

INTERNATIONAL CENTER FOR DISPUTE RESOLUTION

In the Matter of the Arbitration Between


------------------------x

MALA GEOSCIENCE AB,              )

                                 )  Case No.

Claimant and                     )  50 199 T 00261 05

Counterclaim Respondent          )

                                 )

and                              )  Volume V

                                 )
Witten Technologies, Inc.        )
                                 )
Respondent and                   )
Counterclaim Claimant.           )
------------------------x


An Arbitration before
Arbitrator Kenneth A. Genoni
conducted at the offices of the
American Arbitration Association
Eighth Floor, 1176 I Street, Northwest
Washington, D.C.


Friday, April 28, 2006


Civil Action No: 1:06-cv-01343(RMC)
Respondent WTI Sur-Reply:
Exhibit No. 35
Arb. Ex. No:

b2b6f344-a672-437a-9337-9d2fa2a30be9

Capital Reporting Company

Page 1257

1  APPEARANCES:
2  FOR THE CLAIMAINT/COUNTER RESPONDENT
3  KELLY & BERENS, P.A.
4  By: Timothy D. Kelly, Esquire
5      Sara E. Bushnell, Esquire
6      3720 IDS Center
       80 South Eighth Street
7      Minneapolis, Minnesota 55402
       (612) 349-6171
8
   FOR THE RESPONDENT/COUNTER CLAIMANT
9  ERIN L.G. LEWIS, ESQUIRE
       General Counsel
10     Witten Technologies, Inc.
       3638 Overlook Avenue
11     Macon, Georgia 31204
       (478) 474-5024
12
           INDEX OF WITNESSES
13  ROBERT GREEN (resumes direct)
       DIRECT  CROSS  REDIRECT  RECROSS
14     1265
       BRIAN HURSE
15     DIRECT  CROSS  REDIRECT  RECROSS
       1344  1359  1373    1377
16     BERNTH JOHANSSON
       DIRECT  CROSS  REDIRECT  RECROSS
17     1379  1464  1495
       WALTER LINDER
18     DIRECT  CROSS  REDIRECT  RECROSS
       1501  1526  1543  1544
19     TOMMY LEIJON
       DIRECT  CROSS  REDIRECT  RECROSS
20     1546  1550  1552  1554
21
22

Page 1258

1      INDEX OF WITNESSES CONTINUED
2  JAN RYNNING
3  DIRECT  CROSS  REDIRECT  RECROSS
4  1556   1575
5  ROBERT GREEN (resumes for cross)
6  DIRECT  CROSS  REDIRECT  RECROSS
7  1587   1635
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 1259

1              (8:00 a.m.)
2      April 28, 2006
3      THE ARBITRATOR:  Before we start our
4  questions, I need some help on a couple of issues
5  since this might be our last day, and I hope it is,
6  our last day of testimony.  I want to tell you what
7  I need help with so if you need to present more
8  testimony on it today you can focus on that.
9      There are two issues.  One is the
10 manufacturing rights.  Witten has given its
11 reasons, Mr. Kelly, why it thinks the license
12 agreement has granted exclusively manufacturing
13 rights for the hardware to Witten pursuant to the
14 license agreement together with the right to
15 sublicense others such as Hitachi to manufacture
16 the equipment for them.
17     I believe the other day when we discussed this
18 briefly, Mr. Kelly, you mentioned even if that were
19 the case, a later agreement trumps the license
20 agreement.  I think that was the word you used.  I
21 don't understand that yet, so I thought I would
22 alert you to that fact, so if you want to devote

Page 1260

1  some time to that today, or you can rely on it in
2  your brief, that's fine, but I don't understand it.
3      I think you were referring to the exchange
4  agreement.
5      MR. KELLY:  Correct.
6      THE ARBITRATOR:  It wasn't clear to me
7  yesterday.  There was some indication that there
8  might have been still another agreement that gave
9  rights back to Mala, I don't know, but I'm just
10 telling you that I'm confused about it.
11     MR. KELLY:  Let me make a point on that
12 initially.  If you terminate the license agreement,
13 Section 1 goes away.
14     THE ARBITRATOR:  I understand that.  The
15 other issue is the GLUE patent and whether or not I
16 have power or authority to decide whether or not
17 the GLUE patent should have been assigned from
18 Witten to Mala.
19     The license agreement says that patents
20 covering improvements to hardware, to Mala's
21 hardware, will be owned by Mala subject, of course,
22 to the license agreement.

2 (Pages 1257 to 1260)

b2b6f344-a672-437a-9337-9d2fa2a30be9

Capital Reporting Company

Page 1269

1    necessary wave characteristics."
2    Is that, in essence, the hardware that we
3    had Mala build?
4    A   No. It got built before Mala built it.
5    There were other people that were building it.
6    This is the GSSI patent that Mala now has a license
7    to. The first real example of that particular
8    thing, the data acquisition system, is the radar
9    array.
10   If you're doing geophysical diffraction
11   tomography, you're using radar. If you're using
12   acoustics, it is an acoustical array. Remember we
13   built an acoustical camera which was a data
14   acquisition system.
15   THE ARBITRATOR: You said this is the
16   GSSI patent.
17   THE WITNESS: No.
18   MS. LEWIS: No.
19   THE ARBITRATOR: This information ended
20   up in the GSSI patent?
21   THE WITNESS: Yes.
22   THE ARBITRATOR: Then, I do not

Page 1270

1    understand what you meant.
2    THE WITNESS: What Erin's question was,
3    if you go to the second paragraph, Item 1, the
4    development of a data acquisition system: Is this
5    what Mala developed? The answer is no. What Mala
6    developed was a second version of what GSSI
7    developed, the data acquisition system.
8    THE ARBITRATOR: Where did GSSI get the
9    idea? Was it independent?
10   THE WITNESS: It is independent. They
11   became independent of it and developed and patented
12   the radar array in 1993.
13   BY MS. LEWIS:
14   Q   So this is five years prior to that time.
15   A   Yes, yes, the data acquisition system,
16   everybody understood geophysical diffraction
17   tomography that can take data from an acquisition
18   system either acoustical, electromagnetic or radar.
19   THE ARBITRATOR: They patented this in
20   what year?
21   THE WITNESS: In 1993. What GSSI did, is
22   they independently -- People have great ideas that

Page 1271

1    are independent, and they recognized that if you
2    take a radar array you can gain a lot of radar
3    data, but they could not do anything with it. That
4    was their problem. They had a lot of radar data,
5    but the radar data was incoherent. It was just a
6    bunch of radar data and nothing more could be done
7    with it.
8    BY MS. LEWIS:
9    Q   In looking at all three collectively
10   where it talks about what Dr. Witten, and even in
11   the title:
12   "It is a hardware/software
13   system."
14   He was thinking:
15   "The whole system, (1), the data
16   acquisition, and (2) -- "
17   Well, I am not real sure about the second
18   part:
19   "Quantification of the incident
20   field homogenous host matrix."
21   Then 3:
22   "The infield realtime signal

Page 1272

1    processing."
2    Number 3, has that been the goal of
3    Witten?
4    A   Taking this idea was the initial goal of
5    Witten Technologies it took to commercialize these
6    notions. What ultimately has come out, as of 2006,
7    there are Items 4, 5, 6, 7 and 8, that we have also
8    had to develop, and patent, in order to get to the
9    point that we have a commercial product that the
10   Florida DOT will write a check for.
11   Q   What jumps out at me here are the words
12   "in three-signal processing." Ms. Bushnell,
13   yesterday, as she interviewed Mr. Shane Green, she
14   tried to identify Mala's software, or part of their
15   addition to this project, as being a hardware and a
16   signal processing and Witten's was just an image
17   processing.
18   Looking at this, this looks exactly
19   contrary to the definition of a framing that she
20   was trying to create, is that accurate?
21   A   Yes. Sara is misleading people. Bottom
22   line: A radio does signal processing. It's what's

5 (Pages 1269 to 1272)

b2b6f344-a672-437a-9337-9d2fa2a30be9

## Capital Reporting Company

Page 1273

```
1    relevant to the commercialization of radar
2    tomography.  All radar systems, when they get their
3    signal back, they process a signal to some form of
4    a data output.  "Do you want it in 20 milliamps at
5    this hertz?  How do you want it?"
6         Everybody has to do that.  GSSI's array
7    has to do it.  Mala's array has to do it.
8    Everybody's array has to do it.
9         There is nothing unique about what Mala
10   is doing that somebody else is not going to
11   accomplish in the same way.  It is a matter of your
12   driving a Ford or you are driving a Chevrolet.
13        It's what we do with it with the signals
14   after we gain them from any of these things, how we
15   manage them, how we process them, how we take the
16   data.  It is this process which is the GLUE patent
17   that this whole process after it leaves the
18   equipment is the source of the GLUE patent.
19        THE ARBITRATOR:  Would you say that
20   again.
21        THE WITNESS:  It's this whole process
22   once it leaves the equipment.  So when Alan says
```

Page 1274

```
1    that it's a hardware/software arrangement, you have
2    to have someone's radar array or someone's
3    acoustical array has got to feed the data to the
4    system.
5         THE ARBITRATOR:  In that patent, were
6    there any changes to the basic hardware array?
7         THE WITNESS:  No, and this was fought out
8    in detail before we ever filed the patent.  You
9    will see between our attorneys and Mr. Linder, is
10   that they were contending that this was improvement
11   and we kept saying, "No, this is a generic system.
12   This is a generic system and it's anybody's radar
13   array."
14        Let me further add, that's why you don't see
15   that show up in the assignment because when we
16   tried to settle the exchange and settlement
17   agreement there was a very good reason it wasn't
18   mentioned because that was the "terms of trade" is,
19   "You did not get this patent, or there is no deal.
20   You do not get this patent, or there is no deal,"
21   and they agreed to that.
22        (Ms. Bushnell now joins the
```

Page 1275

```
1         proceedings.)
2         THE ARBITRATOR:  Sorry, but this is an
3    issue on my mind.  When and how did you first find
4    out that the GLUE patent had been assigned?
5         THE WITNESS:  My daughter.  After they
6    sued us, and when we kept thinking, "This is
7    ludicrous."  I looked at this lawsuit, and said,
8    "This is ludicrous their accusing us of this."
9         MR. KELLY:  Accusing you of what?
10        THE WITNESS:  Their claims are ludicrous,
11   and I looked at them and I said, "There is
12   something else going on."  We sat for two months
13   and finally Erin comes over one day and she shows
14   me an assignment.  Well, I almost fell on the
15   ground.
16        THE ARBITRATOR:  She showed you what?
17        THE WITNESS:  She showed me the
18   assignment where Mala had assigned the GLUE patent
19   to themselves and I said, "How did they do that?"
20        THE ARBITRATOR:  You mean they recorded
21   with the Patent Office, is that what we are talking
22   about?
```

Page 1276

```
1         THE WITNESS:  Yes.  Yes.
2         MS. LEWIS:  I was going to say that I was
3    on the United States Patent and Trademark Office
4    website reviewing the patent files and I came
5    across the patent assignment, and with my
6    familiarity in dealing with all of the patents, all
7    of the fees we paid, everything that we do
8    worldwide, I had instantly noticed that this was
9    not, to my understanding, the correct patent that
10   was supposed to have been assigned, so I ask him
11   because I was new and he confirmed that with me.
12        THE WITNESS:  It took me a month to
13   believe it, quite frankly.
14        THE ARBITRATOR:  Was that after the
15   arbitration?
16        MS. LEWIS:  That is correct.  I believe
17   it was prior to our filing our amended response or
18   our response to their amended demand.
19        MR. KELLY:  Why don't you see if you can
20   get a date for these events and at your convenience
21   just tell us when this all happened, will you?
22        MS. LEWIS:  I will have to go through my
```

6 (Pages 1273 to 1276)

b2b6f344-a672-437a-9337-9d2fa2a30be9

Capital Reporting Company

Page 1277

1  e-mails.
2       MR. KELLY:  You do not have to do it, not
3  this minute, but I think it is important that we
4  not have vague statements about after this lawsuit.
5       THE WITNESS:  We can be specific.
6       MS. LEWIS:  Yes, I might have some
7  e-mails that I can forward to you.
8       THE WITNESS:  I think you have the patent
9  assignment that you downloaded and printed and that
10 will be dated.
11      MS. LEWIS:  I believe it is when we tried
12 to confirm with Tony Clifford if this was accurate.
13      THE WITNESS:  Right, and I think that is
14 in evidence.
15      THE ARBITRATOR:  There was a letter.
16      MR. KELLY:  That is November 2005.
17      THE ARBITRATOR:  Yes.
18 BY MS. LEWIS:
19      Q   Mr. Green, would you say, again, that
20 it's a more accurate statement that the GLUE patent
21 would be considered a process patent, that it is a
22 process by which data, that is collected from

Page 1278

1  various forms of hardware can then turn the data
2  into an image?
3       A   Yes, to a certain -- Yes, the GLUE patent
4  was the brilliance of a man named Frank DeCosta at
5  Finnegan & Henderson.  Frank DeCosta and Finnegan &
6  Henderson had just won a Supreme Court case over
7  being able to patent software.
8       The first thing we did is we right footed
9  that down to their office and we found those guys
10 and Frank DeCosta and their group instantly
11 recognized what we were doing and they said, "What
12 you do not want is a widget patent.  You don't want
13 a patent on a timing circuit.  You want to patent
14 the commercial relevance of this invention,
15 geophysical diffraction tomography."
16      That entire patent was constructed very
17 carefully and very expensively.  We are into
18 hundreds of thousands of dollars to get a process
19 methodology patent, because what we were after, the
20 impact of radar tomography, the front end of the
21 patent clearly refers to generic radar systems and
22 this really goes to the core, I mean, this is the

Page 1279

1  substance of this whole complaint and this whole
2  arbitration.
3       The form is such that we are not out
4  selling things, but the real substance of this
5  thing, Mr. Genoni, is that Witten has essentially
6  patented the software.
7       An example is look at us as a Microsoft.
8  Look at Mala like you would Dell or Hewlett.  Now
9  Bill Gates doesn't care where Windows goes.  He
10 just wants his end-user license agreement is what
11 he wants.
12      What has happened is that Mala recognized
13 this early on.  They recognized that their timing
14 circuit patent was not going to be a block and that
15 what we were doing, and we were using our funding,
16 to really grab the core of the opportunity.
17      THE ARBITRATOR:  Who were the inventors
18 named?
19      THE WITNESS:  It was Alan Witten.  If you
20 go back to these documents, you go back to what he
21 is doing.  What we were after was is that we wanted
22 to go from any type, of anybody's array, and what

Page 1280

1  Mala did was that they just reached over, an
2  obvious "slight of hand" when you study like I
3  have, and they snagged a patent that had been
4  agreed upon prior to their even trying to close the
5  exchange and settlement agreement.
6       We told them over and over again, and in
7  fact, they fought us tooth and nail at the Patent
8  Office trying to prevent us from getting a patent.
9  They fought us tooth and nail.  What Frank DeCosta did
10 was he finally took every letter, every complaint,
11 and he appended it to the patent, and said, "Okay,
12 let the Patent Office decide."  Well, they did
13 decide.
14      MR. KELLY:  Wait a second.  "Mala fought
15 us tooth and nail to avoid the patenting of the
16 GLUE patent."
17      THE WITNESS:  Right.  Right.  So we just
18 took all of their complaints and appended that to
19 the patent and filed that at the Patent Office and
20 the Patent Office saw it our way.
21 BY MS. LEWIS:
22      Q   Robert, isn't it true that the GLUE

7 (Pages 1277 to 1280)

(866) 448 - DEPO
www.CapitalReportingCompany.com

b2b6f344-a672-437a-9337-9d2fa2a30be9

**Erin Lewis**

**From:**    Erin Lewis [erinlglewis@aol.com]
**Sent:**    Wednesday, March 29, 2006 2:00 PM
**To:**    'Sarah Bushnell'
**Subject:** RE: Limited Privilege Waiver

Dear Sarah,

Thank you for getting back with me in regards to this issue. I understand your point of view and I believe it is what you expressed in the hearing with Mr. Genoni on November 10th. According to the Hearing Report Mr. Genoni stated that he would decide whether there is a factual basis for Witten's claims for relief after a full hearing of the issues. Witten attempted to explore this issue with both Mr. Rynning and Mr. Leijon but they both, especially Mr. Leijon, said it was left to the attorneys to work out. We are being prevented from exploring the full facts of the patent assignment if all the information is being protected by the attorney client privilege per Mr. Leijon's testimony.

Best,
Erin

Erin L. G. Lewis, Esq.
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, Georgia 31204
478.474.6644
404.808.0812 (Cell)
478.474.8688 (Fax)
erinlglewis@aol.com
www.wittentech.com


Confidentiality Note:
The information which follows and is transmitted herewith is attorney/client privileged, trade secret and/or confidential. Information intended only for the viewing and use of the individual recipient named above. If the reader of this message is not the intended recipient, you are hereby notified that any review, use, communication, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via the U.S. Postal Service or overnight delivery service at our expense. Thank you.

**From:** Sarah Bushnell [mailto:sbushnell@kellyandberens.com]
**Sent:** Monday, March 27, 2006 12:57 PM
**To:** Erin Lewis
**Cc:** Timothy Kelly
**Subject:** RE: Limited Privilege Waiver

Civil Action No: 1:06-cv-01343(RMC)
Respondent WTI Sur-Reply:
Exhibit No. 36
Arb. Ex. No: C to WTI Reply Brief

I'm sorry for the delayed response, Erin. This got lost in the shuffle. We are not interested in waiving the privilege on the patent assignment issue, because we don't believe it is properly before Mr. Genoni. As we argued in the November motion practice, Witten has not pled any facts or made any claims regarding the patent assignment. More fundamentally, Mr. Genoni does not have the power to arbitrate an issue related to the patent assignment, because the patent assignment arises out of the ESA and, as

you know, any "dispute, controversy or claim arising out of or in connection with [the ESA] . . . shall be finally settled by arbitration administred by the Arbitration Institute of the Stockholm Chamber of Commerce . . ."


*Sarah E. Bushnell, Esq.*
Kelly & Berens, PA
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 349-6171
(612) 349-6416 (fax)
http://www.kellyandberens.com

***********************
This message is a PRIVILEGED and CONFIDENTIAL communication.  If you are not the intended recipient, please do not read, copy, or use it, and do not disclose it to others.

Please notify the sender of the delivery error by replying to this message, and then delete it from your system.
Thank you.
***********************




**From:** Erin Lewis [mailto:erinlglewis@aol.com]
**Sent:** Monday, February 27, 2006 3:26 PM
**To:** Sarah Bushnell
**Subject:** RE: Limited Privilege Waiver

Sarah,

I do not believe that Witten's interest will be served by providing a limited waiver to attorney-client privilege as to the GSSI patent and license agreement issue and the FCC 200 mhz CART waiver issue. These issues primarily involve allegations against Mala and not Witten.  If Mala believes it is better served by waiving attorney-client privilege on these issues then obviously that is Mala's decision; however, Witten does not see the need in waiving privilege as to these issues on their side.

One issue I do believe would benefit from both parties agreeing to a limited waiver of attorney-client privilege are those communications dealing with the Patent Assignment.  It appears per Tommy's testimony, he believes this issue was worked out among the attorneys and the two patent assignments occurred as a result of the attorneys' agreement.  As you know, this is contrary to Witten's perspective. Witten would agree to a limited waiver of the attorney-client privilege as to Mr. Joe Berl of Powell Goldstein in regards to the Patent Assignment.  Witten would request Mala to agree to this limited waiver of communications with Mr. Berl and also agree to a limited waiver as to Mala's communications with Mr. Linder and Mr. Kaplan.

Erin


9/22/2006

Erin L. G. Lewis, Esq.
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, Georgia 31204
478.474.6644
404.808.0812 (Cell)
478.474.8688 (Fax)
erinlglewis@aol.com
www.wittentech.com


Confidentiality Note:
The information which follows and is transmitted herewith is attorney/client privileged, trade secret and/or confidential.  Information intended only for the viewing and use of the individual recipient named above.  If the reader of this message is not the intended recipient, you are hereby notified that any review, use, communication, dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via the U.S. Postal Service or overnight delivery service at our expense.  Thank you.

**From:** Sarah Bushnell [mailto:sbushnell@kellyandberens.com]
**Sent:** Tuesday, February 21, 2006 2:49 PM
**To:** Erin Lewis
**Subject:** RE: Limited Privilege Waiver

Have you come to a conclusion on this matter?

*Sarah E. Bushnell, Esq.*
Kelly & Berens, PA
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 349-6171
(612) 349-6416 (fax)
http://www.kellyandberens.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message is a PRIVILEGED and CONFIDENTIAL communication.  If you are not the intended recipient, please do not read, copy, or use it, and do not disclose it to others.

Please notify the sender of the delivery error by replying to this message, and then delete it from your system.
Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


**From:** Erin Lewis [mailto:erinlglewis@aol.com]


9/22/2006

**Sent:** Monday, January 23, 2006 7:47 PM
**To:** Sarah Bushnell
**Subject:** RE: Limited Privilege Waiver

Sarah:

Witten will agree to a limited privilege waiver as to the documents produced by Mala in regards to these two issues. I will need to review Witten's documents to determine whether Witten would be amenable to waiving privilege on them also.

Erin

Erin L. G. Lewis, Esq.
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, Georgia 31204
478.474.6644
404.808.0812 (Cell)
478.474.8688 (Fax)
erinlglewis@aol.com
www.wittentech.com

Confidentiality Note:
The information which follows and is transmitted herewith is attorney/client privileged, trade secret and/or confidential. Information intended only for the viewing and use of the individual recipient named above. If the reader of this message is not the intended recipient, you are hereby notified that any review, use, communication, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via the U.S. Postal Service or overnight delivery service at our expense. Thank you.

**From:** Sarah Bushnell [mailto:sbushnell@kellyandberens.com]
**Sent:** Thursday, January 19, 2006 3:42 PM
**To:** Erin Lewis
**Subject:** Limited Privilege Waiver

Erin:

Greeetings. I have recommended that Mala waive the attorney-client privilege as to the GSSI patent and license agreement issue and the FCC 200 mhz CART waiver issue. Mala is willing to do that contingent upon your agreement that the privilege waiver would be limited to those two issues. At such time as you acknowledge your agreement to the terms of this limited waiver, I will produce otherwise-privileged documents to you related to these matters.

We suggest that Witten also waive the privilege in respect to these matters.
*Sarah E. Bushnell, Esq.*
Kelly & Berens, PA
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 349-6171

9/22/2006

(612) 349-6416 (fax)
http://www.kellyandberens.com

**********************
This message is a PRIVILEGED and CONFIDENTIAL communication.  If you are not the intended recipient, please do not read, copy, or use it, and do not disclose it to others.

Please notify the sender of the delivery error by replying to this message, and then delete it from your system.
Thank you.
**********************