International Centre for Dispute Resolution

| | |
|---|---|
| In the Matter of the Arbitration Between | |
| MALA Geoscience, AB, | |
|      Claimant, | |
| and | Case No. 50 199 T 00261 05 |
| Witten Technologies, Inc., | |
|      Respondent. | |

## PRE-ARBITRATION BRIEF OF WITTEN TECHNOLOGIES, INC.

COMES NOW Witten Technologies, Inc. ("WTI"), Respondent in the above-captioned matter, and files its Pre-Arbitration Brief, showing the Arbitrator the following:[1]

## INTRODUCTION

Mala Geoscience, AB ("Mala"), Claimant in the above-styled case, seeks the termination of the License Agreement ("LA") the parties signed in 1997 in conjunction with their Prototype Development Agreement ("PDA") and later effectuated via the signing of the 2002 Exchange and Settlement Agreement ("ESA"). Specifically, Mala alleges that termination is warranted due to WTI's alleged: (i) perpetration of a scheme to fraudulently induce Mala into executing the LA; (ii) failures to meet its obligations to use its "best efforts" to promote the parties' jointly developed technology; (iii) insolvency; and (iv) failure to make timely accounting and royalty payments. WTI denies all of Mala's assertions. Mala's fraud claim flatly fails under the scrutiny of New York law. Mala's claim that WTI breached the best efforts sales provision similarly cannot succeed because: (i) Mala's own failures to deliver a marketable CART under the PDA

---

[1] All exhibits and documents attached hereto are hereby incorporated herein by reference. Additionally, the following agreements are attached PDA, Ex. 1; LA, Ex. 2; and ESA, Ex. 3.

Civil Action No: 1:06-cv-01343(RMC)
Respondent WTI Sur-Reply:
Exhibit No. 37
Arb. Ex. No:

and LA wholly prevented WTI's sales obligations from arising, and (ii) irrespective of whether such obligations did arise, WTI has met and exceeded all sales/marketing obligations contemplated by the LA. Furthermore, Mala cannot claim WTI is insolvent when WTI is not insolvent under any definition of the term; and any failure by WTI to timely pay its bills to Mala was due to Mala's failures to meet certain conditions precedent and failure to supply CARTs of operable quality. The actuality of the situation is that most of the financial trouble WTI has encountered since 1998 has been a direct result of Mala's efforts to undermine WTI's ability to continue in business. WTI further responds that Mala has, by exhibiting a long pattern of actions inconsistent with its allegations, waived the right to assert any of its claims in these proceedings.

WTI raises its own counterclaims, as well. WTI asserts that Mala has (i) perpetrated and concealed an intricate fraudulent scheme designed to induce WTI into giving Mala its valuable assets and (ii) breached the parties' contracts in multiple ways, resulting in vast damages to WTI. If it were possible WTI would agree to terminate the LA since this has not only been an unbearable relationship between the two companies, WTI has shoulder the lion's share of costs associated with this project. Because WTI management, employees and numerous shareholders have so much faith in the product produced, WTI has been forced to meet Mala's unjustified demands in hopes that the product would soon gain rapid market acceptance and cure any financial burdens created. Unfortunately, at this juncture, WTI could not operated easily should it lose its manufacturing rights and also the right to patents WTI paid for but which Mala now holds.

The product created and desired by the market is not what Mala's hardware produces … 2D radar data. The market wants and is accepting what WTI's technology does with that data and interprets it into an image most people can appreciate. Mala has seen the truth in this fact

and has done everything it can to sit and hope the compromised equipment fails and WTI goes under thereby releasing Mala from the exclusivity requirements. This would generate much greater financial gain for Mala in the long run. Since WTI has remained solvent, Mala has now decided to take an active role in attempting to loot WTI's proprietary inventions.

## STATEMENT OF FACTS

### a. Background and Execution of the PDA and LA

WTI was incorporated in October 1994 by the late Dr. Alan Witten and Robert Green, current Witten CEO, to develop Dr. Witten's world-renowned work with geophysical diffraction tomography (hereinafter "GDT") and its applications through ground penetrating radar to see underground. Dr. Witten had been the first person to create readable, three-dimensional images of underground utilities with GDT. Mala,[2] a company looking for improvements in ground penetrating radar ("GPR"), approached WTI in 1996/7. At that time, WTI was seeking a manufacturer to build a radar array[3] so that Dr. Witten's imaging technology could be tested. Representatives of WTI and Mala met in 1997 to discuss a possible collaborative effort between the two companies to develop a mobile ground penetrating radar system primarily for mapping underground utilities, as well as other additional applications,. The result of the parties'

---

[2] Mala is a world leader and expert in the manufacture and sales of ground penetrating radar. Established in 1935, Mala became a privately-run corporation in 1994.

[3] A "radar array" was patented by GSSI and is known in the GPR industry as an array of radar transmitters and receivers that shoot radar waves into the ground and collect the data which bounces back from underground objects. The radar array and WTI's processing and methodology patents are necessary for producing a 3D readable image of the underground using GDT. Hence, by combining any radar array with WTI's patent process, methodologies and image processing software, any radar array becomes capable as a Computer-Assisted Radar Tomography" system ("CART").

extensive negotiations[4] was the Prototype Development Agreement ("PDA") executed on September 9, 1997.

The PDA's aim was to have Mala build the array and Witten to attempt to construct the revolutionary software. Under the PDA's terms, Mala was to develop a prototype of a physical apparatus to be used with WTI's imaging software technology for the production of a combined product/system (CART[5]) capable of producing an image of underground utilities for use by surveyors, engineers and building contractors. Both parties were highly optimistic that, if successful, the prototype's (or CART's) development would cause the then-existing $50 million annual GPR market to grow as much as tenfold.[6]

PDA § 7.01 and § 7.02 required Mala to give WTI, in exchange for royalties, an exclusive license for CART use in utility locating applications and a non-exclusive license in non-utility applications; the parties' LA set forth the terms of both licenses and was incorporated into the terms of the PDA as an exhibit attached thereto. The "Remuneration Clause" of the LA presumes the array is commercially available in large numbers. The array was available to Mala to be resold for other uses outside utility locating, whereas WTI retained the right exclusively to that field. After 2002 Mala was encouraged to explore sales of the array inside and outside the utility locating industry.

The LA's "Whereas" paragraphs conveyed to WTI all of Mala's CART-related "know-how"[7], "Licensor (Mala) agrees to allow Licensee (WTI) use of its Know-how and intellectual property, and Licensee agrees to pay certain license fees ..." (LA at 1) These provisions reflect

---

[4]  Jan Rynning represented Mala. Robert Green, Shane Green and Alan Witten represented WTI.
[5] "CART" stands for "Computer Assisted Radar Tomography."
[6] Ltr. R. Green to J. Rynning, 8-29-97, M 00016, Ex. 4.
[7] defined in the LA as "knowledge, experience, data, technology, designs, techniques, drawings, software, and other information and knowledge, relating in any way to the parties."

an unmistakable grant by Mala to WTI of all manufacturing rights and access to manufacturing specifications with respect to all of Mala's CART-related technology.  In spite of numerous demands by WTI, to date, Mala has failed and refused to provide this promised "know-how" to WTI in two ways.  Prior to 2002, Mala flatly refused to produce this information even though Mr. Rynning admitted to their board of directors that "[i]f we can't manage to do this (adjust a piece of equipment) Witten has the right to take Mala's know-how and turn to another supplier. The agreement is constructed this way.  The risk is therefore obvious that we through this create a powerful competitor."[8]  Furthermore, Mr. Rynning said to the board in January of 2000 that it was his and Mr. Leijon's (Mala's President) that Mala "shall not let go of the know-how" even though they had already given drawings to a person/corporation unknown to WTI named "Pajala."[9]  My Rynning also said that he wanted to first get feedback on some modifications for the next generation of CARTs, yet still deny WTI the manufacturing details in which WTI helped to create.  Mala made these harmful decisions all the while complaining about WTI's financial position and gaining copies of WTI's valuable software and processes.

After 2002 Mala continued to refuse to provide WTI the know-how because Mala has lacked the ability to convey such manufacturing rights based upon an agreement entered into with GSSI.[10]  Mala contends the GSSI agreement does not effect its rights to convey rights to WTI, whereas GSSI's President Dennis Johnson disagreed.[11]  It was his opinion that under the GSSI/Mala agreement Mala was not to sub-license its manufacturing rights and the CART is in a form which violates GSSI's patent.

---

[8] J. Rynning, June 29, 1998, M 003809.1.  Ex. 5.
[9] J. Rynning, January 20, 2000, M 003819.1-.2.  Ex. 6.
[10] GSSI/Mala License Agreement  Ex. 7.
[11] Dennis Johnson deposition at 69/07-70/06.  Ex. 8.

Under § 2 of the LA, WTI is to use its "best efforts" to promote the CART; LA § 11 allows either party to terminate the LA upon the other's material breach of its LA obligations or upon the other's insolvency or bankruptcy. WTI will present evidence of its _extensive_ marketing efforts and successes, among them such high-profile activities as a Discovery Channel special showcasing WTI in Madagascar searching for Captain Kidd's treasure, coverage on CNN, a 20 minute news special in all of Europe, the Wall Street Journal's 2004 "Best and Brightest Technology and Innovation," the 2002 NOVA Award by the Construction Innovation Forum, Engineering News Record's "Top 25 Newsmakers," The Florida Engineering Society's "New Product Award" and numerous other articles covering WTI's imaging software. WTI has admittedly endured financial difficulties precipitated by the development costs,[12] as many great inventions go through. However, WTI is not in the dire straits Mala asserts. WTI's was recently valued at $155 million; current balance sheets indicate WTI's assets exceed liabilities; and WTI remains capable today of paying all bills.

PDA §6.03 and LA §6 stated the parties' intention to share equally all costs of obtaining and maintaining CART technology. Despite these provisions, WTI shouldered the _entire_ cost burden associated with patenting CART technology and sustaining the parties' patent rights when Mala abandoned their obligations because "largely due to the Swedish culture, the Mala technical team did not have the same appreciation for the benefit of aggressive patenting."[13]

**b. The ESA**

---

[12] Email M. Oristaglio to T. Leijon & J. Rynning, November 13, 2000, WTI 3660-4. Ex 9.
[13] Summary of Meeting between Mala and Witten, Uppsala, Sweden, September 14/15, 1998, WTI 319-322. Ex 10.

Hoping to "close"[14] the PDA, Mala proposed the Exchange & Settlement Agreement ("ESA"), which was executed on October 31, 2002. The ESA[15]: (i) reiterated and activated the rights promised WTI in the LA (ESA at 1), thereby requiring WTI to begin paying royalties to Mala (ESA § 2); (ii) required WTI to sell Mala its three (3) CARTs to be upgraded[16] and leased back to WTI (ESA §1.1(a)); (iii) identified Patent Application 09/658,188, filed September 8, 2001 as the patent created and to be transferred to Mala pursuant to the PDA/LA (ESA § 1.1(c)) and to give Mala five (5) licenses to WTI software (ESA §1.1(b)); and (iv) called for the release of all WTI indebtedness to Mala under its 09/09/97 note (ESA §1.2).

While its payments have not always been timely, mainly due to disputes over WTI owing money in light of Mala's consistent refusal to abide by the agreements, WTI has made the royalty payments pursuant to LA. WTI assigned the patent and delivered copies of the software to Mala; [17] however, Mala has failed to: fully upgrade the CARTs; sign the Software License Agreement ("SLA"); cancel the $500,000 note; and never delivered documents WTI needs for the use of the CART, manufacture or lease. The current CART is not sufficiently durable to be leased to a third party, and WTI was denied access to the know-how in order to mitigate the

---

[14] The PDA was set to "close" upon fulfillment of both parties' obligations under the ESA. (PDA §1.) The PDA never terminated because Mala never fulfilled its obligations under the ESA.

[15] Disputes arising from the parties' ESA, Side Agreement ("SA"), and Equipment Lease are not within this forum's jurisdiction; however, WTI asserts that consideration of these contracts' terms is pivotal in understanding the parties' history and current dispute under the contemporaneous LA and PDA.

[16] The parties' Side Agreement ("SA"), executed with the ESA, required Mala's upgrades to be "to the latest version, at the time, of the hardware, firmware and operating software…"(SA § 1.2)

[17] When WTI supplied Mala with the five (5) software licenses promised under the ESA on November 11, 2002, WTI CEO Mike Oristaglio also supplied Mala with a Software License Agreement ("SLA") and instructed Mala to sign and return it prior to using the software. Mala did not do so & now claims to not be bound by the terms even though it has used the software & derived considerable royalties therefrom. WTI 0903, Ex 11.

problems despite the parties' agreements.  Mala's use and dissemination of WTI software without signing WTI's SLA as WTI requested has further harmed WTI.

### c. Disintegration of the WTI-Mala Relationship

By 2002 and early 2003, it became apparent that Mala had abandoned all of its obligations to WTI. Using fraudulent and deceptive means, Mala failed to: produce the commercially viable CART contemplated by the PDA; deliberately failed to obtain FCC waivers for the 200 MHz CART[18] as it had obtained for its less-commercially relevant 400MHz CART; provide maintenance/manufacturing documents; and otherwise meet the terms specified in subsequent agreements, including the Equipment Lease.[19]  Mala's refusals to produce an operable CART (or to give WTI the ability to repair the inoperable ones Mala did supply) generated many complaints from WTI and its customers.[20]

Naturally, WTI has withheld payments[21] from Mala in reasonable expectation that Mala would cure the defects quickly in Charleston[22] as promised in SA §1.2 or, at the very least, provide WTI the requested information necessary for repairing the CART devices on-site themselves (i.e., CART user manual, troubleshooting guides, etc.).  Because it was unable to perform its own repairs, WTI has been forced to send malfunctioning equipment all the way to Sweden for repair at exorbitant rates that precluded WTI from mitigating its damages.  WTI noticed Mala that it was justifiably and temporarily suspending royalty payments in connection

---

[18] Mala uses its failure to obtain FCC approval for the CART as an excuse for not supply WTI with "new" CARTs as promised in SA §1.2.

[19] The parties' 10/31/02 Lease required WTI to pay lease payments to Mala on its 200 MHz CART leases (Lease §2) and required Mala to repair CART equipment at WTI's request in "a timely fashion, normally within 3 working days." (Lease § 4.)

[20] Ltr. G. Jefferies to R. Green, February 21, 2005, M 004146-9. Ex 12.

[21] Over the years, WTI has received many idle threats from Mala that it would terminate the parties' agreements on allegations of WTI's breach for non-payment.

[22] In 2005, Tommy Leijon inexplicably further complicated the repair process by suddenly requiring, without exception, that WTI contact only him when seeking CART repairs.

with the refusal of its sublicensee, Craig A. Smith ("CAS"), to pay WTI in connection with the inoperable CART Mala had sent CAS in 2004.   Mala's deception has also cut off WTI's access to CART hardware while our competitor, GSSI is freely producing radar arrays[23]; WTI's cutting edge software requires properly functioning hardware in order to execute its business plan. Consequently, WTI has suffered severe financial damage.

### d. 2005 Negotiations

It became obvious that Mala wanted to enter into the market place and compete with WTI in selling completed CART systems.   Naturally Mala would have to obtain approval from WTI for them to sell a CART System using WTI's proprietary software.   But as Matt Wolf said in an internal Mala report "software sells the hardware."[24]   In May, 2005, for the second time Witten unsuccessfully offered a modification of the LA which would have allowed Mala to sell CARTs under Witten's LA through an End User's License Agreement ("EULA");   however, Tommy Leijon wanted to do things the "European way".[25]   It was obvious their ultimate goal "is that Mala shall be able to sell completed CART systems on a non-exclusive basis worldwide except for in North America" and refuse to pay the true value of WTI's software or abide by necessary protectionary agreements.[26]   In order to effectuate that goal outlined by the Board, Mala now seeks to terminate the LA with one claim being based on WTI's alleged insolvency.   Were this to happen, under the ESA §3.1(a) Mala would be able to claim WTI's software source codes as their own and go forward, with unrestricted use of WTI's valuable software worldwide.   The LA's "Premature Termination" provision in § 11 is Mala's only hope for obtaining WTI's software free and clear.   Mala is trying to terminate the LA because it protects Witten's business

---

[23] WTI would consider purchasing arrays from GSSI but for an exclusive licensing agreement GSSI has with another company.
[24] T. Fenner, internal Mala memo, 3-17-00, M 004693-5.  Ex 13.
[25] TL email, WTI , Ex. 14.
[26] Minutes from Mala's Board of Director's meeting, February 16, 2005, M 003867.1.  Ex 15.

opportunity paid for by over $10,000,000 invested in development costs, not because WTI is in breach.

## ARGUMENT AND CITATION OF AUTHORITY

I.  **MALA'S FRAUDULENT INDUCEMENT CLAIM MUST FAIL AS A MATTER OF LAW, FOR SUCH CLAIMS CANNOT BE BASED UPON A PARTY'S PROJECTIONS OR EXPECTATIONS OF FUTURE PERFORMANCE**

### a.  Statements of projection are insufficient to support New York fraud claims

Mala's fraud claims are fatally deficient under New York law and must, therefore, fail. In its September 23, 2005 supplemental demand for arbitration ("Demand"), Mala stated that "[t]he Agreement has not operated as envisioned, planned and projected by both sides. This failure was due to misrepresentations made by Witten to Mala at the outset of negotiations ..." (Demand at 2.)  Mala went on to outline the following five (5) alleged misrepresentations on the part of WTI principal Robert Green, none of which is based on any past or existing fact known at the time the LA was signed in 1997:[27]  (a) that Green had gathered sufficient investor funds for developing a commercial CART sales network; (b) that Green expected losses for WTI in the immediate future but extremely large revenues/profits in 1999 and following; (c) that each CART placed in the marketplace could generate upwards of $1 million in income per year starting in 1999; (d) that there should be 40-50 units sold or leased by 1999 and as many as 140-160 by 2001; and (e) that Mala's requested a "minimum quantity" requirement in return for WTI's utility mapping exclusivity was unnecessary because U.S. law would allow Mala to terminate the LA if Witten failed to develop a satisfactory sales organization.  (Demand at 2-3.)

Under New York law, a cause of action for fraud:

---

[27] In the interest of saving space, WTI includes merely a summary of Mala's allegations.

"requires proof of [1] a representation of fact which is false and [2] known to be false when made, which is [3] offered to deceive another and [4] with the intention to induce the other to act or refrain from acting, and [5] proof of reliance upon the representation which causes injury."

*Koagel v. Ryan Homes, Inc.*, 167 A.D.2d 822, 822 (1990) (quoting *Chase Manhattan Bank v. Perla*, 65 A.D.2d 207, 210 (1978)).   As a general rule, "representation of opinion or predictions of something which is hoped or expected will occur in the future will not sustain an action for fraud. 'To constitute actionable fraud, the false representation relied upon must relate to a past or existing fact, or something equivalent thereto, as distinguished from a mere estimate or expression of opinion.'" *Id.* (quoting *Perla*, 65 A.D.2d at 210 and *Benz v. Kaderbeck*, 241 A.D. 583 (1934); *see also Zanani v. Savad*, 217 A.D.2d 696, 696-97 (1995)).   A good fraud claim further requires reliance on the alleged misrepresentation to have been *justifiable*.  *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (N.Y. 1996).

Simply stated, Mala must prove a misrepresentation of a *fact* in order to succeed on its fraud claim.   Mala was made well aware of Witten's financial position and capital raised in 1997; whether it was "sufficient" was *not* an existing fact as of that date but was rather an expression of opinion.   (Jan Rynning's 8/12/97 report regarding WTI, M003929.1-3929.4 at 3929.2.)   In 1997, neither party could have anticipated the events that would later transpire during the CART's development phase or the precise speed of market uptake.   As a matter of law, Demand allegation "a" cannot support Mala's fraud claim in that it alleges no misrepresentation of *fact* but only refers to an expression of his *estimation* with regard to the money Witten had raised.

The alleged misrepresentation raised in Demand subparagraph "b" similarly cannot underlie a successful fraud claim; *by Mala's own admission* in the Demand, Mr. Green's alleged statements were purely expressions of "expectation."   When asked whether he believed projections made in regards to a new and developing market were completely reliable, Mr. Rynning answered as follows:

> No, of course it's not completely reliable and you have to, when you read those projections you have to make your own estimates and analysis of the facts ...

(Jan Rynning Dep. at 0053, ln. 8-17.)(Emphasis added.)  The legal principle that estimations and projections as to future performance are not proper grounds for fraud claims is likewise germane to an analysis of Demand subparagraphs "c" and "d." The alleged representations of subparagraph  "c" relate to the annual income expected upon the CART's market introduction, while those contained in subparagraph "d" forecast the number of CART units Green expected to enter the marketplace in coming years.   Assuming *arguendo* that Mr. Green made such statements as alleged, they cannot be regarded as actionable statements of *fact* but merely represented Mr. Green's best guesses, for there was no CART even in existence at that time, let alone market awareness of the product upon which to base such projections.

Mr. Rynning noted in a 1997 letter to Mala's Board of Directors that the pictures created with WTI's software were "very good" and "impressive."  (M003929.1.)  (Ex. 16)  Mr. Rynning then balanced his enthusiasm with the reality that WTI had to offer only what was in Alan Witten's mind and Robert Green's marketing knowledge and contacts.  (M003929.1-.2.)  Mr. Rynning notably stated that "we have to accept that it is a **high-risk project** that can cost us 3-4 million SEK.  What we can learn technically even if the project fails is probably worth the money.  We will be able to use the knowledge and contacts in other present and future projects."  (M003929.4.)  (Emphasis added.)   Obviously, Mala's principals appreciated the uncertainty

involved with the CART project and had reason to know Mr. Green's alleged statements were merely estimations, not statements of fact.

Mala, a self-proclaimed "world leader in GPR technology" with vast experience in taking multiple products to market, was in a much better position than WTI, a start-up software technology company with no experience in taking new products to market, to forecast how long it would take to develop the CART and how much money could be made once it became ready to sell. Clearly, any reliance by Mala on WTI's alleged projections was unjustifiable as well as un-actionable under NY law and cannot now form the basis of a fraud action.

### b.  Misrepresentations of Legal Principles Are Not Actionable Fraud

Mala's fraud argument based on alleged statements set forth in Demand subparagraph "e" is equally deficient. There, Mala claims that it was fraudulently induced into signing the Agreement by WTI's alleged statements that U.S. law would permit termination of the LA should WTI fail to develop a "satisfactory marketing and sales organization."

Under New York law, "[t]he general rule that statements concerning the law are expressions of opinion which will not support an action for fraud has been held to embrace opinions on questions of law based on facts known to both parties alike . . . [and] representations as to what the law will permit to be done . . ." *See* 60A NY Jur Fraud and Deceit § 54 *(*citing *Magalnick v. Empire State Mut. Life Ins. Co.,* 180 N.Y.S.2d 575 (1958) and *De Franco v. Shedden,* 251 A.D. 720 (1937)). *See also Royal American Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016 (2d Cir. 1989), in which the U.S. Court of Appeals for the Second District applied New York common law and held a plaintiff's reliance on certain alleged misrepresentations concerning the requirements of a New York statute to have been unjustifiable because the contents of the representation were "not peculiarly within [one] party's knowledge

and both parties have available the means of ascertaining the truth." *See also Verschell v. Pike*, 85 A.D.2d 690, 691 (1981) (attorney not justified in relying upon adversary's statement that lease was legal under zoning ordinance).

Pursuant to these authorities, any understanding of U.S. law Mr. Green may have shared with Mala cannot give rise to actionable fraud. Not only were such alleged statements based in mere lay opinion rather than fact, but Mala's reliance on them cannot be regarded as justifiable or reasonable. Moreover, Mr. Rynning, an accomplished attorney himself and Mala's negotiations representative at the time these statements are alleged to have been made, should have known that any statement of legal opinion coming from WTI should be verified as accurate before it was relied upon. [28]

### c. As a Matter of Law, Mala Cannot Support a Claim of Fraud Based on Alleged Misrepresentations of Fact that Mala's Principals, by their Own Admission, Actually Believe to be Accurate.

In the *Koagel* case cited *supra*, 167 A.D.2d at 822, the court stated that an action for fraud "requires proof of a representation of fact which is false and known to be false when made." 167 A.D.2d at 822. It is Witten's position that the subject representations were not facts at all, but rather projections, estimations and expressions of opinion. However, even assuming *arguendo* that those representations set forth in Demand subparagraphs "b" through "d" *were* statements of fact, Mala's claim for fraud remains fatally flawed as a matter of law, given that Mala's principals have admitted they, like WTI, regarded (and, in some cases, still regard) the projections as true reflections of the market for CART services. Such admissions negate the first

---

[28] Fax J. Rynning to A. Witten and O. Forslund, 9-11-97, WTI 00889. Exhibit 17. Jan Rynning acknowledges the need to consult American lawyers regarding the PDA's terms' "conformity to American law."

and second elements required for any fraud claim: the making of a *false* representation of fact, *known* to be false *when made*.

Mala cannot terminate the LA based on Witten's alleged fraud when Mala's own Chairman, Mr. Rynning (who, negotiated the LA's terms with WTI in 1997) agrees that there was and still is a very large market for the CART. Rynning believed in 1997, and continues to believe today, that WTI's projections were, and still are, within reach. (Jan Rynning Dep.at 0050–0051.) Mr. Rynning further testified that their was a ***huge market***. (Jan Rynning Dep. at 0053, ln. 8-17.)(Emphasis added.)

Mr. Leijon testified that Mala considers the market for ground penetrating radar to be between $100 million and $120 million. (Tommy Leijon Dep. at 0124). Mr. Leijon further testified that the market was large and that Mala could sell 150 CARTs worldwide in a period of three to five years. (Tommy Leijon Dep. at 0126–27.) Based upon this testimony, Mala cannot now claim it was misled by Witten's alleged representations when Mala's principals, based on their own estimates and market analysis, believed in 1997 and still believe the original revenue projections to be true and attainable.

If Mala believes that there *was* in 1997 and still *is* a "huge market" valued at "$100-120 million," then Mr. Green's alleged projections cannot be counted as *false*—indeed, they were statements of opinion which cannot plausibly be deemed true or false. It logically follows that the statements, therefore, do not meet the "made with knowledge of their falsity" element, either, especially considering that Mala's principals now confirm that Mr. Green's expectations were reasonable and true. Mala's fraud claim must fail due to its failure to meet both the "falsity" and "knowledge" elements of the *prima facie* case for fraud under New York law.

### d. **By Signing the ESA in 2002, Mala Waived any Claim that it had been Fraudulently Induced into Signing the LA in 1997.**

Pursuant to the doctrines of waiver, estoppel and ratification, Mala is now legally precluded from claiming it was induced into signing the LA in 1997.   With the benefit of five (5) years' hindsight, Mala affirmed the LA and its terms in 2002 when it signed the ESA.  Mala had full knowledge of whether each alleged misrepresentation had been fulfilled.

The following excerpt from *New York Jurisprudence* is most instructive:

As a general rule, where a contract is wholly executory, neither party having performed any part of it, if one party ascertains that the other has been guilty of fraud in the procuring or making of the contract, or with reference to the subject matter thereof, *he or she may repudiate the contract*, since it is in no way binding on him or her, but the defrauded party may not remain silent as to the fraud and perform the contract, and then claim damages for the fraud. [Towers Realty Corp. v. Fox, 278 A.D. 74 (1951).]  Thus, ***one who discovers that fraud has been practiced upon him or her while the transaction remains wholly executory, but nevertheless either executes or performs it, or requires performance on the part of the other party, thereby waives the fraud*** and cannot subsequently maintain an action for damages therefor.  [*Saratoga & S.R. Co. v. Row*, 1840 WL 3515 (N.Y. Sup 1840).] . . . to permit recovery [under such circumstances] would be tantamount to allowing a recovery for self-inflicted injuries and permitting the complaining party to speculate on the other's fraud; it is deemed to be the duty of the defrauded party, on discovering the fraud, to elect whether he or she will perform or rescind. [*Id.*]  ***A fortiori, performance of a contract with knowledge of the fraud will defeat the***

> **right of rescission** [*Whitney v. Allaire*, 1 N.Y. 305, 1848 WL 5195 (1848)], **as well**
>
> **as the defense of fraud**. [*Baird v. City of New York*, 96 N.Y. 567, 1884 WL 12390
>
> (1884)].

60A NY Jur Fraud and Deceit § 219 (emphasis added).  *See also Chalos v. Chalos*, 128 A.D.2d

498 (1987) (holding that a wife's action to rescind a separation agreement on the ground of fraud

was barred where she *ratified* the agreement by her substantial compliance with its terms over a

three-year period) and 22A New York Jur Contracts § 369 (noting that "waiver may be express

or implied from the acts of the parties.").

The parties' execution of their Exchange & Settlement Agreement ("ESA," attached) in

2002 initiated the LA and the payment of royalties as outlined therein.  (ESA §2.)  All of the

allegedly fraudulent representations/projections raised in Mala's Demand were made some five

(5) years before the LA actually went into effect.  In other words, the LA was merely an

"executory contract" from its signing in 1997 at least until its activation in 2002, and Mala had

five (5) full years to determine whether it had been fraudulently induced into signing the LA

before:  (i) *affirming and activating* its terms in 2002 and (ii) acting from 2002 to 2005 in

*performance* of its duties under the LA, thereby *ratifying* the agreement. By failing to seek the

LA's rescission while it remained an executory contract, and by choosing instead to activate the

LA and begin performing pursuant to its terms (with knowledge of the alleged fraud), Mala lost

its right to attempt such rescission now.  Mala's long history of actions contradictory to its

current position preclude Mala from claiming it was fraudulently induced into executing the LA.

By 2002, Mala would have surely known: (i) whether the investment funds raised were

sufficient to meet the anticipated goals; (ii) whether the revenues expected via the statements

alleged in Demand subparagraph  "b" had been realized; (iii) whether Witten had generated the

income projected in the statements alleged in Demand subparagraph "c"; and (iv) whether the CART sales numbers Mr. Green purportedly expected to occur from 1999-2001 had, in fact, come to pass.  Under the doctrines of waiver, estoppel and laches, Mala is now barred from claiming that WTI's representations fraudulently induced Mala to act or refrain from acting.

Put simply, Mala has, at all times relevant to this dispute, not disagreed with WTI's projections but has wanted to take WTI's business opportunity in the market. [Jan Rynning dep. at 0050-0051].[29]  Now that market acceptance is imminent, Mala is using this meager fraud claim as a desperate attempt to cancel its contract with WTI in an effort to usurp WTI's opportunity and enter the "huge market" with WTI's software and patents free of charge. This dispute has nothing to do with fraud. One of Mala's problems is that a sound fraud claim under New York law must be based on the legal principles set forth above, and Mala's allegations fail, as a matter of law, to satisfy those principles.

## II.    MALA'S CLAIM FOR RESCISSION BASED ON BREACH OF THE SALES PROVISION OF THE LA CANNOT STAND

Mala seeks to terminate the LA, alleging that WTI breached the LA by failing both to "use its best efforts to promote the sales of the Product within the Territory" and to "create and maintain an efficient sales organization for the Product" under LA § 2.  (Demand at 3-4.)

### a.    New York law does not enforce "best efforts" provisions in contracts that fail to define the exact performance expected thereunder.

Mala's claim is fatally deficient as a matter of law, for New York law generally does not recognize the enforceability of "best efforts" provisions like the one in the LA where what is meant by "best efforts" is not explained elsewhere in the contract. *See, e.g., Strauss Paper Co. v. RSA Exec. Search, Inc.,* 260 A.D.2d 570, 571 (N.Y. App. Div. 1999) (holding that no material

---

[29] Ltr. J. Berl to H. Kaplan, WTI 1926-7. Ex 18.

issue of fact existed with respect to whether the defendant had utilized its "best efforts" in performing under a contract where the parties' agreement did not contain clear guidelines against which to measure such efforts in order for such clause to be enforced).  Here, as in *Strauss Paper*, the "best efforts" provision involving WTI's sales efforts is unenforceable and gives rise to no material issue of fact because the LA is silent as to the performance Mala expected when it bound WTI to "use its best efforts" in promoting the CART.

Mala's Demand cites then-WTI Vice President Shane Green's detailed 1997 marketing plan in support of its claim under LA § 2, claiming that Mr. Green's plan "confirm[ed] statements made orally before the PDA or [LA] Agreement were signed[.]"  (Demand at 4.) Mala's reliance on Mr. Green's marketing plan in this context is wholly misplaced for at least two (2) related reasons.  First, the plan cannot be said to comprise part of the LA sufficient for describing what the parties meant by "best efforts" in the LA, as the plan was prepared, on information and belief, *after* the contract was executed.  Second, even accepting the plan as reflective of the parties' oral understanding just prior to executing the PDA and LA, Mala's reliance on the plan in this context remains misplaced, for both the PDA and LA contain clauses purporting to have merged *all* prior understandings into the respective contracts' terms.  (LA at § 18.05; PDA at § 14.05) Accordingly, Mala's allegations under LA § 2 are ripe for dismissal.

  **b.**   **<u>WTI has exhibited a good faith effort to meet its sales obligations and has not breached LA § 2, even as Mala's failures to deliver a marketable CART frustrated WTI's sales efforts.</u>**

"It is well recognized that agreements executed at substantially the same time and related to the same subject matter are regarded as contemporaneous writings and must be read together as one." *Flemington Nat'l Bank & Trust Co. v. Domler Leasing Corp.*, 65 A.D.2d 29, 32 (N.Y.

App. Div. 1978) (citing *Nau v Vulcan Rail & Constr. Co.*, 286 NY 188, 197 (1941)).  Here, the PDA and LA were executed by the parties at the same time (September 1997) and regarded the same subject matter; accordingly, New York law requires that they be construed together as contemporaneous contracts.  PDA § 2 indicates that the parties saw that the success of the project was highly dependent on both parties timely performing their obligations as outlined in Exhibit A to the PDA.  Mala's attempted satisfaction of those requirements was both untimely and technologically inadequate.

CART 0 was the first prototype radar array manufactured by Mala.  It was shipped from Sweden in December 1998 and was returned to Mala in the Fall/Winter of 1999 fornumerous fatal problems.  Technologically it failed at almost everything.[30]  Thankfully WTI was able to derive some usefulness from it, but as Mr. Oristaglio pointed out in his email that the CART did not work properly because of bad timing circuits.  He further points out that "Mala more or less refused to acknowledge any problems" with the CART for over eight months until WTI employees came to Sweden demonstrated the failures.  *Id.*  In numerous instances Mala's product has continued to have multiple problems which Mala often refuses to own up to or remediate.  However, it is WTI's software and processes are the key to the CART development and what are unusual, not a radar array.  Because of WTI's technological successes, it has been able to continue performing in spite of Mala's severe deficiencies.

New York law "does not require a party to fulfill a condition of a contract that is incapable of fulfillment and is not that party's fault" so long as there has been a "genuine good-faith effort to fulfill the condition." *Buffardi v. Parillo*, 168 A.D.2d 812, 814 (1990).  It is a basic rule of New York common law that a party to a contract who alleges the other's breach

---

[30] Email M. Oristaglio to T. Leijon & J. Rynning, November 13, 2000, WTI 3660-4.  Ex 9.

"must show that he himself is free from fault in respect of a condition precedent." *Samuel Eiseman & Co., Inc. v. Furchtman*, 211 A.D. 543, 548 (1924). Further, where a promisor himself causes the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure" (*Kaplon-Belo Associates, Inc. v. Kim*, 145 A.D.2d 413, 414), and, finally, "a party may not frustrate an agreement by causing the failure of a condition precedent thereto." *Lindenbaum v. Royco Property Corp.*, 165 A.D.2d 254 (1991).

Mala's failures under its contracts with WTI have continually frustrated WTI's sales activities, but WTI has still exerted good faith efforts to satisfy its LA §2 obligation to promote the CART. While WTI must concede that it was certainly unable to begin extensive marketing activities as early as initially envisioned, Mala's failure to produce the CART hardware with the anticipated commercial ruggedness is wholly to blame for any such delay.

Even after the CART was ready for demonstrations and deployment in paying jobs, a myriad problems with its hardware fostered great uncertainty as to whether the CART was rugged enough in design to support widespread acceptance in the emerging market. At arbitration, WTI will present witnesses and copious documents attesting to: (i) the poor quality of the CART Mala produced; (ii) the numerous and exorbitantly expensive repairs the malfunctioning CARTs have constantly demanded just to keep them minimally operational, (iii) the obstructive and obstinate behavior of Mala's agents in response to WTI requests for new CARTs and repairs to the old CARTs; (iv) WTI's sublicensee's refusal to pay royalties because Mala had delivered the CART in an embarrassingly inoperable state; and (iv) the marketing quandary in which WTI found itself as a result of Mala's poorly developed hardware and erratic behavior.[31] Mala's production shortcomings prevented WTI from confidently launching the kind of no-holds-barred promotional campaign it had planned to launch and, indeed, *would* have

---

[31] Minutes of Board of Directors for WTI, 8-15-00 WTI 2561-3. Ex 19.

launched had the CART been delivered in sufficient numbers and of sufficient operability to meet the market response expected to follow such promotional efforts. Mala repeatedly ignored (and, in some cases, utterly dismissed) WTI's many expressions of concern and inquiries for status updates in relation to the FCC problem.

Even in the midst of all the aforementioned difficulties, WTI has managed to promote the CART and obtain paying jobs worldwide and has, in a good faith effort to cooperate, accepted Mala's input as to marketing strategies to be employed. For example, WTI responded to Mala's concerns regarding slow market uptake by granting Mala's request for the authority to sublicense the CART itself, but Mala's efforts have yielded feeble results as compared to those WTI has reaped. In 2005, WTI again exhibited good faith in agreeing, at Mala's urging, to execute a "reseller software license agreement" which would allow Mala to pursue international business opportunities alone. WTI expended much time and energy, not to mention more than $ 15,000 in legal fees, trying to accommodate Mala's desires before discovering Mala's unscrupulous motive in soliciting the deal, to pillage WTI's intellectual property and seize the entire CART-related business opportunity for itself.

It is still unclear whether WTI ever even incurred sales obligations under LA §2 due to Mala's failure to produce a CART capable of being promoted. Either way, WTI has more than satisfied the requirements of LA § 2 through copious and extensive activities in connection with promoting the CART worldwide, especially considering that WTI has had to perform such activities blindly, always uncertain as to whether Mala would (or even could) produce a commercially viable CART product for interested customers.[32] The non-exhaustive list of WTI's wide-ranging marketing/sales/promotion activities in connection with the CART attached

---

[32] Email R. Green to T. Leijon, 3-19-04, M 001091-2. Ex 21.

hereto as Exhibit 22 reflects WTI's good faith efforts to promote of the CART worldwide pursuant to LA §2.

In sum, Mala's claim under the "best efforts" clause of LA §2 cannot prevail as a matter of law. Even if the claim is entertained, it must fail either because WTI has exceeded and not breached any sales obligation it may have under the LA, or because Mala has waived the claim.

## III.    WITTEN IS NOT INSOLVENT AND HAS NOT FAILED TO PERFORM UNDER LA § 11

Mala seeks to terminate the LA by alleging, under LA § 11, that WTI is insolvent according to WTI's 2000-2004 financial statements and that WTI failed to pay royalties or to deliver certain reports for 2004 and certain WTI invoices arising from CART revenues from late 2004 through June 2005. (Demand at 6-7; Mala's Request to Supplement Demand at 1-2.) These claims must fail for several related reasons.

### a.  Mala's Motive in Seeking to Terminate the LA Based on Insolvency

Mala's attempt to terminate the LA based on insolvency is part of a grand scheme to acquire rights to WTI's source code and proceed, unfettered by any agreement with WTI, and with unrestricted and free use of WTI's valuable software in worldwide CART sales. Mala's Board discussed this true motivation in its February 16, 2005 meeting, the minutes of which stated as follows: "It was decided that the CEO and Chairperson shall try to put together a meeting with representatives from Witten in order to investigate if the parties can find settlement with respect to further licensing of Witten's software. *The aim is that Mala shall be able to sell completed CART systems on a non-exclusive basis worldwide except for in North America.*" (Exhibit 15 ---M 003867.1)(emphasis added). Negotiations broke down when WTI refused to accept Mala's one-sided proposals to give Mala the utility-locating market outside the U.S. after

WTI had worked for ten years to develop the software and processes to perform in the market; Mala's Board responded with the "legal measures" it had planned at least since May 2005. Terminating the LA based on its insolvency provision is Mala's only hope for getting unrestricted rights to use WTI's invaluable source code, software and processes without which radar array hardware is limited in its usefulness. With WTI's technologies, Mala knows it could gain access to the CART's world market without sharing its spoils with WTI. Mala's plot should not be allowed to succeed.

### b. Mala Cannot Prove WTI is Insolvent Under Either Definition of Insolvency

The recent independent valuation of WTI of $150 million plus clearly indicates that WTI is in fact solvent (defined as liabilities exceeding assets, with no prospects of improvement, and with immediate creditor demands threatening involuntary bankruptcy). WTI's plan for 2006 and for the next 5 years is sound, and recent contract possibilities are exceeding our plan's expectations. There have been (and probably will continue to be) brief periods of illiquidity – where current cash on hand is not sufficient to pay all bills due at the moment. However, those periods have been eliminated in the past – and will continue to be eliminated until cash flow from operations exceeds cash needs–by WTI's negotiating debt from existing shareholders or selling additional shares to qualified investors.

The major current impediment to positive operating cash flow is Mala's failure to perform under the contracts. If WTI had the radar arrays they had expected – and if the CARTS had been delivered were of adequate quality – WTI would be currently generating substantially more cash revenue. Additionally, this would have been the case for the past few years. It is clear to WTI that Mala has been deliberately slow to deliver CARTs and to correct issues that WTI has raised. Management at WTI finds it reprehensible that Mala deliberately fails to meet

contractual obligations, yet has the temerity to accuse WTI of defaulting the contractual terms due to insolvency.

WTI's financial statements as of 12/31/04 and 6/30/05 indicated liabilities in excess of assets. Several events have occurred that have shed light on those statements. First, under the GAAP (Generally Accepted Accounting Procedures) the market value of in-house developed intellectual property cannot be included on the books of a company. WTI has spent large amounts of money prosecuting patents worldwide to develop its value. Second, approximately $200,000 of disputed payables have been reclassified to Deferred Income, as vendors have been unable to provide adequate support of work performed or goods delivered. Also, approximately $1.3 million of deferred compensation has been reclassified as long-term liability. The employees who are creditors of WTI have agreed to long term payouts from the operating profits of WTI. These changes result in current assets exceeding current liabilities as of 3/31/06. Even though total liabilities exceed total assets, total liabilities are only a small fraction of WTI's real market value. Such a situation is not uncommon for development stage companies, especially when there is a continuing shortage of inventory to sell or equipment to operate and earn revenue. The shortage of equipment due to Mala's failure to perform under our contract terms has been noted above, and was the principal reason for WTI's less than stellar financial position both now and at the financial statement dates noted above.

WTI clearly has the means of mitigation and continuing to operate. Raising capital from qualified investors and lenders continues to be a source of cash while WTI waits for Mala's performance under our contracts. Also, WTI is investigating alternative means of sourcing radar arrays. With an adequate inventory, WTI can rapidly improve its financial position and significantly diminish future short-term periods of illiquidity.

In summary, is WTI insolvent?  **NO**.  WTI has a current appraised value in excess of $150 million, and the company has the ability to realize that value by alternatively sourcing CARTS (assuming Mala continues to ignore its contractual obligations) and, when necessary, by issuing additional shares or borrowing capital.

     **c.**    **Mala Has, by its Actions, Waived its Insolvency Argument**

Even assuming *arguendo* that WTI is insolvent, Mala waived this argument long ago through its actions.  Mala has waived any right to terminate the Agreement based on insolvency and is estopped from asserting the insolvency argument now.  At least since 2000 and probably even prior to then, Mala possessed the requisite knowledge of Witten's financial issues but consciously waived its right to terminate the binding nature of the Agreement.  New York law states as follows:

> Waiver is a question of intent.  A waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed . . . . contract terms may be waived by implication or express intention of the party for whose benefit the provision inures.

*In re Gordon Car & Truck Rental, Inc.,* 59 B.R. 956 (Bankr. N.D.N.Y.1985).

In the *Gordon Car & Truck Rental* case, the creditor, car rental company Avis, Inc., attempted to terminate a license agreement based upon an insolvency provision in the agreement. *Id.* at 957. The debtor, Gordon Car & Truck Rental, argued that Avis knew or should have known of the debtor's insolvency a year to two years prior to the debtor's filing for bankruptcy protection under Chapter 11.  *Id.* at 962.  The court determined that based upon the steady decrease of royalty payments the two previous years and Avis's failure to inspect Gordon's financials per the terms of the agreement, Avis waived any rights it had under the license agreement.  *Id.* at 962-3.

The facts in the *Gordon* case are strikingly similar to those at work in the present case. Here, Mala, like Avis, has known of WTI's financial position for years; indeed, Mala has enjoyed this knowledge for a much longer period than Avis did and has also been provided much more documentation of WTI's financial situation than was Avis. Mala has opted again and again over the years to continue its contractual relationship with WTI, even in the face of WTI's alleged financial uncertainty. Mala continued with the LA to their benefit, thereby waiving any rights to seek its termination. Applying this most pertinent holding from the *Gordon* case, Mala, like Avis, has waived its right to terminate the LA on the basis of WTI's alleged insolvency.

On June 12, 2000, Robert Green notified Tommy Leijon of his desire to pay for CART 2 after delivery, stating that "every bill we can delay will help" and that WTI was still a long way from returning money to investors. (Ex 23, M005441.) Even more compelling is an analysis of WTI's financial position given to Mala's Board on September 11, 2001, some four (4) full years after the Agreement was initially signed and one (1) year before the ESA was signed to effectuate the Agreement's terms. ( Ex 24 M003842.1-3842.2.) In discussing WTI's effort to branch into new markets, Mala discusses WTI as if it were destined for bankruptcy. The letter goes on to outline four (4) options with respect to Mala's relationship with Witten, all of which indicate similar understanding of WTI's financial state.

In a February 2002 report to Mala's Board, Mr. Rynning and Mr. Leijon discuss their impressions that "Witten's situation is primarily the same as earlier. The company has a vile liquidity. Certainly, equally as messy as before." (Ex 25, M0003854.1 – 3854.4. at M 003854.2.) Mala again had full knowledge of WTI's financial position yet failed to exercise its rights to terminate the LA. Instead, Mala chose to sign the ESA later that same year which commenced the LA and its royalty payment terms.

Based upon these documents, it is clear Mala recognized, at least since 2000, its potential right to terminate the PDA/LA but waived that right continuously and consciously after thoughtful consideration of whether doing so would be beneficial to Mala. As a matter of law, Mala should be estopped from now attempting to reclaim rights it waived long ago.

### d. WTI's Late Payments to Mala Are Justified Due to Mala's Failure to Deliver Operable CARTs

WTI would have happily provided reports on CART revenues and paid Mala's royalties on time had Mala supplied operable and adequate equipment and performed timely repairs to the CART as contemplated in the parties' Side Agreement and Equipment Lease.  As noted elsewhere herein, WTI justifiably refused on various occasions to pay until CART defects were cured; indeed, WTI exhibited good faith in paying bills it still does not owe (due to design problems and lack of know-how with the CART that still have not been addressed) merely to avoid discord with Mala or further interruption of WTI's business.  These deficiencies were repeatedly noted to Mala by WTI personnel and customers, and WTI's intention to withhold payments until such deficiencies were remedied.

Further, certain alleged failures of WTI's were due to Mala's repeated refusals to provide WTI with the "know-how" (i.e., CART user manuals, troubleshooting guides, notes on work-arounds, preventative maintenance and servicing guides, CART power specifications, specs on interplay between CART components) Mala promised WTI on Page One of the LA, despite WTI's persistent requests for such information so that it could make its own cost-efficient, on-site repairs to the CART.  Mala also frustrated WTI's ability to perform jobs (and, in turn, willingness to pay royalties) by failing to provide manuals or troubleshooting documents to the

antennas and control units.[33]  make timely repairs to the CART or maintain an adequate service center in Charleston, SC as promised under SA §1.2.  Tommy Leijon's insistence that WTI personnel bring repair issues directly to him in Sweden (instead of more accessible Mala USA personnel) further obstructed WTI's ability to access repairs and terminated Witten's ability to license the CART, therefore, perform the very jobs from which Mala's royalty rights arose.

Clearly, while Mala's LA-frustrating actions rightly dissuaded (and fully absolved) WTI from paying its royalty bills on time or at all, WTI still made such payments in good faith and cannot now be regarded as having breached the LA.  (*See* Ex. 26, consisting of the majority of all royalty and repair payments.)  To the contrary, as set forth *infra*, WTI has itself been damaged due to Mala's failures in this regard.

Turning specifically to Mala's claim that it can terminate the LA due to WTI's failure to timely pay royalties during the 30-day cure period following Mala's 9/23/05 notice of termination, WTI responds that its obligation to cure the alleged default was removed by the fact this arbitration was then pending and allowed WTI to postpone all disputed payments.  Further, Mala's long history of threatening and purporting to terminate the LA with WTI without following through on the same caused WTI to regard this termination notice as equally ineffectual as the previous ones.  Upon  receipt of the Notice of Termination, WTI's counsel advised Mala's attorney to address the issue in arbitration considering their client asked for certain issues to be arbitrated.  Mala never broached the topic of non-payment in the arbitration until it asked to amend their Demand.

It was WTI's position that considering the numerous breaches and monies paid to Mala, and the recent denial by Tommy Leijon of paying a $16,000 software license upgrade fee, WTI would be further damaged by payment of additional royalties.  However, WTI's counsel

---

[33] Emails between T. Leijon and T. Clifford, January 2005, WTI 1962-1965.  Ex 27.

instructed WTI's management to continue such payments per the order of Arbitrator Genoni. Unfortunately some confusion arose as to the requirement of payments to be made and they were not all made current until April 2006.

## WITTEN TECHNOLOGIES COUNTERCLAIM AGAINST MALA

### I.   MALA FRAUDULENTLY INDUCED WTI INTO THE LA AND OTHER AGREEMENTS BY ITS MISREPRESENTATIONS AND ONGOING SCHEME TO CONCEAL A MATERIAL FACT

As noted *supra*, a New York fraud action "requires proof of [1] a representation of fact which is false and [2] known to be false when made, which is [3] offered to deceive another and [4] with the intention to induce the other to act or refrain from acting, and [5] proof of reliance upon the representation which causes injury." *Koagel*, 167 A.D.2d at 822. Silence may constitute fraud where one knows the other party "is acting under a mistaken belief as to a material fact" and the failure to disclose the fact is "calculated to induce a false belief." *Donovan v. Aeolian Co.*, 270 N.Y. 267, 271-72 (1936). "The suppression of material facts which a person is in good faith bound to disclose is evidence of and equivalent to a false representation." *Merrill Lynch v. Chipetine*, 221 A.D.2d 284, 285 (1995).

Mala has fraudulently induced WTI into giving up software licenses and patent rights under the LA and ESA by misrepresenting its ability to convey CART manufacturing rights to WTI in the PDA, LA, and subsequent agreements and has engaged in continuing fraudulent concealment by deliberately laboring to hide this material fact from WTI; WTI has relied on such misrepresentation to its detriment. WTI recently learned that Mala has never at any time relevant to this dispute had the power to convey the CART manufacturing rights it purported to convey, and allowed WTI to continue believing had been conveyed, to WTI. In truth, Mala

acquired in 2000 only a non-assignable *license* to manufacture a radar array and had no ability to share this right with WTI as it constantly represented.  (*see* Exhibit 7, 2000 GSSI-Mala Patent License Agreement, M 003079-98] and Exhibit 28, GSSI letter to Tommy Leijon dated 6/23/05.)

At least since the execution of its agreement with GSSI in 2000, Mala has known it lacked the ability to supply WTI with the manufacturing know-how promised in the LA and has acted since that time with the intention of concealing this material fact from WTI in an effort to preserve its access to WTI's valuable software.  In 2000 when Mala executed its agreement with GSSI, it knew that the PDA granted WTI rights to manufacture.  However Mala entered into the agreement with GSSI thereby preventing any sub-licensing of this right.  Again, in 2002 when Mala signed the ESA and thereby activated the LA, Mala knew full well that the LA contained another obligation to WTI of CART manufacturing rights and that it could not, either legally or in good faith, purport to convey such rights in light of its limited 2000 agreement with GSSI. Mala made such promises and concealed the material fact concerning manufacturing rights in a conscious effort to induce WTI into detrimentally (i) supplying Mala with valuable licenses to WTI software and (ii) assigning to Mala two valuable WTI patents[34] under ESA § 1.1.

Since the ESA and LA were activated, Mala has deceitfully let WTI continue believing it had the right to manufacture CARTs under the LA, even when WTI has directly requested the "know-how" to which the LA entitled it, knowing that procuring manufacturing rights was key in WTI's decision to deal with Mala, and WTI has relied on Mala's lies to its detriment and damage.

---

[34]Through contrived actions by Mala, it perpetrated a fraud by asking WTI execute the Patent Assignment which conveyed not only the single patent WTI had promised to assign in the ESA pursuant to obligations under the LA but also an additional patent which was never agreed to by the parties.

Mala has set forth that it had the right to allow WTI to manufacture because the relevant patent was not infringing upon the GSSI patent. Mala's IP attorney Mr. Walter Linder will testify as an expert saying there is no infringement and WTI would be free to manufacture the CART should it have that right. However, in deposition, Dennis Johnson, GSSI's President, confirmed his belief that should WTI manufacture the CART we would be infringing on their patent because the GSSI/Mala agreement does not permit sub-licensing.[35] Mr. Johnson also described how he became aware of the additional CARTs WTI purchased from Mala but Mala failed to pay any royalties to GSSI on the sales.[36]

WTI's reliance on both (i) Mala's false assurances that WTI enjoyed the rights to manufacture CARTs independently of Mala and (ii) Mala's repeated representations—both implied and explicit—that it had the power to give WTI such manufacturing rights was reasonable and justifiable for the following reasons:[37]  (i) Mala's long history as a respected leader in the GPR technology industry and vast resources made it reasonable for WTI to rely on Mala's representations that it was capable—without having to contract with a third party—of providing WTI with the hardware it required; (ii) Mala's promises of manufacturing rights were the subject of several formal agreements drafted and executed with the assistance of legal counsel, thereby adding to the apparent legitimacy of the promises contained therein; (iii) during extensive WTI-Mala negotiations in 1997, WTI representatives adamantly demanded the ability to manufacture in anticipation that manufacturing may shift to a facility equipped to fill larger manufacturing orders than Mala could handle; and (iv) WTI knew that the CART Mala

---

[35] Dennis Johnson deposition at 69/07-70/06.  Ex. 8.
[36] Dennis Johnson deposition at 30/20-31/17 and 32/20-33/14.  Ex. 29.  Ltr. D. Johnson to T. Leijon, 6-23-05, M 0001926-7.  Ex. 28.

[37] This list of reasons justifying Witten's reliance on Mala's promises is not exclusive.

manufactured needed Witten's software and, therefore, had reason to expect full cooperation from Mala with respect to its contractual promises to WTI.

Absent Mala's misrepresentations, WTI never would have pledged itself to the burdensome requirements imposed by its contracts with Mala, provided such valuable software licenses to Mala, or executed the Patent Assignment described above. WTI would have, instead, sought GSSI as a radar array source and would today possess plenty of operable, FCC-approved CARTs with the proper width. Mala's fraudulent activities dictate the return of WTI's software and source codes, especially considering that after WTI dutifully provided the five (5) licenses to the software as promised under ESA § 1.1(b) on November 11, 2002, Mala never signed or honored the terms of the Software License Agreement ("SLA") Mike Oristaglio, WTI CEO, told Mala to sign and return prior to using the software. Mala now conveniently claims not to be bound by the SLA's terms even though Mala has been using the software & deriving royalties therefrom since 2002. WTI's software is now vulnerable to being looted of its source code and sold by Mala to the highest bidder; therefore, equity demands, at least, that all copies of WTI software currently in Mala's possession, along with ownership of the two (2) patents WTI assigned to Mala, should be returned to WTI due to Mala's fraud.

**II.    MALA HAS MATERIALLY BREACHED THE LA AND PDA**

**a.    Mala Breached Its Duties Under LA §6 by Failing to Share Patent Costs**

LA §6 required WTI to maintain all its intellectual property rights and such applications in good standing . . . " and provided that Mala and WTI would "equally the costs [of] recording, registration, renewal and other similar fees in connection with maintaining the intellectual property and applications in good standing." PDA § 6.03 similarly required the parties to equally share the costs of patent applications and maintenance for patents developed in

connection with the CART project. Mala materially breached and to this day continues to breach the terms of both PDA § 6.03 and LA § 6 by failing to reimburse WTI for its portion of the costs associated with acquiring certain patents of CART technology, in spite of WTI's many requests for reimbursement. Mala's refusal to become involved in this patent application process required Witten to shoulder the entire expense of preparing and filing the "Application for the 'Ground Penetrating Radar Array and Timing Circuit'" which cost WTI approximately $40,000 to prepare but continues to cost WTI money through various maintenance and filing fees worldwide. Mala has never assumed this role in relation to this patent but forces WTI to pay these cost rather than run the risk of losing patent protection.

Mala likewise materially breached the first sentence of LA § 6 when it failed to maintain its radar array license with GSSI. Mala still needed to fulfill its contractual obligations to WTI by maintaining all intellectual property rights. Mala breached the PDA and LA by failing both to maintain intellectual property rights and to obtain manufacturing rights for WTI under the GSSI/Mala License; in other words, the terms of the GSSI/Mala License preclude WTI from manufacturing the CART as Mala promised it could do as well as allow WTI to do under the PDA and LA. Such manufacturing would apparently violate the GSSI radar array patent. Mala's breach in this regard has crippled WTI's business opportunity by removing its only CART hardware source.

**b.  Mala's Continues to Refuse to Deliver Documentation for CART Repair or Manufacture**

Pursuant to the LA's "Whereas" provisions, Mala agreed to allow WTI to use its "know-how" and intellectual property. (LA at p.1.) Mala further granted WTI: (i) "a worldwide exclusive right and license to *sell, use, lease and assemble*, with respect to the detection of utilities only," and a "nonexclusive right and license to *sell, use, lease and assemble*, with

respect to any application other than the detection of utilities[,]" all technology developed as part of the parties' CART project; and (ii) the rights to use Mala's patents and "know-how" and to grant sub-licenses to the CART. LA § 1(a)-(b) (emphasis added). These provisions reflect Mala's grant of all CART manufacturing rights and Mala's obligation to supply WTI with all manufacturing specifications concerning CART technology so that it might be able to properly pursue the rights/markets it was granted.

Mala's intention to convey (and WTI's insistence that it be given) these pivotal manufacturing rights is clear from the parties' negotiations. Indeed, WTI negotiator Steve Willard refused during PDA/LA negotiations to give Mala exclusive manufacturing rights, recognizing that to do so would give Mala too much control over WTI.[38] Since the LA was executed, Mala has repeatedly refused to hand over CART specifications and other "know-how" to WTI as the LA dictates and has, in so failing, breached the LA. Mala has intentionally breached the LA by refusing to supply such "know-how." Mala's breach was just one element in its ongoing scheme to conceal the truth concerning its license from GSSI, and WTI has been damaged as a result.

### c.     Mala Breached the LA by Failing to Deliver "Commercially Viable" CARTs

Mala was successful in creating a commercial prototype of the CART. However, the prototype is still that, a prototype. Yes, WTI can use the commercial prototype to perform demonstrations and perform paying jobs, however the need for the array which was anticipated by WTI can not be met by the quality of the prototype. The Lease obligated Mala to deliver a commercially viable CART. Mala has failed to produce commercially viable CART hardware in the reproducible quantities or the quality condition the market demands. As discussed *supra* at and referenced in the attached exhibits, the technical shortcomings and structural limitations of

---

[38] Ltr. S. Willard to J. Rynning, August 14, 1997, M 003206. Ex. 29.

the CART, along with Mala's failure to acquire FCC approval for 200 MHz CART operation in the United States, have rendered WTI limited by the restraints of the equipment. With all of its technical problems and lack of approval, Mala's prototypes cannot be regarded as "commercially viable" under any definition of the term, and Mala has breached its obligation under the LA.

Mala's inexcusable failure to supply an FCC-approved CART that isn't worn from use or otherwise damaged has further hindered WTI's ability to promote the CART in the United States; indeed, WTI cannot be expected to market a product to prospective U.S. customers that cannot be operated anywhere in the nation. Mala received notice of impending changes in the FCC rules governing usage of GPR more than two years in advance but failed to obtain or even apply for the FCC waivers required for the CARTs' continued operation within, and shipment into, the United States; Mala's failure in this regard cannot be justified, especially considering that, competitor GSSI apparently had no trouble obtaining FCC approval for their six-foot wide arrays and can now supply them in unlimited quantities.

The FCC had granted waivers for use of the 400 MHz CART but Mala has not even applied for the waivers for the 200 MHz CART.   The 400 MHz CART is only half as wide as the 200 MHz CART which was built pursuant to specifications in the PDA.   The 400 MHz CART also takes more than twice as long to collect and process data on the same surface area as the 200 MHz CART and, as such, minimized the commercial capability of the 200 MHz CART which was requested by WTI.  WTI has unwillingly endured Mala's failure to correct the FCC problem and has suffered lost jobs, lost revenues and has been forced to dilute its patent base for cash it would be gleaning from jobs with working CARTs but for Mala's breach.

As a result of Mala's contract breaches, WTI has been severely damaged.   As compensation for its damages, WTI respectfully requests: (i)  that Mala be required to reimburse

WTI for half of the costs WTI expended in acquiring and/or maintaining patents in connection with the CART project; (ii) that all monies WTI paid Mala for costs of repairs and freight charges related to CART repair in Sweden be returned to WTI in full, as Mala's failure to supply CART specifications precipitated such exorbitant fees; (iii) that Mala be made to recompense WTI for lost profits WTI could have and would have garnered had Mala provided CARTs of adequate quality and sufficient number; and (iv) that WTI be awarded all forms relief listed on page 16 of its counterclaim.

## CONCLUSION

Based on the foregoing, Respondent respectfully requests that the Court find entirely in its favor, dismissing Claimant's claims and awarding Respondent damages and other relief as requested herein.

Respectfully submitted, this 19th day of April, 2006.

ERIN L.G. LEWIS
Georgia Bar No. 450320

BREE O. SULLIVAN
Georgia Bar No. 691141

Attorneys for Respondent:

ERIN L. G. LEWIS, Esq.
Witten Technologies, Inc.
3638 Overlook Avenue
Macon, Georgia 31204
478.474.6644
478.474.8688 (f)

BREE O. SULLIVAN, Esq.
Bree O. Sullivan, LLC
109 Hampton Court

Thomasville, Georgia 31792
229.226.3033