## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MALA GEOSCIENCE AB,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-1343 (RMC)** |
| ) | |
| **WITTEN TECHNOLOGIES, INC.,** ) | |
| ) | |
| ) | |
| **Respondent.** ) | |

## MEMORANDUM OPINION

Mala Geoscience AB ("Mala") petitions the Court to vacate, in part, an arbitration award rendered in Washington, D.C. Mala claims: (1) the arbitrator exceeded his authority when he ordered Mala to convey the so-called "Glue Patents" to Respondent Witten Technologies, Inc. ("WTI") because the arbitrator interpreted an agreement over which he had no jurisdiction since disputes under the agreement had to be arbitrated in Sweden, not the United States; (2) the arbitrator acted without the requisite factual support when he found WTI to be solvent, thereby precluding Mala from terminating the parties' licensing agreement due to WTI's alleged insolvency; and (3) the arbitrator again acted without the required evidentiary support when he ordered Mala to pay attorney fees based on the value of certain stock options. WTI opposes Mala's petition, seeking confirmation of the arbitration award. As explained below, the Court finds that the arbitrator exceeded his power when he ordered Mala to convey the Glue Patents. That portion of the award will be vacated, and the remainder of the award will be affirmed.

## I.  BACKGROUND FACTS

Mala is a Swedish company that manufactures technology used to locate objects buried underground, including ground-penetrating radar.  Mala's Application to Partially Vacate Award of Arbitrator ("App. to Vacate") ¶ 11.  In September of 1997, Mala entered into a Prototype Development Agreement ("PDA") and Licensing Agreement ("LA") with WTI.  *Id.* ¶ 13.  WTI is a U.S. corporation,[1] founded by Robert Green and the late Dr. Alan Witten to develop Dr. Witten's work with "geophysical diffraction tomography . . . and its applications through ground penetrating radar to see underground."  Opp. Ex. 5, WTI's Post Arbitration Brief at 4; *see* App. to Vacate ¶ 12.  Mala and WTI came together to determine if software developed by Dr. Witten could be joined with ground-penetrating radar to make a commercially viable mobile machine to locate underground objects such as utility pipes.  Opp. Ex. 5, WTI's Post Arbitration Brief at 4; *see* App. to Vacate ¶ 12.[2]

The parties entered into the PDA to develop Computer Assisted Radar Tomography ("CART").  *Id.* ¶ 13.  Mala was required to develop a prototype radar array; WTI was required to develop software that could process and display the data collected by the radar array and to create and maintain a sales organization to market the CART.  *Id.*  In exchange, under the terms of both the PDA and the LA, Mala granted WTI an exclusive license to sell the CART in the primary utility locating market and a non-exclusive license in other markets.  *Id.* ¶ 14; *see* Opp. Ex. 1, LA & Ex. 12, PDA.  In December 1999, Mala delivered the prototype to WTI and began manufacturing CARTs

---

[1] WTI is incorporated in Florida and has its principal place of business in Jacksonville, Florida.  App. to Vacate ¶ 1; WTI's Opp. to Mala's App. to Vacate ("Opp.") at 1.  Because Mala is a Swedish corporation and there is more than $75,000 in controversy, the Court has diversity jurisdiction over this case.  *See* 28 U.S.C. § 1332(a)(3).

[2] The parties sought to develop a machine that would be faster, more accurate, and more efficient than those already on the market.  App. to Vacate ¶ 12.

on a small scale.  App. to Vacate ¶ 15.[3]

The parties anticipated that new patents and patent improvements might be created in the course of their business relationship.  Thus, the PDA and the LA assigned the rights to such patents and patent improvements as follows: (1) Mala had the right to its radar hardware and radar software technology, together with any improvements on such radar hardware and radar software; and (2) WTI had the right to its software display technology together with any improvements on such software display technology.  App. to Vacate ¶ 32.

Disputes arose between the parties.  In October 2002, the parties resolved some of those disputes by entering into an Exchange and Settlement Agreement ("ESA").  App. to Vacate ¶ 16.  The ESA "signaled the end of the prototype development phase and the beginning of the commercial marketing phase of the CART."  *Id*.  The ESA contained an arbitration clause, providing that arbitration of disputes in connection with the ESA must take place in Sweden.[4]  Opp. Ex. 11, ESA ¶ 5.

In accordance with the ESA, on September 29, 2004, WTI executed a Patent Assignment transferring to Mala the Ground-Penetrating Radar Array and Timing Circuit, Patent Application Serial No. 09/658,188 (the "Timing Circuit Patent").  Opp. Ex. 15, Patent Assignment. The Patent Assignment conveys the Timing Circuit Patent together with all "continuing applications,

---

[3] At the time the Application to Vacate was filed in July 2006, less than twenty CARTs had been manufactured, App. to Vacate ¶ 15, and WTI had not purchased a CART from Mala since 2004.  *Id*. at ¶ 18.

[4] The ESA provides, "[A]ny dispute, controversy or claim arising out of or in connection with this agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the SCC Institute)."  Opp. Ex. 11, ESA at ¶ 5.

continuations, . . . and continuations-in-part." *Id*., Patent Assignment at 1.  Pursuant to the

"continuation" language, Mala recorded the Patent Assignment against the Glue Patents,[5] patents

which essentially cover software that connects the Mala radar and software to the WTI software, and

in this way Mala attempted to obtain ownership of the Glue Patents.  App. to Vacate ¶ 33.  WTI

contends that Mala was not entitled to ownership of the Glue Patents.

   Despite the settlement of certain claims under the ESA, disputes between the parties

continued.  As a result, on June 2, 2005, Mala brought a claim in arbitration seeking termination of

the LA for the reasons, among others, that WTI breached its duty to market the CART and that WTI

was insolvent.  *Id*. at ¶¶ 7 & 19.[6]  WTI asserted a counterclaim, and the claim and counterclaim were

arbitrated at a hearing on April 24-28, 2006.  On July 10, 2006, the Arbitrator rendered his decision.

*Id*. ¶ 10.  The Arbitrator entered an Award, finding in favor of WTI with regard to the principal

issues as follows:

    1. The LA shall remain in effect;

    2. Mala shall convey the Glue Patents back to WTI;

    3. Mala shall pay WTI $420,000 in attorney's fees and costs; and

    4. Mala shall pay the fees and expenses of the arbitration forum.

WTI's Mot. to Confirm Ex. A, Award ("Award") at 15.

   Subsequently, Mala filed in this Court its Application to Vacate the Award in part.

---

[5] The Glue Patents are U.S. Patent Nos. 6,700,526 and 7,034,740.  Patent No. 7,034,740 is a continuation of No. 6,700,526.

[6] The LA includes a binding arbitration clause, requiring all disputes  that arise among the parties relating to the LA to be arbitrated in Washington D.C. under the auspices of the American Arbitration Association ("AAA").  Opp. Ex. 1, LA § 17.  Pursuant to AAA procedures, Kenneth A. Genoni, an experienced patent attorney, served as the Arbitrator for this dispute.  Opp. at 3.

Mala seeks to vacate three parts of the Award: (1) the portion requiring Mala to transfer the Glue Patents to WTI; (2) the portion finding WTI to be solvent and thereby denying Mala's request to terminate the LA; and (3) the portion requiring Mala to pay WTI's attorney's fees based on valuations for certain stock options. WTI seeks confirmation of the Award.

## II.  LEGAL STANDARDS

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1-16, was passed by Congress "to establish an alternative to the complications of litigation." *Revere Copper & Brass v. Overseas Private Inv. Corp.*, 628 F.2d 81, 83 (D.C. Cir. 1980). Further, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241 (1962). Judicial review of an arbitration award is narrowly limited. *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 395-96 (2002); *Revere Copper*, 628 F.2d at 83. "Allowing undue challenges to arbitration awards would defeat the finality and speedy dispute resolution expected of the arbitration procedure." *Revere Copper*, at 83 n.1. "By agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the court [ ] for the simplicity, informality, and expedition of arbitration." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991).

Under section 10 of the FAA, an arbitration award may be vacated where:

1) the award was procured by corruption, fraud, or undue means;

2) the arbitrators were partial or corrupt;

3) the arbitrators were guilty of misconduct in refusing to postpone the hearing or refusing to hear relevant and material evidence, or for misbehavior that prejudiced the rights of a party; and

4) the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award was not made.

9 U.S.C. § 10(a). In addition, in some circuits, including this one, an arbitrator's "manifest disregard of the law" can compel a court to vacate an award. *LaPrade v. Kidder Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001).

> Manifest disregard of the law "means more than error or misunderstanding with respect to the law." Consequently, to modify or vacate an award on this ground, a court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.

*Id.* (citations omitted).

Errors of fact and errors of law are not sufficient to cause *vacatur* of an arbitration award. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *Teamsters Local Union No. 61 v. UPS*, 272 F.3d 600, 604 (D.C. Cir. 2001);[7] *see also Denver & Rio Grande W.R.R. Co. v. Union Pac. R.R. Co.*, 119 F.3d 847, 849 (10th Cir. 1997) (errors in arbitrator's factual findings or legal interpretations do not justify review or reversal absent a showing of manifest disregard). "[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error is not sufficient to overturn his decision." *Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509 (2001) (internal quotation marks omitted). Further, issues of credibility and relevance are for the arbitrator to decide. *Id*. at 510 (credibility); *Berlacher v. PaineWebber Inc.*, 759 F. Supp. 21, 24 (D.D.C. 1991) (relevance).

---

[7] The Court recognizes that labor arbitration, drawing its authority from the collective bargaining agreement, and commercial arbitration under the FAA are related, but distinct, legal *fora*. Principles may nonetheless be borrowed from one to the other. *See Revere Copper*, 628 F.2d at 83 n.1.

## III. ANALYSIS

### A.  Arbitrator's Authority To Order Mala to Convey the Glue Patents to WTI

Mala argues that the Arbitrator exceeded his authority when he ordered Mala to convey the Glue Patents to WTI because the Arbitrator interpreted the Patent Assignment, an agreement subject to arbitration in Sweden.  The parties dispute whether Mala had the right to record the Patent Assignment, which specifically identifies only the Timing Circuit Patent, to obtain ownership of the Glue Patents.  The Arbitrator determined that Mala did not have this right and ordered Mala to transfer the Glue Patents to WTI.

In order to decide this issue, the Arbitrator had to consider whether he had jurisdiction.  Even though the Arbitrator did not have jurisdiction to decide disputes arising under the ESA (since those had to be arbitrated in Sweden) and the Patent Assignment states that it is made in "accordance with" the ESA,[8] the Arbitrator still found that he had jurisdiction under the LA to decide who owned the Glue Patents.  He explained that he had to "go to the License Agreement" to decide who owned the Glue Patents:

> Counsel for Mala argues that I do not have jurisdiction over this issue because the Patent Assignment was drafted in accordance with the ESA and the ESA, paragraph 5, provides that any dispute [arising from the ESA] shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce. The Patent Assignment is silent on the issue of arbitration jurisdiction.  There is no dispute which would require me to investigate or analyze the breach, termination or invalidity of the ESA, and there is no dispute over Mala's right to an assignment of the Timing Circuit patent, the only patent identified in the ESA. *There is, however, a dispute over whether or not Mala had the right to record the Patent Assignment, which specifically identifies only the*

---

[8] Opp. Ex. 15, Patent Assignment at 1.

> *Timing Circuit patent, to obtain ownership of the Glue Patent.*[9]  *It is necessary to go to the License Agreement to get the answer. Therefore, the dispute arises under the License Agreement, not the ESA, and Section 17 of the License Agreement gives jurisdiction to the Arbitrator to resolve the dispute.*

Award at 9 (emphasis added).  Because he had to "go to" the LA, the Arbitrator determined that the dispute "arises under" the LA.  He stated that because the "basis for" the Patent Assignment was found in the LA, he had jurisdiction as provided in the LA.

> In addition, I disagree with Mala's assertion that the "Patent Assignment undeniably arises only out of the ESA."  The Patent Assignment, which was drafted by Mala, refers only to the ESA, not the License Agreement.  *But [the] basis for the assignment of* foreign counterparts and *continuations-in-part applications can only be found in the License Agreement*. . . .

*Id.* at 9 (emphasis added).

Then, the Arbitrator found that the LA provided that Mala was entitled only to "continuations-in-part" directed toward an improvement to Mala's hardware.  Because the Glue Patents were continuations-in-part but they were not directed toward Mala's hardware, the Arbitrator concluded that interpreting the Patent Assignment to include the Glue Patents violated the LA.

> It is clear from the License Agreement that WTI would have a duty to assign a continuation-in-part application, or any other patent application, only if the application was directed to an improvement to Mala's hardware. . . . [T]he Glue Patent is a "continuation-in-part" of the Timing Circuit patent application, but *the Glue Patent is not directed to an improvement to Mala's hardware*.  Nevertheless, without notifying Witten, Mala used the Patent Assignment (Ex. 14) to record the assignment of the Glue Patent to Mala in the United States Patent Office.  *Interpreting "continuation-in-part" to include applications not directed to an improvement to Mala's hardware was a violation of the License Agreement.*

---

[9] This portion of the Award discussed only Glue Patent No. 6,700,526.  However, the Arbitrator applied the same rationale to Glue Patent No. 7,034,740.  Award at 12-13.

*Id*. at 10 (emphasis added).

The Arbitrator erred in finding that he had jurisdiction to interpret the Patent Assignment. His approach to the issue was backwards — he focused on the LA and used the language of the LA to interpret the Patent Assignment, something he lacked jurisdiction to do. Instead, the Arbitrator should have approached the problem directly. To determine if the Patent Assignment covered the Glue Patents, the Arbitrator first had to examine the terms of the Patent Assignment itself.

A close examination of the Patent Assignment reveals that it was expressly drafted "in accordance" with the ESA. Nowhere does the Patent Assignment refer to the LA. The Patent Assignment provides, "Whereas, [i]n accordance with the Settlement Agreement [the ESA], Assignor desires to assign to Assignee all right, title and interest in and to the inventions and related patents . . . entitled the Timing Circuit [Patent]." Opp. Ex. 15, Patent Assignment at 1. In "accordance" means in "agreement." *Webster's Third New International Dictionary* 12 (2002); *accord Black's Law Dictionary* 18 (8th ed. 2004) ("accordant" defined as "in agreement"); *see Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 659 (1999) (a Title IX violation occurs only if plaintiff was subject to discrimination "under" an education program; the term "under" means "pursuant to, in accordance with, or as authorized or provided by"). Thus, the Patent Assignment was drafted in agreement with and pursuant to the ESA.

The next logical step in this straight forward approach is to examine the terms of the ESA. The ESA's express terms include an arbitration clause, providing that arbitration of disputes in connection with the ESA must take place in Sweden. The ESA provides, "[A]ny dispute, controversy or claim arising out of or in connection with this agreement, or the breach, termination

or invalidity thereof, shall be finally settled by arbitration administered by the Arbitration Institute of the Stockholm Chamber of Commerce (the SCC Institute)." Opp. Ex. 11, ESA at ¶ 5. The Patent Assignment was drafted in accordance with and as authorized by the ESA. Thus, a dispute regarding the meaning of the Patent Assignment was necessarily a dispute that arose out of or in connection with the ESA. Such disputes had to be arbitrated in Stockholm, Sweden.[10]

Here, there was a dispute under the Patent Assignment — the parties disputed whether the Patent Assignment was intended to cover the Glue Patents when it does not expressly reference the Glue Patents. Mala contended that the Patent Assignment was written broadly to include the Timing Circuit Patent and any continuations-in-part of the Timing Circuit Patent. Further, the Glue Patents could be defined as "continuations-in-part" of the Timing Circuit Patent. *See* Award at 10 ("It turned out that the Glue Patent is a 'continuation-in-part' of the Timing Circuit Patent, but the Glue Patent is not directed to an improvement to Mala's hardware."). In contrast, WTI argued that the Patent Assignment did not cover the Glue Patents. Anthony Clifford, who executed the Patent Assignment on behalf of WTI, indicated that he did not know what a "continuation-in-part" was[11] and he did not know that the Glue Patents were continuations-in-part

---

[10] The Arbitrator found that Mala acquired the Glue Patents in violation of the parties' intent as evidenced by the LA. Award at 10. Mala asserts that the parties' intent concerning the ownership of intellectual property changed between the time they entered into the LA in 1997 and the time they settled various disputes by entering into the ESA in 2002 and the Patent Assignment in 2004. Reply at 8. This Court will not opine as to the intent of the parties, as this is a matter for the parties to submit to an arbitrator in Sweden. This Court finds only that the Arbitrator lacked jurisdiction to interpret the Patent Assignment.

[11] A "continuation-in-part" patent application contains new matter that may be directed to a different invention than the one disclosed in the parent application. Award at 10.

of the Timing Circuit Patent.  Award at 11.[12]

The parties' dispute regarding the meaning of the Patent Assignment had to be arbitrated in Sweden, not in Washington, D.C.   The Arbitrator only had the power to arbitrate those disputes which the parties agreed to arbitrate before him.  A party cannot be compelled to submit to arbitration any dispute which he has not agreed to submit.  *Atkinson*, 370 U.S. at 241 (1962).  "Arbitration . . . is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. . . . [T]hey may limit by contract the issues which they will arbitrate . . . ."  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995).  By deciding a dispute over which the parties had contracted to submit to a different arbitral forum, the Arbitrator exceeded his authority.

The Arbitrator may have been motivated to exceed his authority due to his belief that Mala desired "to drive WTI into bankruptcy," Award at 4, and due to his finding that Mala took "extreme and wrongful actions [ ] to acquire ownership of the Glue Patent[s]."  *Id.* at 5; *see also* Award at 11 (finding that Mala acquired the Glue Patents using "intentionally deceptive acts").  Further, his interpretation of the parties' intent in entering into Patent Assignment might be correct.  Nevertheless, the Arbitrator exceed his power. He simply did not have jurisdiction to interpret the Patent Assignment and to order Mala to transfer the Glue Patents to WTI.

In sum, because the Patent Assignment was drafted "in accordance" with the ESA, and the disputes arising from or in connection with the ESA were subject to arbitration in Sweden,

---

[12] Mala argues that WTI was not misled regarding the scope of the Patent Assignment and that WTI should have called its attorney, Joe Berl, to testify regarding the parties' intent in negotiating the Patent Assignment.  The Court does not address this argument, as it is relevant only to the proper interpretation of the Patent Assignment; it is not relevant to the issue at hand, that is, whether the Arbitrator had jurisdiction to interpret the Patent Assignment in the first place.

the parties' dispute regarding whether the Patent Assignment included an assignment of the Glue Patents must be arbitrated in Sweden. It is misleading to state, as the Arbitrator did, that the Patent Assignment was "silent" with respect to arbitration jurisdiction, *see* Award at 9, as the Patent Assignment was written "in accordance" with the ESA. The ESA indicates that controversies arising out of or in connection with the ESA shall be arbitrated in Stockholm, Sweden. Under this contractual scheme, any dispute regarding the Patent Assignment must be arbitrated in Sweden. Because the Arbitrator exceeded the scope of his jurisdiction, the portion of the Award that requires Mala to transfer the Glue Patents to WTI will be vacated. *See* 9 U.S.C. § 10(a)(4) (award may be vacated when arbitrator exceeded his powers).

B. Arbitrator's Finding Regarding Solvency

Mala also contends that the Arbitrator acted without any basis in fact when he found that Mala failed to prove WTI to be insolvent and when he prevented Mala's termination of the LA due to the alleged insolvency. The LA provides that each party has the right to terminate the agreement if the other party becomes insolvent. LA § 11. Mala argued that, under a New York statute,[13] a corporation is insolvent when its liabilities exceed the fair market value of its assets. WTI argued that the common law applies and that a corporation is insolvent when is unable to meet its obligations when they become due in the ordinary course of business. The Arbitrator found that Mala did not prove WTI to be insolvent under either of these tests.

Relying on the testimony of Mr. Vince Shea, WTI's expert witness, the Arbitrator found that WTI's liabilities did not exceed its assets. Mr. Shea testified that WTI's net present value was $155 million, far in excess of its liabilities of less than $5 million. Award at 5. The Arbitrator

---

[13] The construction of the LA is governed by New York law. LA § 18.06

explained:

> This evaluation [by Mr. Shea] may be excessive, but it is clear from the awards WTI received and WTI's ability to continue to raise money from investors that WTI's intellectual property is recognized as being very valuable.  It is also clear . . . that Mala recognized that the Witten intellectual property was very valuable.

*Id*.  The Arbitrator also found that WTI has been able to meet its obligations as they mature in the ordinary course, although it has paid "a little late from time to time."[14]  *Id*.

Reviewing courts are not permitted to vacate an arbitration award due to an arbitrator's errors in making factual findings or legal interpretations in the absence of manifest disregard for the law.  *Denver & Rio Grande*, 119 F.3d at 849.  Further, credibility determinations are within the discretion of the arbitrator.  *Major League Baseball,* 532 U.S. at 510.  Although the Arbitrator thought that Mr. Shea's valuation "may be" excessive, the Arbitrator still credited his testimony.  Moreover, even if this Court disagreed with the Arbitrator's allegedly erroneous findings, because the Arbitrator did not disregard the law, the Court must affirm.

Mala's argument that there is no support in the record for the Arbitrator's conclusion is based on a misreading of the record.  The Arbitrator found, based on the evidence before him, that Mala had not met its burden of proof.  Mala contended that WTI's book value was $1.2 million while its book liabilities exceeded $5 million, and that Mr. Shea's valuation was improperly based on revenue projections.  App. to Vacate at 25-26.  Mala asserts that upon making this showing, the burden of proof shifted to WTI to show that it is solvent.

WTI met its burden by presenting evidence that its intellectual property was not

---

[14] WTI argued in arbitration that it made certain royalty payments late due to Mala's alleged failures to perform under the LA.  App. to Vacate Ex. D, WTI's Pre-Arbitration Brief at 28.

represented in the book value,[15] and Mr. Shea testified that WTI's net present value was $155 million.  Award at 5.  Taking into consideration the uncertain value of WTI's intellectual property, the Arbitrator determined that Mala failed to prove that WTI was insolvent.  Even assuming that Mr. Shea's valuation was not worthy of the credence the Arbitrator gave it, the credibility of witnesses and the materiality of evidence are matters for the Arbitrator that may not be second-guessed by this Court.  *See Major League Baseball,* 532 U.S. at 510; *Berlacher*, 759 F. Supp. at 24.  This portion of the Award will be affirmed.

### C.  Arbitrator's Finding Regarding Attorney's Fees

Mala also argues that the Arbitrator acted without the required evidentiary support when he ordered Mala to pay, as part of WTI's attorney's fees, $261,799 for the alleged value of stock options that WTI issued to its lawyer.  The parties agree that the Arbitrator had the authority to award attorney's fees,[16] but Mala contends that the evidence did not support the calculation of the value of the stock options.

WTI submitted its fee application in the amount of $520,040 to the Arbitrator, for fees paid to its in-house counsel, Erin Lewis.  WTI explained to the Arbitrator that it hired Ms. Lewis specifically for the purpose of the arbitration.  App. to Vacate Ex. E, WTI's Arbitration Reply at 21

---

[15] Mala also contends that to meet its burden of proof, WTI was required to prove a specific value for WTI's assets and intellectual property, citing *Buffalo Auto Glass v. Schueler (In re Buffalo Auto Glass)*, 187 B.R. 451, 453 (W.D.N.Y. 1995). In *Buffalo Glass*, the court described the shifting burden of proof on the issue of insolvency.  The bankruptcy trustee had presented the debtor's tax return revealing negative retained earnings and because the debtor did not rebut this evidence, the court found that the trustee was entitled to summary judgment on the issue of insolvency.  187 B.R. at 453. While *Buffalo Glass* describes how the burden of proof shifts, it does not require that the party seeking to show solvency present a specific value.

[16] Under the LA, the Arbitrator had the discretion to award attorney's fees as he "deem[ed] appropriate under the circumstances."  LA § 17(d).

& nn. 95-96.  Because Ms. Lewis devoted a small portion of her time to other matters, WTI included

only 80% of her salary in its fee application.  Further, WTI compensated Ms. Lewis by providing a

small salary and by issuing stock options to her for 175,000 shares.  To calculate the stock options,

WTI relied on Mr. Shea's expert valuation of WTI's stock at $4.08 per share.  Ms. Lewis's

employment contract calls for a $0.34 strike price, leaving a value of $3.74 per share.  WTI then

divided this price in half, resulting in a per-share value of $1.87.  Calculating Ms. Lewis's 175,000

shares at this price, WTI submitted a figure of $327,250 as the value of Ms. Lewis's stock options.

        The Arbitrator reduced the stock option value submitted by WTI by another 20%

($65,451) to account for time Ms. Lewis may have spent on other matters and by $37,465 for

arbitration fees awarded separately.  Award at 15.  After rounding, the Arbitrator awarded attorney's

fees and expenses to WTI in the amount of $420,000, an amount which included $261,799 for the

stock options.  *Id*.

        Mala argues that the Arbitrator improperly adopted WTI's speculative calculation of

the value of the stock options, because the calculation does not constitute evidence.  Mala asserts that

the only way to value WTI's stock would be to examine recent sales and the Arbitrator failed to do

this.  According to Mala, the average amount investors have actually paid over the last four years for

WTI stock is $.11, and because Lewis's strike price was $.34, the shares had no value to Lewis.[17]

        Contrary to Mala's assertion, the Arbitrator valued the stock options based on the

evidence presented.  Adopting WTI's approach, he accepted Mr. Shea's expert valuation as

---

[17] WTI contends that the $.11 improperly values stock warrants on an equal basis to stock
sales and that the warrant payments were for personal letters of credit.  Opp. at 35.  Further, WTI
argues that "WTI stock sold at a peak price of $2.50/share in 2000 to sophisticated investors who
managed large investment funds."  *Id*.

discounted by one-half.  While the Court may not agree with the Arbitrator's fact finding with regard to the value of the stock options, the Court may not question the finding since the Arbitrator did not exceed his authority and did not manifestly disregard the law.  *See Denver & Rio Grande*, 119 F.3d at 849.  Mala asks the Court to question the credibility of the expert, Mr. Shea, but this the Court may not do.  *See Major League Baseball,* 532 U.S. at 510.  Mala's application to vacate the portion of the fee award attributable to Ms. Lewis's stock options will be denied.

## IV.  CONCLUSION

For the reasons explained above, Mala's Application to Vacate [Dkt. # 1] and Respondent's Opposition and Petition to Confirm Award [Dkt. # 10 & # 13] will be **GRANTED IN PART AND DENIED IN PART**.  Because the Arbitrator had no authority to decide disputes arising in connection with the ESA and the Patent Assignment, he had no authority to find that Mala improperly took ownership of the Glue Patents under the Patent Assignment or to require Mala to convey the Glue Patents to WTI.  The portion of the Award requiring Mala to transfer the Glue Patents to WTI will be vacated.  The remainder of the Award will be affirmed.  Further, WTI's motion for leave to file a surreply [Dkt. # 19] will be granted, Mala's motion to strike [Dkt. # 20] WTI's motion for leave to file surreply will be denied, and both parties' surreply briefs will be accepted for filing.  A memorializing order accompanies this Memorandum Opinion.


Date:   May 30, 2007                    _____/s/_____
                                        ROSEMARY M. COLLYER
                                        United States District Judge