UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MALA GEOSCIENCE, AB,<br><br>Respondent in Petition to Confirm and Applicant in Application to Vacate,<br><br>v.<br><br>WITTEN TECHNOLOGIES, INC.,<br><br>Petitioner in Petition to Confirm and Respondent in Application to Vacate. | Civil Action No.: 1:06-cv-01343 (RMC) |

## WITTEN TECHNOLOGIES, INC.'S SURREPLY BRIEF IN RESPONSE TO MALA'S REPLY MEMORANDUM REGARDING APPLICATION TO PARTIALLY VACATE AWARD OF ARBITRATOR

COMES NOW Witten Technologies, Inc. (hereinafter "WTI"), and files this Surreply Brief in Response to Mala's Reply Memorandum Regarding Application To Partially Vacate Award of Arbitrator ("Reply") filed in this Court, showing the Court as follows:

### I.  INTRODUCTION

This brief will respond only to new lines of argument Mala employed in its Reply to support its overarching position with respect to the Arbitrator's jurisdiction over the Patent Assignment issue. First, WTI will show Mala's factually incorrect assertions that the parties' Exchange and Settlement Agreement ("ESA") somehow "trumped" the License Agreement ("LA"), thereby bringing any dispute concerning the Patent Assignment within the ambit of the ESA's arbitration provision. Second, WTI will show Mala has absolutely no basis or evidence in the record to belatedly claim there was any sort of "agreement" to assign the Glue Patents. Third, WTI will refute Mala's unfounded and speculative assertions concerning why WTI's

attorney Joe Berl did not testify at arbitration.  Finally, this brief will address Mala's unsupported assertion that WTI was obligated to meet some burden of proving a particular value in dollars by which WTI's assets could be measured and briefly explain the severe ramifications which will result should the Court vacate the Arbitrator's solvency ruling.

## II.   ARGUMENT AND CITATION OF AUTHORITY

### A. THE PATENT ASSIGNMENT DISPUTE AROSE FROM THE LA AND WAS PROPERLY WITHIN THE ARBITRATOR'S JURISDICTION

#### 1. The ESA In No Way "Trumps" The LA; In Fact, the ESA, By Its Own Terms, *Activated* the LA and its Arbitration Provision

Mala's position is that the Arbitrator lacked jurisdiction over the Patent Assignment issue because the Patent Assignment arose solely from the ESA and, therefore, any dispute concerning the Patent Assignment would fall within the purview of the ESA's arbitration provision, which calls for arbitration in Sweden.  The Arbitrator found that his jurisdiction extended to this dispute according to the LA's broad arbitration clause, which grants him jurisdiction over "any claim, dispute, disagreement or controversy that arises between the parties relating to" the LA.

By falsely characterizing the LA as an antiquated agreement whose terms were later eradicated by the ESA's execution, Mala's Reply attempts to portray as nonsensical the Arbitrator's ruling that the LA gave him jurisdiction over the Patent Assignment issue.  In truth, Mala is well aware that *the ESA's very terms activated the LA* and made the LA's terms (including its arbitration provision) binding on the parties for the first time.  Executed in October 2002, the ESA states as follows:

> NOW, THEREFORE, the parties have agreed that by the fulfilling of this Agreement, the PDA [Prototype Development Agreement] will terminate and, except as hereinafter provided, neither party shall have any other or further obligation to the other under the

> PDA. . . . *The parties have also agreed upon that <u>the LA shall commence on the effective date of October 1, 2002</u>.*[1]

and

> **2.    License Agreement**
>
> *The parties have agreed that the LA shall commence on the effective date of October 1, 2002*, implying that any job or royalty payment received or invoiced after this date shall be in accordance with Section 3 of the LA *with October 1, 2002 being the Commencing Date (as such term is defined in the LA)* for the purposes of such Section 3.[2]
>
> *Emphasis added.*

Contrary to these ESA provisions, Mala's Reply insidiously states that the ESA was somehow necessary in 2002 because the "the LA had not been effective in preventing or resolving the parties' disputes up to 2002,"[3] thereby implying both that the LA was active before 2002 (which it was not) and that the ESA's arbitration provision governs all the parties' disputes arising after the ESA was in place. Nothing could be further from the truth.

Obviously, the ESA could not possibly have both ***activated*** the LA ***and***, as Mala suggests, "***trumped***" it at the same time. Mala's Reply consciously and deceptively conceals from the Court the ***undisputed fact*** that the terms of the ESA ***activated*** the terms of the LA,[4] thereby bringing its terms into the realm of enforceability and making it entirely logical for the Arbitrator to have based his Patent Assignment jurisdiction thereon. Mala presented this

---

[1] Ex. 11, ESA, page 1, final paragraph.
[2] Ex. 11, ESA § 2.
[3] Reply at 8.
[4] The LA (Ex. 1) was executed in 1997 and embodied the licensing terms with the understanding that they would be activated sometime after a licensable CART had been built. Once a usable CART was produced, the parties' licensing arrangement could commence, with WTI paying Mala royalties on jobs it performed with the CART. The ESA, signed in 2002, was simply the vehicle the parties used to activate the LA and hoped would terminate the PDA. However the PDA remains in effect since Mala has failed to fully perform its obligations under the ESA. *See* Ex. 11, ESA § 1.

3

identical argument to the Arbitrator, and, having failed to convince him[5] of its correctness in light of the evidentiary record, now seeks to sway this Court to rule its way, knowing it is not propounding the full truth. Indeed, the LA could not possibly have been "effective" in resolving the parties' pre-October 2002 disputes *because it was not even <u>in</u> <u>effect</u> at that time*. Prior to the ESA's execution in October 2002, the parties operated under the PDA which was signed in 1997 along with the LA.

The parties' relationship consisted of two (2) phases: (1) a prototype development phase (from September 1997 to the present) during which the PDA generally governed the relationship;[6] and (2) a licensing phase, which commenced in October 2002 and continues today and is governed by the LA..[7] The purpose of the ESA was to facilitate the transition into its licensing phase, as WTI had been displeased with Mala's performance during the PDA-governed prototype development phase.[8] Unfortunately, Mala has continued its failures into the licensing phase with its multiple refusals to honor its obligations thereunder.[9]

---

[5] *See* Ex. 4, Award at § 15.
[6] *See* Ex. 12, PDA "WHEREAS, the parties … have sought to negotiate terms for a cooperative and succeful [sic] relationship between for the purpose to produce a functioning prototypical device for the detection of utility services …"
[7] *See* Ex. 12, PDA § 7 <u>License</u>  (which references the exclusive license to Witten once the New Technology is developed pursuant to the PDA "in the form of Exhibit C (LA)").
[8] *See* Ex. 29 (Arb. Ex. 324) Email M. Oristaglio to T. Leijon and J. Rynning, 11-13-00, p. 1-5  (Email from Oristaglio concerning multiple problems with Mala and the constant CART hardware failures. He explains in detail the display failures, insufficiency of the operating system, Mala's refusal to admit issues until WTI employees flew to Sweden to demonstrate failures, bad timing circuits, antennas too fragile, components inadequately laid out, …); *See* Ex. 30 (Arb. Ex. 321) Email between R. Green, T. Leijon and J. Rynning, 10-23-00 (On p. 2, Green points out Mala's failure to pay their portion of the attorney's fees;  p. 1 Rynning replies that Witten is to provide a financial statement from Witten's patent attorneys at Finnegan & Henderson. It is also notable to point out Mala's Chairman J. Rynning mentions that Witten is to assign its rights to the single hardware patent – there is no mention of any other patents to be assigned); and Ex. 31 (Arb. Ex. 334) Email M. Oristaglio to T. Leijon and B. Johansson, 10-26-01, p. 1-2 (Oristaglio states that "Another CU (Control Unit) has failed … All three of our CU's have failed in the last 4 months (none has been in service for more than a 18 months [sic]).").
[9] *See* Ex. 4, Award at § 11(c), where the Arbitrator found "Mala misused the ESA to acquire ownership of the Witten Glue Patent. There was much testimony by Robert Green and Anthony Clifford that, even after the ESA was signed, Mala was difficult to deal with and failed to support WTI. Although relief for Mala's breach of the ESA cannot be given in this arbitration, it is important to note that Mala's refusal to perform its obligations under the ESA … Mala's actions demonstrate its lack of good faith in dealing with WTI."

4

Mala's attempts to muddy the facts on this issue by making the new argument that the ESA "trumps" the LA's arbitration provision should not be paid any more credence than the Arbitrator gave it when Mala made similar assertions to support an argument that WTI did not enjoy manufacturing rights under the LA due to the ESA's alleged nullification of the LA. Mala argued to the Arbitrator that if Witten had a right to manufacture under the LA then it was curtailed by the signing of the ESA. Mr. Genoni found this argument unpersuasive and stated that "[t]he ESA does not terminate the License Agreement or attempt to limit WTI's license under a Mala 'patent or other intellectual property right' … At most, the ESA defers or modifies Mala's duty to make available blueprints to WTI."[10] Just as the Arbitrator found the ESA did not modify the LA in regards to the manufacturing right, the same can be said regarding this new argument by Mala that the arbitration provision of the LA was altered by the signing of the ESA. The ESA does not purport to modify or alter the LA in any fashion, not with respect to its arbitration provision or otherwise. Instead, the ESA shows the parties' clear intent to commence the LA in full form and effect.

As the 2004 Patent Assignment was silent[11] on the matter of dispute resolution and the dispute "related" to the LA, the Arbitrator acted entirely within his broad jurisdiction under LA ¶ 17 when he ordered the return of WTI's Glue Patents. Mala would have the Court view the LA and ESA simply as two agreements containing "the same subject matter"[12] yet with "slightly

---

[10] *See* Ex. 4, Award §14(c). Nowhere in the ESA does it purport to supersede, modify or replace any provision of the LA. *See* Ex. 11, ESA §2 (entitled "License Agreement") and ESA §3 (which states the escrow arrangement is to be "a separate agreement" "*in addition to the LA*" rather than an alteration of it).
[11] *See* page 7, infra, for further discussion on this point.
[12] *See* Reply at 6 (citing *Kreiss v. McCown De Leeuw & Co.*, 37 F.Supp.2d 294, 301 (S.D.N.Y. 1999)). Mala's reliance on the *Kreiss* case is misplaced, as the most cursory reading of the LA and ESA shows that the two agreements contain entirely different terms; in no way can the ESA be fairly characterized as merely a later version of the LA.

5

differing" arbitration provisions[13] so as to pave the way for its argument that the ESA, being the later in time, supersedes the LA and its arbitration provision. This argument is fatally flawed; it defies logic how Mala can credibly call into question the validity of the LA or its arbitration provision after *Mala itself* conceded both the LA's validity and the validity of its arbitration clause when it invoked the LA's arbitration provision and affirmed the LA's legitimacy by seeking in 2005 to terminate the LA via arbitration under the LA's arbitration provision.[14] Indeed, if the LA's arbitration provision were impotent for resolving the parties' disputes as Mala suggests, arbitration proceedings would have had to be held, if at all, in Sweden under the ESA rather than under the LA in D.C. before Mr. Genoni. Additionally, the LA and ESA pertain to entirely different aspects of the parties' project. The LA sets forth the terms for CART licensing and the parties' respective intellectual property rights as contemplated since 1997, while the ESA is an entirely new deal supported by completely separate and distinct consideration — they in no way can be viewed so as to enable the ESA to annul the LA when the ESA by its own language directly and specifically commences the LA without limitation.

> **2. The Patent Assignment's "In Accordance With the ESA" Language Does Not Sweep the Patent Assignment Dispute Within The ESA's Arbitration Provision, For The Patent Assignment Itself Relates To Several Of The Parties' Agreements And Is Silent As To Dispute Resolution.**

Mala argues that the Patent Assignment's "in accordance with the [ESA]" language is a statement concerning dispute resolution to the effect that it allegedly brings the Patent Assignment within the ESA's arbitration provision. This argument is strained, at best. If the

---

[13] *See* Reply at 6 (citing *Dickinson v. Heinold Sec., Inc.*, 661 F.2d 638, 639 n.2 (7th Cir. 1981), for the proposition that, where two arbitration agreements "differ slightly in certain immaterial respects[,]" the later agreement controls). The LA and ESA do contain arbitration agreements with divergent terms, but this divergence is in no way "slight" or "immaterial." It is hard to imagine two arbitration agreements with greater dissimilarity; the LA (like the PDA) calls for arbitration in Washington, D.C., while the ESA requires the parties to arbitrate disputes in Sweden. These arbitration agreements are anything but similar, and the ESA's arbitration provision has not usurped the LA's arbitration provision.

[14] *See* Ex. 32, Mala's Supplemental Demand for Arbitration, September 23, 2005, at 1, calling for arbitration "under Paragraph 7, the arbitration clause, of the [License Agreement], as we agreed.")

parties had agreed to limit themselves—either in terms of jurisdiction or forum—as to how they would resolve disputes arising from the Patent Assignment, they would have made such intention clear on the face of the Patent Assignment itself. WTI stands by its position (and the Arbitrator's accord) that the Patent Assignment is silent with respect to arbitration jurisdiction and that disputes arising from the Patent Assignment were properly examined by the Arbitrator pursuant to the LA's broad arbitration agreement and section governing the disposition of the intellectual property.

Clearly it can be argued that the Patent Assignment was made "in accordance with" the terms of *several* of the parties' agreements, including the LA, ESA and PDA. The Patent Assignment dispute undeniably "relates to the LA," which lays out the parties' longstanding intellectual property rights, and the Arbitrator, as evidenced by the Award had more than sufficient justification for his decision to exercise jurisdiction over that dispute.[15]

### 3. Mala's Admissions Support the Arbitrator's Exercise of Jurisdiction

Mala also takes issue with WTI-supportive documents and depositions wherein Mala executives repeatedly admit that the Patent Assignment arose from the LA, discrediting these documents on the basis that they reflect "pre-ESA communications."[16] As explained *supra*, the ESA did not change either party's LA-given intellectual property rights (or any other part of the LA), and it is inconsistent and absurd to argue that the parties had problems the LA could not solve between 1997 and 2002, especially when the LA was not even active until 2002.

The fact that Mala's admissions came prior to the ESA's execution is immaterial here because ***the ESA in no way changed the LA's terms***; these documents unequivocally show Mala's understanding that the parties' respective intellectual property rights were ***always*** to be

---

[15] *See* Ex. 11, Award §15.
[16] Reply at 9.

7

dictated by the LA's terms.[17]  The LA staunchly established the rights from which Mala's entitlement to certain intellectual property sprung, and these terms were never altered.  The LA's arbitration clause unquestionably governed the patents assigned in the Patent Assignment; Mala's principals have repeatedly admitted as much, and the Arbitrator correctly agreed.

### B. THERE IS ABSOLUTELY NO EVIDENCE IN THE RECORD TO SUPPORT MALA'S ASSERTION THAT ANY "AGREEMENT" EXISTED TO ASSIGN THE GLUE PATENTS.

For the first time in its Reply Brief, Mala asserts there was an "agreement to assign the Glue Patents" between the parties.[18]  Previously, in effort to convince the Arbitrator to let it keep the WTI patents it managed to steal, Mala has asserted jurisdictional arguments designed to justify with legal loopholes Mala's ownership of these patents via the fraudulent Patent Assignment.  Mala has not made this assertion previously because the evidentiary record is devoid of any support for it. Conversely, the record is replete with evidence that the parties only "agreed" to the assignment of the single Timing Circuit patent.

In 2000 Mala's Chairman, Jan Rynning mentions in an email to Robert Green that "Witten has to assign it's [sic] rights to the hardware patent to Mala"[19] as one of the deliverables in closing the PDA.  The ESA, which was essentially this document referred to in this 2000 email was intended to close the PDA.  ESA § 1.1(c) states that the single hardware patent, the Timing Circuit patent, was to be assigned.  Probably one of the more telling documents contrary to this "agreement" Mala now purports to have occurred is Arbitration Exhibit 350.[20]  The first page is an email in Swedish from T. Leijon to J. Rynning dated April 14, 2003 (after the signing

---

[17] Even taking Mala's argument as true for the sake of argument, it should be noted that the clear language of the ESA § 1.1(c) called for the assignment of a ***single patent***, indicating the parties' clear intent that only the Timing Circuit patent named therein be assigned to Mala and supporting Mr. Genoni's ruling that Mala's Patent Assignment reached beyond the agreements and stole these patents from WTI.
[18] Reply at 6.
[19] Ex. 30 (Arb. Ex. 321) 10-23-00.
[20] Ex. 33 (Arb. Ex. 350) Email from Leijon to Rynning with FAQ attachment, Document Production No. M 000913-919.

8

of the ESA and the supposed "agreement" to assign Mala the Glue Patents) and attached are two Witten Technologies – FAQ 2003 documents. The translation of the email says "I am sending you two bases that describe Witten's view on Schlumberger and Mala."[21] In the document it states that WTI is the owner of the Glue Patent ("Method and Apparatus for Identifying Buried Objects using Ground Penetrating Radar") which is a broad patent, independent of any particular hardware embodiment.[22] Later in the document it states that the Timing Circuit application is a hardware patent and to be assigned to Mala, with WTI to retain a License once a satisfactory framework for the assignment is reached.[23] It is abundantly clear in this documents and multiple others presented to the Arbitrator that WTI never had any intention of transferring the Glue Patents to Mala.

This evidence as well as numerous other documents presented to the Arbitrator demonstrated there was no "agreement" or even any discussion at the time the ESA was signed that Mala would take ownership of WTI's Glue Patents.

### C. JOE BERL'S TESTIMONY IS IRRELEVANT WHEN MALA FAILED TO PRESENT ANY EVIDENCE CONFLICTING WITH THE TESTIMONY OF WTI'S PRINCIPALS.

Mala alleges, with great conjecture and wild speculation, WTI's supposed ulterior motives in not calling attorney Joe Berl to testify at arbitration. While WTI deems this issue to be one with which the Court need not (and, indeed, *should* not) concern itself, Mala's unfounded accusations on this point must be dispelled since it is truly a non-issue.

Mala raised the "Joe Berl question" in post-arbitration briefing, and WTI responded with a thorough explanation of the reasons Mr. Berl was not present for the hearing.[24] WTI identified

---

[21] *Id.* at M 000913.1.
[22] *Id.* at M 000917, the second bullet on p. 4-5 of the FAQ attachment.
[23] *Id.* at M 000918, Page five of the FAQ attachment, third bullet point .
[24] *See* Ex. 6, WTI's Post-Hearing Reply Brief, at 8-9.

the massive collection of documentary evidence (not to mention the testimonial evidence of WTI's principals) clearly showing Mala's "intentionally deceptive acts"[25] in connection with the Patent Assignment. Mala failed to produce any testimony or evidence at the hearing which would have been inconsistent with Mr. Clifford's and Mr. Green's testimony.[26]

What is interesting is that Mala also argues for the first time in its Reply that:

> … the thrust of Mala's argument against putting weight on Clifford's testimony that he was misled as to the scope of the Patent Assignment when he executed it at the direction of WTI outside counsel Joe Berl, was that the wrong witness was testifying on this legal conclusion.[27]

The first fallacy of this argument is that Joe Berl could only have been offered as a fact witness and would not have qualified as an expert equipped to present a "legal conclusion." In arbitration proceedings, fact witnesses are not permitted to offer legally conclusory testimony, as it is the sole prerogative of the arbitrator to reach such conclusions. Mala presented no fact evidence to rebut Mr. Clifford's or Mr. Green's testimony or any of the documents showing that the parties never negotiated or agreed to the Glue Patents' assignment to Mala. Though it could have easily done so, Mala did not present its own corporate counsel, Harvey Kaplan, to recount his discussions with Mr. Berl concerning the Patent Assignment, nor did Mr. Linder testify of any conversations he had with Mr. Berl regarding this issue. Unless called as an expert, Mr. Berl's "understanding" of the assignment would have been superfluous and irrelevant since Berl

---

[25] Ex. 4, Award ¶ 15(h).
[26] Ex. 34, Testimony of A. Clifford, 841:8 through 844:1 (testifying that "[t]here was a patent, pursuant to, I guess it was the prototype development agreement … that mala had the rights to the hardware patent …
it was written that Mala had the rights to hardware patents and there was one hardware patent that Witten had and Tommy wanted that back. I basically said, yes, I mean, we should get that accomplished, and in the process of doing that Tommy, apparently, made a successful attempt, to at least so far a successful attempt to try to steal a patent that was developed by Witten's founder, Alan Witten, that had nothing to do with hardware. It was software. It was something that Alan had assigned to Witten and I just thought that that was just completely despicable that move.
Q  What made you think he was trying to steal the patent?
A  He didn't deserve it according to the prototype development agreement. It was a software patent. It wasn't a hardware patent."). *See also* Ex. 35, Testimony of R. Green, 1272:11 through 1280:20 (Mr. Green explains his discovery of the theft of the Glue Patents and gives detailed reasoning why Mala is not entitled to the Glue Patents).
[27] Reply at 4.

would be adding nothing but his opinion.[28]

If Joe Berl's testimony was so important to Mala and comprised the "thrust" of its argument, then why didn't Mala call Mr. Berl as a witness or agree to WTI's offer to waive attorney-client privilege?  WTI offered early in the case to waive attorney-client privilege with respect to Mr. Berl (in exchange for a reciprocal waiver of privilege from Mala of communications with its patent attorney) so that the parties could fully explore the Patent Assignment issue, but Mala flatly refused the deal.[29]  Ironically, after refusing to waive the privilege early in the case, Mala realized at the hearing that WTI's compelling evidence of Mala's theft (even in Berl's absence) necessitated their waiving the privilege anyway so as to present Linder as a rehabilitating witness.  In short, Mala's arguments pertaining to Mr. Berl are tantamount to nothing more than a red herring designed to distract the Court and confuse the issues.  That the Arbitrator withheld any mention of Joe Berl's absence from his written Award only underscores the argument's weakness.

### D. THERE IS NO LEGAL BURDEN REQUIRING WITTEN TO PROVE A PARTICULAR VALUE OF ITS ASSETS AND VACATING THE ARBITRATOR'S SOLVENCY RULING WOULD BRING DRASTIC RAMIFICATIONS

Because Mala's Reply largely rehashes the same arguments Mala raised in its vacatur application, WTI need not address them again here.  Only one main point bears mentioning.  Mala is arguing that WTI had the burden of proving a *particular value* of WTI's assets (or intellectual property) in order to show its solvency, i.e., that WTI's assets exceeded their

---

[28] Mr. Berl would also be an improper expert and would only offer a legal conclusion which is within the arbitrator's exclusive determination as the fact finder.  It is black letter law that a party may not utilize the testimony of an attorney as to the obligations created or not created under a contract and also may not advise the court as to conclusions of law.

[29] *See* Ex. 6, WTI's Brief in Reply to Mala's Post-Hearing Brief, at 8-9 (citing to WTI's Reply Brief Ex. C but attached hereto as Ex. 36 (On 2-27-06, p. 2, ¶2, Lewis wrote to Bushnell requesting waiver of attorney client privilege as to the Patent Assignment;  Bushnell replied on 3-27-06, p. 1-2, refusing to waive privilege, at 1; Lewis replied on 3-29-06, p. 1, referencing Genoni's decision that he would withhold this jurisdictional issue until after a full hearing of the evidence)).

11

liabilities.[30] This proposition is legally inaccurate, and ***Mala provides no case law*** to support this supposed burden to show a specific value. Mala relies on *Buffalo Auto Glass v. Schueler*[31] to say that WTI was to prove an exact value of its assets and that the burden shifted from Mala (to prove WTI was insolvent) to WTI, which was allegedly obligated to prove that it is solvent. WTI presented evidence at arbitration that WTI's intellectual property is an asset not represented on the books and that its value greatly exceeded the liabilities of the company. The success of Mala's insolvency claim hinged upon ***Mala's burden to prove WTI was insolvent***, ***not WTI's burden to prove the <u>exact value</u> of its assets and that it <u>is</u> solvent***. The Arbitrator obviously considered whether Mala met its burden, decided Mala had failed to prove WTI was insolvent, and, therefore, denied Mala's claim for terminating the LA based upon Mala's failure to prove insolvency.

The reason this issue is so important to Mala is because they have ***drastically oversimplified the insolvency issue*** and, in doing so, have subtly downplayed the ***severe ramifications*** that will result if the Court should vacate the Arbitrator's Award with respect to it. If the LA is terminated on the basis of insolvency, not only will the parties divorce, but Mala would arguably gain access to the very heart and soul of WTI's business—the source code which forms the foundation of WTI's software. Such result would strip WTI of its founder's genius inventions, revolutionary developments in ground-penetrating radar technology that WTI has tirelessly worked and heavily invested to protect.[32] Under ESA §3.1(c), Mala could attempt to claim ownership of WTI's source codes should WTI be deemed insolvent. Without the ability to keep its source code proprietary, ***WTI would be effectively put out of business***. As the Arbitrator pointed out in his Award, there was evidence of Mala's deliberate failure to support

---

[30] Reply at 9 – 10.
[31] 187 B.R. 451, 453 (W.D.N.Y. 1995).
[32] *See* Ex. 37, WTI Pre-Arbitration Brief, 23-24.

12

WTI in an effort to drive WTI into bankruptcy, along with evidence that Mala acted in bad faith in its dealings with WTI, taking actions the Arbitrator described as "extreme and wrongful."[33] Mala has already taken *possession* of WTI's software under the ESA and refused to abide by the software licensing terms all WTI licensees follow, and Mala has stolen WTI's key process patents. Now, adding insult to injury, Mala seeks to terminate the LA on insolvency grounds because those grounds could give Mala a colorable basis for claiming access to WTI source codes and, therefore, the ability to freely sell CARTs containing WTI world-renowned, patent-protected software without owing WTI a dime in license fees or adhering to any terms governing the software's usage.

The Arbitrator spent five (5) full days with the parties and was privy to all the copious evidence both sides presented, and, in his wisdom, found WTI to be solvent under both of New York's insolvency tests.[34] As discussed in WTI's recent Brief In Response to Mala's Application to Vacate Award of Arbitrator,[35] this Court cannot fairly or lawfully substitute its view of the evidence for that of the Arbitrator or question how he applied the law to the facts, and his ruling must, therefore, be confirmed.

### III. CONCLUSION

One point is clear: this is a complex case involving multiple agreements and copious testimonial and documentary evidence, and only the Arbitrator and the parties can truly appreciate the entire context from which the Award was issued. Courts are not permitted to vacate arbitration awards absent extreme circumstances; the present case is simply not one in which vacatur is appropriate; and Mala has wasted this Court's time in seeking vacatur. For the foregoing reasons, WTI respectfully reiterates its requests that:

---

[33] *See* Ex. 4, Award ¶ 11(c), 12.
[34] *See* Ex. 4, Award ¶12.
[35] *See* WTI's Brief in Response to Mala's Application to Vacate Award of Arbitrator at 26-32.

13

(i) Mala's Application to Partially Vacate Award of Arbitrator (and all relief requested therein) be DENIED;

(ii) WTI's Motion to Confirm Arbitration Award be GRANTED without the time and expense of a full hearing;

(iii) this Court would issue an enforceable JUDGMENT confirming the Arbitrator's Award in its entirety; and

(iv) WTI's request for attorneys' fees, costs and interest be GRANTED.

Respectfully submitted, this 22nd day of September, 2006.

/s/ Tracy G. Parker
William Sekyi (DC # 480325)
Tracy G. Parker (DC # 482575)
FISH & RICHARDSON, P.C.
1425 K Street, NW, 11th Floor
Washington, DC 20005
TEL: (202) 783-5070

Raymond R. Castello
FISH & RICHARDSON, P.C.
Citigroup Center, 52nd Floor
153 East 53rd Street
New York, NY 10022
TEL: (212) 765-5070

*Attorneys for Witten Technologies, Inc.*