## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Malå Geoscience AB,<br><br>          **Applicant**<br><br>   **v.**<br><br>Witten Technologies, Inc.,<br><br>        **Respondent** | **Civil No. 1:06CV01343**<br>**Judge: Rosemary M. Collyer** |

### MALA GEOSCIENCE AB'S RESPONSE TO SURREPLY BRIEF

I.    **The Exchange and Settlement Agreement's Dispute Resolution Provision Exclusively Governs the Patent Assignment Dispute.**

     A.    <u>Interpretation of the Patent Assignment can only Occur Under the ESA's Dispute Resolution Provision</u>

WTI's Surreply mischaracterizes Malå's position in regard to the interaction between the LA and ESA. Malå does not argue that the ESA terminated the LA or trumps the LA in regard to substantive provisions of the LA that do not conflict with the ESA. But performance of the ESA, as the Patent Assignment undoubtedly is, can only be challenged through the exclusive arbitration remedy in the ESA, i.e., arbitration in Sweden. That was the deal the parties made.

While both WTI and the Arbitrator engaged in mental gymnastics in an attempt to relate the Patent Assignment to the LA, there is no real disagreement between the parties that the assignment obligation was created in the ESA – as WTI's own principals testified.[1] WTI's CEO also testified

---

[1] <u>See</u> Att. H at 95 (WTI executive who negotiated ESA testifying that "part of . . . the [ESA] . . . was that [WTI] would make an assignment of the rights to the -- what you called the timing circuit patent to Mala"); Att. A at 987 (WTI executive who executed Patent Assignment testifying that he understood "that the patent assignment arose out of the [ESA]"); <u>Id</u>. at 993-94

that the resolution of the Patent Assignment dispute turns on what the parties negotiated in the ESA.[2]

WTI's Surreply[3] invites this Court to invade the ESA – just as it successfully convinced the

Arbitrator to do – by interpreting the language of the ESA to conclude that the parties did not really

intend when they negotiated the ESA that WTI would assign the Glue Patents to Malå.

       In short, both sides agree that the Patent Assignment arose out of the ESA; was an obligation

created by the ESA; and that the point of reference for determining what the parties intended with

respect to an assignment of the Glue Patents is the ESA and Patent Assignment negotiations.  WTI,

however, wanted the Arbitrator to order Malå to assign the Glue Patents back to WTI.  To that end,

it successfully (but improperly) invited the Arbitrator to use the LA to interpret the Patent

Assignment and to conclude that such use of the LA was sufficient to give him jurisdiction.

---

(WTI executive who executed the Patent Assignment: "Q: Do you agree with me that the
[patent] assignment you made was pursuant to the [ESA]?  I mean that is what it says. A: I think
the [ESA] was a settling of the prototype development agreement").

[2] See, e.g., Att. A. at 1293 ("Q: In [Mike Oristaglio's] opinion [in Ex. 87], he says . . . he think[s]
[the Glue Patent] is a patent that Witten should jointly own with Mala, isn't that true? A: That
was his opinion at the time.  Q: Was that ever agreed to? A: No.  No, that was part of what we
tried to come to on the [ESA]"); Id. at 1274 ("when we tried to settle the [ESA] there was a very
good reason [the Glue Patent] wasn't mentioned because that was the 'terms of trade' is, 'You
did not get this patent, or there is no deal. You do not get this patent, or there is no deal,' and
they agreed to that").

[3] WTI Surreply Br. at 8 n.17 (". . . it should be noted that the clear language of the ESA § 1.1(c)
called for the assignment of a ***single patent***, indicating the parties' clear intent that only the
Timing Circuit patent named therein be assigned to Mala and supporting Mr. Genoni's ruling
that Mala's Patent Assignment reached beyond the agreements and stole these patents from
WTI").

2

B.  The Effective Date of the LA

The Surreply also misstates the timing of the commencement of performance obligations under the LA.  WTI argues:

> By falsely characterizing the LA as an antiquated agreement whose terms were later eradicated by the ESA's execution, Mala's Reply attempts to portray as nonsensical the Arbitrator's ruling that the LA gave him jurisdiction over the Patent Assignment issue. In truth, Mala is well aware that ***the ESA's very terms <u>activated</u> the LA*** and made the LA's terms (including its arbitration provision) binding on the parties for the first time.[4]

WTI then characterizes Malå's arguments regarding the relationship between the ESA and LA as "insidious[]," "consciously . . . deceptive[]," and dishonest.

In fact, the LA was, by its terms effective when the parties signed the agreement in 1997. "This Agreement becomes effective on the date of signing by both parties…."[5] Furthermore, WTI became obligated to pay royalties to Malå long before the ESA came into existence.  "[D]uring the three year period…commencing on the date…on which the Licensee first sells, lease or itself uses the Product…Licensee shall pay to the Licensor a royalty…."[6] Those events happened well before September 2002.  But WTI refused to abide by its obligations in the LA and did not pay royalties to Malå.  Given WTI's failing financial condition and in an effort to salvage the parties' deteriorating relationship, Malå agreed in the ESA, in September 2002, to forgive the past royalty debt by agreeing to "activate" the LA in the ESA so that Malå could not in the future claim back royalties. The LA was in effect and operating for years prior to the ESA's execution (as demonstrated by

---

[4] Id. at 2.

[5] Ex. 2 at WTI 1034.

[6] Id. at WTI 1031.

correspondence cited by WTI in regard to the parties' patent disputes in which the parties discussed the effective provisions of the LA on those disputes).[7] The ESA was a settlement of certain disputes that had arisen between the parties in regard to their respective performances under the PDA and LA. As such, the ESA created new rights and duties between the parties (including WTI's duty to make the Patent Assignment) that are governed exclusively by the ESA's dispute resolution provision.

WTI's attempt to use Malå's generosity as to past negotiations to claim that the LA was not effective until the ESA was executed is the type of disingenuousness of which WTI repeatedly accused Malå, and is an excellent example of the fact twisting and accusatory rhetoric WTI employed throughout the arbitration.

C.  The Parties Agreed to the Assignment of the Glue Patents

WTI is correct that this Court is called upon to rule on a jurisdictional issue (i.e., whether the Arbitrator improperly invaded the ESA's dispute resolution provision).[8] The Court must not, however, make a factual determination about what the parties intended with respect to the Patent Assignment. Malå has nevertheless argued the merits of that issue, because we think it is important that the Court understand that WTI's assertion that Malå has stolen patents from WTI is false, and that this Court will do justice by enforcing the ESA's dispute resolution provision.

---

[7] WTI argued in its response to Malå's Application, at 19, that "Even Mala's President, Tommy Leijon, admitted: (i) that the parties' IP rights arose under the LA; (ii) that that the Timing Circuit had been developed under the LA; and (iii) that Mala's right to own the patent to the Timing Circuit arose from the LA." For this proposition, WTI cited 1999 and 2000 correspondence – correspondence that long predated the ESA's alleged "activation" of the LA.

[8] Surreply Br. at 9.

In this regard, WTI argues that Malå raised for the first time in its Reply Brief to this Court the notion that the parties agreed to the assignment of the Glue Patents and that "the evidentiary record is devoid of any support"[9] for that proposition. In fact, the record is full of support for that very proposition, and Malå has always insisted that WTI knew exactly what it was doing when it assigned the Glue Patents.[10] Malå's patent lawyer testified at the hearing that the Assignment was drafted to effect the parties' intentions as manifested in the ESA.[11] Likewise, the WTI executive who executed the Assignment testified that he received the assignment from WTI's IP lawyer, Joe Berl, "circulated it to people within [WTI]" and then executed it based on the advice of Berl, who told the executive "that it was appropriate to sign [the Patent Assignment] at this point in time based on the negotiations he had had with Malå's counsel."[12] Recognizing that Clifford, the WTI executive, was not knowledgeable about the scope of a legal document like the Assignment, Malå asked him at the hearing about his knowledge:

> Q: To the extent you had questions about the scope of this [Assignment] document, was there someone knowledgeable in patents on staff that you could ask questions to?

---

[9] Id. at 8.

[10] See, e.g., Att. E at 23-27.

[11] Att. A at 1519. ("Well, because of this application, the 188 application [named in the ESA], in fact, never even issued as a patent, it went abandoned as shown [Ex. 263], and in fact, what happened is a couple of subsequent applications . . . were filed claiming priority back to the 188 application. So in order to ultimately get the rights that were referred to in the [ESA] they went through a series of procedural approaches in the Patent Office"); see also id. at 1538 ("Any attorney would prepare an assignment that made sure it encompassed all of the rights that could possibly be associated with the patent application that was identified as a source"). See also id. at 1529 ("Q: How did you determine in preparing the patent assignment what rights your client bargained for? A: Well, they would at a minimum have gotten the rights to any of the subject matter that was disclosed in the 188 application and any continuity applications that followed from that").

[12] Id. at 986.

5

A:  There was no one on staff, per se, and actually, I viewed this as a contract matter, and when Joe Berle told me to sign it I did.[13]

WTI's arguments regarding Joe Berl's absence from the hearing are also misguided.  First, the contention that Berl could not have testified, as Malå suggests, unless WTI called him as an expert (or without a privilege waiver), is simply wrong.  The crucial testimony Berl could have delivered was (at the time he advised Clifford to execute the Assignment) the identification of the particular "Patents" he understood were being conveyed.  That is a state-of-mind historical fact and is based on the negotiations between the parties through their counsel and his understanding of the language of the Assignment, a matter that is not privileged.

Second, the argument that Berl's testimony would have been irrelevant since Malå did not refute the testimony of WTI principals that they were misled, simply emphasizes Malå's point.  WTI created the false impression that the Patent Assignment did not accord with the negotiations between counsel as to the assignment by calling witnesses who were not knowledgeable about the negotiations and by not calling the only WTI witness who in fact was.

**II.  The Arbitrator Relied on a Non-Fact, or Manifestly Disregarded the Law, to Reach His Insolvency Determination, and WTI Erroneously Depicts the Consequences that Would Flow from Vacatur.**

   A.   <u>The Insolvency Ruling Must Be Vacated</u>

Malå did have the burden to prove WTI's insolvency and did so.  Neither WTI nor the Award disputes that Malå provided clear evidence that WTI's booked liabilities exceed its booked assets by millions of dollars.[14]  Instead, the Award concludes that WTI had off-book assets of unknown value

---

[13] <u>Id.</u> at 988.
[14] <u>See</u> Ex. 19.

6

that must exceed the excess liabilities. Buffalo Auto Glass (and AAA R-30(a)) stand for the proposition that once Malå has met its burden by proving the booked amount of WTI's assets and liabilities, the burden shifts and WTI may rebut that evidence by providing evidence of the value of off-book assets, or that the book numbers are too high or too low. WTI did not do that, and the Award in regard to insolvency is therefore based on a non-fact (or upon the Arbitrator's unstated adoption of a standard other than the standard he acknowledged was the legal standard for insolvency under New York law). The insolvency portion of the Award must be vacated as set forth in the Application.

B.    The Consequences of Vacatur

Apparently recognizing that the Award must be vacated in regard to the insolvency ruling, WTI now contends that the consequences vacating the award would be dire – allowing Malå to make off with the source code for WTI's software and then destroy WTI's core business. WTI, of course, did not bother to inform the Court about the provision of the ESA that WTI claims would "arguably" bring about this result. The provision states:

> [WTI] shall deposit with the Stockholm Chamber of Commerce a sealed package containing a complete copy of the source code of [WTI'] CART software….Malå shall be entitled to receive, use and further develop the Source Code if [WTI] is declared bankrupt…or ceases doing business as a going concern.[15]

By the plain terms of this provision, WTI would have to go bankrupt or cease doing business as a going concern before Malå could access the escrow. A determination that WTI is insolvent will not trigger the provision. Moreover, WTI failed to disclose to the Court that after the ESA was executed, both parties abandoned the escrow obligation due to the expense of escrow services, so

---

[15] Ex. 3 at 3-4.

WTI has never deposited the source code into escrow in Stockholm and is not at risk today that the Stockholm Chamber of Commerce might release its code to Malå.[16]

Finally, even if the consequences of vacating the Award were as WTI argues, that would not change the fact that it is the legally correct and just result.

## **CONCLUSION**

For the foregoing reasons, the Court should vacate the Award in part as set forth in Malå's Application, grant the other relief requested therein, confirm the Award in all other respects, and deny the relief requested by WTI.

---

[16] WTI made similarly baseless accusations throughout the arbitration proceedings that Malå had stolen, or was in the process of stealing, WTI's source code. For example, WTI alleged that Malå had been able to access WTI's source code from the copies of software WTI had provided to Malå. See Att. A at 46-49. WTI dropped this assertion in the face of testimony by Malå's President and Vice-President that Malå cannot access the source code, because WTI delivered the software in protected form, (See Att. O at 554-57; id. at 1454-56), and testimony by WTI's own former president (who was responsible for delivering the software to Malå) that the software WTI delivered to Malå was "delivered in executable form, meaning, it's machine readable only. There's no source code." Id. at 684-86. Likewise, WTI argued (and apparently still argues) that Malå "has already taken *possession* of WTI's software under the ESA and refused to abide by the software licensing terms all WTI licensees follow." Surreply Br. at 13. In fact, Malå has possession of five copies of WTI software, because WTI agreed in the ESA to deliver, and did deliver, five copies of WTI's software to Malå pursuant to the terms ***Malå and WTI*** agreed to in the ESA and concurrently executed Side Agreement. That Malå and WTI did not agree to the same licensing terms as WTI reached with other licensees is meaningless. The *sine qua non* is that Malå does not have WTI's source code.

Respectfully submitted,

By: _/s/ Thomas W. Brunner_____
    Thomas W. Brunner (D.C. 170480)
    Albert C. Lambert (D.C. 489562)
    WILEY REIN & FIELDING LLP
    1776 K Street NW
    Washington, DC  20006
    TEL: 202.719.7032

    Timothy D. Kelly (MN 54926)
    Sarah E. Bushnell (MN 0326859)
    3720 IDS Center
    80 South Eighth St.
    Minneapolis, MN 55402
    (612) 349-6171

Dated: September 29, 2006        *Attorneys for Mala Geoscience A.B.*